**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| LISA CARLSON, | : | CIVIL ACTION |
| | : | |
| *Plaintiff,* | : | |
| v. | : | NO. 2:22-CV-00125-MAK |
| | : | |
| QUALTEK WIRELESS, LLC, | : | JURY TRIAL DEMANDED |
| | : | |
| *Defendant.* | : | |
| | : | |

**DEFENDANT, QUALTEK WIRELESS, LLC'S APPENDIX IN SUPPORT OF MOTION**
**FOR SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56(a)**

**TABLE OF CONTENTS**

**Exhibit Name and No.**                                                    **Page No.**

A – Plaintiff's Amended Complaint                                               1a

B – EEOC Determination                                                         25a

C – Charge of Discrimination with Addendum                                     28a

D – Severance Agreement and Release                                            34a

E – Director of Finance Job Description                                        40a

F – Director Degree List 2017– 2020                                           44a

G – November 2017 Offer Letter                                                49a

H – Plaintiff's Resume                                                        52a

I – March 2018 Offer Letter                                                   55a

J – Relevant Portions of Bruce Neff's Personnel File                          57a

K – Salary Records of Plaintiff and Bruce Neff                                68a

L – Relevant Portions of Brandon Ebeling's Personnel File                     71a

M – Qualtek Director of Finance Email Chain                                    84a

N – Human Resources Meeting Summary ............................................. 92a

O – January 31, 2020 Restructuring Email ......................................... 94a

P – October 2019 – January 2020 Email Chain ..................................... 97a

Q – January 2020 Bonus Email Chain .............................................. 103a

R – Plaintiff's Employee Reviews ................................................ 109a

S – Relevant Portions of Elizabeth Downey's Deposition Transcript ............... 130a

T – Relevant Portions of Stefanie Trybula's Deposition Transcript ............... 180a

U – Relevant Portions of David Conn's Deposition Transcript ..................... 232a

V – Relevant Portions of Lauren Petzar's Deposition Transcript .................. 294a

W – Relevant Portions of Shawn Kemmerer's Deposition Transcript ................. 314a

X – Personnel Action Notice submitted by Busky .................................. 358a

Y – Relevant Portions of Plaintiff's Deposition Transcript ...................... 360a

Z – Relevant Portions of Website ................................................ 455a

# EXHIBIT "A"

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

| | |
|---|---|
| LISA CARLSON | : |
| 2805 243rd Avenue Northwest | : |
| St. Francis, MN 55070 | : |
| | :     CIVIL ACTION |
| _Plaintiff,_ | : |
| | : |
| v. | :     No: 2:22-cv-00125 |
| | : |
| QUALTEK LLC | :     JURY TRIAL DEMANDED |
| 1150 First Avenue., Suite 600 | : |
| King of Prussia, PA 19406 | : |
| | : |
| _Defendant._ | : |

_____

## FIRST AMENDED COMPLAINT

Plaintiff, Lisa Carlson (hereinafter referred to as "Plaintiff" or "Ms. Carlson") hereby complains as follows against Defendant, QualTek L.L.C. (hereinafter referred to as "Defendant" or "QualTek") and files her First Amended Complaint.

## I. INTRODUCTION

Plaintiff initiates this instant action to recover damages for sex discrimination, retaliation, and pay discrimination is in violation of her right to equal opportunity under the Title VII of the 1964 Civil Rights Act (42 U.S.C. § 2000e, _et seq_.) and the Equal Pay Act (29 U.S.C. § 206(d)(1).

Plaintiff asserts that Defendant discriminated against her in terms of pay and treatment and then terminated her from employment with the Defendant because of her sex, and in retaliation for her complaints of sex discrimination and her complaints of discriminatory pay practices based on sex.

## II.  PARTIES

1.      Plaintiff is a resident of Minnesota with an address as captioned above.

2.      Defendant is a Limited Liability Corporation with its head office at the address captioned above.

## III.  JURISDICTION AND VENUE

3.      Plaintiff incorporates all of the allegations in the foregoing paragraphs as if set forth in full.

4.      The United States District Court for the Eastern District of Pennsylvania may properly maintain personal jurisdiction over the Defendant because Defendant's contacts with this Commonwealth in general and with this Judicial District, in particular, are sufficient for exercising jurisdiction over Defendant.

5.      The United States District Court for the Eastern District of Pennsylvania has jurisdiction over this matter due to a forum selection agreement between the parties, executed at the inception of Plaintiff's employment.

6.      The United States District Court for the Eastern District of Pennsylvania has original subject matter jurisdiction over the instant action pursuant to 28 U.S.C. § 1332 (diversity of citizenship) in that Plaintiff and Defendant are citizens of different states, and the amount in controversy exceeds $75,000.00 exclusive of interest and costs.

7.      Venue is properly laid in this District pursuant to 28 U.S.C. §§ 1391(a)(2) and 1391(c) because a substantial part of the events giving rise to the claims herein occurred in this judicial District and because the parties executed an agreement placing the venue of this case in the Eastern District of Pennsylvania.

3a

## IV.   PROCEDURAL AND ADMINISTRATIVE REQUIREMENTS

8.        The foregoing paragraphs are incorporated herein as if set forth in full.

9.        Plaintiff has satisfied the procedural and administrative requirements for proceeding under Title VII of the 1964 Civil Rights Act (42 U.S.C. § 2000e, *et seq*.) as follows:

i.        On or about April 15, 2020, Plaintiff filed a timely written charge of      discrimination against Defendant with the Equal Employment Opportunity Commission   alleging sex discrimination, retaliation, and pay discrimination in violation of her right to equal opportunity under the Title VII of the 1964 Civil Rights Act (42 U.S.C. § 2000e, *et       seq*.)

ii.        The EEOC issued a Notice of Right to Sue on the foregoing charge on or about October 21, 2021.

iii.        The instant action is timely because it is initiated within 90 days of the      receipt of the foregoing Notice;

iv.        Plaintiff has exhausted her administrative remedies as to the allegations of the instant complaint.


## V.   FACTUAL BACKGROUND

10.        The foregoing paragraphs are fully incorporated herein as though set forth at length.

11.        Before her employment with Defendant, Plaintiff was employed for seven years with Velocitel.

12.        Defendant purchased Velocitel in 2017.

3

13.     With Velocitel her work had been exceptional, with excellent performance reviews throughout her employment.

14.     Plaintiff started a coordinator, which was an entry-level position.

15.     Plaintiff was ultimately promoted to Finance Manager.

16.     She managed a team of coordinators handling all financial matters relating to Minnesota, Iowa, S, and N. Dakota & Nebraska.

17.     Velocitel built and repaired, upgraded wireless towers for AT&T.

18.     When QualTek acquired Velocitel in late 2017, only selected employees from Velocitel were retained, Plaintiff being one of them.

19.     On November 29, 2017, Plaintiff became a QualTek employee.

20.     Plaintiff's official title was Market Financial Planning and Analysis (FP&A) Manager.

21.      Plaintiff worked within QualTek's Finance Department and reported to Dana Freedman, Director of Financial Planning & Analytics.

22.     For over two (2 years) starting in Aug 2015, Plaintiff had reported to Ms. Freedman when employed with Velocitel.

23.     Ms. Freedman had, each year, given Plaintiff excellent reviews.

24.     At QualTek, Plaintiff's starting salary was $92,300.

25.     Plaintiff also had a bonus potential of 10% of her base salary.

26.     In early February 2018, Ms. Freedman announced she would be resigning at the end of March 2018.

27.     Ms. Freedman recommended Plaintiff as her replacement and started to train her before her departure.

28.     Plaintiff received a second offer letter on March 30, 2018, which stated in relevant part, ' In addition, you will be eligible to participate annually in the company bonus program. Your annual potential bonus eligibility will be $20,000, however, for 2018, it will be prorated to the commencement date for this position.'

29.     Plaintiff's compensation was increased to $105,000 per annum.

30.     Velocitel Vice President of Finance Dave Conn and Adam Spittler (President) agreed that Plaintiff would be promoted to Ms. Freedman's position (a director-level role).

31.     Shortly after Ms. Freedman's resignation announcement, Plaintiff began absorbing all of Ms. Freedman's duties and taking over all her responsibilities which included but not budgeting, forecasting companies revenue and costs, reporting results for the month, managing a team, conducting weekly meetings to go through the financial results, involved in auditing regarding finances, creating journal entries and balancing of financials.

32.     In January 2018, Plaintiff was sent to QualTek University per her promotion to Director.

33.     In February 2018, Mr. Conn told Ms. Carlson that her title would be 'Director' just like Ms. Freedman.

34.     The particular bonus program for Directors was 20%, and Defendant, in its second offer letter, had informed Plaintiff of her entitlement to participate.

35.     As Mr. Conn was implementing these changes, he advised Plaintiff that he had allegedly encountered resistance to these changes from Elizabeth Downey, the Chief Administrative Officer.

36.     Plaintiff was informed that her promised title change to "Director" had been rejected by Downey, and now Plaintiff's bonus potential would be $20,000, not 20% of a base salary.

37.     Plaintiff received no explanation for Defendant's backtracking on Plaintiff's promotion.

38.     Dave Conn told Plaintiff that he and others would help to continue to get her promoted as promised.

39.     Plaintiff was given the title of "Finance Manager" despite operating from that point forward until her termination as a *de facto* director, having taken on all of Ms. Freedman's duties.

40.     On information and belief, in December 2018, Plaintiff saw a company email stating that the Company had performed well and would pay out half the compensation of the bonuses due,  with the remainder to be paid later.

41.     In December 2018, Plaintiff received half her bonus, the sum of $2,500. The additional  $2,500 was to be paid six months later, in June 2019.

42.     Plaintiff realized she should have received a bonus of $20,000, with $10,000 being paid in December 2018 and the remaining $10,000 paid in June 2019.

43.     Plaintiff brought this compensation error to Payroll Manager Kristie Marzocco and notified her supervisor, Director of Finance, Shawn Kemmerer.

44.      H.R. confirmed to Mr. Kemmerer that the $2,500 payment was an underpayment in error and stated that nothing could be done regarding the $2,500 already paid.

45.     Mr. Kemmerer informed the Plaintiff that H.R. had corrected the bonus amount in the system to reflect the $20,000 in her offer letter.

6

46.     In June 2019, the second half of the bonuses were paid out, and Plaintiff only received $2,500.

47.     Plaintiff informed Kristie Marzocco of H.R. and Mr. Kemmerer that it was again incorrect and instead of $2,500, it should have been $10,000.

48.     Mr. Kemmerer agreed to raise that issue with  QualTek HR but was told nothing could be done about it at that point.

49.     Mr. Kemmerer told Plaintiff she should have received $7500 in additional bonus in December 2018.

50.     In 2019, QualTek promoted Bruce Neff to a Director of Finance, a similarly situated position to Plaintiff.

51.     Bruce Neff had precisely the same duties as Plaintiff but in significantly less volume.

52.     Plaintiff handled all finances for the AT&T contracted nationwide

53.     Mr. Neff did precisely the same thing for Defendant's non-AT &T  contracted work.

54.     Plaintiff handled 80% of Defendant's contractual volume (in revenue), whereas Mr. Neff handled 20%.

55.     Plaintiff knows this because the revenue generated by Mr. Neff and Plaintiff was visible to her since they were recorded every week.

56.     Mr. Neff, however, was given the title of Director and was eligible for a higher percentage bonus than Plaintiff.

57.     Later, towards the end of 2019, QualTek hired Brandon Ebeling into a Director of Finance position, directly above the Plaintiff.

4856-9911-5801, v. 3

58.     His position was also similarly situated to Plaintiff, and he exactly duplicated the same job functions as Plaintiff.

59.     Not only was Plaintiff deprived of the title Director', but she and other women were being paid less than her similarly situated male counterparts.

60.     Plaintiff knows this from direct complaints by the female employees who were paid less than males who knew this from males who had voluntarily disclosed to Plaintiff their bonus awards.

61.     On or around October 10, 2019, Ms. Carlson complained to Ms. Petzar of H.R. that as a woman, because of the disparities in pay and promotion, favoring men, she could not advance in finance because less qualified men, specifically Bruce Neff and Brandon Ebeling, had been promoted above her.

62.     Plaintiff also complained to Ms. Petzar that she was being paid less than similarly situated males, specifically Bruce Neff and Brandon Ebeling.

63.     Ms. Carlson further complained that Bruce Neff and Brandon Ebeling were less qualified than she and have experienced far less time in the business.

64.     Ms. Petzar, instead of dealing with Plaintiff's discrimination complaints herself, asked Plaintiff if she wanted to speak with her boss Ms. Trybula.

65.     Plaintiff declined for fear of retaliation and because she did not see the necessity to do so given that she had complained to Ms. Petzar and requested her to correct the gender-based disparities.

66.     Ms. Petzar did nothing to investigate Plaintiff's complaints.

67.     Ms. Petzar never interviewed anyone in respect of Plaintiff's complaints.

4856-9911-5801, v. 3                                                                                          9a

68.     Ms. Petzar never issued a report and never circled back to Plaintiff to discuss the resolution of Plaintiff's concerns.

69.     On November 26, 2019, Plaintiff formally applied for a Director of Finance position, which she discovered was open.

70.      The job description specified duties that Plaintiff had been trained on and had successfully performed for years.

71.     Specifically, the duties posted for the Director of Finance position were as follows:

   a. Develop timely and accurate financial plans and projections for the Company

   b. Conduct weekly and monthly financial assessments with field operations

   c. Plan, coordinate and execute the annual budget process

   d. Analyze and report on budget variances, trends, and key cost drivers

   e. Drive operational efficiencies by developing system controls, metrics, and goals based on financial projections

   f. Analyze the financial risks and benefits of various business initiatives

   g. Direct the maintenance of general and subsidiary ledgers, accounts receivable, revenue distribution, depreciation, cost, operating expenses, and insurance records

   h. Oversee the preparation of various financial statements and reports

   i. Oversee the Company's finance I.T. system

   j. Oversee all audit and internal finance control operations

   k. Update and implement financial policies and procedures

l.   Other duties as assigned

72.    By December 8, 2019, Plaintiff had been interviewed by a male H.R. employee who allegedly was in charge of the recruiting.

73.    He told her that she would not be given the position because she was not physically located in Pennsylvania, where QualTek was headquartered.

74.    Defendant's excuse was bogus because Plaintiff had, from the beginning, executed all her 'Director duties' from Minnesota without complaint or qualification by Defendant.

75.    These Director duties include but are not limited to those set forth in paragraph 70 and its subparts.

76.    In the same month, December 2019, Plaintiff's bonus was again listed incorrectly at $11,000 and not $20,000.

77.    Plaintiff raised this discrepancy with her direct boss Mr. Shawn Kemmerer, who was told by H.R. that Plaintiff's bonus should indeed have been $20,000.

78.    Mr. Kemmerer communicated this information directly to the Plaintiff.

79.    By this point, QualTek had shorted Plaintiff's compensation by $24,000.

80.    Specifically, in 2018, Plaintiff's bonus had been shorted by $15,000. An additional error occurred in 2019 where Plaintiff was shorted $9000, having received only $11,000.

81.    This sum of $24,000 had been calculated by Mr. Kemmerer, who communicated it to the Plaintiff.

82.     Mr. Kemmerer confirmed the bonus amounts were incorrect in both Dec 2018 and Dec 2019 and confirmed to Plaintiff that H.R. had told him the bonus amounts had been corrected in the system.

83.     On January 21, 2020, Plaintiff was informed that she would be withdrawn from all markets, that her staff would be removed, and her Department would be realigned with the new Director position, which had not been offered to her.

84.     Instead, Plaintiff would be relegated to a "reporting" role and instructed to create reports.

85.      Defendant stated that their Director had to be located in Pennsylvania.

86.     Defendant never informed Plaintiff that certain of her tasks could only be completed in Pennsylvania.

87.     Plaintiff was never asked if she wished to relocate to Pennsylvania to take the job.

88.     On and information and belief, the Director worked remotely for months during Covid.

89.     At the time, Plaintiff had a stellar performance record, and this 'Realignment' was a *de facto* demotion without any legitimate reason and clearly in retaliation for her continual complaints of disparate treatment.

90.     In response, on January 22, Plaintiff emailed Ms. Petzar to ask if either she or Ms. Trybula had escalated her complaints of gender discrimination since she was being retaliated against.

91.     Ms. Petzar called the Plaintiff and told her there had been no escalation.

92.     In the same phone call, Plaintiff complained to Ms. Petzar that she had been retaliated against by a bogus 'realignment' and complained again of retaliation and unlawful gender discrimination.

93.     On January 23, 2020, bonuses were announced, and most people received a payout of approximately 25% of the bonus declared by the Defendant to be owed.

94.     Plaintiff knew this from the Spreadsheet she compiled directly from information given to her by employees who told her how much of a bonus they had received.

95.     According to the Spreadsheet, female employees had received significantly less compensation than similarly situated males.

96.     On January 23, 2022, the Plaintiff's direct report, Kayla Lorenzen, emailed Ms. Petzar, Ms. Trybula, and Ms. Marzocco and complained that women were being paid less than men and people of color were being paid less than white employees.

97.      Plaintiff was copied on Ms. Lorenzen's email.

98.     Plaintiff also emailed Ms. Petzar, Ms. Trybula, and Ms. Marzocco separately to report that her bonus was again incorrect.

99.     The following day, January 24, 2020, Plaintiff was called by Ms. Trybula, Mr. Conn, and Mr. Kemmerer and told that it was just her "opinion" that there were issues and that she should be grateful she got any bonus at all.

100.    Ms. Trybula told Plaintiff that it was none of her business how QualTek determined bonuses.

101.    The tone, content, and anger of Ms. Trybula's call were highly intimidating to Ms. Carlson.

102.    It became obvious to Plaintiff that QualTek had not and would not take any action regarding her complaints of discrimination and pay disparities.

103.    Plaintiff complained to Mr. Kemmerer about how Ms. Trybula had treated her.

104.    Ms. Trybula, noting that Plaintiff had been absent on January 23, 2020, because she had been so upset, threatened Plaintiff that any more sudden absences might be brought to the attention of her department head and would result in disciplinary action.

105.    Irrespective of this threat, Ms. Trybula did contact Mr. Conn to whom Mr. Kemmerer, Plaintiff's direct boss reported  and, without permission from the Plaintiff to disclose her medical situation, nonetheless told him that the Plaintiff had been absent because of her mental health

106.    On January 31, 2020, promptly following Plaintiff's complaints of pay disparities, unlawful, gender discrimination, and retaliation, QualTek terminated her employment by calling her on the phone and telling her r job had been 'eliminated.'

## COUNT I

## TITLE VII RETALIATION
## 42 U.S.C. § 2000e–3(a)

107. All of the allegations in the foregoing paragraphs are incorporated by reference herein as if the same were set forth at length.

108.    Plaintiff engaged in "protected activity," as defined by the anti-retaliation provision of Title VII, which protects those who participate in certain Title VII proceedings and those who oppose discrimination made unlawful by Title VII.

109.    Specifically, Plaintiff opposed her discrimination based on her gender.

4856-9911-5801, v. 3

14a

110.    Plaintiff complained that similarly situated males were more favorably treated regarding their title, pay, and promotion opportunities.

111.    In good faith, Plaintiff held an objectively reasonable belief that the activity of Defendant in respect of the foregoing was unlawful under Title VII.

112.    Plaintiff assembled a spreadsheet that exposed Defendant's preference of paying men a higher bonus than women.

113.    The same spreadsheet demonstrated Defendant's preference for paying black employees less than white employees.

114.    Plaintiff complained to H.R. about her unlawful gender discrimination.

115.    Plaintiff was specific in her complaint, naming Bruce Neff and Brandon Ebeling as similarly situated male employees who were paid more than she and given employment opportunities that she did not have.

116.    Plaintiff's opposition to Defendant's unlawful discrimination was clear, unequivocal, and communicated more than once directly to Defendant's H.R. department.

117.    Plaintiff was denied the position of Director of Finance despite having successfully discharged those duties for years but without the title or benefits.

118.    The alleged reason Defendant denied the Plaintiff the position was not for lack of qualifications but because she was in Minnesota and not in Pennsylvania despite Defendant having permitted Plaintiff for years to discharge all of the de facto functions of a Director of Finance.

119.    As a direct consequence of Plaintiff's complaints about unlawful discrimination, she was denied her bonuses, continually denied promotion, demoted, and ultimately terminated allegedly because the job she had been demoted to had been eliminated.

120.    On January 22, 2020, Plaintiff followed up with H.R. regarding her complaints of gender discrimination to see if they had been escalated.

121.    Ms. Petzar informed her there had been no escalation.

122.    On the same phone call, Plaintiff complained that she had been retaliated against by a bogus 'realignment' and complained again of retaliation and unlawful gender discrimination.

123.    The next day, January 23, 2020, the Plaintiff's direct report, Kayla Lorenzen, emailed Ms. Petzar, Ms. Trybula, and Ms. Marzocco and complained that women were being paid less than men and people of color were being paid less than white employees.

124.    Plaintiff was openly copied on that email.

125.    On January 24, 2020, Plaintiff was retaliated against for complaining about the disparate treatment in respect of her bonus and told by Ms. Trybula, in a particularly nasty and aggressive tone, with the President and Mr. Kemmerer listening that it was just the Plaintiff's opinion that there were issues and she should be grateful she got any bonus at all.

126.    Ms. Trybula then disclosed Plaintiff's health issue, which had kept her out for a day, and threatened her that if she were out again, Ms. Trybula would complain to Plaintiff's manager, something she had already done.

127.    A week later, Plaintiff was summarily terminated from employment.

128.    Allegedly her job had been eliminated.

129.    Plaintiff's complaints of adverse employment actions specifically altered her compensation, terms, conditions, or privileges of employment and deprived her of employment opportunities, and adversely affected her status as an employee.

130.    Plaintiff's opposition to and her participation in proceedings against unlawful discrimination would have dissuaded any reasonable worker from making or supporting a

charge of discrimination.

131.    The reasonable worker would have understood that a complaint of unlawful discrimination would not be investigated or taken seriously by the Defendant.

132.    The reasonable worker would have understood that Defendant would take no action against blatant unlawful gender discrimination, despite the clarity of complaints by the Plaintiff.

133.    The reasonable worker would have understood that, because Plaintiff had complained of unlawful gender discrimination, she had been continually denied employment opportunities, specifically promotions, not paid the compensation to which she was entitled and ultimately terminated despite her stellar performance and sophisticated financial skills.

134. The reasonable worker would have understood that Plaintiff's termination was directly linked to her protected complaints, the last one of which was one week before her termination.

135. The foregoing conduct by Defendant constitutes unlawful retaliation against the Plaintiff based on her previous engagement in protected activity.

136. As a result of Defendant's unlawful discrimination, Plaintiff has suffered damages as set forth herein.

## COUNT II

## PENNSYLVANIA WAGE PAYMENT AND COLLECTION LAW

137.    Plaintiff incorporates by reference paragraphs 1 through 136 above as if fully set forth herein at length.

138.    Plaintiff can bring her claim for unpaid wages under the WPCL because the protections of the WPCL extend to those working outside Pennsylvania when the employee's

4856-9911-5801, v. 3

17a

contracts with their employers contained Pennsylvania choice of law provisions and/or Pennsylvania forum selection clauses as in this case. *Crites v. Hoogovens Tech. Servs., Inc.*, 43 Pa. D. & C.4th 449, 452–56 (Pa.C.P.2000); *Synesiou v. DesignToMarket*, No. 01–5358, 2002 U.S. Dist. LEXIS 5687, at *3, 2002 WL 501494, at *1 (E.D.Pa. April 3, 2002).

139.    At all relevant times, Plaintiff and Defendant had an employment contract that set forth their agreement on wages to be paid to Plaintiff.

140.    The WPCL provides that "[e]very employer shall pay all wages, other than fringe benefits and wage supplements, due to his employees on regular paydays designated in advance by the employer." 43 Pa. C.S.A. § 260.3(a).

141.    Defendant QualTek is an employer under the WPCL. 43 Pa. CSA § 260.2(a).

142.    The term "wages" is defined by the WPCL as "all earnings of an employee, regardless of whether determined on time, task, piece, commission or other method of calculation." *Id.*

143.    Fringe benefits or wage supplements include "any other amount to be paid pursuant to an agreement to the employee…." *Id.*

144.    The WPCL provides employees a statutory remedy to recover wages and other benefits that are contractually due to them.

145.    Defendant QualTek willfully failed to pay Plaintiff all amounts of wages, in this case, bonuses, earned within the limits set forth in the WPCL. 43 Pa. C.S.A. §§ 260.1 *et seq.*

146.    The Defendant is liable to Plaintiff for willfully failing to pay Plaintiff all amounts of wages earned pursuant to the WPCL.

147.    Defendant admitted that Plaintiff was oh $24,000 in bonuses she was never paid.

148.    Further, Plaintiff never received her bonuses for the year 2019.

149.    Plaintiff is entitled to her unpaid bonuses, which are wages under the WPCL.

150.    Plaintiff is also entitled to liquidated damages, attorneys' fees, and costs pursuant to the WPCL.


## COUNT III

## EQUAL PAY ACT (THE "E.P.A."), 29 U.S.C. § 206(d)(1),

151.    Plaintiff incorporates by reference paragraphs 1 through 150 above as if fully set forth herein at length.

152.    Defendant paid Bruce Neff and Brandon Ebeling more than the Plaintiff for equal work.

153.    The work they performed was of substantially equal skill, effort, and responsibility under similar working conditions.

154.    The actual job content performed by Bruce Neff and Brandon Ebeling was the same, in that they had a common core of tasks, the significant portion of which was identical to that performed by the Plaintiff.

155.    In the case of Bruce Neff, his job was identical to that of Plaintiff, except that his responsibility was for non-AT&T clients.

156.    Brandon Ebeling's as Director of Finance was identical to Plaintiff.

157.    There is no other legitimate explanation for the disparity in income and bonuses, except Bruce Neff and Brandon Ebeling are male.

158.    The Defendant discriminated against Plaintiff based on her sex by paying her less than the rate paid to male employees for equal work that required equal skill, effort, and responsibility and which was performed under similar working conditions.

159.    As a result of the Defendant's unlawful violations, the Plaintiff has suffered damages as set forth herein.

## COUNT IV

## EQUAL PAY ACT (THE "E.P.A."), RETALIATION

160.    Plaintiff incorporates by reference paragraphs 1 through 159 above as if fully set forth herein at length.

161.    Plaintiff was specific in her complaint, naming Bruce Neff and Brandon Ebeling as similarly situated male employees who were paid more than she and given employment opportunities that she did not have.

162.    Plaintiff engaged in protected activity when she consistently complained to the Defendant that she was being paid less than her similarly situated male counterparts.

163.    Defendant then retaliated against her by treating her in a hostile and antagonistic manner as alleged above and finally discharging her from their employment under the pretext of a 'Realignment' of duties.

164.    As a result of QualTek's retaliation and termination of Plaintiff's employment, Plaintiff has suffered, is suffering, and will suffer lost wages, earnings, and benefits, as a result of which Plaintiff is entitled to an award of back pay from the time of her constructive discharge until the date when an award or verdict is rendered in this case.

165.    As a further result of QualTek's retaliation and termination of Plaintiff's employment, Plaintiff is entitled to an award of front pay representing the amount of wages, earnings, and benefits Plaintiff is expected to lose in the future, following the date when an award or verdict is rendered in this case.

166.     Defendant is also entitled to a liquidated damages award in an amount equal to the wages, earnings, and benefits she has lost and will lose due to Defendant's unlawful action.

167.     As a further result of the Defendant's retaliation, Plaintiff has suffered emotional distress, shock, fear, panic attacks, anxiety, depression, feelings of frustration and helplessness, loss of confidence, self-esteem, embarrassment, humiliation, despair, sleeplessness, physical pain, and an inability to concentrate.

168.     Plaintiff is also entitled to an award of punitive damages to punish Defendant and deter it from committing further acts of retaliation in violation of the E.P.A.

169.     As a further result of Defendant's retaliation and termination of Plaintiff's employment, Plaintiff has incurred and will incur attorneys' fees and costs.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court enter judgment in her favor and against each Defendant and that it enter an Order as follows:

a.   Defendant is to be permanently enjoined from discriminating or retaliating against Plaintiff on any basis prohibited under applicable federal and Pennsylvania and state law;

b.   Defendant is to be prohibited from continuing to maintain its illegal policy, practice, or custom of discriminating or retaliating against employees based on any basis prohibited under applicable federal and state law and be ordered to promulgate an effective policy against such discrimination and to adhere thereto;

c.   Defendant is to compensate Plaintiff, reimburse Plaintiff, and to make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not

21a

been for Defendant's illegal actions, including but not limited to back pay, front pay, salary, pay increases, bonuses, medical and other benefits, training, promotions, pension, and seniority. Plaintiff should be accorded those benefits illegally withheld from the date he first suffered discrimination at the hands of Defendant until the date of the verdict;

d.  Plaintiff is to be awarded actual damages, as well as damages for the pain, suffering, and humiliation caused to her by Defendant's actions as permitted by applicable law;

e.  Plaintiff is to be awarded punitive damages as permitted by applicable law, in an amount believed by the Court or trier of fact to be appropriate to punish Defendant for its willful, deliberate, malicious, and outrageous conduct, and to deter Defendant or any other employees from engaging in such misconduct in the future;

f.  Plaintiff is to be accorded any, and all other equitable and legal relief as the Court deems just, proper, and appropriate;

g.  Plaintiff is to be awarded the costs and expenses of this action and reasonable legal fees as provided by applicable federal and state law;

h.  Any verdict in favor of Plaintiff is to be molded by the Court to maximize the financial recovery available to Plaintiff in light of the caps on certain damages set forth in applicable federal law;

i.  Plaintiff is to be granted such additional injunctive or other relief as he may request during the pendency of this action to ensure Defendant does not engage –

4856-9911-5801, v. 3

22a

or ceases engaging - in illegal retaliation against Plaintiff or other witnesses to this action;

j.  The Court is to maintain jurisdiction of this action after verdict to ensure compliance with its Orders therein.

k.  Plaintiff claims are to receive a trial by jury to the extent allowed by applicable law. Plaintiff has also endorsed this demand on the Complaint caption in accordance with Federal Rule of Civil Procedure 38(b).


Respectfully submitted,

KOLMAN LAW, P.C.

*/s/ Timothy M. Kolman*

Timothy M. Kolman, Esquire
414 Hulmeville Avenue
Penndel, PA 19047
(T) 215-750-3134 / (F) 215-750-3138
Tkolman@KolmanLaw.com


Dated:  March 27, 2022

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing First Amended Complaint was served upon all counsel of record via this Court's CM/ECF system.

Respectfully submitted,

KOLMAN LAW, P.C.

*/s/ Timothy M. Kolman*

Timothy M. Kolman, Esquire
414 Hulmeville Avenue
Penndel, PA 19047
(T) 215-750-3134 / (F) 215-750-3138
Tkolman@KolmanLaw.com

Dated:  March 27, 2022

24a

4856-9911-5801, v. 3

# EXHIBIT "B"


**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Minneapolis Area Office**

Charge Number:  444-2020-01164

Lisa Carlson                                             Charging Party
2805 243rd Ave. NW
St. Francis, MN 55070

vs.

Qualtek LLC                                              Respondent
1150 1st Ave., Suite 600
King of Prussia, PA 19406

DETERMINATION

Under the authority vested in me by the Equal Employment Opportunity Commission's ("Commission") Procedural Regulations, I issue the following determination on the merits of the subject charge filed under Title VII of the Civil Rights Act of 1964, as amended (Title VII) and the Equal Pay Act of 1963, as amended (the EPA).

The Respondent is an employer within the meaning of Title VII and the EPA, and all requirements for coverage have been met.

The Charging Party alleged that Respondent discriminated against her based on her sex, Female, subjected her to an EPA violation, and retaliated against her when she was paid less than similarly situated male employees, was denied promotions, and was terminated from employment,  in violation of Title VII and the EPA.

I have determined that the evidence obtained in the investigation establishes reasonable cause to believe Respondent violated the statutes when it offered the Charging Party and a class of employees a Severance Agreement and General Release which limits an employee's right to participate in an investigation and file a charge of discrimination, in violation of Title VII and the EPA.

This determination is final.  When the Commission finds that violations have occurred, it attempts to eliminate unlawful practices by informal methods of conciliation.  Therefore, I invite the parties to join with the Commission in reaching a just resolution to this matter.  Disclosure of information obtained by the Commission during the conciliation process will be made only in accordance with the Commission's Procedural Regulations (29 CFR Part 1601.26).

If the Respondent wishes to accept this invitation to participate in conciliation efforts, please notify your Commission representative Denae Schuldt at (612) 552-7310 or by email, at denae.schuldt@eeoc.gov within 10 days.  You are encouraged to include proposed terms for a conciliation agreement.  The remedies may include, as appropriate, an agreement by the

Respondent not to engage in unlawful employment practices, taking appropriate steps to remedy unlawful employment practices such as including explicit language in severance agreements that informs employees that the severance agreement does not prohibit them from filing charge or participating in an investigation with the Commission, placement of identified victims in positions they would have held but for discriminatory actions, back pay, restoration of lost benefits, injunctive relief, compensatory and/or punitive damages, and notice to employees of the violation and the resolution of the claim.

Should the Respondent have further questions regarding the conciliation process we encourage it to contact the assigned Commission representative, Denae Schuldt, at (612) 552-7310 or by email, at denae.schuldt@eeoc.gov. Should there be no response from the Respondent in ten (10) days, we may conclude that further conciliation efforts would be futile or nonproductive.


On Behalf of the Commission,


*August 16, 2021*                               *Julianne Bowman/cad*

Date                                            Julianne Bowman
                                                District Director


cc:     Respondent's Representative:            Charging Party's Represnetative:
        Colin D. Dougherty                      Darren Sharp
        Fox Rothschild LLP                      Schaefer Halleen LLC
        10 Sentry Parkway, Suite 200            412 South Fourth Street, Suite 1050
        P.O. Box 3001                           Minneapolis, MN 55415
        Blue Bell, PA 19422-3001                DSharp@SchaeferHalleen.com
        CDougherty@foxrothschild.com

# EXHIBIT "C"

| CHARGE OF DISCRIMINATION<br>This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form. | AGENCY<br>___ FEPA<br>**X** EEOC | CHARGE NUMBER |
|---|---|---|

<table>
<tr><td colspan="3" align="center"><u>MDHR</u> and EEOC<br><i>State or local Agency, if any</i></td></tr>
</table>

| NAME *(Indicate Mr. Ms., Mrs.)*<br>**Lisa Carlson** | HOME TELEPHONE<br>**612-741-5687** |
|---|---|

| STREET ADDRESS<br>**2805 243rd Ave. NW** | CITY, STATE AND ZIP CODE<br>**St. Francis, MN 55070** | DATE OF BIRTH<br>███████ |
|---|---|---|

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME. *(if more than one list below).*

| NAME<br>**QualTek LLC** | # OF EMPLOYEES<br>**500+** | TELEPHONE *(Include Area Code)*<br>**484-804-4500** |
|---|---|---|

| STREET ADDRESS<br>**1150 1st Avenue, Suite #600** | CITY, STATE AND ZIP CODE<br>**King of Prussia, PA 19406** | COUNTY<br>**Montgomery** |
|---|---|---|

| CAUSE OF DISCRIMINATION BASED ON *(Check appropriate box(es))*<br>☐ RACE ☐ COLOR ☒ SEX ☐ RELIGION ☐ NATIONAL ORIGIN<br>☒ RETALIATION ☐ AGE ☐ DISABILITY ☒ OTHER (EQUAL PAY) | Date discrimination took place<br>*EARLIEST*     *LATEST*<br>**03/30/2018**   **01/31/2020** |
|---|---|

THE PARTICULARS ARE: *(If additional space is needed, attach extra sheets).*

**I.**      **STATEMENT OF HARM.** See Addendum to Charge of Discrimination of Lisa Carlson.

**II.**      **REASON FOR ADVERSE ACTION.** I was discriminated against in terms of pay and treatment and then terminated from my employment from QualTek LLC because of my sex, and in retaliation for my complaints of sex discrimination and my complaints of discriminatory pay practices based on sex.

**III.**      **STATEMENT OF DISCRIMINATION:** This sex discrimination, retaliation, and pay discrimination is in violation of my right to equal opportunity under the Title VII of the 1964 Civil Rights Act (42 U.S.C. § 2000e, *et seq.*), the Equal Pay Act (29 U.S.C. § 206(d)(1), and the Minnesota Human Rights Act (Minn. Stat. § 363A.08 *et seq.*).

| ☑ I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (When necessary for State and Local Requirements)<br><br>_____ |
|---|---|

| I declare under penalty of perjury that the foregoing is true and correct.<br><br>04/15/2020      *[signature]*<br>Date     Charging Party *(Signature)* | (NOTARY STAMP)<br><br>SIGNATURE OF CHARGING PARTY WAS SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE |
|---|---|

29a

Addendum to Charge of Discrimination of Lisa Carlson

I, Lisa Carlson, am providing this narrative statement to support my allegation that QualTek LLC ("QualTek") discriminated against me when they denied me a Director title while promoting and hiring less-qualified, less-experienced men for Director roles, paid me less than male employees for equal work, and retaliated against me by terminating my employment less than one week after my most recent complaint of sex discrimination.

I worked for Velocitel for seven years until QualTek acquired Velocitel in late 2017. My work at Velocitel had been exceptional: I had strong performance reviews throughout my employment; I had never been subject to any form of discipline; and I was considered by colleagues and management alike as reliable and productive and as a growing leader. As such, QualTek was eager to retain me as an employee. Thus, on November 29, 2017, I officially became a QualTek employee. My official title was Market FP&A Manager, and I worked within QualTek's Finance department. I continued to report to Dana Freedman, the Director of Financial Planning & Analytics, as I had with Velocitel. My starting salary was $92,300, plus I had a bonus potential of 10% of my base salary.

In early February 2018, Ms. Freedman announced that she would be resigning at the end of March 2018. With this announcement, Velocitel Vice President of Finance Dave Conn and Adam Spittler (currently the Chief Strategy Officer) determined that I would be promoted and would take Ms. Freedman's place. No one raised any issue with me taking this director-level role while I continued to reside in the State of Minnesota. Promptly after Ms. Freedman's announcement and Velocitel's decision to promote me, I began absorbing all of Ms. Freedman's duties and taking over her responsibilities.

Mr. Conn began working to implement these changes: changing my title to "Director," increasing my pay to $105,000, and increasing my bonus to 20%. Along the way, Mr. Conn informed me that he was facing resistance to these changes from Chief Administrative Officer Elizabeth Downey. Mr. Conn told me that the title change to "Director" had been rejected and that the bonus potential would be $20,000, not 20% of base, as previously stated by Mr. Conn. Eventually, Velocitel determined that my title would be "Finance Manager." Even though from that point forward – until my termination – I performed the work of a Director, Velocitel refused to award me that title.

During the month of July, QualTek was closing the sale of itself to Bright Star. During this period, there were lots of questions that came from Senior Vice President of Finance Mike Michini and Mr. Conn and others regarding numbers. I pushed back on some of the numbers Velocitel was trying to use that were incorrect. From Mr. Michini's responses to me, I could tell they were frustrated with my questioning these errors and explaining the issues I had identified. In response, Mr. Michini retaliated against me by taking away one of my employees, Jaime Maurer, and making me select another manager. Ms. Maurer had been working with me for a short while and originally had been interested in accounting, but then she left accounting school and decided that she was uneasy about working for the management in QualTek's accounting departments. Ms. Maurer declined the move.

On July 30, 2018, Mr. Michini called me and berated me, yelling that I had put ideas into Ms. Maurer's head and that I had made Ms. Maurer decline the position. He made me email him a list of Ms. Maurer's duties to justify her continued work on my team. He was unhinged during

the call, so much so that I was in tears. Promptly after the call, I emailed HR Director Lauren Petzar to tell her that a situation had arisen and that I needed to speak with her. Ms. Petzar and I then spoke on the phone, with me describing Mr. Michini's conduct to her and what had led to it. Ms. Petzar followed up with the Vice President of HR, Stefanie Trybula, but nothing more came of the issue at that time and Ms. Maurer was moved under another manager.

During December 2018, I learned that employees were being paid half of their bonuses at that time, with the remaining half to be paid later. That month, I received a bonus of $2,500 (with another $2,500 to be paid in June 2019). I should have received four times that amount, $10,000 in December 2018, which would be half of the $20,000 bonus spelled out in my promotion paperwork. (I should have then received the remaining $10,000 in June 2019.) I immediately noticed the error and informed Payroll Manager Kristie Marzocco. I also notified my supervisor, Director of Finance Shawn Kemmerer, via instant message. When Mr. Kemmerer spoke with HR regarding the $2,500 payment, HR confirmed the error, stated that it had been corrected, but that there was nothing that could be done about what was paid out.

In June 2019, the second half of the bonuses were paid out. Again, mine was for $2,500 – the QualTek-acknowledged wrong amount.

During 2019, QualTek promoted Bruce Neff to a Director of Finance position. After his promotion, he performed the same job functions as I did, though I was only allowed the title of Finance Manager. Also towards the end of 2019, QualTek hired Brandon Ebeling into a Director of Finance position. In his Director position, Mr. Ebeling also performed the same job functions that I did. The fact that I was doing the same work as these men, but being paid less and not being allowed to carry the same title was disheartening and unfair.

On October 10, 2019, I spoke in person with Ms. Petzar and described this issue to her and how I felt, that as a woman, QualTek would not allow me to advance in the company's Finance department. I reported that executive management was intentionally not giving me the ability to advance, but was having no issue promoting or hiring males – and paying them more – that did not have the experience or qualifications that I did. After a few days, Ms. Petzar asked me if I wanted to further escalate the issue to Ms. Trybula. I reiterated that I wanted to be treated fairly, but that I did not want to continue to press the issue and face more retaliation.

On November 26, 2019, I formally applied for a Director of Finance position. The position had a job description that exactly described the work that I was already performing. By December 8, 2019, I was informed that I would not be awarded the job because I was not physically located in Pennsylvania, where QualTek is headquartered. This response was illogical, as QualTek continued to allow me to perform the work of a Director, while residing in Minnesota.

Later in December, the new budget file came out and, again, my bonus was listed incorrectly. It was listed at $11,000, not $20,000. Mr. Kemmerer then addressed the issue with HR, who again claimed to have corrected the issue going forward. By this point, QualTek's errors had cost me $24,000 in promised and earned, but unpaid, bonus payments.

On January 21, 2020, I received a call from Mr. Kemmerer who informed me that QualTek had decided to take me off of all markets, remove my staff, realign the department reporting

structure, create a new Director position (which I could not have), and push me off to a "reporting" role to create reports. As I had been for years and was then currently, I was one of the best performing people on the team. Thus, there was no legitimate basis for this move and it was clear that it was made in clear retaliation for me continued complaints of disparate treatment.

In response, on January 22, I emailed Ms. Petzar to ask if she or Ms. Trybula had escalated my concerns of discrimination and my inability to advance because I am a woman. Given the stress of the situation, I took a sick day on January 23. Ms. Petzar then reached out to me and I confirmed that things were not going well and that this change felt like retaliation. Ms. Petzar claimed that neither she nor Ms. Trybula has escalated the issue, but it was odd that Ms. Petzar avoided stating so in writing.

Further troubling, I learned that Ms. Trybula had notified another Vice President that I had taken a "mental health day" and asked the Vice President whether he knew anything about it. This disclosure was inappropriate and upsetting to me – Ms. Trybula had no business disclosing this information and had not even bothered to connect with my actual manager. I promptly emailed Ms. Trybula and expressed my dissatisfaction with this disclosure, and stated that I preferred that private information be kept private.

That same day, bonuses were announced. While bonuses were averaging 25% for most people, female employees received significantly less:

| Employee | Title | Bonus Potential | Actual Bonus | Bonus % | Sex |
|---|---|---|---|---|---|
| Lisa Carlson | Finance Manager | $ 20,000.00 | $ 2,875.00 | 14.4% | Female |
| Kayla Lorenzen | Finance Supervisor | $ 3,675.00 | $ 348.00 | 9.5% | Female |
| Jim Champion | Finance Supervisor | $ 7,500.00 | ? | | Male |
| Dorjan Dheskali | Finance Supervisor | $ 7,500.00 | ? | | Male |
| Michelle Kneisl | Financial Analyst | $ 5,000.00 | $ 1,117.00 | 22.3% | Female |
| Derrickus Spratlin | Financial Analyst | $ 1,000.00 | $ 250.00 | 25.0% | Male |
| Sheena Hill | Financial Project Manager | $ 7,550.00 | $ 348.00 | 4.6% | Female |
| Dylan O'Laughlin | Finance Operations Supervisor | $ 5,000.00 | $ 1,155.00 | 23.1% | Male |
| Ollie Giles | Finance Operations Supervisor | $ 5,000.00 | $ 1,155.00 | 23.1% | Male |

Furthermore, the only Financial Analyst who is a person of color was paid one-fifth the bonus of all the other analysts.

My direct report, Kayla Lorenzen, emailed Ms. Petzar, Ms. Trybula, and Ms. Marzocco, and informed them that women were being paid less than men and that people of color were being paid less than white employees. Ms. Lorenzen copied me on the email, as Ms. Lorenzen has discussed the issue with me and I supported her report of this information to HR. Following Ms. Lorenzen's email, I also emailed Ms. Petzar, Ms. Trybula, and Ms. Marzocco separately to report that my bonus was again incorrect.

The following day, January 24, Ms. Trybula gathered Mr. Conn and Mr. Kemmerer and called me to inform me that it was just my "opinion" that there were issues, that I should be grateful that I got anything at all, and that it was none of my business how QualTek decided who was

getting what. Ms. Trybula was very aggressive in the call and it made me feel tremendously uncomfortable, and as if HR planned to do nothing to look into these continued discrepancies.

Following the joint call, I instant messaged Mr. Kemmerer directly and voiced my dissatisfaction with how I had been treated by Ms. Trybula and how uncomfortable Ms. Trybula's aggressive tone made me feel. After this conversation, Ms. Trybula added further insult to injury by emailing me and stating that she reserves the right to discuss with the department head if she hears someone is out and it is not listed in ADP. Due to my condition, I had not entered it into the system in the morning of the 23rd, but did so on that afternoon. Ms. Trybula claimed that only unplanned emergencies are allowed to be entered after the event.

On January 31, promptly following my complaints of pay disparities, discrimination, and retaliation, QualTek terminated my employment, while calling it a "job elimination" and offering me two weeks of severance pay.

This alleged "job eliminated" is pretext for retaliation, which can be demonstrated by analyzing my exemplary performance while with QualTek and having male employees being treated substantially better than I was. QualTek engaged in illegal sex-based discrimination and retaliation in violation of state and federal law.

I am providing this narrative statement to allow the investigation of my charge to proceed with a detailed understanding of the illegal treatment that I have experienced. My legal counsel Darren Sharp at Schaefer Halleen, LLC, and I are available to produce greater detail and evidence to substantiate the facts I describe above. I reserve the right to supplement and/or amend these facts as this matter proceeds, and in litigation, if that becomes necessary.

# EXHIBIT "D"



January 31, 2020

Lisa Carlson
2795 243rd Avenue Northwest
Saint Francis, MN 55070

      Re:      **Severance Agreement and General Release**

Lisa:

      We are interested in resolving amicably your separation of employment with QualTek LLC ("the Company" or "QualTek") and any and all affiliates or subsidiaries, January 31, 2020. Toward this end, we propose the following Severance Agreement and General Release.

      You may consider our offer for twenty-one (21) days. If you need a reasonable amount of additional time, it will be granted upon request. You are encouraged to review this Agreement with an attorney before signing it.

      The proposed terms and conditions of your separation from employment are as follows:

      1.      In consideration for your General Release set forth below in Paragraph 2, the Company agrees, intending to be legally bound, to pay you two weeks (2) of severance in the gross sum of four thousand five hundred fifty-five dollars and seventy-eight cents ($4,555.78), less taxes and other deductions required by law. This payment will be made to you in accordance with the Company's biweekly payroll schedule after the expiration of the Revocation Period set forth below, so long as you timely execute and do not timely revoke this Agreement.

      2.      In consideration for the Company's payment set forth above in Paragraph 1, you agree, intending to be legally bound;

      (a)      That the payment is comprised of two separate and distinct elements and represents the following: $1,503.40 of total, less applicable withholdings and deductions, represents payment for the release and waiver set forth in paragraph 2(b) below any and all claims that could arise under the Age Discrimination in Employment Act of 1967 and $3,052.38, less applicable withholdings and deductions, represents payment for the release and waiver of all other claims set for in paragraph 2(b) below

      (b)      to release and forever discharge the Company and its related or affiliated companies, including but not limited to QualTek LLC, QualTek Wireline LLC, QualTek Wireless LLC, QualTek Fulfillment LLC, QualTek Recovery Logistics LLC, NX Utilities, ULC, and their respective past, present and future officers, shareholders, directors, attorneys, employees, owners, insurers and agents, successors and assigns (collectively "Releasees"), jointly and severally, from any and all actions, complaints, causes of action, lawsuits or claims of any kind (collectively "Claims"), known or unknown, which you, your heirs, agents, successors or assigns ever had, now have or hereafter may have against Releasees arising heretofore out of any matter, occurrence or event existing or occurring prior to the execution hereof, including, without limitation: any claims relating to or arising out of your employment with and/or termination of employment by the Company and/or any of its related and/or affiliated

companies, effective January 31, 2020; any claims for unpaid or withheld wages, severance, benefits, bonuses, commissions and/or other compensation of any kind; any claims for attorneys' fees, costs or expenses; any claims of discrimination and/or harassment based on age, sex, race, religion, color, creed, disability, handicap, citizenship, national origin, ancestry, sexual preference or orientation, or any other factor prohibited by Federal, State or Local law (such as the Age Discrimination in Employment Act, 29 U.S.C. §621 et. seq., the Equal Pay Act of 1963; Title VII of the Civil Rights Act of 1964, as amended, the Americans with Disabilities Act, the Pennsylvania Human Relations, the Pennsylvania Fair Employment and Housing Act, the Family Medical Leave Act 1993 any and all other relevant laws of Pennsylvania and all other relevant state and local Fair Employment Practices and discrimination laws); any claims for retaliation and/or any whistleblower claims; and/or any other statutory or common law claims, now existing or hereinafter recognized, including, but not limited to, breach of contract, libel, slander, fraud, wrongful discharge, promissory estoppel, equitable estoppel and misrepresentation.

(c)     not to disclose any confidential information relating to the Company or any of its affiliates which you acquired in the course of your employment with the Company that is not generally known by and readily accessible to the public.  This confidential information includes, but is not limited to: customer and client lists; employee information and employment files; marketing, business and legal plans, procedures and strategies; pricing plans and/or operating or accounting procedures of the Company or any of its affiliates.  (This restriction shall not be construed to preclude you from disclosing confidential information pursuant to an order of a court, administrative tribunal or arbitration panel. However, immediately upon receipt of notice of any proceeding in which you may be required to give testimony which involves the Company or any of its affiliates, directly or indirectly, you shall inform, in writing, the HR Director of QualTek and the Company of the existence of the proceeding so that the QualTek and/or the Company can seek an appropriate protective order.)

3.     The General Release in Paragraph 2(b) above does not apply to any claims to enforce this Agreement or to any claims arising out of any matter, occurrence or event occurring after the execution of this Agreement.

4.     You acknowledge and agree that the Company's payment under Paragraph 1 above is not required by any policy, plan or prior agreement and constitutes adequate consideration to support your General Release in Paragraph 2(b) above and all other obligations within this Agreement.

5.     Regardless of whether you execute this Agreement:

(a)     This is written notice that your last day of employment will be January 31, 2020.

(b)     You will be paid for all days actually worked prior to the termination of your employment.

(c)     You will be paid $695.93, minus taxes and other deductions required by law, which is the monetary equivalent of 12.22 hours of unused, accrued paid time off.

(d)     You will return all Company property, confidential information and company documents including any and all copies and originals, laptop, keys, software, hardware, phones, etc.

6.      Except as expressly provided for in this Agreement, you shall not be eligible for any compensation (i.e., wages, benefits, bonus, incentive, stock) from the Company or Company-paid benefits subsequent to the termination of your employment on January 31, 2020.

7.      You agree never to deprecate or disparage, directly or indirectly, the Company, its affiliates, subsidiaries, predecessors or successors, owners, managers, services, clients and/or employees.

8.      You agree that, at all times, the existence, terms and conditions of this Agreement will be kept secret and confidential and will not be disclosed voluntarily to any third party, except to the extent required by law, to enforce the Agreement or to obtain confidential legal, tax or financial advice with respect thereto.

9.      This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania.

10.     Nothing in this Agreement shall be construed as an admission or concession of liability or wrongdoing by the Company or any other Releasee as defined above.  Rather, the proposed Agreement is being offered for the sole purpose of settling amicably any and all possible disputes between the parties.

11.     In the event you breach this Agreement by bringing a Claim released pursuant to Paragraph 2 above, you shall indemnify and hold harmless Releasees as defined above for any attorneys' fees, costs or expenses which may be incurred in defending the released Claim.  Notwithstanding the foregoing, the General Release set forth in Paragraph 2(b) above shall remain in full force and effect.

12.     You agree to pay any and all federal, state and local taxes assessed against you with respect to any consideration received pursuant to this Agreement.

13.     You agree that you will inform me or my successor at the Company, in writing, immediately if you are contacted by any nonemployee with whom you had any contact in your capacity as an employee of the Company with regard to any claims or possible claims against the Company.

14.     If any provision of this Agreement is deemed unlawful or unenforceable by a court of competent jurisdiction, the remaining provisions shall continue in full force and effect.

15.     This Agreement constitutes the entire agreement between the parties and supersedes any and all prior agreements, written or oral, expressed or implied.

16.     You agree and represent that:

        (a)      You have read carefully the terms of this Agreement, including the General Release;

        (b)      You have had an opportunity to and have been encouraged to review this Agreement, including the General Release, with an attorney;

        (c)      You understand the meaning and effect of the terms of this Agreement, including the General Release;

(d)     You were given as much time as you needed to determine whether you wished to enter into this Agreement, including the General Release;

(e)     The entry into and execution of this Agreement, including the General Release, is of your own free and voluntary act without compulsion of any kind;

(f)     No promise or inducement not expressed herein has been made to you; and

(g)     You have adequate information to make a knowing and voluntary waiver.

*[remainder of page intentionally left blank]*

17.     If you sign this Agreement, you will retain the right to revoke it for seven (7) days.  The Agreement shall not be effective until after the Revocation Period has expired.  To revoke this Agreement, you must send a certified letter to my attention.  The letter must be post-marked within 7 days of your execution of this Agreement.  (The Company shall have no obligations under Paragraph 1 above until after the Revocation Period has expired, and provided only that you do not revoke the Agreement in a timely manner in accordance with this Paragraph.)

*     *     *

If you agree with the proposed terms as set forth above, please sign this letter indicating that you understand, agree with and intend to be legally bound by such terms.

Sincerely,

*Elizabeth Downey*

Elizabeth Downey
Chief Administrative Officer
QualTek LLC, and
QualTek Wireless LLC

UNDERSTOOD AND AGREED,
INTENDING TO BE LEGALLY BOUND:

_____
Lisa Carlson


_____
Date


_____
Witness

# EXHIBIT "E"



# DIRECTOR OF FINANCE IN KING OF PRUSSIA, PA AT QUALTEK

**Date Posted:** 3/2/2020

## APPLY
## (HTTPS://APPLICATION.CAREERBUILDER1.COM/QUALTEK/APPLY/CB1/J3W0KG6
## IPATH=TNJOB&JOB_DID=J3W0KG64KY28W67DDYG&SC_CMP1=JS_JOBDETAILS
## JOB-RECOMMENDATIONS&UTM_CAMPAIGN=MEMBER-SCHEDULED-JOB-
## RECS&SITEID=TNALERT_WEEKLY&LANGUAGE=EN-US)

Not ready to Apply? (/en-US/join)

---

## JOB SNAPSHOT

⧗ **Employee Type:**
Full-Time

📍 **Location:**
King Of Prussia, PA (/En-US/Search?Facetcountry=Us&Facetcitystate=King%20of%20prussia%2Cpa)

🔺 **Job Type:**
Telecommunications (/En-US/Search?Facetcategory=Telecommunications)

💼 **Experience:**
Not Specified

🕐 **Date Posted:**
3/2/2020

---

## JOB DESCRIPTION

This position is responsible for the oversight of all financial operations of the business and for driving the Company's financial strategy and planning. The Director of Finance is also responsible for assessing the financial performance of the Company as well as possible risks and investments.

**Primary Responsibilities:**

- Develop timely and accurate financial plans and projections for the Company
- Conduct weekly and monthly financial assessments with field operations
- Plan, coordinate, and execute the annual budget process
- Analyze and report on budget variances, trends, and key cost drivers
- Drive operational efficiencies by developing system controls, metrics, and goals based on financial projections
- Analyze the financial risks and benefits of various business initiatives

41a

- Direct the maintenance of general and subsidiary ledgers, accounts receivable, revenue distribution, depreciation, cost, operating expenses, and insurance records
- Oversee the preparation of various financial statements and reports
- Oversee the Company's finance IT system
- Oversee all audit and internal finance control operations
- Update and implement financial policies and procedures
- Other duties as assigned

## JOB REQUIREMENTS

**Education:**

- Bachelor's degree in finance, accounting, or similar field; master's degree a plus
- CFA and/or CPA credentials is a plus

**Experience:**

- Seven (7) to ten (10) years of related finance experience
- Solid working knowledge of corporate finance principles, accounting, industry standards, best practices, and relevant laws

**Technical Skills:**

- Computer and Microsoft Office proficiency; extremely strong knowledge of MS Excel
- Ability to utilize financial management software

**Soft Skills:**

- Highly organized and detail orientated
- Aptitude for analytical thinking, problem solving, and strategic development
- Strong business minded consultative approach with a focus on profitability and margin
- Ability to consistently demonstrate sound ethics and judgment
- Flexibility and the ability to thrive in a fast-paced environment

**Physical Requirements:**

- Must be able to pass pre-employment screening that includes background and drug testing
- Individuals must have a valid driver's license and driving record meeting the company policy conditions
- Travel up to 25% of the time, including short notice travel. Travel may include local site travel or national travel depending on training needs
- Sitting at a desk for 6-8 hours a day
- Working on a computer for 6-8 hours a day

EOE

**QUALTEK**

## APPLY (HTTPS://APPLICATION.CAREERBUILDER1.COM/QUALTEK/APPLY/CB1/J3W0KG6₄ IPATH=TNJOB&JOB_DID=J3W0KG64KY28W67DDYG&SC_CMP1=JS_JOBDETAILS_ JOB-RECOMMENDATIONS&UTM_CAMPAIGN=MEMBER-SCHEDULED-JOB-RECS&SITEID=TNALERT_WEEKLY&LANGUAGE=EN-US)

Not ready to Apply? (/en-US/join)

## CHECK OUT OUR SIMILAR JOBS

Controller Jobs (/en-US/search?keywords=Controller)   |   CFO Jobs (/en-US/search?keywords=CFO)
   |   Jobs in Audubon, Pennsylvania (/en-US/search?location=Audubon, Pennsylvania,US)
   |   Controller Jobs Audubon, Pennsylvania (/en-US/search?keywords=Controller&location=Audubon, Pennsylvania,US)

Privacy Policy (https://qualtekservices.com/privacy-policy/)

# EXHIBIT "F"

**2020**

| Name | Position | Status | Hire/Rehire Date | Education |
|------|----------|--------|------------------|-----------|
| Thuyduong Lau | Director/Accounting | Active | 11/5/2013 | Bachelors, Accounting |
| Jeremy Villano | Director/Finance | Active | 4/14/2014 | Bachelors, Accounting |
| Bruce Neff | Director/Finance | Active | 2/19/2018 | Bachelors, Accounting |
| Brian Timlin | Director/Finance | Terminated | 04/20/2020 | Bachelors, Accounting |
| Michael Michini | Officer/Chief Financial | Active | 12/28/2012 | Bachelors, Accounting (Masters in progress) |
| Thomas Montvydas | Treasurer | Terminated | 3/25/2013 | Bachelors, Accounting |
| Charles Orfe | Controller | Terminated | 5/1/2018 | Bachelors, Accounting |
| Vincenzo Battaglia | Vice President/Finance | Active | 9/17/2012 | Bachelors, Accounting |
| David Conn | Vice President/Finance | Active | 1/23/2018 | Bachelors, Accounting |
| Shawn Kemmerer | Director/Finance | Terminated | 7/22/2013 | Bachelors, Accounting |
| Brandon Ebeling | Director/Finance | Active | 10/7/2019 | Masters, Accounting |
| Edward Zaucha | Vice President/Finance | Active | 5/26/2020 | Bachelors, Accounting (Masters in progress) |
| Trenton Pierce | Vice President/Finance | Terminated | 08/19/2013 | Bachelors, Accounting |
| Scott Baur | Director/Financial Planning & Analysis | Active | 8/19/2019 | Bachelors, Accounting |
| Jeffrey Howski | Director/Finance | Terminated | 1/21/2019 | Masters, Business Administration |
| Joshua Jones | Director/Financial Reporting | Terminated | 5/28/2013 | Bachelors, Accounting |
| Stephen Forbes | Office/Chief Financial | Terminated | 8/26/2013 | Bachelors, Accounting |
| Adrian Mantini | Vice President/Controller | Terminated | 5/15/2017 | Bachelors, Accounting |

**2019**

| Name | Position | Status | Hire/Rehire Date | Education |
|------|----------|--------|------------------|-----------|
| Thuyduong Lau | Director/Accounting | Active | 11/5/2013 | Bachelors, Accounting |
| Jeremy Villano | Director/Finance | Active | 4/14/2014 | Bachelors, Accounting |
| Bruce Neff | Director/Finance | Active | 2/19/2018 | Bachelors, Accounting |
| Michael Michini | Senior Vice President/Finance | Active | 12/28/2012 | Bachelors, Accounting (Masters in progress) |
| Thomas Montvydas | Director/Accounting | Terminated | 3/25/2013 | Bachelors, Accounting |
| Vincenzo Battaglia | Vice President/Finance | Active | 9/17/2012 | Bachelors, Accounting |
| David Conn | Vice President/Finance | Active | 1/23/2018 | Bachelors, Accounting |
| Shawn Kemmerer | Director/Finance | Terminated | 7/22/2013 | Bachelors, Accounting |
| Brandon Ebeling | Director/Finance | Active | 10/7/2019 | Masters, Accounting |
| Trenton Pierce | Vice President/Finance | Terminated | 08/19/2013 | Bachelors, Accounting |
| Scott Baur | Director/Financial Planning & Analysis | Active | 8/19/2019 | Bachelors, Accounting |
| Jeffrey Howski | Director/Finance | Terminated | 1/21/2019 | Masters, Business Administration |
| Joshua Jones | Director/Financial Reporting | Terminated | 5/28/2013 | Bachelors, Accounting |
| Stephen Forbes | Office/Chief Financial | Terminated | 8/26/2013 | Bachelors, Accounting |
| Adrian Mantini | Vice President/Controller | Terminated | 5/15/2017 | Bachelors, Accounting |
| Robert Bretschneider | Director/Financial Planning & Analysis | Terminated | 4/15/2019 | Bachelors, Business Administration & Economics |
| Maribel Ibarrondo | Director/Operations Finance | Terminated | 7/16/2018 | Masters, Business Administration |
| John Clark | Vice President/Finance | Terminated | 7/30/2018 | Bachelors, Russian Language |

## 2018

| Name | Position | Status | Hire/Rehire Date | Education |
|------|----------|--------|------------------|-----------|
| Thuyduong Lau | Director/Accounting | Active | 11/5/2013 | Bachelors, Accounting |
| Jeremy Villano | Director/Finance | Active | 4/14/2014 | Bachelors, Accounting |
| Michael Michini | Senior Vice President/Finance | Active | 12/28/2012 | Bachelors, Accounting (Masters in progress) |
| Thomas Montvydas | Director/Accounting | Terminated | 3/25/2013 | Bachelors, Accounting |
| Vincenzo Battaglia | Vice President/Finance | Active | 9/17/2012 | Bachelors, Accounting |
| David Conn | Vice President/Finance | Active | 1/23/2018 | Bachelors, Accounting |
| Shawn Kemmerer | Director/Finance | Terminated | 7/22/2013 | Bachelors, Accounting |
| Trenton Pierce | Director/Finance | Terminated | 08/19/2013 | Bachelors, Accounting |
| Joshua Jones | Director/Financial Reporting | Terminated | 5/28/2013 | Bachelors, Accounting |
| Stephen Forbes | Office/Chief Financial | Terminated | 8/26/2013 | Bachelors, Accounting |
| Adrian Mantini | Corporate Controller | Terminated | 5/15/2017 | Bachelors, Accounting |
| Maribel Ibarrondo | Director/Operations Finance | Terminated | 7/16/2018 | Masters, Business Administration |
| John Clark | Vice President/Finance | Terminated | 7/30/2018 | Bachelors, Russian Language |
| Christopher Artz | Director/Financial Planning & Analysis | Terminated | 2/22/2016 | Masters, Business Administration & Information Science |
| Andrew Maginnis | Director/Finance | Active | 10/26/2015 | Masters, Business |
| Adam Spittler | Vice President/Finance | Active | 05/27/2008 | Masters, Finance |

**2017**

| Name | Position | Status | Hire/Rehire Date | Education |
|------|----------|--------|------------------|-----------|
| Michael Michini | Vice President/Finance | Active | 12/28/2012 | Bachelors, Accounting (Masters in progress) |
| Thomas Montvydas | Director/Accounting | Terminated | 3/25/2013 | Bachelors, Accounting |
| Vincenzo Battaglia | Director/Finance | Active | 9/17/2012 | Bachelors, Accounting |
| Shawn Kemmerer | Director/Finance | Terminated | 7/22/2013 | Bachelors, Accounting |
| Trenton Pierce | Director/Finance | Terminated | 08/19/2013 | Bachelors, Accounting |
| Joshua Jones | Director/Financial Reporting | Terminated | 5/28/2013 | Bachelors, Accounting |
| Stephen Forbes | Office/Chief Financial | Terminated | 8/26/2013 | Bachelors, Accounting |
| Adrian Mantini | Corporate Controller | Terminated | 5/15/2017 | Bachelors, Accounting |
| Christopher Artz | Director/Financial Planning & Analysis | Terminated | 2/22/2016 | Masters, Business Administration & Information Science |
| Andrew Maginnis | Director/Finance | Active | 10/26/2015 | Masters, Business |
| Adam Spittler | Vice President/Finance | Active | 05/27/2008 | Masters, Finance |

# EXHIBIT "G"

 

November 19, 2017

Lisa Carlson
3130 Garfield St. NE
Minneapolis, MN 55418

RE: Employment Offer Letter

Dear Lisa:

Contained herein, please find for your review, a letter of employment and benefit information. This letter sets forth the terms of the offer, subject to satisfactory completion of a background investigation acceptable to the Company, which, upon your acceptance, will govern your employment.

You will be employed by QualTek Acquisition, LLC ("Company") in the position of Market FP&A Manager, reporting to the Director of Financial Planning & Analysis, Dana Freedman, with a commencement date of 11/29/2017. You will be required to carry out your duties faithfully, honestly, diligently and to the best of your abilities. You will be required to devote your full time and efforts to the Company. Your responsibilities will be as directed by the Company.

Your annual base salary will be $92,300 payable under the Company payroll schedule (currently bi-weekly). As a salaried, exempt employee, this annual base salary encompasses compensation for all hours worked and will be prorated to the start of your new position as outlined above.

You will be eligible to participate annually in the Management Incentive Compensation Program (MICP). This discretionary program provides participants with an annual incentive opportunity based upon Company, business group, and individual performance. Your target MICP level is based upon your role within the organization. The actual earnings under the MICP each year may be more or less than the target level depending upon the above listed factors. Your annual potential bonus eligibility will be 10% of your base salary. Your annual potential bonus eligibility will be prorated to your start date.

You will be required to sign the Company's standard Intellectual Property, Confidentiality, Non-Competition and Non-Solicitation Agreement ("Agreement").

You will be based out of the Bloomington, MN location.

Paid Time Off (PTO): of 20 days per year in accordance with Company policy. Accrued/unused 2017 PTO will be carried over to QualTek Acquisition, LLC. For the remainder of the year you will accrue PTO each pay period, in accordance with the number of days that you are eligible to receive annually. PTO accrued during 2017 must be utilized by March 31, 2018 or it is forfeited. Thereafter, PTO must be utilized by the last calendar day of the year in which it is accrued.

Benefits: You will remain a participant of your existing health/medical plans through the end of 2017. You may choose to enroll in the QualTek health plan for the 2018 plan year. You can make your elections during the Company's annual open enrollment period, currently scheduled in December 2017. The Company currently offers three PPO Plans; Choice, Balanced Choice and the Choice Plus Plan. The Company currently pays a portion of the "employee" cost based upon the plan each employee chooses and in accordance with Company policy.

1150 1st Avenue
Suite 600
King of Prussia, PA 19406

 

Your employment with the Company is for an indefinite period of time and you are an employee-at-will. This means that you have the right to terminate your employment at any time for any or no reason, with or without notice, and the Company retains the same right. Any promise of employment for a definite period of time or any promise that modifies your status as an employee-at-will must be in writing and approved by the Chairman of the Company. Unless otherwise agreed in writing, and signed by the Company CEO or CAO, these provisions for termination of your employment shall continue to apply even if your position, salary, fringe benefits or other terms of your employment are changed.

Upon termination of your employment, you shall immediately return all documents, information and other items (in whatever form including all copies and all originals) belonging to the Company that are in your possession, or under your control, to the offices of the Company. By signing below, you not only accept the terms and conditions of this offer, but also represent to the Company that you are under no obligation or agreement that would prevent you from becoming an employee of the Company or adversely impact your ability to perform the expected services. Specifically, you confirm by accepting this offer of employment that you have been fully released from any non-competition, non-solicitation or confidentiality agreement with any former employer containing restrictions that remain in force on the date hereof.

In the event a dispute does arise regarding your employment with the Company, including any validity interpretation, construction and performance of this letter, said dispute shall be governed by and construed in accordance with the substantive laws of the Commonwealth of Pennsylvania without regard to any conflict of law. Jurisdiction for resolution of any disputes shall be solely in Eastern District of Pennsylvania. The terms of your employment may in the future be amended, but only with written authorization, which is signed by both you and, the Chief Administrative Officer on behalf of the Company, and approved by the Chairman of the Board.

If the terms and conditions of employment are acceptable as described herein, please sign the enclosed copy of this letter and return it to me at the corporate offices in the self-addressed stamped envelope provided. If you have any questions regarding the aforementioned, please do not hesitate to contact me.

We look forward to a mutually rewarding relationship. This letter supersedes any/all other verbal or written offers.

Yours truly,

Elizabeth Downey
Chief Administrative Officer

I ACCEPT THE OFFER OF EMPLOYMENT ACCORDING TO THE TERMS SET OUT ABOVE.

DATED THIS __28th__ DAY OF __NOVEMBER__ 2017

_____
Witness

_____
Lisa Carlson

1150 1st Avenue
Suite 600
King of Prussia, PA 19406

51a

# EXHIBIT "H"

# LISA CARLSON

2795 243rd Ave NW ♦ St Francis, MN 55070 ♦ (612) 741-5687

lisaccarlson@yahoo.com

## Experience

**VELOCITEL LLC. (Formerly known as FDH Velocitel, now a subsidiary of Qualtek LLC)**    **2010-2020**
*Finance Manager – AT&T Turf*    *2018-2020*
- Direct financial planning and reporting efforts for all AT&T Turf markets ($400M)
- Lead creation of annual operating plan and quarterly forecast for the 4 AT&T Turf markets
- Report on results of all markets weekly, including offline revenue and cost recognition, detailed review of active projects, current trends and operating costs with market leaders, and weekly presentation of results to senior leaders
- Refined revenue recognition and client invoicing process to allow for weekly financial reporting with minimal staff
- Manage team of 3 Financial Analysts and delegate responsibilities accordingly
- Develop tools to automate both the client invoicing & revenue and cost recognition processes
- Managed data conversion to new ERP system and created processes for efficient data entry in new system
- Perform strategic analysis for senior leaders as needed

*Market FP&A Manager*    *2015-2018*
- Processed monthly revenue & cost recognition for total company
- Key participant in ERP conversion, leading conversion of all project related financial data and developing processes to streamline month-end close and revenue recognition
- Oversaw team of 2 billing analysts to identify billings and process client invoices
- Developed tools to automate monthly revenue & cost recognition
- Assisted in due diligence audits during acquisition of Velocitel by Qualtek LLC
- Supported integration efforts to convert Velocitel to proportional performance revenue recognition policy from completed contracts after acquisition
- Created and maintained forecast models for 4 AT&T Turf Market quarterly forecasts
- Compiled monthly open commitments and project accrual files
- Developed financial reports at the request of the executive team to display a variety of information

*Market Finance Manager*    *2012-2015*
- Managed team of 12 coordinators, with additional temporary staff as needed, which processed all market-level cost and revenue for Minnesota turf market ($50M in revenue)
- Assisted Turf Director in developing the market level forecast and reviewing financial results
- Refined internal processes and SOPs to streamline cost and revenue processing
- Developed trackers and tools to automate cost and revenue processing, greatly increasing turn-around times

*Senior Project Coordinator*    *2010-2012*
- Tracked project finances, both client and vendor related
- Managed Client and Vendor Purchase orders from issuance through invoicing
- Created and issued all required client Purchase Order requests, including new requests to changes orders
- Communicated with client and vendors regarding all financial statuses and requests

## VERIZON WIRELESS (TekSystems)    2007-2010
*RF Network Analyst*
- Acted as the region Regulatory Single Point of Contact for any question, communication or issue involving FAA, FCC, NEPA and Verizon Internal Policy network compliance
- Packaged and submit regulatory filings for all new sites, modifications and record corrections, monitoring the process until approval is issued
- Created maps depicting network coverage or other requested scenarios for use in presentations or printing larger maps using MapInfo
- Assisted engineers with reviewing drawings, propagation systems, internal forms, structural and environmental reports to confirm that they reflect the current design and that the current design is compliant with Regulatory

# LISA CARLSON

2795 243rd Ave NW ♦ St Francis, MN 55070 ♦ (612) 741-5687

lisaccarlson@yahoo.com

## PLATINUM TRUST MORTGAGE                                              2006-2007
*Senior Loan Officer*
- Managed loan process, including initiating loans, underwriting, closing and post-closing
- Created individual marketing materials for circulation
- Obtained all third-party documents, including payoff requests, hazard binders, title work, appraisals and all client specific verifications

## BLACK BOX NETWORK SERVICES                                           2004-2006
*Project Coordinator*
- Remotely managed client projects nationwide
- Provided market competitive quotes for client service requests, projects and equipment orders
- Ordered and managed all material and equipment required for completing projects

## NEXTEL PARTNERS, INC                                                 2003-2004
*Local Number Portability (LNP) Analyst*
- Designed and implemented a MapInfo reporting and mapping process to forecast potential porting traffic and to prepare billing tables for LNP launch
- Established LNP agreements and processes with trading partners, reducing customer fallout and significantly decreasing turn-around time
- Trained involved departments on established porting processes
- Initiated and managed specialized landline porting team
- Resolved escalated porting and LNP agreement issues
- Developed and maintained inter-carrier relations involving LNP
- Created and perform all pre-launch testing with potential trading partners
- Attended all industry and internal meetings relating to past, current and future LNP issues

## AT&T WIRELESS SERVICES                                               1998-2002
*Roaming Analyst/Network Technician*                                   *1999-2002*
- Worked closely with roaming partners' engineers and technicians, domestic and international, to resolve any system related problems on or off network
- Initiated and managed creation of a complete departmental training manual, published online and presented in training classes nationwide

*Sales Support Coordinator*                                            *1998-1999*
- Served as point person for National and Major subscriber activation processing for all Minneapolis and St. Louis Account Executives
- Designed and implemented a tracking system for new orders and account changes as a reference tool for all Managers and Account Executive

## Education & Training

***University of MN-Duluth***        ***1996-1998***
 Mathematics and Natural Sciences
***Minneapolis Community & Technical College 2007***
 PMP Prep Course

## Other Skills & Tools

Advanced Excel, including advanced formulas & analytics, basic VBA, Word, Power Point, Access, Adobe Acrobat, and Visio. Strong understanding of AT&T Turfing model and systems.

# EXHIBIT "I"

 

March 30, 2018

Lisa Carlson

Dear Lisa:

Contained herein, please find for your review, a revised letter of employment.

You will be employed by Velocitel, LLC ("Company") in the position of Finance Manager, reporting to the Operations Finance Director, Dave Conn, with an effective date of April 1, 2018. You will be required to carry out your duties faithfully, honestly, diligently and to the best of your abilities. You will be required to devote your full time and efforts to the Company. Your responsibilities will be as directed by the Company

Your annual base salary will be **$105,000** payable under the company payroll schedule (currently bi-weekly). As a salaried, exempt employee, this annual base salary encompasses compensation for all hours worked and will be prorated to the start of your new position as outlined above. In addition, you will be eligible to participate annually in the company bonus program. Your annual potential bonus eligibility will be **$20,000**, however for 2018, it will be prorated to the commencement date for this position.

Your current benefit offerings and PTO tier will remain the same in this new position.

Your employment with the Company is for an indefinite period of time and you are an employee-at-will. This means that you have the right to terminate your employment at any time for any or no reason, with or without notice, and the Company retains the same right. Any promise of employment for a definite period of time or any promise that modifies your status as an employee-at-will must be in writing and approved by the Chairman of the Company. Unless otherwise agreed in writing, and signed by the Company CEO or CAO, these provisions for termination of your employment shall continue to apply even if your position, salary, fringe benefits or other terms of your employment are changed.

Upon termination of your employment, you shall immediately return all documents, information and other items (in whatever form including all copies and all originals) belonging to the Company that are in your possession, or under your control, to the offices of the Company. By signing below, you not only accept the terms and conditions of this offer, but also represent to the Company that you are under no obligation or agreement that would prevent you from becoming an employee of the Company or adversely impact your ability to perform the expected services. Specifically, you confirm by accepting this offer of employment that you have been fully released from any non-competition, non-solicitation or confidentiality agreement with any former employer containing restrictions that remain in force on the date hereof.

In the event a dispute does arise regarding your employment with the Company, including any validity interpretation, construction and performance of this letter, said dispute shall be governed by and construed in accordance with the substantive laws of the Commonwealth of Pennsylvania without regard to any conflict of law. Jurisdiction for resolution of any disputes shall be solely in Eastern District of Pennsylvania. The terms of your employment may in the future be amended, but only with written authorization, which is signed by both you and, the Chief Administrative Officer on behalf of the Company, and approved by the Chairman of the Board.

If the terms and conditions of employment are acceptable as described herein, please sign the enclosed copy of this letter and return it to me at the corporate offices in the self-addressed stamped envelope provided. If you have any questions regarding the aforementioned, please do not hesitate to contact me.

We look forward to a mutually rewarding relationship. This letter supersedes any/all other verbal or written offers.

Yours truly,

Elizabeth Downey
Chief Administrative Officer

I ACCEPT THE OFFER OF EMPLOYMENT ACCORDING TO THE TERMS SET OUT ABOVE.
DATED THIS _____ DAY OF _____, 2018.

_____
Witness

_____
Lisa Carlson

# EXHIBIT "J"




# Velocitel, LLC

## EMPLOYMENT APPLICATION

| | | | |
|---|---|---|---|
| Position applied for: **Accounting Manager** | | | Date: 01/29/18 |

| Name (Last) | (First) | | (Middle) |
|---|---|---|---|
| **Neff** | **Bruce** | | A |

| Present Address (Street) | (City) | (State) | (Zip Code) |
|---|---|---|---|
| 209 Cherokee Circle | Royersford | PA | 19468 |

| Primary Phone | Alternate Phone | Social Security Number |
|---|---|---|
| 610-613-7649 | | ▮▮▮▮▮ |

| Email Address |
|---|
| woodie30@comcast.net |

| | | |
|---|---|---|
| Have you been an employee of this organization in the past? | Yes ◯ | No ⦿ |
| If yes, when? _____ | | |

| | | |
|---|---|---|
| I certify that I am a U.S. citizen, permanent resident or a foreign national with authorization to work in the United States. | Yes ⦿ | No ◯ |

### EDUCATION

| Name and Location (High School, College, Other) | Years Completed | Did you graduate? | Course of Study and Degree Received |
|---|---|---|---|
| Chichester (Chichester PA) | 4 | Yes | Standard (Diploma) |
| USAF Financial Mgmt (Wichita Falls, TX) | 1 | Yes | Finance (Technical) |
| Univ Cal, Riverside (Riverside, Ca) | 4 | Yes | Accounting (BA) |
| | | | |

Are you sufficiently fluent in any foreign language? If yes, please indicate below what languages and capability (i.e. read, write, speak, etc.)

_____

| | | |
|---|---|---|
| Have you ever been in the Armed Forces? | Yes ⦿ | No ◯ |
| Are you currently a member of the National Guard? | Yes ___ | No ___ |
| Specialty Finance | Date Entered 1983 | Discharge Date 1987 |

Doc ID: 20180125160146504
Sertifi Electronic Signature

58a

## DRIVING EXPERIENCE

| | | |
|---|---|---|
| Do you have a valid Driver's license? | Yes ● No ○ | |
| Driver's license number ▓▓▓▓▓ | State of issue PA | Operator ○   Chauffeur ○ |
| Expiration date 07/29/20 | | Commercial (CDL) ___ |
| Have you had any accidents in the past three years? | Yes ___ No ___ | If so, how many? _____ |
| Have you had any moving violations in the past three years? | Yes ___ No ___ | If so, how many? _____ |

| CLASS OF EQUIPMENT | | | DATES (MONTH/YEAR) | | APPROX. NO. OF MILES (TOTAL) |
|---|---|---|---|---|---|
| Motorcycle | Yes ___ | No ___ | From _____ | To _____ | |
| Passenger Car | Yes ___ | No ___ | From _____ | To _____ | |
| Pick-Up Truck | Yes ___ | No ___ | From _____ | To _____ | |
| Van | Yes ___ | No ___ | From _____ | To _____ | |
| Box Truck | Yes ___ | No ___ | From _____ | To _____ | |

List all states operated in the last 5 years _____

Show any trucking, transportation or other experience that may help in your work for this company _____

List special equipment or technical materials you have worked with in the past _____

## EMPLOYMENT HISTORY List *current and former employers beginning with the most recent.*

| | | |
|---|---|---|
| Employer **Universal Concrete Products** | Start Date 10/2016 | End Date 12/2017 |
| Address 400 Old Reading Pike, Pottstown, PA 19464 | Phone **610-323-0700** | |
| Job Title **Controller** | Job Responsibilities Oversee Accounting, Finance, HR, IT & Purchasing | |
| Immediate Supervisor and Title Joe O'Brien (COO) | Reason for leaving **Layoff** | |
| May we contact this reference? | Yes ● No ○ | |
| Employer **UniTek Global Services** | Start Date 02/2009 | End Date 05/2016 |
| Address 2010 Renaissance Blvd, King of Prussia, PA 19406 | Phone **(267) 464-1700** | |
| Job Title Operations Controller | Job Responsibilities • Managed all 4 UniTek businesses (including 1 in Canada) for Accounting and Finance | |
| Immediate Supervisor and Title Jeff Theisen (CFO) | Reason for leaving Layoff (contact Kathy McCarthy for Reference) | |
| May we contact this reference? | Yes ○ No ○ | |

Doc ID: 20180125160146504
Sertifi Electronic Signature

59a

| Employer General Electric Trailer Fleet Services | | Start Date 05/1997 | End Date 05/2008 |
|---|---|---|---|
| Address No longer in Business | | Phone unknown | |
| Job Title Operations Controller | Job Responsibilities Manage the Accounts Payable, General Ledger, Closing and Reporting, Fixed Assets and Account Reconciliation departments | | |
| Immediate Supervisor and Title Nancy Reinhard | Reason for leaving Layoff (I can provide her contact info) | | |
| May we contact this reference? Yes ● No ○ | | | |

## SKILLS AND QUALIFICATIONS

*Summarize any training, skills, licenses, and/or other certificates that may qualify you as being able to perform job-related functions in the position for which you are applying.*

GE Lean Training, 30 years of accounting & finance experience, Telecommunications Experience,

extesive system knowledge and excellent excel skills plus reporting expertize

## RECRUITMENT SOURCE *How did you hear about us?*

| Newspaper | Company Employee |
|---|---|
| School | Internet **Indeed** |
| Walk-in | Other |

## PROFESSIONAL REFERENCES

| Name | Phone | Years Known |
|---|---|---|
| Joe O'Brien | 262-751-3993 | 2 |
| Kathy McCarthy | 215-620-3404 | 9 |
| Kevin McClelland | 484-888-2680 | 9 |

I hereby certify that the facts set forth in the above employment application are true and complete to the best of my knowledge and authorize Velocitel, LLC to verify their accuracy and to obtain reference information on my work performance. I hereby release Velocitel, LLC any/all liability of whatever kind and nature which, at any time, could result from obtaining and having an employment decision based on such information.

I understand that, if employed, falsified statements of any kind or omissions of facts called for on this application shall be considered sufficient basis for dismissal.

I agree to submit to drug and alcohol testing, if requested by Velocitel, LLC. I release Velocitel, LLC, and its employees, plus other persons or companies, from any and all liability arising out of or related in any way to such testing.

I authorize Velocitel, LLC to investigate information concerning my education, employment experiences and all other aspects of my background relevant to my proposed employment. I release Velocitel, LLC and its employees from all liability arising from such investigation.

I understand that should an employment offer be extended to me and accepted that I will fully adhere to the policies, rules and regulations of employment of the Employer. However, I further understand that neither the policies, rules, regulations of employment nor anything said during the interview process shall be deemed to constitute the terms of an implied employment contract. I understand that any employment offered is for an indefinite duration and at will and that either I or the Employer may terminate my employment at any time with or without notice or cause.

Signature of Applicant: *Bruce A Neff*
woodie30@comcast.net

Date: 01/29/18


"Quality First"

February 7, 2018

Bruce Neff
209 Cherokee Circle
Royersford, PA 19468

**RE: Employment Offer Letter**

Dear Bruce:

Contained herein, please find for your review, a letter of employment and benefit information. This letter sets forth the terms of the offer, subject to satisfactory completion of a background investigation acceptable to the Company, which, upon your acceptance, will govern your employment.

You will be employed by QualTek USA, LLC ("Company") in the position of **Finance Manager**, reporting to the Director of Operations Finance, Shawn Kemmerer, with a commencement date of February 19, 2018. You will be required to carry out your duties faithfully, honestly, diligently and to the best of your abilities. You will be required to devote your full time and efforts to the Company. Your responsibilities will be as directed by the Company.

Your annual base salary will be **$90,000** payable under the company payroll schedule (currently bi-weekly). As a salaried, exempt employee, this annual base salary encompasses compensation for all hours worked and will be prorated to the start of your new position as outlined above.

You will be eligible to participate annually in the company bonus program. This discretionary program is based upon the Company meeting certain financial objectives as well as certain personal performance objectives that will be agreed to shortly after the onset of employment. Your annual potential bonus eligibility will be $10,000, however for 2018, it will be prorated to your start date.

You will be required to sign the Company's standard Intellectual Property, Confidentiality, Non-Competition and Non-Solicitation Agreement ("Agreement").

You will be based out of the corporate office in King of Prussia, PA.

**Paid Time Off (PTO):** of 15 days per year in accordance with Company policy.

**Benefits:** Eligible 30 days after hire date. Coverage under the Company's group health/medical plans will be effective on the 1st day of next month. You will receive an enrollment packet 2 weeks prior to eligibility period and coverage and eligibility is governed by the terms and conditions of the plan. The company currently offers a POS Choice, Balanced Choice and Choice Plus Plan. The Company currently pays a portion of the "employee" cost based on the plan the employees chooses and in accordance with Company policy.

Your employment with the Company is for an indefinite period of time and you are an employee-at-will. This means that you have the right to terminate your employment at any time for any or no reason, with or without notice, and the Company retains the same right. Any promise of employment for a definite period of time or any promise that modifies your status as an employee-at-will must be in writing and approved by the Chairman of the Company. Unless otherwise agreed in writing, and signed by the Company CEO or CAO, these provisions for termination of your employment shall continue to apply even if your position, salary, fringe benefits or other terms of your employment are changed.

**1150 1st Avenue**
**Suite 600**
**King of Prussia, PA 19406**



Upon termination of your employment, you shall immediately return all documents, information and other items (in whatever form including all copies and all originals) belonging to the Company that are in your possession, or under your control, to the offices of the Company. By signing below, you not only accept the terms and conditions of this offer, but also represent to the Company that you are under no obligation or agreement that would prevent you from becoming an employee of the Company or adversely impact your ability to perform the expected services. Specifically, you confirm by accepting this offer of employment that you have been fully released from any non-competition, non-solicitation or confidentiality agreement with any former employer containing restrictions that remain in force on the date hereof.

In the event a dispute does arise regarding your employment with the Company, including any validity interpretation, construction and performance of this letter, said dispute shall be governed by and construed in accordance with the substantive laws of the Commonwealth of Pennsylvania without regard to any conflict of law. Jurisdiction for resolution of any disputes shall be solely in Eastern District of Pennsylvania. The terms of your employment may in the future be amended, but only with written authorization, which is signed by both you and, the Chief Administrative Officer on behalf of the Company, and approved by the Chairman of the Board.

If the terms and conditions of employment are acceptable as described herein, please sign the enclosed copy of this letter and return it to me at the corporate offices in the self-addressed stamped envelope provided. If you have any questions regarding the aforementioned, please do not hesitate to contact me.

We look forward to a mutually rewarding relationship. This letter supersedes any/all other verbal or written offers.

Yours truly,

Elizabeth Downey
Chief Administrative Officer

I ACCEPT THE OFFER OF EMPLOYMENT ACCORDING TO THE TERMS SET OUT ABOVE.

DATED THIS ___19th___ DAY OF ___FEBRUARY___, 2018

_____          _____
Witness                                    Bruce Neff


"Quality First"

## NEW EMPLOYEE PAYROLL DATA FORM

### Section I – To be completed by Employee:

Name: **Bruce** **A** **Neff**    Social Security Number:
First    Middle    Last

Street Address: **209 Cherokee Circle**    City: **Royersford**    State: **PA**

Zip Code: **19468**    Phone Number: ( **610** ) **63** - **7649**

Personal Email Address: **wooble30@comcast.net**    Date of Birth:

Gender: ☑ Male ☐ Female      Marital Status: ☐ Single ☒ Married ☐ Divorced ☐ Widowed

Education: ☐ HS/GED ☐ Associate's ☒ Bachelor's ☐ Other: _____

Employee Signature: _____    Date: **02** / **19** / **18**

### Section II – To be completed by Local Office Administrator:

Date of Hire: **02** / **19** / **2018**   Rehire: ☐ Yes ☑ No   PC #: **1200**   Status: ☑ FT ☐ PT

Job Title: **Finance Manager**    Reports to: **Shawn Kemmerer**

Pay Rate: Hourly $_____ Salary $ **90,000**    Hourly ☐ Production ☐

PA Signature: _____    Date: **02** / **19** / **2018**

### Section III – To be completed by Human Resources:

File #: _____    Date Created: : **2** / **13** / **18**    Pass/Pass ☑

PTO: **15 days**    Paid Sick Leave Eligible: ☑ Yes ☐ No    Bonus Amount: **10,000**

Attended New Hire Orientation On Date Of Hire: ☑ Yes ☐ No

HR Signature: _____    Date: **2** / **19** / **18**

### Section IV – To be completed by Payroll:

Taxes: Federal: ☑ State: ☑ SUI: ☑ Local: ☑

Verified: Home Address: ☑ Yes ☐ No   Rate of Pay/Bonus: ☑ Yes ☐ No   Tax Witholding: ☑ Yes ☐ No

DD/Aline Card: ☑ Yes ☐ No   PTO/Sick: ☑ Yes ☐ No

Payroll Signature: _____    Date: **2** / **23** / **2018**

CLUS-32-5 (8-11)



# RESIDENCY CERTIFICATION FORM
## Local Earned Income Tax Withholding

**TO EMPLOYERS/TAXPAYERS:**

This form is to be used by employers and/or taxpayers to report essential information for the collection and distribution of Local Earned Income Taxes. This form must be utilized by employers when a new employee is hired or when a current employee notifies employer of a name and/or address change.

### EMPLOYEE INFORMATION - RESIDENCE LOCATION

NAME (Last Name, First Name, Middle Initial)
**NEFF BRUCE A**

SOCIAL SECURITY NUMBER

STREET ADDRESS (No PO Box, RD or RR)
**209 CHEROKEE CIRCLE**

SECOND LINE OF ADDRESS

| CITY | STATE | ZIP CODE | DAYTIME PHONE NUMBER |
|------|-------|----------|----------------------|
| ROGERSFORD | PA | 19468 | 610-613-7649 |

MUNICIPALITY (City, Borough or Township)
**SPRINGFORD**

| COUNTY | RESIDENT PSD CODE | TOTAL RESIDENT EIT RATE |
|--------|-------------------|-------------------------|
| MONTGOMERY | | |

### EMPLOYER INFORMATION - EMPLOYMENT LOCATION

EMPLOYER BUSINESS NAME (Use Federal ID Name)

EMPLOYER FEIN

STREET ADDRESS WHERE ABOVE EMPLOYEE REPORTS TO WORK (No PO Box, RD or RR)

SECOND LINE OF ADDRESS

| CITY | STATE | ZIP CODE | PHONE NUMBER |
|------|-------|----------|--------------|
| | | | |

MUNICIPALITY (City, Borough or Township)

| COUNTY | WORK LOCATION PSD CODE | WORK LOCATION NON-RESIDENT EIT RATE |
|--------|------------------------|-------------------------------------|
| | | |

### CERTIFICATION

Under penalties of perjury, I (we) declare that I (we) have examined this information, including all accompanying schedules and statements and to the best of my (our) belief, they are true, correct and complete.

| SIGNATURE OF EMPLOYEE | | DATE (MM/DD/YYYY) |
|-----------------------|--|-------------------|
| PHONE NUMBER | EMAIL ADDRESS | |

For Information on obtaining the appropriate MUNICIPALITY (City, Borough, Township), PSD CODES and EIT (Earned Income Tax) RATES, please refer to the Pennsylvania Department of Community & Economic Development website:

**www.newPA.com**



February 11, 2019

Re: Company Transfer

Bruce Neff,

Due to a recent reorganization, you have been transferred from Qualtek USA, LLC to Velocitel, LLC effective **January 1, 2019.**

Velocitel, LLC operates via a different pay schedule than Qualtek, LLC. A breakdown of your upcoming pay schedule is below:

- **February 15, 2019:** You will receive your normal bi-weekly pay for time worked from January 27th through February 9th. Your paycheck will be issued to you via direct deposit.

- **February 22, 2019:** You will receive one week's pay by direct deposit for time worked from February 10th through February 16th.

- **March 1, 2019:** You will receive one week's pay for time worked from February 17th through February 23rd. This check will be a live check that will be sent to your office location. If you would like your check mailed to a different location, please contact the Payroll Department by Monday, February 18th.

- **March 8, 2019:** You will receive one week's pay by direct deposit for time worked from February 24th through March 2nd.

- **March 22, 2019:** Your normal bi-weekly pay schedule will resume. You will receive your normal bi-weekly pay for time worked from March 3rd through March 16th. Your paycheck will be issued to you via direct deposit.

All other terms and conditions of your employment will remain unchanged. Please contact a member of the Payroll Department at 484-804-4500 or via email at payroll@qualtekservices.com with any questions or concerns.

Regards,

Kristie Marzocco
Payroll Manager                    Employee Signature_____

65a



# 2022 Annual Bonus Plan Eligibility

The QualTek 2022 Annual Bonus Plan (ABP) is intended to compensate Participants for achieving the Company's short-term business goals with high levels of performance and for individuals to share in the success of the organization. Objectives of the plan are to:

- Provide variable compensation that rewards contribution to Company success.
- Increase a collaborative team spirit among all Participants.
- Provide competitive levels of incentive compensation as part of an overall compensation package, consistent with position and level of responsibility.

**Plan Summary:**

- Each Participant in the 2022 ABP receives a target bonus opportunity that is expressed as a percentage of base salary or flat dollar amount, per the Participant's job title. The salary used for payment calculation is the base salary paid out at the beginning of the Plan year (or at the time of a salary adjustment/promotion, prorated to the effective date of the employee status change).
- Bonus achievement criteria will be made up of the target components listed in the 2022 Salary and Bonus Worksheet below. The total Company EBITDA target is 85%. This threshold must be achieved for Participants to receive an annual bonus.
- If the total Company EBITDA target is achieved, participants are eligible to receive 100% of the applicable bonus for the remaining targets if 100% of the targets are achieved. Participants will not receive the applicable bonus if the remaining targets fall below 85%. The bonus would be prorated if the target falls between 85% and 100%.
- If the target exceeds 100%, Participants can earn an additional amount on the over-performance, not to exceed a total payout of 125%.

| 2022 Salary and Bonus Worksheet – Revised | | | | |
|---|---|---|---|---|
| Name: | **Bruce Neff** | | | |
| Title: | **Director/Finance** | | | |
| Business Unit: | **QualTek Wireless** | | | |
| 2022 Salary: | **$123,375.20** | | | |
| 2022 Bonus Opportunity | **15% of base pay** | | | |

| Target Components | Company/Business Unit | Target Amount $ | Bonus Percentage | Bonus Amount $ |
|---|---|---|---|---|
| Total Company EBITA | QualTek | $100,000,000.00 | 20% | $3,701.26 |
| Market EBITDA | QualTek Wireless - National | $44,000,000.00 | 50% | $9,253.14 |
| Total Division EBITDA | QualTek Wireless | $44,000,000.00 | 20% | $3,701.26 |
| Total Company Free Cash Flow | QualTek | $26,725,813.00 | 10% | $1,850.63 |
| Total | | | 100% | $18,506.28 |
| Maximum | | | 125% | $23,132.85 |

**General Eligibility:**

- An employee's eligibility for the 2022 ABP is determined on an annual basis, based on position and employment status (only full-time employees are eligible), performance, and contributions. An employee's individual eligibility can be reduced or eliminated based on their individual performance.
- Employees hired within the Plan Year will participate on a pro-rated basis. An employee must be employed by September 30th of the Plan Year to be considered for participation in the Plan for that Year.



- Employees must be actively employed on a full-time basis on each payout date for the Plan Year to be eligible for the payment on such date.
- Effective dates and the performance period are referred to as the Plan Year. The Plan Year is the calendar year commencing on January 1 and ending on December 31st.
- The Annual Bonus Program (ABP) is provided at the discretion of the Board of Directors, which reserves the right to administer, modify, or terminate the plan at any time, with or without notice.

**By providing your signature, you acknowledge that you have read and understand the terms and conditions outlined above. Once executed, please return both pages of this document to your manager for submission to Human Resources. A copy of this document will be added to your employee file.**

*Bruce Neff*
Bruce Neff (May 17, 2022 10:54 EDT)

**Bruce Neff**

May 17, 2022

**Date**

# EXHIBIT "K"



**Colin Dougherty**
Partner
**Fox Rothschild LLP**
10 Sentry Parkway
Suite 200
Blue Bell, PA 19422-3001
(610) 397-3908 - direct
(610) 397-0450 - fax
CDougherty@foxrothschild.com
www.foxrothschild.com

---

**From:** Elizabeth Downey <edowney@qualtekservices.com>
**Sent:** July 1, 2022 6:46 AM
**To:** Dougherty, Colin <CDougherty@foxrothschild.com>
**Subject:** ███████████


**Elizabeth Downey**
Chief Administrative Officer



475 Sentry Parkway E, Suite 200
Blue Bell, PA 19422
Tel: 484.804.4505 • Mobile: 484.429.3406
email: edowney@qualtekservices.com
QualTekServices.com

---

**From:** Kelsey Griffin <kgriffin@qualtekservices.com>
**Sent:** Thursday, June 30, 2022 4:16 PM
**To:** Elizabeth Downey <edowney@qualtekservices.com>
**Subject:** Timeline

Hi Liz,

See below timelines for Lisa Carlson and Bruce Neff. Let me know if you need anything else.

**Lisa Carlson**

- 12/1/2017 – Acquired by QualTek Wireless as a Market FP&A Manager at $92,300
- 4/1/2018 – Promoted to Finance Manager at $105,000.22
- 12/21/2018 – Received bonus in the amount of $2,500.00
- 12/30/2018 – Received year end increase to $115,000.08
- 6/14/2019 – Received bonus in the amount of $2,500.00
- 1/5/2020 – Received year end increase to $118,450.28
- 1/24/2020 – Received bonus in the amount of $2,875.00
- 1/31/2020 – Termination date

**Bruce Neff**
- 2/19/2018 – Hired as Finance Manager at $90,000.04 for QualTek
- 12/21/2018 – Received bonus in the amount of $4,315.07
- 12/30/2018 – Received year end increase to $95,000.10
- 1/1/2019 – Transferred to QualTek Wireless
- 4/7/2019 – Promoted to Director of Finance at $115,000.08
- 6/14/2019 – Received bonus in the amount of $4,315.07
- 1/5/2020 – Received year end increase to $117,500.24
- 1/24/2020 – Received bonus in the amount of $4,313.00
- 1/2/2022 – Received year end increase to $123,375.20

**Kelsey Griffin**
*Director of Human Resources*
C: 610.608.0766 | O: 484.804.4520
475 Sentry Parkway E, Suite 200
Blue Bell, PA 19422



Disclaimer: This email is intended only for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you received this communication in error, please do not distribute it and notify us immediately by email (administrator@qualtekservices.com) or via telephone (484.804.4500) and delete the original message. Unless expressly stated in this email, nothing in this message or any attachment should be construed as a digital or electronic signature.

70a

# EXHIBIT "L"



"Quality First"

## QualTek USA, LLC

### EMPLOYMENT APPLICATION

| | |
|---|---|
| Position applied for: Director of Finance - Wireless | Date: 09/11/2019 |

| Name (Last) | (First) | (Middle) |
|---|---|---|
| Ebeling | Brandon | |

| Present Address (Street) | (City) | (State) | (Zip Code) |
|---|---|---|---|
| 1909 Spruce St. Apt. 1F | Philadelphia | PA | 19103 |

| Primary Phone | Alternate Phone | Social Security Number |
|---|---|---|
| 610-781-4581 | | ▉ |

| Email Address |
|---|
| bebeling01@gmail.com |

| | | |
|---|---|---|
| Have you been an employee of this organization in the past? | Yes ◯ | No ◉ |
| If yes, when? _____ | | |

| | | |
|---|---|---|
| I certify that I am a U.S. citizen, permanent resident or a foreign national with authorization to work in the United States. | Yes ◉ | No ◯ |

### EDUCATION

| Name and Location (High School, College, Other) | Years Completed | Did you graduate? | Course of Study and Degree Received |
|---|---|---|---|
| Penn State University | 5 | Yes | Master of Accounting |
| Penn State University | 5 | Yes | Bachelor of Finance |
| | | | |
| | | | |

Are you sufficiently fluent in any foreign language?  If yes, please indicate below what languages and capability (i.e. read, write, speak, etc.)
No

| | | |
|---|---|---|
| Have you ever been in the Armed Forces? | Yes ◯ | No ◉ |
| Are you currently a member of the National Guard? | Yes ◯ | No ◉ |
| Specialty _____ | Date Entered _____ | Discharge Date _____ |

Doc ID: 20190910143209487
Sertifi Electronic Signature

72a

## DRIVING EXPERIENCE

| | |
|---|---|
| Do you have a valid Driver's license? | Yes ● No ○ |
| Driver's license number ▓▓▓▓ | State of issue PA Operator ● Chauffeur ○ |
| Expiration date 03/26/2022 | Commercial (CDL) ___ |
| Have you had any accidents in the past three years? | Yes ○ No ● If so, how many? ___ |
| Have you had any moving violations in the past three years? | Yes ● No ○ If so, how many? 1 |

| CLASS OF EQUIPMENT | | | DATES (MONTH/YEAR) | | APPROX. NO. OF MILES (TOTAL) |
|---|---|---|---|---|---|
| Motorcycle | Yes ___ | No X | From ___ | To ___ | |
| Passenger Car | Yes X | No ___ | From 2006 | To Current | 100,000 |
| Pick-Up Truck | Yes ___ | No X | From ___ | To ___ | |
| Van | Yes ___ | No X | From ___ | To ___ | |
| Box Truck | Yes ___ | No X | From ___ | To ___ | |

List all states operated in the last 5 years PA and VA

Show any trucking, transportation or other experience that may help in your work for this company
None

List special equipment or technical materials you have worked with in the past
None

## EMPLOYMENT HISTORY List *current and former employers beginning with the most recent.*

| Employer PricewaterhouseCoopers | Start Date 2017 | End Date Current |
|---|---|---|
| Address 2001 Market St. | Phone (267) 330-3000 | |
| Job Title Manager | Job Responsibilities Capital Markets and Accounting Advisory Manager | |
| Immediate Supervisor and Title Brandon Campbell - Director | Reason for leaving Travel requirements | |
| May we contact this reference? Yes ○ No ● | | |

| Employer PricewaterhouseCoopers | Start Date 2014 | End Date 2017 |
|---|---|---|
| Address 1800 Tysons Blvd. | Phone (703) 918-3000 | |
| Job Title Senior Associate | Job Responsibilities Financial Services Assurance Senior Associate | |
| Immediate Supervisor and Title Dan O'Keefe | Reason for leaving Opportunity to join new group outside of audit. | |
| May we contact this reference? Yes ● No ○ | | |

Doc ID: 20190910143209487
Sertifi Electronic Signature

73a

| Employer | | Start Date | End Date |
|---|---|---|---|
| Address | | Phone | |
| Job Title | Job Responsibilities | | |
| Immediate Supervisor and Title | Reason for leaving | | |
| May we contact this reference?     Yes ◯     No ◯ | | | |

## SKILLS AND QUALIFICATIONS
*Summarize any training, skills, licenses, and/or other certificates that may qualify you as being able to perform job-related functions in the position for which you are applying.*

# Certified Public Accountant (PA & VA)

## RECRUITMENT SOURCE *How did you hear about us?*

| Newspaper | Company Employee |
|---|---|
| School | Internet |
| Walk-in | Other          Recruiter |

## PROFESSIONAL REFERENCES
| Name | Phone | Years Known |
|---|---|---|
| Alex Bevis | 267-315-4830 | 9 |
| Mohammad Muhtaseb | 610-717-7217 | 8 |
| Rebecca Byam | 917-885-1264 | 3 |

I hereby certify that the facts set forth in the above employment application are true and complete to the best of my knowledge and authorize QualTek USA, LLC to verify their accuracy and to obtain reference information on my work performance. I hereby release QualTek USA, LLC any/all liability of whatever kind and nature which, at any time, could result from obtaining and having an employment decision based on such information.

I understand that, if employed, falsified statements of any kind or omissions of facts called for on this application shall be considered sufficient basis for dismissal.

I agree to submit to drug and alcohol testing, if requested by QualTek USA, LLC. I release QualTek USA, LLC, and its employees, plus other persons or companies, from any and all liability arising out of or related in any way to such testing.

I authorize QualTek USA, LLC to investigate information concerning my education, employment experiences and all other aspects of my background relevant to my proposed employment. I release QualTek USA, LLC and its employees from all liability arising from such investigation.

I understand that should an employment offer be extended to me and accepted that I will fully adhere to the policies, rules and regulations of employment of the Employer. However, I further understand that neither the policies, rules, regulations of employment nor anything said during the interview process shall be deemed to constitute the terms of an implied employment contract. I understand that any employment offered is for an indefinite duration and at will and that either I or the Employer may terminate my employment at any time with or without notice or cause.

Signature of Applicant: *Brandon Ebeling*
bebeling01@gmail.com

Date: **9/11/19**

Doc ID: 20190910143209487
Sertifi Electronic Signature

74a



October 1, 2019

Brandon Ebeling
1909 Spruce Street #1F
Philadelphia, PA 19103

**RE: Employment Offer Letter**

Dear Brandon:

Contained herein, please find for your review, a letter of employment and benefit information. This letter sets forth the terms of the offer, subject to satisfactory completion of a background investigation and drug screen acceptable to the Company, which, upon your acceptance, will govern your employment.

You will be employed by QualTek ("Company") in the position of **Director of Finance**, reporting to the Vice President of Finance, Dave Conn, with a commencement date of **October 7, 2019**. You will be required to carry out your duties faithfully, honestly, diligently and to the best of your abilities. You will be required to devote your full time and efforts to the Company. Your responsibilities will be as directed by the Company.

Your annual base salary will be **$125,000** payable under the company payroll schedule (currently bi-weekly). As a salaried, exempt employee, this annual base salary encompasses compensation for all hours worked and will be prorated to the start of your new position as outlined above.

You will be eligible to participate annually in the company bonus program. This discretionary program is based upon the Company meeting certain financial objectives as well as certain personal performance objectives that will be agreed to shortly after the onset of employment. Your annual potential bonus eligibility will be 15% of your annual salary, however for 2019, it will be prorated to your start date.

You will be required to sign the Company's standard Intellectual Property, Confidentiality, and Non-Solicitation Agreement ("Agreement").

You will be based out of the corporate office in King of Prussia, PA.

**Paid Time Off (PTO):** of 15 days per year in accordance with Company policy.

**Benefits:** Eligible 30 days after hire date. Coverage under the Company's group health/medical plans will be effective on the 1st day of next month. You will receive an enrollment packet 2 weeks prior to eligibility period and coverage and eligibility is governed by the terms and conditions of the plan. The company currently offers a POS Choice, Balanced Choice and Choice Plus Plan. The Company currently pays a portion of the "employee" cost based on the plan the employees chooses and in accordance with Company policy.

Your employment with the Company is for an indefinite period of time and you are an employee-at-will. This means that you have the right to terminate your employment at any time for any or no reason, with or without notice, and the Company retains the same right. Any promise of employment for a definite period of time or any promise that modifies your status as an employee-at-will must be in writing and approved by the CEO of the Company. Unless otherwise agreed in writing, and signed by the Company CEO or CAO, these provisions for termination of your employment shall continue to apply even if your position, salary, fringe benefits or other terms of your employment are changed.

**1150 1st Avenue**
**Suite 600**
**King of Prussia, PA 19406**

Upon termination of your employment, you shall immediately return all documents, information and other items (in whatever form including all copies and all originals) belonging to the Company that are in your possession, or under your control, to the offices of the Company. By signing below, you not only accept the terms and conditions of this offer, but also represent to the Company that you are under no obligation or agreement that would prevent you from becoming an employee of the Company or adversely impact your ability to perform the expected services. Specifically, you confirm by accepting this offer of employment that you have been fully released from any non-competition, non-solicitation or confidentiality agreement with any former employer containing restrictions that remain in force on the date hereof.

In the event a dispute does arise regarding your employment with the Company, including any validity interpretation, construction and performance of this letter, said dispute shall be governed by and construed in accordance with the substantive laws of the Commonwealth of Pennsylvania without regard to any conflict of law. Jurisdiction for resolution of any disputes shall be solely in Eastern District of Pennsylvania. The terms of your employment may in the future be amended, but only with written authorization, which is signed by both you and, the Chief Administrative Officer on behalf of the Company, and approved by the CEO.

If the terms and conditions of employment are acceptable as described herein, please sign the enclosed copy of this letter and return it to me at the corporate offices in the self-addressed stamped envelope provided. If you have any questions regarding the aforementioned, please do not hesitate to contact me.

We look forward to a mutually rewarding relationship. This letter supersedes any/all other verbal or written offers.

Yours truly,

Elizabeth Downey
Chief Administrative Officer

I ACCEPT THE OFFER OF EMPLOYMENT ACCORDING TO THE TERMS SET OUT ABOVE.

DATED THIS _____10_____ DAY OF _October_ ____, 2019

_____
Witness

_____
Brandon Ebeling



## PERSONNEL ACTION NOTICE

4.5.2020 - KG

| | | | |
|---|---|---|---|
| **Date Created:** 3/25/20 | **Date Effective:** ~~3/29/20~~ | **Submitted by:** Dave Conn | |

**Type of Action:** ☐ Promotion  ☐ Demotion  ☐ Salary Adjustment  ☒ Transfer  ☐ Name Change (Requires Documentation)

☐ Rehire  ☐ Title Change

**Employee ID / File #:** U23701026

**Name:** Brandon Ebeling  **Manager's Name:** Dave Conn

| Salary Adjustment | Change in Position | Transfer |
|---|---|---|
| **Current Rate**  **New Rate** | **Current Position:** | **Current Location:** |
| **Hourly Rate:** $  **Hourly Rate:** $ | Director of Finance | **PC #: 1200** |
| | | **City/State: King of Prussia, PA** |
| **Tech Level:**  **Tech Level:** | **New Position:** | **New Location:** |
| **Annual Rate:** $  **Annual Rate:** $ | | **PC #: 300000** |
| | | **City/State:** King of Prussia, PA |
| **No Rate Change:** ☒ | Bonus Eligible: Yes ☐ No ☐ Bonus Amount: $ | **New Manager:** |
| | No Bonus Change: ☒ | |

**Is this Position Budgeted?**  Yes ☐ No ☐  **Reason for Additional Resource:** _____

**Is this a Replacement?**  Yes ☐ No ☐  **Replacement For:** _____

☒ Permanent Transfer

☐ Temporary Transfer  How Long? _____  Per Diem Amount: $ _____

Comments: Transferring Brandon out of QualTek and into Empire.

### APPROVALS

| | | | |
|---|---|---|---|
| **Manager** | _____ | **Date** | |
| **VP/Director** | *David Conn* | **Date** | 03 / 25 / 2020 |
| **Division CEO** | _____ | **Date** | |
| **Corporate Finance** | *Michael Michini* | **Date** | 04 / 06 / 2020 |
| **HR Director** | *Stefanie Trybula* | **Date** | 04 / 06 / 2020 |
| **COO** | _____ | **Date** | |
| **CAO** | _____ | **Date** | |

### FOR HR / PAYROLL USE ONLY

| | | | |
|---|---|---|---|
| **New Position** | Yes ☐ No ☐ | **Job Description on File** | Yes ☐ No ☐ |
| **Workforce Now Updated** | Yes ☐ No ☐ | **Work Comp Code** | _____ |
| | | **Initials:** | KG 4.6.2020 |

Page 1

Document Ref: IFK5P-VJWQU-QTBCW-KW4TT



## PERSONNEL ACTION NOTICE

| | | |
|---|---|---|
| Date Created: **01/06/2021** | Date Effective: ~~01/10/2021~~ 1.24.2021 - KG | Submitted by: **Kallie Rasp** |

**Type of Action:** ☐ Promotion ☐ Demotion ☒ Salary Adjustment ☐ Transfer ☐ Title Change | ☐ Rehire

**Employee ID / File #:** 4HP701026

**Name:** Brandon Ebeling     **Manager's Name:** David Conn

| Salary Adjustment | Change in Position | Transfer |
|---|---|---|
| **Current Rate**   **New Rate** | Current Position: | Current Location: |
| Hourly Rate:   Hourly Rate:<br>$      $ | Finance Director | PC #: 300000 |
| | | City/State: Corporate |
| Tech Level:   Tech Level: | New Position: | New Location: |
| Annual Rate:   Annual Rate:<br>$125,000.00   $150,000.00 | | PC #: |
| | | City/State: |
| No Rate Change: ☐ | Bonus Eligible: Yes ☐ No ☐ Bonus Amount: $ | New Manager: |
| | No Bonus Change: ☒ | |

Is this Position Budgeted?   Yes ☒ No ☐    Reason for Additional Resource: _____

Is this a Replacement?   Yes ☐ No ☐    Replacement For: _____

☐ Permanent Transfer

☐ Temporary Transfer    How Long?    Per Diem Amount: $

Comments: Salary increase.

### APPROVALS

| | | | |
|---|---|---|---|
| Director/VP | *David Conn* | Date | 01 / 06 / 2021 |
| Division President | | Date | |
| Division CEO | | Date | |
| Corporate Finance | *Michael Michini* | Date | 01 / 15 / 2021 |
| Human Resources | *Stefanie Trybula* | Date | 01 / 06 / 2021 |
| CAO | *Elizabeth Downey* | Date | 01 / 21 / 2021 |

### FOR HR / PAYROLL USE ONLY

| | | |
|---|---|---|
| New Position   Yes ☐ No ☐ | Job Description on File   Yes ☐ No ☐ | |
| Workforce Now Updated   Yes ☐ No ☐ | Work Comp Code _____ | |
| | Initials:   KG 1.21.2021 | |



September 21, 2021

Brandon Ebeling

**RE: Employment Offer Letter**

Dear Brandon:

Contained herein, please find for your review, a revised letter of employment.

We are pleased to extend an offer of at-will employment. Contained herein, please find for your review, an offer letter of employment. This letter sets forth the terms of the offer, subject to satisfactory completion of a background investigation and drug screen acceptable to the Company, which, upon your acceptance, will govern your employment.

You will be employed by QualTek Wireless LLC ("Company") in the full-time position of **Vice President of Finance**, reporting to Michael Michini, Executive Vice President of Finance, with a commencement date of **September 19, 2021**. You will be based out of the **Blue Bell, PA** location. You will be required to carry out your duties faithfully, honestly, diligently and to the best of your abilities. You will be required to devote your full time and efforts to the Company. Your responsibilities will be as directed by the Company.

Your annual base salary will be **$170,000** payable under the Company payroll schedule (currently bi-weekly). As a salaried, exempt employee, this annual base salary encompasses compensation for all hours worked and will be prorated to the start of your new position as outlined above.

You will be eligible to participate annually in the Company bonus program. This discretionary program is based upon the Company meeting certain financial objectives as well as certain personal performance objectives that will be agreed to shortly after the onset of employment. Your annual potential bonus eligibility will be **25% of base salary**, however for 2021, it will be prorated to your start date.

Your current benefit offerings and PTO tier will remain the same in this new position.

Your employment with the Company is for an indefinite period of time and you are an employee-at-will. This means that you have the right to terminate your employment at any time for any or no reason, with or without notice, and the Company retains the same right. Any promise of employment for a definite period of time or any promise that modifies your status as an employee-at-will must be in writing and approved by the CEO or CAO of the Company. Unless otherwise agreed in writing, and signed by the Company CEO or CAO, these provisions for termination of your employment shall continue to apply even if your position, salary, fringe benefits or other terms of your employment are changed.

Upon termination of your employment, you shall immediately return all documents, information and other items (in whatever form including all copies and all originals) belonging to the Company that are in your possession, or under your control, to the offices of the Company. By signing below, you not only accept the terms and conditions of this offer, but also represent to the Company that you are under no obligation or agreement that would prevent you from becoming an employee of the Company or adversely impact your ability to perform the expected services. Specifically, you confirm by accepting this offer of employment that you have been fully released from any non-competition, non-solicitation or confidentiality agreement with any former employer containing restrictions that remain in force on the date hereof.

In the event a dispute does arise regarding your employment with the Company, including any validity, interpretation, construction, and performance of your employment, said dispute shall be governed by and construed in accordance with the substantive laws of the Commonwealth of Pennsylvania without regard to any conflict of law. Jurisdiction for resolution of any disputes shall be solely in the state or federal courts located in the Eastern District of Pennsylvania.

475 Sentry Parkway E
Suite 200
Blue Bell. PA 19422



If the terms and conditions of employment are acceptable as described herein, please sign the enclosed copy of this letter and return a copy to the Corporate office. If you have any questions regarding the aforementioned, please do not hesitate to contact me.

We look forward to a mutually rewarding relationship. This letter supersedes any/all other verbal or written offers.

Yours truly,

Elizabeth Downey
Chief Administrative Officer

I ACCEPT THE OFFER OF EMPLOYMENT ACCORDING TO THE TERMS SET OUT ABOVE.

DATED THIS ___23___ DAY OF __September__ , 2021

_____
Witness

_____
Brandon Ebeling



## PERSONNEL ACTION NOTICE

**Proposed Effective Date:** 8/02/21    **Approved Effective Date:** 9.19.2021    **Submitted by:** **Mike Michini**

**Type of Action:** ☒ Promotion  ☐ Demotion  ☐ Salary Adjustment  ☐ Transfer  ☐ Title Change  ☐ Rehire

**Employee ID / File #:** _____    **Hire Date:** _____

**Name:** Brandon Ebeling    **Manager's Name:** Dave Conn

| Salary | | Position | Location |
|---|---|---|---|
| **Current Rate** / **New Rate** | | **Current Position:** Director of Finance | **Current Location:** PC #: City/State: |
| Hourly Rate: $ / Hourly Rate: $ | | **New Position:** VP of Finance | **New Location:** PC #: City/State: New Manager: |
| Annual Rate: $150,000 / Annual Rate: $170,000 | | | |
| No Rate Change: ☐ | | | |

**Is this Position Budgeted?**   Yes ☒ No ☐    **Reason for Additional Resource:** _____

**Is this a Replacement?**   Yes ☐ No ☒    **Replacement For:** _____

☐ Permanent Transfer

☐ Temporary Transfer    How Long? _____    Per Diem Amount: $ _____

**Comments:** Brandon has excelled since his arrival at QualTek. He has a deep understanding of Wireless finance and accounting and has been the Wireless lead on the audit, Oracle rollout, and the Wireless Project file setup and control. He will run the East.

### APPROVALS

| | | |
|---|---|---|
| Director/VP | _signatures_ | Date 7/19/21    7-19-+ |
| Corporate Finance | | Date |
| Human Resources | _signature_ | Date 7/19/21 |
| Division President/CEO | | Date |
| CAO | _signature_ | Date |

### FOR HR / PAYROLL USE ONLY

**Payroll:**
Reviewed in ADP on: 9/21/2021
Initials: SC

**Human Resources:**
Processed in ADP on: 9.21.2021
Initials: KR

*QualTek Wireless LLC*

81a



## 2022 Annual Bonus Plan Eligibility

The QualTek 2022 Annual Bonus Plan (ABP) is intended to compensate Participants for achieving the Company's short-term business goals with high levels of performance and for individuals to share in the success of the organization. Objectives of the plan are to:
- Provide variable compensation that rewards contribution to Company success.
- Increase a collaborative team spirit among all Participants.
- Provide competitive levels of incentive compensation as part of an overall compensation package, consistent with position and level of responsibility.

**Plan Summary:**
- Each Participant in the 2022 ABP receives a target bonus opportunity that is expressed as a percentage of base salary or flat dollar amount, per the Participant's job title. The salary used for payment calculation is the base salary paid out at the beginning of the Plan year (or at the time of a salary adjustment/promotion, prorated to the effective date of the employee status change).
- Bonus achievement criteria will be made up of the target components listed in the 2022 Salary and Bonus Worksheet below. The total Company EBITDA target is 85%. This threshold must be achieved for Participants to receive an annual bonus.
- If the total Company EBITDA target is achieved, participants are eligible to receive 100% of the applicable bonus for the remaining targets if 100% of the targets are achieved. Participants will not receive the applicable bonus if the remaining targets fall below 85%. The bonus would be prorated if the target falls between 85% and 100%.
- If the target exceeds 100%, Participants can earn an additional amount on the over-performance, not to exceed a total payout of 125%.

| 2022 Salary and Bonus Worksheet | | | | |
|---|---|---|---|---|
| Name: | Brandon Ebeling | | | |
| Title: | Vice President/Finance | | | |
| Business Unit: | QualTek Wireless | | | |
| 2022 Salary: | $170,000.22 | | | |
| 2022 Bonus Opportunity: | 25% of base salary | | | |
| | | | | |
| **Target Components** | **Company/Business Unit** | **Target Amount $** | **Bonus Percentage** | **Bonus Amount $** |
| Total Company EBITDA | QualTek | $100,000,000.00 | 20% | $8,500.01 |
| Market EBITDA | QualTek Wireless - East | $20,117,512.00 | 50% | $21,250.03 |
| Total Division EBITDA | QualTek Wireless | $44,000,000.00 | 20% | $8,500.01 |
| Total Company Free Cash Flow | QualTek | $26,725,813.00 | 10% | $4,250.01 |
| Total | | | 100% | $42,500.06 |
| Maximum | | | 125% | $53,125.08 |

**General Eligibility:**
- An employee's eligibility for the 2022 ABP is determined on an annual basis, based on position and employment status (only full-time employees are eligible), performance, and contributions. An employee's individual eligibility can be reduced or eliminated based on their individual performance.
- Employees hired within the Plan Year will participate on a pro-rated basis. An employee must be employed by September 30th of the Plan Year to be considered for participation in the Plan for that Year.



- Employees must be actively employed on a full-time basis on each payout date for the Plan Year to be eligible for the payment on such date.
- Effective dates and the performance period are referred to as the Plan Year. The Plan Year is the calendar year commencing on January 1 and ending on December 31st.
- The Annual Bonus Program (ABP) is provided at the discretion of the Board of Directors, which reserves the right to administer, modify, or terminate the plan at any time, with or without notice.

**By providing your signature, you acknowledge that you have read and understand the terms and conditions outlined above. Once executed, please return both pages of this document to your manager for submission to Human Resources. A copy of this document will be added to your employee file.**

*Brandon Ebeling*
Brandon Ebeling (Apr 26, 2022 13:34 EDT)

**Brandon Ebeling**

Apr 26, 2022

_____

**Date**

# EXHIBIT "M"

## Kallie Rasp

**Lauren Petzar**
Director of Human Resources
lpetzar@qualtekservices.com
1150 1st Ave, Suite 600, King of Prussia, PA 19406
📞 484-804-4511| 📱 215-510-8753

 QualTekServices.com 

**From:** Lauren Petzar
**Sent:** Wednesday, November 27, 2019 1:53 PM
**To:** Stefanie Trybula <shallman@qualtekservices.com>
**Cc:** Matt Webb <mwebb@qualtekservices.com>
**Subject:** RE: Application - Director of Finance

So I had that conversation with her when I was in MN. I told her that shared services position are in KOP. She said she is not relocating. She just purchased a home in MN.

**Lauren Petzar**
Director of Human Resources
lpetzar@qualtekservices.com
1150 1st Ave, Suite 600, King of Prussia, PA 19406
📞 484-804-4511| 📱 215-510-8753

 QualTekServices.com

**From:** Stefanie Trybula <shallman@qualtekservices.com>
**Sent:** Wednesday, November 27, 2019 1:38 PM
**To:** Lauren Petzar <lpetzar@qualtekservices.com>
**Cc:** Matt Webb <mwebb@qualtekservices.com>
**Subject:** Re: Application - Director of Finance

Is she moving here?

Sent from my iPhone

> On Nov 27, 2019, at 1:35 PM, Lauren Petzar <lpetzar@qualtekservices.com> wrote:
>
> Hi Matt,

1

85a

This is an internal candidate. Forwarding so whomever is handling the req can locate her resume. If this is a Share Services position, generally, the position is here in KOP. Lisa lives in MN. Stef and I can add more color.

<image007.png>
**Lauren Petzar**
Director of Human Resources
lpetzar@qualtekservices.com
1150 1st Ave, Suite 600, King of Prussia, PA 19406
<image003.jpg>
 484-804-4511|
<image004.png>
 215-510-8753
<image008.png>
QualTekServices.com


**From:** Lisa Carlson <lcarlson@velocitel.com>
**Sent:** Tuesday, November 26, 2019 9:17 PM
**To:** Lauren Petzar <lpetzar@qualtekservices.com>
**Subject:** Application - Director of Finance

Hi! I just wanted to let you know that I applied for the Director of Finance position that is posted 😊

Sincerely,
Lisa Carlson
Finance Manager

Velocitel LLC
6100 W 100th St
Bloomington, MN 55438
612-356-4261 Mobile
lcarlson@velocitel.com
www.velocitel.com

Disclaimer: This email is intended only for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you received this communication in error, please do not distribute it and notify us immediately by email (administrator@qualtekservices.com) or via telephone (484.804.4500) and delete the original message. Unless expressly stated in this email, nothing in this message or any attachment should be construed as a digital or electronic signature.

86a

| **From:** | Lisa Carlson |
| **Sent:** | Tuesday, December 3, 2019 11:24 AM |
| **To:** | Matt Webb |
| **Subject:** | RE: RE: Application - Director of Finance |

Sounds good! Talk to you then!!

Sincerely,
Lisa Carlson
Velocitel LLC
612-356-4261

---

**From:** Matt Webb <mwebb@qualtekservices.com>
**Sent:** Tuesday, December 03, 2019 10:12 AM
**To:** Lisa Carlson <lcarlson@velocitel.com>
**Subject:** RE: RE: Application - Director of Finance

Hi Lisa,

I'll give you a call Thursday (I saw you accepted the calendar invite). Talk soon!

Best,

Matt Webb
📞 484-804-4510  📱 215-375-5836
🅕 🅛 🅣  QualTekServices.com

---

**From:** Lisa Carlson <lcarlson@velocitel.com>
**Sent:** Tuesday, December 3, 2019 9:25 AM
**To:** Matt Webb <mwebb@qualtekservices.com>
**Subject:** RE: RE: Application - Director of Finance

Hi Matt! Thanks for reaching out to me! I'd love to speak with you further regarding this position! I have time on Thursday mid-day, Friday morning or Monday morning. Let me know which will work best for you!!! In regards to the location, will they not consider anyone outside of the QualTek KOP office? I currently do the same thing as this position for Velocitel, without issue while located in MN, and the company that this would manage is actually located in MN and I have worked with them for many years and it would be a great benefit to work with them in person. 😊 Look forward to hearing back from you! Thank you!

Sincerely,
Lisa Carlson
Velocitel LLC
612-356-4261

---

**From:** Matt Webb <mwebb@qualtekservices.com>
**Sent:** Monday, December 02, 2019 2:53 PM

1



**To:** Lisa Carlson <lcarlson@velocitel.com>
**Subject:** RE: Application - Director of Finance

Hi Lisa,

Lauren Petzar gave me a heads up that you had applied to this role. I'm the new head of recruiting and I'd be happy to set some time aside to discuss this position although I will mention that it will be located at the office in King of Prussia, PA. Can you send me a few date/ time options that work for you plus the best number to reach you? I'll check my schedule and will circle back to firm up a time to chat.

Best,

Matt Webb
Director of Recruiting
mwebb@qualtekservices.com
1150 1st Ave, Suite 600, King of Prussia, PA 19406
📞 484-804-4510  📱 215-375-5836
QualTekServices.com

**From:**        Lisa Carlson
**Sent:**        Monday, December 9, 2019 2:10 PM
**To:**        Matt Webb
**Subject:**      RE: Follow-up



Thanks Matt for following up

Sincerely,

Lisa Carlson
Velocitel LLC
612-356-4261

---

**From:** Matt Webb <mwebb@qualtekservices.com>
**Sent:** Monday, December 09, 2019 12:04 PM
**To:** Lisa Carlson <lcarlson@velocitel.com>
**Subject:** Follow-up

Hi Lisa,

I want to close the loop on our conversation from last week. I did confirm that the Director role must be based out of QualTek HQ. If you want to discuss, please give me a call.

Best,

Matt Webb
Director of Recruiting
mwebb@qualtekservices.com
1150 1st Ave, Suite 600, King of Prussia, PA 19406
📞 484-804-4510   📱 215-375-5836
  QualTekServices.com

| **From:** | Lauren Petzar |
|---|---|
| **Sent:** | Thursday, February 13, 2020 11:21 AM |
| **To:** | Kallie Rasp |
| **Subject:** | FW: Application - Director of Finance |

**Lauren Petzar**
Director of Human Resources
lpetzar@qualtekservices.com
1150 1ˢᵗ Ave, Suite 600, King of Prussia, PA 19406
📞 484-804-4511| 📱 215-510-8753

QualTekServices.com 



**From:** Lauren Petzar
**Sent:** Wednesday, November 27, 2019 1:36 PM
**To:** Lisa Carlson <lcarlson@velocitel.com>
**Subject:** RE: Application - Director of Finance

Thanks for the email! I let recruiting know.

**Lauren Petzar**
Director of Human Resources
lpetzar@qualtekservices.com
1150 1ˢᵗ Ave, Suite 600, King of Prussia, PA 19406
📞 484-804-4511| 📱 215-510-8753

 QualTekServices.com



**From:** Lisa Carlson <lcarlson@velocitel.com>
**Sent:** Tuesday, November 26, 2019 9:17 PM
**To:** Lauren Petzar <lpetzar@qualtekservices.com>
**Subject:** Application - Director of Finance

Hi! I just wanted to let you know that I applied for the Director of Finance position that is posted 😊

Sincerely,
Lisa Carlson
Finance Manager

Velocitel LLC
6100 W 100ᵗʰ St
Bloomington, MN 55438
612-356-4261 Mobile
lcarlson@velocitel.com
www.velocitel.com

90a

Disclaimer: This email is intended only for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you received this communication in error, please do not distribute it and notify us immediately by email (administrator@qualtekservices.com) or via telephone (484.804.4500) and delete the original message. Unless expressly stated in this email, nothing in this message or any attachment should be construed as a digital or electronic signature.

91a

# EXHIBIT "N"



**January 24, 2020**
**Human Resources Discussion w/ Lisa Carlson (Finance Manager)**

**Participants:**
Stefanie Trybula (VP of Human Resources), Dave Conn (VP of Finance – Wireless), and Shawn Kemmerer (Director of Finance – Wireless and Lisa's manager)

**Purpose:**
On January 23, 2020 Lisa sent an email to Human Resources questioning the amount of the discretionary 2019 bonus that she was scheduled to receive on January 24th. Stefanie responded reminding Lisa that all bonuses paid by the company are discretionary. Lisa then responded stating that the amounts were unfairly calculated. Stefanie, Dave, and Shawn contacted Lisa via phone to discuss her response further.

**Discussion:**
Shawn opened the discussion by reiterating that all bonuses issued by the company are discretionary. Shawn also recapped what was in the bonus notification email (sent by Dave Conn on behalf of Kevin Doran, CEO of QualTek Wireless), stating that the company did not hit their numbers for 2019; the Board of Directors agreed to pay a partial bonus. Shawn also explained that the Velocitel business specifically, which Lisa is a part of, significantly underperformed.

Lisa responded stating that the way the bonus was calculated was not fair. Stefanie asked Lisa why she felt this way. Lisa asked for the conversation to be documented and again insisted the bonus payments were not fair. Stefanie explained to Lisa that that is her perception; and reiterated that the company did not hit the expected targets, Velocitel especially, and that the Board approved a small for 2019 performance. Stefanie went on to state that most people in Velocitel had an expectation of a $0 bonus and that all of the feedback we have received regarding the issuance of the 2019 bonus was positive, most people were very thankful. Stefanie stated that she found it disappointing that a few people were not thankful for having received a bonus.

Lisa said she understood that the company did not perform and that Velocitel specifically did not have a good year but continued to insist that the bonus amounts were not fair. Stefanie then explained that we are working to streamline the bonus structure for bonus eligible employees and that we are currently awaiting 2020 targets from the Board of Directors. Stefanie also noted that this information would be communicated to employees upon receipt.

Lisa said that she had to get on another conference call in a few minutes. Stefanie began to wrap up the conversation by stating that the 2019 bonus was discretionary, the company did not hit their numbers, and it is what it is. Stefanie also explained that she did not have anything further to discuss for the above reasons.

**Drafted by Stefanie Trybula**

# EXHIBIT "O"

**Shawn Kemmerer**
Director of Finance – QualTek Wireless
Office: 484-804-4594    Mobile: 484-269-8120

**From:** David Conn <dconn@qualtekservices.com>
**Sent:** Friday, January 31, 2020 1:55 PM
**Subject:** Wireless Corporate Finance Restructure

Hello Team,

In order to best support our Operations Teams, we have reorganized the structure of the Wireless Corporate Finance Team. This is effective immediately and the transition has begun, though we expect it will take a little bit of time for everyone to settle into their new roles, be introduced to the people within their new regions and cross-train with the other members of our team. Our goal is to make this transition seamless to our Ops partners. You will be contacted soon by your respective Director and FAs to introduce themselves to you and discuss the go forward plan, if you don't already know them.

`hawn Kemmerer and also Adrian Mantini will be supporting the West Region while we continue to integrate and then they will train and be replaced by a permanent Director. Shawn will then transition to a new position within Wireless Finance dealing with Financial Planning and Analysis and reporting.

The final budgets have been approved and those will also be sent to the respective market leaders for review.

MR call days and times will not change as of now but the people on the calls may, as they will begin to transition into their new responsibilities.

Let's embrace this change and overcommunicate with each other over the next few weeks and months. I believe the support structure we have in place will allow for very strong and effective relationships between Operations and Finance for 2020 and beyond. The Wireless division of QualTek is the largest and has many goals for the year - I believe we have the proper team to achieve them all. We in Finance look forward to working closely and successfully with each of you. We anticipate many spirited and successful discussions and collaborations through our weekly rhythm calls and we vow to provide timely and accurate reporting to review and measure results.

Below is the breakdown of the Finance Teams supporting the three new regions.

As always, please feel free to reach out with any questions or concerns.

Best,
Dave

**East Region:**

Director of Finance – Brandon Ebeling

Financial Analysts – Tori Beideman, Jeremy Reese, Jim Champion, Cody Wenitsky, Ryan Paul

Markets – New England Turf, Ohio/PA Turf, Upstate NY Turf, EPA Turf, VA/WV Turf, Virginia Non-Turf, Aerial, SiteSafe, RI Legacy (Florida/NC/VA), Georgia

**Central Region:**

Director of Finance – Bruce Neff
Financial Analysts – Michelle Kneisl, Todd Rogers, TBD
Markets – VL markets (Neenah, Illinois, Wanamingo, RMR, Texas), MNP Turf, Texas

**West Region:**
Director of Finance – Shawn Kemmerer/Adrian Mantini
Financial Analysts – Zack Van Loon, Dorjan Dheskali, Derrickus Spratlin
Markets – Vinculums Turf markets (NoCal, SoCal, PNW), PNW Turf (VTEL), Any Legacy VTEL Non-Turf (DSW, SoCal)

Ben Sydnes will be taking a role supporting all of our Systems Integrations.
Lisa Carlson is no longer with the company. Please redirect any items you directed to her in the past to Kayla Lorenzen and Shawn Kemmerer for the near future. Kayla will transition to a role supporting the National Billing/Unbilled efforts for Wireless.

**Dave Conn** | Vice President of Finance



**1150 1st Avenue, Suite 600, King of Prussia, PA 19406**

Mobile: 856.404.0921
Office: 484.804.4556
email: dconn@qualtekservices.com

Disclaimer: This email is intended only for the use of the individual or entity to which it is addressed, and may contain information that is privileged confidential and exempt from disclosure under applicable law. If you received this communication in error, please do not distribute it and notify us immediately by email (administrator@qualtekservices.com) or via telephone (484.804.4500) and delete the original message. Unless expressly stated in this email, nothing in this message or any attachment should be construed as a digital or electronic signature.

96a

# EXHIBIT "P"

| | |
|---|---|
| **From:** | Lauren Petzar |
| **Sent:** | Thursday, February 13, 2020 11:20 AM |
| **To:** | Kallie Rasp |
| **Subject:** | FW: Lisa Carlson - 1.23.2020 |

**Lauren Petzar**
Director of Human Resources
lpetzar@qualtekservices.com
1150 1st Ave, Suite 600, King of Prussia, PA 19406
📞 484-804-4511| 📱 215-510-8753

QualTekServices.com 

 **From:** Lauren Petzar
**Sent:** Thursday, January 23, 2020 2:55 PM
**To:** Stefanie Trybula <shallman@qualtekservices.com>
**Subject:** Lisa Carlson - 1.23.2020

Hi Stef,

I spoke with Lisa Carlson today. Per Lisa, she is upset due to the Finance reorg. She said "I have the right of mind to tell them "Yes, I will move to PA." and she said I bet they still wouldn't give me the Director role.". She said I am very upset today and needed to take a mental health day. She said she feels like Michini is leading this charge and Dave Conn is just following his direction.

Thank you,

 **Lauren Petzar**
Director of Human Resources
lpetzar@qualtekservices.com
1150 1st Ave, Suite 600, King of Prussia, PA 19406
📞 484-804-4511| 📱 215-510-8753
 QualTekServices.com

1

98a

## Kallie Rasp

**Lauren Petzar**
Director of Human Resources
lpetzar@qualtekservices.com
1150 1st Ave, Suite 600, King of Prussia, PA 19406
📞 484-804-4511 | 📱 215-510-8753

 QualTekServices.com 

**From:** Lauren Petzar
**Sent:** Thursday, January 23, 2020 9:24 AM
**To:** Lisa Carlson <lcarlson@velocitel.com>
**Subject:** RE: Availability

Hi Lisa,

As a follow up to my voicemail, let me know if you would like to speak with Stef or I. Hope all is OK.

**Lauren Petzar**
Director of Human Resources
lpetzar@qualtekservices.com
1150 1st Ave, Suite 600, King of Prussia, PA 19406
📞 484-804-4511 | 📱 215-510-8753

 QualTekServices.com

**From:** Lisa Carlson <lcarlson@velocitel.com>
**Sent:** Wednesday, January 22, 2020 12:57 PM
**To:** Lauren Petzar <lpetzar@qualtekservices.com>
**Subject:** Re: Availability

Hi Lauren! Just wanted to follow up on something, did you or Stef mention any of this conversation to Dave or Mike or anyone else? Thanks! Hope you're having a great day!!!

**From:** Lisa Carlson
**Sent:** Tuesday, October 22, 2019 10:47:44 AM
**To:** Lauren Petzar <lpetzar@qualtekservices.com>
**Subject:** RE: Availability

No problem! Thank you!

Sincerely,
Lisa Carlson

1

99a

**From:** Lauren Petzar <lpetzar@qualtekservices.com>
**Sent:** Tuesday, October 22, 2019 10:24 AM
**To:** Lisa Carlson <lcarlson@velocitel.com>
**Subject:** Re: Availability

Hi Lisa,

Sorry for the delay. That's fine! I let stef know and she got the cancellation.

Lauren Petzar
Director of Human Resources
Qualtek USA, LLC
484-804-4500

> On Oct 21, 2019, at 9:01 AM, Lisa Carlson <lcarlson@velocitel.com> wrote:

> Good morning, I'd like to cancel tomorrow's meeting with Stef for now, if possible. Want to wait a bit and see how things go with my trips out there before talking with her. Thank you so much for your help and coordination with this!!

> Sincerely,
> Lisa Carlson
> Velocitel LLC
> 612-356-4261

> **From:** Lauren Petzar <lpetzar@qualtekservices.com>
> **Sent:** Wednesday, October 16, 2019 4:46 PM
> **To:** Lisa Carlson <lcarlson@velocitel.com>
> **Subject:** RE: Availability

> Hi Lisa,

> Stef has some time tomorrow and Friday. Should I schedule some time in?

> <image002.png>
> **Lauren Petzar**
> Director of Human Resources
> lpetzar@qualtekservices.com
> 1150 1st Ave, Suite 600, King of Prussia, PA 19406
> <image003.jpg>
>  484-804-4511|
> <image004.png>
>  215-510-8753
> <image006.png>
> QualTekServices.com

**From:** Lauren Petzar
**Sent:** Tuesday, October 15, 2019 11:27 AM
**To:** Lisa Carlson <lcarlson@velocitel.com>
**Subject:** RE: Availability

Hi Lisa,

Are you sure you want to wait? Why don't we get a call going and if there is follow up with can handle in person.

<image008.png>
**Lauren Petzar**
Director of Human Resources
lpetzar@qualtekservices.com
1150 1st Ave, Suite 600, King of Prussia, PA 19406
<image003.jpg>
 484-804-4511|
<image004.png>
 215-510-8753
<image006.png>
QualTekServices.com

**From:** Lisa Carlson <lcarlson@velocitel.com>
**Sent:** Tuesday, October 15, 2019 10:56 AM
**To:** Lauren Petzar <lpetzar@qualtekservices.com>
**Subject:** RE: Availability

Hello! It sounds like I'll be travelling to KOP in the next couple weeks, so, if possible, could we wait until I'm out there? Thank you!!! I really appreciate you taking the time to speak with me!

Sincerely,
Lisa Carlson
Velocitel LLC
612-356-4261

**From:** Lauren Petzar <lpetzar@qualtekservices.com>
**Sent:** Monday, October 14, 2019 3:29 PM
**To:** Lisa Carlson <lcarlson@velocitel.com>
**Subject:** Availability

Hi Lisa,

As a follow up to our conversation on Thursday, what is your availability like this week to speak with Stef?

<image011.png>
**Lauren Petzar**
Director of Human Resources
lpetzar@qualtekservices.com
1150 1st Ave, Suite 600, King of Prussia, PA 19406
<image003.jpg>
 484-804-4511|

3

101a

<image004.png>
 215-510-8753
<image006.png>
QualTekServices.com

# EXHIBIT "Q"

| **From:** | Stefanie Trybula |
| --- | --- |
| **Sent:** | Monday, January 27, 2020 8:22 AM |
| **To:** | Lisa Carlson |
| **Cc:** | David Conn; Shawn Kemmerer |
| **Subject:** | RE: Bonus issue |

Lisa,

Thank you for your time on Friday morning.  As discussed, the Company is in the process of streamlining the bonus structure for all bonus eligible employees.  We are awaiting the 2020 approved targets from the Board of Directors.  The 2019 bonus was discretionary, as all bonuses are; however the 2019 bonus was paid at a reduced amount, due to the overall performance of the Company.

Regards,
Stefanie

**Stefanie Trybula**
Vice President of Human Resources
strybula@qualtekservices.com
1150 1ˢᵗ Ave, Suite 600, King of Prussia, PA 19406
📞 484-804-4517| 📱 610-517-7483
QualTekServices.com 🇫 🇮🇳 🇹



**From:** Lisa Carlson <lcarlson@velocitel.com>
**Sent:** Friday, January 24, 2020 9:38 AM
**To:** Stefanie Trybula <shallman@qualtekservices.com>
**Cc:** Shawn Kemmerer <skemmerer@empiretelecomm.com>; David Conn <dconn@qualtekservices.com>; Kristie Marzocco <kmarzocco@qualtekservices.com>; Lauren Petzar <lpetzar@qualtekservices.com>
**Subject:** RE: Bonus issue

Stefanie, I am echoing Kayla's concerns and would like to understand how these were fairly calculated and determined that one person qualifies for a higher payout than another. This is the 2ⁿᵈ year that I have been shorted on the correct bonus payout, compared to what %s were paid to other employees and my counterparts.

Sincerely,
Lisa Carlson
Velocitel LLC
612-356-4261

**From:** Stefanie Trybula <shallman@qualtekservices.com>
**Sent:** Friday, January 24, 2020 7:18 AM
**To:** Lisa Carlson <lcarlson@velocitel.com>
**Cc:** Shawn Kemmerer <skemmerer@empiretelecomm.com>; David Conn <dconn@qualtekservices.com>; Kristie Marzocco <kmarzocco@qualtekservices.com>; Lauren Petzar <lpetzar@qualtekservices.com>
**Subject:** RE: Bonus issue

Lisa,

I am aware that the discretionary bonus amount listed in your offer letter is 20k.  Please note that Kevin's email regarding the bonus explained that our Board of Directors approved a reduced bonus for the 2019 calendar year, as the Company did not achieve the appropriate thresholds to pay out a full bonus.  Additionally, please be advised that Human Resources did not determine the bonus amounts that were issued to employees.  You were approved for a gross amount of $2,875.

Regards,
Stefanie

**Stefanie Trybula**
Vice President of Human Resources
strybula@qualtekservices.com
1150 1st Ave, Suite 600, King of Prussia, PA 19406
📞 484-804-4517| 📱 610-517-7483
QualTekServices.com

---

**From:** Lisa Carlson <lcarlson@velocitel.com>
**Sent:** Thursday, January 23, 2020 2:12 PM
**To:** Kristie Marzocco <kmarzocco@qualtekservices.com>; Lauren Petzar <lpetzar@qualtekservices.com>; Stefanie Trybula <shallman@qualtekservices.com>
**Cc:** Shawn Kemmerer <skemmerer@empiretelecomm.com>
**Subject:** Bonus issue

My bonus was calculated off off the wrong amount. My bonus is 20k, not 11k. Please have the correct amount deposited tomorrow. Thank you!



| **From:** | Kayla Lorenzen |
|---|---|
| **Sent:** | Friday, January 24, 2020 9:22 AM |
| **To:** | Stefanie Trybula |
| **Cc:** | Lisa Carlson; Shawn Kemmerer; David Conn; Lauren Petzar; Kristie Marzocco |
| **Subject:** | RE: Bonus Concern |
| | |
| **Importance:** | High |

Stefanie – I understand they may be discretionary and that they were partially paid out.

My concerns and issues are the following:

1. My base bonus is less than 50% of my male counterparts with the same title
2. My base bonus is less than the analyst bonus and my own direct report
3. My direct reports have the same job/title and yet the African American males bonus is 1/5 of the others and less than half of the junior analyst bonus.

Please help me understand how these were fairly calculated and how it was determined that one person is entitled to a higher percentage payout than another.

<span style="color:blue">Thank you,</span>



<span style="color:blue">Kayla Lorenzen
612-655-0594 (M)
952-944-1858 x 144 (O)</span>

**From:** Stefanie Trybula <shallman@qualtekservices.com>
**Sent:** Friday, January 24, 2020 7:31 AM
**To:** Kayla Lorenzen <klorenzen@velocitel.com>
**Cc:** Lisa Carlson <lcarlson@velocitel.com>; Shawn Kemmerer <skemmerer@empiretelecomm.com>; David Conn <dconn@qualtekservices.com>; Lauren Petzar <lpetzar@qualtekservices.com>; Kristie Marzocco <kmarzocco@qualtekservices.com>
**Subject:** RE: Bonus Concern

Kayla,

Please note that any bonus issued by the Company is discretionary. The email that came from Kevin Doran regarding the payout of the 2019 bonus clearly explained that the Board of Directors approved a reduced bonus for the 2019 calendar year, as the Company did not achieve the appropriate thresholds to pay out a full bonus. Human Resources was not responsible for determining the bonus amounts that were issued to employees. You were approved for a gross amount of $348.

Regards,
Stefanie

**Stefanie Trybula**
Vice President of Human Resources
<span style="color:blue">strybula@qualtekservices.com</span>

1150 1ˢᵗ Ave, Suite 600, King of Prussia, PA 19406
📞 484-804-4517| 📱 610-517-7483
QualTekServices.com 

---

**From:** Kayla Lorenzen <klorenzen@velocitel.com>
**Sent:** Thursday, January 23, 2020 2:15 PM
**To:** Lauren Petzar <lpetzar@qualtekservices.com>; Stefanie Trybula <shallman@qualtekservices.com>; Kristie Marzocco <kmarzocco@qualtekservices.com>
**Cc:** Lisa Carlson <lcarlson@velocitel.com>
**Subject:** RE: Bonus Concern
**Importance:** High

Additionally – I was just informed that the correct bonus percentage is 25% and my teams are incorrect. Derrickus Spratlin should match Michelle Kneisl. Therefore, they should each be receiving $1250.00 and I should be receiving $1875.00.

Please resolve ASAP.

Thank you,

Kayla Lorenzen
612-655-0594 (M)
952-944-1858 x 144 (O)

---

**From:** Kayla Lorenzen
**Sent:** Thursday, January 23, 2020 12:49 PM
**To:** Lauren Petzar <lpetzar@qualtekservices.com>; Stefanie Trybula <shallman@qualtekservices.com>; Kristie Marzocco <kmarzocco@qualtekservices.com>
**Cc:** Lisa Carlson <lcarlson@velocitel.com>
**Subject:** Bonus Concern
**Importance:** High

Hello Stefanie and Lauren – I have an issue with my bonus.

To my knowledge the finance supervisor bonus is $7500.00. My bonus check is $348 pre-tax. My team got 22% which would mean mine should be around $1650.00

Can you please advise on why this happened or what is going on? I would like this resolved asap.

Thank you,

**Kayla Lorenzen**
Finance Supervisor

![velocitel complete wireless solutions]

**Velocitel**
6100 W 110ᵗʰ St.
Bloomington, MN 55438
Mobile: 612-655-0594

107a

Email:         KLorenzen@velocitel.com
Website:   www.velocitel.com

Disclaimer: This email is intended only for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you received this communication in error, please do not distribute it and notify us immediately by email (administrator@qualtekservices.com) or via telephone (484.804.4500) and delete the original message. Unless expressly stated in this email, nothing in this message or any attachment should be construed as a digital or electronic signature.

# EXHIBIT "R"

Change Password | Sign out | Reload Database Settings | Choose a locale [English (US)]



**Employee Portal**

**HR Portal**

**Manager Portal**

**Manage Locales**

**Support Tools**

Resources

2018 Manager Training

2018 Performance Management Guidelines & Timeline

Instruction for Managers

Instructions for Employees

2018 Rating Scale

Human Resources Contacts

Performance Appraisal Best Practices for Managers



**HR Form**

**Annual Performance Review**

[Print] [Close]

View this review in another language: [English (US) ▼]

**Form Status: Finalized**

## 2018 Performance Review Process

The Performance Review process applies to all employees hired prior to March 1, 2018 with the exception of technicians and piece rate employees.

The Performance Review process will begin on September 24, 2018 and will end in December 2018.  Reviews are based on an employee's performance from October 1, 2017 through September 30, 2018.

Please contact Human Resources with any questions or email your inquiries to EPM@QualTekServices.com.

| Review Guidelines | |
|---|---|
| **Rating** | **Description** |
| N/A = Too New to Rate | Employee has not been in the position long enough to rate performance. |
| 1 = Unsuccessful/Unacceptable Performance | Performance fails to meet minimum expectations for this role; immediate and sustained improvement is required. |
| 2 =Partially Successful Performance/Needs Improvement | Performance does not consistently meet or occasionally falls below what is required of the position; improvement in specific areas is required. |
| 3 = Fully Successful/Effective Performance | Performance consistently meets the critical requirements of the position, continually achieves preset goals and performs with distinction. Incumbent performance is reliable and consistent in adding value to the work unit. |
| 4 = Superior/Highly Effective Performance | Performance is continually and consistently superior and regularly goes beyond what is expected. An exceptional contributor whose performance exceeds expectation on a consistent and sustainable basis. |

| 5 = Distinguished Performance and Role Model Status | Clearly and consistently demonstrates extraordinary and exceptional accomplishment in all major areas of responsibility. Performed above and beyond expectations under exceptional circumstances during the review period. Others rarely equal performance of this caliber in similar roles. |
| --- | --- |

## Review Period

| | |
| --- | --- |
| **Begin** | Sunday, January 01, 2017 |
| **End** | Sunday, December 31, 2017 |
| **Due Date** | Friday, March 16, 2018 |

## Employee Information

| | | | |
| --- | --- | --- | --- |
| **First Name:** | Lisa | **Title:** | Manager, Market FP&A |
| **Last Name:** | Carlson | **Reports to:** | Dana Freedman |
| **Anniversary Date:** | Monday, November 08, 2010 | | |

## Values                                                                            Hide All

Honesty and integrity is at the core of all we do.  We make difficult decisions and accept responsibility.  We adhere to the policies and guidelines that have been established for the Company.  We are committed to fostering a climate for success and for providing a safe and pleasant work environment for all employees.

### Integrity & Ethics

Integrates ethics and value-based principles into the management of people and processes. Makes transparent decisions without favoritism or bias. Makes and upholds decisions that are ethical regardless of opposition. Safeguards company resources, and ensures compliance with internal controls.

**Employee Rating:**   (n/a)

**Manager Rating:**   4

**Employee Comment:**

**Manager Comment:**

Lisa is always looking for the right answer regardless of what the outcome is.  She is ethical in all decisions and behaviors.  Her sense of responsibility to the company is very high, constantly striving to improve processes and help increase visibility to results.

## Safety

Embraces safety as a core value. Demonstrates knowledge of internal and external health and safety regulations. Complies with all company policies and procedures to maintain a safe workplace. Completes required health and safety training, wears necessary protective equipment as appropriate, and follows emergency procedures.

**Employee Rating:** (n/a)

**Manager Rating:** 3

**Employee Comment:**

**Manager Comment:**

Lisa meets all safety guidelines.

## Functional

[ Hide All ]

We possess the knowledge and skills that are required to do our jobs successfully. We thoughtfully implement and utilize processes, technology, and tools to yield desired results. We accept challenges, persevere, and grow and learn from our errors.

### Judgment & Decision Making

Analyzes and critically questions information, utilizing insights to identify root causes and possible solutions. Demonstrates ability to see 'big picture' as opposed to constrained, positional viewpoint. Considers short and long-term consequences of decisions.

**Employee Rating:** (n/a)

**Manager Rating:** 5

**Employee Comment:**

**Manager Comment:**

Lisa quickly can understand the true purpose of the task at hand and works to make sure she finds the right solution. She also works to make sure that even on what may be a one-time analysis, she is designing her work in such a way that it can be reused in the future. This helps to maintain consistency in the long-term.

### Results Oriented

Provides focused and committed effort, especially during critical moments, to consistently deliver business results. Recommends ways to improve processes and eliminate non-value-added work. Engages and collaborates with team members and other colleagues in developing goals and plans to meet deliverables.

**Employee Rating:** (n/a)

**Manager Rating:** 4

**Employee Comment:**

**Manager Comment:**

Lisa's commitment is unquestionable. She has consistently gone above and beyond to drive results and design new processes. Her efforts also helped drive the due diligence process and a successful sale. She has also been instrumental in transition to Qualtek.

### Self-Management & Accountability

Sets well-defined and realistic goals and displays a high level of initiative. Maintains realistic perspective of self-worth and ability. Manages time effectively and consistently meets deadlines. Deals effectively with pressure, and remains focused and persistent in response to setbacks or adversity. Holds self and others accountable for actions and decisions. Follows through on commitments. Accepts constructive feedback as necessary and learns from mistakes.

**Employee Rating:** (n/a)

**Manager Rating:** 4

**Employee Comment:**

**Manager Comment:**

Lisa knows when to ask questions and seek guidance but she is also very self driven. She always meets deadlines and deals with extreme pressure coming from all sides. She takes initiative and drives processes independently.

**Customer Orientation**

Delivers highest quality of service for internal and external customers. Seeks to understand specific nature of internal and/or external customer needs. Considers customers' long-term interests when providing service. Resolves customer disputes and complaints quickly and effectively. Provides recommendations for improving customer service.

**Employee Rating:** (n/a)

**Manager Rating:** 4

**Employee Comment:**

**Manager Comment:**

Lisa deals with internal customers at all levels, from PC to CEO. She is able to evaluate each request and provide a timely and accurate response. In many cases her response to a question is turned into an ongoing process, which she manages without issue.

---

**Interpersonal** | Hide All

We work as a team, listen, and respond honestly and constructively to the ideas of others. We provide assistance, information, and support to others as needed. We reinforce, express gratitude, and appreciation for the contributions of others.

**Communication**

Promotes culture of open communication (open door policy). Appropriately persuades and influences others to build consensus and further organizational goals. Creates and develops networks to strengthen partnerships.

**Employee Rating:** (n/a)

**Manager Rating:** 4

**Employee Comment:**

**Manager Comment:**

Lisa's communication skills are fantastic. She works to create partnerships with coworkers at all levels and communicates her findings without being combatative.

**Relationship Building**

Creates and/or collaborates with strategic alliances to achieve larger, departmental and/or company objectives. Removes barriers to collaboration. Champions principles of diversity and equality, and works to leverage diversity to achieve key business objectives.

**Employee Rating:** (n/a)

**Manager Rating:** 4

**Employee Comment:**

**Manager Comment:**

Lisa was awarded Employee of the Month in MNP this year based on her relationships and willingness to help all in the office. She is well-liked by all who work with her.

---

**Leadership**    Hide All

We don't stop at the first right answer; we focus on new ways to create solutions. We are aware that we can influence change and positively make efforts to do so. We have a clear and distinct vision and seek ways to transfer that vision to action. We are respected leaders among our peers.

**Supervision**

Motivates staff and builds staff morale. Provides clear direction on task, goals, and projects. Gives clear, honest feedback and promptly addresses poor performance. Provides staff with ongoing tools and support.

**Employee Rating:** (n/a)

**Manager Rating:** 4

**Employee Comment:**

**Manager Comment:**

Lisa supervised one analyst in 2017, Kayla Lorenzen. Kayls is a strong performer and Lisa has worked very well to help Kayla learn and grown in her new role.

**Change Management**

Acts as a catalyst for change and understands drivers for change in the Company's strategy. Seeks ways to improve profitability, growth, and competitive edge by reacting to marketplace changes and opportunities. Ensures changes are effectively implemented through strong leadership and change sponsorship.

**Employee Rating:** (n/a)

**Manager Rating:** 5

**Employee Comment:**

**Manager Comment:**

Lisa has been a champion of the change with the acquisition. She communicates her excitement and has assuaged the fears of many in her office. She is never tethered to something because "that's how it was always done". She is constantly looking for ways to improve processes and herself.

## Overall Assessment

The overall rating is an average rating of the scores given above on the competencies.

**Employee Overall rating is:** (n/a)

**Manager Overall rating is:** 4.10

Additional Comments:

**Employee Comment:**

**Manager Comment:**

Lisa is an outstanding employee whose commitment to the company is unquestionable. She is without a doubt one of the most valuable employees in Finance as a whole. She was instrumental in gathering data for the due diligence efforts and has been a key to transition post-acquisition. I enjoy working with her tremendously and hope to see even more opportunity for her in 2018.

**HR Comment:**

### Actions for the review of Lisa Carlson

Close

*Close this form and return to the portal.*

Print

*View this review form in a printer-friendly format.*





## Employee Portal

## HR Portal

## Manager Portal

## Manage Locales

## Support Tools

### Resources

2018 Manager Training

2018 Performance Management Guidelines & Timeline

Instruction for Managers

Instructions for Employees

2018 Rating Scale

Human Resources Contacts

Performance Appraisal Best Practices for Managers



**HR Form**

**Annual Performance Review**

[Print] [Close]

View this review in another language: [English (US) ▾]

**Form Status: Finalized**

**2018 Performance Review Process**

The Performance Review process applies to all employees hired prior to March 1, 2018 with the exception of technicians and piece rate employees.

The Performance Review process will begin on September 24, 2018 and will end in December 2018. Reviews are based on an employee's performance from October 1, 2017 through September 30, 2018.

Please contact Human Resources with any questions or email your inquiries to EPM@QualTekServices.com.

| Review Guidelines | |
|---|---|
| **Rating** | **Description** |
| N/A = Too New to Rate | Employee has not been in the position long enough to rate performance. |
| 1 = Unsuccessful/Unacceptable Performance | Performance fails to meet minimum expectations for this role; immediate and sustained improvement is required. |
| 2 =Partially Successful Performance/Needs Improvement | Performance does not consistently meet or occasionally falls below what is required of the position; improvement in specific areas is required. |
| 3 = Fully Successful/Effective Performance | Performance consistently meets the critical requirements of the position, continually achieves preset goals and performs with distinction. Incumbent performance is reliable and consistent in adding value to the work unit. |
| 4 = Superior/Highly Effective Performance | Performance is continually and consistently superior and regularly goes beyond what is expected. An exceptional contributor whose performance exceeds expectation on a consistent and sustainable basis. |

117a

| | Clearly and consistently demonstrates extraordinary and exceptional accomplishment in all major areas of responsibility. Performed above and beyond expectations under exceptional circumstances during the review period. Others rarely equal performance of this caliber in similar roles. |
|---|---|
| 5 = Distinguished Performance and Role Model Status | |

## Review Period

| Begin | Sunday, October 01, 2017 |
|---|---|
| End | Sunday, September 30, 2018 |
| Due Date | Friday, December 14, 2018 |

## Employee Information

| First Name: | Lisa | Title: | Manager, Finance |
|---|---|---|---|
| Last Name: | Carlson | Reports to: | Shawn Kemmerer |
| Anniversary Date: | Monday, November 08, 2010 | | |

## Values

Hide All

Honesty and integrity is at the core of all we do. We make difficult decisions and accept responsibility. We adhere to the policies and guidelines that have been established for the Company. We are committed to fostering a climate for success and for providing a safe and pleasant work environment for all employees.

### Integrity & Ethics

Integrates ethics and value-based principles into the management of people and processes. Makes transparent decisions without favoritism or bias. Makes and upholds decisions that are ethical regardless of opposition. Safeguards company resources, and ensures compliance with internal controls.

**Employee Rating:** (n/a)

**Manager Rating:** 3

**Employee Comment:**

**Manager Comment:**

**Safety**

Embraces safety as a core value. Demonstrates knowledge of internal and external health and safety regulations. Complies with all company policies and procedures to maintain a safe workplace. Completes required health and safety training, wears necessary protective equipment as appropriate, and follows emergency procedures.

**Employee Rating:** (n/a)

**Manager Rating:** (n/a)

**Employee Comment:**

**Manager Comment:**

---

**Functional**                                    Hide All

We possess the knowledge and skills that are required to do our jobs successfully.  We thoughtfully implement and utilize processes, technology, and tools to yield desired results.   We accept challenges, persevere, and grow and learn from our errors.

**Judgment & Decision Making**

Analyzes and critically questions information, utilizing insights to identify root causes and possible solutions. Demonstrates ability to see 'big picture' as opposed to constrained, positional viewpoint. Considers short and long-term consequences of decisions.

**Employee Rating:** (n/a)

**Manager Rating:** 4

**Employee Comment:**

**Manager Comment:**

Lisa is very methodical and analytical. She can be a key contributor to both detailed, data-driven conversations and also high-level, business-wide conversations.

### Results Oriented

Provides focused and committed effort, especially during critical moments, to consistently deliver business results. Recommends ways to improve processes and eliminate non-value-added work. Engages and collaborates with team members and other colleagues in developing goals and plans to meet deliverables.

**Employee Rating:** (n/a)

**Manager Rating:** 4

**Employee Comment:**

**Manager Comment:**

Lisa's work ethic is unmatched. The existing wireless environment is wrought with consistent change and adaptability needs. It is growing rapidly and Finance is expected to maintain the status quo without much additional support. Lisa does a great job in this very difficult environment.

### Self-Management & Accountability

Sets well-defined and realistic goals and displays a high level of initiative. Maintains realistic perspective of self-worth and ability. Manages time effectively and consistently meets deadlines. Deals effectively with pressure, and remains focused and persistent in response to setbacks or adversity. Holds self and others accountable for actions and decisions. Follows through on commitments. Accepts constructive feedback as necessary and learns from mistakes.

**Employee Rating:** (n/a)

**Manager Rating:** 4

**Employee Comment:**

**Manager Comment:**

Self-management is a key skill required particularly within the Corporate Finance umbrella in a decentralized location. Lisa maintains weekly, monthly, and quarterly rhythms with a very high level of thoroughness in the face of much adversity with system issues, personnel issues, and consolidation continuity issues. Lisa's ability to prioritize with little assistance or oversight is an absolute asset to her, me, and the company.

### Customer Orientation

Delivers highest quality of service for internal and external customers. Seeks to understand specific nature of internal and/or external customer needs. Considers customers' long-term interests when providing service. Resolves customer disputes and complaints quickly and effectively. Provides recommendations for improving customer service.

**Employee Rating:** (n/a)

**Manager Rating:** 3

**Employee Comment:**

**Manager Comment:**

---

## Interpersonal                                    Hide All

We work as a team, listen, and respond honestly and constructively to the ideas of others.  We provide assistance, information, and support to others as needed.  We reinforce, express gratitude, and appreciation for the contributions of others.

### Communication

Promotes culture of open communication (open door policy). Appropriately persuades and influences others to build consensus and further organizational goals. Creates and develops networks to strengthen partnerships.

**Employee Rating:** (n/a)

**Manager Rating:** 3

**Employee Comment:**

**Manager Comment:**

### Relationship Building

Creates and/or collaborates with strategic alliances to achieve larger, departmental and/or company objectives. Removes barriers to collaboration. Champions principles of diversity and equality, and works to leverage diversity to achieve key business objectives.

**Employee Rating:** (n/a)

**Manager Rating:** 3

**Employee Comment:**

**Manager Comment:**

## Leadership

Hide All

We don't stop at the first right answer; we focus on new ways to create solutions. We are aware that we can influence change and positively make efforts to do so. We have a clear and distinct vision and seek ways to transfer that vision to action. We are respected leaders among our peers.

### Supervision

Motivates staff and builds staff morale. Provides clear direction on task, goals, and projects. Gives clear, honest feedback and promptly addresses poor performance. Provides staff with ongoing tools and support.

**Employee Rating:** (n/a)

**Manager Rating:** 3

**Employee Comment:**

**Manager Comment:**

Lisa cares about the responsibilities of her team and her team members themselves. Lisa is great at laying groundwork and structure for the department deliverables that her team can work within. This will become particularly important as Wireless Finance looks to achieve and establish best practices across all sub-processes.

### Change Management

Acts as a catalyst for change and understands drivers for change in the Company's strategy. Seeks ways to improve profitability, growth, and competitive edge by reacting to marketplace changes and opportunities. Ensures changes are effectively implemented through strong leadership and change sponsorship.

**Employee Rating:** (n/a)

**Manager Rating:** 5

**Employee Comment:**

**Manager Comment:**

Lisa was critical for the implentation of Oracle for legacy Velocitel. The project itself was a major change for the company and Lisa was the biggest reason it succeeded. She is committed to ensuring the other Wireless businesses successfully transition to Oracle.

### Overall Assessment

The overall rating is an average rating of the scores given above on the competencies.

**Employee Overall rating is:** (n/a)

**Manager Overall rating is:** 3.56

122a

Additional Comments:

**Employee Comment:**

**Manager Comment:**

Lisa has a versatile skillset that will lend very well to the growth of the Wireless division. In 2019, I look forward to spending a lot more time with the Wireless Finance leaders, especially Lisa, to help develop best practices among MR management, Unbilled management, Field Finance management, PACE and Norad financial management, and any other key metrics we identify. Lisa deserves thanks for her exceptional effort in 2018 and I am happy to be working her in 2019.

**HR Comment:**

## Actions for the review of Lisa Carlson

Close

*Close this form and return to the portal.*

Print

*View this review form in a printer-friendly format.*

©2012 Jakoba Software

**JAKOBA**
SOFTWARE

Performance Management 2019 January 12, 2020

# Carlson, Lisa

6FIN06 - Manager/Finance
305000 - National SG&A Legacy Velocitel

**Reviewed by Kemmerer, Shawn**

**Review Period**
October 01, 2018 - September 30, 2019

---

**Rating Scale**

---

**5 5 = Distinguished Performance and Role Model Status**
Clearly and consistently demonstrates extraordinary and exceptional accomplishment in all major areas of responsibility. Performed above and beyond expectations under exceptional circumstances during the review period. Others rarely equal performance of this caliber in similar roles.

**4 4 = Superior/Highly Effective Performance**
Performance is continually and consistently superior and regularly goes beyond what is expected. An exceptional contributor whose performance exceeds expectation on a consistent and sustainable basis.

**3 3 = Fully Successful/Effective Performance**
Performance consistently meets the critical requirements of the position, continually achieves preset goals and performs with distinction. Incumbent performance is reliable and consistent in adding value to the work unit.

**2 2 = Partially Successful Performance/Needs Improvement**
Performance does not consistently meet or occasionally falls below what is required of the position; improvement in specific areas is required.

**1 1 = Unsuccessful/Unacceptable Performance**
Performance fails to meet minimum expectations for this role; immediate and sustained improvement is required.

---

| **Competency 1 of 10** | **Integrity &amp; Ethics** | **Weighted at 10%** |
|---|---|---|

**Develops and maintains the highest standards of ethics and integrity; demonstrates a sense of responsibility to the Company and its stakeholders**

**Reviewer Response**

 **3 = Fully Successful/Effective Performance**

Lisa works day-in and day-out ensuring our revenue recognition methods are accurate and our company financials are sound. We have encountered errors in our methodologies over time as project circumstances change and evolve, but she has adapted to those changes once they were made aware to her.

---

| **Competency 2 of 10** | **Customer Orientation** | **Weighted at 10%** |
|---|---|---|

**Delivers highest quality of service for internal and external customers and resolves customer complaints timely and effectively**

**Reviewer Response**

**3** **3 = Fully Successful/Effective Performance**

Lisa is very prompt and direct when managing external clients and is always exceptionally quick to address any QualTek-level inquiries or issues.

| Competency 3 of 10 | Judgement &amp; Decision Making | Weighted at 10% |
|---|---|---|

**Exercises excellent judgment in all aspects of the execution of job duties**

**Reviewer Response**

 **4 = Superior/Highly Effective Performance**

Lisa's decision making ability is beyond the expectations of her role. Often times when discussing a certain issue or question, she reaches my desired conclusion on her own without my help.

| Competency 4 of 10 | Strategic Thinking | Weighted at 10% |
|---|---|---|

**Looks towards the broadest possible view of an issue or challenge; demonstrates the ability to manage and explore alternatives to the status quo**

**Reviewer Response**

 **4 = Superior/Highly Effective Performance**

Our financial processes are subject to much scrutiny on a weekly, monthly, quarterly basis. Lisa needs to navigate the thought-processes of extremely detail-oriented, individual project-level financials and also company-wide objectives beyond just legacy-Velocitel AT&T Turf financials. She does more than hold her own.

| Competency 5 of 10 | Self-Management &amp; Accountability | Weighted at 10% |
|---|---|---|

**Utilizes time effectively, organizes and prioritizes tasks, and consistently meets deadlines; holds self and others accountable for actions and decisions, accepts constructive feedback, and learns from mistakes**

**Reviewer Response**

 **4 = Superior/Highly Effective Performance**

Lisa is very self-sufficient. I am consistently pulled in many directions, which sometimes means Lisa may go a few days without communicating with me. This is a non-issue as she pushes her team to consistently meet deadlines, and quicker than any other group. Oftentimes, these deadlines are consistently met while I use Lisa and some of her team members to perform duties to help other teams or assist with other system-related projects.

---

| **Competency 6 of 10** | **Communication** | **Weighted at 10%** |
|---|---|---|

**Identifies and utilizes effective communication channels and methods**

**Reviewer Response**

 **3 = Fully Successful/Effective Performance**

Lisa can communicate effectively to all levels of the organization. She always crafts clear and concise emails and pounces on any inquiries directed to her or her team.

---

| **Competency 7 of 10** | **Building Collaborative Relationships** | **Weighted at 10%** |
|---|---|---|

**Creates and collaborates with strategic alliances to achieve larger, department, and/or Company objectives; removes barriers to collaboration**

**Reviewer Response**

 **3 = Fully Successful/Effective Performance**

Lisa is very much a team-player. She has assimilated herself and her team members seamlessly with the legacy-Empire finance group and they continue to collaborate effectively.

---

| **Competency 8 of 10** | **Managing People** | **Weighted at 10%** |
|---|---|---|

**Models behavior that supports the Company's vision; motivates team and builds morale, provides staff with ongoing tools and support, and deals effectively with difficult people or situations**

**Reviewer Response**

 **3 = Fully Successful/Effective Performance**

Lisa provides a very supportive environment to foster positive growth. Her dedication to her team is admirable. She is also very prompt in dealing with mistakes made by her team, especially those that affect others.

---

| **Competency 9 of 10** | **Developing People** | **Weighted at 10%** |
|---|---|---|

**Invests time in managing and developing individuals; provides clear and honest feedback and promptly address poor performance**

**Reviewer Response**

 **4 = Superior/Highly Effective Performance**

Lisa takes great pride and care in developing her team. She develops strong connections with them and then uses that connection to build them into well-rounded team members. She is truly an advocate for each of them and personally invests herself in their success.

| Competency 10 of 10 | Change Management | Weighted at 10% |
|---|---|---|

**Is open to new ideas, perspectives, strategies, and positions; acts as a catalyst for change and understands drivers for change in the Company's strategy**

**Reviewer Response**

 **4 = Superior/Highly Effective Performance**

Lisa is the first person I go to when it comes to discussing updates or changes to our routines. She always has great ideas and is highly adaptable.

## Summary

 Overall Rating
**3 = Fully Successful/Effective Performance**

**3.5** Competency
100% of Overall Rating

**Reviewer Overall Comments**

Lisa provides tremendous value to the National Wireless finance team. She has great excel skills and has valuable and relevant AT&T Turf experience. She is generally excited about providing financial feedback to the business and invests more than her fair share of time to ensure our collective success.

## Signatures

_____
**Employee Signature**

_____
**Date**

_____
**Reviewer Signature**

_____
**Date**

_____
**Human Resources Signature**

_____
**Date**

# EXHIBIT "S"



COURT REPORTING

LEGAL VIDEOGRAPHY

VIDEOCONFERENCING

TRIAL PRESENTATION

MOCK JURY SERVICES

LEGAL TRANSCRIPTION

COPYING AND SCANNING

LANGUAGE INTERPRETERS





NAEGELI
DEPOSITION & TRIAL

CELEBRATING
40
YEARS IN BUSINESS

(800) 528-3335
NAEGELIUSA.COM

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

LISA CARLSON,
2805 243rd Avenue Northwest
St. Francis, MN 55070

     Plaintiff,

v.                           CIVIL ACTION
                             No.: 2:22-cv-00125

QUALTEK, LLC
1150 First Avenue, Suite 600
King of Prussia, PA 19406

     Defendant.

_____

**VIDEOCONFERENCE DEPOSITION OF**

**ELIZABETH DOWNEY**

**TAKEN ON**
**THURSDAY, JUNE 30, 2022**
**12:16 P.M.**

**PENNSYLVANIA**

1 has to do with in a minute, okay, Colin?  If you

2 just be patient.  And by the way, I can't see you

3 when you go like this.

4     **Q.   Did you make decisions about whether or**

5 **not Lisa Carlson should be a director?**

6     A.   I opined.

7     **Q.   Beg your pardon?**

8     A.   I was not the final decision-maker in that

9 matter. The decision was made before it came to me.

10     **Q.   Okay.  Why don't we take a step back.  The**

11 **decision not to make Lisa Carlson a director was**

12 **made before it came to you.  So who made it before**

13 **it came to you?**

14     A.   Well, there are multiple people that are

15 involved in that decision, including the ops team,

16 the finance team, the HR team and then I'm the final

17 signature on the pen.

18     **Q.   Okay.  That's fine.  Why don't we repeat**

19 **the question.  Who made the decision?  Who, meaning**

20 **people as opposed to committees who don't have**

21 **names.  Who made the decision that Lisa Carlson was**

22 **not to be a director before the final decision came**

23 **to you?**

24     A.   What's the time frame that you're

25 referencing, please?

1      Q.    The time frame -- the time frame would be

2  from the time that David Conn brought her name

3  forward to be a director and that would be -- that

4  would be after Dana Freedman left, in fact, shortly

5  after Dana Freedman left and she had taken over all

6  of those duties.  And a memo went to HR from David

7  Conn.  I'm just trying to find the exact document,

8  which I may have upstairs.  So one second.

9             MR. DOUGHERTY:  I'm objecting to the form

10  of the question.  I'm also objecting to the fact

11  that it assumes facts not in evidence but the facts

12  are contrary --

13             MR. KOLMAN:  I can't understand a word

14  you're saying.

15             MR. DOUGHERTY:  Well, I'll put my mic back

16  on and it'll reverb.

17             MR. KOLMAN:  I still can't understand a

18  word you're saying.

19             MR. DOUGHERTY:  I object to the form of

20  the question.  I object to the facts -- assumes

21  facts that are not in evidence.  It also --

22             MR. KOLMAN:  Okay.

23             MR. DOUGHERTY:  -- Dave Conn's testimony.

24             MR. KOLMAN:  It's a speaking objection.

25             Please don't.

1          **MR. DOUGHERTY:**  And you haven't actually

2    asked the question.

3          **MR. KOLMAN:**  No, because I'm responding to

4    her question as to when it was.

5          **Q.    This would be March of 2018.**

6          A.    Well, there --

7          **Q.    Around that time.**

8          A.    -- would have been no reason for Lisa --

9          **(THERE WAS AN OFF-THE-RECORD DISCUSSION)**

10         A.    You referenced Dana Freedman.  Dana

11   Freedman's position was not being replaced so there

12   was no position available to make Lisa a director at

13   that time.

14         **Q.    And where is the memo stating that her**

15   **position is not being replaced.  Is there such a**

16   **memo?**

17         A.    No idea.

18         **Q.    You have no idea?  Have you looked for**

19   **one?**

20         A.    No.

21         **Q.    Did you get our discovery requests?**

22         A.    We did.

23         **Q.    Okay.  And did you look at them?**

24         A.    I did.

25         **Q.    And did you go looking for documents**

1  pursuant to responding to those --

2      A.    We did.

3      Q.    -- discovery requests?

4      A.    We turned everything over that was

5  requested that we had.

6      Q.    Okay.  Just wait, there's no question

7  before you. There will be in a minute.

8          You remember the initial disclosures that

9  you're -- you're obligated to give over documents,

10 and in fact, you did, pursuant to the initial

11 disclosure requirement of Federal Court, remember

12 that?

13     A.    I remember the request when it came in,

14 yes.

15     Q.    And you -- were you involved in gathering

16 together the documents pursuant to your duties, by

17 "your" I mean, QualTek's duties to turn over

18 documents?

19     A.    I did not gather them.

20     Q.    And who did?

21     A.    The HR team.

22     Q.    Sorry, who?

23     A.    The human resources team.

24     Q.    Okay.  And when you say the human

25 resources team, we are talking about presumably an

1  **individual and I'm asking which individual are we**

2  **talking about?**

3      A.   No, I would not presume it was an

4  individual, it was a team.

5      **Q.   And who is on the team that was**

6  **responsible for gathering the documents?**

7      A.   At the time, and I don't recall exactly

8  the time that the request came in, but certainly

9  Stephanie Trybula.

10     **Q.   Okay.  You don't recall when it came in,**

11 **so you don't know who on the team actually**

12 **responded, you just say the team responded, is that**

13 **correct?**

14     A.   No, I said the team gathered.

15     **Q.   Okay.  The team gathered it, but you don't**

16 **know who on the team gathered it, correct?**

17     A.   Correct.

18     **Q.   So after they gathered all those**

19 **documents, did they then give those documents to you**

20 **for your review?**

21     A.   Yes.

22     **Q.   And did you actually have a meeting with**

23 **the team or a member of the team to determine**

24 **whether or not there had been a full and complete**

25 **disclosure in respect to your duties?**

1    A.    Sorry.   Yes.

2    Q.    And then pursuant to that after they were

3  sent to counsel, et cetera, et cetera they were

4  ultimately sent to us.

5          Now, in the documents with respect to Dana

6  Freedman's position not being replaced, I have to

7  tell you I haven't seen any document that reflects

8  that decision and you say that was the decision.

9  And my question is, if that was the decision, would

10  there be any written document anywhere that would

11  reflect that that was indeed the decision of the

12  company?

13    A.    No.

14    Q.    So in fact, a decision to replace someone

15  like Dana Freedman it wouldn't exist anywhere, there

16  wouldn't be, I mean, this is I understand your

17  answer, so I'm not trying to -- I'm just trying to

18  qualify your answer so I understand.   So there

19  wouldn't be any email and there would be no

20  memorandum and there would be no ultimate resolution

21  if you will that Dana Freedman's position should be

22  eliminated, am I correct?

23    A.    Correct.   To the best of my knowledge

24  nothing of the sort exists.

25    Q.    So how would everyone or anyone know that

1  **her position was, in fact, being eliminated if**

2  **there's no written reflection of it?**

3      A.   Because we have a shared services model

4  and corporate positions were out of the corporate

5  office in Pennsylvania.

6      **Q.   Okay.  Now, did -- okay, that's fine.  And**

7  **is there a document that reflects what you just**

8  **said, that all corporate -- I guess, it's all**

9  **persons employed by corporate finance are out of the**

10 **office in Pennsylvania.  Is there a document that**

11 **reflects that anywhere?**

12     A.   No, I didn't say just corporate finance.

13 I said we had a shared services platform and that

14 platform operates -- the back office operates out of

15 the Pennsylvania office.

16     **Q.   And what does that really mean, if you can**

17 **explain it to me as a layperson, the back office**

18 **operates out of Pennsylvania.  First of all, what is**

19 **the back office that you're referring to?**

20     A.   So the shared services platform is a

21 structure, essentially that we set up many, many

22 years ago that's been extremely effective for us.

23 It means, when we say back office, kind of the back

24 office functions of HR, risk and safety, payroll,

25 finance, accounting, fleet, facilities, IT are based

1  in a centralize environment.  In this case, it was

2  the King of Prussia office, now it's Blue Bell,

3  Pennsylvania.  When we hire people for those

4  positions they're in the corporate office.

5      **Q.    But not all of them are in the corporate**

6  **office, some of them actually commute.  Some of them**

7  **are not in the corporate office, I mean, some of**

8  **them connect in remotely, correct?**

9      A.    No.

10     **Q.    None of them connect in remotely?  What**

11 **about billing?  Your billing department's in**

12 **Syracuse, New York.**

13     A.    No.

14     **Q.    Why aren't -- why aren't they in the**

15 **corporate office?**

16     A.    Because billing at the time of this

17 acquisition that we're referring to in 2017 when

18 Lisa came on board, was an operations function, and

19 it was a Velocitel function that was in East

20 Syracuse.  So when we do acquisitions we leave

21 everything as is and migrate to a shared services

22 environment.  The company's -- most companies that

23 we have do not have a back office, which is why we

24 do it.  Velocitel was the first one where we tried

25 to have (connection faltered).  It didn't work.  It

1  did not fit our model.  It just didn't work.

2  Billing was an operations function that was not a

3  corporate -- we should try something different here.

4       Q.    But so your billing department's no longer

5  in Syracuse, is that correct?

6       A.    We have billers in Syracuse.

7       Q.    But I thought you said it didn't -- it

8  didn't work out because I thought you said that you

9  kept it because that's the way it was when Velocitel

10  was acquired, but it doesn't work out so I thought

11  you said that that was now --

12       A.    No.

13       Q.    -- going to be --

14       A.    I don't think you understand our

15  structure.

16       Q.    Oh, I understand the structure fine.

17       A.    No, I don't think you do.

18       Q.    Okay.  You know what --

19       A.    Otherwise you wouldn't be --

20       Q.    -- Ms. Downey --

21       A.    -- so confused.

22       Q.    Ms. Downey, please -- please try not to be

23  adversarial towards me.

24       A.    I am not.  I'm trying not to get

25  frustrated because your questions --

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM
140a

1    Q.   Well, you --

2    A.   -- are not well-structured and you're not

3  understanding what I'm trying to explain --

4    Q.   Well, my understanding is based on a prior

5  deposition, so if I'm incorrect about it, I

6  appreciate your input.

7        Let me ask you this.  When Dana Freedman

8  was employed, she was employed for a period of time

9  after the acquisition of Velocitel, is that correct?

10   A.   Yes, about three months.

11   Q.   And during those three months she was not

12 actually based in Blue Bell, correct?  She actually

13 lived in Illinois, is that right?

14   A.   The Velocitel corporate office was in

15 Illinois. They still have that office open and

16 that's where she reported to.

17   Q.   Okay.  Let me answer that.  Let me ask the

18 question again.  She actually lived in Illinois, did

19 you know that?

20   A.   I'll admit to that, sure.  She lived in

21 Illinois.

22   Q.   And then she would come to Blue Bell on as

23 many occasions as is necessary, is that correct?

24   A.   No.  We didn't have the Blue Bell office

25 then.

1    Q.    Your office was, you know, King of

2   Prussia, sorry. She came as many times as was

3   necessary several times a month?

4    A.    I'm aware of it.

5    Q.    You're aware of that.  Was there ever any

6   criticism of Ms. Freedman in not being able to do

7   her job because she was resident in Illinois, if you

8   know?

9    A.    I don't know.  She wasn't here long enough

10  but we never had conversations Dana.

11   Q.    Was Ms. Freedman terminated from her

12  employment?

13   A.    She resigned to pursue a job that was

14  closer to her home.

15   Q.    The answer is no, she wasn't, right?

16   A.    Well, everybody's terminated when they

17  leave, but her reason for leaving was she resigned.

18   Q.    Okay.  She resigned.  The -- QualTek did

19  not fire her, maybe that's a simpler question for

20  you to answer. QualTek did not fire her, correct?

21   A.    Correct.

22   Q.    So she was working for three months out of

23  a home in Illinois.  Now --

24   A.    Excuse me, I'm not aware that she worked

25  from her home.  We were told she reported in to

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM
142a

1 their corporate office every day which became an

2 office location for us in Illinois.

3    **Q.    Okay.  Well, the reason I'm raising it is**

4 **because according to what I've learned, QualTek**

5 **requires each and every employee to be resident in**

6 **Pennsylvania, is that correct?**

7    A.    No, that is not correct.

8    **Q.    Okay.  Then it requires each and every**

9 **employee of corporate finance to be in Pennsylvania,**

10 **is that correct?**

11    A.    A resident of Pennsylvania, no, that's not

12 correct.

13    **Q.    They require -- they are required to be in**

14 **the office physically in Pennsylvania?**

15    A.    So let me explain the shared service model

16 for you again.  In our environment it was very

17 collaborative and still is.  We did not allow people

18 to work from home.  In the corporate office everyone

19 showed up here every single day and reported to work

20 in King of Prussia, we are now in the Blue Bell

21 office.  We have 80 offices throughout the country.

22 People report into those other offices throughout

23 the country.  The corporate office reports to the

24 corporate office.  We did not allow people to work

25 from home. Velocitel had an environment where they

1  did, but that was not ours.  We bought Velocitel; we

2  were migrating them to our environment.

3      Q.    Did -- did you ever tell Lisa Carlson that

4  she would have a job if she actually worked in the

5  corporate office?

6      A.    I did not.

7      Q.    Do you know if anyone said to her the

8  reason why you're not going to be a director is

9  because you are resident in Minnesota and you won't

10  move?

11      A.    I know that there were conversations with

12  Lisa asking her if she would be interested in

13  moving.  I don't know who had those conversations or

14  when they occurred, but the answer was no interest

15  in moving to Pennsylvania.

16      Q.    So you say you know that conversations

17  were had. You don't know who made them or had them

18  but you know what the answer is, am I correct?

19      A.    Correct.

20      Q.    And how do you know all this considering

21  you don't know it firsthand?

22      A.    Well, because I have meetings with people

23  in the office all the time.

24      Q.    Okay.  And are you saying that what you

25  just testified to was pursuant to a meeting that you

1   had or more than one meeting?

2        A.    I'm saying there were conversations

3   surrounding Lisa obviously, and I may have even

4   asked the question, if she wanted to move to

5   Pennsylvania.  No, we've had those conversations,

6   she's not willing to move to Pennsylvania. We had

7   those conversations with many people.

8        Q.    Okay.  I forgot to tell you not to

9   speculate, that's my fault.  Please don't speculate.

10  When you say I may have had a conversation it really

11  doesn't help the record be clear.  Either you know

12  you had it or you don't know you had it, but you may

13  have had it just doesn't help much.

14            Are there any notes that you took

15  concerning Lisa reflecting any meeting that you ever

16  had with any member of the team or any employee of

17  QualTek concerning her employment at QualTek after

18  QualTek acquired Velocitel?

19       A.    No.

20       Q.    And are you -- would it be fair to say

21  that you have a lot of meetings every -- every day

22  because of your administrative responsibilities?

23       A.    I have many meetings.

24       Q.    And would it be fair to say that despite

25  the fact that you have many meetings you effectively

1 **don't have a protocol for determining which meetings**

2 **you're going to memorialize and which you're not?**

3      A.    No, I typically don't take notes in any of

4 my meetings anymore.

5      Q.    **And so how do you remember everything that**

6 **you've spoken about and everything everyone's**

7 **contributed after a meeting?**

8      A.    I have conversations with my teams.

9      Q.    **That's really not my question.   My**

10 **question is, how do you remember or recall**

11 **everything that's happened in a meeting and what**

12 **other people have said in meeting if you don't have**

13 **notes that reflect that?**

14      A.    I have my memory and my conversations with

15 my team.   I don't have notes.

16      Q.    **So you, in fact, let me be clear, take no**

17 **notes whatsoever and rely on your memory and the**

18 **memory of your teams, is that correct?**

19      A.    Most times.

20      Q.    **When you say, "most times," well, what**

21 **times do you not?**

22      A.    In case I'm in a board meeting and the

23 board has a specific request, I may take a note on

24 that to make sure I follow up on it.

25      Q.    **And that's about it, is that right?**

1    A.    There are ad hoc meetings all the time,

2  sir.  I can't tell you that I have a definitive I

3  take notes for this one but not for that one.  I'm

4  stating in general, I don't take notes in my

5  meetings.

6    Q.    Okay.  So you have many meetings, some of

7  them are ad hoc.  Some of them you take notes for,

8  some of them you don't.  What is your criteria for

9  determining that notes should be -- should be taken

10  or not taken, do you have some kind of internal

11  principle that governs whether notes should be taken

12  or not?

13    A.    No.

14    Q.    So you just decide right then and there

15  whether you're going to take notes or not, just as a

16  matter of a determination right then and there for

17  whatever reason because you don't say what the

18  reason is, would that be fair?

19    A.    Sure.

20    Q.    Do you recall that Lisa Carlson was

21  advanced by Dave Conn as a replacement for Dana

22  Freedman?  Do you remember ever seeing that

23  document?

24    A.    No.

25    Q.    Do you ever remember a meeting that you

 1  had with Dave Conn regarding Ms. Carlson and what

 2  her position might be in the company after Dana

 3  Freedman left?

 4      A.   No.

 5      Q.   Did you ever have a conversation with

 6  Shawn Kemmerer about the future of Lisa Carlson's

 7  career after Dana Freedman left?

 8      A.   Well, I think Shawn Kemmerer wasn't

 9  involved with Lisa in 2018.  I don't believe Shawn

10  Kemmerer had anything to do with Lisa until the

11  following year.  So I don't know what --

12      Q.   So the answer would be no.  The answer

13  would be no in that regard, but in the sense that --

14  did Shawn Kemmerer ever bring complaints to you

15  about the fact that Lisa Carlson believed that she

16  was not being compensated fairly?

17      A.   No.

18      Q.   Did you ever hear of such complaints from

19  anyone in HR, either Lauren Petzar or Stephanie

20  Trybula or anyone else?

21      A.   Compensation as far as pay or a bonus?

22      Q.   Pay and bonus.

23      A.   Never anything on pay.  I believe there

24  was an issue on her bonus where she felt she didn't

25  receive enough of a bonus.



1      Q.    You believe there is an issue.  Actually,

2  my question was whether or not you heard about these

3  complaints from anyone in HR, not the nature of the

4  complaint necessarily, that would be my next

5  question, but whether you heard about the complaints

6  instead of saying I believe there was an issue.  How

7  do you know there was an issue, by the way?

8      A.    Well, I guess I have a clarifying question

9  again.  I sat in on Stephanie Trybula's deposition

10  yesterday where I heard this line of questioning so

11  I don't know -- I'm a little confused, did I hear it

12  in the questioning yesterday or if you're asking me

13  did Stephanie bring it to me at some point in time,

14  yes she did as a matter of record.  But no --

15      Q.    No, I understand that you are definitely

16  confused. Let me make it clear.  I think the

17  question was clear. Forgetting about the deposition

18  for a minute, and whatever you learned or didn't

19  learn is not relevant to what I'm asking.  I'm

20  asking if in your capacity as being in charge of HR

21  initially, whether a complaint regarding -- a

22  complaint made by Lisa Carlson with respect to

23  either her disparate -- her arguing that she was

24  paid less than men, or a problem with her bonus,

25  whether that was accelerated to you or escalated to

1  **you at the very time or close to the time that she**

2  **was making the complaint.  Is there anything not**

3  **clear about the question?**

4       A.    Let me -- I'll answer your question.  Very

5  clear, that was fine.  Thank you.

6            The issue of her bonus was indeed brought

7  up to me by Stephanie Trybula.  She advised me that

8  Lisa had complained saying that she didn't get

9  enough of a bonus. There was never an issue about a

10 man versus woman to my knowledge as far as pay goes.

11 The issue with the bonus was Lisa felt that she

12 didn't get enough when the truth is, it was a

13 discretionary bonus.  The wireless team did not hit

14 a number across the board and should have gotten

15 zero and we had to go and fight and scrape for every

16 dollar that we gave to people.  And it was

17 distributed in conjunction with the division heads

18 who said this is the amount that people should get.

19 We had a very limited number to give to people and

20 frankly, it should have been a zero.

21      Q.    And thank you for that.  And where is all

22 **the documentation backing up what you just said**

23 **about the performance and about the resolution that**

24 **QualTek was apparently being generous and that**

25 **everyone should have got zero?  Are there emails**

1  that reflect that?

2      A.    There was a meeting in New York --

3      Q.    **Okay.  Just wait.  Just wait.  Are there**

4  **emails --**

5      A.    You asked me a question.

6      Q.    **Just --**

7      A.    No.

8      Q.    **No, the question is, are there emails that**

9  **reflect that?  I didn't ask about a meeting, I**

10  **simply asked are there emails that reflect that --**

11     A.    Well --

12     Q.    **-- nothing more.  I will get to a meeting,**

13  **I will. You'll get to answer the question, but I'm**

14  **just asking, are there emails that reflect that?**

15     A.    There are emails that reflect the

16  financials. There are emails that reflect this is

17  how much the bonus is to be paid.  There is not an

18  email that would say you should get a zero.

19     Q.    **Okay.  And these emails that exist, can**

20  **you tell me who they are between or who they come**

21  **from?**

22     A.    The finance department on company

23  financials.

24     Q.    **Yes.  And I presume that there is someone**

25  **in the finance department who actually wrote them**



1   and who would that be?

2       A.    We have 2,000 employees.  I can't give you

3   who would write an email.  I have no idea who would

4   roll up an email every single week on company

5   financials.

6       Q.    Okay.  I didn't know it was every single

7   week, first of all.  And secondly, if the issue was

8   raised by Ms. Carlson with respect to her complaint

9   that she should have got -- she should have been

10  paid her bonus and there were emails that pertain to

11  that, I'm sure that you can narrow down who it was

12  on the team who actually wrote a relevant email.

13  And instead of telling me that there are 2,000

14  people I'm sure the 2,000 people didn't -- weren't

15  involved with writing an email.  Do you know who was

16  involved in writing the email?

17      A.    Well, understand that Lisa had an offer

18  letter that stated it's a discretionary bonus as to

19  --

20      Q.    I'm really not --

21      A.    -- as to --

22      Q.    -- talking about that right now.  And I

23  would focus you on my -- on my question, which is

24  simply, you said there were emails and I'm asking --

25  well, let me ask you this, did you see these emails?



1    A.    Understand when you say --

2    **Q.    Excuse me --**

3    A.    -- email --

4    **Q.    -- did you see the emails dealing with the**

5    **issue that a bonus was not going to be paid?**

6    A.    No, that's not what you asked.

7    **Q.    Let me put it this way.  Let me -- I'm not**

8    **done. Let me put it this way.  Did you see any**

9    **emails that reflect or reference the fact that the**

10   **company was not doing well enough to pay bonuses to**

11   **employees, including Lisa Carlson?**

12   A.    No.

13   **Q.    That is my question.  You never saw them?**

14   A.    No.

15   **Q.    So how do you know that they exist when I**

16   **asked you about the emails?**

17   A.    Because we have a financial department and

18   we close our books weekly and we track our numbers

19   and know how the company financial performance is

20   doing.  And any person that was in a position of

21   authority would look at it and say, Oh my God, this

22   is not good.  So to say that there's a specific

23   email and you want me to quantify regarding bonus,

24   we knew what our budget was.  We knew that we were

25   tracking and we knew that we were not hitting our

1  budget.  So there is not a definitive plan or email

2  that exists to say nothing for anybody.

3      Q.    And so given the fact that that was the

4  way the company was doing and given the fact that it

5  was, as you say, Oh my God, I presume that there are

6  documents that went out to employees of QualTek from

7  the finance department or even internally that

8  indicate the fact that the company just was not

9  doing well, irrespective of an email to Lisa

10  Carlson.  Do those emails exist?

11      A.    No.

12      Q.    Are there -- is there any memorandum --

13  okay.  So let me ask you, if the company was not

14  doing well, how was the fact that the company was

15  not doing well communicated downstream to those who

16  had to know that it wasn't doing well?

17      A.    I don't know how it was communicated

18  downstream.

19      Q.    So did you ever speak to anyone about the

20  fact that the company was not doing well and that

21  therefore bonuses were not going to be large, if

22  they were paid at all?

23      A.    Yes.

24      Q.    And who did you speak to about that?

25      A.    My direct reports.

1    Q.    And your direct reports -- and who with

2    respect to the many direct reports you have, are we

3    specifically talking about?

4    A.    Stephanie Trybula, Rob Fabrizio, Paul

5    Kestenbaum,

6    Q.    And I presume that when you spoke to them

7    this was as it were in accordance with what appears

8    to be the protocol, there was a team meeting, but of

9    course, no memorialization of that team meeting was

10   made by you because that's just not necessarily what

11   you did.  And so in this case, although you say

12   there were team meetings, we don't have any written

13   documents to reflect that, would that be fair?

14   A.    Fair.

15   Q.    However, if we were to ask those

16   individuals, they would apparently testify that yes,

17   there was such a meeting and yes, this information

18   was communicated to them, would that be -- would

19   that be true?

20        MR. DOUGHERTY:  Objection.  You're asking

21   her to testify about what other people will testify

22   about?

23        MR. KOLMAN:  Well, I -- I'm asking because

24   she says that that's -- was in the meeting so I'm

25   assuming as a corroborate of that, that they would

1  indeed confirm that this meeting occurred.  So I'm

2  just asking her, do you believe that they would

3  confirm that such a meeting occurred?  That's my

4  question.

5       **MR. DOUGHERTY:**   You can answer.

6       **MR. KOLMAN:**  I don't know why you're

7  looking over to him, it's a perfectly reasonable

8  question.

9       **Q.   Do you believe -- I'm not saying they**

10 **would, I'm saying just do you believe they would --**

11      A.   I'm trying to answer and you started

12 talking again.  Yes, I believe my team would say

13 there was a meeting and they were very aware that

14 there was no bonus being paid and we're very happy

15 when there was a little piece of it that was

16 consequently paid.

17      **Q.   And did you give instruction for the --**

18 **for these people on your team to communicate this**

19 **information to the relevant employees?**

20      A.   They gave instruction to their employees.

21      **Q.   My question is, did you tell the people on**

22 **your team to let the employees know if there should**

23 **be a question that guess what, they were lucky to**

24 **get a bonus at all and there really wasn't a whole**

25 **lot of money anyway?**

1        A.    I don't recall if I gave that specific

2   instruction or not.

3        Q.    **So what was the purpose of the meeting?**

4        A.    I don't understand your question.

5        Q.    **Well, you had a meeting with your team**

6   **just to say, you know, this is the situation with**

7   **the company and bonuses are being squeezed out, out**

8   **of the generosity of QualTek, and that's that.  What**

9   **were they supposed to do with that information,**

10  **didn't you tell them what to do with it?**

11       A.    Well, I didn't say I had a meeting just on

12  that specific topic.  I said it came up in a meeting

13  and we had conversation regarding it.  So I don't

14  understand your question.

15       Q.    **Well, my question is simply based on what**

16  **you testified to and you said there'd be a team --**

17  **there was a team meeting.  I asked who was on the**

18  **team, you told me.  I understand that you may have**

19  **had other issues to discuss, but I didn't ask about**

20  **those, I asked strictly about the bonus.  So in**

21  **following up that train of questioning, my question**

22  **to you was, well, if there's no instruction as to**

23  **what the team is supposed to do with that**

24  **information, what's the purpose of having the**

25  **meeting, except just to let them know?  What were**

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM
157a

1  **they supposed to do with the information you were**

2  **giving them?**

3      A.    It was information that I was giving.  I

4  don't know what they're supposed to do with it, they

5  were talking to their teams.  People are asking

6  about bonus.  I said, Here's the information that we

7  have so far.

8      **Q.    Okay.  And Shawn Kemmerer, did he get any**

9  **information on bonus at all from you?**

10     A.    I have no idea that Shawn Kemmerer

11  received --

12     **Q.    Did Shawn -- did Shawn Kemmerer ever bring**

13  **a complaint from Lisa Carlson that half of her bonus**

14  **had not been paid?  I'm not talking about the**

15  **amount, I'm talking about half of it.  In other**

16  **words, that she was given $5,000 but only 2,500 was**

17  **paid at one specific time and the other 2,500 was**

18  **supposed to be paid in six months and wasn't.**

19     A.    I don't know if Shawn escalated to

20  Stephanie or if Lisa escalated to Stephanie.  I

21  don't know.

22     **Q.    But it was escalated to Stephanie, did it**

23  **ultimately come to you on your desk or not?**

24     A.    Stephanie had a conversation with me about

25  it.

1      Q.   And there's no memorialization of that,

2   correct?

3      A.   Correct.

4      Q.   And in fact, it wasn't just -- that wasn't

5   just the complaint was that Lisa Carlson said that

6   she was entitled or believed she would be entitled

7   to $20,000, not $5,000, given her position.  Do you

8   remember that?

9      A.   I don't remember that.

10     Q.   There was some indication that after Ms.

11  Carlson's name was put forward to become a director

12  that you were the one who said she's not becoming a

13  director, she can remain a finance manager.  Did you

14  --

15         MR. DOUGHERTY:   Objection to form.

16     Q.   Did you have anything to do -- well, first

17  of all, did you have anything to do with such a

18  decision, is my question?

19     A.   Well, I think, going back to time frames,

20  Lisa had different roles.  So in 2018 or 2017, she

21  came on as, I want to say manager of FDNA (phonetic)

22  in the old Velocitel system.  We didn't have that

23  role, so somewhere around March or April of 2018 she

24  became a finance manager.  The next director role

25  was not until in or around October of 2019, where I

1  believe at that time is when her name came up that

2  she applied for a position that was posted on our

3  website for director of finance role.

4      Q.    And what about Bruce Neff?  He was never

5  an employee of QualTek, correct, until he came on

6  board, would that be -- would that be true?

7      A.    Say that -- he was never an employee of

8  QualTek until he came on board?

9      Q.    Yeah.  I mean, he -- in other words, he

10  wasn't promoted internally, he was from outside?

11      A.    Correct.  He came from an outside role

12  when he was hired.

13      Q.    And were you responsible in part for

14  hiring him?

15      A.    No.

16      Q.    Do you know who was?

17      A.    First he came on as a finance manager in

18  2018, so that would have been the CFO at the time,

19  Steve Forbes.

20      Q.    And who was that?  I'm sorry, who was

21  that?

22      A.    Steve Forbes.  Steve Forbes, F-o-r-b-e-s.

23      Q.    Had Steve Forbes ever talked to you about

24  the hiring of Bruce Neff in any way?

25      A.    Yes.

1      Q.    Before he was hired?  And what was the

2   nature of your conversation with him?

3      A.    He wanted to bring Bruce in in a very

4   specialized role surrounding unbilled.

5      Q.    And was this an area that at the time Lisa

6   Carlson was employed in?

7      A.    In unbilled?

8      Q.    Yeah.

9      A.    I don't think she had anything to do with

10  unbilled.  I don't know her day-to-day, what she

11  did.

12     Q.    Do you know what Lisa Carlson did in her

13  job when she was employed by QualTek before she was

14  demoted?

15     A.    Why do you say she was demoted?  She was

16  never demoted.

17     Q.    Okay.  Well, irrespective of whether she

18  was or wasn't, as finance --

19     A.    Well, she wasn't.

20     Q.    Okay.  Well, as finance manager, do you

21  know what her job duties were?

22     A.    She was responsible for the P&L.  In

23  certain markets she, I guess unbilled was a

24  component of that where we had a ton of outstanding

25  unbilled and we needed to have a defined person

1  attack that.  She was responsible for doing

2  subaccruals, which by the way, we had to write off

3  millions because her subaccruals were wrong.  That

4  was all a piece of what she did on a day-to-day

5  basis.

6      **Q.   And how do you know all of this about her,**

7  **what she did was wrong and what she did on a day-to-**

8  **day basis. Do you -- wait.  Do you have a memo or**

9  **some kind of list of her job responsibilities that**

10  **indicate or support what you just said?**

11      A.   I have conversations with Dave Conn and

12  Mike Machini and her job description.

13      **Q.   And of course, those conversations are not**

14  **memorialized anywhere so we don't know when they**

15  **took place or what their content is, correct?**

16      A.   Well, I can get you when the subaccrual

17  occurred because we had to write it off, so we have

18  a date that I can get for you on that if you would

19  like it.  But there is --

20      **Q.   I'm sorry --**

21      A.   -- no memo, correct.

22      **Q.   -- I didn't -- I didn't hear your answer.**

23  **What could you get if I want it?**

24      A.   When we had to write down millions on the

25  subaccrual that was done incorrectly we have a date,

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM
162a

1  so I am happy to provide that date for you.  I don't

2  have it now.  I can get that from the finance

3  department, though.

4      **Q.   Oh, wasn't she in charge of AT&T?**

5      A.   AT&T, she was not in charge.  It was one

6  of our customers and Velocitel, was Velocitel's

7  customer.  We have many customers throughout the

8  company.

9      **Q.   But she handled that customer, did she**

10 **not?**

11     A.   Our company is an $800 million company.

12 Velocitel, the Minnesota office was about 25 to 30,

13 I think in 2018, projected to do 30 million.  We

14 lost that business.

15     **Q.   Okay.  Can I just --**

16     A.   We lost --

17     **Q.   -- can you just --**

18     A.   -- AT&T business.

19     **Q.   -- can you just answer my question, Ms.**

20 **Downey, which was, she was handling the AT&T**

21 **customer, is that correct, yes or no?  Simple.**

22     A.   She did not handle the customer.  She

23 handled the finance.

24     **Q.   Okay.  So she handled the finance --**

25     A.   She's not a customer --

1    Q.   -- with regard to the customer.  And who

2   well did she do that?

3    A.   The feedback that I got from her superiors

4   was her Excel skills were pretty good but she had

5   communication issues.  And once we lost the AT&T

6   turf model and that market, there really wasn't much

7   else to do.

8    Q.   Okay.  And where are the reviews -- I

9   understand there are reviews that were done that I

10  haven't received because they are kept somewhere

11  else.  Did you review how well she was doing or not

12  doing with respect to her superiors so that you are,

13  as it were, informed about her inability to

14  communicate adequately or however you put it?

15   A.   No.  It was just a conversation.  I did

16  not review her reviews.

17   Q.   So let me understand this, just recapping.

18  It would be fair to say that you're having all these

19  conversations with all these people about many, many

20  things, but when it comes to actually documenting

21  them and asking with whom you had them or what the

22  content was, there really isn't anything to go on

23  from a paper trail standpoint, would that be

24  correct?

25   A.   In regards to my stuff, sure, that's fair.

1      Q.   Okay.  Good.

2           MR. KOLMAN:  So let me take -- let me take

3  10 minutes, okay?  I'll be right back.  Thank you.

4           (RECESS TAKEN FROM 1:06 P.M. TO 1:21 P.M.)

5  BY MR. KOLMAN:

6      Q.   Let me ask you a few questions about your

7  qualifications.  Prior to coming to QualTek, where

8  did you work?

9      A.   UniTek.

10     Q.   And would I be correct in saying that

11 there's a lot of employees at QualTek who worked at

12 UniTek, is that correct?

13     A.   Yes.

14     Q.   And have you been responsible at all for

15 hiring employees because you have known them at

16 UniTek or someone has known them at UniTek?

17     A.   When you say responsible for my

18 interviewing them and hiring them or --

19     Q.   Well, let me put it this way; I accept

20 that that might not have been the best question.

21          In the sense that there are a lot of

22 employees who originally worked at UniTek, does

23 QualTek have an advantage in -- if you know, in

24 possibly knowing more about that employee because

25 there are currently -- that possible employee

1 **because there are employees currently employed by**

2 **QualTek who knew that employee when he or she was in**

3 **-- at UniTek?**

4     A.   I wouldn't say it was an advantage.  I

5 would say that we certainly knew some people and

6 knew their skill sets and their qualifications and

7 if we had a position that opened up and they applied

8 for it, we would interview them. And if they were

9 the most qualified candidate that, you know, the

10 hiring manager would decide if they wanted them or

11 not.  But I wouldn't say it was an advantage to know

12 them.

13     **Q.   Was that a case in Bruce Neff's case**

14 **because he was originally at UniTek?**

15     A.   I don't' know if I had left UniTek at the

16 time that Bruce had started.  I'm not sure of his

17 dates at UniTek, to tell you the truth.  I knew that

18 he was there.

19     **Q.   Did someone inform you that he had been**

20 **there?**

21     A.   I don't recall if I knew that he was there

22 or if someone told me that he was there, because I

23 don't recall his dates of employment at UniTek.

24     **Q.   Do you know if someone advanced his resume**

25 **through the system because that person knew of the**

1  **vacancy and thought Bruce Neff might possibly be a**

2  **good fit?**

3      A.   I don't know how he applied.

4      **Q.   Was there, if you know, a determination**

5  **that Bruce Neff would take over any duties that Lisa**

6  **Carlson was handling?**

7      A.   No.   Like I said, he was brought in

8  specifically to work on unbilled.

9      **Q.   Who actually took over her duties, if you**

10  **know?**

11      A.   I don't know what her day-to-day duties

12  were, but her position was not replaced.

13      **Q.   I was only talking about the duties that**

14  **she was doing and seeing who it was who absorbed**

15  **them.   And I understand your answer is you're not**

16  **sure, you don't know, correct?**

17      A.   I don't know.

18      **Q.   Do you know where the requirement so**

19  **called, to have a degree came from as a threshold**

20  **for being, I believe it's corporate finance, but it**

21  **may be --**

22      A.   You keep cutting out.

23      **Q.   I'm sorry.   I'm asking about the**

24  **requirement to have a degree.   Did you hear about**

25  **that requirement or know about it?**

1        A.    They're in our job descriptions.

2        **Q.    Right.  And I'm asking why that is a**

3   **threshold requirement, if you know?**

4        A.    So we believe that someone having a

5   degree, you know, it's just a level of

6   professionalism.  It's a level of education.  It

7   shows somebody that's willing to work hard in

8   general and learn new things.  We feel it's

9   important for us to have people, specifically in

10  certain areas, to have degrees.

11       **Q.    But if you know the employee because that**

12  **employee's been with you a long time, you can judge**

13  **whether the employee does work hard or -- and**

14  **whether they do have the intellectual heft to do the**

15  **job, am I right?**

16       A.    In certain cases if someone's been there a

17  long time.

18       **Q.    And would you agree with me that there are**

19  **some degrees that are much more -- much more**

20  **difficult to achieve than others, and the fact not**

21  **all degrees are equal?**

22       A.    Sure.

23       **Q.    And that you could get a -- and by degree,**

24  **do we mean a bachelor's degree or an associate's**

25  **degree?  Is there a threshold as to what kind of**

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM
168a

1  **degree it will be?**

2      A.   Well, it depends.  I mean, typically, and

3  I'm just speaking in general job descriptions we may

4  say bachelor's degree required but master's or as an

5  example in accounting, CPA preferred.

6      **Q.   Scott Hisey doesn't have a degree, does**

7  **he?  He's the CEO.**

8      A.   That's correct.

9      **Q.   And -- I'm sorry?**

10     A.   He's the CEO and founder of the company.

11     **Q.   Right.  Do you know if he's the one who**

12  **says that a degree is necessary in some areas?**

13  **You're not sure where it comes from, that**

14  **requirement?**

15     A.   No.  No, he wouldn't have job description

16  duties.

17     **Q.   If the degree is in the history of pop**

18  **art, for example, and it's from a community college,**

19  **does that necessarily show that the individual has**

20  **the capability of working hard and has the**

21  **intellectual capacity required for job?**

22     A.   Well, again, going back to the position.

23  If we want an accountant we're not going to hire

24  somebody with a degree in the history of pop.  We

25  want an --

1    Q.    Correct.

2    A.    -- accounting degree.

3    Q.    And I'm asking whether or not in respect

4    of the director's job that Lisa applied for, whether

5    in fact it said a degree in accounting or financial

6    management or anything else.  Do you know if it said

7    that or do you know if just said a degree?

8    A.    The job description for that as well as

9    the posting would have said degree in accounting or

10    finance.

11    Q.    Are you sure about that?  Did you look at

12    the description?

13    A.    I looked at the job description, yes.

14    Q.    But you would -- but I think you agree

15    with me that if the individual had already proven

16    themselves that that might not -- the degree might

17    not necessarily give QualTek any more information

18    that it already had about the employee --

19    A.    In some cases.  But in the case that

20    you're referencing, the director position in 2019,

21    we found Brandon Ebeling who had a CPA and a

22    master's in accounting and was more qualified for

23    the role.

24    Q.    And did Brandon Ebeling ever have any

25    experience in QualTek before he was hired?

1    A.    No.

2    Q.    And did he -- was he at UniTek by any

3  chance?

4    A.    No.

5    Q.    So he had to basically learn the job when

6  he came on board, would that be right?

7    A.    He was in public accounting for quite a

8  few years and had telecom companies that he worked

9  with.  So he, yes he had to learn QualTek but he did

10 not have to learn accounting.

11    Q.    And what does he do for the company, by

12 the way?

13    A.    He's -- currently he's the Vice President

14 of Wireless Finance.

15    Q.    What does that mean?  What does he do?

16 What are his duties, do you know?

17    A.    His duties again, involve overseeing the

18 West, Central and East divisions.  Working on

19 rolling up the P&L for each market.  Advancing

20 profitability in each market.  Working on the

21 management reports necessary to run the business.

22    Q.    With respect to the hiring of Bruce Neff

23 and Brandon Ebeling, that looks to me like a bit of

24 a reorganization, would you agree with me?  Maybe

25 not a reorganization but a realignment if you will,

 1  after the -- after the acquisition the Velocitel.

 2  Do you understand what I'm asking?

 3      A.    I don't know if it was a reorganization.

 4  I think that we had to get higher caliber folks on

 5  board and we were growing.  And we needed to expand

 6  customer base.  We certainly had some issues, you

 7  know, we were losing turf markets, we were getting

 8  new customers so we needed to expand, you know, the

 9  roles that people had and certainly we would want to

10  be able to hire the best candidates out there for

11  any position that we had available.

12      Q.    Sorry to interrupt.  And with respect to

13  this -- this vision if you will, or change, where is

14  that memorialized?  It may not be, but is there some

15  kind of memorandum that reflects what you said?  For

16  example, the company needs to expand its client

17  base, we need this kind of caliber of person, et

18  cetera, et cetera.  Does that exist anywhere, if you

19  know?

20      A.    No.

21      Q.    But you know about it, right?  And so how

22  do you know that that is what the company was going

23  to do or needed to do?

24      A.    Well, again, we have staff meetings.  We

25  have ad hoc conversations.  We have conversations

1  about the future. We wanted to go to be a public

2  company at some point in time.

3      Q.    Are any of the team meetings recorded?

4      A.    No.

5      Q.    Are any of the team -- at any of the team

6  meetings is someone designated to take notes?

7      A.    No.

8      Q.    After the team meeting, do emails, if you

9  know, go out to everyone to codify what exactly the

10  meeting was about and what was decided at the

11  meeting?

12      A.    I can only speak for my meetings, no.

13      Q.    Have you -- so when you conduct a meeting,

14  that doesn't happen.  Does it happen when you attend

15  a meeting that you haven't -- haven't -- I'm not

16  talking about a board meeting now, but I'm talking

17  about any meeting that you are part of, but not

18  actually leading.  Do you get emails after that?  I

19  mean, on a general basis.

20      A.    No, I don't recall.

21      Q.    Do you have a degree?

22      A.    I do.

23      Q.    And what's your degree in?

24      A.    I have a bachelor's and an MBA.

25      Q.    The bachelor's is in what subject or what

1  areas?

2      A.    Communications.

3      Q.    And where did you graduate from?

4      A.    Penn State.

5      Q.    And the MBA is from where?

6      A.    University of Phoenix.

7      Q.    So that would be off-line, right?  Not

8  off-line --

9      A.    Online.

10     Q.    -- that would be remote, correct?

11     A.    Correct.

12     Q.    And you can do that while you work,

13 correct?

14     A.    No.

15     Q.    That's what they say.

16     A.    No.  That's what the problem was.  It was

17 from 1998 so technology was certainly not what it is

18 today.

19     Q.    The University of Phoenix, they advertise

20 that while you're still employed you can get your

21 MBA remotely by taking courses and you don't have to

22 be in Phoenix to do it. That wasn't the case when

23 you took your MBA, is that correct?

24     A.    I don't know if they advertised back then

25 or not. I mean, I guess they were a for-profit

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM
174a

1  organization so I really don't know what their

2  marketing strategy was.

3      Q.    Were you -- you took the MBA while being

4  employed, correct?

5      A.    I did.

6      Q.    So we dealt, going back with UniTek, just

7  go back for me a little further, and what did you do

8  at UniTek?

9      A.    I was the Chief Administrative Officer.

10     Q.    And why did you leave?

11     A.    I was fired after a new board came on

12  board and they wanted to restructure the way that

13  the company handled debt and didn't agree with it,

14  so we parted ways.

15     Q.    When was that?

16     A.    That was September of 2012.

17     Q.    How long did it take you to get re-

18  employed, was that a couple of years because QualTek

19  was what, 2014?

20     A.    I was on a severance and no-compete.

21     Q.    Oh, was that for a couple of years?

22     A.    It was 18 months.

23     Q.    Okay.  But you still could have worked

24  presumably, but not in that same area, correct, or

25  not in the same -- I don't know what it said, but

1    sometimes there's a geographical limitation and a

2    limitation as to what you can be involved in.  Did

3    you -- you weren't employed during that -- let me

4    ask you, you weren't employed during that time,

5    correct?

6         A.    Correct.

7         Q.    From 2012 to 2014.  And prior to joining

8    UniTek, were you employed?

9         A.    Yes.

10        Q.    And where were you employed?

11        A.    Lightship Telecom.

12        Q.    What did you do for them?

13        A.    Senior Vice President of Employee

14   Relations.

15        Q.    How long did you have that job?

16        A.    I was there from 2001 and we sold the

17   company in 2006 and then started at UniTek in 2006.

18        Q.    With regard to employee relations, is that

19   kind of like HR, an HR job?

20        A.    Yes.

21        Q.    And before that, before 2001, were you

22   employed?

23        A.    Yes.

24        Q.    Where were you employed?

25        A.    Capsule Communications.

1    Q.    What did you do for them?

2    A.    Vice President of Human Resources.

3    Q.    Oh, okay.  And how long did you have that

4    job?

5    A.    That was two years.

6    Q.    And that takes us back to, I guess it's --

7    A.    Around 2000.

8    Q.    -- 1999.  Yeah, I mean, were you employed

9    before 1999?

10    A.    Yes.

11    Q.    What was your employment?

12    A.    I worked for an international publishing

13    firm and I was the general manager which encompassed

14    all of HR and some operations.

15    Q.    Let me ask you this question.  With regard

16    to memorialization of team meetings and so on, would

17    I be right in assuming that QualTek doesn't have a

18    protocol about how these meetings are to be

19    memorialized, there's nothing requiring a

20    memorialization of a team meeting, correct?

21    A.    Correct.

22    Q.    And by the same token, there are no

23    requirements not to memorialize a meeting, correct?

24    A.    Correct.

25    Q.    So the decision whether, you know, to put

 1  down what happened or not put down what happened,

 2  would be an individual decision by whoever it is

 3  who's leading the team, would that be correct?

 4      A.    Correct.

 5      Q.    Generally -- generally speaking.

 6      A.    Everybody has their own way of doing

 7  things.

 8      Q.    And if you -- and if you don't mind, I may

 9  have asked this question before and if I have, I

10  apologize.  What was the reason why you didn't write

11  down -- it's not that you didn't write down what

12  happened, it's just that you decided whether it was

13  -- whether you were going to or not based on the

14  nature of the meeting, would that be correct?

15      A.    Yes.

16      Q.    Okay.

17          MR. KOLMAN:  So I'm just going to check

18  with Lisa.  I think I'm probably finished.  Let's

19  take -- let's just take five minutes, okay?

20          THE WITNESS:  Okay.

21          (RECESS TAKEN FROM 1:40 P.M. TO 1:43 P.M.)

22          MR. KOLMAN:  Okay.  I don't have any

23  further questions.

24          (THERE WAS AN OFF-THE-RECORD DISCUSSION)

25          MR. DOUGHERTY:  I had one question.



1  EXAMINATION

2  BY MR. DOUGHERTY:

3      Q.    Ms. Downey, you were asked by Mr. Kolman

4  earlier if Ms. Carlson was in charge of the AT&T

5  relationship for QualTek, do you remember that?

6      A.    Yes.

7      Q.    Was she in charge with the overall

8  relationship of AT&T with QualTek or the former

9  Velocitel AT&T turf contract?

10     A.    So she worked on the former Velocitel AT&T

11 turf contract.

12     Q.    And QualTek and all divisions handle

13 multiple lines of business through their

14 relationship with AT&T, is that correct?

15     A.    Yes.

16          MR. KOLMAN:  Objection.  Leading.

17          MR. DOUGHERTY:  I have no other questions.

18          MR. KOLMAN:  Okay.  Great.  Okay.  Thank

19 you.

20          (SIGNATURE WAIVED)

21          (DEPOSITION CONCLUDED AT 1:43 P.M.)

22

23

24

25

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM
179a

# EXHIBIT "T"



COURT REPORTING

LEGAL VIDEOGRAPHY

VIDEOCONFERENCING

TRIAL PRESENTATION

MOCK JURY SERVICES

LEGAL TRANSCRIPTION

COPYING AND SCANNING

LANGUAGE INTERPRETERS





(800) 528-3311

NAEGELIUSA.COM

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

LISA CARLSON,
2805 243rd Avenue Northwest
St. Francis, MN 55070

      Plaintiff,

v.                         CIVIL ACTION
                               No.: 2:22-cv-00125

QUALTEK, LLC
1150 First Avenue, Suite 600
King of Prussia, PA 19406

      Defendant.

_____


**VIDEOCONFERENCE DEPOSITION OF**

**STEPHANIE TRYBULA**


**TAKEN ON**
**WEDNESDAY, JUNE 29, 2022**
**12:45 P.M.**


**PENNSYLVANIA**

1  launching a full-blown investigation, if that makes

2  sense.

3      Q.   Sure.  And --

4      A.   And document the matter, but you know,

5  sometimes employees have, you know, kind of petty

6  disagreements, if you will, in the workplace and we

7  will coach that employee on working through the

8  matter rather than opening an investigation.  Does

9  that make sense?

10     Q.   Yeah.  So instead of formal or informal,

11  it's like if it's severe or if it's just routine,

12  something like that, would that be fair enough?

13     A.   Sure.  I mean, sure.  And we document

14  things, you know, nonetheless that we spoke with XYZ

15  employee on X date.

16     Q.   With respect to documentation, is there a

17  process that you undertake -- your department

18  undertakes in regard to documentation of complaints?

19     A.   Yes.

20     Q.   And what is the process for documentation?

21     A.   There are files that we maintain so that

22  we have an easy -- easily accessible history of

23  discussions that we've had with employees or you

24  know, formal write-ups, et cetera.

25     Q.   Is there a file on the complaints made by

1  Lisa Carlson?

2      A.    We have notes on discussions that we've

3  had with Lisa, yes.

4      Q.    So that's not really my question.  I don't

5  mean notes, I mean a file.  You mentioned files so

6  is there -- is there a file that specifically deals

7  with complaints by Lisa Carlson to HR?

8      A.    Yes.

9      Q.    And is that file accessible to you?

10     A.    Yes.

11     Q.    Do you know if you passed that on to your

12  attorney in order to be sent to me?

13     A.    Yes.

14     Q.    Do you know -- did you look at the file

15  before it was sent?

16     A.    It's been a very long time, but presumably

17  I did.

18     Q.    So we don't want "presumably" because

19  again, that's speculative.  So if you don't know say

20  "I don't know" or if you believe you absolutely did

21  then "yes, I did because that's what I usually do."

22  So did you look at the file before it went to

23  counsel?

24     A.    Our process is for me to review all files

25  that are passed to counsel.

1    Q.    And did you remove any --

2    A.    I do not recall --

3    Q.    Go ahead.

4    A.    Yeah.  I don't recall specifically

5    reviewing this file because it was sent to counsel a

6    very long time ago. But that is our internal

7    process.

8    Q.    Did you remove any documentation from the

9    file?

10   A.    No.

11   Q.    When you -- when the file was sent to

12   counsel, was it sent in electronic form?

13   A.    I can't recall.

14   Q.    Were you, yourself responsible for the

15   transmission of this file?

16   A.    I -- I can't recall.

17   Q.    Did this file go to counsel as a

18   consequence -- did this file go to counsel before

19   there was a lawsuit, if you know?

20   A.    I don't know why it would have, but I

21   can't say specifically.

22   Q.    Prior to it going to counsel, did you or

23   your department do any research or investigation in

24   respective complaints made by Lisa Carlson?

25   A.    I don't think that we ever conducted a

1  formal investigation but we absolutely addressed

2  issues as they were called to our attention.

3      Q.   Did you in preparation for this

4  deposition, refresh your recollection as to what

5  those issues were?

6      A.   I'm sorry, can you repeat the question?

7      Q.   Yes.  In preparation for this deposition,

8  did you refresh your recollection in respect of what

9  those issues were?

10     A.   I met with counsel.

11     Q.   Okay.  I don't want to know anything about

12 your discussions with counsel, I want to make that

13 very, very clear at the outset, okay?  So I'm not

14 going to ask you any questions about your

15 communications with counsel.  But what I was -- what

16 I asked about was whether you, yourself looked at

17 any documentation in preparation for or more perhaps

18 to refresh your recollection about what this was

19 about?

20     A.   I did briefly.

21     Q.   Do you recall what documents you looked

22 at?

23     A.   I read the claim.  There was a letter that

24 was sent by Lisa's counsel.

25     Q.   Is that -- was that claim a claim made by



1  Minnesota counsel?

2      A.    I can't recall.

3      Q.    Was that a claim that existed in the

4  actual complaint that was filed in Federal Court?

5      A.    I can't recall.  It was -- I know it was

6  addressed to our CEO, Scott Hisey.

7      Q.    Okay.  So you looked at that document.

8  And do you recall more or less the content of that

9  letter?  Not verbatim of course, but more or less.

10 Do you recall what it said?

11     A.    More or less.

12     Q.    And what did it say more or less?

13     A.    There was a timeline of events of --

14 started out talking about another employee who had

15 left and Lisa feeling like she had taken on some of

16 her job duties.  There was a few paragraphs in there

17 about, I want to say her discussing things with

18 Lauren, our director.  Another person in -- a few

19 other people in finance were referenced as well that

20 she, you know, reported to or rolled up to,

21 discussions that she had with them.  I can't recall

22 what else specifically, but.

23     Q.    In respect of the complaints made by Lisa

24 Carlson, did you ever have a discussion with Lauren

25 Petzar regarding these complaints?  And by

1  **discussion I mean you met with Lauren and Lauren**

2  **gave you information regarding a complaint that she**

3  **had heard either directly or indirectly from Lisa**

4  **Carlson.**

5        MR. DOUGHERTY:   Object to form.  You can

6  answer if you understand.

7        **Q.   I can rephrase and make it simpler for**

8  **you.**

9        **Did you talk to Lauren Petzar about any**

10 **complaint made by Lisa Carlson?**

11       A.   The first -- the first thing or the only

12 thing I really recall Lauren specifically coming to

13 me about was the fact that, I guess Lisa had applied

14 for a position in our Blue Bell office and I know

15 that she and Lauren had a discussion about that.

16       **Q.   And why would that implicate human**

17 **resources for any reason?  It doesn't sound like a**

18 **complaint.**

19       A.   So she had applied for a position and I

20 think she was -- I want to say she was told by our

21 director of recruiting at the time that the position

22 was based in Blue Bell and, you know, he had gone

23 through kind of what the job requirements were.  And

24 I guess had told her, I don't know if he had gone to

25 Lauren first off if he had replied to Lisa first,

1  but had gone through what the job requirements were

2  and said, you know, it's not really in line with the

3  candidate that we're looking for.  And at that

4  point, you know, Lauren -- Lauren brought that to

5  me.

6      Q.   And she brought it to you on the basis of

7  what, exactly?

8      A.   Because she sensed that Lisa wasn't happy

9  with what she was told, or maybe Lisa specifically

10 said that to her.  I don't know what their

11 conversation was exactly but at that point, you

12 know, Lauren shared that conversation with me.

13     Q.   And so what did they want human -- what

14 did she want human resources to do about that?

15     A.   What did Lisa want Lauren to do or us to

16 do?

17     Q.   Yeah.  Lauren or --

18     A.   I'm not --

19     Q.   -- you.

20     A.   -- I'm not --

21     Q.   Or the department.

22     A.   I'm not really sure.  She just expressed,

23 you know, her dissatisfaction with what she was

24 told.

25     Q.   Did -- did you have an understanding that

1   Lisa Carlson was the replacement for Dana Freedman

2   after Dana left?

3        A.   Me personally, no.

4        Q.   The department then, institutionally, did

5   they -- did they get documentation indicating that

6   Lisa was going to replace Dana Freedman?

7             MR. DOUGHERTY:   Objection to form and to

8   the extent you're asking her to speak as a 30(b)(6)

9   witness.  Answer to what you know.

10       A.   Not that I recall.

11       Q.   Did Shawn Kemmerer ever indicate that Ms.

12  Carlson was going to be a director at any time?

13       A.   Not that I recall.

14       Q.   Did Lisa Carlson ever complain that she

15  was given an understanding that she was to be a

16  director and ended up as simply a finance manager?

17  Did she ever complain about that to human resources?

18       A.   Not that I recall or was aware of.

19       Q.   Did you ever look at the file that was

20  sent over the counsel prior to your deposition

21  today?

22       A.   Did I ever look at it?

23       Q.   Did you look at it prior to your

24  deposition today? I mean within a matter of days or

25  weeks prior to the deposition to refresh your

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM
189a

1 recollection as to precisely what, if anything, Lisa

2 Carlson did complain about?

3    A.    I briefly reviewed some of the documents

4 that were in the file.

5    Q.    Did you see any document that indicated

6 that Lisa Carlson was going to replace Dana

7 Freedman?

8    A.    Not that I recall or saw.

9    Q.    If there was -- assuming for a minute, and

10 this is a institutional question so it's not

11 hypothetical.  If there was a document that

12 indicated that Lisa Carlson was to be the

13 replacement for Dana Freedman, is that something

14 that would come to human resources if it was signed,

15 let's say, by a direcor?

16       MR. DOUGHERTY:   Objection.   Calls for

17 speculation, form.   She's --

18    Q.    Let me rephrase.

19       What kind of documents come through human

20 resources that are put into a personnel file that

21 deal with promotion?

22    A.    We have an internal document that we use

23 for, you know, personnel changes if you will.

24    Q.    What is that document called?

25    A.    I'm sorry, I didn't hear what you said.

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM
190a

1      Q.    I'm sorry.  What's that document called,

2  if anything?

3      A.    We call it a personnel action notice.

4      Q.    And if that personnel action notice comes

5  in, does human resources have any input into whether

6  that personnel action should or should not take

7  place?

8      A.    Yes.

9      Q.    And what kind of input does human

10 resources have with respect to either supporting

11 that promotion or not supporting it?

12     A.    Sure.  So you know, there's multiple

13 approvers required for any type of personnel change,

14 even if it's a simple market transfer if you will.

15 From an HR perspective, there's multiple approvers

16 who look for different things.  HR, you know, will

17 review the employee's file to determine if they've

18 had any past performance issues, safety issues,

19 behavioral issues and will weigh in, you know, on

20 whether or not they may or may not be ready for a

21 new position or a different position or have the

22 skill sets to do such position.

23     Q.    Do you know if anyone weighed in with

24 regard to any promotion that was intended for Lisa

25 Carlson?

1    A.   I -- I don't really recall any discussions

2  surrounding a promotion for Lisa.

3    **Q.   Is there anything in Lisa's file that**

4  **indicates that there was any problem with her**

5  **performance?**

6    A.   Not -- no, not that I've seen.

7    **Q.   Are there reviews in Lisa's file?**

8    A.   Not in her personnel file but yes, we --

9  we have performance reviews on file for Lisa.

10    **Q.   And where are they?**

11    A.   Well, it depends.  So we transitioned

12 performance review systems so they're in one of two

13 places, either on our HR drive or in our ACP system,

14 which is our HR app.

15    **Q.   So you have those and -- and they're not**

16 **in the personnel file, am I correct but they're held**

17 **elsewhere, would that be right?**

18    A.   Yes.

19    **Q.   And what else is held elsewhere that might**

20 **usually be in a personnel file?**

21    A.   Only internal HR investigation notes pr.

22 You know, documents that don't pertain to a specific

23 employee.

24    **MR. KOLMAN:**  I'm going to ask the court

25 reporter to mark the last part of Ms. Trybula's

1  testimony beginning with reviews not being in the

2  personnel file but being elsewhere.  You could

3  highlight that for me up to the present.  Thank you.

4       A.    I didn't say review though, I said -- I

5  said document.

6       **Q.    Yes, you did, but first of all it was**

7  **reviewed and then I asked another question about**

8  **documents, so I apologize for ambiguity, but anyway,**

9  **just that paragraph. That's for me, by the way, Ms.**

10 **Trybula, so --**

11           MR. DOUGHERTY:  Can we take a quick break?

12           MR. KOLMAN:  Of course.  We'll take 10

13 minutes?

14           MR. DOUGHERTY:  I hope it doesn't take me

15 10 minutes but okay.

16           MR. KOLMAN:  We can take 15 minutes, okay,

17 Colin?

18           MR. DOUGHERTY:  Ten's fine.

19           **(RECESS TAKEN FROM 1:27 P.M. TO 1:46 P.M.)**

20 BY MR. KOLMAN:

21      **Q.    So the last question, Ms. Trybula, was you**

22 **were saying about we dealt with the reviews that**

23 **were somewhere else, not in the personnel file and**

24 **you were talking about other things that are**

25 **offsite, including the notes of complaints**

1  **concerning Ms. Carlson.  Are those notes pursuant to**

2  **what we were discussing before about her issues that**

3  **she had with -- the issues that she had before that**

4  **you referenced?**

5        MR. DOUGHERTY:   Object to form.  You can

6  answer if you understand.

7     A.   Can you repeat the question?

8     **Q.   Yeah.  You testified that Ms. Carlson made**

9  **certain complaints and you couldn't recall all of**

10 **them, correct?**

11    A.   I don't know.  I don't recall saying that

12 she made complaints.  I said she would talk to one

13 of our HR directors from time to time about things

14 that she was unhappy about.

15    **Q.   Oh, okay.  So the fact that she was**

16 **unhappy about something doesn't mean she's**

17 **complaining about it, is that right?**

18    A.   Again, I don't know all of their

19 discussions.

20    **Q.   No, but if Ms. Petzar took down notes I**

21 **presume in accordance with the protocols required,**

22 **those notes would be where you said they were which**

23 **is in some file other than simply her personnel**

24 **record and her reviews, would that be correct?**

25    A.   So you're referring to our internal HR



1  notes. Performance reviews would -- would not be

2  maintained in the same place.  But yes, we do have a

3  file where we maintain internal HR notes.

4       **MR. KOLMAN:**  If the court reporter will

5  kindly highlight that answer.

6       **Q.   Do you remember turning over those reports**

7  **to your counsel?**

8       A.   Do I remember specifically turning them

9  over, me personally?

10      **Q.   What about your department?**

11      A.   I'm sure that we did --

12      **Q.   What about the reviews --**

13      A.   But I --

14      **Q.   -- you turn those over, too?**

15      A.   I can't recall every -- every piece of

16  documentation that we turned over.

17      **Q.   But we're not talking about every piece of**

18  **documentation, Ms. Trybula, we're talking about**

19  **critical documents that you would normally have in**

20  **the personnel file.  Those would be reviews and**

21  **complaints.  But you're saying you don't recall**

22  **whether they were sent to counsel, is that correct**

23  **or you're saying they were sent to counsel or you're**

24  **saying I don't know?**

25      **MR. DOUGHERTY:**  Objection to form.  Is

1  there a question, Tim?

2         **MR. KOLMAN:**  Yes.  That's the question.

3  What she's saying exactly about whether she sent

4  them or didn't send them.

5      A.   I cannot recall specifically.  Sometimes

6  when we get legal requests they'll specifically

7  mention, you know, performance reviews, sometimes

8  they don't.  We provide everything that you

9  requested.  I can't recall.

10     **Q.   Did you or were you ever told by anyone**

11 **that the reviews were being asked for specifically?**

12        **MR. DOUGHERTY:**  Objection to something

13 that calls for you to divulge something you and I

14 talked about.

15        **MR. KOLMAN:**  I withdraw the question.

16 That's fine, I withdraw the question.

17     **Q.   Is it my understanding that you require a**

18 **specific request for a specific set of documents**

19 **before you'll turn them over to your counsel?**

20     A.   Generally, you know, whether it's a

21 subpoena for information or a request from counsel,

22 usually there is a list of specific items that we're

23 supposed to provide and we will respond accordingly.

24     **Q.   You remember -- I'm not asking what's in**

25 **the list, do you remember getting the list?**

1      A.    No, I don't.  It was a long time ago.

2      **Q.    Do you believe you got a list?**

3      A.    I can't recall.  It was a very long time

4  ago.

5      **Q.    Very long time ago.  What do you call a**

6  **very long time ago, by the way, what is that for**

7  **you?**

8      A.    It's, I mean, it's been multiple years

9  since a claim originally arose and we would have

10 turned over documentation.  I can't recall.

11     **Q.    Well, this -- this lawsuit's only been**

12 **going almost three months, so that is three months**

13 **not a long time, right?**

14     A.    But we turned over documentation related

15 to the claim awhile ago.

16         **MR. DOUGHERTY:**  It's filed with the EEOC,

17 Tim.

18         **MR. KOLMAN:**  I'm sorry?

19         **MR. DOUGHERTY:**  Your client filed with the

20 EEOC three years ago.

21         **MR. KOLMAN:**  Right.  But I don't know

22 whether there was any request that long ago for -- I

23 mean, you would know, I wouldn't.

24         **(THERE WAS AN OFF-THE-RECORD DISCUSSION)**

25         **MR. KOLMAN:**  I'm going to ask actually, I

1  might as well ask it on the record and ask Colin to

2  provide the reviews that I was told did not exist

3  and could not be found when I propounded admissions.

4  And I would also ask for the notes of

5  investigations.  I don't believe that they're

6  privileged.  I'd ask that those be turned over

7  immediately since they would normally be a personnel

8  file and I'm requesting the personnel file.  So I

9  would very much appreciate it if counsel could

10 gather those together.  I can send a formal letter

11 if you wish.  I don't think --

12        **MR. DOUGHERTY:**  To the extent they did and

13 they haven't been turned over, I'm happy to look for

14 them and turn them over.

15        **MR. KOLMAN:**  I know.  I appreciate that.

16 And any other documents that might be offsite.

17      **Q.   Do we have anything else that you might**

18 **keep offsite?  By offsite, I mean not in the**

19 **personnel file. That's what I mean by offsite, so.**

20        **Is there anything else like for example,**

21 **promotion documents or anything else that you can**

22 **know of that might not be readily available when you**

23 **look at the personnel file?**

24      A.   Promotion documents or offer letters, all

25 that would be in an employee file.  There's nothing

1  further, to answer your question.

2      Q.   Did you or your department ever discuss

3  who was going to take over Dana Freedman's position?

4          MR. DOUGHERTY:  Objection to the extent

5  you're asking her to speak as a 30(b)(6).  Answer if

6  you understand the question.

7      A.   Not that I recall.

8      Q.   I'm not asking if it's the corporation, by

9  the way.  I'm just asking if the personnel

10  department, the human resources department got

11  information.  So you don't recall that?

12      A.   I do not.

13      Q.   Do you recall any request by anyone for

14  example, Dave Conn, to make Lisa Carlson a director?

15      A.   I do not.

16      Q.   Is that a request that would come through

17  human resources, at least in terms of a record that

18  it was requested?

19      A.   You have to define requested.  Sometimes

20  the finance department would have internal

21  discussions about people that they want to promote

22  as an example and it may not go anywhere, but may

23  not have ever been escalated to human resources

24  necessarily.  Not that I recall.

25      Q.   Is it the case, and well, you already

1  answered this, that human resources can wheel in, in

2  respect of what they believe might not be an

3  appropriate promotion or there might be an issue of

4  some kind that might give them pause and then they

5  would communicate that to the department.  Did I

6  understand your testimony in that way broadly?

7      A.    That's -- that's correct.  There's

8  multiple approvers on every employee change.  And

9  everyone has the opportunity to provide, you know,

10 their thoughts and the best approach on the

11 transaction that's being requested.

12     Q.    And would that include a change of title

13 as well, that would reflect the promotion?

14     A.    Yes.  Anything related to an employee

15 change.

16     Q.    Would Elizabeth Downey have been the last

17 person in the chain of command in human resources

18 that could ultimately say that she did not believe

19 that a promotion should be made?

20     A.    Yes.

21     Q.    Do you remember or know if she ever did

22 that in respect of Lisa Carlson?

23     A.    I do not know.

24     Q.    If she did that would there likely be a

25 document in -- I hesitate to say personnel file,



1   **somewhere in the annals of human resources that**

2   **reflected Elizabeth Downey's point of view?**

3       A.    There was a -- if a request is not

4   approved we wouldn't save that to an employee file

5   or other place.

6       **Q.    So in other words, if -- if someone, let's**

7   **say Elizabeth Downey decided that this particular**

8   **person despite being recommended for this job should**

9   **not take the job, she would not document that**

10  **anywhere and human resources would not therefore**

11  **have a record of it, is that your testimony?**

12      A.    I mean, it's -- it's possible that she

13  could have personally documented something but

14  within -- with regard to HR files or an employee

15  file, an employee transaction that's not, you know,

16  fully signed off on or approved would not be saved.

17          **MR. DOUGHERTY:**  And real quick, Liz Downey

18  returned to her office so she is now observing the

19  deposition as corporate rep.

20          **MR. KOLMAN:**  Elizabeth Downey is

21  observing?

22          **MR. DOUGHERTY:**  She's as the corporate

23  rep.

24          We're in her office, she just came back

25  from her --

1       **MR. KOLMAN:**  Okay.  Good.

2       **Q.   So do you know why on earth that document**

3  **would not be preserved?  I mean, what would be the**

4  **reason for not preserving such a critical document,**

5  **which is in a sense, the nixing of an employee -- an**

6  **employee's promotion?**

7       A.   For the, I mean, for the exact reason that

8  -- it wasn't approved, it wasn't processed,

9  therefore we -- why would we save it?

10      **Q.   Why wouldn't you save it?  Well, for**

11 **example, if it wasn't processed because of some**

12 **aspect of discrimination I would understand why you**

13 **wouldn't want to preserve it. But in the sense that**

14 **there's a real reason for not approving it, of**

15 **course you would want to preserve it so that others**

16 **could see that this was the reason this individual**

17 **was not promoted and you would have no record of**

18 **that if, for example, Elizabeth Downey left and you**

19 **-- and someone else wanted to promote her to that**

20 **position, would look at documents and find there was**

21 **no reason why she shouldn't be promoted.  In other**

22 **words, the institutional memory of QualTek would be**

23 **compromised.  Did that not occur to anyone?**

24      A.   I would say that, you know, you're saying

25 that there's a formal request made by documentation

1  in all situations where employees aren't promoted,

2  which wouldn't happen either.  So I --

3      Q.   I'm not saying that.  What I'm asking

4  about is where a promotion -- where an employee is

5  recommended to be employed -- to be promoted and all

6  of those documents go to human resources and

7  Elizabeth Downey decides that that's not going to

8  happen.  And she has her own reasons why and she

9  says, I don't agree with this.  And --

10     A.   Well, I --

11     Q.   -- and -- wait.  And you're saying I don't

12 agree with this, isn't documented anywhere and the

13 reasons why she doesn't agree with it aren't

14 documented anywhere and the only information that

15 the employee gets is, guess what, it was nixed by

16 Elizabeth Downey.  Why isn't there -- you might not

17 know this and maybe it's an unfair question to you,

18 but who makes the policy that Elizabeth Downey's

19 decision in such a case is not memorialized in

20 writing somewhere in QualTek's files?

21     A.   I don't know that that's happened.  And I

22 would say, and I think I mentioned this before, but

23 not all these documents ever even make it to human

24 resources.  So I can't -- I can't say definitively

25 that we see them 100 percent of the time either.

1    Q.   So there are documents that bypass human

2   resources that you don't get to see and why would

3   you be kept -- why would human resources be kept out

4   of the loop, for example, in such an issue as

5   promotion?

6    A.   I didn't say bypass.  It's possible that

7   the approvers prior to HR, you know, complete a

8   request if you will and it's rejected by someone

9   earlier in the process or they change their mind.

10  You know, we don't see every single request that,

11  you know, in terms of a paper form that could be

12  drafted.  I don't know that -- I don't know that I

13  follow.

14   Q.   You have an understanding in this case

15  that Lisa Carlson is saying that Elizabeth Downey

16  rejected Dave Conn's request to make her a director?

17   A.   You're asking me to confirm that Lisa said

18  that?

19   Q.   No.  I'm asking if it's that -- do you

20  understand that part of this case that we're talking

21  -- that we're litigating now is that Lisa Carlson

22  asserts that Dave Conn's request to make her a

23  director was rejected by Elizabeth Downey.  Did you

24  have an understanding that that's one of the claims

25  in this case?

1      A.    I understand that Lisa had said that.  I

2  do not recall that happening.

3      **Q.    Okay.  I understand that you don't recall**

4  **it happening, but you also testified that not all**

5  **documentations necessarily come through you, that**

6  **you would necessarily see that, correct?**

7      A.    Correct.  If it does not reach the human

8  resources department.

9      **Q.    And there would be no documentation**

10 **according to you anyway that if Elizabeth Downey did**

11 **indeed stop Lisa Carlson's promotion for some**

12 **unknown reason, that would not be memorialized in**

13 **writing anywhere except perhaps in Elizabeth**

14 **Downey's own personal private journal, assuming that**

15 **such a thing exists, correct?**

16     A.    We -- we would not save an employee file,

17 a personnel action notice that was not processed,

18 correct.

19     **Q.    And then if there's a complaint by Lisa**

20 **Carlson as a consequence and she goes to, let's say**

21 **Lauren Petzar and says, Hey, my application to be a**

22 **director was sent in and recommended by Dave Conn**

23 **and I wasn't -- I wasn't approved. Would Lauren**

24 **Petzar be able to tell her that hey, guess what,**

25 **sorry, Elizabeth Downey just decided by fiat to**

1    **prevent her from being promoted.   Would Lauren**

2    **Petzar have that information?**

3        A.    Lauren Petzar could confirm for an

4    employee whether or not a personnel action notice

5    was approved or pending or not approved.  She could

6    absolutely say that, yes.

7        **Q.    How would Lauren Petzar know that it was**

8    **Elizabeth Downey who decided that she shouldn't be**

9    **promoted given that there's no writing?**

10       A.    Maybe.

11       **Q.    Would Elizabeth Downey as far as you know**

12   **communicate verbally to HR that she was nixing a**

13   **promotion?**

14       A.    It's possible because that would be the

15   type of thing that we would discuss.  I don't recall

16   that discussion taking place as it relates to Lisa.

17       **Q.    But you're saying there have been**

18   **discussions between you and Lisa with respect to --**

19   **I'm sorry, you and Elizabeth Downey with respect to**

20   **why a specific candidate should not be promoted, is**

21   **that correct?**

22       A.    We have had those types of conversations,

23   yes.

24       **Q.    When those conversations occur, you have a**

25   **protocol of writing down the nature of that**

1    **conversation and memorializing it?**

2        A.    I do not document every conversation that

3    Liz and I have, no.

4        **Q.    Do you not document a conversation so**

5    **critical in respect of an employee's inability to**

6    **get promoted for some reason that's being discussed**

7    **between you?**

8            MR. DOUGHERTY:    Object to form.

9        **Q.    Why would that not be -- I mean, why would**

10    **that not be documented?  I guess, is my question.**

11            MR. DOUGHERTY:    Object to form.  You can

12    answer if you understand.

13        A.    Can you repeat the question?

14        **Q.    Why wouldn't you document the reasons why**

15    **an employee would not be promoted given a discussion**

16    **regarding that has taken place between Elizabeth**

17    **Downey and youreself?**

18        A.    Again, in some cases maybe we would, but I

19    do not necessarily document every conversation that

20    I have with Liz.

21        **Q.    I appreciate that and that's fine.  But**

22    **I'm asking about a specific kind of conversation,**

23    **one that is critical to an employee's career?  And**

24    **what you're saying is, I would not necessarily**

25    **document my discussion with Elizabeth Downey or**

1  anyone else regarding the reasons for the lack of

2  promotion, correct?

3      A.   It depends.

4      Q.   Okay.  It depends.  And what does it

5  depend on?

6      A.   The situation.  It would depend -- I mean,

7  there -- we get requests to promote people on a

8  regular basis. You know, it doesn't mean that

9  everyone gets promoted and no, we don't document the

10 reason for every individual for the reasons that

11 they don't get promoted.

12     Q.   So isn't is important for an employee to

13 know where their shortcomings are or why they

14 haven't been promoted?  Is that something that an

15 employee should know that would benefit QualTek?

16     A.   Sure.  And managers have those

17 conversations with their employees and a lot of

18 their -- or a lot of the managers within our company

19 maintain, you know, their own notes.  They're not

20 necessarily -- they don't necessarily submit

21 everything to HR for an employee file or for an HR

22 file.

23     Q.   I'm talking about the promotion being

24 nixed high up.  In other words, at the Elizabeth

25 Downey level for some reason.  Wouldn't it be

1  **important for that employee to know, for example,**

2  **that it wasn't for discriminatory reason?  But if**

3  **they're never told the reason then they might assume**

4  **it's discriminatory.  She might assume it's**

5  **something else.  I might be putting you on the spot**

6  **here because -- and I apologize if I am, because I**

7  **know you are not responsible for determination of**

8  **what might or might not be best for the company.**

9  **But insofar as you are in human resources, I would**

10  **ask you that in terms of taking care of personnel, I**

11  **don't know what the policy is, if there is a policy,**

12  **and let me ask you that question.  Is there a policy**

13  **on telling employees why they did not get a**

14  **promotion?**

15      A.   Not a policy.  A lot of times employees

16  don't even know that they're up for promotion

17  necessarily.  So a lot of times those are

18  discussions that are had with department heads,

19  with, you know, senior divisional leadership, with

20  human resources.  And then you know, employees are

21  told that they are being promoted or there's an

22  opportunity for them to be promoted.

23      Q.   **Speaking specifically about the Lisa**

24  **Carlson case, you actually personally don't really**

25  **know anything about the issue of promotion, correct?**

1    A.    I really don't recall, no.

2    Q.    And you not only do not recall but you

3 haven't read anything prior to this deposition that

4 would either refresh your recollection or indicate

5 something that would be responsive to my question

6 that would give me sort of more information on that

7 issue of promotion?

8    A.    You broke off at the tail end of that.

9    Q.    Okay.  So I'm just -- I mean, I'm just

10 being thorough.  So and there's nothing that you

11 read prior to this deposition that either informed

12 you as to the reasons why -- let me be clear --

13 informed you that Ms. Carlson was up for promotion

14 and nothing to indicate that why she was denied the

15 promotion if she was up for it, would that be

16 correct?

17    A.    I do know from things that I've read that

18 Lisa thought that she was taking over an employee's

19 job duties who, you know, had left the company.  And

20 I -- and she thought that as a result of that she

21 was being promoted.

22    Q.    And do you know the reasons why she

23 understood she was being promoted?

24    A.    No.

25    Q.    So you don't know necessarily whether this

1    **is just some aggrandized idea in the head of Lisa**

2    **Carlson or whether Lisa Carlson actually got this**

3    **information from another employee higher up than**

4    **she, correct?**

5        A.    Correct.    If -- if someone told her that,

6    I'm not aware.

7        Q.    **You're not aware if someone told her and**

8    **you're not aware if someone actually put her in for**

9    **promotion, correct?**

10        A.    Correct.

11        Q.    **Do you understand the apparent requirement**

12    **to have a degree and/or also to be in Pennsylvania**

13    **in order to work in corporate finance?**

14        A.    For -- yes.    I mean, our positions are

15    based in Blue Bell.    You know, specific to the

16    finance director position, if that's what you're

17    referring to, yes, that is one that we do require a

18    degree for along with many of our other positions,

19    specifically in finance and accounting.

20        Q.    **And when you say a degree in finance and**

21    **accounting, where does it say anywhere that that --**

22    **that the degree has to be in finance and accounting?**

23        A.    Sorry, within the finance and accounting

24    department.    The majority of our positions within

25    those departments do require a degree.

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM
211a

1      Q.   So assuming that the degree is in the

2   finer parts of Ulysses by James Joyce, it would

3   still be a degree and that qualification at least

4   would be satisfied, is that correct?

5           MR. DOUGHERTY:   Objection to form.   You

6   can answer if you understand.

7      A.   I don't understand the question.

8      Q.   Well, a degree can be in many different

9   things, correct?

10     A.   So our job descriptions, you know,

11  specifically will state for a finance position that

12  the degree should be in finance, accounting or

13  another related field.

14     Q.   Where is that written?

15     A.   In our job description for finance

16  director or other finance and accounting position

17  and it's part of our job postings as well when we

18  search for those types of positions.

19     Q.   Well, when Lisa Carlson was denied a job

20  she was told it was because she didn't have a

21  degree, it wasn't because she didn't have a degree

22  in finance or accounting. Did you know that?

23     A.   A bachelor's degree is required.

24     Q.   Right, it is.  And as we know, a

25  bachelor's degree can be in many different things,

1  correct?

2      A.   Sure.

3      Q.   And a bachelor's degree requirement is not

4  or it does not have to be in finance or accounting,

5  it can be in something else, I mean, at least

6  looking at the qualifications that were later

7  required for that position.

8          MR. DOUGHERTY:   Objection to the form --

9      Q.   You can answer.

10         MR. DOUGHERTY:   -- of the question.

11     Q.   So having a degree is a threshold issue

12  but it doesn't have to necessarily be a degree in

13  finance or accounting, would that be correct?

14     A.   The way that the job descriptions are

15  written for a finance position, for instance, will

16  specify that they must have a bachelor's degree in

17  finance, accounting or another related field.

18     Q.   Okay.   I'm not going to argue with you

19  about this issue.

20          In respect of being a resident in

21  Pennsylvania, who made that requirement, by the way?

22  I ask because we are in the current land of Zoom.

23     A.   Yeah, I know, I know.   And that -- and

24  that's fair.   We have a shared services module here.

25  I don't know if this has been explained to you to

1  date, but our company has a shared services group

2  that's based in Blue Bell, Pennsylvania and there's

3  a number of, you know, let's say non-revenue

4  generators if you will, such as myself who provide

5  back office support to all of our field locations.

6  We sit in this building.  We support our operators

7  in the field.  We provide them a service if you

8  will, as it relates to our area of expertise so that

9  we can ensure compliance with applicable law so that

10  we can ensure that situations are handled

11  consistently so that we don't have redundancies

12  across markets, if you will.  So in everything

13  related to human resources runs through my

14  department for the entire company, if that makes

15  sense.

16      Q.    I understand --

17      A.    We're all based here in the Blue Bell

18  office.

19      Q.    I understand that with regard to human

20  resources, I do.  But in respect of corporate

21  finance that may have to interact remotely with, for

22  example, the billing group in Syracuse, New York, or

23  elsewhere with operators in the field or with

24  customers.  It wouldn't make any difference whether

25  they were in the office or remote, not in this day

1   and age, correct?

2          Let me ask you this, it's an unfair

3   question, so let me just ask it this way.  Do you

4   know, you may not know, it's not a trick question,

5   do you know why the corporate office, the corporate

6   finance department demands that people in that

7   department actually be physically in the Blue Bell

8   office?  Do you know what the rationale is for that

9   as far as the company's concerned?  And you may not.

10         A.   When QualTek was -- I mean, I'll -- I'll

11  give you -- I'll give you the answer.  When the

12  company was founded we had a shared services model,

13  even though we were relatively small.  We have

14  always been a group that is centralized.  We have

15  always been a group that's been in the office.  We

16  still have a strong office presence to this day.

17  We're in, you know, four days a week.  It's just how

18  we operate.  We are a rapidly growing organization.

19  We've grown tremendously since our inception.  We've

20  grown a lot by acquisition.  We're a very

21  collaborative group and it absolutely benefits the

22  company for us to be centralized and in one place.

23  And that's our model not just in finance.

24         Q.   So that model is elsewhere as well,

25  correct?

1    A.    Throughout shared services, yes.

2    **Q.    But there are employees who do connect**

3 **remotely, correct?**

4    A.    Today, yes.

5    **Q.    And so they're not -- there should be --**

6 **they should actually be in the office physically,**

7 **correct?   In accordance with the model.**

8    A.    We have evolved.   As I mentioned, we are a

9 rapidly growing company and we have evolved but for

10 the most part we are centralized in the Blue Bell

11 office.

12    **Q.    Wasn't really the answer to my question.**

13 **In respect of employees who are remote, you're not**

14 **arguing necessarily that they should be in the**

15 **office because of the evolution of the company, is**

16 **that correct?   Let me be clear, the evolution of the**

17 **company in respect of technology and possibly**

18 **accepting Zoom or collaborative space on -- online**

19 **as being an alternative.**

20    A.    I would -- I would agree, yes, that today

21 in 2022 it is easier to work remote.   But I will say

22 that we still have a very strong office presence and

23 we've been kind of built on that ideology.

24    **Q.    What happened during Covid, by the way?**

25 **Did you guys -- did you guys all come into the**

1   office anyway just the way it was?

2       A.   We had flex schedules and most of the time

3   we were in the office.

4       Q.   By flex schedules, you mean people were

5   working when other people weren't there so they had

6   more space, is that correct?

7       A.   Correct.

8       Q.   So when not everyone was working, doesn't

9   that undercut your model?  Because it's not

10  collaborative space anymore, it's collaborate space

11  for some and not others.  Did you have to bring all

12  those others in via remote?

13          MR. DOUGHERTY:   Objection to the form.

14      Q.   In other words, when Covid was happening

15  and it was on a flex basis, was Zoom used during

16  that time to bring employees into a meeting or for

17  some other reason?

18      A.   Sure.

19      Q.   When -- when if they hadn't been Covid

20  they would have actually been physically there but

21  because there was Covid they weren't?

22      A.   Sure.  We -- yeah, we use teams.

23      Q.   With respect to Dave Conn, do you know if

24  he comes in the office every day?

25      A.   He does.



1    Q.    And are there any employees in corporate

2    finance as far as you know who do interact remotely,

3    not all the time but largely?

4    A.    Not in corporate finance.

5    Q.    Are the needs for corporate finance any

6    different from any other department given what you

7    said was the apparent culture of the company itself,

8    which was to have physical collaborative space

9    together?  Is there anything unique about corporate

10   finance that does not relate to other areas of the

11   business?

12   A.    Yeah.  I don't -- I don't -- it's not the

13   finance, though, it's all of the shared services

14   departments.  It's human resources, it's legal, it's

15   fleet, facilities, IT, telecom, risk, safety.

16   Q.    And all of those, you're saying that all

17   of those demand that someone -- that there be

18   physical space, that they will be --

19   A.    Yes.

20   Q.    -- physically connected.  Are you saying

21   then that all of those departments do not tolerate

22   presence by Zoom or remote or being remote unless --

23   unless there are extenuating circumstances?

24   A.    Yeah.  I would say that we can absolutely

25   conduct business when we need to, you know, via a

1 teams call, but it is not the norm for QualTek

2 shared services.

3      Q.    Do you know Dana Freedman, by the way,

4 when she was working at QualTek?  Did you know who

5 she is or was?

6      A.    I -- yeah, I remember Dana.

7      Q.    Do you remember that Dana lived in

8 Illinois?  Do you recall that?

9      A.    Yes.

10     Q.    But do you recall --

11     A.    Yes.

12     Q.    -- that despite being in Illinois she

13 continued to visit the Blue Bell office on a very

14 regular basis --

15          MR. DOUGHERTY:  Objection to form.

16     Q.    Do you recall that?

17     A.    So I don't really remember how often she

18 was in the Blue Bell office.  I know she was here a

19 few times.  But what I will say about Dana, you

20 know, she just like Lisa was part of a transaction

21 when we purchased the company called Velocitel and

22 they had a number of remote workers.  And again,

23 that's just -- that was not QualTek's practice to

24 have remote workers, but it was there's.  We

25 acquired the company; we inherited those remote

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM
219a

 1  workers.

 2      Q.   At any point, did any person at QualTek

 3  tell Dana Freedman that because she was in Illinois

 4  she could not continue to work for the company?

 5          MR. DOUGHERTY:   Objection to form.  Are

 6  you asking her to speak on behalf of all the

 7  employees of

 8  QualTek?

 9      Q.   As far as you know.

10      A.   I don't know.

11      Q.   Do you know why she left?

12      A.   I cannot recall.

13      Q.   Do you recall any complaint that Lisa made

14  about the payment of her bonus?

15      A.   I do.

16      Q.   And tell me what you recall.

17      A.   So I recall that Velocitel, the company

18  that I just mentioned where, you know, Lisa was a

19  legacy employee of -- they had not performed well.

20  I believe this is in reference to the 2019 bonus.

21  But that was the year that she and I had the

22  discussion regarding.  They had not performed --

23  wireless in general, wireless division in general

24  hadn't performed well, but Velocitel specifically

25  underperformed and somehow a small bonus was



1  approved for wireless and employees in general.  And

2  the CEO of the division put out a pretty nice

3  communication to employees explaining, you know,

4  what I just said to you and the bonuses were issued

5  and Lisa, I guess, did not like the amount that she

6  received. And --

7      Q.    So -- okay, go on.

8          MR. DOUGHERTY:  You can finish your

9  answer.

10      Q.    Please finish, I apologize.

11      A.    Yeah, I can't recall specifically how it

12  was escalated to me, if Lisa came directly to me and

13  questioned it or if she went to a member of my staff

14  or maybe she talked to her boss.  I'm not really

15  sure, but she and I did have a conversation about

16  the bonus.

17      Q.    **Was there a complaint by her that half the**

18  **bonus that -- was there a policy at that time that**

19  **half the bonus be paid in the end of the year and**

20  **half the bonus be paid mid-year?**

21      A.    At that time, we actually -- we didn't

22  have a formalized bonus plan, which I believe I

23  discussed with Lisa when we had a -- had the bonus

24  discussion, if you will.  But generally, you know,

25  just historical QualTek when we've issued

1  performance bonuses to employees they've been made

2  in separate installments.

3      Q.    Right.  And was there a complaint by Lisa

4  **that the other half of that bonus, in other words,**

5  **the one that would be either -- well, I think it**

6  **would be actually around June, was not given to her?**

7  **In other words, she only got half; the other**

8  **installment never came.  Did she make that**

9  **complaint?**

10     A.    I remember discussing with Lisa that she

11 didn't like the amount of the bonus that she was

12 given.  I don't recall specifically what you're

13 referring to.

14     Q.    **Did you ever check with payroll to see how**

15 **much bonus she should get?**

16     A.    She should get?  So again, that was, you

17 know, part of the discussion that I had with Lisa

18 when we met on this a few years ago.  We didn't have

19 a formalized bonus plan.  Bonus payments are always

20 discretionary, you know, she did receive a bonus.

21 But in terms of what -- what someone should get or

22 should not get is not necessarily up to payroll.

23     Q.    **So the answer to my question is, you**

24 **didn't check with payroll to see if there was an**

25 **error, correct?**

1        A.    Check with payroll when?

2        **Q.    Check with payroll when a complaint came**

3   **in from Lisa that half her bonus had not been paid.**

4   **Never mind about the amount right now, that half the**

5   **bonus that she was given had not been paid.  So if**

6   **she was given $5,000, only 2,500 was given to her,**

7   **let's say, in December and the other half that was**

8   **due her because it had been already determined that**

9   **she would get the five.  That other 2,500 she never**

10  **got despite being promised that it would be there.**

11  **That's what I'm talking about with her complaint.**

12       A.    So I don't -- I don't recall specifics so

13  I don't want to speculate.  But is it possible that

14  since she terminated in January of 2020 that she

15  didn't receive the second half because she wasn't

16  active, she wasn't an active employee?  Is that what

17  you're referring to?

18       **Q.    I'm not.  I'm really not referring to**

19  **that.  I'm referring to the fact that payroll as far**

20  **as Lisa is concerned stated that there had been an**

21  **error and it needed to be corrected and it never was**

22  **corrected so she never got the other half of the**

23  **bonus.  Irrespective of, you know, by the other side**

24  **-- other part of the bonus.  I mean, the bonus that**

25  **had already been determined that she should get.**

1   **That's what I'm referring to.  But you don't really**

2   **know much about that, correct?**

3       A.   I can't recall.  Again, I -- I don't want

4   to speculate.

5       Q.   **You did speak with her at some point,**

6   **didn't you, and tell her that she was lucky to get a**

7   **bonus at all, do you remember that?**

8       A.   I had a conversation with Lisa about the

9   bonus.  I explained to her what was, you know,

10  nicely laid out by the wireless CEO as it relates to

11  the performance of the company and specifically the

12  performance of the legacy Velocitel market.  I did

13  -- I do recall specifically sharing with her that

14  we'd actually gotten a lot of positive feedback from

15  employees because employees were not expecting

16  anything and I said that I was surprised that she

17  was upset about getting a bonus because in general

18  the feedback from employees was very positive.  We

19  had a discussion, she didn't like the answer but I

20  didn't have any additional information to share with

21  her.  She was given a bonus.  She didn't like the

22  amount.  There wasn't much I could do about that.

23  But she asked me to have a discussion and I feel

24  like, or I believe if memory serves, she had asked

25  for the conversation to be documented, which I did.

 1  And I didn't hear from her on the subject

 2  thereafter.

 3       Q.    You got a bonus, though, right?

 4       A.    I'm sorry, I didn't -- I didn't hear what

 5  you said --

 6       Q.    You got -- you got a bonus that year,

 7  correct? You got one?

 8       A.    I -- I honestly can't recall.

 9       Q.    You've actually had a bonus every year

10  almost, correct?

11       A.    I actually do not agree with that

12  statement.  My bonus is based on the performance of

13  the company and our core businesses, wireless being

14  a huge part of that.

15       Q.    So you don't recall whether in 2018 or

16  2019 you got any bonus, correct?

17       A.    In 2018, I do believe I did.  For 2019, I

18  cannot recall.

19       Q.    Okay.

20            MR. KOLMAN:  Let me talk to my client,

21  I'll be back in 15.

22            (RECESS TAKEN FROM 2:34 P.M. TO 2:52 P.M.)

23  BY MR. KOLMAN:

24       Q.    I just have one thing that I just want to

25  ask you, Ms. Trybula, and that is about complaints

1  made in respect of disparate pay between males and

2  females.  Do you ever get a complaint like that?

3      A.   Disparate pay between males and females,

4  no, not -- not that I can recall.

5      Q.   There was never a complaint made by Lisa

6  Carlson or indeed anyone else alleging that males

7  were getting paid more money than females for the

8  equivalent job, is that correct?

9      A.   The equivalent job, not that I recall.

10     Q.   Okay.  Because if you had got such a

11  complaint, that's something that human resources

12  would have investigated, correct?

13     A.   Yes.

14     Q.   But since you didn't get such a complaint

15  there never was an investigation, correct?

16     A.   I -- I don't recall that with Lisa.

17     Q.   It wasn't just Lisa, it was anyone.

18     A.   No -- no issues with other employees to

19  that effect and I don't recall Lisa specifically

20  making that allegation while she was employed by us.

21     Q.   When you say specifically making, did she

22  non- specifically make it, whatever that means?

23     A.   I do not recall Lisa making that

24  allegation.

25     Q.   If she had made that allegation, is that

1    something that human resources would document?

2        A.    Yes.

3        Q.    Is that past the threshold for a serious

4    complaint?

5        A.    I would say so, yes.

6        Q.    And then there would be notes and we would

7    be able to see those notes except we don't see them

8    right now, but assuming that Colin gets those notes,

9    if there was such a complaint they would be in the

10   notes, correct?

11       A.    If it was documented, yes.

12       Q.    I mean, if it was documented, it would

13   have to be documented because by your own testimony

14   it's a serious complaint, correct?  And therefore it

15   -- and therefore it passes the threshold of being

16   needed to be documented by your own testimony, is

17   that right?

18       A.    Yes.

19       Q.    Good.  Then I think I'm done.

20            MR. KOLMAN:  Give me two minutes,

21   actually.

22            I'm not going to need anything else.  Stay

23   where you are, everyone.

24            (RECESS TAKEN FROM 2:55 P.M. TO 2:59 P.M.)

25   BY MR. KOLMAN:

1    Q.    Just very briefly, in human resources you

2    get to see a lot of confidential medical

3    information, correct?

4    A.    I do.

5    Q.    But you don't discuss that with anyone,

6    you keep it private, is that correct?

7    A.    Correct.

8    Q.    Do you recall --

9    A.    Protected health information of our

10    employees is something I take very seriously.

11    Q.    Sure.  So do you recall when Lisa said she

12    was taking a mental health day?  Remember that?

13    A.    I do recall that, actually.

14    Q.    Yeah.  She was taking a mental health day

15    and you went and told Dave Conn her supervisor that

16    she was taking a mental health day.  Why did you do

17    that?

18        MR. DOUGHERTY:    Object to form.

19    A.    I have no issue answering.  So one, I did

20    have a -- I did have a discussion with Dave.  I

21    asked him if he was aware that she was not working.

22    I did not share any protected health information

23    during that discussion and the reason that I asked

24    Dave specifically was because I had heard that they

25    had concerns, meaning Dave and Shawn had concerns

1  about how frequently she went to the office to work

2  versus, you know, working remote.

3         And there was also a situation too where

4  apparently she was supposed to spend more time in

5  Blue Bell when she was visiting but kind of left

6  without giving anyone notice.  So when that was

7  called to my attention I didn't see any time off for

8  her in our HRIF platform so I did ask Dave.  I said,

9  you know, are you aware that she is not working

10 today?  And I also said to him, like is everything

11 okay?  You know, she's -- she's saying she's taking

12 a mental health day, is there anything that we have

13 to be aware of?  But I did not share any protected

14 health information; I didn't have any protected

15 health information to share.

16     Q.   So it's your view that telling her

17 supervisor that she was taking a mental health day

18 is not a communication of any protected medical

19 information, is that what you're saying?

20     A.   No.

21     Q.   Okay.  So -- okay.  Do you believe -- I

22 mean, your testimony is that you do not believe you

23 shared any confidential information with Dave Conn

24 when you said concerning Lisa Carlson she's taking

25 -- she says she's taking a mental health day?

1        **MR. DOUGHERTY:**  Objection to form.

2        **Q.    You don't believe that that's**

3  **communication --**

4        **MR. DOUGHERTY:**  Are you --

5        **MR. KOLMAN:**  I'm sorry, go ahead.

6        **MR. DOUGHERTY:**  Are you asking a question

7  about something that is legally protected or that

8  she considered confidential?

9        **MR. KOLMAN:**  No, legally protected.

10        **MR. DOUGHERTY:**  Okay.

11        **Q.    You don't believe that that information is**

12  **legally protected?**

13        A.    To me it was -- it's an expression.  I did

14  not share any of Lisa's personal health information.

15        **Q.    Did you tell Lisa that you reserved the**

16  **right to tell any director about any aspect of her**

17  **health if you thought it was appropriate?**

18        A.    I would never say that.

19        **Q.    Is it your view that the taking of mental**

20  **health day is not specific enough to trigger the**

21  **responsibility of HIPAA in respect of communication,**

22  **is that what you're saying?**

23        A.    Yes.

24        **MR. DOUGHERTY:**  Object --

25        **MR. KOLMAN:**  She answered the question.  I

1  don't really have anything else so we'll leave it

2  there.   Thank you very much, Ms. Trybula.

3           **MR. DOUGHERTY:**   Thank you.   I have no

4  questions.

5               **(SIGNATURE WAIVED)**

6               **(DEPOSITION CONCLUDED AT 3:05 P.M.)**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT "U"



COURT REPORTING

LEGAL VIDEOGRAPHY

VIDEOCONFERENCING

TRIAL PRESENTATION

MOCK JURY SERVICES

LEGAL TRANSCRIPTION

COPYING AND SCANNING

LANGUAGE INTERPRETERS







**(800) 528-3335**

**NAEGELIUSA.COM**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

LISA CARLSON,
2805 243rd Avenue Northwest
St. Francis, MN 55070

      Plaintiff,

                   CIVIL ACTION
v.                  No.: 2:22-cv-00125

QUALTEK, LLC
1150 First Avenue, Suite 600
King of Prussia, PA 19406

      Defendant.

_____

**VIDEOCONFERENCE DEPOSITION OF**

**DAVE CONN**

**TAKEN ON
WEDNESDAY, JUNE 29, 2022
10:08 A.M.**

**PENNSYLVANIA**

1    A.   Where I work currently at QualTek?

2    **Q.   Yes.**

3    A.   Corporate finance.

4    **Q.   And when you applied for your position,**

5    **was that in corporate finance also or somewhere**

6    **else?**

7    A.   No, it was corporate finance, yes.

8    **Q.   And when did you actually start in the**

9    **corporate finance office at QualTek?**

10   A.   January 2018.

11   **Q.   Do you know if, at that point, QualTek had**

12   **acquired Velocitel?**

13   A.   They had.

14   **Q.   Were you involved in any way in the**

15   **integration of Velocitel and QualTek?**

16   A.   I was.  I believe that the acquisition was

17   in December of 2017.  I don't remember exact date

18   and then I started like I said, about a month later.

19   I was involved in the integration piece as far as

20   the financial reporting and things like that.  I was

21   also still doing non-wireless acquisition due

22   diligence so when I first started there was a little

23   bit of everything.

24   **Q.   What did you have to do in terms of --**

25   **just broadly, in terms of the integration of**

1  **Velocitel with QualTek in terms of corporate**

2  **finance?**

3      A.    Maybe I would say it was a smaller company

4  that I was joining our large division.  We have a

5  kind of unique way of reporting our metrics that not

6  everybody else in the industry normally does.  We do

7  weekly P&Ls, which is not the norm so we kind of --

8  what I was brought on to do really was to help

9  integrate the piece that takes what the acquired

10  company does as far as their reporting.  It's

11  usually monthly, it's usually not as granular, and

12  put it into our format kind of.  We call them

13  managers reports that go out every week.  And then

14  we have exception reporting, KPIs, and I don't have

15  to get into the nitty gritty, but that's kind of

16  where I come in and what I've done for this

17  executive team in the past is helping the

18  integration to take what we get and turn it into

19  what we want it to look like under QualTek.

20      **Q.    Did you take over any employees that had**

21  **been retained by QualTek that previously were**

22  **employed by Velocitel that now reported to you?**

23      A.    Directly?  I don't recall if any of them

24  reported to me directly.  I know that, you know,

25  they may have reported to somebody on my team, but I

1  don't recall if any of them reported to me directly.

2      Q.   **Who was on your team at the time?**

3      A.   Financial analysts mostly.

4      Q.   **Who?**

5      A.   Financial analysts.

6      Q.   **Okay.**

7      A.   Like I said, you know, I wasn't just

8  wireless in the beginning so they were across a

9  couple of different divisions but mostly financial

10 analysts made up my team when I first got here as

11 Director of Finance.

12     Q.   **How many people indirectly reported to you**

13 **through the chain of command?**

14     A.   I'd be estimating, but at that time,

15 because it has changed.  You're talking about when I

16 first started?

17     Q.   **Well, I'm talking about as you began the**

18 **integration of Velocitel with QualTek.  I think**

19 **that's really the time frame that I'm looking at.**

20 **Specifically, let me be specific, Velocitel**

21 **employees.  How many Velocitel employees either**

22 **directly or indirectly reported to you from the time**

23 **that you came on board to let's say, December of**

24 **2020?**

25     A.   How many legacy Velocitel folks.  Four,

1 that's an estimate.

2     **Q.    Can you tell me their names?**

3     A.    I don't remember all their names.

4 Obviously, Lisa Carlson.  I don't -- and then there

5 was more teammates in Minnesota, Kayla.  Sorry, I

6 don't remember all their names and I think there was

7 two more.

8     **Q.    Were you in any way responsible for**

9 **bringing Brandon Ebeling on board?**

10     A.    Responsible?  No.  I mean, he applied and

11 I interviewed him.

12     **Q.    Okay.  You didn't know him before,**

13 **correct?**

14     A.    I did not.

15     **Q.    But you knew Bruce Neff before, correct?**

16     A.    I did, yes.

17     **Q.    So when Bruce Neff came in to interview,**

18 **you already knew him from UniTek, is that right?**

19     A.    I knew Bruce but I did not interview him

20 when he came to QualTek.  But yes, I did know him.

21     **Q.    Was there a reason you didn't interview**

22 **him when he came to QualTek?**

23     A.    When he started he was -- it was a unique

24 role for us as far as our AR unbilled and he was

25 brought in by our CFO, at the time, for that unique

1  role so he was on my team. So you know, everybody

2  kind of worked with Bruce before so the CFO brought

3  him in knowing his past experiences so I didn't

4  interview him.

5       Q.   And the CFO was who?

6       A.   Steve Forbes.

7       Q.   I'm sorry?

8       A.   Steve Forbes.

9       Q.   Steve knew him from UniTek?

10      A.   I don't know where Steve knew him from.  I

11  knew him from UniTek.

12      Q.   Did you know Steve from UniTek?

13      A.   No.

14      Q.   When you say you knew Bruce Neff from

15  UniTek, did Bruce ever reach out to you prior to or

16  contemporaneously with applying for a job at

17  QualTek?

18      A.   No.

19      Q.   How did you first find out that Bruce Neff

20  was applying for a job at QualTek?

21      A.   I believe I saw him in Steve's office one

22  day.

23      Q.   Saw him in Steve's office one day?  How

24  did that happen?

25      A.   I've no -- I assume that they hooked up



1  somehow.  I don't know.  I can't -- I don't know how

2  Bruce ended up in Steve's office; they know each

3  other.

4      Q.   Okay.  Were you walking past the office

5  one day and you just happened to see Bruce Neff in

6  Steve's office?

7      A.   I mean, I don't know if that's exactly how

8  it happened, but I saw Bruce in the office one day

9  and found out he was meeting with Steve.

10     Q.   Were you asked to attend that meeting?

11     A.   No.

12     Q.   Do you know if at the time Bruce Neff had

13  been employed, in other words, been given an offer

14  by QualTek or did you have an understanding that the

15  reason why Bruce Neff was in Steve's office was

16  pursuant to an interview that --

17          MR. DOUGHERTY:   Objection --

18     Q.   -- Steve was having?

19          MR. DOUGHERTY:   Answer if you understand

20  it.

21          THE WITNESS:   Sorry?

22          MR. DOUGHERTY:   I said objection to the

23  form, you can answer it if you understand it.

24     A.   I guess -- are you -- are you asking if I

25  knew if Bruce had a job prior to QualTek?

1      Q.    Well, no.  Let me -- let me rephrase,

2  okay?

3      A.    Sure.

4      Q.    When you saw Bruce Neff in Steve's office,

5  did you then go into Steve's office?

6      A.    No, I don't think so.  I don't remember

7  but I don't think so.

8      Q.    In other words, you saw Bruce Neff in

9  Steve's office and you walked right by?

10     A.    I don't exactly remember the encounter.  I

11  just remember seeing Bruce in the office one day,

12  said hi to him.

13     Q.    Saw Bruce in the office one day, you

14  didn't go into Steve's office, you didn't say

15  anything to Bruce and yet you recall seeing him,

16  would that be correct?

17     A.    That sounds about right.  I might have

18  said something to him like hi, but I didn't go into

19  the office when he met with Steve.

20     Q.    And do you recall whether at that date or

21  time Bruce Neff was employed by QualTek?

22     A.    I don't know when Bruce was actually

23  employed by QualTek after that.

24     Q.    At some point after seeing him in Steve's

25  office, did you and Bruce have a discussion?

1      A.   If we did it would have been the day he

2  started, whenever that was.

3      **Q.   And the day he started may have been**

4  **before he was in the office or after he was in the**

5  **office?**

6      A.   After.

7      **Q.   Do you know how long after?**

8      A.   I don't.

9      **Q.   Do you remember -- how far is Steve's**

10  office from your office, by the way?

11      A.   In feet, I don't know, it's pretty close.

12  I'd say probably -- it's across the other side of

13  the hall, but not that far.

14      **Q.   And is it a glass paneled office so you**

15  **can see who's inside?**

16      A.   No.

17      **Q.   So if you were walking past the office you**

18  **wouldn't have been able to know who's inside,**

19  **correct?**

20      A.   Probably not, no.

21      **Q.   Unless you had x-ray vision, correct?**

22  **Which, of course you don't have.  So my question is,**

23  **if you walked past the office how could you possibly**

24  **know that Bruce Neff was inside?**

25      A.   I probably saw him go in or maybe saw him



1  come out.

2      Q.   Okay.  So --

3      A.   Maybe he's got windows -- sorry?

4      Q.   Okay.  So now we're doing something which

5  I suggested before should not be done, which is not

6  to speculate about what you did or did not do.  I

7  may have done this, I may have done that, et cetera,

8  et cetera.  I mean, I'm asking you what actually

9  happened to the best of your recollection.

10          Just to circle back for a minute, you

11  informed me that you saw him in Steve's office.  You

12  then testified you did not go into the office.  If

13  there's anything about my recollection about your

14  testimony, you may correct me and the record.  And

15  yet now we find out that you could not have seen him

16  from the outside and yet you testified you did not

17  go in.

18          Now, is there any part of your testimony

19  thus far looking back that you may wish to clarify

20  for the record, and I would just mention again, that

21  you are under oath and I would ask that you recall

22  to the best of your ability so that the record is

23  clear about what exactly happened on the day that

24  you know or knew that Bruce Neff was in Steve's

25  office.

1    A.    So understood.  I don't remember exactly

2  if I maybe saw him walking out of Steve's office,

3  walking around the actual giant office and not just

4  Steve's office where everybody sits, the open area,

5  or if I walked and the door was open and I saw him

6  sitting in Steve's office.  I don't recall.  I just

7  remember seeing Bruce that day and knowing that he

8  was meeting with Steve.

9    Q.    Then your testimony was that you didn't

10 say anything to Bruce Neff until after he was

11 actually employed which was after his meeting with

12 Steve, and yet you saw Bruce Neff at sometime,

13 someplace around the office, possibly in the office

14 and your testimony was that you did not speak with

15 him.  But is -- do you want to rethink that for a

16 minute?  I mean, did you in fact --

17          MR. DOUGHERTY:   Objection.

18    Q.    -- not speak to him at all?

19          MR. DOUGHERTY:   Objection.  Is there a

20 question?

21          MR. KOLMAN:   Yes.

22    Q.    Did you not speak to him at all?  That's

23 the question.

24    A.    Yeah, I don't remember.  I actually don't

25 remember if I spoke to him, but I -- I don't

1  remember.

2     Q.    It's your testimony you did not --

3     A.    I remember --

4     Q.    It's your testimony you did not know that

5  Bruce Neff was coming in, correct?

6     A.    I'm sorry, could you repeat that?

7     Q.    Your testimony was you didn't know that he

8  would be coming in, correct?

9     A.    I did not.  No, I did not.

10    Q.    Now, Lisa Carlson reported to you

11 indirectly.  I believe that was your testimony,

12 correct?

13    A.    I believe so, yes.

14    Q.    And in between Lisa and yourself, given

15 that her reporting to you was indirect, was who?

16 Who was the intermediary between her and -- excuse

17 me, between her and you?

18    A.    I believe Shawn Kemmerer.

19    Q.    And how long did Lisa Carlson report

20 indirectly to you before she was no longer at

21 QualTek?

22    A.    I believe she reported to Shawn the entire

23 time.

24    Q.    And how long did Shawn report to you?

25    A.    Shawn reported to me also the entire time.

1    Q.   And when you say the entire time, I

2  understand when you came on board, but when did that

3  entire time end? For example, when did Shawn

4  Kemmerer leave?  Let's start there.

5    A.   Shawn Kemmerer left recently.  I would say

6  two months ago.

7    Q.   Do you know if Shawn Kemmerer was

8  terminated from his employment?

9    A.   No, he was not.

10    Q.   So it's your understanding that he left

11  for some other reason, voluntarily to take another

12  job, you're not sure what or maybe you are, but he

13  was not terminated as far as you know, would that be

14  right?

15    A.   That's correct.  That's correct.

16    Q.   Do you -- have you kept in touch with

17  Shawn after he left QualTek?

18    A.   Once or twice through a text maybe.

19    Q.   You consider him an acquaintance or a

20  friend?

21    A.   Yeah, he was a work friend.  I knew him a

22  pretty long time.

23    Q.   My understanding is that you knew Shawn

24  Kemmerer from UniTek, would that be correct, when

25  you came on board?

1  A.   Yes.

2  Q.   **And how long was Lisa Carlson there after**

3  **you came on board at QualTek in 2018, January?**

4  A.   When was Lisa's last day?

5  Q.   **Well, approximately.**

6  A.   I don't know.

7  Q.   **I don't want you to recall that exactly,**

8  **but if you can tell me broadly what it was, I'll**

9  **take it.**

10  A.   I -- I don't know.  I don't know when -- I

11  don't know when she -- when her last day was.

12  Q.   **Do you know if Lisa was terminated from**

13  **her employment?**

14  A.   I believe the position was eliminated,

15  yes.

16  Q.   **When you say, "the position was**

17  **eliminated," you're talking about which position?**

18  A.   The one that she held at the time.

19  Finance manager, I believe.

20  Q.   **Okay.  And do you know what her duties**

21  **were as finance manager?**

22  A.   Reporting.  Same as I mentioned before is

23  what my team does.  A lot of reporting, Excel

24  spreadsheets, a lot of the AT&T, they're contract

25  subs for that particular area.

1    Q.    So you say that was -- that was all -- and

2  you may not have been responsible for this, but it's

3  your understanding that that position was

4  eliminated.  Did you have anything to do with the

5  elimination of that position?

6    A.    No.  I mean, my -- part of my

7  responsibility was to build a team in our current,

8  well, in our old King of Prussia, Pennsylvania

9  office as a corporate team.  So that was kind of

10 where I focused.

11   Q.    I understand that was your focus.  It's

12 not entirely responsive to my question.  So my

13 question is, did you have anything to do with the

14 so-called "elimination" of Lisa Carlson's position?

15 Albeit --

16   A.    I knew about it.

17   Q.    -- albeit for this greater purpose that

18 you state.

19   A.    I mean, I knew -- I knew about it, if

20 that's what you're asking me, yes.

21   Q.    And you knew about it when?

22   A.    When the decision was made, so our

23 restructure and you know, the team that we're kind

24 of building going forth.

25   Q.    And when was that decision made?  Well,

1  let me ask you a prior question.  Was that a

2  collective decision, not just you but others made

3  that determination at some point?

4      A.    That's -- yeah, that's fair.

5      Q.    And was that in -- was that in a committee

6  or possibly by email or in some other collective

7  action that was made before -- well, was made to

8  eliminate Lisa's position?

9      A.    I think it was more of a kind of a team

10  agreement as far as the structure we wanted and

11  where we wanted the team to be built.  So I imagine

12  that it was a conversation amongst my team and then,

13  you know, eventually HR.

14      Q.    And when you say you imagine but when you

15  say that you're saying that's what happened,

16  correct?  In other words, when you say you -- is

17  that right?

18      A.    Yes.

19      Q.    And who on the team was part of this

20  decision?  We know you were because you testified

21  that you were, but who else on the team was part of

22  this decision to eliminate Lisa Carlson's position?

23      A.    I would say, you know, each -- anybody on

24  my team. So Shawn who you mentioned earlier.  All my

25  --

1    Q.    Kemmerer --

2    A.    -- financial --

3    Q.    Let me take you one step at a time so I

4  can just note down.  So Shawn Kemmerer was part of

5  the elimination process, is that correct?

6    A.    Everybody on my team was a part of the

7  discussion I would say, as far as how we wanted the

8  structure of our team to look and where we wanted it

9  to be.

10    Q.    So Shawn Kemmerer would be one and who

11  else?

12    A.    I guess my financial analysts.

13    Q.    And is there anyone else?

14    A.    Probably my direct report, my boss who

15  I've -- I work with, too, I'm sure was --

16    Q.    Who's that?

17    A.    -- in discussion.  I'm sorry?

18    Q.    Who is your direct boss at that time?

19    A.    Mike Machini.  I would say we were all --

20  we were all in conversations.

21    Q.    Anyone else?

22    A.    Not that I can recall.

23    Q.    At that time, was there discussion about

24  Bruce Neff taking over some of these duties that

25  Lisa Carlson had?

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM
249a

1       A.   No, I don't believe so.

2       **Q.   Did Bruce Neff's name come up in any way**

3  **with respect to the kind of team that everyone**

4  **wanted to build?**

5       A.   I don't remember.

6       **Q.   What was it about Lisa Carlson that**

7  **prevented her from being part of the new team that**

8  **QualTek wanted to build?**

9       A.   I mean, so we were looking for candidates

10 with, you know, a bachelor's degree at a minimum for

11 not just our higher level people but for our

12 financial analysts.  We were shifting towards a

13 little bit of some accounting experience, not

14 necessarily an accounting degree but some accounting

15 experience because of the role we wanted.  And you

16 know, I guess just as importantly, you know, because

17 of the camaraderie we were building it had to be a

18 position that was going to be in our corporate

19 office in King of Prussia, had to be local.

20      **Q.   Okay.  So who is "we"?  Is that the "we"**

21 **that you just described, the people who were on this**

22 **as it were, informal restructuring committee or team**

23 **building committee --**

24           MR. DOUGHERTY:  Objection --

25      **Q.   -- the names you just made?  Okay --**

1    A.   I --

2    Q.   -- with regard to -- okay, you say you

3 wanted someone with a degree, what does a degree

4 bring to the job that someone not having a degree

5 brings, if you know?

6    A.   I mean, just from -- I can just speak from

7 my experience the reason why, you know, this is part

8 of my job description and I feel it's a more well-

9 rounded professional.  Somebody who's, you know, had

10 -- has gone through and had the accounting and had

11 the finance and had that type of experience.  So

12 it's been my experience and that's all I can speak

13 to is my experience that that's the bare minimum

14 that we look for and any kind of, you know,

15 tangibles after that.  So that's what I've always

16 searched for in a candidate.

17    Q.   So it doesn't matter -- it doesn't matter

18 what the degree in it -- the degree is in, it could

19 be in the history of basketball or 12th century

20 Chinese banking, it's just that they have a degree,

21 is that correct?

22    A.   No, that's not true.  It would -- it would

23 be --

24    Q.   It doesn't say -- excuse me.  It doesn't

25 say that the degree has to be in finance or

1  **accounting, it just says there has to be a degree,**

2  **is that right?**

3      A.   What doesn't say?  I don't know what

4  you're referring to.

5      **Q.   I said the requirement as I understand it**

6  **is to have a bachelor's degree but it doesn't say a**

7  **bachelor's degree in accounting, a bachelor's degree**

8  **in finance, am I right?**

9          MR. DOUGHERTY:  Objection.  Are you --

10  Tim, are you referencing something?

11         MR. KOLMAN:  Yes, I'm representing the

12  alleged qualifications required to be a candidate

13  for this team.  And allegedly what you require is a

14  bachelor's degree but it doesn't have to be a

15  bachelor's degree in finance or accounting, it

16  simply has to be a bachelor's degree, and that's

17  what I'm asking about.

18      Q.   So my --

19         MR. DOUGHERTY:  You're saying, "it doesn't

20  say."  What are you referring to as "it" --

21         MR. KOLMAN:  I'm referring to the fact

22  that -- I'm referring to the fact that Mr. Conn just

23  said that we, you know, we require a bachelor's

24  degree.  I'm asking, is it just a bachelor's degree

25  or is it a bachelor's degree in some specific

1 specialty?  As far as I'm aware, having read the

2 documents, it's simply a bachelor's degree and I'm

3 asking for clarification on that.  That's all.

4     **Q.    Is it a bachelor's degree or is it --**

5     **MR. DOUGHERTY:**  Okay.  Objection --

6     **Q.    -- a bachelor's degree in some kind of**

7 **specialty, that's all I'm asking.  You can answer.**

8     A.    I mean, I would say that, yes.  I would

9 say that we were looking for a bachelor's degree in

10 business or finance or accounting, to answer your

11 question.

12     **Q.    And where does it say -- and where does it**

13 **say that anywhere, do you know?**

14     A.    Where does -- where does what say that?

15 Job description?

16     **Q.    Yeah.  Is it written down?**

17     A.    I don't have the job description in front

18 of me. I'm not exactly sure what it says.

19     **Q.    Do you know how long Lisa Carlson had been**

20 **employed at Velocitel?**

21     A.    Before the acquisition?

22     **Q.    Before the acquisition.**

23     A.    I do not.

24     **Q.    Did you ever look at Lisa Carlson's**

25 **personnel records?**



1    A.    Her personnel records?

2    **Q.    Yes.**

3    A.    No.

4    **Q.    Did you ever look at her reviews to see if**

5    **she had received good reviews and different reviews**

6    **or bad reviews?**

7    A.    Before the acquisition or after the

8    acquisition?

9    **Q.    Well, after the acquisition, obviously.**

10    A.    Well, you asked me if I knew how long she

11    worked there so I wasn't sure.  So I would say after

12    the acquisition, yeah, I'm sure I saw her reviews.

13    **Q.    And were you one of the persons**

14    **responsible for retaining her for a period of time**

15    **after the acquisition because you thought she might**

16    **be useful?**

17    A.    Yeah.  I mean, when I -- when I first

18    started, like I said, I wasn't just wireless so when

19    we do acquisitions we typically don't keep, you

20    know, non- operators or things like that, you know,

21    finance folks and HR folks.  But in this case

22    because of the timing it made sense to keep some of

23    the finance people and give them a shot and see what

24    they can do.  So yeah, I do recall, you know, that

25    team, you know, being the decision to keep that team

1  to see what we can get from them.  So yes.

2      **Q.    And what -- and what could Lisa Carlson**

3  **do?**

4      A.    From what I recall, very good Excel skills

5  and you know, the AT&T turf contract piece was kind

6  of what Lisa's strength was.

7      **Q.    And when you say the AT&T contract piece,**

8  **can you elaborate a little about what that is?**

9      A.    It's just a lot of different rules for

10  AT&T as far as milestones and billing and, you know,

11  dates and their systems.  So you know, all that is

12  involving AT&T piece.

13      **Q.    And who took over all of those things**

14  **after she was gone?**

15      A.    I mean, I also had people on my team that

16  were also good at that.  Shawn Kemmerer who we

17  mentioned earlier had a background in AT&T turf.  He

18  also sat right next to me so it made it easy for me

19  to go over there and kind of talk to him.  So I

20  would say he probably took most of that going

21  forward, that role.

22      **Q.    What was Shawn Kemmerer doing prior to**

23  **being given that role in addition?**

24      A.    Just general reporting.

25      **Q.    Did Shawn Kemmerer ever recommend to you**



1 that Lisa Carlson be retained by the company?

2      A.   I don't recall that.

3      Q.   Did Shawn Kemmerer ever talk to you about

4 Lisa Carlson being told she was going to be a

5 director?

6      A.   I don't recall that either.

7      Q.   Did you have any direct discussion with

8 Lisa Carlson, at any time, after you came on board

9 at QualTek?

10      A.   Did I ever talk to Lisa?

11      Q.   Directly in a work situation, not

12 socially, not having coffee, but with respect to any

13 duties she was performing or any other business

14 capacity in which you were employed or she was

15 employed?

16      A.   Yes.

17      Q.   How many times did you speak with her in

18 respect to your -- her duties and yours?

19      A.   I mean, I don't remember how many times.

20      Q.   Did you give her instruction as to what

21 she needed to do at times?

22      A.   I'm sure we had conversations around the

23 reporting and what was expected and back and forth.

24      Q.   Did you ever tell her that she was doing a

25 good job?



1      A.    I don't remember.

2      Q.    **Were you ever required to assess the**

3   **employees who reported to you indirectly?  In other**

4   **words, review them on a six-month or yearly basis or**

5   **on any basis?**

6      A.    We do -- we do yearly reviews and the

7   direct supervisor does the review.  As the second

8   supervisor, I would see it and just kind of review

9   it, but I wouldn't do the actual sit-down.  I only

10  do that with my direct reports.

11     Q.    **Do you know if Shawn Kemmerer ever did a**

12  **review of Lisa that you saw?**

13     A.    I don't remember.  I'm sure he did because

14  of the length that she was here, but I don't

15  remember them exactly.

16     Q.    **Well, QualTek says they don't have a**

17  **review of Lisa Carlson.  Do you know if that's the**

18  **case?**

19     A.    I don't.  I'm not positive.

20     Q.    **If there had been a review of Lisa**

21  **Carlson, do you know where that would go?**

22     A.    The reviews that I --

23     Q.    **Would that go in the file somewhere?**

24  **Sorry, go on.**

25     A.    The reviews that I do, I can speak to

1  those.  They go to HR and then they go to the actual

2  employee after that.

3      Q.    Do you recall any complaints made by Lisa

4  Carlson that you heard about either directly or

5  indirectly regarding the payment of her bonus?

6      A.    I don't recall.

7      Q.    Did Shawn Kemmerer ever come to you to

8  tell you that Lisa Carlson was complaining that she

9  had not been paid her full bonus?

10      A.    I don't remember having a conversation

11  like that.

12      Q.    Did Shawn Kemmerer ever come to you and

13  make any complaint on Lisa's behalf about any

14  disparity of pay, meaning that Lisa was complaining

15  that she was not being compensated fairly?

16      A.    I don't remember having any of those

17  conversations either.

18      Q.    Did you receive any complaints from any

19  female employees at any time that they believed they

20  were not being paid on the same equal basis as men

21  for the same work?

22      A.    No.

23      Q.    Did you ever pass on any complaints of any

24  employees to HR regarding any complaint for what

25  would be described as descrimination on the basis of

1  gender, race, national origin, religion or

2  disability?

3      A.   You lost me.  Did I ever pass on something

4  --

5      Q.   To HR.

6      A.   -- on behalf?

7      Q.   Yes.  A complaint made --

8      A.   No, not --

9      Q.   -- complaints made to you and you pass it

10  on to HR for investigation or review?

11      A.   Not that I can recall, no.

12      Q.   When you say not that you can recall, do

13  you keep notes of meetings that you have with

14  employees?

15      A.   Sometimes.

16      Q.   When you keep notes, are those notes

17  electronic? In other words, you type them up?

18      A.   Typically if I take notes, no.  They're

19  usually handwritten but I can't say that I've never

20  typed them up.

21      Q.   With respect to the meetings that were

22  held to determine that Lisa Carlson's job should be

23  eliminated, do you have -- was there any record kept

24  of the agenda of that meeting?

25      A.   None that I can recall, no.

1    Q.    Was there any record kept of the

2  resolution that was made after the meeting with

3  respect to what was decided as a consequence of

4  putting together this new team as you call it?

5    A.    I don't recall having any record of that,

6  no.

7    Q.    Is there any written document, and by

8  written, I mean written as an email, written as a

9  memo, written just on ordinary paper regarding the

10 termination of Lisa Carlson?

11   A.    Not that I can recall, no.

12   Q.    So let me circle back.  There is no

13 document as far as you know, anywhere that states

14 that Lisa Carlson's posision will be eliminated?

15   A.    Not that I know of.  No, no document.

16   Q.    Even though that decision was allegedly

17 made at some point by the people you mentioned, four

18 people apparently, but you're not sure if it was all

19 of those or some of those, and it was -- and that

20 there was a meeting in some kind of collective

21 capacity, whether it was virtual or whether it was

22 actual, you don't know but that was one of the

23 outcomes.  Is there anything I said that is

24 different from what you testified to?

25        MR. DOUGHERTY:  Object to form.  You can

1  answer --

2      Q.   Correct the record if I'm mistaken.   That

3  was my understanding.   Is there anything about my

4  understanding that is incorrect with regard to your

5  testimony?

6      A.   I didn't follow exactly your line of your

7  question.

8      Q.   Well, I was actually trying to as it were,

9  circle back and make sure that I understood your

10 testimony correctly.   And as I understood it, it was

11 that -- why don't we take it in pieces, that a

12 collective decision was made that a new team would

13 be constituted, am I right about that?

14     A.   Yes.

15     Q.   And that this new team would not include

16 Lisa Carlson, correct?

17     A.   Correct.

18     Q.   And that one of the reasons it would not

19 include her was because she did not have a degree,

20 would that be correct?

21     A.   That's one of the reasons, correct.

22     Q.   And -- and the fact that she had been

23 doing this specific job apparently very well, didn't

24 matter because the issue of the degree was a non-

25 negotiable issue, is that my understanding?



1      A.    Also the location of the job was also a

2  non- starter.

3      **Q.    Did you ever meet or speak with Dana**

4  **Freedman?**

5      A.    Yes, once or twice.  She wasn't here very

6  long after I started.

7      **Q.    And what was Dana Freedman's position?**

8      A.    I don't remember.  She was here for a week

9  after I started.

10     **Q.    And do you know why she left?**

11     A.    I don't.

12     **Q.    Anyway, circling back with respect to this**

13 **decision that was made collectively for this**

14 **restructuring, although it was made collectively**

15 **there are no minutes from those -- that meeting,**

16 **correct?**

17     A.    None that I have, no.

18     **Q.    And there's no agenda from the meeting as**

19 **far as you know, correct?**

20     A.    Correct.

21     **Q.    And the decision, the decisions that were**

22 **made, they are not memorialized in any form that**

23 **could be understood?  In other words, they're not in**

24 **email, they're not in metaform, they're not in any**

25 **documentary form, is that correct?**

1      A.    Not that I can recall, no.

2      Q.    **So if that was the case, in whose mind did**

3   **this decision to restructure exist?  I mean, if it's**

4   **not written down anywhere, how is it going to be**

5   **manifested?  Did you -- were you the one who put it**

6   **through and manifested it because --**

7      A.    Put what through?

8      Q.    **The restructuring.  Because it was in your**

9   **head. Not that it was written down anywhere, but it**

10  **was in your head and you made the decision to**

11  **restructure.**

12     A.    Yeah, so I think the goal of myself and my

13  team and my boss was to ultimately have a specific

14  team, corporate finance team in King of Prussia,

15  Pennsylvania with certain, you know, levels, whether

16  it's financial analysts and directors of finance at

17  my -- you know, a corporate team.  It's what worked

18  in the past, it's what I -- the team I wanted to

19  build.  So I think that -- yeah, so the people that

20  I met with, like I said, my boss and my team, this

21  is the direction we wanted to go as we were growing

22  and creating a corporate finance team, having a team

23  in King of Prussia, Pennsylvania.

24     Q.    **You ever speak to Lisa Carlson about the**

25  **fact that she would not be part of this team?**



1      A.    Did I ever speak with her?

2      **Q.    Yes.  Did you speak to her?**

3      A.    I don't think directly.  I believe she

4   probably spoke with Shawn.

5      **Q.    Okay.  Let's talk about you for a minute.**

6   **In the sense that you were the one who was putting**

7   **this new team together, is there a reason you didn't**

8   **directly speak to her and tell her, listen, you're**

9   **not qualified to go forward with the team that I'm**

10  **putting together so you --**

11     A.    I don't --

12     **Q.    -- you -- wait.  You don't have a degree**

13  **and you don't live in Philadelphia so I'm afraid**

14  **you're not going to be part of the team.  You never**

15  **said anything like that to her, correct?**

16     A.    I don't believe I've ever had that

17  conversation, no, directly.

18     **Q.    And why would you not speak to her**

19  **directly about those particular things?  If you're**

20  **going to restructure her out, why wouldn't you talk**

21  **to her directly?**

22     A.    I think probably her direct supervisor

23  handled that, which was Shawn at the time.  So I'm

24  pretty sure, you know, from what I know, because I

25  had a conversation with Shawn who was in the meeting

1  and was on the same page and he had that -- he had

2  that communication.

3     **Q.   Did Shawn Kemmerer agree that Lisa Carlson**

4  **should be terminated because she could not be part**

5  **of this new vision that you were putting together at**

6  **QualTek?**

7     A.   To my recollection, yes.

8     **Q.   Did you write that down anywhere?**

9     A.   Did he write that down anywhere?

10    **Q.   Yeah, ever give you a memo about that?**

11    A.   Not that I can recall.

12    **Q.   Have you received or did you receive any**

13 **emails with respect to the termination of Lisa**

14 **Carlson or the restructuring of this new team**

15 **without Lisa Carlson in it?**

16    A.   I don't, I mean, I got an email, you know,

17 the day she was termed like I do any other terms but

18 I don't think I got any emails about the plan, you

19 know, we had meetings.

20    **Q.   Did you ever look for any such emails?**

21    A.   Did I ever look for it?

22    **Q.   Did you ever look for any emails**

23 **concerning the termination of Lisa Carlson?**

24    A.   I don't recall ever doing so.  I don't

25 remember.

1    Q.    Were you ever requested to search for

2    documents regarding the termination of Lisa Carlson?

3         MR. DOUGHERTY:   Objection to the extent it

4    calls for a conversation he never had.

5    Q.    Let me ask you this, were you ever told to

6    -- not to erase any documents regarding Lisa

7    Carlson?

8         MR. DOUGHERTY:   Objection --

9    Q.    In other words, was there a litigation

10   hold put on this case?

11   A.    I don't know what that is.

12   Q.    You don't know what a litigation hold is,

13   is that correct?

14   A.    I don't.

15   Q.    I just want to be really clear.  So you

16   are saying that you don't recall -- you don't recall

17   one document, one email except for the day that she

18   was terminated, dealing with the restructuring of

19   your team and the effect it would have on Lisa

20   Carlson?  The fact that her job description would be

21   adopted or her job duties would be adopted by Shawn

22   Kemmerer.  Nothing like that at all, is that right?

23   A.    Not that I can recall.

24   Q.    What you recall, meaning that they could

25   exist but you haven't looked for them, is that

1  right?

2       MR. DOUGHERTY:  Objection to the form.

3       Q.   You can answer.  They could exist, you

4  just don't remember them, correct?

5       A.   I don't remember them, that's correct.

6       Q.   Do you keep a diary of events so that you

7  can keep your schedule straight and you know where

8  you're going and when?

9       A.   I have my calendar on my computer, if

10  that's what you mean.

11      Q.   Yes.  And your calendar on your computer,

12  that would have your various appointments, would

13  that be right?

14      A.   Yes.

15      Q.   And so if you met with your team regarding

16  the -- this restructure, would one expect that to be

17  on your calendar?

18      A.   It may or may not be.  I've ad hoc

19  meetings 15 times a days sometimes, which is why

20  it's so great to have, you know, my team at arm's

21  length because we can have those type of meetings

22  whenever they pop up.  So I can't -- I don't know

23  that every meeting I have throughout the day is on

24  my calendar.  Sometimes they just pop up ad hoc,

25  whatever's kind of -- whatever topic is going on.

1    Q.    Does anyone assist you in putting items in

2    your calendar apart from you?

3    A.    No.

4    Q.    You're responsible for reviewing Shawn

5    Kemmerer and his -- and his performance?

6    A.    Yes, I was.

7    Q.    And you reviewed him from 2018 up to what,

8    a couple of months ago, would that be correct?

9    A.    Yes.

10    Q.    And what was -- what were his reviews

11    like?

12    A.    They were very good.

13    Q.    And were you also responsible for deciding

14    if he was going to get a bonus or not?

15    A.    I don't really have that authority.

16    Q.    Do you know if -- do you get a bonus if

17    you perform well?

18    A.    My bonus is -- my potential bonus is tied

19    to a couple different things.  It's not just -- it's

20    just not that if I perform well, it's if the company

21    performs well.

22    Q.    Is that because you're considered a

23    director?

24    A.    I don't know -- I don't know why that was

25    set up the way it was set up.  I don't know what the

1  levels are but I can tell you that just me

2  personally, my bonus is tied to a different, a

3  couple different things.

4      **Q.    Is the maximum bonus that you can get 20**

5  **percent?**

6      A.    Currently or as a director?

7      **Q.    We're talking about your bonus, is it 20**

8  **percent? Is the potential 20 percent?**

9      A.    My bonus right now potential, I believe is

10 either 20 or 25 percent.

11     **Q.    But you don't know if it's 20 or 25, you**

12 **just believe that that's what it is, just like you**

13 **believed other things, so we're not sure whether**

14 **it's true or not, is that correct?**

15     A.    I think it's 25 percent, but I'm not sure.

16     **Q.    You're not sure?  You're a finance guy,**

17 **right? You're a finance guy.  You deal with numbers**

18 **all the time and you also deal with corporate**

19 **spreadsheets and all of that and yet when it comes**

20 **to your own bonus you don't know whether it's 20**

21 **percent or 25 percent, is that going to be your**

22 **testimony?**

23     A.    I believe --

24     **MR. DOUGHERTY:**  Object to form.

25     **Q.    Asking, is that your testimony?**



1    A.    I believe it's 25.  But I'd love to tell

2    you the gross margin of every project that I have if

3    you want that.

4        Q.    Do you know if Lisa Carlson was ever told

5    that she would be a director?

6        A.    Not that I -- I don't know.  I don't

7    recall that.

8        Q.    Did you ever go to QualTek University?

9        A.    I was an instructor.

10       Q.    Do you know the purpose of QualTek

11   University?

12       A.    It's got a bunch of different purposes,

13   but yeah, I'm aware of it, I've been involved with

14   it.

15       Q.    And are people selected to go to QualTek

16   University?  I mean, it's not like --

17       A.    Yeah.

18       Q.    Yeah, it's not like, you know, Scranton

19   College, you can't just appyly, you have to be

20   allowed to go or told to go, would that be correct?

21       A.    That's correct.

22       Q.    And would it be also correct that the

23   company has some interest in the employee going

24   there because they with the employee to learn

25   something that would be important for their ongoing

1  employment, would that be correct?

2      A.    Yeah, I think it's usually around

3  acquisitions for new companies coming to learn the

4  QualTek way, sure.

5      Q.    But not everyone goes to QualTek

6  University, we know that, right?

7      A.    That's correct.

8      Q.    So the individuals who go there, they are

9  specifically selected for some specific purpose,

10  would that be fair?  And the company believes that

11  they should go there to be instructed?

12          MR. DOUGHERTY:  Objection to form.

13      Q.    Let me rephrase.  You're an instructor at

14  QualTek University.  Have you been told what the

15  purpose of QualTek University is?

16      A.    Have I been told that?

17      Q.    Well, do you have an understanding based

18  in some kind of reality of what QualTek University

19  actually is?

20          MR. DOUGHERTY:  Objection to form.

21      Q.    What is your understanding?

22      A.    QualTek University again, as I mentioned,

23  it's got a couple different purposes.  A lot of the

24  times they're conducted to bring in folks that

25  stayed on board during acquisition to teach them the

1 QualTek way of finance and HR, risk and kind of meet

2 the teams that they're going to be working with and

3 stuff like that.  Like I said, typically around an

4 acquisition want to grab new folks to come in and

5 learn.

6     **Q.    Do you agree with me that QualTek**

7 **University, I mean, to send an employee to QualTek**

8 **University suggests that the company's going to**

9 **invest in them in some way, would that be fair?**

10     A.    I don't -- I don't select who comes to

11 QualTek University.  Like you mentioned, I work in

12 finance.

13     **Q.    In having -- being an instructor at**

14 **QualTek University, do you have some understanding**

15 **of the specific employees who are selected to go**

16 **there?**

17     A.    I imagine it's, you know, manager level.

18 And folks that are added to QualTek as a result of

19 an acquisition and I teach the finance piece of it.

20     **Q.    You would agree with me that there's no**

21 **point in sending an employee to QualTek University**

22 **if they're not going to -- if there's not some**

23 **understanding that they're going to be retained,**

24 **would that be your understanding as well as mine?**

25     A.    I think so.

1    Q.    And so if an employee goes to QualTek

2  University it wouldn't be unfair to assume that at

3  least to some degree there's an understanding that

4  that employee has sufficient promise to invest in

5  them a little further and send them to QualTek

6  University, would that be correct?

7           MR. DOUGHERTY:   Objection to the form.

8  You can answer.

9    Q.    Understand the question?

10   A.    No.

11   Q.    The question was simply this.   That would

12 it be your understanding as well as mine that a

13 company like QualTek would not send an employee to

14 QualTek University unless that -- unless it was

15 thought that that employee could be of benefit to

16 QualTek in the long term and therefore the

17 investment of time in QualTek University is worth

18 it, it's worth making for that employee?

19   A.    At that time, yes, I would agree with

20 that.

21   Q.    And do you know -- you don't make the

22 decision of who goes to QualTek University, but do

23 you know who does?

24   A.    I don't.

25   Q.    Do you know what criteria is made?



1    A.    I'm not involved in that decision.

2    **Q.    When Lisa went to QualTek University, were**

3 **you one of her lecturers?**

4    A.    I don't remember that specific class, but

5 I've been doing it, so sinces I've been here.

6    **Q.    When you have candidates who come in to**

7 **QualTek, do you have to grade them?**

8    A.    To QualTek University?

9    **Q.    Yeah.**

10    A.    No, I don't grade them.

11    **Q.    Okay.  Is there any criteria to determine**

12 **whether they are actually benefitting from the**

13 **classes or not?  Some examination, some informal**

14 **review, anything like that?**

15    A.    The only thing I know of are that each

16 student after each session rate the instructors and

17 comment on improvements, things like that.  That's

18 all I know about.

19    **Q.    You did know that Lisa Carlson went to**

20 **QualTek University, correct?**

21    A.    I didn't remember.

22    **Q.    You didn't remember or your didn't know**

23 **until I mentioned it?**

24    A.    I didn't remember until you mentioned it.

25    **Q.    Do you know how soon after she went to**

1  **QualTek University that there was a decision to get**

2  **rid of her?**

3      A.   I don't remember when she was at QualTek

4  University.

5      **Q.   No one told you that she was, is that**

6  **right?  Oh, let me put it this way.  The fact that**

7  **she was at QualTek University was never brought up**

8  **in respect to possibly retaining her, correct?**

9      A.   I don't believe so, no.

10     **Q.   With respect to not keeping Lisa Carlson,**

11 **is it my understanding that it was because she would**

12 **not be in further and did not have a degree, that**

13 **were the two issues that --**

14         **MR. DOUGHERTY:**  Objection.

15     **Q.   And ended any ability of her to be part of**

16 **this new team, would that be correct?**

17         **MR. DOUGHERTY:**  Objection.  Yoy may

18 answer.

19     A.   Can you repeat it please?

20         **MR. KOLMAN:**  Yeah.  We're going to take a

21 break after this for like, 10 minutes, okay?  So

22 we've been going a while.  And I don't know how much

23 longer I'm going to be, by the way.  Probably not a

24 whole lot longer, but I want to talk to Lisa.

25     **Q.   Yeah, my question is simply this, with**

1  regard to Lisa not being part of this new team, is

2  it your understanding that it was because number

3  one, she didn't have a degree and number two, she

4  wasn't going to relocate to Philadelphia.  Those two

5  -- or Pennsylvania.  Those two things.

6      A.   I think that sounds -- yeah.

7      Q.   And there wasn't anything else that we're

8  talking about that prevented her from being part of

9  the team, but those two things just made her

10  ineligible, would that be fair?

11     A.   That's fair.

12         MR. KOLMAN:  Okay.  Guys, why don't we

13  take a break for like, 10 minutes and I'm going to

14  just circle back and see what's up.

15         (RECESS TAKEN FROM 11:25 A.M. TO 11:43

16  A.M.)

17  BY MR. KOLMAN:

18     Q.   We're back on the record.

19         Okay.  Mr. Conn, just back on the record,

20  I just want to clarify a couple of things then I

21  think I'm done.

22         As far as your testimony is concerned you

23  mentioned that you only saw Dana Freedman for a

24  couple of weeks after you got on board, is that

25  correct?  That was your testimony?  As far as you

1  can recall -- you're on mute, so no one can hear

2  you.

3      A.   Can you hear us now?

4      Q.   Yeah, I hear you.  That was my -- that was

5  my recollection of what you said, that she wasn't

6  there very long after you came on board, is that

7  right?

8      A.   Yes, my recollection that's correct.

9      Q.   And that you only saw her for a couple of

10  weeks and that was that, is that correct?

11     A.   Yes.

12     Q.   And the other thing was with respect to

13  Dana Freedman you didn't see -- that's Dana

14  Freedman, right.  So you didn't see her very long,

15  that's what we're talking about.

16          And then with regard to the replacement

17  for Dana Freedman, you just didn't have anything to

18  do with that, would that be fair?

19          MR. DOUGHERTY:   Objection.  Assumes facts

20  not in the record.  You can answer if you know.  You

21  can answer if you understand.

22     Q.   Let me back up a little bit and give some

23  foundation.

24          Dana Freedman left, was there any

25  discussion about who would replace her at all that

1   you recall?

2        A.    Not that I recall.

3        Q.    And there's no documents as far as you can

4   recall or remember that indicates that Lisa Carlson

5   would replace her, is that correct?

6        A.    Not that I recall, no.

7        Q.    And if there had been such a document you

8   believe you would remember it, would that be right?

9        A.    If there were a document stating that who

10  Dana's replacement would be?

11       Q.    Yeah.

12       A.    I don't know if I would or not.

13       Q.    I'm sorry, are you saying that you

14  wouldn't have remembered it or are you saying you

15  would have remembered it or you're saying I can't

16  remember if there was or not?

17       A.    I don't know if there was ever a document

18  that I can recall.

19       Q.    You don't remember there being a document.

20  You wouldn't -- would you have -- you wouldn't have

21  been involved -- would you have been involved in any

22  event with determining who was going to replace Dana

23  Freedman if that issue was even brought up?  Is that

24  something you would have been involved with?

25       A.    I may have.  As I mentioned before I

1  wasn't strictly wireless in the beginning so I

2  don't, you know, I don't know if I would have been

3  involved in this directly at that time.

4      **Q.   Did you ever make a determination that**

5  **Lisa Carlson should replace Dana Freedman?**

6      A.   Not that I recall.

7      **Q.   Do you have any idea whether -- whether**

8  **just theoretically at least, Lisa Carlson could**

9  **replace Dana Freedman, whether she was qualified to**

10 **do so?  You have any opinion on that?**

11     A.   I didn't know -- I didn't know Dana well

12 enough to know her qualifications.

13     **Q.   Did Dana Freedman ever talk to you about**

14 **Lisa Carlson replacing her?**

15     A.   I don't remember.

16     **Q.   Did you ever meet with Lisa Carlson and**

17 **Dana Freedman for a number of times in Philadelphia?**

18     A.   I do remember meeting with them when they

19 were here, yes.

20     **Q.   And how -- and was that in the two weeks**

21 **that Dana Freedman was there after you came on**

22 **board?**

23     A.   Again, I don't remember if it was two

24 weeks or how many weeks it was, but it was during

25 that time frame, obviously before Dana left the

1   company.

2      Q.   And what was the purpose of those

3   meetings?

4      A.   I guess to meet the team, if I recall

5   correctly, to meet the new team.  Talk about go

6   forward plans.  Talk about --

7      Q.   Are you guessing?  Are you just -- are you

8   just guessing?  Are you just -- is this just out of

9   the top of your head that that's what it must have

10  been about?  I mean, you don't know, you don't

11  recall?

12     A.   I don't recall the exact meeting from 2018

13  or not.

14     Q.   Okay.  You don't have any documentation of

15  what the meetings were about because you didn't keep

16  any memos, is that correct?

17     A.   No -- yes, that's correct.

18     Q.   And these meetings, they took place in

19  Philadelphia, is that correct?

20     A.   King of Prussia, Pennsylvania.

21     Q.   Yeah, and do you know if they were

22  frequent, like every week?

23     A.   The meetings with Lisa and Dana?

24     Q.   Yeah.

25     A.   I don't remember how frequent they were.

1      Q.    But in any event just circling back, they

2    probably weren't more than a couple of weeks after

3    you came on board, would that be right?

4        A.    I would say so, yes.

5            MR. KOLMAN:  All right.  I just don't

6    think I have anything else.  Colin, do you have any

7    questions?

8            MR. DOUGHERTY:  I do not.

9            MR. KOLMAN:  Okay.  So let me just circle

10   back to Lisa one last time and I think we're done.

11   So if everyone would indulge me for 10 minutes, I

12   will --

13            I'll be right back.  Thank you.

14            (RECESS TAKEN FROM 11:49 A.M. TO 11:58

15   A.M.)

16   BY MR. KOLMAN:

17       Q.    So just back on the record for a very,

18   very brief moment.

19            Mr. Conn, do you know whether Dana

20   Freedman lived in Philadelphia or not?

21       A.    Do I know if she lived in Philadelphia?

22       Q.    Yeah, or in Pennsylvania.

23       A.    I don't believe she did, no.

24       Q.    And do you know where she did reside?

25       A.    No, I don't.

1      Q.    Currently are there any employees who

2   report directly or indirectly who do not to you --

3   who not live in Pennsylvania?

4      A.    There are.  Not corporate finance, but

5   other positions.

6      Q.    Okay.  And what positions are they?

7      A.    We have a national billing team.

8      Q.    National billing team.  Okay.  What do

9   they do?

10     A.    Billing.

11     Q.    I beg your pardon?  I'm sorry.

12     A.    They do our billing and our invoicing for

13   all our customers.

14     Q.    And where do they reside?

15     A.    In Syracuse, New York.

16     Q.    And is that -- how many people reside

17   there, one?

18     A.    I have one direct report and five or six

19   on the billing team.

20     Q.    Five or six on the billing team and where

21   are they?

22     A.    They're in Syracuse, New York.

23     Q.    And is there a reason that they don't have

24   to be in Pennsylvania?

25     A.    They have a share services role where it's

1   finance or accounting or risk or safety to payroll

2   for that matter, so they're not part of my corporate

3   finance team.

4       Q.   Okay.  And tell me the distinction as to

5   if you're on the corporate finance team why you

6   can't travel to Pennsylvania, you know, however many

7   times it takes and why it's necessary to actually be

8   in Pennsylvania if you're part of the corporate

9   finance team?

10      A.   Sure.  Well, in my experience for as long

11  as I've been doing this, and being doing this for

12  this particular executive team, that the best way to

13  -- the team that works the best is the team that

14  works in the same building, can have meetings when

15  they pop up, can walk in somebody's office or

16  somebody's cube.  And it's what's worked the best

17  for me.  It's what I know the support and shared

18  services model that works, done it before.  So in my

19  experience the team that works the best is the team

20  that's in the same building.

21      Q.   How did you all manage in the time of

22  Covid?  You didn't -- you weren't in all the -- you

23  weren't in all the same offices then, right?

24      A.   We were.

25      Q.   Okay.  So were -- you're in the same

1  **offices, so what about self-isolation, were you --**

2  **did you have your meetings via Zoom?  Did you have**

3  **your --**

4       A.   No, we had our meetings --

5       Q.   -- meetings by -- wait.  So in the height

6  **of Covid, all of you were still meeting in the same**

7  **office, none of you were actually connecting**

8  **remotely, is that what you're saying?**

9       A.   Yes.

10      Q.   **You have meetings now that are via Zoom,**

11  **correct?**

12      A.   With my operators and folks in the field,

13  yes.

14      Q.   **And why -- what's the difference between**

15  **having a corporate meeting via Zoom and having a**

16  **corporate meeting in an office?  I mean, why is**

17  **there any difference?**

18      A.   Again, it's been my experience that the

19  level of reporting and granular detail that we do,

20  the meetings that pop up that we have and all the

21  moving parts the fact that we can go to another

22  department, whether it be accounting or risk or

23  safety or payroll or HR and have meetings and be

24  right there, it's in the office, is the best

25  practice that I've ever encountered in my 18, 20

1  years of telecom and finance, corporate finance.

2  And that's the level of shared service support that

3  my executive team wants and it's the only thing

4  that's worked for me.

5      Q.    And is that written somewhere, these --

6  your experience that's been developed over these 18

7  or 20 years, is that incorporated in some kind of

8  memo that the reason why you have to be in

9  Pennsylvania is because of all of these benefits

10 that you just mentioned.  And then there are other

11 significant differences between that and having a

12 meeting via Zoom.  Is that memorialized anywhere or

13 is that just your experience?

14     A.    I don't know if it's written somewhere.

15 Not to my knowledge.

16     Q.    So we can't look at any corporate document

17 as far as you know to see what the benefit is of

18 being in Pennsylvania?

19     A.    As far as I know, I don't know of any

20 document like that exists.

21     Q.    You would agree with me that in a Zoom

22 meeting you can bring in all the guys from Syracuse,

23 right?  You want to have a meeting with those guys,

24 six of them, you don't have to go up to Syracuse for

25 that and they don't have to come down and waste time

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM
285a

1  **traveling, especially in the wintertime. And you can**

2  **just connect immediately with them and with**

3  **corporate finance to deal with whatever you need to**

4  **deal with, correct?**

5      A.    I could have a Zoom meeting with the

6  billing team and I've done it, but as far as my

7  corporate finance team and our financial reporting,

8  it's been my experience that's the best way to work

9  is to have everybody under the same roof and working

10 side-by-side.

11     **Q.    Can I just -- just answer the question,**

12 **which is simply that isn't it true that it would be**

13 **more efficient to have your meeting with the billing**

14 **team in Syracuse via remote than have to travel what**

15 **must be at least four hours, maybe more, five or six**

16 **hours to Syracuse, New York to be in the same office**

17 **as they are and five or six hours back, and waste**

18 **all that time when they could just not only come up**

19 **remotely but also documents can be shared on the**

20 **screen at the same time.  You would have to agree**

21 **with me that that has to be more efficient than**

22 **meeting with them in the same office?**

23         **MR. DOUGHERTY:**  Objection to form.  Answer

24 it if you understand.

25     **Q.    You'll agree?**

1      A.     For the billing team, yes, that does work.

2  My corporate finance reporting team, that's not --

3  it does not work in my opinion.

4      **Q.    So for the corporate finance team you**

5  **would agree that you can see -- you could see all of**

6  **them on Zoom, just like we're seeing each other now**

7  **and that if there are any documents to review, they**

8  **could also be brought up on the screen and everyone**

9  **could look at them, would that be right?**

10     A.     Yes, that's correct.

11     **Q.     And it would also be true that if any of**

12  **them were in the field or indeed abroad or anywhere**

13  **in the world, they could be brought into this**

14  **meeting in a way that they never could if that**

15  **meeting was under one roof physically in an office,**

16  **correct?**

17     A.     They could.

18     **Q.     And just to recap -- just to recap, as you**

19  **said there is nothing anywhere in any corporate**

20  **document indicating that actually being physically**

21  **present in Pennsylvania is now necessary for the**

22  **performance of any position in the corporate finance**

23  **team.   That's what you said -- I believe that's what**

24  **you said, correct?**

25     A.     I don't know of such a document that

1  exists.

2      Q.   And you mentioned the billing team, who

3  else are -- which other employees are remote and not

4  in Pennsylvania?

5      A.   I mean, there's operators.  Nobody reports

6  directly to me.

7      Q.   But -- but I know they're not relates to

8  you but what do they do and who are they related to?

9      A.   There's plenty of people that don't work

10  in this building that are operators that work in

11  their local markets.

12      Q.   As the finance director for a minute or as

13  a finance manager, is -- is the finance manager part

14  of the corporate finance team?

15      A.   Well, I don't know if I have any finance

16  managers currently.  It used to be if I can

17  remember.

18      Q.   When Lisa was a finance manager, was she

19  considered part of the corporate finance team as

20  such?  I mean, she wasn't a diretor.

21      A.   At the time, yes.

22      Q.   At the time she was a -- at the time she's

23  finance manager she's part of the corporate, what

24  makes you part of the corporate finance team and

25  what makes you not part of it?

1      A.    If you're part of the corporate finance

2  team you're -- you're working for corporate -- you

3  work for the corporate finance team, you work with

4  shared services.  You -- you're -- you work with all

5  the reporting.  I don't believe I understand the

6  question.  If you work in corporate finance you

7  support the entire division or whichever you're in,

8  and you -- we handle all the financial reporting.

9      **Q.    But don't they do any of that in Syracuse?**

10     A.    No, they just strictly do billing.  They

11 don't do any financial reporting, as such that we do

12 here.  They don't do any metrics or KPIs or any

13 weekly reporting.  They deal with the customer and

14 they -- they handle the billing, our invoicing.

15     **Q.    I think you mentioned other operators but**

16 **I'm not sure you were specific as to what they do.**

17     A.    Well, we have markets in all different

18 regions. So there's a market director at local -- at

19 the local region.  There's technicians.  There's

20 warehouse workers. There's construction managers.

21 They all work --

22     **Q.    What makes --**

23     A.    -- locally and --

24     **Q.    I'm sorry.  What is special about the**

25 **corporate finance team as apart from all of these**

1  **other areas that makes it necessary to be in**

2  **Pennsylvania when many of these other operators are**

3  **not?**

4      A.   The corporate finance is a shared services

5  piece where we support the entire company.  It's

6  just that we don't have duplicated costs.  We have

7  one HR, we have one payroll, we have one finance.

8  It's a shared services model in our corporate office

9  and it handles, I mean, our particular division, the

10 department handles everything for the entire

11 company.  There is local people that do local

12 operations that are separate from corporate.

13     **Q.   Is Steve -- is Steve Forbes still live in**

14 **Pennsylvania?**

15     A.   I am not sure where Steve Forbes lives.

16     **Q.   You know however, that all the people who**

17 **work for you are in Pennsylvania, correct?**

18     A.   I live in New Jersey and I come here.  So

19 I don't know that everybody lives in Pennsylvania,

20 but they all come here every day.

21     **Q.   You live in New Jersey and not in**

22 **Pennsylvania?**

23     A.   That's right.

24     **Q.   Where in New Jersey do you live?**

25     A.   Sewell, New Jersey.



1    Q.    **Where?**

2    A.    Sewell, S-e-w-e-l-l.

3    Q.    **How's the -- how far is that from King of**

4    **Prussia?**

5    A.    It's about 50 or so miles, 55, maybe at

6    the most.

7    Q.    **And do you ever do your job from remote**

8    **location, from your home?**

9    A.    I -- I come to the office.

10    Q.    **Each and every day?**

11    A.    Yes.

12    Q.    **And how long does it take you, an hour, an**

13    **hour and a half?**

14    A.    It depends on traffic.  It could take me

15    an hour and a half, it could take me two hours.

16    Q.    **I want to be very clear about this.  You**

17    **know, so just each and every day you come into the**

18    **office.  There's not a day that you do not take a**

19    **meeting remotely from home?**

20    A.    I would say if it snowed four feet I

21    probably would be stuck at home.

22    Q.    **Okay.  That's the not the answer to my**

23    **question. My -- the question is --**

24    A.    Every other day I come in.

25    Q.    **I'm sorry?**

1      A.   Every other day I come in, yes.

2      Q.   **Every other day?**

3      A.   Every day -- every work day except for if

4  I'm on vacation I come in.

5      Q.   **And do you come in for a full day or is**

6  **there a portion of the day that having come in you**

7  **then do meetings at home or in other -- in other**

8  **remote location?**

9      A.   I'm here all day.

10     Q.   **I realize that.  Do you ever take meetings**

11 **remotely from home, assuming there's no snow?**

12     A.   I can't imagine, I mean, unless I'm

13 traveling, very rarely.

14     Q.   **The -- this new team that you guys were**

15 **building out, was Bruce Neff part of that team, was**

16 **going to be part of that team?**

17     A.   Bruce was eventually, not at first.  He

18 was eventually.  He as I mentioned before, I think,

19 he had kind of unique unbilled AR kind of role,

20 didn't really get involved a lot in our financial

21 reporting that my team does. He was kind of you

22 know, a unique role.

23     Q.   **I realize that.  My question is simply,**

24 **while you were making this decision, these four**

25 **people to build out this new -- this new team of**

1  which Lisa Carlson was not going to be part of, it

2  was discussed, was it not, that Bruce Neff would be

3  a part of that team, am I right?

4      A.   Not part of my corporate team at that

5  time, no.

6      Q.   And what about Brandon Ebeling?

7      A.   Brandon started way after that.  I don't

8  know exactly when, but he wasn't --

9      Q.   When did Bruce Neff come onto the team

10 after the discussions about creating that specific

11 team?

12     A.   I don't remember exactly.

13     Q.   And I don't mean to be impertinent or

14 anything but you don't have any trouble with your

15 memory, is that correct?

16     A.   Not that I know of, no.

17     Q.   I don't have anything else then and I'm

18 through with any questions.

19         MR. DOUGHERTY:  I have no questions.

20         (SIGNATURE WAIVED)

21         (DEPOSITION CONCLUDED AT 12:45 P.M.)

22

23

24

25

# EXHIBIT "V"



COURT REPORTING

LEGAL VIDEOGRAPHY

VIDEOCONFERENCING

TRIAL PRESENTATION

MOCK JURY SERVICES

LEGAL TRANSCRIPTION

COPYING AND SCANNING

LANGUAGE INTERPRETERS





**(800) 528-3335**

**NAEGELIUSA.COM**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

LISA CARLSON,
2805 243rd Avenue Northwest
St. Francis, MN 55070

      Plaintiff,

v.                      CIVIL ACTION
                          No.: 2:22-cv-00125

QUALTEK, LLC
1150 First Avenue, Suite 600
King of Prussia, PA 19406

      Defendant.

_____

**VIDEOCONFERENCE DEPOSITION OF**

**LAUREN PETZAR**

**TAKEN ON**
**THURSDAY, JUNE 30, 2022**
**4:47 P.M.**

**PENNSYLVANIA**

295a

1    A.    No.

2    Q.    Did you ever read the complaint in this

3 matter at all?  The complaint that was in Federal

4 Court?

5    A.    No.  Not -- no.  I'm stuttering because I

6 think I was gone.  I think I wasn't there.

7    Q.    No, you probably were gone.  I'm just

8 asking if you had read the complaint.

9    A.    Oh, no.  No, I didn't, no.

10    Q.    And that complaint would have been filed

11 in Federal Court.

12    A.    No, I didn't read it.

13    Q.    I'm wondering whether you were there when

14 she filed an administrative complaint with the EEOC

15 and the local Minnesota civil rights institution.

16 Do you know anything about that?

17    A.    I don't.

18    Q.    Are you someone who has seen any EEOC

19 complaints filed by any employees during the time

20 that you have been employed?

21    A.    Yes.

22    Q.    Or is that something that never went to

23 you?

24    A.    No, I would have been privy to that

25 information.

1    Q.    You were an employee of QualTek before

2    QualTek acquired Velocitel in late 2017, is that

3    correct?

4    A.    Yes, that's correct.

5    Q.    Did you ever have a reason to look at the

6    performance reviews of Lisa Carlson?

7    A.    I mean, I ran the performance review

8    process so I looked at -- I was privy and looked at

9    everyone's.

10    Q.    And these performance reviews, they're not

11    kept in personnel file, are they?

12    A.    They're kept in ADP.

13    Q.    What is an ADP?

14    A.    It's the company HRIS system.

15    Q.    And is that accessible -- would that be

16    accessible by you when you were employed?

17    A.    Yes.

18    Q.    And do you know if during this time there

19    were any employment reviews that QualTek or

20    Velocitel did for Lisa Carlson, if you know?

21    A.    I don't recall specifically but, you know,

22    we did annual evaluations; therefore, I would assume

23    Lisa had one as well.

24    Q.    Did you know Lisa Carlson's title when she

25    worked at QualTek?

1      A.   Well, I don't recall, I'm sorry.

2      **Q.   You were there during the time that Dana**

3  **Freedman was there, is that correct?**

4      A.   The name -- I recognize the name.  I don't

5  know her dates of employment to confirm yes or no.

6      **Q.   With respect to bonuses for a minute, do**

7  **you know how bonuses were given or determined?**

8      A.   They were determined above -- that was not

9  my responsibility to determine them.  So no, my

10 answer is no.

11     **Q.   Did you know that Ms. Freedman had**

12 **designated Lisa Carlson as her successor?**

13         **MR. DOUGHERTY:**  Objection.  Calls for

14 speculation, assume facts not in the record.

15         **MR. KOLMAN:**  It does because of her --

16 because of Dana Freedman's affidavit.  So I think

17 there's some --

18         **MR. DOUGHERTY:**  Stand by my objection.

19     **Q.   Nonetheless, did you -- do you have any**

20 **knowledge, let me put it that way, of Dana Freedman**

21 **designating Lisa Carlson as her successor when she**

22 **left?**

23     A.   No.

24     **Q.   Were you in any meetings regarding the --**

25 **regarding the termination of Lisa Carlson?**

1        A.    Yes.

2        Q.    At what meetings were you in?  Was there

3   more than one?

4        A.    I specifically recall her termination

5   meeting.  I was -- I was the HR presence.

6        Q.    And who else was in that meeting?

7        A.    Shawn Kemmerer and Lisa.

8        Q.    And that was the moment that she was

9   actually terminated, is that correct?

10       A.    To the best of my recollection, yes.

11       Q.    Was there any meeting before that that you

12   attended about the decision to terminate her and the

13   reasons why?

14       A.    Not that I can recall.

15       Q.    Do you know who made the decision to

16   terminate her?

17       A.    There's a multilayer approval process as

18   it relates to terminations.

19       Q.    Does that mean you don't know or does that

20   mean many people were involved?  What does -- what

21   does that answer mean?

22       A.    That would mean that my -- likely my boss

23   -- not likely, my boss, Stephanie Hallman or my boss

24   and Liz Downey would have been part of that

25   decision.  I don't recall who was the -- I guess it

1 was Kemmerer, her management would have been part of

2 that decision as well.

3     **Q.   You say that because that's customarily**

4 **what happens, is that correct?**

5     A.   We -- there's a process, you know, no one

6 person can make a termination decision.

7     **Q.   But you don't remember seeing who gave**

8 **what input into her termination, is that correct?**

9     A.   That -- that's correct.

10     **Q.   You were not privy to any meeting, if it**

11 **took place, amongst the people that you just**

12 **described?  Dealing --**

13     A.   I just -- yeah -- go ahead, I'm sorry.

14     **Q.   Dealing with her termination, not her**

15 **actual termination, but dealing with the intent to**

16 **terminate.  I'm asking if you were privy to any team**

17 **meeting in that respect?**

18     A.   No, I understand the question.  It was so

19 long ago at this point.  I just -- I don't -- I just

20 don't recall.  I was privy, you know, to some more

21 senior conversations but I as this particular

22 matter, I honestly just, I can't recall.  I mean,

23 I'm sure there would have been at least one to

24 relay, you know, the okay approval to me.  I would

25 not make the decision alone.

1    Q.    Did you ever get a complaint from Ms.

2  Petzar (sic) where she complained that QualTek would

3  not allow her to advance in the company's finance

4  department?

5    A.    Can you just clarify, did you mean Ms.

6  Carlson?

7    Q.    I'm sorry.

8    A.    That's okay.

9    Q.    Yeah, I did.  What did I say?

10    A.    My name.  That's okay, just wanted to

11  clarify.

12    Q.    Yeah, I'm sorry.  Yeah, Ms. Carlson.

13    A.    I'm sorry, could you -- I'm sorry, could

14  you just repeat that question?

15    Q.    On October 10, 2019, do you have any

16  recollection of Lisa Carlson speaking to you in

17  person and stating, among other things, that QualTek

18  would not allow her to advance in the company's

19  finance department?  That's the question.

20    A.    I understand.  I'm thinking.  I just can't

21  recall.  I can't recall our specific conversations

22  at this point in time.  I remember having a

23  conversation with Lisa Carlson.  I believe I was in

24  Minnesota at the time, but I just don't remember the

25  specifics, it's been too long.

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM
301a

1    Q.   And I'm not really asking for the

2  specifics, just the sum and just the substance or

3  topic or subject.

4    A.   I -- I can't say.

5    Q.   Do you recall her stating that as a woman

6  she felt that the management was intentionally not

7  giving her the ability to advance?

8    A.   I don't remember any specific statements

9  about gender.  But again, it's so hard to remember.

10   Q.   Do you recall her stating that QualTek had

11  no issue promoting or hiring males and paying them

12  more and they did not have the same qualifications

13  or experience as Lisa did?

14   A.   I certainly don't remember anything as it

15  relates to differences in pay.  That I can say.  I

16  can't -- I don't know about the gender piece of that

17  question, I can't -- I can't remember.

18   Q.   Do you recall ever telling -- asking her

19  whether she wanted to escalate her complaints to Ms.

20  Trybula?

21   A.   I -- I don't.  Again, it's so hard to

22  remember the specifics, but I absolutely -- that is

23  absolutely something I would have said in a

24  conversation, so you know, generally if there were

25  matters that I felt needed to go above me, then

1  that's absolutely something I would have said.

2      **Q.   And let's suppose for a minute that the**

3  **complaints that I -- that I spoke to you about that**

4  **you can't recall, if those complaints had been made,**

5  **is that something that you would escalate or ask**

6  **whether the complainant, in this case Lisa Carlson,**

7  **wanted to escalate the matter to Ms. Trybula?**

8      A.   Yes.

9      **Q.   Do you recall at all that Lisa applied for**

10  **a director of finance position in November 20 -- in**

11  **November of 2019?**

12     A.   No.  I'm not aware of that but I wasn't --

13  I didn't handle recruitment.

14     **Q.   Do you recall the requirement to have a**

15  **degree and to be able to be physically located in**

16  **the King of Prussia office as a -- as two necessary**

17  **conditions of being employed in corporate finance?**

18     A.   Well, I'll say yes.  Our headquarters was

19  in King of Prussia, Pennsylvania.  Corporate

20  positions were out of King of Prussia.

21     **Q.   I'm talking about corporate finance, do**

22  **you know anything about that requirement?**

23     A.   I mean, I don't remember the job

24  description specifically, but our finance team was

25  out of King of Prussia.

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800) 528-3335
NAEGELIUSA.COM
303a

1      Q.   Do you recall any employees being -- doing

2    their job remotely from the King of Prussia office?

3    Doesn't mean that they weren't in an office, but

4    doing their job remotely from another office?  Was

5    that something that occurred, if you know

6      A.   That I will tell you that's part of the

7    reason I left QualTek because they did not approve

8    remote work even under extreme circumstances.  So

9    maybe a one off here or there I could absolutely

10   recall, but the general answer is no, we did not

11   work remotely even during the pandemic.

12     Q.   So you're saying you left because of that

13   -- that condition, correct?

14     A.   Part of the reason.

15     Q.   Did you ask to be as it were -- I don't

16   mean legally accommodated but accommodated from a, I

17   guess, from a computer standpoint to connect

18   remotely to King of Prussia by working at home?

19     A.   I did not because I knew it wasn't

20   supported.  I didn't even -- I didn't even -- I

21   didn't go there.  But it was more complicated than

22   that.

23     Q.   Did you feel that you could have done your

24   job remotely, at least for part of the time?

25     A.   Hypotheticals are always tough.  I think

1  for maybe a short period, not long-term.

2      **Q.   But you never asked because you felt that**

3  **the answer would always be no, you have to be**

4  **physically present, is that correct?**

5      A.   We were -- we were physically present five

6  days a week in King of Prussia.

7      **Q.   Is there any other reason why you left?**

8      A.   Yes.  I was a little tired.

9      **Q.   You were a little tired?**

10     A.   I had a -- I had -- I just had a baby and

11  it was a long process and I worked -- we work really

12  hard at QualTek. It's -- there's -- it's not easy.

13  And I left because the office relocated to Blue

14  Bell.  I did not want to commute to Blue Bell, that

15  was far for me.  I had a six-month-old that we spent

16  a lot of time and money for.  We used a surrogate to

17  have him and I just took a leap of faith and, you

18  know, walked away for some time with my son.

19     **Q.   Did you get maternity leave?**

20     A.   I did, I got two weeks of paid leave and I

21  took FMLA, yes.  Yeah, we had a paid parental leave

22  policy.  I was given two weeks of paid time off that

23  ran concurrently with 12 weeks of FMLA.

24     **Q.   Did you ever -- did you get a severance**

25  **from QualTek?**

1      **MR. DOUGHERTY:**  I'm going to object to the

2  extent that severance is confidential and the

3  company is certainly not waiving any confidential

4  right -- confidentiality rights it has and I am not

5  aware of Ms.

6          Petzar's severance or confidentiality, so

7  if it is confidential, I am direct -- I am directing

8  that the company is not waiving any of its rights

9  and would therefore say Ms. Petzar, you do not have

10  to answer that.

11      A.    Then I --

12      **MR. KOLMAN:**  I would -- I would add that

13  actually, Mr. Dougherty doesn't represent you.  He

14  hasn't --

15      **MR. DOUGHERTY:**  No, I represent the

16  company and the company is a signature to that

17  agreement.

18      **MR. KOLMAN:**  Well, I think whether or not

19  there is an agreement is not confidential.  The

20  contents may be but the -- whether there is or is

21  not a severance -- I'm not asking how much it was or

22  whether there is a severance agreement, that's not a

23  confidential issue.  So I would ask --

24      **MR. DOUGHERTY:**  It's also not a relevant

25  one, but that's fine, she can answer that.

1      Q.    So if there was a severance and there was

2   a severance agreement?  You can answer if --

3      A.    Am I allowed to answer?

4      Q.    Yes.

5      A.    So no, I did not have a severance

6   agreement.

7      Q.    You have a confidentiality agreement?

8      A.    I don't recall signing one, so not that

9   I'm aware of.

10     Q.    Did you sign any agreement when you left?

11     A.    Oh, when I left?  No, I didn't sign any

12  agreements when I left.

13     Q.    Were you given any money when you left?

14     A.    No, I was not.

15     Q.    Okay.  Have you spoken to anyone about

16  this case?

17     A.    No, I have not.

18     Q.    Do you recall Kayla Lorenzen emailing you

19  about -- actually, not just her by the way, but

20  emailing her about -- emailing you about the fact

21  that women were being paid less than men?  Do you

22  remember her doing that?

23     A.    I remember Kayla.  I remember conversing

24  with Kayla.  I do not remember any communications

25  regarding pay disparity.

1      Q.    Do you remember any complaint by Ms.

2  Lorenzen about gender discrimination?  That's a

3  question.

4      A.    I understand.  I'm thinking.  I'm just

5  trying to think back to my exchanges with Kayla.

6  You know, similar with Lisa, I know we conversed in

7  person and in email, that I know.  I just don't

8  recall anything about gender.  I don't.

9      Q.    And do -- you don't recall anything about

10 Lisa complaining about gender discrimination, is

11 that -- is that correct?

12     A.    I don't.  I don't.

13     Q.    And you don't recall Kayla Lorenzen

14 complaining about race discrimination in that people

15 of color were being paid less than white employees,

16 you recall that?

17     A.    I don't.  I don't recall anything about

18 pay disparity.

19     Q.    Anyway, those issues that I just raised,

20 if you had heard them, would they be in your opinion

21 serious enough to escalate upwards to Stephanie

22 Trybula?

23     A.    Yes.  It would have escalated.

24     Q.    When you escalate a matter to Stephanie

25 Trybula, how do you do that?  Do you do it by a memo

1  or by memorandum or in a meeting?  How is it done?

2       A.   My office is right next to hers and we

3  would -- we would stand up and talk to each other in

4  person a lot of times, for you know, exercise to get

5  up off of our desks just to move a minute and most

6  of our conversations were -- were face-to-face.

7       Q.   Did you receive an email from Ms. Trybula

8  saying I received your escalated complaint on behalf

9  of a particular employee and I'm requesting that you

10  do a following or anything -- anything like that?

11       A.   I don't recall as it relates to Lisa, but

12  if there was an exchange via email, that sounds like

13  something Stephanie would have exchanged.

14       Q.   Stephanie testified that she doesn't

15  necessarily document her team meetings or send

16  emails.  Do you know if that's true?

17       A.   I don't want to --

18           MR. DOUGHERTY:  Objection --

19       A.   -- on Stephanie.

20           MR. DOUGHERTY:  -- not the testimony.

21       Q.   You can answer.  Well, let me put it this

22  way. You were right next to her, correct, your

23  office?

24       A.   Yeah, my office is right next to her.

25       Q.   So if there's a serious discrimination



1  **complaint, do you type it up and give it to her?**

2      A.    I mean, as an HR professional I'm trained

3  to document what I deem as a investigatory, if

4  that's the right word, complaint.  So if there is

5  something of a serious nature, then yes, I'm

6  absolutely going to document that on a piece of

7  paper.

8      **Q.    And where would that be filed, by the way?**

9      A.    We kept a folder with employee relations

10  documents on our drive.

11      **Q.    I'm sorry, you kept a -- how's it**

12  **described?**

13      A.    It was just a file folder on our -- on our

14  HR share drive.

15      **Q.    And how would you access the complaints by**

16  **a particular employee?**

17      A.    So you would go to the employee relations

18  folder and then for example, if there was a folder

19  for Lisa, you would go to Lisa's folder and access

20  it.

21      **MR. KOLMAN:**  I'm asking counsel to access

22  that folder for Lisa Carlson and send me any and all

23  details that are in there regarding her complaint

24  and the complaint of -- well, any complaints by

25  Kayla

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM
310a

 1  Lorenzen.  Please mark that on the record.

 2          **MR. DOUGHERTY:**  Okay.  I'll be --

 3          **THE WITNESS:**  Can I -- can I -- go ahead,

 4  Colin.

 5          **MR. DOUGHERTY:**  Tim, you have it.

 6          **MR. KOLMAN:**  I have her -- oh, yeah, I

 7  have her written complaints that was provided.

 8          **MR. DOUGHERTY:**  Yeah.

 9          **MR. KOLMAN:**  I believe there is -- there

10  is some documentation of written complaints.  Is

11  that all there is?

12          **MR. DOUGHERTY:**  Yeah.

13      **Q.   When was the time that you left, by the**

14  **way?  What year and what month, do you know?**

15      A.   A year and a half ago, so 2020.  December

16  -- it was November or December 2020.  I'm looking

17  that way to look at my calendar.

18          **THE WITNESS:**  Am I allowed to have a two-

19  minute pause?

20          **MR. KOLMAN:**  Of course.  Let's take 10

21  minutes so --

22              **(THERE WAS AN OFF-THE-RECORD DISCUSSION)**

23              **(RECESS TAKEN FROM 1:40 P.M. TO 1:43 P.M.)**

24  BY MR. KOLMAN:

25      **Q.   I'm sorry, you were getting the date.  We**

1  **were just trying to get the date marked in.**

2      A.    Oh, in my answer?

3      **Q.    Yeah, your answer.**

4      A.    When I left QualTek?

5      **Q.    When you left.**

6      A.    It was November or December of 2020.  It

7  was six months after my son was born, so it was

8  November or December.

9      **Q.    Okay.  In August of -- okay, that's 2020,**

10  **correct?**

11      A.    Yes.

12      **Q.    So Lisa made a charge of discrimination**

13  **back in April of 2020, do you recall reading that**

14  **charge of discrimination?**

15      A.    I -- I don't.

16      **Q.    Is that something that would normally come**

17  **to HR or would it go straight to counsel or**

18  **something else?**

19      A.    I mean, Colin would have been looped in,

20  of course.  So it would have gone to HR and

21  definitely Colin. April might, with my son, April I

22  was like in and out with April because I had to go

23  to Texas so I -- Stephanie -- if something came in

24  Stephanie probably just handled it.

25      **Q.    With respect to this -- her complaint,**

1  **would that get filed in the same place as any**

2  **internal complaints that she made, if you know?**

3      A.   You know, I don't know the answer to that.

4  I know there's like a portal with EEO stuff.  I

5  don't know if we kept it anywhere other than that.

6  That would -- Stephanie would know the answer to

7  that, I think.

8          **MR. KOLMAN:**  I want to be the one to take

9  a 15-minute break, all right?  Let's see what else

10 we have to do, if anything.  All right, guys, I'll

11 see you in 15.

12          **(RECESS TAKEN FROM 5:18 P.M. TO 5:30 P.M.)**

13          **MR. KOLMAN:**  I have no further questions.

14          Thank you.

15          **THE WITNESS:**  Thank you.

16          **MR. DOUGHERTY:**  I have no further -- I

17 have no questions for you, Ms. Petzar.

18          **(SIGNATURE RESERVED)**

19          **(DEPOSITION CONCLUDED AT 5:30 P.M.)**

20

21

22

23

24

25

# EXHIBIT "W"



COURT REPORTING

LEGAL VIDEOGRAPHY

VIDEOCONFERENCING

TRIAL PRESENTATION

MOCK JURY SERVICES

LEGAL TRANSCRIPTION

COPYING AND SCANNING

LANGUAGE INTERPRETERS





(800) 528-3311
NAEGELIUSA.COM

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

LISA CARLSON,
2805 243rd Avenue Northwest
St. Francis, MN 55070

      Plaintiff,

v.                  CIVIL ACTION
                    No.: 2:22-cv-00125

QUALTEK, LLC
1150 First Avenue, Suite 600
King of Prussia, PA 19406

      Defendant.

_____

**VIDEOCONFERENCE DEPOSITION OF**

**SHAWN KEMMERER**

**TAKEN ON**
**THURSDAY, JUNE 30, 2022**
**12:45 P.M.**

**PENNSYLVANIA**

1  may have some questions, so let me begin.

2          Is it my understanding that you used to

3  work for QualTek?

4      A.   That's correct.

5      Q.   And how long did you work for QualTek?

6      A.   Just under nine years.

7      Q.   Now, when you say nine years, did you ever

8  work for Velocitel?

9      A.   No.

10     Q.   And when you first came to QualTek, what

11 was your position?

12     A.   Financial analyst.

13     Q.   Can you tell me a little bit about what a

14 financial analyst does, or at least what you did

15 while at QualTek?

16     A.   Sure.  So in the beginning when I came on

17 as a financial analyst, my primary duties were

18 specifically around financial reporting and in the

19 very beginning, more specifically around the

20 accounts payable process, processing vendor

21 invoices, ensuring that they were accurate and

22 should be approved for payment, kind of designing a

23 process around that.  But then ultimately leading

24 into weekly, monthly financial reporting for all of

25 our ongoing projects, which at the time was quite

1  small.  I was brought on to QualTek in its infancy.

2      **Q.**  **And did your job description change**

3  **throughout the nine years?**

4      A.  Yes.

5      **Q.**  **And can you tell us how it changed?**

6      A.  Yeah, so the second year I was promoted to

7  finance manager.  We had hired maybe one or two

8  financial analysts that would report to me through

9  that next year.  You know, I was largely training

10  them to do what I had done in the beginning of my

11  tenure there, but then also managing them and kind

12  of working a little more closely with our field

13  market operations personnel.

14        So I was the finance manager for a few

15  years.  Ultimately, there were -- there was some

16  turnover in my superiors.  My director had left.  I

17  assumed some of those responsibilities and I think

18  within the next year or two I was promoted to

19  Director of Finance.

20      **Q.**  **And was that prior to the acquisition of**

21  **Velocitel?**

22      A.  It was.

23      **Q.**  **And in what year was -- and this may be a**

24  **hard question, let me put it this way.  Was any due**

25  **diligence done by QualTek prior to the acquisition**

1  of Velocitel?

2      A.   Yes.

3      Q.   And what kind of due diligence was that,

4  broadly speaking?

5      A.   I can tell you what I was privy to, and

6  that was largely some financial reviews.  Looking at

7  some of their customer information, revenues, costs,

8  project financials, ultimately helping understanding

9  what we were acquiring that would go on our opening

10 balance sheet.  So largely financial.

11     Q.   And how long did this due diligence take,

12 at least for you?

13     A.   A few months.

14     Q.   And about what time frame was that?

15     A.   Mid 2017 till like mid -- like summer to

16 fall of 2017, I believe.

17     Q.   And did that require you to be in -- I

18 don't know if Velocitel has an office, but did that

19 require you to look directly at Velocitel's

20 financial information?

21     A.   Yes.

22     Q.   And in respect of that, did you work with

23 Lisa Carlson for any of those activities?

24     A.   Not directly, no.

25     Q.   When was the actual acquisition, if you



1    can recall?

2        A.    I can't.  I believe it was 2017 sometime.

3        Q.    And after that -- after the acquisition,

4    did you continue in your position as Director of

5    Finance?

6        A.    I did.

7        Q.    And once Velocitel was acquired, did you

8    need to be involved in any duties that you had not

9    been involved in before in order to smooth the

10    acquisition of Velocitel into QualTek?

11        A.    I would say yes.

12        Q.    And can you briefly describe what was

13    required -- what was required by you in terms of --

14    in terms of that integration.

15        A.    Sure.  So you know, QualTek has their way

16    of managing financial reporting, both at a project

17    level, a market level, a corporate level.  And you

18    know, the goal was to acclimatize the legacy

19    Velocitel processes, people and systems into the

20    QualTek way of doing things, so to speak.

21            The Velocitel business was split up into

22    kind of two major pieces.  You have their major

23    client, which was AT&T and then you had kind of

24    every other client, non-AT&T. QualTek and what I was

25    involved to prior to the Velocitel acquisition was

1  heavily based on the client AT&T.  So my goal was to

2  help bring again, a lot of the Velocitel financial

3  reporting into the same lines of what I'd been used

4  to and have reported on previously, you know, with

5  the legacy QualTek markets.

6      **Q.    And in respect of the major client AT&T,**

7  **and that integration, did you -- was Lisa Carlson**

8  **involved in any way in assisting in respect of that**

9  **conversion?**

10     A.    Yes.

11     **Q.    And can you tell us how she was involved?**

12     A.    Sure.

13     **Q.    Go ahead.**

14     A.    So she -- she brought a lot of financial

15  analytical Excel skills to the table when it comes

16  to what is required for the reporting that I've been

17  talking about. So I showed Lisa many of the things

18  that I would do in kind of hopes to kind of train

19  her in a way to do those same things using her

20  legacy knowledge of the Velocitel business to kind

21  of bring those -- those processes and systems up to,

22  you know, the QualTek way of doing things.

23     **Q.    And over what period of time did this**

24  **training occur if you can recall, approximately?**

25     A.    So this would be 2017, late 2017, 2018, I

1  imagine. But I can't say for sure.

2      Q.   Do you recall actually becoming her boss

3  in August of 2018 or thereabouts?

4      A.   Yes.

5      Q.   And in respect of being her boss, did that

6  mean she directly reported to you?

7      A.   Yes.

8      Q.   And did that mean also that you -- you

9  reviewed her performance?

10     A.   Yes.

11     Q.   Did you, in fact, review her performance

12 from August 2018 onwards?

13     A.   Yes.

14     Q.   And did you review that performance in any

15 document?

16     A.   Yes.

17     Q.   And do you recall the nature of the

18 document?

19     A.   So yeah, QualTek has an annual performance

20 measurement process through a web portal that has, I

21 believe 10 or 11 specific attributes that are asked

22 to be expounded upon for specifically for each

23 employee if they had -- the given measurement

24 period.

25     Q.   And can you recall what those, and you may

1 **not recall all of them, but as many as you can**

2 **recall, the 10 or 11 attributes that you had to**

3 **judge Lisa on in respect of her review?**

4     A.   I will try.

5     **Q.   Do the best you can.  Take your time.**

6     A.   So ethics.  I believe like customer

7 integrity, ethics.  There's a series of performance-

8 based ones, relationship-building.  She was a

9 manager at the time, so there was some managerial

10 notes, you know, how well she can develop and train

11 and supervise people.  How results- oriented the

12 employee is.  That's -- that's about as good as I

13 think I'm going to get.

14     **Q.   That's fine.  And do you recall what kind**

15 **of annual performance you gave her?  Or let me ask**

16 **you this, at what point did you give her a**

17 **performance review given that you became her boss**

18 **around August of 2018, if you can recall?**

19     A.   So the performance periods, the review

20 periods usually began for QualTek in September-

21 October time frame. Because it was so recent that I

22 had kind of brought Lisa on to my team, I don't

23 recall if or how I ultimately had given her that

24 review for that one.  But I know I fully did provide

25 one the following year.

1    Q.   And the following year would be 2019?

2    A.   Right.

3    Q.   And what, if you can remember, was the

4 content of the annual performance review done by

5 you?

6    A.   Sure.  So generally very positive.  You

7 know, Lisa was very detail-oriented.  She was always

8 a person that would work as many hours as she needed

9 to to complete a task.  You know, she brought some

10 soft skill like Excel skills to the table that were

11 even beyond me in some instances, and I consider

12 myself pretty highly skilled in Microsoft Excel.  So

13 I was very complimentary in the fact that she was

14 able to help set up and perform a lot of those

15 duties that we had talked about in terms of the way

16 QualTek had set up financial reporting.

17    Q.   At the point that you gave her that

18 review, how integrated was the Velocitel style of

19 financial reporting? How integrated had it become

20 into QualTek?

21    A.   For again, the pieces that I was more

22 focused on by August of 2018 through the end of

23 2018, I can't recall, but I can tell you by the time

24 2019 it was largely integrated to the point where

25 Lisa was mostly just -- there wasn't a lot of -- a

 1  lot to do on an integration standpoint, it was just

 2  maintaining.

 3      Q.   And after that, what was Lisa's job

 4  duties?  What were her job duties, if you can

 5  recall?

 6      A.   Sure.  So project level financial

 7  reporting across the markets in which she was

 8  designated and that was weekly, monthly reporting

 9  resulting in journal entries for accounting

10  purposes, monthly reporting up through corporate

11  for, you know, F&Os which are monthly kind of

12  executive level financial and operational meetings.

13  And then managing a small team to support her in

14  those efforts.

15      Q.   Did you ever give her more than one

16  evaluation while you were there?

17      A.   Again, I can't recall for 2018, but I know

18  I did for 2019.

19      Q.   And during the time after her evaluation,

20  did you find that her skill set and everything that

21  you'd mentioned in the annual performance review

22  continued in terms of her attributes?

23      A.   Yes.

24      Q.   Would it be fair to say that she had

25  become an employee of QualTek in the sense that now

1  she was functioning within the QualTek environment

2  of financial reporting?

3      A.   My opinion, yes.

4      Q.   And what other -- who else reported to you

5  in terms of being director of finance apart from

6  Lisa?

7      A.   I had two to three financial analysts.

8  There was a gentleman names James Champion, a

9  gentleman named Dorian Dheskali, a gentleman named

10 Zachary Van Loon, those were three analyst-level

11 employees that had reported to me.  And then I had

12 also, I believe in 2018 had hired a finance manager

13 named Benjamin Sydnes and at the time I may have

14 still had two other folks that weren't in the Blue

15 Bell, King of Prussia area named Kevin Bettencourt

16 and Amanda Silino, who did a lot of operational

17 level financial duties.

18     Q.   Even though these individuals were not in

19 the King of Prussia office, did they -- did they do

20 much of their work from a remote location?

21     A.   I'll say no from the standpoint of it was

22 from an office location owned or leased by the

23 company, not from their homes, like a work-from-home

24 situation, no.

25     Q.   And those office locations, were where, do

1  you know?

2      A.   Syracuse, New York.  Amanda Silino had

3  worked in Syracuse, New York and Billerica,

4  Massachusetts, Kevin Bettencourt worked in

5  Massachusetts.

6      Q.   Do you know if Velocitel had an office in

7  Minnesota?

8      A.   I do and they did.

9      Q.   They had an office in Minnesota?

10     A.   Yes.

11     Q.   And that would be an office not -- similar

12  to the one at Syracuse and in Massachusetts?

13     A.   That's correct.  That's correct.

14     Q.   With respect to the contract with AT&T,

15  was Lisa involved with that contract?

16     A.   In terms of QualTek's financial reporting

17  and processes internally around that, yes.

18     Q.   And how important was -- if you know, was

19  the client AT&T to QualTek?

20     A.   Paramount.

21     Q.   And why was it paramount?

22     A.   They comprised at a minimum 60 percent of

23  the wireless revenues, which is, you know, my area,

24  throughout the entirety of my employment there.

25  They were the number one customer as long as I was

1  there to my knowledge.

2  **Q.    Do you have a focus on the amount of money**

3  **that was in revenue?**

4  A.    Over what period?

5  **Q.    Over an annual period.**

6  A.    I mean, it again, varied largely from 2014

7  up through 2022.  I know in the very early years

8  before we had acquired Velocitel, it was maybe $17

9  million in 2013.  And I know in 2022 it was well

10 over 200 million when I had departed.

11 **Q.    And could you just describe if you know,**

12 **what exactly Lisa did or was doing with the AT&T --**

13 **with the contract with AT&T turf.**

14 A.    So it really goes to a lot of what I was

15 saying earlier.  Everything that I was working

16 closely with Lisa on was AT&T.  You know, a lot of

17 the non-AT&T stuff was given to other folks within

18 the company and our focus was the AT&T side.  So

19 yeah, everything I had mentioned earlier is what

20 Lisa was working on for AT&T.  I can go through it

21 again, if you'd like.

22 **Q.    That's -- that's fine.  Did you rely on**

23 **Lisa in respect of the contract with AT&T?**

24 A.    For the portions that she was responsible

25 for, yes.

1    Q.    Okay.  And in respect of those portions,

2    **was there a way of determining how successful she**

3    **was by looking at financial reports on a monthly**

4    **basis or was there some other way in which you could**

5    **determine whether she was or was not successful in**

6    **dealing with the contract?**

7    A.    Sure.  I would say Lisa's responsibility

8    wasn't necessarily on the performance but more or

9    less the reporting and being able to provide insight

10   into the performance.  You know, that was our roles

11   as analysts and managers and directors of finance.

12   And while I probably had more of the role in kind of

13   working closely with the executives in that type of

14   reporting, there was also feedback and discussions

15   and meetings that were held by Lisa to discuss

16   performance.  But to measure her success would be to

17   ensure that those reports and forms that we require

18   to be sent weekly, monthly are done on time and Lisa

19   was effective at that.

20   Q.    **When you say insights into the**

21   **performance, can you expand a little bit on what**

22   **insights you're referring to?**

23   A.    Sure.  So when -- when we talk about the

24   financial reporting that the finance team provides,

25   it's largely based off of a full profit and loss

1  statement for a market level. I think Lisa at the

2  time had four major markets that she was responsible

3  for and each one of those had a full profit and loss

4  that we managed from a budget, an actual, a

5  trending, all -- all manners of financial reporting

6  over periods of time.  So to be able to create and

7  distribute those is one thing, but it's another to

8  be able to intelligently and effectively communicate

9  what those results mean and understand potential

10 ways to improve them.  So between those two things

11 that was what was kind of required of her.

12      **Q.    Intelligently communicating what they**

13 **meant, did she ever memorialize or require to**

14 **memorialize any of those analyses?**

15      A.    Not in any routine fashion, no.

16      **Q.    But in terms of a team meeting or meeting**

17 **with her, did she give her input as to what her take**

18 **was on -- on what they meant?**

19      A.    Trying to think of any specific examples.

20 It was -- it was less of a focus at least for me and

21 what I was looking for, but that's not to say that

22 she didn't.

23      **Q.    Now, you indicated earlier in your**

24 **testimony that you had hired a number of people and**

25 **you gave their names and I obviously have them.  At**

1 **some point was Bruce Neff hired to do more or less**

2 **the same job as Lisa, although he was non-turf?**

3    A.   My understanding of what Bruce was

4 initially brought on for was a lot of our system

5 implementation needs at the time.  You know, we had

6 acquired Velocitel, we had talked about trying to do

7 more things with the Oracle platform and I had

8 worked directly with Bruce previously with some of

9 those specific types of needs.  So initially that

10 was the reason to bring Bruce on.  I think once he

11 had come on, it kind of quickly switched to there's

12 a lot of things that Velocitel needs; he also had a

13 skill set with some of the financial reporting needs

14 that we had for the non-AT&T part of the business.

15 So I think it had moved that way.

16    Q.   **Did you now Bruce from UniTek?**

17    A.   I did.

18    Q.   **And did you discuss with Bruce before he**

19 **came on board that there was an opening for him**

20 **possibly or that wasn't you?**

21    A.   No, Bruce actually had reached out to me

22 through LinkedIn at the time.  I think he had saw

23 that there was an opening accounting position and,

24 you know, I had engaged in conversation with him

25 just about what we've had going on, you know, not in

1 any formalized manner.  But again, I think it

2 ultimately came up where there was some finance

3 roles that opened up because of, again, the system

4 needs and kind of the process needs that was a good

5 fit for him ultimately.

6 **Q.    When he came on board, would it be fair to**

7 **say that he was dealing with the non-turf portion**

8 **and Lisa was still dealing with the turf portion of**

9 **the -- of the Velocitel wireless revenue?**

10 A.    Yes.

11 **Q.    And is it true that the turf portion was**

12 **around 80 or 90 percent of revenue at that time and**

13 **the non-turf revenue was the remainder?**

14 A.    To my recollection, yes, that sounds about

15 right.

16 **Q.    How long -- do you remember when Bruce**

17 **came on board?**

18 A.    I'm sorry, I can't recall specifically the

19 time frame.

20 **Q.    When Bruce handled unbills, did Lisa**

21 **calculate it for AT&T turf and send it to Bruce and**

22 **Bruce consolidated it once a month?**

23 A.    Yes.

24 **Q.    Now, was there a time that Lisa complained**

25 **about her title to you and said that her bonus was**

1    incorrect in the system?

2         A.    Title, I can't say, but bonus, yes.

3         **Q.    And can you tell us how that came about?**

4         A.    I believe there was -- so part of --

5    before I had taken on Lisa as part of my team I know

6    there was discussions about a potential promotion,

7    which included a change in salary that I was not

8    privy to.  I just knew that it was something that

9    was ongoing.  So in regards to Lisa's title, that

10   wasn't something I had very close involvement with

11   -- with that potential, you know, potential

12   promotion.  But for the bonus, I believe at one

13   point, it was shown or I had seen kind of the piece

14   of the change that was approved and I know her bonus

15   potential, which is always discretionary for

16   QualTek, had changed.  That change was approved.

17        **Q.    Had it changed upwards or downwards?**

18        A.    Upwards.

19        **Q.    Okay.  Do you recall -- just to interrupt**

20   **briefly, had it changed from 5,000 to 20,000?**

21        A.    Exactly, yes.

22        **Q.    Okay.  Go on.  Do you know who changed it,**

23   **by the way?**

24        A.    That I do not know.

25        **Q.    Okay.  Go on.**



1    A.   That's basically it.  So I knew that it

2 had happened but I had only known it had happened

3 once Lisa informed me.  Because again, a lot of

4 those conversations happened before I technically

5 took her over as an employee, or where the

6 discussions happened before then.

7    **Q.   And with respect to the bonus being**

8 **incorrect, what complaint, if any, did Lisa make to**

9 **you?**

10    A.   Sure.  So there was a discretionary bonus

11 that was made on QualTek's behalf and I do not

12 recall why.  I don't know, I don't think it was

13 performance-based but I don't think it's for me to

14 say at this point.  But it was, to my knowledge it

15 was to be based off of some percentage of the annual

16 bonus potential.  That was my understanding, that

17 was Lisa's understanding, but that doesn't

18 necessarily mean that that was correct because it

19 wasn't ever told specifically to us that way.

20    **Q.   Did you know what the percentage bonus**

21 **potential was?**

22    A.   No.

23    **Q.   Do you know how QualTek was doing at the**

24 **time from a financial standpoint?  Broadly speaking.**

25    A.   I mean --

1  information for many employees within the wireless

2  piece, including mine, including Lisa.  I -- that --

3  so I had mentioned Lisa had an understanding that

4  her annual bonus amount as defined in ADP, which

5  holds that information, was incorrect.  I took her

6  at her word and brought that up.  Again, I didn't

7  know at the time if it had changed or if it was

8  approved, I only know what the ADP was telling me.

9        But yeah, I had mentioned that to them and

10  I think it was acknowledged that okay, yeah, there

11  was a change that was not accurately reflected in

12  ADP at that time.

13     Q.   When they said a change that was not

14  adequately reflected, was that the change to

15  $20,000?

16     A.   Yes.

17     Q.   And so who acknowledged that?

18     A.   I believe it was, again, in -- I don't

19  think there's anything in writing, but it's at least

20  between Dave Conn and Stephanie Trybula.  I think

21  they both acknowledged that, yes, it should have

22  been changed.

23     Q.   And having acknowledged it, do you know if

24  they went -- if they did anything to correct what

25  appeared then to be a discrepancy?

1    A.    I don't recall.

2    Q.    Did they tell you, and they may not have,

3  what they might or might not do in respect of

4  putting it right?

5    A.    No.

6    Q.    With regard to the way bonuses were paid

7  at that time, were they split so that there was a

8  bonus, I believe it may have been in November or

9  September and then one six months later?

10   A.    Yes.

11   Q.    And is that the way QualTek always paid

12 their bonuses?  Well, in your experience.

13   A.    No.

14   Q.    Was your bonus split half and half?

15   A.    Yes.

16   Q.    Did you circle back to Lisa and tell her

17 that you had escalated her complaint to Dave Conn

18 and Stephanie Trybula?

19   A.    I believe I did.

20   Q.    And at some point later on, did she inform

21 you that there was still a problem with her bonus?

22   A.    Yes.

23   Q.    And do you remember how long after it was?

24   A.    I'm sorry, I do not.

25   Q.    Do you recall what she said in sum and

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM
335a

1  **substance?**

2      A.    What Lisa had said?

3      **Q.    Yes.  To you a second time.**

4      A.    Just that the facts of it still wasn't

5  apparent in the system and therefore the bonus that

6  she thought she should have been entitled to was

7  never corrected.

8      **Q.    And at that point, did you advocate on her**

9  **behalf again?**

10     A.    Yeah.

11     **Q.    And just tell us what you did.**

12     A.    I believe I put -- I sent an email to

13  Stephanie just kind of explaining that again, that

14  the issue -- I didn't see the change in the system.

15  In talking with Lisa, she also doesn't see it.  It's

16  just a matter of, you know, is there something

17  that's going to be updated in the system, because it

18  was my understanding that any kind of bonus that was

19  calculated to be paid out was discretionary in

20  nature and whatever her total amount or total

21  expected amount was, that, you know, may or may not

22  have been different from what ADP was showing was

23  not necessarily relevant for that calculation.

24     **Q.    Do you understand that the first time you**

25  **complained there was an acknowledgment that her**

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM
336a

1    bonus should have been $20,000?

2        A.    Yes.

3        Q.    And the second time, who did you talk to

4    in respect of the fact that it had not been

5    corrected?

6        A.    I believe Stef, Stephanie.

7        Q.    And did Stephanie respond to what you were

8    saying?

9        A.    I don't recall in any -- I mean, I know

10    there was an acknowledgment that it was initially

11    incorrect.

12        Q.    Was there an acknowledgment that it was

13    still incorrect the second time?

14        A.    Yes.

15        Q.    Was there a statement by her or by someone

16    else that they would attempt to correct it in the

17    system?

18        A.    Verbally, yes.

19        Q.    Do you know what's involved with -- and

20    you may not, of what's involved with correcting it

21    in the system? Is that a difficult thing to do, if

22    you know?

23        A.    I am not involved and I would not know.

24        Q.    Following the second time that you

25    advocated or complained on her behalf, was there a

1  **third time that she came to you at all to tell you**

2  **that the matter had not been resolved?**

3       A.   I can't recall.

4       **Q.   Did you have any understanding as to why**

5  **her bonus potentially was $20,000 and not $5,000?**

6       A.   I believe it was an acknowledgment that

7  her duties had increased and changed over time from

8  when they initially brought her on and she's -- she

9  was effectively running, you know, or managing

10 again, a small team to perform the duties that had

11 been outlined for her to do.  But again, a lot of

12 those conversations kind of came about before I took

13 her on as an employee and would have been more

14 specific with regards to the folks involved in that

15 before me.

16      **Q.   Do you know if, and you may not know, if**

17 **she was ever -- if she was ever put forward for**

18 **promotion to a director?**

19      A.   I knew that there was an attempt, yes.

20      **Q.   And you know that intent from where?**

21      A.   Discussions.

22      **Q.   And can you tell us who you discussed this**

23 **with or who they discussed it with you?**

24      A.   Dave Conn, Adam Spittler, Mike Machini,

25 those are three names that I would have talked to on

1  a daily basis as those things were happening.

2  **Q.    And can you give us an approximate time**

3  **frame for that when that occurred, or maybe it was**

4  **ongoing?**

5  A.    It was.  It was, because I knew it was

6  something where just the general management of that

7  team because I believe at the time Adam Spittler,

8  who was the president of Velocitel was moving into a

9  more corporate sourcing type role and finance, in

10 general, was kind of going through a bit of a shake-

11 up.  So it would have been ongoing.

12     **Q.    Was there ever a discussion at that time**

13 **that Lisa Carlson could not be a director?**

14     A.    Yes.

15     **Q.    And what discussion was that and with**

16 **whom?**

17     A.    So a lot of the discussions I had weren't

18 direct kind of one-on-one communications.  These

19 were kind of more group discussions with the likes

20 of like Dave Conn, Mike Machini.  But the context of

21 those discussions was effectively that there was a

22 greater push to move finance into the corporate

23 location at King of Prussia.  It's definitely a big

24 concern and a focus of executive management of

25 finance and the reporting that that team provides.

1  You know, even when we look to higher analysts, it's

2  always making sure that they can report through that

3  office to have that visibility that, you know,

4  anyone from the senior management could come by, an

5  analyst at any point in time and ask about questions

6  specific to markets they may be discussing.  So

7  remote corporate finance employees is generally not

8  a thing that QualTek promotes.

9      Q.    Would there be any -- do you know how

10  QualTek managed its employees during Covid?

11      A.    Yes.

12      Q.    And how did they do that?  Did they have

13  everyone still come in?

14      A.    Yes.

15      Q.    But they had them come in on a flex basis,

16  is that correct?

17      A.    For a period of time, yes.

18      Q.    And so that meant that some came in at one

19  time and others came in at another time?

20      A.    Yes.

21      Q.    In respect of the issue you raised, which

22  was visibility and the ability to respond to at any

23  particular time to any question, is there any reason

24  why Lisa, being as it were, remote from King of

25  Prussia could not have responded in much the same

1  way that she would have responded had she been in

2  the King of Prussia office?

3      A.   Can you ask that again?

4      Q.   Yes.  I'm sorry.  My question is, I

5  understand that there was a push.  Do you know why

6  there was a push at that time to have the focus of

7  financing in the King of Prussia office?

8      A.   Yeah.  Like I mentioned, finance -- the

9  finance organization within QualTek was going

10  through a bit of a mix-up, you know, with Adam

11  Spittler kind of moving out of operations back into

12  more of a senior leadership strategic role and kind

13  of between Dave Conn and Mike Machini trying to kind

14  of get in and understand a lot more of finance and

15  to making sure that they had people where they

16  wanted them to ultimately support their

17  organizations.

18      Q.   Had there ever been a case where the fact

19  that Lisa Carlson was not in the King of Prussia

20  office, was there ever a case where that was deemed

21  a significant disadvantage in respect of doing her

22  job?

23      A.   To me, no.

24      Q.   Did she continue to perform at the level

25  she had performed even though she was not directly



1   in the King of Prussia office?

2       A.   Yes.

3       Q.   **Would there be any reason that you would**

4   **know of why she could not continue to perform at the**

5   **level she was performing if she had remained in**

6   **Minnesota?**

7       A.   My opinion?

8       Q.   **Yes.**

9       A.   No.  No reason.

10      Q.   **In respect of the group discussions**

11  **regarding her possible directorship, was there, in**

12  **terms of her work anyway, a general consensus that**

13  **she was qualified to be a director by virtue of her**

14  **various skills, many of which you've outlined but,**

15  **in particular, the fact that she was managing a**

16  **small team and she was working fully and completely**

17  **as a QualTek employee with respect to the most**

18  **important client, AT&T?**

19          MR. DOUGHERTY:   Objection to form.

20      Q.   **You can answer.  I'm just protecting the**

21  **record.**

22      A.   So for -- there was two primary -- well,

23  the move from a manager to a director is a

24  significant one in a sense where there's a lot more

25  focus on ensuring effective communications upwards,

1  and that's directly with operational executives.  So

2  knowing that Lisa is a very skilled analyst and has

3  very strong skills with data manipulation and

4  analytical type duties, she's very, very qualified

5  to do that -- that work.  When it comes to

6  directors, I know QualTek has very specific

7  requirements, both educational and, you know, that

8  communication level where Lisa may not have had the

9  requisite skill set.

10      **Q.   But when you say education, are you**

11  **talking about the necessity for a degree?**

12      A.   Yes.

13      **Q.   And was that degree required to be in some**

14  **area of finance or was it just a degree?**

15      A.   I believe it was accounting or finance,

16  but I can't say for sure.

17      **Q.   And in Lisa's case at least, do you know**

18  **whether a degree in accounting or finance would have**

19  **-- and this is a bit speculative, but let me put it**

20  **this way, did you notice any reduction in the**

21  **quality of Lisa's work by virtue of her not having**

22  **an accounting or finance degree?**

23      A.   No.  In what she was required to do, no.

24      **Q.   In respect of the issue of communications,**

25  **you were referring -- were you referring to a degree**

1  or were you referring to a degree in something else?

2      A.    No, not necessarily a degree, but more or

3  less just active communication relationship-building

4  within the organization.  And I mention that because

5  I know specifically in the beginning once Lisa was

6  managing some of her own market level calls, I know

7  that there were executives on those calls and, you

8  know, I think Lisa at one point made a bad

9  impression one way or the other and ultimately that

10  is part of why I think she was kind of seen as

11  someone who can't necessarily effectively perform

12  that level of directors.

13      Q.    Do you know if they ever, if QualTek ever

14  told her that?

15      A.    I don't.

16      Q.    Do you know if what you just described was

17  ever put into writing and put in her personnel file

18  or just put into writing somewhere?

19      A.    I don't recall.

20      Q.    Why was Lisa not given a chance to know

21  that this was an area that she required to possibly

22  improve on before she could get a directorship?

23      A.    I think maybe that might have been on me

24  in my way of kind of communicating upward for Lisa's

25  skill set. Because again, Lisa had a very strong

1  skill set for what I was requiring of her and I

2  didn't necessarily need her to continue at director

3  level communications and meetings because that

4  effectively was my role.  You know, if there were

5  plans to bring her outside of my organization or

6  promote me and make her director, that was never

7  explained to me.  But I don't think that was ever

8  the case.

9      Q.   So I'm not -- I'm not quite sure I fully

10 understand your answer as far as Lisa's concerned.

11 Did you have a problem with her becoming a director?

12     A.   I don't think it was ever kind of for me

13 to have a problem with it.  It was something where

14 obviously the entire work structure would have

15 needed to change, you know, selfishly where I would

16 have fit in I would have needed to understand, but I

17 don't think it was ever necessarily something I was

18 expecting only because it seemed like by the time

19 Lisa became my employee it was already something

20 that was determined that she can't be.

21     Q.   Okay.  So at that point, it was as it were

22 a fait accompli, is that correct?

23     A.   I'm sorry, I don't know that term.

24     Q.   A fait accompli, it's French.  It means it

25 was a done -- done deal.

1      A.    Yeah.  Seemingly, yeah.

2      **Q.    And why was that?  Was that because she**

3 **did not have a degree and/or was not in the King of**

4 **Prussia office?**

5      A.    Those are the things that I've heard, but

6 you know, the ultimate decision would have lied

7 elsewhere and kind of beyond me.

8      **Q.    And who did you hear that from?**

9      A.    Again, nothing in writing, just kind of

10 discussions from all the folks I mentioned before,

11 you know, Dave Conn, Mike Machini, maybe even Stef.

12 Those were all reasons that I kind of heard that it

13 wasn't going to happen.

14     **Q.    Do you know that Dave Conn put forward**

15 **Lisa as the replacement for Dana Freedman?**

16          **MR. DOUGHERTY:**  Objection.  No foundation.

17          **MR. KOLMAN:**  He knows, what's the problem?

18          **MR. DOUGHERTY:**  Because that's -- you want

19 to do this on the record, fine.  That's not what

20 Dave Conn testified to, that's -- and there's no

21 document to that effect.

22          **MR. KOLMAN:**  That's not true, there is a

23 document directly to that effect.  That's --

24          **MR. DOUGHERTY:**  Oh, there's a document?

25          **MR. KOLMAN:**  -- where you're wrong.

1              **MR. DOUGHERTY:**  No, there's a document

2      that Joe Boski put her forward.

3              **MR. KOLMAN:**  Yeah, but -- okay.  Well, we

4      can disagree on that.

5              **MR. DOUGHERTY:**  I don't know how we can

6      since it's -- that's what the document says.  And

7      you read that document and you keep talking about

8      it's something else.

9              **MR. KOLMAN:**  Okay.  Well, you can talk to

10     the witness about it if you want.

11             **MR. DOUGHERTY:**  Okay.  So then objection,

12     you're misrepresenting the record.  You're

13     misrepresenting Dave Conn's testimony.  You're not

14     laying a proper foundation for the question.  You're

15     calling for speculation.

16             **MR. KOLMAN:**  And I'm going to ask the

17     court reporter to mark the record there was a

18     speaking objection.

19             **MR. DOUGHERTY:**  Okay.  That's fine.

20             **MR. KOLMAN:**  Thank you.  Okay.  Why don't

21     we go on.

22         **Q.  Let me put it this way, do you know if --**

23     **if Lisa Carlson was ever recommended to be the**

24     **replacement for Dana Freedman?**

25         A.   Like, nothing in writing.  I may have

1  heard that that was something -- again, before --

2  because Dana had left before I was directly involved

3  in, you know, what Lisa would be managing or doing

4  at that point in time.

5       Q.   **Was Dana Freedman a director, if you know?**

6       A.   Yeah, I believe she was.

7       Q.   **Do you know if Dana Freedman ever**

8  **recommended that Lisa Carlson be her replacement?**

9       A.   I don't.

10      Q.   **You don't know what Dana Freedman was**

11  **doing prior to her leaving, is that right?**

12      A.   I was working closely with Dana on

13  diligence before acquiring Velocitel and because

14  Lisa was a direct report of Dana's, I was more

15  working closely with Dana at that time.  So I do

16  know in a sense of Lisa ultimately was supporting

17  Dana and Dana was effectively doing, you know, was

18  working with me on a lot of the transition items on

19  the early phases of the acquisition before she had

20  left.

21      Q.   **Did Dana talk to you about Lisa Carlson**

22  **and how Lisa might be of help?**

23      A.   Not that I recall.  I mean, I had some

24  firsthand experience.  I had met Lisa by then and

25  was able to kind of see her grasp on the AT&T

1  contract and the skills that she had, so I knew she

2  was valuable.  But I could not assess whether, you

3  know, she could ascend from her current position at

4  that point in time.

5      Q.   **And you testified the issue of Lisa not**

6  **being qualified to be a director was done early on,**

7  **why were there group discussions about whether she**

8  **should or shouldn't be a director?  Did those occur**

9  **after this decision that had been made by other**

10 **people?**

11     A.   Maybe.  But what I would say is just

12 because obviously it's within the finance

13 organization and all the people that I've mentioned

14 are obviously my superiors and very relevant to how

15 we are going to be operating going forward.  So

16 it's, you know, if there are promotions or changes

17 to that hierarchy, I would say it's very important

18 to all of us.

19     Q.   **When Bruce Neff came on board at any point**

20 **did he take over the duties of Lisa Carlson?**

21     A.   I don't believe so.

22     Q.   **Do you recall that in January 2020, two**

23 **weeks before Lisa was fired she was given the**

24 **highest raise possible, 10 percent, due to her**

25 **excellent performance?**

1    A.    Can you say that question again?

2    **Q.    Do you know that in January 2020, two**

3 **weeks before she was fired, she was given the**

4 **highest raise percent possible, 10 percent --**

5        **MR. DOUGHERTY:**  Objection to form.

6    **Q.    -- due to her performance?**

7        **MR. DOUGHERTY:**  You can answer.

8    A.    No, I don't recall.

9    **Q.    In that week which ended January 24th, did**

10 **you tell Lisa that she was going to be demoted into**

11 **a reporting role without any direct reports?**

12    A.    No.  Well, scratch that, maybe.  That

13 might have been the understanding at the time.

14    **Q.    The understanding?**

15    A.    Yeah.

16    **Q.    What understanding?**

17    A.    So that Lisa would continue to help kind

18 of work with me on different reporting things

19 because I think at the point in time I might have

20 been moving towards a different role, but you know,

21 those -- I think a lot was kind of in motion at that

22 point in time.

23    **Q.    What was the issue with her being demoted**

24 **to a reporting role given your assessment, your good**

25 **assessment of her with regard to the AT&T turf?**

 1        **MR. DOUGHERTY:**  Objection to form.  You

 2   can answer, sir.

 3        A.    I think it's more around -- it was more

 4   around the hierarchy of finance was undergoing a

 5   change in terms of the titles that we wanted to have

 6   and the reporting structure. And effectively Lisa's

 7   title at the time, I believe was still finance

 8   manager and the directive was to eliminate that

 9   title, that position to have analysts kind of report

10   up through directors so Lisa kind of fell into this

11   kind of nexus of a title where it doesn't have a

12   home anymore in the new structure.

13        **Q.    When you say directive, which directive**

14   **and from whom?**

15        A.    You know, my -- my managers, Dave Conn,

16   Mike Machini at the time that was -- the direction

17   was to remove that role across the business.  I

18   believe they did in non- wireless and (inaudible) as

19   well.

20        **Q.    Is there any document to reflect that?**

21        A.    Not that I'm aware of.

22        **Q.    Do you know if QualTek has some kind of**

23   **protocol of never documenting meetings?**

24        A.    Not purposely that I'm aware of, no.

25        **Q.    Did you document any meetings that you had**



1    **during this time?**

2        A.    No.

3        **Q.    With respect to this change, would this**

4    **involve Lisa Carlson doing something other than what**

5    **she had done before, which was work on the AT&T turf**

6    **portion?**

7        A.    Yeah.  I think -- again, this was a very

8    small period of time and it was an understanding of

9    what we -- where we thought it was going.  But yeah,

10   I believe at the time the understanding was she'd be

11   more of a financial planning and analysis national

12   more -- more budgeting and forecasting, less actual

13   reporting.  But again, that was such a small period

14   of time but I think that's what I recall.

15       **Q.    Did you consider that a demotion?**

16       A.    No.  I think it's -- it's a different

17   role, for sure and requires a strong knowledge of

18   finance and the business, which she had.  I saw it

19   as something different. But if it's something where

20   the title couldn't be a manager or a director, then

21   you know, I kind of had to follow the will of the

22   business there and say okay, well, then we have to

23   give her a different title.

24       **Q.    But it wasn't that she -- it wasn't that**

25   **there's no work for her to do and then it was taken**

1  over by someone else, is that correct?

2       A.    That's correct.

3       Q.    Okay.  Do you know why she was terminated?

4       A.    I think primarily due to the -- the role.

5  Again, the manager position being removed, and her

6  not having the, you know, what was deemed the

7  requisite skill set to be promoted as well as her

8  being not local to Eastern Pennsylvania.  I think

9  all of those were key reasons, but I ultimately was

10 not involved in the direct decision to do that.

11      Q.    If you were -- if you had been asked,

12 would you have said that she still had an important

13 role to play and it was just a matter of finding her

14 the title?

15      A.    Yes.

16      Q.    Who did take over her job duties after she

17 was terminated?

18      A.    Me.

19      Q.    Well, you already had a lot on your plate

20 so this -- this was given to you in addition?

21      A.    Yes.

22      Q.    Did you ever request that someone be hired

23 to assist you, perhaps not in that area but in

24 others so that you could concentrate on this and

25 other duties that you had that you now -- that you

1  **now had been given or had assumed?**

2      A.    I don't recall.  I mean, I know that you

3  know, I've always been someone to, you know, I'll

4  put in the extra hours if I need to to progress

5  things and you know, being in a position of finance,

6  I try to do that with as few people as possible to

7  maximize the value.  But at the time, you know, with

8  Lisa being let go and I believe maybe some others as

9  well, it was just something where it didn't seem

10 like the right time.

11     **Q.    Do you -- do you know why you were never**

12 **consulted about her termination, given that you were**

13 **her boss?  This may be speculative, I'm --**

14     A.    Sure.

15     **Q.    -- asking if you know.**

16     A.    I know I have -- again, I know not a lot

17 of this is documented or maybe documented at all,

18 but I know I've -- I recommended to several people

19 that I kind of make Lisa -- give her a different

20 role as opposed to terminating her. She has a lot of

21 skills and knowledge that were very useful to my

22 team and the duties that were required of me and my

23 team.  But you know, I always saw it as something

24 above my paygrade that the decision was made and the

25 reasons were never really articulated in a way that

1 I could answer that question effectively.

2     **Q.    Do you know anything about any complaints**

3 **that were ever made maybe by Lisa, maybe not, about**

4 **disparate pay between males and females?**

5     A.    Yes.

6     **Q.    Can you tell us what you know about that?**

7     A.    So yeah, the only complaint I had received

8 was from Lisa and I believe it was two analysts on

9 her team, Michelle and Derrikus did have a smaller

10 salary than the analysts that were on my team when

11 we had acquired Velocitel.  So I know that they were

12 doing largely different things at that point in

13 time.  Again, the analysts are expected to do a lot

14 in QualTek.  It's a very strong role. And I know

15 what we were asking some of the folks on Lisa's team

16 to do was a bit different.  But I can't quite recall

17 if anything had ever come of it.  I think it was

18 just kind of they live in a different locality, they

19 have different backgrounds and it was never any type

20 of, you know, deliberate wrongdoing to get that pay

21 to be that disparate.

22     **Q.    Did you know of any investigation that was**

23 **done after the complaint?**

24     A.    No.

25     **Q.    Do you know if Lisa made such a complaint**



1    and if she did, when she did it?

2        A.    Outside of telling me, no, I'm not aware.

3        Q.    **After Lisa was fired, did you discuss with**

4    **anyone the reasons why that happened?**

5        A.    No.

6        Q.    **Were you ever told the reasons why that**

7    **happened?**

8        A.    Not directly.

9        Q.    **What about indirectly?**

10       A.    It's no different than kind of what I've

11    already mentioned.  You know, her locality and her

12    perceived lack of skills to be promoted kind of put

13    her in this role where the business didn't really

14    see a need for the way that the finance wanted to be

15    structured going forward.  That was always my

16    understanding.

17       Q.    **But that understanding is not necessarily**

18    **based on what you were ever told, is that right?**

19       A.    No, I mean, again, indirectly, like

20    through discussions, just again, nothing written

21    down but yeah, that was the understanding.

22       Q.    **But you were never part of that?  You**

23    **never had input into that decision, correct?**

24    **Because if you had you would have said her skill**

25    **set's just fine and she still has a contribution to**

1 **make and a role should be fine -- found for her,**

2 **correct?**

3     A.   I wouldn't say I didn't have input.  You

4 know, again, I was part of some conversations, but a

5 lot of the decision-making happened above my level

6 and ultimately yeah, my concerns weren't necessarily

7 addressed.

8     **Q.   Okay.**

9         **MR. KOLMAN:**  We're going to take a 10 to

10 15- minute break.  I'm going to represent that I'm

11 not going to talk to Mr. Kemmerer and I'm just going

12 to put us on mute and I'm going to kill the video.

13 And we'll reconvene.

14         **(RECESS TAKEN FROM 3:13 P.M. TO 3:35 P.M.)**

15         **MR. KOLMAN:**  So I have no more questions

16 of the witness.

17         **MR. DOUGHERTY:**  Mr. Kemmerer, I have no

18 questions for you.  Thank you for coming in today.

19         **(SIGNATURE RESERVED)**

20         **(DEPOSITION CONCLUDED AT 3:36 P.M.)**

21

22

23

24

25

# EXHIBIT "X"



## PERSONNEL ACTION NOTICE

| | | | | |
|---|---|---|---|---|
| Date Created: 03/08/18 | Date Effective: 4/1/18 | Submitted by: Joe Busky | | |

**Type of Action:** x☐ Promotion ☐ Rehire ☐ Demotion ☐ Title Change ☐ Salary Adjustment ☐ Transfer ☐ Name Change (Requires Documentation)

**Employee ID / File #:**

**Name:** Lisa carlson     **Manager's Name:** Dave Conn

| Salary Adjustment | Change in Position | Transfer |
|---|---|---|
| **Current Rate**   **New Rate** | Current Position: | Current Location: |
| Hourly Rate: $   Hourly Rate: $ | Market FPA manager | PC #: |
| | | City/State: |
| Tech Level:   Tech Level: | New Position:   FINANCE | New Location: |
| Annual Rate: $92300   Annual Rate: $102000   105,000 ✓ | Director FPA   MGR. | PC #: |
| No Rate Change: ☐ | Bonus Eligible: Yes ☒ No ☐   Bonus Amount: $   20,000. | City/State: |
| | No Bonus Change: ☐ | New Manager: |

| | | |
|---|---|---|
| Is this Position Budgeted?   Yes x☐ No ☐ | Reason for Additional Resource: | |
| Is this a Replacement?   Yes x☐ No ☐ | Replacement For: Dana freedman | |

☐ Permanent Transfer

☐ Temporary Transfer    How Long?    Per Diem Amount: $

**Comments:** Promotion

## APPROVALS

| | | Date | |
|---|---|---|---|
| Director/ VP | | | |
| Division President | | Date 3-28-18 | |
| Division CEO | See Attached | Date | |
| Corporate Finance | | 3/28/18   3-26-18   3-28-18 | |
| HR Director | | Date 3/28/18 | |
| CAO | | Date | |

## FOR HR / PAYROLL USE ONLY

| | | |
|---|---|---|
| New Position   Yes ☐ No ☐ | Job Description on File   Yes ☐ No ☐ | |
| Workforce Now Updated   Yes ☐ No ☐ | Work Comp Code | |
| | Initials: KG 4/5/18 | |

# EXHIBIT "Y"

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

---

LISA CARLSON
2795 243rd Avenue Northwest
St. Francis, MN 55070,

Plaintiff,

v                                   No.:  2:22-CV-00125

QualTek WIRELESS LLC
1150 First Avenue, Suite 600
King of Prussia, PA 19406,

Defendant.

---

ZOOM VIDEOCONFERENCE DEPOSITION OF

LISA CARLSON

---

DATE TAKEN:  6-14-2022          BY LISA M. HUTTON



361a

```
 1   APPEARANCES:

 2


 3   KOLMAN LAW PC
     414 Hulmeville Avenue
 4   Penndel, Pennsylvania 19047
     Phone:  215-750-3134
 5   Email:  tkolman@kolmanlaw.com
     By:  Timothy Kolman
 6   for the Plaintiff

 7

     FOX ROTHSCHILD LLP
 8   10 Sentry Parkway
     Suite 200
 9   PO Box 3001
     Blue Bell, Pennsylvania 19422
10   Phone:  6120-397-6500
     Email:  cdougherty@foxrothschild.com
11   By:  Colin D. Dougherty
     for the Defendant
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



1                    I N D E X

2                                                          PAGE

3    Examination by Mr. Dougherty                            4

4

5

6

7

8                    E X H I B I T S

9    1    Carlson Discovery 000024 through 26               73

10   2    Carlson Discovery 000044 through 45               77

11   3    Carlson DISCOVERY 000050                          81

12   4    QualTek 000188 through QualTek 000190             83

13   5    QualTek 000197 through QualTek 000198             86

14   6    Bonus chart                                       91

15

16

17

18   OBJECTIONS

19        Mr. Kolman 11, 16, 18, 23, 33, 34, 36, 37, 39, 40,

20   41, 43, 46, 47, 48, 49, 54, 55, 59, 67, 68, 69, 82

21

22

23   CERTIFICATE

24

25



```
 1              LISA CARLSON,

 2         a witness in the above matter, after having been

 3         first duly sworn, testified under oath as follows:

 4                   EXAMINATION

 5    BY MR. DOUGHERTY:

 6    Q    Ms. Carlson, my name is Colin Dougherty.  I

 7         represent QualTek Wireless in this lawsuit that you

 8         filed.  Could you state and spell your full name

 9         for the record, please?

10    A    Lisa Cai Carlson, L-I-S-A C-A-I C-A-R-L-S-O-N.

11    Q    Have you ever given a deposition before, ma'am?

12    A    No.

13    Q    Okay.  So I'm sure you went over some stuff with

14         your attorney on how these work, and I don't want

15         you to ever tell me anything you talked to him

16         about, but I'll just give you some instructions on

17         the record, okay?  The first one is the nice lady,

18         Ms. Hutton, she can't take down shoulder shrugs and

19         head nods and all that normal stuff we do in normal

20         conversation on the record, so I would ask that all

21         of your answers be verbal and out loud so that she

22         can write it down.  Is that okay?

23    A    Yes.

24    Q    Okay.  Great.  Secondly, I'm going to do my best to

25         do the same for you, I would ask that you wait
```



1              until I am done asking my question before you

2              answer it even if you are super sure you know what

3              I'm about to ask you, and then I will do the same

4              and wait until you are done speaking before I ask

5              the next question.  That way, again, Ms. Hutton can

6              get everything down on the nice, clean record,

7              okay?

8    A        Okay.

9    Q        Finally, I'm going to assume you understand my

10             question if you answer it.  I'm not here to try and

11             trick you, so if you don't understand, please let

12             me know and I'll try and rephrase it or state it

13             differently in a way that we all can understand.

14             Is that okay?

15   A        Yes.

16   Q        Okay.  You are under oath, but we are obviously not

17             in a courtroom.  You look like you are in part of

18             your house.  I'm in my office.  Mr. Kolman is in

19             the room with all his soldiers.  So it's -- you

20             know, if you need to take a break -- I don't know

21             if you smoke, I don't know if, you know, there's a

22             reason you need to take a break fairly routinely.

23             I have had depositions where people who are, for

24             example, diabetic and need to take a break every

25             half hour.  Just let me know and I'm happy to



```
 1        accommodate you, I just ask that you answer any
 2        pending question before we take a break.  Is that
 3        okay?
 4   A    Yes.
 5   Q    Okay.  Are you on any medication today that would
 6        prevent you from understanding my questions and
 7        answering truthfully?
 8   A    No.
 9   Q    Have you consumed alcohol in the last six hours?
10   A    No.
11   Q    Is there any reason you don't believe you can sit
12        for your deposition today and answer my questions?
13   A    No.
14   Q    Great.  Are you currently employed?
15   A    Yes.
16   Q    And where do you work?
17   A    I work for Medtronic through a company called
18        Donatech, which is a contracting company.
19   Q    And how long did you work for Donatech?
20   A    A year and -- what month is it?  June.  A year and
21        four months.
22   Q    Is that the first job you had after you left
23        QualTek?
24   A    Yes.
25   Q    How much money do you make at Donatech?
```



MAGNA
LEGAL SERVICES

366a

```
 1   A    I make $47 an hour, but they just gave me a
 2        3 percent increase, and I don't think it's taken
 3        effect yet.  But it'll be, like, $48 and some
 4        change per hour.
 5   Q    Is it a full-time position?
 6   A    Yes.
 7   Q    Does it provide benefits?
 8   A    No.
 9   Q    Does it have overtime?
10   A    No, not approved -- it's not approved for overtime
11        right now.
12   Q    Okay.  And I think you said you've been working
13        there for about a year and eight months.  Is that
14        what you said?
15   A    A year and four months in.  February 3, 2021.
16   Q    Did you apply for any jobs after you left QualTek
17        before the Donatech position?
18   A    Yes.
19   Q    Okay.  And where did you apply?
20   A    I applied to many positions through Indeed and
21        other -- I don't recall websites that would, you
22        know, have jobs available.  I also had my resume
23        posted on multiple websites for recruiters to
24        contact.
25   Q    Did you get any job offers during that time before
```



 1          Donatech?

 2     A    No.

 3     Q    Did you have any job interviews during that time

 4          before you accepted the position with Donatech?

 5     A    I believe so, yes.

 6     Q    I'm --

 7     A    I do not fully recall.

 8     Q    Okay.  Do you recall any of the companies that you

 9          interviewed with?

10     A    No.  usually the positions went through recruiters,

11          so I would work with recruiting agencies.

12     Q    Okay.  And where do you currently live, ma'am?

13     A    I live in Minnesota.  Do you want more detail than

14          that?

15     Q    What's -- the town is fine?

16     A    St. Francis, Minnesota.

17     Q    Is that where you lived when you worked for

18          QualTek?

19     A    Yes.

20     Q    Is it the same house?

21     A    Yes.

22     Q    Okay.  What's the -- what's the highest level of

23          education that you achieved?

24     A    Pardon me, I didn't catch that.  It broke up a

25          little bit.



```
 1   Q   Sorry.  What's the highest level of education that
 2       you've completed?
 3   A   Some college.
 4   Q   Okay.  And where was that?
 5   A   The University of Minnesota Duluth.
 6   Q   Okay.  Do you have, like, an associate's degree or
 7       bachelor's degree or anything like that?
 8   A   No.
 9   Q   Do you have any certificates?  You know, some of
10       those programs give out certificate in analytics,
11       certificate in -- to something.  Do you have any
12       certificate programs you've completed?
13   A   No.
14   Q   Have you ever filed a lawsuit before?
15   A   Yes.
16   Q   Okay.  And where was that?
17   A   In Minnesota.  I had -- yeah, in Minnesota it was
18       filed.
19   Q   Okay.  Were you the plaintiff?  You were the
20       plaintiff?
21   A   Yes.
22   Q   What kind of lawsuit was it?
23   A   I had damage on my driveway from a neighbor's
24       contractor, so I filed small claims court.  They
25       resolved the issue by fixing the damage, so I
```



```
 1        dropped the case.

 2   Q    Okay.

 3   A    And I have one additional one.  I was in a very bad

 4        accident, and so I received money from an insurance

 5        company to cover my loss for that fee.  And those

 6        were the only two.

 7   Q    When was the accident?

 8   A    I want to say maybe 2003.

 9   Q    Okay.  So it was 20 years ago almost?

10   A    Yeah, yeah.

11   Q    Okay.  I believe you said you've never given a

12        deposition before, but have you ever otherwise

13        testified under oath?

14   A    No.

15   Q    Okay.  Have you ever filed for personal bankruptcy?

16   A    Yes.

17   Q    Okay.  When was that?

18   A    I believe that was 1999.

19   Q    So again, 23 years --

20   A    Yeah.

21   Q    Something like that?

22   A    Yes, correct.  A long time ago.

23   Q    And was that discharged?

24   A    What does "discharged" mean?

25   Q    Was the bankruptcy case ever closed, resolved,
```



1      finished?

2    A    Yes, it was completed in that same year.

3    Q    Okay.  What is your job title currently?

4    A    Senior financial analyst.

5    Q    And what are your job responsibilities?

6    A    I create Excel spreadsheets, report numbers, create

7         presentations of the numbers.  I report results for

8         our portfolio piece under Medtronic.  So I report

9         for the whole portfolio, and then underneath are

10        some businesses.

11   Q    Who's your supervisor?

12   A    Marcello Hernandez.

13   Q    And you said, are you, like, on a placement through

14        Donatech?  How does that work?  Like, who pays your

15        check, Donatech or Medtronic?

16   A    Donatech pays my paycheck, but Medtronic approves

17        my time sheet and hours.

18   Q    Okay.  So could Donatech move you to another role?

19   A    I'm under contract.

20   Q    Okay.  So you are at Medtronic for as long as they

21        need you, something like that?

22              MR. KOLMAN:  Objection.

23              THE WITNESS:  Yeah.

24   BY MR. DOUGHERTY:

25   Q    Okay.



```
 1   A    I am.  I am as long as they need me and are able to

 2        retain me.

 3   Q    Okay.  Did you apply for unemployment after you

 4        left your position at QualTek?

 5   A    Yes.

 6   Q    And was that with a Minnesota State agency?

 7   A    Yes.

 8   Q    Do you have any of your own employment application

 9        paperwork?

10   A    Everything is completed online, so there's no paper

11        copies.  It's completely an online system.

12   Q    And I assume you were approved for unemployment?

13   A    Yes.

14   Q    Just so that we are using the same terminology, if

15        I talk -- when I talk about QualTek, I mean the

16        company who bought Velocitel or Old Velocitel.  I

17        know that sometimes they used that name

18        interchangeably after that position, but I want to

19        try and keep the record clear for when you were

20        working for the Minnesota-based company originally

21        called Velocitel and then the company it acquired.

22        Is that okay?

23   A    Yes, but it's -- Velocitel was not a

24        Minnesota-based company.

25   Q    Okay.  Where was Velocitel based out of?
```



1    A    Chicago, Illinois.  Northbrook, to be specific.

2    Q    How did you -- or when did you start working for

3         Velocitel?

4    A    November 8, 2010.

5    Q    Okay.  What was your first position you held with

6         Velocitel?

7    A    Project coordinator.

8    Q    And how long -- how long did you have the project

9         coordinator role for Velocitel?

10   A    I believe it was a year or a year and a half.

11   Q    Okay.  And then what was your next position with

12        Velocitel?

13   A    I was managing the finance team.  I do not recall

14        the date of the actual title change, but that is

15        what happened.  I obtained a team underneath me,

16        and led the finance team.

17   Q    How many people reported to you?

18   A    It changed as the company had acquired a new

19        contract, so we were hiring rapidly.  So at most I

20        want to say I had 14 to -- 14 plus.  But things

21        structurally changed.  But temporarily I would

22        have, like, 30 employees, but then it was only a

23        temporary thing.

24   Q    Did you hold any other positions at Velocitel?

25   A    Finance manager was the highest position that I



1       held.

2    Q    Okay.  And did you hold that until the date of the

3       acquisition?

4    A    Pardon me?

5    Q    Were you in that role on the date of the

6       acquisition of Velocitel by QualTek?

7    A    Yes.

8    Q    Where did you work out of for Velocitel?  Out of

9       your home or did they have an office?

10   A    They had an office.  I would work from home as

11      needed, but since I had a new team, I was in the

12      office.

13   Q    How many people roughly would you say worked in the

14      office in Minnesota?

15   A    I believe at the maximum it might be 200.

16   Q    So this was a significant operation base.  Is that

17      right?

18   A    Yes, but it was equal to other operation bases we

19      had nationwide.  We had key offices across the

20      nation.  This was one of them.

21   Q    Okay.  How did you first learn about QualTek?

22   A    During the acquisition.

23   Q    Okay.  Did someone -- did a leader or executive at

24      Velocitel tell you about it?  Tell you about

25      QualTek was going to acquire Velocitel?  How did



1          that work?

2    A     I was part of the acquisition, so I worked on

3          the -- I don't recall the term they used, but the

4          background secret paperwork for the acquisition and

5          the date of consolidation and all of that.  So I

6          was part of the acquisition.

7    Q     So was it, like, called diligence team or something

8          like that?

9    A     No, it was me and my boss Dana Freedman who dealt

10         with the finance piece of the acquisition.

11   Q     Gotcha.  Did you interact with anybody from QualTek

12         during the acquisition?

13   A     Yes.

14   Q     Who?

15   A     Yes.

16   Q     Who was that?

17   A     I do not recall everyone, but I know I worked a lot

18         with Shawn Kemmerer because he had a similar

19         position to me with QualTek.  So we had to convert

20         our data to their data methodology and revenue

21         recognition methodology.  So I worked with him to

22         obtain their profit and methodologies, and then I

23         applied it to Velocitel's information.

24   Q     And after the acquisition you were hired by

25         QualTek.  Is that right?



```
 1   A    Correct.

 2   Q    Did you have to fill out an application or any type

 3        of onboarding paperwork?

 4   A    I believe so, but I do not fully recall.

 5   Q    Did you have an interview?

 6   A    No, I don't believe so.

 7   Q    Do you remember what your job -- your job title was

 8        when you first joined QualTek?

 9   A    Finance manager.

10   Q    And who did you report to at that time?

11   A    Dana Freedman.

12   Q    And that was the same woman you had reported to at

13        Velocitel?

14   A    Correct.

15   Q    And was -- how was the position of finance --

16        strike that.  Who paid your checks?  Did it say

17        QualTek?  Did it say Velocitel?  Did it say

18        something else after the acquisition?

19   A    I do not recall.  I believe they said QualTek.

20   Q    Was your position -- was the position of finance

21        manager after the acquisition ever explained to

22        you?

23                MR. KOLMAN:  Objection as to form.

24   BY MR. DOUGHERTY:

25   Q    You can answer it if you understand it.
```



 1   A   Can you repeat that, please?

 2   Q   Sure.  Was the position of finance manager at

 3       QualTek ever explained to you after the

 4       acquisition?  In other words, were your job duties

 5       or responsibilities explained to you as to what

 6       QualTek expected?

 7   A   QualTek expected me to handle the finance piece for

 8       the Velocitel wireless portion for the AT&T

 9       contracts.  I continued what I was currently doing,

10       and that's what I was doing.

11   Q   Okay.  Did you work on any other portions of AT&T

12       contracts for other QualTek entities?

13   A   I assisted Empire Telecom at the time with the

14       tools that I built for automatically determining

15       revenue recognition, costs for that, so on and so

16       forth.

17   Q   Okay.  When you joined QualTek, did you receive an

18       offer letter, if you recall?

19   A   I do not recall.

20   Q   What was your understanding when you joined QualTek

21       that -- what your pay would be?

22   A   I do not recall having that discussion.  When we

23       were acquired, everything remained status quo for a

24       bit.

25   Q   And --



```
1    A    I do not recall the time line on that though.

2    Q    No problem.  And how much were you making at the

3         time of the acquisition?

4    A    I believe it was $92,000 and change.

5    Q    And did you have any bonus opportunities?

6    A    Yes.

7    Q    What was the bonus opportunity?

8                    MR. KOLMAN:  Objection as to --

9                    THE WITNESS:  As a packager?

10                   MR. KOLMAN:  Wait, wait.  When?  In

11        other words, the timing?

12                   MR. DOUGHERTY:  Well, she was answering

13        it, so she seemed to understand.

14                   MR. KOLMAN:  Well, she may have

15        understood, I just want the -- I just want the

16        answer to be clear as to when and what.  I mean,

17        you are right, she can answer.  If you have a

18        follow-up, I guess you ask it.

19   BY MR. DOUGHERTY:

20   Q    Did you have a bonus opportunity when you left

21        QualTek?

22   A    Yes.

23   Q    What was your understanding of the bonus

24        opportunity?

25   A    As a manager, I was part of their bonus program for
```



1       10 percent of my annual salary.

2   Q   And what went into deciding what the bonus was?

3   A   That was QualTek's standard.  They have a standard

4       tier for bonusing based on title.

5   Q   Right.  But was the bonus discretionary?  Was it

6       your understanding that the bonus was discretionary

7       or was it automatic?

8   A   I honestly don't recall.  I believe the bonuses

9       were tied to personal performance, and I don't

10      understand -- I was never provided with how the

11      bonuses were determined to be paid out.  So I don't

12      really fully understand that.

13  Q   Okay.  Did you have some understanding that the

14      company's performance affected the bonus or not?

15  A   It could have, but I do not fully recall, to be

16      honest.

17  Q   Okay.  Did you eventually have any other positions

18      at QualTek?

19  A   I performed the position of the director of

20      finance, however, my title remained finance

21      manager.

22  Q   Okay.  And why do you say you performed the

23      position of director of finance?

24  A   Because that was the position that Dana Freedman

25      was in, and she resigned, and so I absorbed her



1      duties.

2  Q    What duties did you absorb?

3  A    I conducted the weekly financial result meeting

4      with all of the directors nationwide.  I provided

5      all of the financial results for the wireless turf

6      division to upper management, CFOs, VPs.  I

7      compiled the bank reporting for the results.  I

8      completed the budgeting and forecast annual

9      operating -- I'm losing my -- I can't place the

10      word right now, sorry.  But the AOP process and the

11      updating of the forecast process.  And I managed

12      financial analysts.  I traveled to meet with the

13      directors to help determine their financial, you

14      know, forecast.  And this was nationwide.

15           I -- let me think here.  The way -- it

16      boils down, to make it just plain and simple, was

17      the wireless division was split into AT&T turf and

18      nonturf.  I handled all AT&T turf, which was about

19      80 percent if not more percentage of the total

20      revenue for the wireless division in QualTek.

21  Q    In QualTek or in the QualTek division that was

22      Velocitel?

23  A    The QualTek division that was Velocitel.  At this

24      point Empire Telecom was still separate.

25  Q    Okay.  And did Dana have -- when she was the



```
 1        director -- or first of all, let me ask it this
 2        way.  When did Dana leave?
 3    A   I don't recall the exact date, but it was March,
 4        the end of March, of 2018.
 5    Q   Did she have supervisory authority over both turf
 6        and nonturf?
 7    A   No.  It was -- hold on, I apologize.  At that point
 8        in time I do not recall.  I don't believe so
 9        because nonturf was handled separately.
10    Q   Okay.
11    A   It was always separately, just as Empire was.
12    Q   Who handled nonturf?
13    A   I do not recall.  I believe at that time it was
14        Katrinka Tezyk.  She was the one that was over the
15        nonturf piece.
16    Q   And was she a former Velocitel employee, or did she
17        come from QualTek?
18    A   She was former Velocitel, but acquired by QualTek
19        during the acquisition.
20    Q   Did you ever get a promotion at QualTek?
21    A   Define promotion.
22    Q   All right.  Did you ever get a raise?
23    A   I received raises, yes.
24    Q   Okay.  How often did you receive raises?
25    A   Annually.
```



```
 1   Q    Okay.  Did you have a title change?

 2   A    No.

 3   Q    Did you ever sign any additional paperwork

 4        indicating a change in responsibility or job title?

 5   A    I want to clarify one answer.  They did add the

 6        word "FP&A" to finance manager, so -- but we were

 7        already in the FP&A department, that was the

 8        finance piece.  So they called me a finance

 9        manager, FP&A, or something like that.

10   Q    What's FP&A?

11   A    But it was just -- financial planning analysis.

12   Q    Okay.  So it's F as in, like, fox?

13   A    Fox, Peter, and apple.

14   Q    Okay.  Gotcha.  And do you recall when that title

15        change was done?

16   A    At the end of March 2018.

17   Q    So it was after Dana left?

18   A    It was -- correct, the process to give me a new

19        title of director of finance was started prior to

20        Dana leaving.  It was then modified to be just a

21        title of financial manager FP&A.

22   Q    Okay.  Why did you believe you were going to get

23        the director title?

24   A    Because I have -- there was a form they called

25        personal action notice, or PAN form, that says
```



```
 1          director of finance to replace Dana Freedman that
 2          was submitted.
 3    Q     Do you know who submitted the PAN form?
 4    A     I believe it was David Conn.
 5    Q     Okay.  And does someone above Mr. Conn have to
 6          approve that?
 7    A     It goes to HR and the HR process.  I do not know
 8          the details of that process, but I believe that the
 9          final signature comes from Elizabeth Downey.
10    Q     Okay.  So just so I understand what happened, did
11          you apply for a position of director or -- because
12          you said you didn't get it?
13                    MR. KOLMAN:  Object as to form.
14                    THE WITNESS:  No, there was no --
15                    MR. KOLMAN:  You can go ahead.
16    BY MR. DOUGHERTY:
17    Q     You can answer.
18    A     There was no application process needed.  It was
19          just understood that I would be taking over Dana's
20          duty.  So she trained me for three months on her
21          duties while this PAN form was submitted to change
22          my title.
23    Q     Who?
24    A     She gave it.
25    Q     Okay.
```


MAGNA
LEGAL SERVICES

383a

```
 1   A     I apologize, I just want to clarify.  Dana gave a
 2         long notice, I believe it might have been 60 days
 3         or 90 days so that there was time to transition her
 4         duties to me.
 5   Q     And did she recommend you for her replacement?
 6   A     Yes.
 7   Q     Do you know who she recommended you to?
 8   A     I know that she recommended me to her superior Joe
 9         Busky, who was currently the CFO at the time, and
10         she worked with David Conn and Adam Spitteler on
11         getting me admitted to be the director.
12   Q     But was that -- were you ever promoted to the
13         position of director?
14   A     They submitted the request to promote me, but it
15         was modified by HR.  That's what I was told,
16         that -- to be a finance manager anyway.  So they
17         crossed off director and wrote finance manager on
18         the form.
19               MR. KOLMAN:  Continue.  I can hear you.
20         Continue.
21               THE WITNESS:  Okay.
22   BY MR. DOUGHERTY:
23   Q     Did you -- was it -- was any explanation for that
24         given to you?
25   A     No.
```



1   Q   Did you ask anyone?

2   A   Yes.

3   Q   Who did you ask?

4   A   David Conn.

5   Q   And did he respond?

6   A   He said he didn't understand why, but that

7       Elizabeth Downey had said or had made the change to

8       finance manager.

9   Q   Did you talk to Mr. Conn, like, in person, on the

10      phone, or via email?

11  A   I don't recall.  Probably in person.  Because

12      during the acquisition I traveled quite a bit to

13      the King of Prussia.

14  Q   So --

15  A   So I traveled frequently to the King of Prussia

16      office, so many conversations happened in person.

17  Q   Okay.  But during the acquisition, that was in,

18      what, June of '17?

19  A   No, the acquisition was -- well, it started in

20      2017, but it was completed the end of '17.  So the

21      transition from Dana Freedman to myself occurred

22      during the first three months of 2018.

23  Q   Okay.  Is that when you were traveling to King of

24      Prussia?

25  A   Yes.



```
 1    Q    When you were in King of Prussia, did you ever meet
 2         with Liz Downey?
 3    A    No, I was advised not to, and that David Conn would
 4         work to rectify this issue.
 5    Q    Okay.  Who advised you not to meet with Ms. Downey?
 6    A    David Conn.  Liz Downey also was known to be a very
 7         tough cookie.  If you pushed her, she was known to
 8         retaliate.  So I was advised to let them handle
 9         this.
10    Q    And why do you say that Ms. Downey was known to
11         retaliate?
12    A    That was just a known fact.  There were many other
13         employees who have come up against her.  That was
14         just her known persona.
15    Q    So that was something you heard from other former
16         Velocitel employees or someone else?
17    A    Or current QualTek employees.
18    Q    Can you recall anyone specifically who told you
19         that?
20    A    Not specifically.  I do recall later incidences,
21         but at that time I don't recall.  There was so much
22         going on with that acquisition, so I knew that if
23         David Conn advised me to not push the issue, then I
24         listened because he was very high up and close with
25         the upper management.
```



```
 1    Q    So you didn't get the promotion.  Did you make any

 2         complaints?

 3    A    Yes.

 4    Q    To whom?

 5    A    To David Conn.

 6    Q    Did you make --

 7    A    He was my supervisor at that time after Dana left.

 8    Q    Did you make any complaints to anyone in HR?

 9    A    At that time I do not recall.  I believe I stuck

10         with just David Conn based on his advice.  The

11         upper management -- I would like to explain,

12         sorry -- is a friend group.  So David Conn is

13         friends with the CEO.  Elizabeth Downey is friends

14         with the CEO.  So if David Conn advises me not to

15         discuss this issues with another higher-up, I

16         listened.

17    Q    Okay.  So we are now in, I guess, March, the end of

18         March, early April of '18.  Did you ever get

19         another change in title while you were at --

20    A    No.

21                   MR. KOLMAN:  Let him finish.

22                   THE WITNESS:  I apologize, I did not

23         mean to interrupt.

24    BY MR. DOUGHERTY:

25    Q    Did you ever complain to HR about that?
```



```
 1   A    Yes.

 2   Q    Okay.  Who did you complain to at HR?

 3   A    Lauren Petzar.

 4   Q    Okay.  Anyone else?

 5   A    Lauren Petzar was the main contact in HR, and above

 6        her were, like, VP and people.  So she was my point

 7        of contact and would actually help me as far as I

 8        understand if needed.

 9   Q    Okay.  When did you first contact Lauren?

10   A    I do not recall the date of the first contact.

11   Q    And did she respond to you?

12   A    I do not recall.  I -- yeah, I do not recall.

13   Q    Okay.  Did she -- did you ever speak with

14        Stefanie either Holmen or Stefanie Trybula, she

15        goes by both names?

16   A    Pardon me?

17   Q    She goes by both names, so I don't --

18   A    At the time she was Stephanie Trybula, and as far

19        as I -- she was Lauren Petzar's boss.  And as far

20        as I understood, Lauren was speaking to her.

21   Q    So what were your complaints to Lauren?

22   A    That I felt I could not be promoted because of

23        being a woman.  I had complained of bullying

24        treatment and mistreatment.  I advised her that I

25        was concerned about potential retaliation, and I
```



1        discussed these issues with her.

2  Q    Do you recall when -- the time frame this was?

3  A    I believe those started in mid-2019 as I was giving

4        David Conn time to sort this out.  Because I was

5        told that they would be trying to get me the

6        director position by the end of the year, by the

7        next couple months.  So I was waiting on them to

8        complete and rectify the issue, which never

9        happened.

10  Q    Who bullied you?

11  A    Michael Michini and Stephanie Trybula.

12  Q    How did Mr. Michini bully you?

13  A    I had -- they were in the process of being acquired

14        by Bright Star, who was an investment firm.  I

15        don't understand full acquisition or partial,

16        whatever.

17            During that time they needed to present

18        certain numbers that they were told -- that they

19        had told Bright Star they would hit.  I was

20        uncomfortable modifying and adjusting numbers, and

21        so I pushed back, I believe, on that.  And I do not

22        recall how I pushed back.  But Michael Michini came

23        back and decided that he was going to move one of

24        my employees.  This employee contacted me and said

25        she was uncomfortable because he was known to be --



1     to be very difficult.  In fact, from what I

2     understood, he had served time in prison for

3     assault or hitting somebody, and then they may have

4     died.  But he was a little bit of a scary

5     character.

6            Michael Michini had decided to do that,

7     to move my employee.  My employee contacted Michael

8     Michini and said I was not -- I would like to not

9     move to a different department.  I want to stay

10    doing the duties that I am.  He then proceeded to

11    call me early on a Monday morning -- because this

12    occurred on a Friday -- and was yelling at me and

13    telling me I put ideas in the employee's head, and

14    it's my fault that she wants to do this.  It

15    brought me to tears he was so difficult.

16            I turned around that day and I called

17    Lauren Petzar, or I emailed her and told her to

18    call me, and I discussed this issue with her.

19  Q   Okay.  And what -- what, if anything, happened

20    after you discussed it with Lauren?

21  A   Nothing.

22  Q   What was Michael Michini's role with QualTek at the

23    time?

24  A   At the time he was either a senior VP or a

25    temporary CFO.



```
 1   Q    Okay.  So was he above you in the chain of command?
 2   A    Absolutely.
 3   Q    Was he your direct boss, or was he Dave Conn's
 4        boss?  Was he Dave Conn's boss's boss?  What's your
 5        understanding of where he was in the food chain?
 6   A    I believe at that time David Conn may have reported
 7        to him.
 8   Q    Okay.  So he never threatened your job though, is
 9        that correct?
10   A    I don't recall.
11   Q    He never commented on the fact that you were a
12        woman when he talked to you that day.  Is that
13        correct?
14   A    I don't recall.
15   Q    Well, he complained that you had told -- or that he
16        thought you were encouraging an employee that was
17        beneath him in the chain of command to not want to
18        transfer.  Is that right?
19   A    He told -- the employee reported to me.  So she was
20        my employee.  And he told me in a very, very
21        forceful yelling tone that it was my fault that she
22        did not want to move because I was putting ideas in
23        her head.
24   Q    All right.  But he never -- he never said that you
25        were -- doing anything improper because you were
```



```
 1        female.  Is that right?

 2    A   I don't recall.

 3    Q   He never used a derogatory term towards you about

 4        being female?

 5    A   I don't recall.  There was many curse words and

 6        derogatory terms in that phone call, and the phone

 7        call was extremely distressing.  So I just remember

 8        the feeling of being so upset and distressed by the

 9        call, and I remember reaching out to Lauren Petzar.

10        The details, I don't recall the actual wording he

11        used.

12    Q   This is at what time?  This was early '19?

13    A   Mid '19.

14    Q   Oh, but if I understand your testimony --

15    A   July.

16    Q   Your complaint was that he was somehow

17        discriminating against you because you are a woman,

18        and I'm trying to understand why you believe that?

19    A   I believe that because I was performing the duty of

20        a director of finance, same as a male counterpart

21        that replaced Katrinka after Katrinka was laid off

22        and he was given the director title.  We performed

23        the same job.  I was promised I would have the

24        director title, and instead they gave it to two men

25        and not me.  And I was still performing the same
```



1    job, and my volume -- the money and the volume of

2    work that I performed was four times the level of

3    theirs.  The tools I built to support my financial

4    side was used by them.  We did identical jobs.

5    They had much less volume.

6 Q  Okay.  So I want to talk about that in a second,

7    but that wasn't exactly what I asked you.  Why do

8    you believe Michael Michini on the day that he

9    called you was discriminating against you because

10   you were a woman?  It sounds like you are

11   describing to me that he acted like a jerk, and I

12   understand that, and it made you upset.  But why do

13   you think he did that?  Because you were a woman or

14   was discriminatory because you are a woman?

15                MR. KOLMAN:  Objection as to form.  You

16   can answer.

17                THE WITNESS:  I responded that way

18   because you asked me a question about who bullied

19   me.  And that was my answer to your question about

20   bullying.

21 BY MR. DOUGHERTY:

22 Q  Okay.  So can we agree then that you weren't

23   discriminated against because you were a woman by

24   Michael Michini?

25                MR. KOLMAN:  Objection as to form.  You



1    can answer.

2                    THE WITNESS:  I do not know how Michael

3    Michini was involved in the background after David

4    Conn requested me to be director since he was above

5    David Conn.  I do not know his involvement in that.

6  Q    So is it fair to say that your only belief that you

7    were discriminated against being a woman is because

8    you understand that two men were promoted to

9    director?

10                   MR. KOLMAN:  Objection as to form.

11                   You can answer again.

12                   THE WITNESS:  That -- yes, and it --

13    yes, that is it.  I was performing the job, yes.

14    The title and the bonus opportunities were given to

15    the men and not me regardless of the fact that my

16    volume and responsibility was four times the volume

17    of theirs.

18  BY MR. DOUGHERTY:

19  Q    Who were the men you are referring to?

20  A    Bruce Smith, and then later on they hired Brandon

21    Eberling.

22  Q    When was Mr. Neff hired?

23  A    I don't recall the exact date.  I just know that

24    they laid off Katrinka Tezyk and hired Bruce Neff.

25    It was understood that Bruce Neff was a friend of



1    the CFO, so he wanted his friend to come in, and

2    that's why Bruce Neff was hired and replaced

3    Katrinka.

4    Q    And how was that understood?

5    A    It was common knowledge who was friends.  The CEO

6         was quite open about discussing these things, and

7         they had replaced -- Michael Michini, okay, Michael

8         Michini was, I believe, a temporary CFO until

9         Steven Forbes came back.  Steven Forbes was

10        retired, and Steven Forbes came back.  And Bruce

11        Neff was a close friend of Steven Forbes.  So that

12        is how I knew his position on that.  Because the

13        CEO and David Conn and Shawn Kemmerer, it was

14        common knowledge how these people were friends.

15   Q    But you are making an -- I guess are you making the

16        assumption that because they are friends, Mr. Neff

17        wasn't qualified?

18   A    No.

19   Q    Okay.  So then why -- why does it matter whom he

20        was friends with?

21   A    They laid off Katrinka Tezyk who was extremely

22        qualified for this position, and replaced it with

23        Bruce.  I was not told of Bruce's qualifications.

24        I do not know his educational background.  I do

25        know that Katrinka Tezyk had the experience with



```
 1          this and had been doing this, and they laid her off
 2          and replaced her with Bruce.
 3    Q     Well, you aren't Katrinka's supervisor, were you?
 4    A     No, we were performing equal duties.
 5    Q     So you weren't in charge of grading her performance
 6          or tracking her performance, correct?
 7    A     Correct.
 8    Q     So you have no idea how she was actually performing
 9          in her job, correct?
10    A     Correct, just what I observed with my own personal
11          interactions.
12    Q     Okay.  Would you agree with me that qualifications
13          for a position is not simply experienced, there's
14          other things that can go into being qualified,
15          correct?
16                    MR. KOLMAN:  Objection as to form.
17                    You can answer.
18                    THE WITNESS:  Qualifications are --
19          explain what you mean by qualifications.  Repeat
20          the question too, I would like to have clarity on
21          that question.  I don't understand.
22    BY MR. DOUGHERTY:
23    Q     So you testified -- I believe your testimony -- and
24          if I'm misstating it, please let me know, was that
25          Katrinka was qualified for the position.  Is that
```



1    right?

2  A    Yes.

3  Q    And but you are basing that solely on your

4       understanding of her experience.  Is that right?

5                 MR. KOLMAN:  Objection.

6                 THE WITNESS:  It's Katrinka.

7  BY MR. DOUGHERTY:

8  Q    Katrinka?

9  A    And she was the original one who hired me at

10      Velocitel in 2010.  So I have worked with

11      Ms. Katrinka for many years, and when the duties

12      are split, as they were between turf and nonturf,

13      Katrinka managed the nonturf piece and had been

14      doing that for a while.  And as far as I understood

15      or could observe, she seemed good.  But as I said,

16      I did not report on her --

17 Q    Right.

18 A    I did not do her performance report.

19 Q    Right.  So you are making an assumption that she

20      was qualified for the position that ultimately went

21      to Mr. Neff?

22                MR. KOLMAN:  Objection as to form.

23                You can answer.

24 BY MR. DOUGHERTY:

25 Q    Is that correct?



```
 1    A    Yes.

 2    Q    All right.  You actually have no idea if she was

 3         qualified for the position that went to Mr. Neff.

 4         Is that right?

 5    A    What would the qualifications have been for that

 6         position?

 7    Q    Well, I don't know.  You are the one who has

 8         testified that you believe you had been

 9         discriminated against because Mr. Neff was hired

10         for a position that Katrinka had previously held.

11         She was a woman and you are a woman, and you

12         weren't promoted to it as well.  Did I state that

13         correctly?

14    A    Yes, I believe when Mr. Neff was hired, he was

15         hired as a finance manager.  And shortly thereafter

16         promoted to director of finance.

17    Q    Do you know if -- do you know if Mr. Neff has any

18         degrees?

19    A    I do not know anything about Mr. Neff's educational

20         history.

21    Q    Do you know anything about Mr. Neff's work history

22         prior to coming to QualTek?

23    A    Only that he worked at AT&T for a bit, but I could

24         not understand in what capacity or for how long.

25    Q    And do you have any understanding of Mr. -- you
```



1       aren't Mr. Neff's supervisor when he was hired as a

2       financial manager, correct?

3  A    I was not his supervisor, but we were equal and we

4       performed the same duties.

5  Q    So if I understand you correctly, you have no

6       understanding of Mr. Neff's educational background,

7       you have no understanding of Mr. Neff's employment

8       background, and you have no understanding of

9       Mr. Neff's performance background, but you are

10      assuming that because he got the role of director

11      and you didn't, it was discriminatory based on your

12      sex?

13               MR. KOLMAN:  Objection as to form.

14  BY MR. DOUGHERTY:

15  Q    Did I state that correctly?

16  A    I apologize.  Am I okay to answer?

17               MR. KOLMAN:  Yeah, sure.  Of course.

18               THE WITNESS:  Okay.  And can you repeat

19      the question?

20  BY MR. DOUGHERTY:

21  Q    Sure.  So I'll even break it down.  Do you --

22  A    Okay.

23  Q    Do you agree -- you agree with me, correct, that

24      you have no understanding of Mr. Neff's educational

25      background, correct?



```
 1   A      Correct.

 2   Q      You have no understanding of Mr. Neff's experience

 3          prior to QualTek, correct?

 4   A      By all my understanding is that he worked at AT&T

 5          for a short period of time.  I do not understand in

 6          which capacity.  I do not have that information.

 7   Q      And AT&T is QualTek's biggest customer.  Is that

 8          right?

 9   A      Correct.  And I also performed the work at AT&T as

10          well.

11   Q      And you have no understanding of Mr. Neff's

12          performance as his position as finance manager,

13          correct?

14   A      I do know that there were issues as far as Excel

15          skills and understanding, because I helped him get

16          processes set up.  I helped him build spreadsheets.

17          I helped him train and understand what to do in

18          this situation.

19   Q      You weren't his supervisor though, correct?

20   A      I was not his supervisor.

21   Q      So if I understand you, your only reason for

22          believing that you were discriminated against was

23          because he's a man and he got the position, and you

24          didn't, is that right?

25                  MR. KOLMAN:  Objection as to form.  You
```



1     can answer.

2                    THE WITNESS:  He was given -- he was

3     promoted to director of finance as a man while

4     performing the same duties as me but at a quarter

5     of the volume.

6  BY MR. DOUGHERTY:

7  Q    But ma'am, you also -- but you admitted that you

8     have no idea of his educational background, you

9     have no idea of his performance, and you have no

10    idea of his prior experience?

11                   MR. KOLMAN:  Objection as to form.

12  BY MR. DOUGHERTY:

13  Q    So again, is the only belief -- is the only reason

14    for your belief that it was a discriminatory act is

15    because he's a man?

16                   MR. KOLMAN:  Objection as to form.  You

17    can answer.

18                   THE WITNESS:  Can you repeat that so I

19    can answer correctly?

20  BY MR. DOUGHERTY:

21  Q    I'm trying to understand why you believe Mr. Neff's

22    promotion was somehow discriminatory when you know

23    nothing about his experience or background?

24  A    I can't.

25                   MR. KOLMAN:  Okay, which -- I think she



401a

1    answered that.  I'm going to say asked and answered

2    on that.

3              But you can answer it again if you --

4    if you want.

5              THE WITNESS:  I do feel that as I was

6    submitted to be a director, so my qualifications

7    and my location and my performance were appropriate

8    for that position, it was requested, and I was

9    denied.  Bruce Neff was approved.  When QualTek

10   submitted me to be the director, they knew I am not

11   relocating.  They knew I did not have a degree.  In

12   fact, I discussed it with Scott Heise, the CEO at

13   QualTek University in January of 2018.  This was

14   well-known.  They proceeded to submit me to be the

15   director with a 20 percent bonus and a raise, and

16   it was denied.  Later Bruce Neff was given the

17   director position, and I was told mine was going to

18   be rectified, and it never was.

19   BY MR. DOUGHERTY:

20   Q    Okay.  But Mr. Neff worked in the King of Prussia,

21        is that correct?

22   A    Correct, but when they submitted the request for

23        me, she knew I would not relocate, and they were

24        okay with it.  In fact, they let me hire staff --

25   Q    But --





1    A    I thought I would be able to finish, please.  They

2         let me hire staff in Minnesota to report to me

3         here.

4    Q    But ma'am, you were submitted -- I understand that

5         you were submitted, but it was declined.  Isn't

6         that correct?

7    A    Yes, that's the issue.

8              MR. KOLMAN:  Wait, let Mr. Dougherty

9         finish his question so the court reporter can put

10        down both your question and your answer, okay?

11   BY MR. DOUGHERTY:

12   Q    So ma'am, it was declined, and Mr. Neff worked in

13        King of Prussia and had a college degree and had

14        other experience?

15             MR. KOLMAN:  Objection as to form.

16   BY MR. DOUGHERTY:

17   Q    Isn't that right?

18             MR. KOLMAN:  Objection as to form.

19   BY MR. DOUGHERTY:

20   Q    We can move on.  Who's Mr. Eberling?

21   A    He was a man hired as a director in -- I don't

22        recall what year.  I want to say later 2019, but he

23        was director of finance.

24             MR. KOLMAN:  I'm sorry, can we take

25        five?  I just need to put eye drops in.



1          MR. DOUGHERTY:  That's fine.

2          (A short recess was taken.)

3   BY MR. DOUGHERTY:

4   Q    Ms. Carlson, we just came back from a break, and is

5        there anything now after the break or during the

6        break you thought of that -- from your testimony so

7        far that you want to change?

8   A    Not change, but I would like to clarify.

9   Q    Sure.  Go ahead.

10  A    I would like to clarify speaking about experience

11       and Bruce Neff's experience because I was able to

12       see performance and I knew the revenue numbers and

13       I knew how my numbers were -- how my processes went

14       and what my team did.  And they were much more

15       functional.  That they -- so much that QualTek

16       wanted to implement my processes with.  So I do

17       know based on performance that I was definitely

18       qualified more for this position.  Also, I have

19       many years of experience with a very specific type

20       of finance that's required for this, that gave me

21       that extra edge in understanding.

22               So I wanted to clarify to that piece

23       when it came to experience because the amount of

24       revenue and the processes and the teams for

25       revenue -- was four times as high on my side and



1    the processes were much more clear.  So much so

2    that they wanted to implement my process and I

3    insisted on that side of it.  I had three analysts

4    handling four times the volume, and he had, I

5    believe, three or more -- I don't remember how many

6    analysts he had that were performing much less

7    efficiently for a significantly less volume.

8  Q  Is this Mr. Eberling?

9  A  Mr. Neff.

10 Q  I believe you said there was Mr. Neff and

11    Mr. Eberling?

12 A  Mr. Eberling was hired in the end of 2019, I

13    believe.  So I don't understand exactly what he was

14    doing as I carried on my duties.  But after I was

15    terminated, I -- I was terminated shortly there --

16    like a few months after he was hired, so I don't

17    know exactly what he did or why he was there.

18 Q  So do you even know if he had the same role as you

19    or different role?

20 A  This -- this knowledge is extremely specific.  It's

21    not something you learn in school.  You learn by

22    experience and understanding the contracts with the

23    client and how they do revenue recognition, how we

24    handle the costs associated with it, how that fits

25    into our gap processes, and that's what I was --



```
 1           had the extreme knowledge of.  I also helped with
 2           pricing.  I helped with all sorts of aspects of the
 3           contracts with the clients because of my
 4           experience.
 5    Q      Okay.  I don't think that answered my question.
 6           What did Mr. Eberling -- did Mr. Eberling and you
 7           do the same thing?
 8    A      I do not know what Mr. Eberling did.  I don't know
 9           why he was hired, I just know that he was hired as
10           a director.
11    Q      And he was a man, so that's why you are assuming it
12           was discriminatory?
13                   MR. KOLMAN:  Objection as to form.  You
14           can answer.
15                   THE WITNESS:  Okay.  I saw two men get
16           promoted to the position that I was promised when I
17           was performing the job significantly better than
18           what I saw Mr. Neff performing.
19    BY MR. DOUGHERTY:
20    Q      Well -- okay, go ahead.  I'm sorry.
21    A      Okay.  So with this, I could make the assumption
22           that I was discriminated against as a woman, as I
23           was told I would get that position, but instead
24           they gave it to two different men.
25    Q      So what I'm trying to understand is it's unclear to
```



1        me whether it is the same position or a different

2        position?

3  A    Bruce Neff and I performed the same position.  He

4        had 20 percent of the business.  I had 80 percent

5        the business.  Our positions were identical.  In

6        fact, the way it was split is if a question came in

7        on turf, it came to me regardless, no matter what

8        it was.  If it was a question on nonturf, it went

9        to Bruce Neff.  We handled 100 percent of the

10       finances for those pieces and performed the exact

11       same job.  And I know that because every week we

12       had to perform and report the exact same forms

13       which had to hold the exact same meetings.  We had

14       to provide the base the exact same information.  We

15       both handled all aspects exactly the same, except

16       mine was turf and 80 percent of the business, and

17       his was nonturf 20 percent of the business.

18  Q    Okay.  And you don't know what Mr. Eberling did?

19  A    I don't know what he did or why he was hired.

20  Q    Well, I'm trying to understand, you say they were

21       the same position but they covered different

22       aspects.  One covers turf, one covers nonturf.

23       Turf and nonturf are different, correct?

24              MR. KOLMAN:  Objection as to form.

25              THE WITNESS:  The turf and nonturf -- I



1    apologize.  Am I okay to answer?

2                   MR. KOLMAN:  Sure.

3                   THE WITNESS:  Okay.  The turf and

4        nonturf split was simply like a process definition

5        just so you have a clear line.  How we recognize

6        revenue, how we reported it to the bank, how we

7        held our meetings, how we obtained this

8        information, what our teams bid, were identical.

9    BY MR. DOUGHERTY:

10   Q    So that's your understanding of Mr. Neff's role,

11       but you don't have an understanding of

12       Mr. Eberling's role, correct?

13   A    I do not.

14                  MR. KOLMAN:  Objection, asked and

15       answered.

16                  THE WITNESS:  Is it okay if I answer?

17                  MR. KOLMAN:  So it's fine.  Only if I

18       tell you not to answer.  But just making the

19       objection asked and answered, you can answer it, no

20       problem.

21                  THE WITNESS:  Okay.

22   BY MR. DOUGHERTY:

23   Q    You testified earlier that Mr. Neff -- you feel you

24       were discriminated against because Mr. Neff and

25       Mr. Eberling were hired, but I'm trying to



1         understand what the basis on that other than -- if

2         you don't know what he did, you don't know his

3         background other than he's a man, right?  Does it

4         just boil down to that he's a man, he got a

5         director position and you didn't, and therefore --

6         you are a woman, therefore it's discrimination?

7                   MR. KOLMAN:  Objection as to form.  You

8         can answer it if you can understand it and know

9         what you are answering.

10                  THE WITNESS:  I can understand it

11        because his position that he was hired for was also

12        one I applied for.  The job description, every

13        single point on that job description was what I was

14        currently doing.

15   BY MR. DOUGHERTY:

16   Q    Well, I guess that's not entirely true, is it?

17        Because doesn't the job description say you had to

18        have a bachelor degree, MBA or CPA preferred, isn't

19        that correct?

20                  MR. KOLMAN:  Objection as to form.

21                  You can answer.

22                  THE WITNESS:  That was a qualification

23        that they had added after I was performing that

24        duty already.

25   BY MR. DOUGHERTY:



409a

1  Q   Well, but that's -- they posted the job position on
2      a national database.  Isn't that right?
3  A   On their website.
4  Q   Okay.  And they required the position to work in
5      the King of Prussia, right?
6  A   That was a requirement added after I was already
7      performing the job.  I want to repoint to the fact
8      that QualTek knew that I was not relocating and I
9      did not have a degree, and they were okay with it.
10     They let me hire staff in Minnesota, as I was not
11     relocating, and they knew I did not have a degree,
12     yet they still were okay with it and they requested
13     I be promoted to director.  And the form
14     specifically has it crossed off and written finance
15     management.  It states on the form, "replacing Dana
16     Freedman," who was the director of finance, and I
17     absorbed all of his duties.
18 Q   But Mr. Conn put you in for the director position,
19     that is your understanding.  Isn't that right?
20 A   And that's correct.
21 Q   And that position was denied?  You were denied that
22     position by Ms. Downey.  That is your
23     understanding, correct?
24 A   That is my understanding, but I would like to
25     clarify if I can?



 1   Q     Well --

 2                MR. KOLMAN:  Let her clarify, Colin.

 3         Go on.

 4   BY MR. DOUGHERTY:

 5   Q     Let me finish my question.  Ms. Downey --

 6                MR. KOLMAN:  Wait, wait.  Colin, she's

 7         answering your question, and she's simply

 8         clarifying.  What's wrong with that?

 9                MR. DOUGHERTY:  I asked a yes or no

10         question.

11                MR. KOLMAN:  That's not yes or no,

12         that's the trouble.  That's why she's clarifying.

13         Let her clarify.

14                MR. DOUGHERTY:  Fine, clarify.

15                MR. KOLMAN:  Go on.

16                THE WITNESS:  I had spoken with Scott

17         Heise, who was Ms. Downey's superior, and he knew I

18         did not have a degree and I was not relocating, and

19         it was okay with QualTek.  I spoke with him on this

20         before the form was submitted.  The form was

21         submitted after with that knowledge.  Why

22         Ms. Downey declined it, I don't know and David Conn

23         doesn't know, and he could not provide me an

24         explanation.  If it was due to a degree, I believe

25         David Conn would have known and have told me.



```
 1   BY MR. DOUGHERTY:

 2   Q    Well, why do you believe that?

 3   A    Because he -- if that was a simple qualification,

 4        you can't have that position because you don't have

 5        a degree, he would have known the answer.  He did

 6        not have an answer.  He did not understand why

 7        Ms. Downey denied this request.

 8   Q    What about if she denied because you wouldn't move

 9        to the King of Prussia?

10   A    That was already established before the submission

11        of this, and it was clarified and understood by the

12        CEO of the company, who's her superior.

13   Q    But if --

14   A    Ms. Downey does not --

15   Q    He understood that --

16   A    -- they, okay.

17   Q    Let -- can I ask my question now?

18   A    Yes, you go ahead.

19   Q    So the job position that you applied for later that

20        was posted on their website required it to be in

21        the King of Prussia, required a college degree,

22        isn't that correct?

23             MR. KOLMAN:  Asked and answered.

24             You can answer it if you can.

25   BY MR. DOUGHERTY:
```



```
 1   Q    Mr. Neff has a college degree, Mr. Eberling has two

 2        college degrees, and both were willing to work in

 3        the King of Prussia.

 4                  MR. KOLMAN:  Is that a question or is

 5        that a statement?

 6                  MR. DOUGHERTY:  Tim, are you making an

 7        objection?

 8                  MR. KOLMAN:  No, I'm just waiting for

 9        the question.

10                  MR. DOUGHERTY:  Okay.  Federal rules

11        require you are supposed to sit there like a potted

12        plant.  You know the case law, right?

13                  MR. KOLMAN:  I would like a question,

14        Colin.

15                  MR. DOUGHERTY:  I asked a question.

16                  MR. KOLMAN:  I'm not objecting.

17                  MR. DOUGHERTY:  Stop interrupting me.

18                  MR. KOLMAN:  I'm not interrupt you, I

19        thought you were finished.

20   BY MR. DOUGHERTY:

21   Q    So ma'am, if the reason was that you needed a

22        college degree for the position like it was posted,

23        and you didn't have a college degree, that would

24        not be discriminatory against you for being a

25        woman, correct?
```



1          MR. KOLMAN:  Objection as to form.

2          You can answer.

3          Calls for speculation.

4          THE WITNESS:  The position that was

5      posted requiring a college degree was posted when I

6      had been performing this job for almost two years.

7  BY MR. DOUGHERTY:

8  Q    That wasn't an answer to my question.  The job

9      required college --

10 A    That was the first --

11 Q    You didn't have it?

12 A    That was the first time I knew of a college degree

13     being required, was a year after I was performing

14     the position.  As I stated, it was a requirement

15     added after I had been performing the position.

16 Q    It was not the first time you had been told you had

17     -- the position was in the King of Prussia,

18     correct?

19 A    That was the first time I was told it was in King

20     of Prussia, as I had been performing it in

21     Minnesota for almost two years.

22 Q    The position was advertised that it was required to

23     be in the King of Prussia, correct?

24 A    The position posted in late 2019 stated that.  At

25     that point I had been performing the job for almost



1          two years.

2     Q    And it was your understanding that Ms. Downey was

3          the one that denied the position, correct?

4     A    Correct.

5     Q    Okay.  So Ms. Downey is a woman, and your position

6          is she discriminated against you for being a woman.

7          Is that right?

8                    MR. KOLMAN:  Objection.

9                    You can answer.

10                    THE WITNESS:  I don't know why she

11         denied it.  Ms. Downey did not work in finance,

12         Ms. Downey worked in HR.  Finance is where the

13         issue was, and that's where I had the issue.  What

14         happens in other departments, I do not know, as I

15         do not work in them.

16    BY MR. DOUGHERTY:

17    Q    But I'm trying to -- Ms. Downey was the ultimate

18         decision-maker, correct?

19    A    She was not supposed to be.  HR is simply supposed

20         to process the forms that are received after the

21         decision has been made by the head of the

22         departments that are hiring.

23    Q    And first of all, that wasn't my question.  She was

24         the ultimate decision-maker, isn't that your

25         understanding, correct?



```
 1   A   No.
 2   Q   Okay.  And you aren't a -- you were never a CSWE
 3       person, so you have no idea how decisions are
 4       supposed to be made, do you?
 5   A   I was informed by David Conn that this -- they
 6       are -- there are decisions to make, and they
 7       submitted it to HR, and HR simply begins to process
 8       it.  He did not understand why they changed it.
 9   Q   But he told you Ms. Downey changed it, correct?
10   A   Correct.
11   Q   And when Mr. Eberling was hired, you never reached
12       out to Ms. Downey, did you?
13   A   I was advised at the point in March of 2018 when my
14       promotion to director was denied not to contact
15       Ms. Downey and push the issue, david Conn would
16       handle it.  When Mr. Eberling was hired and when
17       Mr. Neff got the promotion, I did make a complaint
18       to Lauren Petzar.
19   Q   And Mr. Eberling was hired 18 months after you
20       first -- the position you didn't get, the
21       promotion, correct?
22   A   Yeah, approximately that time frame.
23   Q   And it's --
24   A   I had been performing it for close to two years.
25   Q   My understanding is you believe then -- your
```



```
 1          testimony is you believe that you were
 2          discriminated twice and not did get a promotion
 3          that went to a man at that point when Mr. Eberling
 4          was hired.  Is that correct?
 5     A    Can you repeat that?  I don't understand.
 6     Q    Sure.  You believe that Mr. Neff was promoted, and
 7          as a man, that was the first discriminatory
 8          promotion to director, correct?
 9     A    Correct.
10     Q    And then 18 months later Mr. Eberling was hired,
11          and I believe your testimony is your belief is that
12          was the second discriminatory hire of a man in the
13          director role, correct?
14     A    Correct.
15     Q    Okay.  So after 18 months Mr. Conn had failed to
16          get you promoted at least twice.  Is that right?
17     A    Mr. Conn -- after the denial from HR in late
18          March of 2018, Mr. Conn had been telling me he was
19          going to rectify this issue.  And I trusted him to
20          do that.  Later on I ended up -- they pushed Shawn
21          Kemmerer, and Shawn Kemmerer was also working to
22          get me the director position.  So I was trusting
23          them to get this done.  After Bruce Neff got
24          promoted, I realized there was an issue, and I made
25          a complaint to HR.
```



```
 1    Q    Okay.  And then Mr. Eberling got promoted and

 2         sometime later hired, actually, right?  So --

 3    A    Directly to the director position that was posted

 4         that I applied for, which was the exact job

 5         description that was I was performing.

 6    Q    And despite all of that you never contacted

 7         Ms. Downey?

 8    A    I was advised to not.

 9              MR. KOLMAN:  Asked and answered.  You

10         can answer it again.

11  BY MR. DOUGHERTY:

12    Q    You were advised by Mr. Conn not to, correct?  More

13         than 18 months and two promotions later, you were

14         still trusting Mr. Conn's advice?

15    A    No, I made the report to HR after Bruce Neff got

16         promoted.  Then I realized there was an issue, and

17         I raised it with HR.  My contact in HR was Lauren

18         Petzar.  The hierarchy within there, I don't know.

19         Lauren I believe reported to Stephanie Trybula who

20         then reported to Elizabeth Downey, but my contact

21         was with Lauren, and I expected Lauren to handle it

22         as she was the manager or director of HR at that

23         time.

24    Q    And Ms. Petzar ultimately never got satisfaction

25         because you were never promoted, correct?
```



```
 1                    MR. KOLMAN:  Objection.

 2                    THE WITNESS:  Your phone broke up

 3          there.  Can you repeat the question?

 4  BY MR. DOUGHERTY:

 5  Q    Sure.  Ms. Petzar never handled it to your

 6         satisfaction because you were never promoted,

 7         correct?

 8                    MR. KOLMAN:  Objection as to form.

 9                    THE WITNESS:  Yes.

10  BY MR. DOUGHERTY:

11  Q    Okay.

12  A    It was never rectified after I made my complaint.

13  Q    Okay.  So I'm trying to understand, Ms. Petzar then

14         offered you a meeting with Ms. Trybula in person, I

15         believe, isn't that right?

16  A    That's correct.

17  Q    And you scheduled that meeting, isn't that correct?

18  A    That's correct.

19  Q    You ultimately chose to cancel that meeting even

20         though you were going to be in King of Prussia.

21         Isn't that correct?

22  A    That's correct, but I want to clarify on why I

23         canceled it.

24  Q    Okay.

25  A    I canceled it because I had a fear of retaliation.
```



```
 1          Ms. Trybula, which she's -- which she then proved
 2          later on was a very difficult person.  And so
 3          she -- I had a strong fear of retaliation.  I was
 4          in the process of closing on a house, and I did not
 5          want to risk losing my job in the middle of closing
 6          on a house.  So I was scared of retaliation.  I
 7          told her that I would prefer not to talk to her,
 8          and I specifically said due to my fear of
 9          retaliation.
10     Q    Who did you say that to?
11     A    Lauren Petzar.
12     Q    And when did you say that to her?
13     A    I believe that was in the fall of 2019.
14     Q    And did you say that in an email?
15     A    I don't recall the form.  I honestly don't recall
16          if it was phone or email.  It would have been one
17          of the two.
18     Q    So you expressed to Ms. Petzar that you wanted to
19          cancel your meeting with Ms. Trybula because you
20          were afraid Ms. Trybula would retaliate against
21          you?
22     A    Correct.
23     Q    What was Ms. Petzar's response?
24     A    I don't recall her exact response.
25     Q    Have you ever seen the QualTek handbook?
```



```
1   A    Like see as in what?  Like laying on the table
2        or -- what do you mean by "see"?  Please clarify.
3   Q    Did you receive a copy of it when you were hired?
4   A    All employees received a copy of the handbook, I
5        believe via AED (phonetic) and had to sign off on
6        there for the handbook.  So I do recall I was in
7        King of Prussia at the point where I had to sign my
8        final hiring paperwork with QualTek.  The meetings
9        were very intense, and so they left it at the front
10       desk for me and said just sign these forms because
11       we need to process your payroll.  So I do recall
12       having to rush to sign the forms and not be given a
13       chance to read these documents due to the meetings
14       and requirements of the company.
15  Q    You were given a copy of the handbook.  Isn't that
16       right?
17  A    Not handed a copy of it, no.  I was given papers to
18       sign for onboarding.
19  Q    Sorry.
20  A    Copies were available online if you wanted to go
21       look at them.
22  Q    But I thought you just testified that they left it
23       at the front desk for you?
24  A    They left the paper to acknowledge all of these
25       things.  You have to sign a variety of paperwork
```



```
 1         when you get onboarded.  And for them to be able to
 2         process my payroll, I had to sign all of these
 3         forms that day.  So they left it at the front desk.
 4         I was running by, they said here's the packet,
 5         sign, sign, sign.  And then I went on to my next
 6         meeting.  At that point it was still early, and I
 7         had a very good relationship with this company, as
 8         I was performing so well.  I was doing the entire
 9         implementation, their data conversion, everything.
10         So I had trust still.  At that point I don't -- we
11         hadn't even been -- they hadn't even denied my
12         promotion yet.  I still thought I was getting the
13         director position.  So at that point I didn't have
14         reason to mistrust them.
15    Q    And you went to QualTek University, I believe you
16         testified to that?
17    A    Correct, in January of 2018.
18    Q    And there's a manager's part of that that talks
19         about HR roles as a manager.  Isn't that right?
20    A    What was the question?  I didn't understand it.
21    Q    Isn't there a unit in QualTek University that talks
22         about as a manager HR policies, things like no
23         retaliation?
24    A    Sure.  They say they have no retaliation, no
25         discrimination, no bullying, all of which they had
```



```
 1          proven that they obviously don't stick to.
 2    Q     Okay.  So everything you perceived from the company
 3          told you there was no retaliation, but your
 4          testimony is you believe Ms. Trybula would
 5          retaliate against you?
 6    A     Absolutely.
 7    Q     And why was that if you already complained to HR to
 8          Ms. Petzar, what's the --
 9    A     What was the question?
10    Q     If you already made a complaint to HR, why do you
11          think Ms. Trybula would retaliate against you when
12          Ms. Petzar wouldn't?
13    A     There was a history of retaliation with
14          Ms. Trybula.  In fact, they -- in the market where
15          I was located, it was a large opportunity in
16          Minnesota.  There was a director, and there was a
17          battle with the director and HR.  So Ms. Trybula
18          flew out and separated the company into --
19          separated the markets into groups, and they -- she
20          took the group and talked about why she was going
21          to terminate this director.  And her tone and her
22          approach was very harsh and very belligerent, that
23          was just her nature.  And so I had a fear of
24          retaliation, and due to closing on a house or just
25          having closed on a house, I did not want to lose my
```


423a

```
 1          job at that point.

 2                     And she proved this when later on I

 3          made a complaint about bonuses, and Ms. Trybula

 4          called me with David Conn and Shawn Kemmerer and

 5          chewed me out for making that complaint.  And it's

 6          a week later I was fired.

 7     Q    So when did you complain about bonuses?

 8     A    I complained about bonuses -- oh, I believe it

 9          was -- it was the week of January 24, which I think

10          the 24th was a Friday, in 2020.  So it would have

11          been during that week is when I was demoted and

12          told I was no longer going to have a team and I

13          would be moved to a reporting role.  Keep in mind,

14          they had just given me the highest possible raise

15          for performance two weeks prior.

16                     I then had to take a day off for mental

17          health because it was extremely disturbing.  I had

18          put my all into my team.  They were my heart and

19          soul and we had a good, good relationship.  And

20          even today they still tell me I'm their favorite

21          boss that they ever had.  I had to take a mental

22          health day.

23                     Ms. Trybula went and told David Conn

24          that I was taking a day off because I needed mental

25          health, which was not something I had disclosed to
```



1      him or to Shawn Kemmerer, I had told HR, and -- I

2      told Lauren Petzar.  She went and violated my

3      personal confidentiality with HR and told them the

4      reason I was being -- I was off that day.

5           So I emailed Ms. Trybula and I said

6      these conversations I prefer to be private.  I

7      don't want you to discuss my medical history with

8      anybody.  This is a private thing.  She -- and then

9      I had also made a complaint -- I don't remember the

10     exact date, but this all happened during that one

11     week about the bonuses.  Because I had been getting

12     complaints from my employees and other employees

13     around, and I had made a list of the bonuses that

14     were paid out.  I had noticed a pattern that the

15     men were being paid 25 percent of their bonus

16     amount.  On average the women were paid -- mine was

17     14 percent, others were 3 percent, others were 2

18     percent.  The girl -- the woman -- or there was

19     women in there performing the same job as other

20     men, and her bonus potential was half of it.

21          So we started noticing this pattern,

22     and it was like this just proves again women are

23     not getting paid the same.  So I made this

24     complaint, and one of my employees also made a

25     complaint.  After that I was demoted.  I took a



1       mental health day, Ms. Trybula revealed my medical

2       information to somebody who was -- I did not

3       authorize her to.

4              I told her I didn't appreciate that.  I

5       then got a phone call from Ms. Trybula telling

6       me -- with Dave Conn and Shawn Kemmerer in a very

7       belligerent manner that I should just be happy I

8       got anything at all.  It's none of my business how

9       they figure this out and if this is how it's going

10      to be, blah, blah, blah.  She was very belligerent

11      to the point I made a complaint to my supervisor,

12      Shawn Kemmerer, about how belligerent she was.  The

13      following week I was terminated.

14  Q   You were informed that the finance department was

15      going through a restructuring before you were

16      terminated.  Isn't that right?

17  A   After I made the complaint, I was demoted to a

18      reporting role and then changed to just straight

19      termination.  After they had given me the highest

20      bonus possible for my performance.

21  Q   Okay.

22  A   Two weeks prior.

23  Q   So did you make a complaint that you didn't receive

24      your bonus, or did you make a complaint that women

25      didn't receive bonuses?



426a

1   A      I made a --

2                    THE WITNESS:  Pardon me, Tim, you are

3          on mute.  Tim?  Tim?  Still on mute.

4                    MR. KOLMAN:  I'm sorry about that.  Can

5          you hear me?  I was listening, so I just --

6                    THE WITNESS:  Okay.  I thought you had

7          an objection.

8                    MR. KOLMAN:  Objection to -- what was

9          the question?

10                   THE WITNESS:  Please repeat the

11         question.

12   BY MR. DOUGHERTY:

13   Q      Did you complain that you didn't receive the bonus

14         you expected or that women didn't?

15                   MR. KOLMAN:  That's an objection as to

16         form.

17                   But you can answer it.

18                   THE WITNESS:  Okay.  I made the

19         complaint that the bonuses paid out were not paid

20         out at an equal percent, noting that all the men on

21         my list where I had received the information got

22         paid 25 percent of their bonuses, where women were

23         paid 5 percent, 10 percent.  I got 14 percent.  And

24         that was it.  So it was a distinguishable pattern

25         based on the information that I had obtained.



1    BY MR. DOUGHERTY:

2    Q    The amount of bonus dollars you received was more

3         than any of the men though, isn't that correct?

4                   MR. KOLMAN:  Objection as to form.

5                   THE WITNESS:  It's not -- the bonus

6         structure are set based on your position.  I should

7         have had a 20 percent bonus.  But you had a flat

8         bonus.  I was not complaining on this dollar

9         amount, I was complaining about the percentage paid

10        out as the potential bonus for everyone.  Everyone

11        had different bonus levels, so I was concerned that

12        if the men were getting paid 25 percent of their

13        bonus, I should also be getting paid 25 percent of

14        the bonus.  And the women beneath me should have

15        also been paid, but we weren't, only the men were

16        getting paid 25 percent of the bonus.

17   BY MR. DOUGHERTY:

18   Q    So it was your belief that you were entitled to the

19        20 percent bonus because it was -- you believe you

20        should have been a director?

21   A    That is the director's structure based on their

22        bonuses.  Managers get paid 10 percent, directors

23        get 20 percent.  I wasn't given a percent, they

24        gave me a flat bonus, so I had no opportunity to

25        get my bonus based on rate like the one I had



 1          received two weeks prior.

 2     Q    Yeah, but that was outlined in your offer letter,

 3          correct?

 4                    THE WITNESS:  You are on mute again,

 5          Tim.

 6                    MR. KOLMAN:  Objection as to form,

 7          sorry.

 8                    THE WITNESS:  No problem.

 9                    Can you restate your question?

10     BY MR. DOUGHERTY:

11     Q    Your bonus amount was outlined in your offer

12          letter, correct?

13     A    Correct, as was everybody's.  But when the company

14          makes a determination on what they are paying out,

15          the percentages should be equal.  The company

16          performed this, so everybody only gets a quarter of

17          their bonus.  But we noticed that they only do that

18          for the men, not the women.

19     Q    When were you terminated?

20     A    January 31, 2020.

21     Q    Who performed the termination?

22     A    Lauren Petzar and Shawn Kemmerer.

23     Q    Was it in person?

24     A    Over the phone.

25     Q    And what did they tell you was the reasoning?



```
 1    A    That my position was no longer available.  I
 2         believe, I don't recall, it had something to do
 3         with some -- some generic reason.  But it was
 4         obvious that it was done in retaliation because I
 5         had made this complaint that -- close to them
 6         deciding to change everything and terminated after
 7         I started complaining.
 8    Q    Are you aware of any other people that were
 9         terminated on January 31?
10    A    No, I'm not -- not that I'm aware of.
11    Q    And were you informed prior to that, that QualTek
12         was going through a company-wide restructuring at
13         the time you were terminated?
14    A    I was advised that they would be restructuring, but
15         I was given a different position.  They had told me
16         they would put me in a reporting role because they
17         wanted me to continue to work with the data.  And
18         then made a complaint -- or I had made the
19         complaint, and then the retaliation happened after
20         that.  And that title that I was told about a week
21         and a half prior was now no longer there, and I was
22         just gone.
23    Q    Have you talked to anybody about this lawsuit other
24         than your attorney?
25    A    As far as what aspects of it?
```



| 1 | Q | As far as anything? |
|---|---|---|
| 2 | A | As far as any?  Only -- people would only know what |
| 3 | | was publicly available information.  And I'm |
| 4 | | talking about leaving my father and my mother and |
| 5 | | my ex that I was with for 20-plus years. |
| 6 | Q | Have you talked to any potential witnesses? |
| 7 | A | I had reached out to Dana Freedman to ask her if |
| 8 | | she would speak to my attorney, and she did. |
| 9 | Q | Okay. |
| 10 | A | I also reached out to Katrinka Tezyk and asked her |
| 11 | | to speak to my attorney.  She said she was unsure |
| 12 | | if she legally could, based on the verbiage in her |
| 13 | | severance agreement, which the EEOC found to be |
| 14 | | illegal in their findings from my complaint, and |
| 15 | | that a class of people were affected by verbiage in |
| 16 | | QualTek's severance agreement, so she was scared to |
| 17 | | talk to the attorney.  I also contacted Shawn |
| 18 | | Kemmerer just to see if he would connect with just |
| 19 | | a simple, "Hey, I see you out there.  Would you |
| 20 | | like to connect?  Give me a call here if you do." |
| 21 | | And that was it. |
| 22 | Q | Well, was what through LinkedIn? |
| 23 | A | Yeah, through LinkedIn.  I had sent him a message. |
| 24 | Q | Anyone else? |
| 25 | A | I did talk to Kayla Lorenzen about speaking to my |



```
 1        attorney.  She did not want to -- she was scared of
 2        retaliation because Elizabeth Downey told her after
 3        she made a complaint about the bonus that if she
 4        pushes this issue, she would be terminated.  She
 5        was in the middle of a custody case and is
 6        terrified to get terminated right now because it
 7        would affect her custody case.  So she was nervous
 8        because of the potential.
 9    Q   Who's Kayla Lorenzen?
10    A   She was my former employee.  She's still employed
11        at QualTek.
12    Q   Where does she work?
13    A   She's in the Minnesota office, and she does finance
14        for Velocitel.
15              MR. DOUGHERTY:  Why don't we take a
16        five-minute break.  I'm going to have some
17        documents to go over after I get them loaded up on
18        my screen and stuff.
19              MR. KOLMAN:  I'm sorry, you are going
20        to ask about what?
21              MR. DOUGHERTY:  Some documents.
22              MR. KOLMAN:  So can we take ten.  Is
23        that okay?
24              MR. DOUGHERTY:  Yeah, that's fine.
25              (A short recess was taken.)
```



 1  BY MR. DOUGHERTY:

 2  Q    Ms. Carlson, we took another break.  Coming back

 3        from the break, is there anything that you thought

 4        of from your testimony that you would like to

 5        change?

 6  A    No.

 7  Q    Okay.  So I'm going to share my screen.  Let me

 8        know if you can see it when it pops up?

 9  A    I can see it.

10  Q    Okay.

11               MR. KOLMAN:  I can see it.

12  BY MR. DOUGHERTY:

13  Q    Great, we'll call this Carlson 1.

14           (Exhibit 1 marked.)

15  BY MR. DOUGHERTY:

16  Q    And it's Carlson -- just Bates Number Carlson

17        Discovery 000024 through 26.  Do you recognize this

18        document, ma'am?

19  A    This is a job description, but this was not the job

20        description posted at the time of my termination.

21        I have a copy of one downloaded from that time.

22        This was posted a month -- over a month after I was

23        terminated.  It was a different one online at that

24        time.

25  Q    Well, you were terminated in 2021?


MAGNA ▶
LEGAL SERVICES

433a

```
 1   A    No, I was terminated in 2020.  This is -- the date
 2        posted on this document is 3-2-2020.  There was a
 3        different one posted on 1-27-2020 that I have a
 4        downloaded copy of.
 5   Q    Did you provide that to your counsel for
 6        production?
 7              MR. KOLMAN:  I don't know whether we
 8        had it.  Did you give that to me?  I'm not sure I
 9        saw it.
10              MR. DOUGHERTY:  I have it.
11              MR. KOLMAN:  That's fine, Colin.  One
12        second.
13              Lisa, did you have a copy of that one?
14              THE WITNESS:  I do.  It was also
15        provided to QualTek during the EEOC process along
16        with a detailed description line by line of how
17        this associated with what I was doing for my job.
18        So it was included in EEOC.
19   BY MR. DOUGHERTY:
20   Q    You --
21   A    It was in response to QualTek on I believe 5-20 of
22        2020 during the EEOC process that contained the
23        documents and my responses to each one.
24   Q    Can you provide that to your counsel when we are
25        done so he can get it to me?
```



1    A    Yes.

2    Q    Thank you.

3              MR. KOLMAN:  Lisa, did you provide that

4         to me or are you going to provide it?

5              THE WITNESS:  I did provide it.  There

6         was an email I sent that had the -- I believe it

7         was titled Carlson Rebuttal to QualTek EEOC or

8         something like that.  And it contained these

9         things.  I can resend or forward if you did not get

10        that.

11             MR. KOLMAN:  Let me kill that sound.

12        One second.

13             Okay.  Okay, that's good, we are fine.

14   BY MR. DOUGHERTY:

15   Q    Ma'am, how is this one different than the one that

16        you applied for?

17   A    The one posted before I was terminated was not the

18        one I applied for.  The one I applied for was

19        posted in November of 2019.  So again, this

20        document was created and posted after my

21        termination and after two other director of

22        finance, which QualTek does have.  It's in the EEOC

23        filing provided rebuttal and provided to QualTek, I

24        believe, on 5-20-2020 as part of the EEOC process.

25   Q    You said provided, but you mean you provided it to



1    the EEOC?

2  A   It was a letter from my attorney in response to

3      QualTek's EEOC response.  So it was provided to

4      both QualTek -- I believe it was provided directly

5      to you and also to the EEOC.  So it would be on

6      5-20-2020, I believe, and it has a detailed

7      description of every point and how that -- how I

8      was performing that job at that time.  Do you have

9      that copy from 5-20-2020?  It would have been from

10     Aaron Sharp as an attorney.

11 Q   I do not.

12 A   I don't know if it was provided directly to you.

13              MR. KOLMAN:  You are saying you don't

14     have a copy.  Is that correct?

15              MR. DOUGHERTY:  Let's go off the record

16     for a second.

17              (A short recess was taken.)

18 BY MR. DOUGHERTY:

19 Q   So this is the job application you just sent me

20     from January of 27, 2020.  Do you recognize this

21     document, Ms. Carlson?

22 A   Yes.

23 Q   And was this the application you applied for?

24 A   No, I applied in November of 2019.

25 Q   Is this -- how is this application different than



1          the one you applied for?

2    A    I would need to see them side by side to detail

3          that out.  But this was the one that was posted at

4          the time of my termination.

5    Q    And it indicates that the position is in King of

6          Prussia.  Is that correct?

7    A    Yes, that's what it says.

8    Q    And it indicates education requirement of a

9          bachelor's degree in finance, accounting or similar

10         master's degree would be a plus.  CFA or CPA

11         credentials is a plus.  Is that correct?

12   A    That is what it says.

13   Q    Did the position you applied to in November also

14         have those requirements?

15   A    I do not recall what the job description

16         specifically said at that time.

17   Q    Okay.  So let's go to -- we'll call this Carlson 2.

18         It is a Carlson Discovery 000044 to 000045.

19              (Exhibit 2 marked.)

20   BY MR. DOUGHERTY:

21   Q    Do you recognize this document, ma'am?

22              MR. KOLMAN:  Wait, does everyone else

23         have something else on the screen?  I may not have

24         it.

25              THE WITNESS:  Yeah.



437a

1        MR. KOLMAN:  Because I've got problems

2    with my screen.  This is not the first time that's

3    happened.  One second.  Oh, there it is.  There it

4    is.  Go ahead.

5        THE WITNESS:  Yes, I do recognize this

6    document.  I only see the first page though.

7    BY MR. DOUGHERTY:

8    Q    Okay.

9    A    But I recognize this page.

10    Q    Here's the second page.

11    A    Yes, okay.

12    Q    Is that your signature?  Or I mean, it looks a

13        little faded from copying, but is that your

14        signature?

15    A    Yes.

16    Q    And is this your offer letter for when you

17        transitioned over from Velocitel to QualTek?

18    A    Yes.

19    Q    And it indicates your salary would be $92,300.  Is

20        that right?

21    A    Yes.

22    Q    Was that the same you were making at Velocitel or

23        less?

24    A    I don't recall, but I believe it was the same.

25    Q    Okay.  And it says here in the next paragraph you



1       will be eligible to participate annually in the

2       management incentive compensation program, or MICP.

3       What was your understanding of the MICP?

4   A   That it was the bonus program that QualTek had in

5       place, and it had tiers for -- depending on the

6       level of what your position is.  It was based on

7       your title.

8   Q   Okay.  The next sentence is "This discretionary

9       program provides participants with an annual

10      incentive opportunity based upon company, business

11      group, and individual performance."  Did I read

12      that correctly?

13  A   Yes.

14  Q   What do you understand that sentence to mean?

15  A   That depending upon the performance of the company

16      and individual performance would determine the

17      amount of bonuses paid out.

18  Q   Do you understand that there's a possibility that

19      no bonus could be paid out?

20  A   It was a possibility, but there was a full bonus

21      paid out off of this offer letter.

22  Q   And in your first --

23  A   But it would be in the correct amount, yes.

24  Q   So what was paid in your first year?

25  A   My first year I was paid -- let's see here.  It was



439a

```
 1        paid out in -- at the end of 2018.  December of
 2        2018 we were advised that the full bonuses would be
 3        paid out half in January and half in June.  When I
 4        received my first half, I noticed that it was
 5        only -- and at this point I apologize, let me
 6        clarify one piece.  This offer letter only was in
 7        place until they had adjusted my offer letter when
 8        they submitted my request to become a director
 9        to -- to HR.  So the bonus that covered most of
10        2018 was actually the $20,000 bonus.
11             When my amount was paid out after being
12        advised that it was full bonuses, I got half of
13        what HR had in their system as their bonus.  They
14        mistakenly entered my bonus of $5,000, and I was
15        paid $2,500.  I raised this issue to Shawn
16        Kemmerer.  He reached out to HR and was told too
17        bad, we can't change it in the system.  We'll try
18        to fix it by the second half payment.  The second
19        half payment came out, and it was still not
20        corrected in the system, and they told me there was
21        really nothing I could do about it.
22   Q    So it was your understanding that was an accounting
23        error?
24   A    It was an accounting error in HR.
25   Q    Okay.
```



1  A    There is a system that contains the bonus amounts,

2       and mine was incorrectly entered at $5,000 instead

3       of the $20,000 that I was under at the point of

4       this.

5  Q    So under this offer letter, you never received a

6       bonus?

7  A    No, not under this offer letter because this offer

8       letter was only in place for three months.

9  Q    Okay.  So is then the next offer letter -- this is

10      a document, Carlson Discovery 00050.  We'll call

11      this Carlson 3.

12               (Exhibit 3 marked.)

13 BY MR. DOUGHERTY:

14 Q    Is the next offer letter you are talking about this

15      document?

16 A    Yes, this is the one that was signed in March of

17      2018.  So it controlled the majority of the year of

18      2018.

19 Q    And that's your signature on the bottom?

20 A    That is.

21 Q    This looks like you got almost a $12,000 raise.  Is

22      that right?  Raise up to $105,000 from $93,000?

23 A    Correct.

24 Q    It indicates your annual bonus potential would be

25      $20,000.  That's what you were talking about?



```
 1   A      Yes.

 2   Q      Okay.  But you only got $5,000?

 3   A      It was supposed to be the full amount, but HR had

 4          mistakenly entered $5,000 in the system as my bonus

 5          potential.  They had made a clerical error instead

 6          of the $20,000.

 7   Q      Okay.  So that wasn't anything -- you don't think

 8          that was discriminatory, that was just a clerical

 9          error?

10                  MR. KOLMAN:  Objection as to form.

11          Calls for speculation.

12                  You can answer.

13                  THE WITNESS:  Can you repeat the

14          question?

15   BY MR. DOUGHERTY:

16   Q      Sure.  That bonus error -- we talked about a couple

17          of bonus errors and things like that, this one from

18          2018, so I understand it, is not a basis for

19          discrimination complaint, is it?

20                  MR. KOLMAN:  Objection, calls for

21          speculation.

22                  You can answer.

23                  THE WITNESS:  I don't know the reason

24          why they wouldn't correct my bonus into the system

25          to reflect what is actually on my offer letter.
```



1    BY MR. DOUGHERTY:

2    Q      Okay.  If we go to the next document, it's

3           Bates-stamped QualTek 00188 and it goes through

4           QualTek 00190.  We'll call this Carlson 4.

5                  (Exhibit 4 marked.)

6    BY MR. DOUGHERTY:

7    Q      So this is an email like when you read emails you

8           get to read them backwards -- actually, this one is

9           not backwards.  Yeah.  So here's page 2 with an

10          email.  It's -- the bottom of the first page is

11          from Matt Webb to you on December 2, 2019.  Do you

12          recognize or remember that e-mail?

13   A      I recall the conversation.  I don't remember the

14          exact verbiage in the email, but I do recall this

15          conversation via email.

16   Q      And you had a conversation or interview with Matt

17          Webb?

18   A      Yeah, I want to highlight where your mouse is right

19          now, this is an important part of this here because

20          if you read this piece of the email, it says, "In

21          regards to location, they will not consider anyone

22          outside of the QualTek office?  I currently do the

23          same thing in this position for Velocitel without

24          issue located in Minnesota."  And the company that

25          this was managing is actually located in Minnesota



```
 1          and have worked with them -- oh, I recall this
 2          one -- so this was talking regarding a -- let's see
 3          here, they wanted a director to manage the -- it
 4          was acquisition for a company in Minnesota.  And so
 5          that's why I referenced this piece.  This was
 6          managed and actually located in Minnesota, and I
 7          had worked with them for many years.  "It would be
 8          a great benefit to working with them in person.
 9          Look forward to hearing back from you."
10    Q     This position was actually with QualTek Shared
11          Services, isn't that right?
12    A     It was to manage a new company acquisition for a
13          company called Vertical Limits.
14    Q     Okay.
15    A     Which their headquarters is in Minnesota near the
16          Minnesota office.
17    Q     Okay.  But the application specifically had a King
18          of Prussia office location.  Isn't that right?
19    A     I was told they would not consider anybody outside
20          of the QualTek office, which is why I had a
21          question mark, because I was wondering -- because I
22          was currently performing the same position in
23          Minnesota, and the company it was for was in
24          Minnesota as well.
25    Q     Right.  But you were informed it had to be the King
```



1       of Prussia office.  Isn't that right?

2   A   For this position to manage Vertical Limit, Inc., I

3       believe that I was told that from Lauren Petzar

4       when I complained about the discrimination.  With

5       Lauren Petzar I was saying I was going to apply to

6       this, and they said that might be an issue because

7       they wanted someone in the QualTek office.  So

8       that's why I had question with Matt in this email.

9   Q   So did you have this conversation with Matt Webb

10      that was implied here?

11  A   Yes, I did.

12  Q   And did he inform you that it was in the King of

13      Prussia office?

14  A   He said he was going to talk to his superiors to

15      see and understand why it needed to be in King of

16      Prussia because of the issues I had brought up in

17      the email.

18  Q   And did he also inform you that the decision was

19      made to keep it in King of Prussia?

20  A   Yes.

21  Q   And you were at the time unwilling to move to King

22      of Prussia.  Is that right?  Or to Pennsylvania?

23  A   Correct.  Because I had just closed on the house

24      that I referenced earlier.

25  Q   It looks like there's -- this is actually I think a



```
 1        follow-up, so it looks like on Monday, December 9
 2        he got back to you?
 3   A    Yes.
 4   Q    And sort of formally said it has to be in King of
 5        Prussia.  Is that right?
 6   A    That's correct.
 7   Q    Okay.  Let's go to the next email, next exhibit.
 8        It starts with QualTek 000197 and goes through
 9        QualTek 000198.
10             (Exhibit 5 marked.)
11  BY MR. DOUGHERTY:
12   Q    Do you recognize this email?
13   A    Yes.
14   Q    And you sent it to -- who's Kristie Marzocco?
15   A    She was the payroll manager at the time.  So I
16        included her, Lauren Petzar, her boss, and I cc'd
17        my manager.  And it references again how the
18        clerical error was still not corrected apparently
19        after the last one they changed it to $11,000 in
20        the system, again not $20,000.
21   Q    You copied Stephanie Trybula too?
22   A    Trybula, yes.
23   Q    So when you sent this, were you no longer concerned
24        that Ms. Trybula would retaliate against you?
25   A    She retaliated the next day against me.  I was
```



1    concerned but at this point I needed to have this

2    corrected so I wanted to raise the flag as far as I

3    could, which is why I included Lauren's boss and my

4    boss.

5  Q  Is this email from Friday, January 24 from

6    Ms. Trybula the retaliation you are referring to?

7  A  No, I'm referring to a phone call that was

8    received.

9  Q  Okay.  When did she make that phone call?

10 A  She made the phone call along with David Conn and

11   Shawn Kemmerer that same morning.  She called me

12   after these emails went.

13 Q  Okay.  What did she say?

14 A  She said that she was -- this is where she was very

15   belligerent and very forceful and said that it's

16   none of my business how things are calculated.  I

17   should quote/unquote be grateful that I got

18   anything at all, and that -- I don't recall, it was

19   a very belligerent conversation.  I don't remember

20   the rest of the words from it.  But I remember

21   being extremely upset and telling my boss, Shawn

22   Kemmerer, and I was extremely uncomfortable by her

23   tone and that it was really upsetting.

24 Q  And this occurred on --

25 A  Which is why she --



1  Q    Go ahead.

2  A    This occurred on Friday, and you can see in the

3         email above she follows up with an email saying,

4         "Thank you for your time on Friday."  Yes, and this

5         email does not reflect the tone she had in the

6         call.

7  Q    So in your email here on the -- from 9:38 says "I'm

8         echoing Kayla's concerns."  What were Kayla's

9         concerns?

10  A    Kayla and I compiled the list of the bonuses

11         showing that women were paid a lesser percentage of

12         their bonus, and that also we found that minorities

13         were paid lesser percentage of their bonuses.  So I

14         supported Kayla with this, and we emailed -- we

15         emailed HR, and then I responded back to echo on

16         this -- on her concerns too, to reinforce this.  I

17         was cc'd on the email that Kayla sent, and that's

18         why I requested this information, to understand how

19         these were calculated and determined that one

20         person qualified for a higher percent than another.

21                And as I state right here, this is the

22         second year I've been shorted on the correct bonus

23         paid amount compared to what the percentages were

24         paid and due to my system issue.

25  Q    Do you have that analysis?



```
 1                    THE WITNESS:  Tim, you are on mute.

 2                    It was also provided in the initial

 3        EEOC claim.

 4   BY MR. DOUGHERTY:

 5   Q    Okay.  This will be -- what are we are up to,

 6        Carlson 6?

 7                    (Exhibit 6 marked.)

 8   BY MR. DOUGHERTY:

 9   Q    This starts at -- it jumps all around.  You know

10        what, strike this one.  This one jumps all around.

11                    (Exhibit 6 taken out.)

12                    MR. DOUGHERTY:  Why don't we take a

13        five-minute break.  I'm going to review my notes.

14        We are probably pretty close to being done.

15                    (A short recess was taken.)

16   BY MR. DOUGHERTY:

17   Q    I have a few more questions.  Ms. Carlson, you

18        testified earlier that you were part of the people

19        putting the transition or the finances together for

20        the QualTek acquisition for Velocitel.  Do I

21        remember that correctly?

22   A    Yes.

23   Q    Who else was on that team or in that group?

24   A    I worked with Dana Freedman and we worked with

25        Shawn Kemmerer on the QualTek side.
```



```
 1   Q    I'm sorry, I wasn't clear.  Who else from old
 2        Velocitel was on it?  Just you and Dana or anyone
 3        else?
 4   A    I'm sure there were more people, but Dana and I
 5        assisted with the financial piece.  I'm sure Joe
 6        Busky, the CFO, was involved.  Yeah, that was
 7        pretty much -- and then Peter Nordby, who was our
 8        IT guy, had to be involved.  But we did the
 9        financials.
10   Q    Did Mr. Busky ever ask you to alter or change
11        numbers when they were being presented to QualTek?
12   A    Never.
13   Q    Did you ever express concerns about him for the
14        numbers at Velocitel to anyone at QualTek?
15   A    No, I don't recall doing that at all.
16   Q    Okay.  Was there ever an audit or anything done of
17        the old Velocitel numbers that proved to be
18        incorrect or called into question the veracity of
19        those numbers that you are aware of?
20   A    Not that I'm aware of.
21   Q    So you wouldn't have participated in any audit like
22        that?
23   A    No.  I did participate in every audit that was
24        held, but I provided information to the auditors
25        and was just advised the audits were complete and
```



450a

1       that I no longer needed to print that document.

2   Q   Okay.

3   A   This was an annual thing.  There was annual audits

4       at the company.

5   Q   Okay.  Did you have any concerns about the numbers

6       that were being presented from Velocitel to

7       QualTek?

8   A   Not that I recall at all.

9   Q   I'm going to show you my screen for one more

10      document.

11                  (Exhibit 6 marked.)

12  BY MR. DOUGHERTY:

13  Q   Do you recognize this document, ma'am?

14  A   Yes.

15  Q   Is this the chart you've been referencing about

16      bonuses?

17  A   Yes.

18  Q   Okay.  And this is the chart you and -- I'm sorry,

19      I believe you said Ms. Lorenzen helped you with?

20  A   Yes.

21  Q   And you are talking about your 14 percent bonus.

22      Is that right?

23  A   Yes.

24  Q   You agree with me that you received the highest

25      bonus of anyone on this chart by more than double.



```
 1        Isn't that right?
 2   A    These were not equal parts.  These were people who
 3        were below me, so either reported to me or were
 4        formerly reporting to me.
 5   Q    And you didn't answer my question.  You would agree
 6        with me that you received the highest bonus on this
 7        chart by more than double.  Correct?
 8   A    I feel that question is misrepresenting the
 9        intention of this chart.  The chart was here to
10        show what -- the information that I had, how people
11        were paid based on percentages.
12   Q    And I'll --
13   A    And again, this is not line by line, so their bonus
14        potential as you can see is much lower.  So the
15        amount is actually irrelevant.
16   Q    And I'll -- again, I'll ask you the same question.
17             MR. KOLMAN:  We'll stipulate that it
18        says that she got the most on that chart.  It's
19        quite clear that she did.
20   BY MR. DOUGHERTY:
21   Q    Were you aware of what Mr. Champion received?
22   A    I do not.  But the intent in there was Kayla was
23        performing the same job, and her bonus potential
24        was half.  And she still only got paid 9 percent of
25        half.  I -- the colors indicate levels of
```



1     management on the hierarchy, that's why they are

2     colored in different groups.

3  Q   And how did you get access to bonus and pay

4     information?

5  A   I did not access that information.  That is

6     information that was verbally told to me by the

7     employee.

8  Q   So but you didn't actually see anybody's check,

9     right?

10  A   No.  And I never searched to look for that

11     information because that would have been an

12     inappropriate use of my access that I had.

13  Q   So you don't know if it's true -- the information

14     you provided is true, you are just going with what

15     people told you?

16  A   The date that I collected that chart was the date

17     that the bonuses were paid out.  So people were

18     looking at their paychecks and giving me those

19     dollar amounts because of the discrepancies they

20     saw.

21  Q   Ma'am, we started over three hours ago.  Looking

22     back, is there anything you would want to change or

23     update in your deposition?

24  A   Not that I can think of right now at all.

25           MR. DOUGHERTY:  Then I have no further



1      questions.  Mr. Kolman may have some questions for

2      you, I don't know.

3             MR. KOLMAN:  I don't have any

4      questions.  Thank you.

5             She would like to read and sign.

6             I would take a copy.  If you could put

7      it in all forms, that's ASCII, minuscript and any

8      others, that would be great.  Not hard copy.  Sent

9      by email, and we'll print it out.

10            MR. DOUGHERTY:  I would like mini and a

11     digital.

12           (The  deposition ended at 11:50 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

454a

# EXHIBIT "Z"

# Connecting the World

Our dedication to quality, best-in-class safety practices, and committed workforce are what makes QualTek an industry leading one-stop infrastructure solutions provider.

**LEARN MORE**

## Services

QualTek is a turnkey provider of infrastructure services and renewable energy project solutions to the North American telecommunications and power industries.

**ALL SERVICES**

Choose a service:

Wireless ▼

## Wireless

With the telecommunications industry constantly innovating, QualTek Wireless is equipped to meet the growing demand for site acquisition, full turnkey construction, and maintenance upgrades in communities nationwide.

**LEARN MORE**

## Commitment to Our Veterans

We proudly support military veterans looking to transition into work opportunities in our industry. We value the qualities instilled through participation in military service and prioritize your interest in joining our team.

**LEARN MORE**

456a



## Careers

Our people are our greatest asset. That is why QualTek hires the best people for the job, invests in their success, and supports them in individual professional goals.

**LEARN MORE**

# News                                                                **ALL NEWS**

6/9/2022
QualTek Services Inc. set to join Russell Microcap® Index

5/17/2022
QualTek Announces First Quarter 2022 Financial ResultsQualTek Announces First Quarter 2022 Financial Results

5/5/2022
QualTek Services Inc. to Report First Quarter 2022 Financial Results on May 17, 2022

# Investors                                                          **FULL CHART**

## $1.49

QualTek Services Inc - Ordinary Shares - Class A

| QTEK | 1.4 |
|------|-----|
| HIGH | 1.49 |
| LOW | 1.34 |
| VOLUME | 2 |

**Contact** 

| Services | About | News | Careers |
|----------|-------|------|---------|
| Wireless | Safety | Investors | Career Opportunities |
| Wireline | History | Veterans | Contractors & Vendor Partners |
| Renewables | Leadership | | Training |
| Recovery Logistics | Locations | | |
| RF Compliance | Mergers & Acquisitions | | |

QualTek

Corporate Headquarters
475 Sentry Parkway E, Suite 200
Blue Bell, PA 19422

Copyright ©2022 QualTek. All Rights Reserved.

Privacy Policy    Sitemap



# History

Home / About / **History**

The history of QualTek is rooted in our people. It was founded by strong leaders who continue to lead our teams and company to success. We believe in fostering a family-like culture and take pride in the decades of experience we have gained together. Our dedication, passion, and teamwork have driven us to where we are today.

We are proud of our story, humbled by our roots, and continue to look for ways to innovate and contribute to the industry's future.



**2012**
*Aug*

QualTek is founded on the cornerstones of quality, safety, technology, and people.

**2012**
*Dec*

QualTek adds wireline infrastructure services to its portfolio of services with the acquisition by NX Utilities, LLC of the wireline assets of NexLink USA Communications, Inc. and Advanced Communications USA, Inc.

**2013**
*Jan*

QualTek hits first $1 million revenue week.

**2013**
*Mar*

QualTek expands its wireless service offerings to the Northeastern market with the acquisition by Empire Telecom USA, LLC of the wireless assets of Northeastern Wireless Development, Inc.

459a



QualTek enters the satellite installation sector with the creation of QualSat, LLC.

**2017**
*Nov*

 

QualTek Wireless increases its wireless presence nationwide with the acquisition of certain wireless assets of Velocitel, Inc. (dba FDH Velocitel) and SiteSafe, Inc.

**2018**
*May*



QualTek adds cable installation services with the acquisition of the assets of Aero Communications, Inc. and Cablenet Communications, Inc.

**2018**
*Jul*



Brightstar Capital Partners acquires QualTek in partnership with senior management.



QualTek expands its cable installation footprint with the acquisition of the assets of PremierCC, Inc.



QualTek expands its North American wireline services to Canada with the acquisition of the assets of NX Utilities, Inc.

**2018**
*Oct*



QualTek expands service offerings to the disaster recovery sector with the acquisition of assets of Recovery Logistics LLC.



QualTek solidifies its wireless coverage in the mid-Atlantic states with the acquisition of the assets of Site Resources, LLC, including its Shenandoah Tower assets.

**2019**
*Mar*



**2019**

*Oct*



QualTek strengthens nationwide wireless coverage in the West and Pacific Northwest with the acquisition of wireless assets of Vinculums Services, LLC.



QualTek increases wireless presence in New England with the acquisition of the wireless assets of Aerial Wireless Services, Inc.

**2021**

*Jan*



QualTek expands its service offerings to the renewables sectors with the acquisition of Fiber Network Solutions.

**2021**

*Aug*



QualTek acquires BACOM, a leading provider of infrastructure services for the wireless telecommunications industry in the western United States.



QualTek acquires Concurrent, a top performing utility vendor in the southeast region of the United States.

**2021**

*Oct*



QualTek expands suite of services in its Wireline segment with acquisition of Urban Cable Technology.

**Contact** 

Services          About          News          Careers

Recovery Logistics                    Locations

RF Compliance                         Mergers & Acquisitions

**QualTek**

Corporate Headquarters
475 Sentry Parkway E, Suite 200
Blue Bell, PA 19422

Copyright ©2022 QualTek. All Rights Reserved.

Privacy Policy    Sitemap

462a

## CERTIFICATE OF SERVICE

I, COLIN D. DOUGHERTY, hereby certify that, on this date, I caused the foregoing document to be filed electronically with this Court, where it is available for viewing and downloading from the Court's ECF system, and that such electronic filing automatically generates a Notice of Electronic Filing constituting service of the filed document, upon interested parties.

By: */s/ Colin D. Dougherty*
     COLIN D. DOUGHERTY

Dated: July 26, 2022