# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| LISA CARLSON, | : | CIVIL ACTION |
| | : | |
| *Plaintiff,* | : | |
| v. | : | |
| | : | |
| QUALTEK WIRELESS, LLC, | : | NO. 2:22-CV-00125-MAK |
| | : | |
| | : | JURY TRIAL DEMANDED |
| *Defendant.* | : | |
| | : | |
| | : | |

**DEFENDANT, QUALTEK WIRELESS, LLC'S WITNESS LIST**

Defendant, Qualtek Wireless, LLC ("Defendant" or "QW"), by and through its undersigned counsel, respectfully identify the following witnesses for trial pursuant to the Court's Policies and Procedures and this Court's Order dated March 29, 2022 (ECF. No. 18):

**I.    DEFENDANT'S LIABILITY WITNESSES EXPECTED TO BE CALLED:**

**A.    Elizbeth Downey, Qualtek's Chief Administrative Officer, Qualtek, 475 Sentry Parkway East, Blue Bell, PA 19422:**

Ms. Downey will testify regarding the corporate structure of QW, as well as its parent company, Qualtek, LLC. Ms. Downey will also testify that Dana Freedman, a legacy Velocitel employee, was not being replaced and that Qualtek required all executives within its corporate finance department with the title of "Director" or above to possess at least a bachelor's degree in finance, accounting, or a related field, and to work from Qualtek's Pennsylvania headquarters due to the company's shared services platform. Ms. Downey will further testify that Plaintiff did not have the skills to perform a Director-level role and will describe the various reporting errors Plaintiff made during her tenure at QW. She will also testify to the fact that all bonuses Qualtek employees receive are discretionary, per company policy. Finally, Ms. Downey will describe the massive restructuring Qualtek was undergoing during Plaintiff's tenure at QW and the resulting elimination of Plaintiff's Finance Manager position.

**B.    Stefanie Trybula, Qualtek's Senior Vice President of Human Resources, Qualtek, 475 Sentry Parkway East, Blue Bell, PA 19422:**

Ms. Trybula will testify regarding Qualtek's education and in-person working requirements under its shared services platform. Ms Trybula will further testify that Qualtek's employee bonuses were always discretionary and about the company's underperformance during 2019. Finally, Ms. Trybula will testify to the fact that, while Plaintiff complained about various bonuses she received and her lack of promotion to the Director of Finance position, not once did Plaintiff relate any such complaints to her gender or any other protected category.

C. **Lauren Petzar, Qualtek's Former Director of Human Resources, 1158 Bateman Drive, Phoenixville, PA 19460**:

Ms. Petzar will testify regarding Qualtek's education and in-person working requirements under its shared services platform. Ms. Petzar will testify to the fact that, while Plaintiff complained multiple times regarding her bonuses and lack of promotion, not once did Plaintiff relate any such complaints to her gender or any other protected category.

D. **David Conn, a Former Vice President of Finance at Qualtek, 5 Haddock Dr, Sewell, NJ 08080:**

Mr. Conn will testify regarding Qualtek's education and in-person working requirements under its shared services platform. Mr. Conn will further testify regarding the massive restructuring Qualtek was undergoing during Plaintiff's tenure there, including the elimination of Plaintiff's Finance Manager position.

E. **Shawn Kemmerer, Plaintiff's Supervisor and a Former Director of Finance at Qualtek, 65 Detar Road, Gilbertsville, PA 19525:**

Mr. Kemmerer will testify regarding Plaintiff's job-specific skill set. Mr. Kemmerer will further testify regarding the massive restructuring Qualtek was undergoing during Plaintiff's tenure there, including the elimination of Plaintiff's Finance Manager position, and the effects the restructuring had on multiple other Qualtek employees.

F. **Dana Freedman, Plaintiff's Former Supervisor at the legacy Velocitel, 1326 Somerset Ave, Deerfield, IL 60015:**

Freedman will testify regarding Plaintiff's job-specific skill set at both Qualtek and the legacy Velocitel.

G. **Kristie Marzocco, Qualtek's Payroll Manager, Qualtek, 475 Sentry Parkway East, Blue Bell, PA 19422:**

Ms. Marzocco will testify that the salaries of Plaintiff and Bruce Neff were the same, although Mr. Neff was a Director of Finance. Ms. Marzocco will further testify that any bonuses Qualtek employees received were always discretionary.

**H.      Matt Webb: Qualtek's Former Director of Recruiting: 718 Bridge Street, Mont Clare, PA 19453**

Mr. Webb will testify to the requirements for the Director of Finance position, *i.e.*, possession of a bachelor's degree (or higher) and the ability to commute daily to Qualtek's Montgomery County, Pennsylvania office.

**II.      DEFENDANT'S LIABILITY WITNESSES BY DEPOSITION[1]:**

A.      David Conn

B.      Lauren Petzar

C.      Shawn Kemmerer

The Defendant's deposition designations for the above-referenced individuals are attached hereto as Exhibit "A."  Defendant reserves the right to counter-designate portions of any deposition transcript upon which Plaintiff relies.

Defendant reserves the right to call at trial any of the witnesses listed on Plaintiff's trial witness list.

FOX ROTHSCHILD LLP

By: */s/ Colin D. Dougherty*
        COLIN D. DOUGHERTY
        ERIKA M. PAGE
        980 Jolly Road
        Suite 110
        Blue Bell, PA 19422-3001
        Telephone: (610) 397-6500
        Fax: (610) 397-0450
        cdougherty@foxrothschild.com
        epage@foxrothschild.com
Dated: July 29, 2022                    *Attorneys for Defendant*

---

[1] Defendant is designating the testimony for these individuals out of an abundance of caution, as they are former employees and, as such, are no longer in Defendant's control.

# EXHIBIT "A"

# DEFENDANT'S DEPOSITION DESIGNATIONS

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| LISA CARLSON, | : CIVIL ACTION |
| | : |
| *Plaintiff,* | : |
| v. | : |
| | : |
| QUALTEK WIRELESS, LLC, | : NO. 2:22-CV-00125-MAK |
| | : |
| | : JURY TRIAL DEMANDED |
| *Defendant.* | : |
| | : |
| | : |

| WITNESS:  DAVID CONN (JUNE 29, 2022) | | | |
|---|---|---|---|
| **DEFENDANT'S DESIGNATIONS** | | | |
| **FROM PAGE** | **FROM LINE** | **TO PAGE** | **TO LINE** |
| 9 | 20 | 9 | 25 |
| 10 | 20 | 10 | 21 |
| 23 | 8 | 23 | 13 |
| 23 | 24 | 24 | 4 |
| 26 | 17 | 27 | 4 |
| 35 | 12 | 35 | 19 |
| 39 | 6 | 39 | 19 |
| 47 | 12 | 47 | 22 |
| 71 | 1 | 71 | 5 |
| 72 | 4 | 72 | 20 |
| 75 | 5 | 75 | 10 |
| 75 | 12 | 75 | 22 |
| 75 | 25 | 76 | 3 |
| 81 | 14 | 81 | 22 |

| WITNESS:  LAUREN PETZAR (JUNE 30, 2022) | | | |
|---|---|---|---|
| **DEFENDANT'S DESIGNATIONS** | | | |
| **FROM PAGE** | **FROM LINE** | **TO PAGE** | **TO LINE** |
| 5 | 17 | 5 | 17 |
| 6 | 9 | 6 | 13 |
| 7 | 15 | 8 | 1 |
| 14 | 5 | 14 | 17 |
| 16 | 1 | 16 | 11 |
| 20 | 9 | 20 | 12 |

| WITNESS:  SHAWN KEMMERER (JUNE 30, 2022) | | | |
|---|---|---|---|
| DEFENDANT'S DESIGNATIONS | | | |
| FROM PAGE | FROM LINE | TO PAGE | TO LINE |
| 5 | 17 | 5 | 17 |
| 7 | 2 | 7 | 12 |
| 10 | 21 | 11 | 10 |
| 14 | 17 | 15 | 2 |
| 18 | 11 | 18 | 25 |
| 20 | 1 | 20 | 11 |
| 20 | 25 | 21 | 14 |
| 28 | 12 | 28 | 23 |
| 39 | 22 | 39 | 25 |
| 43 | 3 | 43 | 12 |
| 47 | 2 | 48 | 2 |
| 48 | 3 | 48 | 16 |

1                           **APPEARANCES**

2

3   **Appearing on behalf of the Plaintiff:**

4   TIMOTHY M. KOLMAN, ESQUIRE

5   **Kolman Law, P.C.**

6   414 Hulmeville Avenue

7   Penndel, Pennsylvania 19047

8   (844) 537-2529

9   tkolman@kolmanlaw.com

10

11  **Appearing on behalf of the Defendant:**

12  COLIN D. DOUGHERTY, ESQUIRE

13  **FOX ROTHSCHILD, LLP**

14  980 Jolly Road, Suite 110

15  P.O. Box 3001

16  Blue Bell, Pennsylvania 19422-3001

17  (610) 397-6500

18  (610) 397-0450 Fax

19  cdougherty@foxrothschild.com

20

21  **ALSO PRESENT:**

22  Lisa Carlson

23  Elizabeth Downey

24

25

```
 1                          INDEX

 2                                                    Page

 3

 4   EXAMINATION BY MR. KOLMAN                          7

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

1                          EXHIBITS

2    Exhibit                                          Page

3                        (NONE MARKED)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  IT IS STIPULATED AND AGREED by and between counsel

2  for the parties that the reading and signing of this

3  transcript by the witness is hereby waived.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **VIDEOCONFERENCE DEPOSITION OF**

2                  **DAVE CONN**

3                  **TAKEN ON**

4          **WEDNESDAY, JUNE 29, 2022**

5                  **10:08 A.M.**

6

7  **DAVE CONN,** declared his testimony in this matter is

8  being given under penalty of perjury was examined

9  and testified as follows:

10         **MR. KOLMAN:**  This is Tim Kolman and we

11  agree on behalf of the Plaintiff.

12         **MR. DOUGHERTY:**  Colin Dougherty and I

13  agree on behalf of the Defendant, including Mr.

14  Conn.

15         **MR. KOLMAN:**  Can I just ask if anyone else

16  is listening or attending this deposition whose

17  appearance has not been registered perhaps --

18         **MR. DOUGHERTY:**  Elizabeth Downey.  She's

19  administrative officer, we are in her office.

20         **MR. KOLMAN:**  Does she -- is she the as it

21  were, corporate representative for these purposes?

22         **MR. DOUGHERTY:**  Yes.

23         **MR. KOLMAN:**  She is.  Okay.  Good.  And

24  there's no one else who's listening or attending,

25  correct?



```
 1            MR. DOUGHERTY:  Correct.  Although, I
 2  can't guarantee somebody might not knock on the door
 3  although there is a sign.
 4            MR. KOLMAN:  Well, if someone knock on the
 5  door, you'll let me know, right?
 6            MR. DOUGHERTY:  Yeah.
 7            MR. KOLMAN:  Okay.  I appreciate it.
 8  EXAMINATION
 9  BY MR. KOLMAN:
10     Q.   Hi.  Good morning, Mr. Conn.  It's good to
11  meet you.  My name is Tim Kolman and I represent the
12  Plaintiff, Lisa Carlson in a matter that's being
13  brought against QualTek.
14            I don't know if you've ever been deposed
15  before, but just to make sure that you understand
16  how this matter will go and go smoothly, I'm just
17  going to set forth a few ground rules.
18            You just heard from the court reporter
19  that it's important for you to wait until I've
20  completed my question before answering.  And you may
21  anticipate my question, you may answer before I
22  finish my question, and I might do the same to you.
23  I might ask a question when you haven't finished
24  your answer.  That's not intentional on my part, if
25  that happens let me know so you can complete your
```

1  answer and the record is clear, and I would ask the

2  same courtesy.

3          If you do not understand my question or

4  you don't hear it, you need to let me know so I can

5  repeat the question or rephrase it.  If you answer

6  the question, however, I will assume you've heard it

7  and understood it and answering to the best of your

8  recollection and under oath.  If you don't remember

9  something you need to tell us.  Don't guess and

10  don't try to -- don't try to imagine what may have

11  been the case because then the record won't be

12  clear; however, you can estimate.  So for example,

13  if I ask you when something happened and you say I'm

14  not sure and then you say I believe it was in the

15  summer because of something, that's perfectly fine.

16  You might not know the exact date. I'm not

17  envisioning an issue in that respect.

18          Should you require a break for any reason

19  that will also be fine and I'm sure we aren't going

20  to be too long here, but we'll all take a break

21  probably after an hour or so for a short time.

22          I'm assuming that you're not taking any

23  drugs or under the influence of alcohol that would

24  prevent you from either understanding my questions

25  today or answering truthfully, am I correct?

1     A.   That's correct.

2     Q.   Good.  And please, also articulate your

3  answers as you just did because if you go uh-huh,

4  um-hmm or shake your head, nod your head as we do in

5  general conversation, although, I will understand

6  you and everyone who's watching will, the record

7  simply will not reflect your answer.

8          If -- and you've probably been told this

9  by your counsel, if your counsel objects it will

10 most likely be to the form of the question and so

11 it's possible that I may rephrase the question or

12 have you answer it.  But there will be no need to

13 disrupt the flow necessarily of the deposition.  If

14 your counsel says don't answer that question, well,

15 that will be a different matter.

16         Okay.  Do you have any questions about the

17 process?

18    A.   I don't.

19    Q.   So why don't we start off with the basics.

20 Mr. Conn, you are currently employed by QualTek,

21 correct?

22    A.   That's correct.

23    Q.   And how long have you been employed by

24 them?

25    A.   Since January of 2018.

1      Q.   And before that were you employed

2 somewhere else?

3      A.   I was.

4      Q.   Where were you employed?

5      A.   I was employed at UniTek Global Services.

6 Before that I was at ITS -- ITG Communications.

7      Q.   What did you do for UniTek?

8      A.   At one point, I was controller.  Before

9 that, I was a VP of Finance.

10      Q.   And how old are you?

11      A.   Forty-eight.

12      Q.   And did you go to college?

13      A.   I did.

14      Q.   And which college did you go to?

15      A.   Rosemont College.

16      Q.   Undergraduate?

17      A.   Yes, sir.

18      Q.   And did you graduate?

19      A.   I did.

20      Q.   And what degree did you get?

21      A.   Bachelor of Science in accounting.

22      Q.   When was that?  When -- when did you

23 graduate?

24      A.   I don't know the exact time but I believe

25 it was early 2001.

1        Q.    And how old were you then?

2        A.    I don't know, I'll have to do the math on

3    that.

4        Q.    You're the accounting person.

5        A.    It was, you know, how many years ago, 2001

6    was 21 years ago so I was 30 -- I don't know, 27?  I

7    don't have a calculator and I think I need a

8    calculator.  Usually, I have a calculator.

9        Q.    Did you have a calculator back in

10   Rosemont?

11       A.    I did.

12       Q.    Okay.  After your Bachelor of Science, did

13   you take any postgraduate courses of any kind?

14       A.    I did.  Yes, I took master's classes.

15   Still taking them at Wilmington College in Delaware.

16       Q.    Still taking them, are you enrolled in

17   some kind of degree program, master's degree

18   program?

19       A.    I was.  I'm not currently, I stopped

20   during Covid, but I was.  I plan to resume that

21   later on this year.

22       Q.    What master's program are you or were you

23   enrolled in?

24       A.    MBA.

25       Q.    And how many more credits do you need to

1  complete your MBA?

2       A.   Four full classes.

3       Q.   Is your -- is your college being paid for

4  by QualTek as part of ongoing education?

5       A.   No, sir.

6       Q.   Oh, so this is financed only by you

7  personally?

8       A.   That's correct.

9       Q.   So effectively, you have to do a master's

10  degree while also holding down a full-time job,

11  would that be correct?

12       A.   Not currently but I was in the past, yes.

13       Q.   And you have plans to continue your

14  education, is that right?

15       A.   I hope so, yes.

16       Q.   Now, after you got your Bachelor of

17  Science in accounting in 2001, did you become

18  employed thereafter?

19       A.   I did, yes.

20       Q.   And where were you employed after 2001?

21       A.   I worked for a small CPA firm in South

22  Jersey for a couple years.

23       Q.   Was that your intention to take the CPA

24  exam?

25       A.   It was and then I decided against it.

1     Q.   So you never sat for the CPA exam?  It's a

2  tough exam --

3     A.   I did not.

4     Q.   -- did you ever -- did you ever take part

5  one or part two?

6     A.   No, I did not.

7     Q.   And your decision not to take the CPA

8  exam, that was a decision you made because of what?

9     A.   At that time, I was more interested in

10 corporate finance than I was the accounting side.

11    Q.   So you worked for this small New Jersey

12 accounting firm for a couple of years, then what did

13 you do?

14    A.   You're testing my memory now.  So then I

15 think in -- I don't remember exact dates, I was

16 employed by UniTek as a Director of Finance, I

17 believe 2006.

18    Q.   And tell me a little bit about UniTek,

19 what kind of business are they in?

20    A.   Telecommunications, I guess is the best

21 terminology.  We have contracts were Comcast, AT&T,

22 kind of in the wireless space, in the fullfillment

23 space, satellite space or Direct TV.

24    Q.   When you were employed as Director of

25 Finance what were your duties, what did that involve



1 **broadly speaking?**

2     A.    Mostly financial reporting.  You know, we

3 do things on a weekly basis which is a little

4 different than some places so it was a little bit

5 more heavily involved in, you know, weekly metrics

6 and exception reporting.  We kind of do things at a

7 granular level so my main responsibility and my

8 team's was financial reporting for whichever

9 division I was involved in.  I was in fulfillment

10 for a while, I was involved in satellite, but I

11 would say generally financial reporting in general

12 would be my main responsibility.

13     **Q.    What kind of financial -- what kind of**

14 **financial reporting was this?  I mean, what were you**

15 **reporting, sales or --**

16     A.    Revenue, costs, gross margins.  Also keep

17 performance indicators for it's, you know, we did

18 reporting for our operators, so whatever made sense

19 to them is what we did.  It varied.

20     **Q.    You have -- I'm sorry.  Did you have**

21 **people who reported to you?**

22     A.    I did.

23     **Q.    And how many people reported to you?**

24     A.    In 2006, I'd probably say anywhere between

25 four and 10 financial analysts and such --

```
 1        Q.    Did there --

 2        A.    -- structure so it changed.  Sorry?

 3        Q.    Did there come a time when you left

 4   UniTek?

 5        A.    Yes.  What, 2012.

 6        Q.    And was -- and why did you leave?

 7        A.    There was new ownership came in.  We

 8   became a public company and new ownership came in.

 9   I guess they wanted new faces so it made sense, you

10   know, as my executive team was leaving, for me to

11   look elsewhere as well.

12        Q.    So you were sort of made redundant, would

13   that be fair to say?

14        A.    Yeah, you could say replaced.

15        Q.    Right.  So that -- that left you without a

16   job. How long were you without a job before you got

17   another one?

18        A.    I have a non-compete so after that year

19   was up, I got a job pretty quick.

20        Q.    What did you do during the year that you

21   couldn't compete?  Anything?

22        A.    I went to the beach.  I don't remember

23   exactly.  I have young children so I put them on a

24   bus.

25        Q.    Okay.  After the year was up, where did
```

1  **you get employed?**

2      A.   So I liked kind of the -- the new -- the

3  new me and working from home so I worked as a

4  consultant for my old company, UniTek through

5  another company.  And then not long after that I

6  hooked up with QualTek.

7      Q.   **And what was your position when you went**

8  **back to work?**

9      A.   It was basically just a financial

10 consultant.  I mean, probably because I left the

11 director level, trying to help, you know, improve

12 gross margins, things like that.

13     Q.   **Was that less money for you than you were**

14 **earning?**

15     A.   I'm sorry?

16     Q.   **Was that less of a compensation than you**

17 **were earning at UniTek?**

18     A.   I would say it was probably fairly close.

19 It wasn't more.

20     Q.   **Then you -- then you moved from that job**

21 **to another job.  I forgot what you mentioned, the**

22 **second job you moved to.**

23     A.   Yeah, so ITG Communications was a

24 subsidiary of QualTek and they kind of broke off and

25 I knew many of the executive team so when they did,

1  I went along with them and helped them kind of kept

2  that line of business running.  And I don't remember

3  what year that was but that's where it was between

4  being a consultant and starting at UniTek, I mean,

5  at QualTek, excuse me.

6       Q.   And how long were you there?

7       A.   I would say a little more than a year,

8  maybe 14 months --

9       Q.   And then --

10      A.   -- it was --

11      Q.   Go on, I'm sorry.

12      A.   I was just going to say, you know, it -- I

13  knew it was going to be a role that was going to be

14  temporary till I started at QualTek.  It was just --

15  it was a great experience for me to be build to

16  startup.

17      Q.   And then you left that startup, correct?

18      A.   I did.

19      Q.   And then your next job was with whom?

20      A.   With QualTek in '18.

21      Q.   Let me ask you about that job.  Did you

22  apply for an open position at QualTek?

23      A.   I did, yes.

24      Q.   And how did you hear about the position

25  that was open that you applied for?

```
 1        A.   I've known -- I've known the executive

 2   team and a lot of the other team members at QualTek

 3   for a while.  I worked with many of them in the

 4   past.  So I always kept tabs, I loved working with

 5   them and for them.  So I always had an eye open for

 6   when they had an opening on the website and saw one.

 7   They were in acquisition mode, growing and I'm

 8   pretty good at that so I figured I could help and I

 9   reached out and it was a good fit.

10        Q.   Okay.  You said a lot right there, if I

11   could just break it up.

12        A.   Yes.

13        Q.   Did you know that a vacancy was coming on

14   the website or did you look at the website and

15   realized there was a vacancy or something else?

16        A.   I just -- yeah, I mean, I believe I was

17   just searching.  I looked, I checked it probably

18   once in a while just like any other thing, you know,

19   any other company that I might know of.  So no, I

20   just happened to check it.

21        Q.   And did you know anyone at QualTek?  You

22   may have mentioned that you had kept in contact with

23   someone?  I may have misunderstood your answer.  Did

24   you know anyone at QualTek who was currently working

25   before you were employed by them?
```

1      A.   Yes.

2      Q.   And who was that?

3      A.   Yes.  Many people.  It was a lot of the

4  executive team that I worked with at UniTek.  A lot

5  of the finance team that I worked with at UniTek.

6  So I don't have an exact number for you but a good

7  deal of people I knew were at QualTek when I got

8  there.

9      Q.   Do you know Elizabeth Downey?  Had she

10  worked at QualTek?

11     A.   Yes.

12     Q.   And did -- had Stephanie Trybula worked at

13  QualTek?

14     A.   Yes.

15     Q.   And had Shawn Kemmerer worked at QualTek?

16     A.   Yes.

17     Q.   I'm sorry, I mean, UniTek, forgive me, at

18  UniTek. Had Elizabeth Downey worked at UniTek?

19     A.   Yes.

20     Q.   Okay.  And I'm sorry, Stephanie Trybula,

21  she'd worked at UniTek also?

22     A.   Yes.

23     Q.   Can you name me some other employees who

24  worked at UniTek that you can remember now sitting

25  here today?

```
 1        A.   Scott --
 2        Q.   Oh, by the way -- who currently -- I'm so
 3   sorry, who currently work --
 4        A.   That's fine.
 5        Q.   -- at QualTek.  Who currently work at
 6   QualTek.
 7        A.   So you're asking me people that worked at
 8   UniTek that currently work at QualTek?
 9        Q.   That's correct.
10        A.   Scott Hisey.  Mike Williams.  Rob
11   Fabrizio.  Adam Spittler.  Probably others that I'm
12   forgetting.
13        Q.   What about Bruce Neff?
14        A.   I'm sorry?
15        Q.   Bruce Neff?
16        A.   Yes.  Bruce Neff, yes.
17        Q.   Brandon Ebeling?
18        A.   No.
19        Q.   Lauren Petzar?
20        A.   Was Lauren at UniTek?  I don't remember if
21   Lauren was at UniTek, honestly.  Sorry.
22        Q.   Dana Freedman?
23        A.   Who?
24        Q.   Dana Freedman.  No?
25        A.   I don't know -- I don't know who that is.
```

1      **Q.  Okay.  After you saw the position on the**

2  **website, did you then make a call and reach out to**

3  **people you knew, any particular person?**

4      A.  I'm sure I probably reached out to

5  somebody on the finance team, trying to get a better

6  feel for the role.  I sent my resume in just like

7  anybody else but I probably -- I may have called and

8  just get an idea.  You know, I read about some

9  acquisitions that were going on, so I don't remember

10  exactly the steps I took.  I know I sent my resume,

11  I don't remember if I reached out to somebody.  I'm

12  sure I did, I knew a couple of folks there but I

13  don't exactly recall.

14      **Q.  When you reached out, let me see, you --**

15  **you don't recall who you reached out to, was that**

16  **your answer?**

17      A.  Yes.  I don't.

18      **Q.  Well, do you recall whether the person you**

19  **reached out to is still at QualTek?**

20      A.  I don't remember who I reached out to

21  exactly.

22      **Q.  Did you send your resume to that**

23  **individual?**

24      A.  I sent it to -- if I recall correctly, I

25  sent it to whatever the -- whoever I was directed to

```
 1  on the website.
 2       Q.   Okay.  I understand that you sent your
 3  resume via the website.  My question is whether you
 4  sent your resume to any other employee of QualTek at
 5  the time in addition to sending it to the website?
 6       A.   I don't recall ever doing that, no.
 7       Q.   What was it about finding out more about
 8  this position by talking to someone as opposed to
 9  seeing what was written in the -- on the website
10  regarding what the job entailed and what the
11  qualifications were.  Did you get any additional
12  information from the person that you spoke to about
13  what the job entailed?
14       A.   I don't remember.
15       Q.   How did you even know who to call about
16  the job?
17       A.   I mean, like I mentioned, I knew people
18  that had worked there, I worked with them in the
19  past.
20       Q.   Did you know --
21       A.   And I reached out -- I don't recall
22  exactly.
23       Q.   The department that you are currently
24  employed in, is what, the finance department?  How
25  do they describe it?
```

Dave Conn   June 29, 2022   NDT Assgn # 58457   Page 23

```
1        A.   Where I work currently at QualTek?

2        Q.   Yes.

3        A.   Corporate finance.

4        Q.   And when you applied for your position,

5   was that in corporate finance also or somewhere

6   else?

7        A.   No, it was corporate finance, yes.

8        Q.   And when did you actually start in the

9   corporate finance office at QualTek?

10       A.   January 2018.

11       Q.   Do you know if, at that point, QualTek had

12  acquired Velocitel?

13       A.   They had.

14       Q.   Were you involved in any way in the

15  integration of Velocitel and QualTek?

16       A.   I was.  I believe that the acquisition was

17  in December of 2017.  I don't remember exact date

18  and then I started like I said, about a month later.

19  I was involved in the integration piece as far as

20  the financial reporting and things like that.  I was

21  also still doing non-wireless acquisition due

22  diligence so when I first started there was a little

23  bit of everything.

24       Q.   What did you have to do in terms of --

25  just broadly, in terms of the integration of
```

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

1   **Velocitel with QualTek in terms of corporate**

2   **finance?**

3        A.   Maybe I would say it was a smaller company

4   that I was joining our large division.  We have a

5   kind of unique way of reporting our metrics that not

6   everybody else in the industry normally does.  We do

7   weekly P&Ls, which is not the norm so we kind of --

8   what I was brought on to do really was to help

9   integrate the piece that takes what the acquired

10  company does as far as their reporting.  It's

11  usually monthly, it's usually not as granular, and

12  put it into our format kind of.  We call them

13  managers reports that go out every week.  And then

14  we have exception reporting, KPIs, and I don't have

15  to get into the nitty gritty, but that's kind of

16  where I come in and what I've done for this

17  executive team in the past is helping the

18  integration to take what we get and turn it into

19  what we want it to look like under QualTek.

20       Q.   **Did you take over any employees that had**

21  **been retained by QualTek that previously were**

22  **employed by Velocitel that now reported to you?**

23       A.   Directly?  I don't recall if any of them

24  reported to me directly.  I know that, you know,

25  they may have reported to somebody on my team, but I

1  don't recall if any of them reported to me directly.

2      Q.   **Who was on your team at the time?**

3      A.   Financial analysts mostly.

4      Q.   **Who?**

5      A.   Financial analysts.

6      Q.   **Okay.**

7      A.   Like I said, you know, I wasn't just

8  wireless in the beginning so they were across a

9  couple of different divisions but mostly financial

10 analysts made up my team when I first got here as

11 Director of Finance.

12     Q.   **How many people indirectly reported to you**

13 **through the chain of command?**

14     A.   I'd be estimating, but at that time,

15 because it has changed.  You're talking about when I

16 first started?

17     Q.   **Well, I'm talking about as you began the**

18 **integration of Velocitel with QualTek.  I think**

19 **that's really the time frame that I'm looking at.**

20 **Specifically, let me be specific, Velocitel**

21 **employees.  How many Velocitel employees either**

22 **directly or indirectly reported to you from the time**

23 **that you came on board to let's say, December of**

24 **2020?**

25     A.   How many legacy Velocitel folks.  Four,

```
 1  that's an estimate.
 2      Q.   Can you tell me their names?
 3      A.   I don't remember all their names.
 4  Obviously, Lisa Carlson.  I don't -- and then there
 5  was more teammates in Minnesota, Kayla.  Sorry, I
 6  don't remember all their names and I think there was
 7  two more.
 8      Q.   Were you in any way responsible for
 9  bringing Brandon Ebeling on board?
10      A.   Responsible?  No.  I mean, he applied and
11  I interviewed him.
12      Q.   Okay.  You didn't know him before,
13  correct?
14      A.   I did not.
15      Q.   But you knew Bruce Neff before, correct?
16      A.   I did, yes.
17      Q.   So when Bruce Neff came in to interview,
18  you already knew him from UniTek, is that right?
19      A.   I knew Bruce but I did not interview him
20  when he came to QualTek.  But yes, I did know him.
21      Q.   Was there a reason you didn't interview
22  him when he came to QualTek?
23      A.   When he started he was -- it was a unique
24  role for us as far as our AR unbilled and he was
25  brought in by our CFO, at the time, for that unique
```

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

1    role so he was on my team. So you know, everybody

2    kind of worked with Bruce before so the CFO brought

3    him in knowing his past experiences so I didn't

4    interview him.

5          Q.    And the CFO was who?

6          A.    Steve Forbes.

7          Q.    I'm sorry?

8          A.    Steve Forbes.

9          Q.    Steve knew him from UniTek?

10         A.    I don't know where Steve knew him from.  I

11   knew him from UniTek.

12         Q.    Did you know Steve from UniTek?

13         A.    No.

14         Q.    When you say you knew Bruce Neff from

15   UniTek, did Bruce ever reach out to you prior to or

16   contemporaneously with applying for a job at

17   QualTek?

18         A.    No.

19         Q.    How did you first find out that Bruce Neff

20   was applying for a job at QualTek?

21         A.    I believe I saw him in Steve's office one

22   day.

23         Q.    Saw him in Steve's office one day?  How

24   did that happen?

25         A.    I've no -- I assume that they hooked up

1  somehow.  I don't know.  I can't -- I don't know how

2  Bruce ended up in Steve's office; they know each

3  other.

4       **Q.   Okay.  Were you walking past the office**

5  **one day and you just happened to see Bruce Neff in**

6  **Steve's office?**

7       A.   I mean, I don't know if that's exactly how

8  it happened, but I saw Bruce in the office one day

9  and found out he was meeting with Steve.

10      **Q.   Were you asked to attend that meeting?**

11      A.   No.

12      **Q.   Do you know if at the time Bruce Neff had**

13  **been employed, in other words, been given an offer**

14  **by QualTek or did you have an understanding that the**

15  **reason why Bruce Neff was in Steve's office was**

16  **pursuant to an interview that --**

17           **MR. DOUGHERTY:**  Objection --

18      **Q.   -- Steve was having?**

19           **MR. DOUGHERTY:**  Answer if you understand

20  it.

21           **THE WITNESS:**  Sorry?

22           **MR. DOUGHERTY:**  I said objection to the

23  form, you can answer it if you understand it.

24      A.   I guess -- are you -- are you asking if I

25  knew if Bruce had a job prior to QualTek?

1      Q.   Well, no.  Let me -- let me rephrase,

2  okay?

3      A.   Sure.

4      Q.   When you saw Bruce Neff in Steve's office,

5  did you then go into Steve's office?

6      A.   No, I don't think so.  I don't remember

7  but I don't think so.

8      Q.   In other words, you saw Bruce Neff in

9  Steve's office and you walked right by?

10     A.   I don't exactly remember the encounter.  I

11 just remember seeing Bruce in the office one day,

12 said hi to him.

13     Q.   Saw Bruce in the office one day, you

14 didn't go into Steve's office, you didn't say

15 anything to Bruce and yet you recall seeing him,

16 would that be correct?

17     A.   That sounds about right.  I might have

18 said something to him like hi, but I didn't go into

19 the office when he met with Steve.

20     Q.   And do you recall whether at that date or

21 time Bruce Neff was employed by QualTek?

22     A.   I don't know when Bruce was actually

23 employed by QualTek after that.

24     Q.   At some point after seeing him in Steve's

25 office, did you and Bruce have a discussion?

 1      A.    If we did it would have been the day he

 2   started, whenever that was.

 3      Q.    **And the day he started may have been**

 4   **before he was in the office or after he was in the**

 5   **office?**

 6      A.    After.

 7      Q.    **Do you know how long after?**

 8      A.    I don't.

 9      Q.    **Do you remember -- how far is Steve's**

10   **office from your office, by the way?**

11      A.    In feet, I don't know, it's pretty close.

12   I'd say probably -- it's across the other side of

13   the hall, but not that far.

14      Q.    **And is it a glass paneled office so you**

15   **can see who's inside?**

16      A.    No.

17      Q.    **So if you were walking past the office you**

18   **wouldn't have been able to know who's inside,**

19   **correct?**

20      A.    Probably not, no.

21      Q.    **Unless you had x-ray vision, correct?**

22   **Which, of course you don't have.  So my question is,**

23   **if you walked past the office how could you possibly**

24   **know that Bruce Neff was inside?**

25      A.    I probably saw him go in or maybe saw him

1  come out.

2      Q.   Okay.  So --

3      A.   Maybe he's got windows -- sorry?

4      Q.   Okay.  So now we're doing something which

5  I suggested before should not be done, which is not

6  to speculate about what you did or did not do.  I

7  may have done this, I may have done that, et cetera,

8  et cetera.  I mean, I'm asking you what actually

9  happened to the best of your recollection.

10          Just to circle back for a minute, you

11  informed me that you saw him in Steve's office.  You

12  then testified you did not go into the office.  If

13  there's anything about my recollection about your

14  testimony, you may correct me and the record.  And

15  yet now we find out that you could not have seen him

16  from the outside and yet you testified you did not

17  go in.

18          Now, is there any part of your testimony

19  thus far looking back that you may wish to clarify

20  for the record, and I would just mention again, that

21  you are under oath and I would ask that you recall

22  to the best of your ability so that the record is

23  clear about what exactly happened on the day that

24  you know or knew that Bruce Neff was in Steve's

25  office.

1      A.    So understood.  I don't remember exactly

2  if I maybe saw him walking out of Steve's office,

3  walking around the actual giant office and not just

4  Steve's office where everybody sits, the open area,

5  or if I walked and the door was open and I saw him

6  sitting in Steve's office.  I don't recall.  I just

7  remember seeing Bruce that day and knowing that he

8  was meeting with Steve.

9      Q.    Then your testimony was that you didn't

10  say anything to Bruce Neff until after he was

11  actually employed which was after his meeting with

12  Steve, and yet you saw Bruce Neff at sometime,

13  someplace around the office, possibly in the office

14  and your testimony was that you did not speak with

15  him.  But is -- do you want to rethink that for a

16  minute?  I mean, did you in fact --

17          MR. DOUGHERTY:  Objection.

18      Q.    -- not speak to him at all?

19          MR. DOUGHERTY:  Objection.  Is there a

20  question?

21          MR. KOLMAN:  Yes.

22      Q.    Did you not speak to him at all?  That's

23  the question.

24      A.    Yeah, I don't remember.  I actually don't

25  remember if I spoke to him, but I -- I don't

```
 1  remember.
 2       Q.   It's your testimony you did not --
 3       A.   I remember --
 4       Q.   It's your testimony you did not know that
 5  Bruce Neff was coming in, correct?
 6       A.   I'm sorry, could you repeat that?
 7       Q.   Your testimony was you didn't know that he
 8  would be coming in, correct?
 9       A.   I did not.  No, I did not.
10       Q.   Now, Lisa Carlson reported to you
11  indirectly.  I believe that was your testimony,
12  correct?
13       A.   I believe so, yes.
14       Q.   And in between Lisa and yourself, given
15  that her reporting to you was indirect, was who?
16  Who was the intermediary between her and -- excuse
17  me, between her and you?
18       A.   I believe Shawn Kemmerer.
19       Q.   And how long did Lisa Carlson report
20  indirectly to you before she was no longer at
21  QualTek?
22       A.   I believe she reported to Shawn the entire
23  time.
24       Q.   And how long did Shawn report to you?
25       A.   Shawn reported to me also the entire time.
```

1    Q.    And when you say the entire time, I

2 understand when you came on board, but when did that

3 entire time end? For example, when did Shawn

4 Kemmerer leave?  Let's start there.

5    A.    Shawn Kemmerer left recently.  I would say

6 two months ago.

7    Q.    Do you know if Shawn Kemmerer was

8 terminated from his employment?

9    A.    No, he was not.

10    Q.    So it's your understanding that he left

11 for some other reason, voluntarily to take another

12 job, you're not sure what or maybe you are, but he

13 was not terminated as far as you know, would that be

14 right?

15    A.    That's correct.  That's correct.

16    Q.    Do you -- have you kept in touch with

17 Shawn after he left QualTek?

18    A.    Once or twice through a text maybe.

19    Q.    You consider him an acquaintance or a

20 friend?

21    A.    Yeah, he was a work friend.  I knew him a

22 pretty long time.

23    Q.    My understanding is that you knew Shawn

24 Kemmerer from UniTek, would that be correct, when

25 you came on board?

1        A.   Yes.

2        Q.   **And how long was Lisa Carlson there after**

3   **you came on board at QualTek in 2018, January?**

4        A.   When was Lisa's last day?

5        Q.   **Well, approximately.**

6        A.   I don't know.

7        Q.   **I don't want you to recall that exactly,**

8   **but if you can tell me broadly what it was, I'll**

9   **take it.**

10       A.   I -- I don't know.  I don't know when -- I

11  don't know when she -- when her last day was.

12       Q.   Do you know if Lisa was terminated from

13  her employment?

14       A.   I believe the position was eliminated,

15  yes.

16       Q.   When you say, "the position was

17  eliminated," you're talking about which position?

18       A.   The one that she held at the time.

19  Finance manager, I believe.

20       Q.   **Okay.  And do you know what her duties**

21  **were as finance manager?**

22       A.   Reporting.  Same as I mentioned before is

23  what my team does.  A lot of reporting, Excel

24  spreadsheets, a lot of the AT&T, they're contract

25  subs for that particular area.

1      Q.   So you say that was -- that was all -- and

2  you may not have been responsible for this, but it's

3  your understanding that that position was

4  eliminated.  Did you have anything to do with the

5  elimination of that position?

6      A.   No.  I mean, my -- part of my

7  responsibility was to build a team in our current,

8  well, in our old King of Prussia, Pennsylvania

9  office as a corporate team.  So that was kind of

10 where I focused.

11     Q.   I understand that was your focus.  It's

12 not entirely responsive to my question.  So my

13 question is, did you have anything to do with the

14 so-called "elimination" of Lisa Carlson's position?

15 Albeit --

16     A.   I knew about it.

17     Q.   -- albeit for this greater purpose that

18 you state.

19     A.   I mean, I knew -- I knew about it, if

20 that's what you're asking me, yes.

21     Q.   And you knew about it when?

22     A.   When the decision was made, so our

23 restructure and you know, the team that we're kind

24 of building going forth.

25     Q.   And when was that decision made?  Well,

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

```
 1   let me ask you a prior question.  Was that a
 2   collective decision, not just you but others made
 3   that determination at some point?
 4        A.    That's -- yeah, that's fair.
 5        Q.    And was that in -- was that in a committee
 6   or possibly by email or in some other collective
 7   action that was made before -- well, was made to
 8   eliminate Lisa's position?
 9        A.    I think it was more of a kind of a team
10   agreement as far as the structure we wanted and
11   where we wanted the team to be built.  So I imagine
12   that it was a conversation amongst my team and then,
13   you know, eventually HR.
14        Q.    And when you say you imagine but when you
15   say that you're saying that's what happened,
16   correct?  In other words, when you say you -- is
17   that right?
18        A.    Yes.
19        Q.    And who on the team was part of this
20   decision?  We know you were because you testified
21   that you were, but who else on the team was part of
22   this decision to eliminate Lisa Carlson's position?
23        A.    I would say, you know, each -- anybody on
24   my team. So Shawn who you mentioned earlier.  All my
25   --
```

```
 1      Q.    Kemmerer --
 2      A.    -- financial --
 3      Q.    Let me take you one step at a time so I
 4  can just note down.  So Shawn Kemmerer was part of
 5  the elimination process, is that correct?
 6      A.    Everybody on my team was a part of the
 7  discussion I would say, as far as how we wanted the
 8  structure of our team to look and where we wanted it
 9  to be.
10      Q.    So Shawn Kemmerer would be one and who
11  else?
12      A.    I guess my financial analysts.
13      Q.    And is there anyone else?
14      A.    Probably my direct report, my boss who
15  I've -- I work with, too, I'm sure was --
16      Q.    Who's that?
17      A.    -- in discussion.  I'm sorry?
18      Q.    Who is your direct boss at that time?
19      A.    Mike Machini.  I would say we were all --
20  we were all in conversations.
21      Q.    Anyone else?
22      A.    Not that I can recall.
23      Q.    At that time, was there discussion about
24  Bruce Neff taking over some of these duties that
25  Lisa Carlson had?
```

1      A.   No, I don't believe so.

2      Q.   Did Bruce Neff's name come up in any way

3  with respect to the kind of team that everyone

4  wanted to build?

5      A.   I don't remember.

6      Q.   What was it about Lisa Carlson that

7  prevented her from being part of the new team that

8  QualTek wanted to build?

9      A.   I mean, so we were looking for candidates

10  with, you know, a bachelor's degree at a minimum for

11  not just our higher level people but for our

12  financial analysts.  We were shifting towards a

13  little bit of some accounting experience, not

14  necessarily an accounting degree but some accounting

15  experience because of the role we wanted.  And you

16  know, I guess just as importantly, you know, because

17  of the camaraderie we were building it had to be a

18  position that was going to be in our corporate

19  office in King of Prussia, had to be local.

20      Q.   Okay.  So who is "we"?  Is that the "we"

21  that you just described, the people who were on this

22  as it were, informal restructuring committee or team

23  building committee --

24          MR. DOUGHERTY:   Objection --

25      Q.   -- the names you just made?  Okay --

NAEGELI DEPOSITION & TRIAL          (800)528-3335
                                    NAEGELIUSA.COM

1      A.    I --

2      Q.    -- with regard to -- okay, you say you

3  wanted someone with a degree, what does a degree

4  bring to the job that someone not having a degree

5  brings, if you know?

6      A.    I mean, just from -- I can just speak from

7  my experience the reason why, you know, this is part

8  of my job description and I feel it's a more well-

9  rounded professional.  Somebody who's, you know, had

10  -- has gone through and had the accounting and had

11  the finance and had that type of experience.  So

12  it's been my experience and that's all I can speak

13  to is my experience that that's the bare minimum

14  that we look for and any kind of, you know,

15  tangibles after that.  So that's what I've always

16  searched for in a candidate.

17      Q.    So it doesn't matter -- it doesn't matter

18  what the degree in it -- the degree is in, it could

19  be in the history of basketball or 12th century

20  Chinese banking, it's just that they have a degree,

21  is that correct?

22      A.    No, that's not true.  It would -- it would

23  be --

24      Q.    It doesn't say -- excuse me.  It doesn't

25  say that the degree has to be in finance or

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

1  accounting, it just says there has to be a degree,

2  is that right?

3      A.   What doesn't say?  I don't know what

4  you're referring to.

5      Q.   I said the requirement as I understand it

6  is to have a bachelor's degree but it doesn't say a

7  bachelor's degree in accounting, a bachelor's degree

8  in finance, am I right?

9          MR. DOUGHERTY:  Objection.  Are you --

10  Tim, are you referencing something?

11          MR. KOLMAN:  Yes, I'm representing the

12  alleged qualifications required to be a candidate

13  for this team.  And allegedly what you require is a

14  bachelor's degree but it doesn't have to be a

15  bachelor's degree in finance or accounting, it

16  simply has to be a bachelor's degree, and that's

17  what I'm asking about.

18      Q.   So my --

19          MR. DOUGHERTY:  You're saying, "it doesn't

20  say."  What are you referring to as "it" --

21          MR. KOLMAN:  I'm referring to the fact

22  that -- I'm referring to the fact that Mr. Conn just

23  said that we, you know, we require a bachelor's

24  degree.  I'm asking, is it just a bachelor's degree

25  or is it a bachelor's degree in some specific

1  specialty?  As far as I'm aware, having read the

2  documents, it's simply a bachelor's degree and I'm

3  asking for clarification on that.  That's all.

4       **Q.  Is it a bachelor's degree or is it --**

5       **MR. DOUGHERTY:**  Okay.  Objection --

6       **Q.  -- a bachelor's degree in some kind of**

7  **specialty, that's all I'm asking.  You can answer.**

8       A.  I mean, I would say that, yes.  I would

9  say that we were looking for a bachelor's degree in

10 business or finance or accounting, to answer your

11 question.

12      **Q.  And where does it say -- and where does it**

13 **say that anywhere, do you know?**

14      A.  Where does -- where does what say that?

15 Job description?

16      **Q.  Yeah.  Is it written down?**

17      A.  I don't have the job description in front

18 of me. I'm not exactly sure what it says.

19      **Q.  Do you know how long Lisa Carlson had been**

20 **employed at Velocitel?**

21      A.  Before the acquisition?

22      **Q.  Before the acquisition.**

23      A.  I do not.

24      **Q.  Did you ever look at Lisa Carlson's**

25 **personnel records?**

1    A.   Her personnel records?

2    **Q.   Yes.**

3    A.   No.

4    **Q.   Did you ever look at her reviews to see if**

5    **she had received good reviews and different reviews**

6    **or bad reviews?**

7    A.   Before the acquisition or after the

8    acquisition?

9    **Q.   Well, after the acquisition, obviously.**

10   A.   Well, you asked me if I knew how long she

11   worked there so I wasn't sure.  So I would say after

12   the acquisition, yeah, I'm sure I saw her reviews.

13   **Q.   And were you one of the persons**

14   **responsible for retaining her for a period of time**

15   **after the acquisition because you thought she might**

16   **be useful?**

17   A.   Yeah.  I mean, when I -- when I first

18   started, like I said, I wasn't just wireless so when

19   we do acquisitions we typically don't keep, you

20   know, non- operators or things like that, you know,

21   finance folks and HR folks.  But in this case

22   because of the timing it made sense to keep some of

23   the finance people and give them a shot and see what

24   they can do.  So yeah, I do recall, you know, that

25   team, you know, being the decision to keep that team

1  to see what we can get from them.  So yes.

2       Q.   And what -- and what could Lisa Carlson

3  do?

4       A.   From what I recall, very good Excel skills

5  and you know, the AT&T turf contract piece was kind

6  of what Lisa's strength was.

7       Q.   And when you say the AT&T contract piece,

8  can you elaborate a little about what that is?

9       A.   It's just a lot of different rules for

10 AT&T as far as milestones and billing and, you know,

11 dates and their systems.  So you know, all that is

12 involving AT&T piece.

13      Q.   And who took over all of those things

14 after she was gone?

15      A.   I mean, I also had people on my team that

16 were also good at that.  Shawn Kemmerer who we

17 mentioned earlier had a background in AT&T turf.  He

18 also sat right next to me so it made it easy for me

19 to go over there and kind of talk to him.  So I

20 would say he probably took most of that going

21 forward, that role.

22      Q.   What was Shawn Kemmerer doing prior to

23 being given that role in addition?

24      A.   Just general reporting.

25      Q.   Did Shawn Kemmerer ever recommend to you



1    that Lisa Carlson be retained by the company?

2        A.    I don't recall that.

3        Q.    Did Shawn Kemmerer ever talk to you about

4    Lisa Carlson being told she was going to be a

5    director?

6        A.    I don't recall that either.

7        Q.    Did you have any direct discussion with

8    Lisa Carlson, at any time, after you came on board

9    at QualTek?

10       A.    Did I ever talk to Lisa?

11       Q.    Directly in a work situation, not

12   socially, not having coffee, but with respect to any

13   duties she was performing or any other business

14   capacity in which you were employed or she was

15   employed?

16       A.    Yes.

17       Q.    How many times did you speak with her in

18   respect to your -- her duties and yours?

19       A.    I mean, I don't remember how many times.

20       Q.    Did you give her instruction as to what

21   she needed to do at times?

22       A.    I'm sure we had conversations around the

23   reporting and what was expected and back and forth.

24       Q.    Did you ever tell her that she was doing a

25   good job?

```
 1       A.   I don't remember.

 2       Q.   Were you ever required to assess the

 3  employees who reported to you indirectly?  In other

 4  words, review them on a six-month or yearly basis or

 5  on any basis?

 6       A.   We do -- we do yearly reviews and the

 7  direct supervisor does the review.  As the second

 8  supervisor, I would see it and just kind of review

 9  it, but I wouldn't do the actual sit-down.  I only

10  do that with my direct reports.

11       Q.   Do you know if Shawn Kemmerer ever did a

12  review of Lisa that you saw?

13       A.   I don't remember.  I'm sure he did because

14  of the length that she was here, but I don't

15  remember them exactly.

16       Q.   Well, QualTek says they don't have a

17  review of Lisa Carlson.  Do you know if that's the

18  case?

19       A.   I don't.  I'm not positive.

20       Q.   If there had been a review of Lisa

21  Carlson, do you know where that would go?

22       A.   The reviews that I --

23       Q.   Would that go in the file somewhere?

24  Sorry, go on.

25       A.   The reviews that I do, I can speak to
```

```
 1   those.  They go to HR and then they go to the actual
 2   employee after that.
 3        Q.   Do you recall any complaints made by Lisa
 4   Carlson that you heard about either directly or
 5   indirectly regarding the payment of her bonus?
 6        A.   I don't recall.
 7        Q.   Did Shawn Kemmerer ever come to you to
 8   tell you that Lisa Carlson was complaining that she
 9   had not been paid her full bonus?
10        A.   I don't remember having a conversation
11   like that.
12        Q.   Did Shawn Kemmerer ever come to you and
13   make any complaint on Lisa's behalf about any
14   disparity of pay, meaning that Lisa was complaining
15   that she was not being compensated fairly?
16        A.   I don't remember having any of those
17   conversations either.
18        Q.   Did you receive any complaints from any
19   female employees at any time that they believed they
20   were not being paid on the same equal basis as men
21   for the same work?
22        A.   No.
23        Q.   Did you ever pass on any complaints of any
24   employees to HR regarding any complaint for what
25   would be described as descrimination on the basis of
```

1    gender, race, national origin, religion or

2    disability?

3         A.   You lost me.  Did I ever pass on something

4    --

5         Q.   To HR.

6         A.   -- on behalf?

7         Q.   Yes.  A complaint made --

8         A.   No, not --

9         Q.   -- complaints made to you and you pass it

10   on to HR for investigation or review?

11        A.   Not that I can recall, no.

12        Q.   When you say not that you can recall, do

13   you keep notes of meetings that you have with

14   employees?

15        A.   Sometimes.

16        Q.   When you keep notes, are those notes

17   electronic? In other words, you type them up?

18        A.   Typically if I take notes, no.  They're

19   usually handwritten but I can't say that I've never

20   typed them up.

21        Q.   With respect to the meetings that were

22   held to determine that Lisa Carlson's job should be

23   eliminated, do you have -- was there any record kept

24   of the agenda of that meeting?

25        A.   None that I can recall, no.

```
 1       Q.    Was there any record kept of the

 2  resolution that was made after the meeting with

 3  respect to what was decided as a consequence of

 4  putting together this new team as you call it?

 5       A.    I don't recall having any record of that,

 6  no.

 7       Q.    Is there any written document, and by

 8  written, I mean written as an email, written as a

 9  memo, written just on ordinary paper regarding the

10  termination of Lisa Carlson?

11       A.    Not that I can recall, no.

12       Q.    So let me circle back.  There is no

13  document as far as you know, anywhere that states

14  that Lisa Carlson's posision will be eliminated?

15       A.    Not that I know of.  No, no document.

16       Q.    Even though that decision was allegedly

17  made at some point by the people you mentioned, four

18  people apparently, but you're not sure if it was all

19  of those or some of those, and it was -- and that

20  there was a meeting in some kind of collective

21  capacity, whether it was virtual or whether it was

22  actual, you don't know but that was one of the

23  outcomes.  Is there anything I said that is

24  different from what you testified to?

25            MR. DOUGHERTY:  Object to form.  You can
```

1  answer --

2      Q.    Correct the record if I'm mistaken.    That

3  was my understanding.    Is there anything about my

4  understanding that is incorrect with regard to your

5  testimony?

6      A.    I didn't follow exactly your line of your

7  question.

8      Q.    Well, I was actually trying to as it were,

9  circle back and make sure that I understood your

10 testimony correctly.    And as I understood it, it was

11 that -- why don't we take it in pieces, that a

12 collective decision was made that a new team would

13 be constituted, am I right about that?

14     A.    Yes.

15     Q.    And that this new team would not include

16 Lisa Carlson, correct?

17     A.    Correct.

18     Q.    And that one of the reasons it would not

19 include her was because she did not have a degree,

20 would that be correct?

21     A.    That's one of the reasons, correct.

22     Q.    And -- and the fact that she had been

23 doing this specific job apparently very well, didn't

24 matter because the issue of the degree was a non-

25 negotiable issue, is that my understanding?

 1      A.   Also the location of the job was also a
 2   non- starter.
 3      **Q.   Did you ever meet or speak with Dana**
 4   **Freedman?**
 5      A.   Yes, once or twice.  She wasn't here very
 6   long after I started.
 7      **Q.   And what was Dana Freedman's position?**
 8      A.   I don't remember.  She was here for a week
 9   after I started.
10      **Q.   And do you know why she left?**
11      A.   I don't.
12      **Q.   Anyway, circling back with respect to this**
13   **decision that was made collectively for this**
14   **restructuring, although it was made collectively**
15   **there are no minutes from those -- that meeting,**
16   **correct?**
17      A.   None that I have, no.
18      **Q.   And there's no agenda from the meeting as**
19   **far as you know, correct?**
20      A.   Correct.
21      **Q.   And the decision, the decisions that were**
22   **made, they are not memorialized in any form that**
23   **could be understood?  In other words, they're not in**
24   **email, they're not in metaform, they're not in any**
25   **documentary form, is that correct?**

1       A.    Not that I can recall, no.

2       Q.    **So if that was the case, in whose mind did**

3  **this decision to restructure exist?  I mean, if it's**

4  **not written down anywhere, how is it going to be**

5  **manifested?  Did you -- were you the one who put it**

6  **through and manifested it because --**

7       A.    Put what through?

8       Q.    **The restructuring.  Because it was in your**

9  **head. Not that it was written down anywhere, but it**

10  **was in your head and you made the decision to**

11  **restructure.**

12       A.    Yeah, so I think the goal of myself and my

13  team and my boss was to ultimately have a specific

14  team, corporate finance team in King of Prussia,

15  Pennsylvania with certain, you know, levels, whether

16  it's financial analysts and directors of finance at

17  my -- you know, a corporate team.  It's what worked

18  in the past, it's what I -- the team I wanted to

19  build.  So I think that -- yeah, so the people that

20  I met with, like I said, my boss and my team, this

21  is the direction we wanted to go as we were growing

22  and creating a corporate finance team, having a team

23  in King of Prussia, Pennsylvania.

24       Q.    **You ever speak to Lisa Carlson about the**

25  **fact that she would not be part of this team?**

1    A.   Did I ever speak with her?

2    **Q.   Yes.  Did you speak to her?**

3    A.   I don't think directly.  I believe she

4  probably spoke with Shawn.

5    **Q.   Okay.  Let's talk about you for a minute.**

6  **In the sense that you were the one who was putting**

7  **this new team together, is there a reason you didn't**

8  **directly speak to her and tell her, listen, you're**

9  **not qualified to go forward with the team that I'm**

10  **putting together so you --**

11    A.   I don't --

12    **Q.   -- you -- wait.  You don't have a degree**

13  **and you don't live in Philadelphia so I'm afraid**

14  **you're not going to be part of the team.  You never**

15  **said anything like that to her, correct?**

16    A.   I don't believe I've ever had that

17  conversation, no, directly.

18    **Q.   And why would you not speak to her**

19  **directly about those particular things?  If you're**

20  **going to restructure her out, why wouldn't you talk**

21  **to her directly?**

22    A.   I think probably her direct supervisor

23  handled that, which was Shawn at the time.  So I'm

24  pretty sure, you know, from what I know, because I

25  had a conversation with Shawn who was in the meeting

1  and was on the same page and he had that -- he had

2  that communication.

3      Q.    Did Shawn Kemmerer agree that Lisa Carlson

4  should be terminated because she could not be part

5  of this new vision that you were putting together at

6  QualTek?

7      A.    To my recollection, yes.

8      Q.    Did you write that down anywhere?

9      A.    Did he write that down anywhere?

10     Q.    Yeah, ever give you a memo about that?

11     A.    Not that I can recall.

12     Q.    Have you received or did you receive any

13 emails with respect to the termination of Lisa

14 Carlson or the restructuring of this new team

15 without Lisa Carlson in it?

16     A.    I don't, I mean, I got an email, you know,

17 the day she was termed like I do any other terms but

18 I don't think I got any emails about the plan, you

19 know, we had meetings.

20     Q.    Did you ever look for any such emails?

21     A.    Did I ever look for it?

22     Q.    Did you ever look for any emails

23 concerning the termination of Lisa Carlson?

24     A.    I don't recall ever doing so.  I don't

25 remember.



```
 1        Q.    Were you ever requested to search for
 2   documents regarding the termination of Lisa Carlson?
 3             MR. DOUGHERTY:   Objection to the extent it
 4   calls for a conversation he never had.
 5        Q.    Let me ask you this, were you ever told to
 6   -- not to erase any documents regarding Lisa
 7   Carlson?
 8             MR. DOUGHERTY:   Objection --
 9        Q.    In other words, was there a litigation
10   hold put on this case?
11        A.    I don't know what that is.
12        Q.    You don't know what a litigation hold is,
13   is that correct?
14        A.    I don't.
15        Q.    I just want to be really clear.  So you
16   are saying that you don't recall -- you don't recall
17   one document, one email except for the day that she
18   was terminated, dealing with the restructuring of
19   your team and the effect it would have on Lisa
20   Carlson?  The fact that her job description would be
21   adopted or her job duties would be adopted by Shawn
22   Kemmerer.  Nothing like that at all, is that right?
23        A.    Not that I can recall.
24        Q.    What you recall, meaning that they could
25   exist but you haven't looked for them, is that
```

 1  right?

 2          MR. DOUGHERTY:  Objection to the form.

 3      Q.   You can answer.  They could exist, you

 4  just don't remember them, correct?

 5      A.   I don't remember them, that's correct.

 6      Q.   Do you keep a diary of events so that you

 7  can keep your schedule straight and you know where

 8  you're going and when?

 9      A.   I have my calendar on my computer, if

10  that's what you mean.

11      Q.   Yes.  And your calendar on your computer,

12  that would have your various appointments, would

13  that be right?

14      A.   Yes.

15      Q.   And so if you met with your team regarding

16  the -- this restructure, would one expect that to be

17  on your calendar?

18      A.   It may or may not be.  I've ad hoc

19  meetings 15 times a days sometimes, which is why

20  it's so great to have, you know, my team at arm's

21  length because we can have those type of meetings

22  whenever they pop up.  So I can't -- I don't know

23  that every meeting I have throughout the day is on

24  my calendar.  Sometimes they just pop up ad hoc,

25  whatever's kind of -- whatever topic is going on.

1      Q.   Does anyone assist you in putting items in

2  your calendar apart from you?

3      A.   No.

4      Q.   You're responsible for reviewing Shawn

5  Kemmerer and his -- and his performance?

6      A.   Yes, I was.

7      Q.   And you reviewed him from 2018 up to what,

8  a couple of months ago, would that be correct?

9      A.   Yes.

10     Q.   And what was -- what were his reviews

11 like?

12     A.   They were very good.

13     Q.   And were you also responsible for deciding

14 if he was going to get a bonus or not?

15     A.   I don't really have that authority.

16     Q.   Do you know if -- do you get a bonus if

17 you perform well?

18     A.   My bonus is -- my potential bonus is tied

19 to a couple different things.  It's not just -- it's

20 just not that if I perform well, it's if the company

21 performs well.

22     Q.   Is that because you're considered a

23 director?

24     A.   I don't know -- I don't know why that was

25 set up the way it was set up.  I don't know what the

1  levels are but I can tell you that just me

2  personally, my bonus is tied to a different, a

3  couple different things.

4       Q.   Is the maximum bonus that you can get 20

5  percent?

6       A.   Currently or as a director?

7       Q.   We're talking about your bonus, is it 20

8  percent? Is the potential 20 percent?

9       A.   My bonus right now potential, I believe is

10  either 20 or 25 percent.

11       Q.   But you don't know if it's 20 or 25, you

12  just believe that that's what it is, just like you

13  believed other things, so we're not sure whether

14  it's true or not, is that correct?

15       A.   I think it's 25 percent, but I'm not sure.

16       Q.   You're not sure?  You're a finance guy,

17  right? You're a finance guy.  You deal with numbers

18  all the time and you also deal with corporate

19  spreadsheets and all of that and yet when it comes

20  to your own bonus you don't know whether it's 20

21  percent or 25 percent, is that going to be your

22  testimony?

23       A.   I believe --

24            MR. DOUGHERTY:  Object to form.

25       Q.   Asking, is that your testimony?

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

```
 1       A.    I believe it's 25.  But I'd love to tell
 2  you the gross margin of every project that I have if
 3  you want that.
 4       Q.    Do you know if Lisa Carlson was ever told
 5  that she would be a director?
 6       A.    Not that I -- I don't know.  I don't
 7  recall that.
 8       Q.    Did you ever go to QualTek University?
 9       A.    I was an instructor.
10       Q.    Do you know the purpose of QualTek
11  University?
12       A.    It's got a bunch of different purposes,
13  but yeah, I'm aware of it, I've been involved with
14  it.
15       Q.    And are people selected to go to QualTek
16  University?  I mean, it's not like --
17       A.    Yeah.
18       Q.    Yeah, it's not like, you know, Scranton
19  College, you can't just appyly, you have to be
20  allowed to go or told to go, would that be correct?
21       A.    That's correct.
22       Q.    And would it be also correct that the
23  company has some interest in the employee going
24  there because they with the employee to learn
25  something that would be important for their ongoing
```

1    employment, would that be correct?

2        A.   Yeah, I think it's usually around

3    acquisitions for new companies coming to learn the

4    QualTek way, sure.

5        Q.   But not everyone goes to QualTek

6    University, we know that, right?

7        A.   That's correct.

8        Q.   So the individuals who go there, they are

9    specifically selected for some specific purpose,

10   would that be fair?  And the company believes that

11   they should go there to be instructed?

12           MR. DOUGHERTY:   Objection to form.

13       Q.   Let me rephrase.  You're an instructor at

14   QualTek University.  Have you been told what the

15   purpose of QualTek University is?

16       A.   Have I been told that?

17       Q.   Well, do you have an understanding based

18   in some kind of reality of what QualTek University

19   actually is?

20           MR. DOUGHERTY:   Objection to form.

21       Q.   What is your understanding?

22       A.   QualTek University again, as I mentioned,

23   it's got a couple different purposes.  A lot of the

24   times they're conducted to bring in folks that

25   stayed on board during acquisition to teach them the

1  QualTek way of finance and HR, risk and kind of meet

2  the teams that they're going to be working with and

3  stuff like that.  Like I said, typically around an

4  acquisition want to grab new folks to come in and

5  learn.

6      **Q.   Do you agree with me that QualTek**

7  **University, I mean, to send an employee to QualTek**

8  **University suggests that the company's going to**

9  **invest in them in some way, would that be fair?**

10      A.   I don't -- I don't select who comes to

11  QualTek University.  Like you mentioned, I work in

12  finance.

13      **Q.   In having -- being an instructor at**

14  **QualTek University, do you have some understanding**

15  **of the specific employees who are selected to go**

16  **there?**

17      A.   I imagine it's, you know, manager level.

18  And folks that are added to QualTek as a result of

19  an acquisition and I teach the finance piece of it.

20      **Q.   You would agree with me that there's no**

21  **point in sending an employee to QualTek University**

22  **if they're not going to -- if there's not some**

23  **understanding that they're going to be retained,**

24  **would that be your understanding as well as mine?**

25      A.   I think so.

**NAEGELI**
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

1    Q.   And so if an employee goes to QualTek

2  University it wouldn't be unfair to assume that at

3  least to some degree there's an understanding that

4  that employee has sufficient promise to invest in

5  them a little further and send them to QualTek

6  University, would that be correct?

7         MR. DOUGHERTY:   Objection to the form.

8  You can answer.

9    Q.   Understand the question?

10   A.   No.

11   Q.   The question was simply this.  That would

12 it be your understanding as well as mine that a

13 company like QualTek would not send an employee to

14 QualTek University unless that -- unless it was

15 thought that that employee could be of benefit to

16 QualTek in the long term and therefore the

17 investment of time in QualTek University is worth

18 it, it's worth making for that employee?

19   A.   At that time, yes, I would agree with

20 that.

21   Q.   And do you know -- you don't make the

22 decision of who goes to QualTek University, but do

23 you know who does?

24   A.   I don't.

25   Q.   Do you know what criteria is made?

1       A.   I'm not involved in that decision.

2       Q.   When Lisa went to QualTek University, were

3  you one of her lecturers?

4       A.   I don't remember that specific class, but

5  I've been doing it, so sinces I've been here.

6       Q.   When you have candidates who come in to

7  QualTek, do you have to grade them?

8       A.   To QualTek University?

9       Q.   Yeah.

10      A.   No, I don't grade them.

11      Q.   Okay.  Is there any criteria to determine

12 whether they are actually benefitting from the

13 classes or not?  Some examination, some informal

14 review, anything like that?

15      A.   The only thing I know of are that each

16 student after each session rate the instructors and

17 comment on improvements, things like that.  That's

18 all I know about.

19      Q.   You did know that Lisa Carlson went to

20 QualTek University, correct?

21      A.   I didn't remember.

22      Q.   You didn't remember or your didn't know

23 until I mentioned it?

24      A.   I didn't remember until you mentioned it.

25      Q.   Do you know how soon after she went to

1  QualTek University that there was a decision to get

2  rid of her?

3      A.    I don't remember when she was at QualTek

4  University.

5      Q.    No one told you that she was, is that

6  right?  Oh, let me put it this way.  The fact that

7  she was at QualTek University was never brought up

8  in respect to possibly retaining her, correct?

9      A.    I don't believe so, no.

10      Q.    With respect to not keeping Lisa Carlson,

11  is it my understanding that it was because she would

12  not be in further and did not have a degree, that

13  were the two issues that --

14          MR. DOUGHERTY:   Objection.

15      Q.    And ended any ability of her to be part of

16  this new team, would that be correct?

17          MR. DOUGHERTY:   Objection.  Yoy may

18  answer.

19      A.    Can you repeat it please?

20          MR. KOLMAN:   Yeah.  We're going to take a

21  break after this for like, 10 minutes, okay?  So

22  we've been going a while.  And I don't know how much

23  longer I'm going to be, by the way.  Probably not a

24  whole lot longer, but I want to talk to Lisa.

25      Q.    Yeah, my question is simply this, with

 1  regard to Lisa not being part of this new team, is

 2  it your understanding that it was because number

 3  one, she didn't have a degree and number two, she

 4  wasn't going to relocate to Philadelphia.  Those two

 5  -- or Pennsylvania.  Those two things.

 6      A.   I think that sounds -- yeah.

 7      Q.   And there wasn't anything else that we're

 8  talking about that prevented her from being part of

 9  the team, but those two things just made her

10  ineligible, would that be fair?

11      A.   That's fair.

12          MR. KOLMAN:  Okay.  Guys, why don't we

13  take a break for like, 10 minutes and I'm going to

14  just circle back and see what's up.

15          (RECESS TAKEN FROM 11:25 A.M. TO 11:43

16  A.M.)

17  BY MR. KOLMAN:

18      Q.   We're back on the record.

19          Okay.  Mr. Conn, just back on the record,

20  I just want to clarify a couple of things then I

21  think I'm done.

22          As far as your testimony is concerned you

23  mentioned that you only saw Dana Freedman for a

24  couple of weeks after you got on board, is that

25  correct?  That was your testimony?  As far as you

1   can recall -- you're on mute, so no one can hear

2   you.

3       A.   Can you hear us now?

4       Q.   Yeah, I hear you.  That was my -- that was

5   my recollection of what you said, that she wasn't

6   there very long after you came on board, is that

7   right?

8       A.   Yes, my recollection that's correct.

9       Q.   And that you only saw her for a couple of

10  weeks and that was that, is that correct?

11      A.   Yes.

12      Q.   And the other thing was with respect to

13  Dana Freedman you didn't see -- that's Dana

14  Freedman, right.  So you didn't see her very long,

15  that's what we're talking about.

16          And then with regard to the replacement

17  for Dana Freedman, you just didn't have anything to

18  do with that, would that be fair?

19          MR. DOUGHERTY:  Objection.  Assumes facts

20  not in the record.  You can answer if you know.  You

21  can answer if you understand.

22      Q.   Let me back up a little bit and give some

23  foundation.

24          Dana Freedman left, was there any

25  discussion about who would replace her at all that

1  you recall?

2       A.   Not that I recall.

3       Q.   And there's no documents as far as you can

4  recall or remember that indicates that Lisa Carlson

5  would replace her, is that correct?

6       A.   Not that I recall, no.

7       Q.   And if there had been such a document you

8  believe you would remember it, would that be right?

9       A.   If there were a document stating that who

10  Dana's replacement would be?

11      Q.   Yeah.

12      A.   I don't know if I would or not.

13      Q.   I'm sorry, are you saying that you

14  wouldn't have remembered it or are you saying you

15  would have remembered it or you're saying I can't

16  remember if there was or not?

17      A.   I don't know if there was ever a document

18  that I can recall.

19      Q.   You don't remember there being a document.

20  You wouldn't -- would you have -- you wouldn't have

21  been involved -- would you have been involved in any

22  event with determining who was going to replace Dana

23  Freedman if that issue was even brought up?  Is that

24  something you would have been involved with?

25      A.   I may have.  As I mentioned before I

1  wasn't strictly wireless in the beginning so I

2  don't, you know, I don't know if I would have been

3  involved in this directly at that time.

4      **Q.   Did you ever make a determination that**

5  **Lisa Carlson should replace Dana Freedman?**

6      A.   Not that I recall.

7      **Q.   Do you have any idea whether -- whether**

8  **just theoretically at least, Lisa Carlson could**

9  **replace Dana Freedman, whether she was qualified to**

10  **do so?  You have any opinion on that?**

11      A.   I didn't know -- I didn't know Dana well

12  enough to know her qualifications.

13      **Q.   Did Dana Freedman ever talk to you about**

14  **Lisa Carlson replacing her?**

15      A.   I don't remember.

16      **Q.   Did you ever meet with Lisa Carlson and**

17  **Dana Freedman for a number of times in Philadelphia?**

18      A.   I do remember meeting with them when they

19  were here, yes.

20      **Q.   And how -- and was that in the two weeks**

21  **that Dana Freedman was there after you came on**

22  **board?**

23      A.   Again, I don't remember if it was two

24  weeks or how many weeks it was, but it was during

25  that time frame, obviously before Dana left the

```
 1  company.
 2       Q.   And what was the purpose of those
 3  meetings?
 4       A.   I guess to meet the team, if I recall
 5  correctly, to meet the new team.  Talk about go
 6  forward plans.  Talk about --
 7       Q.   Are you guessing?  Are you just -- are you
 8  just guessing?  Are you just -- is this just out of
 9  the top of your head that that's what it must have
10  been about?  I mean, you don't know, you don't
11  recall?
12       A.   I don't recall the exact meeting from 2018
13  or not.
14       Q.   Okay.  You don't have any documentation of
15  what the meetings were about because you didn't keep
16  any memos, is that correct?
17       A.   No -- yes, that's correct.
18       Q.   And these meetings, they took place in
19  Philadelphia, is that correct?
20       A.   King of Prussia, Pennsylvania.
21       Q.   Yeah, and do you know if they were
22  frequent, like every week?
23       A.   The meetings with Lisa and Dana?
24       Q.   Yeah.
25       A.   I don't remember how frequent they were.
```

```
 1        Q.   But in any event just circling back, they
 2   probably weren't more than a couple of weeks after
 3   you came on board, would that be right?
 4        A.   I would say so, yes.
 5             MR. KOLMAN:  All right.  I just don't
 6   think I have anything else.  Colin, do you have any
 7   questions?
 8             MR. DOUGHERTY:  I do not.
 9             MR. KOLMAN:  Okay.  So let me just circle
10   back to Lisa one last time and I think we're done.
11   So if everyone would indulge me for 10 minutes, I
12   will --
13             I'll be right back.  Thank you.
14             (RECESS TAKEN FROM 11:49 A.M. TO 11:58
15   A.M.)
16   BY MR. KOLMAN:
17        Q.   So just back on the record for a very,
18   very brief moment.
19             Mr. Conn, do you know whether Dana
20   Freedman lived in Philadelphia or not?
21        A.   Do I know if she lived in Philadelphia?
22        Q.   Yeah, or in Pennsylvania.
23        A.   I don't believe she did, no.
24        Q.   And do you know where she did reside?
25        A.   No, I don't.
```

NAEGELI
DEPOSITION & TRIAL

CELEBRATING
40
YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

1      Q.   Currently are there any employees who

2  report directly or indirectly who do not to you --

3  who not live in Pennsylvania?

4      A.   There are.  Not corporate finance, but

5  other positions.

6      Q.   Okay.  And what positions are they?

7      A.   We have a national billing team.

8      Q.   National billing team.  Okay.  What do

9  they do?

10     A.   Billing.

11     Q.   I beg your pardon?  I'm sorry.

12     A.   They do our billing and our invoicing for

13  all our customers.

14     Q.   And where do they reside?

15     A.   In Syracuse, New York.

16     Q.   And is that -- how many people reside

17  there, one?

18     A.   I have one direct report and five or six

19  on the billing team.

20     Q.   Five or six on the billing team and where

21  are they?

22     A.   They're in Syracuse, New York.

23     Q.   And is there a reason that they don't have

24  to be in Pennsylvania?

25     A.   They have a share services role where it's

1    finance or accounting or risk or safety to payroll

2    for that matter, so they're not part of my corporate

3    finance team.

4         Q.   Okay.   And tell me the distinction as to

5    if you're on the corporate finance team why you

6    can't travel to Pennsylvania, you know, however many

7    times it takes and why it's necessary to actually be

8    in Pennsylvania if you're part of the corporate

9    finance team?

10        A.   Sure.   Well, in my experience for as long

11   as I've been doing this, and being doing this for

12   this particular executive team, that the best way to

13   -- the team that works the best is the team that

14   works in the same building, can have meetings when

15   they pop up, can walk in somebody's office or

16   somebody's cube.   And it's what's worked the best

17   for me.   It's what I know the support and shared

18   services model that works, done it before.   So in my

19   experience the team that works the best is the team

20   that's in the same building.

21        Q.   How did you all manage in the time of

22   Covid?   You didn't -- you weren't in all the -- you

23   weren't in all the same offices then, right?

24        A.   We were.

25        Q.   Okay.   So were -- you're in the same

1  offices, so what about self-isolation, were you --

2  did you have your meetings via Zoom?  Did you have

3  your --

4      A.    No, we had our meetings --

5      Q.    -- meetings by -- wait.  So in the height

6  of Covid, all of you were still meeting in the same

7  office, none of you were actually connecting

8  remotely, is that what you're saying?

9      A.    Yes.

10     Q.    You have meetings now that are via Zoom,

11  correct?

12     A.    With my operators and folks in the field,

13  yes.

14     Q.    And why -- what's the difference between

15  having a corporate meeting via Zoom and having a

16  corporate meeting in an office?  I mean, why is

17  there any difference?

18     A.    Again, it's been my experience that the

19  level of reporting and granular detail that we do,

20  the meetings that pop up that we have and all the

21  moving parts the fact that we can go to another

22  department, whether it be accounting or risk or

23  safety or payroll or HR and have meetings and be

24  right there, it's in the office, is the best

25  practice that I've ever encountered in my 18, 20

1  years of telecom and finance, corporate finance.
2  And that's the level of shared service support that
3  my executive team wants and it's the only thing
4  that's worked for me.
5      Q.   And is that written somewhere, these --
6  your experience that's been developed over these 18
7  or 20 years, is that incorporated in some kind of
8  memo that the reason why you have to be in
9  Pennsylvania is because of all of these benefits
10  that you just mentioned.  And then there are other
11  significant differences between that and having a
12  meeting via Zoom.  Is that memorialized anywhere or
13  is that just your experience?
14      A.   I don't know if it's written somewhere.
15  Not to my knowledge.
16      Q.   So we can't look at any corporate document
17  as far as you know to see what the benefit is of
18  being in Pennsylvania?
19      A.   As far as I know, I don't know of any
20  document like that exists.
21      Q.   You would agree with me that in a Zoom
22  meeting you can bring in all the guys from Syracuse,
23  right?  You want to have a meeting with those guys,
24  six of them, you don't have to go up to Syracuse for
25  that and they don't have to come down and waste time

1  traveling, especially in the wintertime. And you can

2  just connect immediately with them and with

3  corporate finance to deal with whatever you need to

4  deal with, correct?

5      A.    I could have a Zoom meeting with the

6  billing team and I've done it, but as far as my

7  corporate finance team and our financial reporting,

8  it's been my experience that's the best way to work

9  is to have everybody under the same roof and working

10  side-by-side.

11      Q.    Can I just -- just answer the question,

12  which is simply that isn't it true that it would be

13  more efficient to have your meeting with the billing

14  team in Syracuse via remote than have to travel what

15  must be at least four hours, maybe more, five or six

16  hours to Syracuse, New York to be in the same office

17  as they are and five or six hours back, and waste

18  all that time when they could just not only come up

19  remotely but also documents can be shared on the

20  screen at the same time.  You would have to agree

21  with me that that has to be more efficient than

22  meeting with them in the same office?

23          MR. DOUGHERTY:  Objection to form.  Answer

24  it if you understand.

25      Q.    You'll agree?

1    A.    For the billing team, yes, that does work.
2  My corporate finance reporting team, that's not --
3  it does not work in my opinion.

4    Q.    So for the corporate finance team you
5  would agree that you can see -- you could see all of
6  them on Zoom, just like we're seeing each other now
7  and that if there are any documents to review, they
8  could also be brought up on the screen and everyone
9  could look at them, would that be right?

10    A.    Yes, that's correct.

11    Q.    And it would also be true that if any of
12  them were in the field or indeed abroad or anywhere
13  in the world, they could be brought into this
14  meeting in a way that they never could if that
15  meeting was under one roof physically in an office,
16  correct?

17    A.    They could.

18    Q.    And just to recap -- just to recap, as you
19  said there is nothing anywhere in any corporate
20  document indicating that actually being physically
21  present in Pennsylvania is now necessary for the
22  performance of any position in the corporate finance
23  team.   That's what you said -- I believe that's what
24  you said, correct?

25    A.    I don't know of such a document that

```
 1   exists.
 2        Q.   And you mentioned the billing team, who
 3   else are -- which other employees are remote and not
 4   in Pennsylvania?
 5        A.   I mean, there's operators.  Nobody reports
 6   directly to me.
 7        Q.   But -- but I know they're not relates to
 8   you but what do they do and who are they related to?
 9        A.   There's plenty of people that don't work
10   in this building that are operators that work in
11   their local markets.
12        Q.   As the finance director for a minute or as
13   a finance manager, is -- is the finance manager part
14   of the corporate finance team?
15        A.   Well, I don't know if I have any finance
16   managers currently.  It used to be if I can
17   remember.
18        Q.   When Lisa was a finance manager, was she
19   considered part of the corporate finance team as
20   such?  I mean, she wasn't a diretor.
21        A.   At the time, yes.
22        Q.   At the time she was a -- at the time she's
23   finance manager she's part of the corporate, what
24   makes you part of the corporate finance team and
25   what makes you not part of it?
```

 1      A.   If you're part of the corporate finance

 2 team you're -- you're working for corporate -- you

 3 work for the corporate finance team, you work with

 4 shared services.  You -- you're -- you work with all

 5 the reporting.  I don't believe I understand the

 6 question.  If you work in corporate finance you

 7 support the entire division or whichever you're in,

 8 and you -- we handle all the financial reporting.

 9      Q.   **But don't they do any of that in Syracuse?**

10      A.   No, they just strictly do billing.  They

11 don't do any financial reporting, as such that we do

12 here.  They don't do any metrics or KPIs or any

13 weekly reporting.  They deal with the customer and

14 they -- they handle the billing, our invoicing.

15      Q.   **I think you mentioned other operators but**

16 **I'm not sure you were specific as to what they do.**

17      A.   Well, we have markets in all different

18 regions. So there's a market director at local -- at

19 the local region.  There's technicians.  There's

20 warehouse workers. There's construction managers.

21 They all work --

22      Q.   **What makes --**

23      A.   -- locally and --

24      Q.   **I'm sorry.  What is special about the**

25 **corporate finance team as apart from all of these**

1    **other areas that makes it necessary to be in**

2    **Pennsylvania when many of these other operators are**

3    **not?**

4         A.   The corporate finance is a shared services

5    piece where we support the entire company.  It's

6    just that we don't have duplicated costs.  We have

7    one HR, we have one payroll, we have one finance.

8    It's a shared services model in our corporate office

9    and it handles, I mean, our particular division, the

10   department handles everything for the entire

11   company.  There is local people that do local

12   operations that are separate from corporate.

13        **Q.   Is Steve -- is Steve Forbes still live in**

14   **Pennsylvania?**

15        A.   I am not sure where Steve Forbes lives.

16        **Q.   You know however, that all the people who**

17   **work for you are in Pennsylvania, correct?**

18        A.   I live in New Jersey and I come here.  So

19   I don't know that everybody lives in Pennsylvania,

20   but they all come here every day.

21        **Q.   You live in New Jersey and not in**

22   **Pennsylvania?**

23        A.   That's right.

24        **Q.   Where in New Jersey do you live?**

25        A.   Sewell, New Jersey.



```
 1      Q.    Where?

 2      A.    Sewell, S-e-w-e-l-l.

 3      Q.    How's the -- how far is that from King of

 4 Prussia?

 5      A.    It's about 50 or so miles, 55, maybe at

 6 the most.

 7      Q.    And do you ever do your job from remote

 8 location, from your home?

 9      A.    I -- I come to the office.

10      Q.    Each and every day?

11      A.    Yes.

12      Q.    And how long does it take you, an hour, an

13 hour and a half?

14      A.    It depends on traffic.  It could take me

15 an hour and a half, it could take me two hours.

16      Q.    I want to be very clear about this.  You

17 know, so just each and every day you come into the

18 office.  There's not a day that you do not take a

19 meeting remotely from home?

20      A.    I would say if it snowed four feet I

21 probably would be stuck at home.

22      Q.    Okay.  That's the not the answer to my

23 question. My -- the question is --

24      A.    Every other day I come in.

25      Q.    I'm sorry?
```

1      A.    Every other day I come in, yes.

2      **Q.    Every other day?**

3      A.    Every day -- every work day except for if

4  I'm on vacation I come in.

5      **Q.    And do you come in for a full day or is**

6  **there a portion of the day that having come in you**

7  **then do meetings at home or in other -- in other**

8  **remote location?**

9      A.    I'm here all day.

10     **Q.    I realize that.  Do you ever take meetings**

11 **remotely from home, assuming there's no snow?**

12     A.    I can't imagine, I mean, unless I'm

13 traveling, very rarely.

14     **Q.    The -- this new team that you guys were**

15 **building out, was Bruce Neff part of that team, was**

16 **going to be part of that team?**

17     A.    Bruce was eventually, not at first.  He

18 was eventually.  He as I mentioned before, I think,

19 he had kind of unique unbilled AR kind of role,

20 didn't really get involved a lot in our financial

21 reporting that my team does. He was kind of you

22 know, a unique role.

23     **Q.    I realize that.  My question is simply,**

24 **while you were making this decision, these four**

25 **people to build out this new -- this new team of**

1  which Lisa Carlson was not going to be part of, it

2  was discussed, was it not, that Bruce Neff would be

3  a part of that team, am I right?

4       A.   Not part of my corporate team at that

5  time, no.

6       Q.   And what about Brandon Ebeling?

7       A.   Brandon started way after that.  I don't

8  know exactly when, but he wasn't --

9       Q.   When did Bruce Neff come onto the team

10 after the discussions about creating that specific

11 team?

12      A.   I don't remember exactly.

13      Q.   And I don't mean to be impertinent or

14 anything but you don't have any trouble with your

15 memory, is that correct?

16      A.   Not that I know of, no.

17      Q.   I don't have anything else then and I'm

18 through with any questions.

19           MR. DOUGHERTY:  I have no questions.

20           (SIGNATURE WAIVED)

21           (DEPOSITION CONCLUDED AT 12:45 P.M.)

22

23

24

25

NAEGELI
DEPOSITION & TRIAL

CELEBRATING
40
YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

1    STATE OF NORTH CAROLINA

2    COUNTY OF RUTHERFORD          C E R T I F I C A T E

3

4              I, Laura Riley Bridges, Verbatim Reporter and

5    Notary Public, do hereby certify that DAVE CONN appeared

6    remotely before me and verbally declared under penalty of

7    perjury to tell the truth; that said deposition was taken by

8    me and transcribed by me and that the foregoing pages

9    constitute a verbatim transcript of the testimony of the

10   said DAVE CONN.  I do further certify that the persons were

11   present as stated.

12             I do further certify that I am not of counsel

13   for or in the employment of any parties to this action, nor

14   do I have any interest, financial or otherwise, in the

15   outcome thereof.

16             IN WITNESS WHEREOF, I have hereunto

17   subscribed my name, this 5th day of July, 2022.

18

19

20   _____

21   Laura Riley Bridges

22   Notary Number: 200909700079

23   Verbatim Reporter

24

25

```
 1                    CORRECTION SHEET

 2   Deposition of: Dave Conn        Date: 06/29/22

 3   Regarding:    Carlson vs. QualTek

 4   Reporter:     Bridges

 5   _____

 6   Please make all corrections, changes or clarifications

 7   to your testimony on this sheet, showing page and line

 8   number.  If there are no changes, write "none" across

 9   the page.  Sign this sheet on the line provided.

10   Page    Line   Reason for Change

11   _____  _____  _____

12   _____  _____  _____

13   _____  _____  _____

14   _____  _____  _____

15   _____  _____  _____

16   _____  _____  _____

17   _____  _____  _____

18   _____  _____  _____

19   _____  _____  _____

20   _____  _____  _____

21   _____  _____  _____

22   _____  _____  _____

23   _____  _____  _____

24           Signature_____

25                    Dave Conn
```

```
 1                         DECLARATION

 2  Deposition of: Dave Conn           Date: 06/29/22

 3  Regarding:     Carlson vs. QualTek

 4  Reporter:      Bridges

 5  _____

 6

 7  I declare under penalty of perjury the following to

 8  be true:

 9

10  I have read my deposition and the same is true and

11  accurate save and except for any corrections as made

12  by me on the Correction Page herein.

13

14  Signed at _____, _____

15  on the _____ day of _____, 2022.

16

17

18

19

20

21

22

23

24             Signature_____

25                     Dave Conn
```



COURT REPORTING

LEGAL VIDEOGRAPHY

VIDEOCONFERENCING

TRIAL PRESENTATION

MOCK JURY SERVICES

LEGAL TRANSCRIPTION

COPYING AND SCANNING

LANGUAGE INTERPRETERS







(800) 528-3335

NAEGELIUSA.COM

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

LISA CARLSON,
2805 243rd Avenue Northwest
St. Francis, MN 55070

      Plaintiff,

v.                                      CIVIL ACTION
                                        No.: 2:22-cv-00125

QUALTEK, LLC
1150 First Avenue, Suite 600
King of Prussia, PA 19406

      Defendant.
_____

**VIDEOCONFERENCE DEPOSITION OF**

**LAUREN PETZAR**

**TAKEN ON**
**THURSDAY, JUNE 30, 2022**
**4:47 P.M.**

**PENNSYLVANIA**

1                              **APPEARANCES**

2

3   **Appearing on behalf of the Plaintiff:**

4   TIMOTHY M. KOLMAN, ESQUIRE

5   **Kolman Law, P.C.**

6   414 Hulmeville Avenue

7   Penndel, Pennsylvania 19047

8   (844) 537-2529

9   tkolman@kolmanlaw.com

10

11  **Appearing on behalf of the Defendant:**

12  COLIN D. DOUGHERTY, ESQUIRE

13  **FOX ROTHSCHILD, LLP**

14  980 Jolly Road, Suite 110

15  P.O. Box 3001

16  Blue Bell, Pennsylvania 19422-3001

17  (610) 397-6500

18  (610) 397-0450 Fax

19  cdougherty@foxrothschild.com

20

21  **ALSO PRESENT:**

22  Lisa Carlson

23

24

25

```
 1                           INDEX

 2                                              Page

 3

 4   EXAMINATION BY MR. KOLMAN                    5

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                              EXHIBITS

2   Exhibit                                              Page

3                          (NONE MARKED)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

```
 1              VIDEOCONFERENCE DEPOSITION OF

 2                    LAUREN PETZAR

 3                       TAKEN ON

 4              THURSDAY, JUNE 30, 2022

 5                     4:47 P.M.

 6

 7  LAUREN PETZAR, declared her testimony in this matter

 8  is being given under penalty of perjury, was

 9  examined and testified as follows:

10         MR. KOLMAN:  Tim Kolman for the Plaintiff.

11         We agree.

12         MR. DOUGHERTY:  Colin Dougherty for the

13  Defendant.  We agree and I'll stipulate that it is

14  Lauren Petzar.

15         THE REPORTER:  Okay.  And Lauren, do you

16  agree?

17         THE WITNESS:  Lauren Petzar, I agree.

18  EXAMINATION

19  BY MR. KOLMAN:

20     Q.   Good afternoon, Lauren.  I apologize, I

21  apologize to everyone for this snafu.  Hopefully,

22  this won't last long.

23         Lauren, do you know -- do you know Colin

24  Dougherty?  He seems to know you.

25     A.   Yes.
```



1     Q.   And how do you know --

2     A.   I do.

3     Q.   -- how do you know him?

4     A.   From my employment time at QualTek.

5     Q.   Okay.  But you haven't discussed this

6  matter with him, have you?

7     A.   I have not.

8     Q.   Okay.  Let's talk about your -- your

9  employment at QualTek.  When were you employed at

10  QualTek?

11     A.   I was employed for seven years.  I left a

12  year and a half ago.  I can't remember the exact

13  years.

14     Q.   Are you currently employed?

15     A.   I am, yes.

16     Q.   And what do you do and who for?

17     A.   I work for the O'Connor Group and I'm an

18  HR consultant.

19     Q.   Is that a full-time job?

20     A.   It is, yes.

21     Q.   Prior to QualTek, did you work at UniTek?

22     A.   I did not, no.

23     Q.   Where did you work?

24     A.   Where did I work?  I worked at Alpha

25  Systems and then I also worked at another company

1  called Nelson before that.

2      Q.   I'm going to be very specific in my

3  questions.

4      A.   Fine.

5      Q.   Now, at some point did you field a

6  complaint or complaints from Lisa Carlson?

7      A.   I'm -- Lisa and I had conversations over

8  the course of my employment.  I have to tell you a

9  year and a half later, you know, since I left it's

10 so difficult for me to remember specifics at this

11 point, so I can confirm I've had many conversations

12 with Lisa.

13     Q.   Right.  And we don't need you to remember

14 verbatim.  We just want to remember if you can in

15 sum and substance.  For example, did you -- did Lisa

16 ever complain to you that she had been shortchanged

17 on her bonus?

18     A.   Not that I can recall to me specifically.

19     Q.   Did Lisa ever complain to you that she had

20 been discriminated against on the basis of her

21 gender?

22     A.   No, not that I can recall.

23     Q.   Did you ever get any complaint during the

24 time that Lisa was at QualTek about the disparity in

25 pay between females and males?



```
 1      A.   No.

 2      Q.   Did you ever read the complaint in this

 3 matter at all?  The complaint that was in Federal

 4 Court?

 5      A.   No.  Not -- no.  I'm stuttering because I

 6 think I was gone.  I think I wasn't there.

 7      Q.   No, you probably were gone.  I'm just

 8 asking if you had read the complaint.

 9      A.   Oh, no.  No, I didn't, no.

10      Q.   And that complaint would have been filed

11 in Federal Court.

12      A.   No, I didn't read it.

13      Q.   I'm wondering whether you were there when

14 she filed an administrative complaint with the EEOC

15 and the local Minnesota civil rights institution.

16 Do you know anything about that?

17      A.   I don't.

18      Q.   Are you someone who has seen any EEOC

19 complaints filed by any employees during the time

20 that you have been employed?

21      A.   Yes.

22      Q.   Or is that something that never went to

23 you?

24      A.   No, I would have been privy to that

25 information.
```

1      Q.    You were an employee of QualTek before

2   QualTek acquired Velocitel in late 2017, is that

3   correct?

4      A.    Yes, that's correct.

5      Q.    Did you ever have a reason to look at the

6   performance reviews of Lisa Carlson?

7      A.    I mean, I ran the performance review

8   process so I looked at -- I was privy and looked at

9   everyone's.

10     Q.    And these performance reviews, they're not

11  kept in personnel file, are they?

12     A.    They're kept in ADP.

13     Q.    What is an ADP?

14     A.    It's the company HRIS system.

15     Q.    And is that accessible -- would that be

16  accessible by you when you were employed?

17     A.    Yes.

18     Q.    And do you know if during this time there

19  were any employment reviews that QualTek or

20  Velocitel did for Lisa Carlson, if you know?

21     A.    I don't recall specifically but, you know,

22  we did annual evaluations; therefore, I would assume

23  Lisa had one as well.

24     Q.    Did you know Lisa Carlson's title when she

25  worked at QualTek?

```
 1        A.   Well, I don't recall, I'm sorry.

 2        Q.   You were there during the time that Dana

 3   Freedman was there, is that correct?

 4        A.   The name -- I recognize the name.  I don't

 5   know her dates of employment to confirm yes or no.

 6        Q.   With respect to bonuses for a minute, do

 7   you know how bonuses were given or determined?

 8        A.   They were determined above -- that was not

 9   my responsibility to determine them.  So no, my

10   answer is no.

11        Q.   Did you know that Ms. Freedman had

12   designated Lisa Carlson as her successor?

13             MR. DOUGHERTY:  Objection.  Calls for

14   speculation, assume facts not in the record.

15             MR. KOLMAN:  It does because of her --

16   because of Dana Freedman's affidavit.  So I think

17   there's some --

18             MR. DOUGHERTY:  Stand by my objection.

19        Q.   Nonetheless, did you -- do you have any

20   knowledge, let me put it that way, of Dana Freedman

21   designating Lisa Carlson as her successor when she

22   left?

23        A.   No.

24        Q.   Were you in any meetings regarding the --

25   regarding the termination of Lisa Carlson?
```

```
 1        A.    Yes.

 2        Q.    At what meetings were you in?  Was there

 3   more than one?

 4        A.    I specifically recall her termination

 5   meeting.  I was -- I was the HR presence.

 6        Q.    And who else was in that meeting?

 7        A.    Shawn Kemmerer and Lisa.

 8        Q.    And that was the moment that she was

 9   actually terminated, is that correct?

10        A.    To the best of my recollection, yes.

11        Q.    Was there any meeting before that that you

12   attended about the decision to terminate her and the

13   reasons why?

14        A.    Not that I can recall.

15        Q.    Do you know who made the decision to

16   terminate her?

17        A.    There's a multilayer approval process as

18   it relates to terminations.

19        Q.    Does that mean you don't know or does that

20   mean many people were involved?  What does -- what

21   does that answer mean?

22        A.    That would mean that my -- likely my boss

23   -- not likely, my boss, Stephanie Hallman or my boss

24   and Liz Downey would have been part of that

25   decision.  I don't recall who was the -- I guess it
```

1  was Kemmerer, her management would have been part of

2  that decision as well.

3      **Q.   You say that because that's customarily**

4  **what happens, is that correct?**

5      A.   We -- there's a process, you know, no one

6  person can make a termination decision.

7      **Q.   But you don't remember seeing who gave**

8  **what input into her termination, is that correct?**

9      A.   That -- that's correct.

10     **Q.   You were not privy to any meeting, if it**

11 **took place, amongst the people that you just**

12 **described?  Dealing --**

13     A.   I just -- yeah -- go ahead, I'm sorry.

14     **Q.   Dealing with her termination, not her**

15 **actual termination, but dealing with the intent to**

16 **terminate.  I'm asking if you were privy to any team**

17 **meeting in that respect?**

18     A.   No, I understand the question.  It was so

19 long ago at this point.  I just -- I don't -- I just

20 don't recall.  I was privy, you know, to some more

21 senior conversations but I as this particular

22 matter, I honestly just, I can't recall.  I mean,

23 I'm sure there would have been at least one to

24 relay, you know, the okay approval to me.  I would

25 not make the decision alone.

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

1      Q.    Did you ever get a complaint from Ms.

2  Petzar (sic) where she complained that QualTek would

3  not allow her to advance in the company's finance

4  department?

5      A.    Can you just clarify, did you mean Ms.

6  Carlson?

7      Q.    I'm sorry.

8      A.    That's okay.

9      Q.    Yeah, I did.  What did I say?

10      A.    My name.  That's okay, just wanted to

11  clarify.

12      Q.    Yeah, I'm sorry.  Yeah, Ms. Carlson.

13      A.    I'm sorry, could you -- I'm sorry, could

14  you just repeat that question?

15      Q.    On October 10, 2019, do you have any

16  recollection of Lisa Carlson speaking to you in

17  person and stating, among other things, that QualTek

18  would not allow her to advance in the company's

19  finance department?  That's the question.

20      A.    I understand.  I'm thinking.  I just can't

21  recall.  I can't recall our specific conversations

22  at this point in time.  I remember having a

23  conversation with Lisa Carlson.  I believe I was in

24  Minnesota at the time, but I just don't remember the

25  specifics, it's been too long.

1    Q.   And I'm not really asking for the

2  specifics, just the sum and just the substance or

3  topic or subject.

4    A.   I -- I can't say.

5    Q.   Do you recall her stating that as a woman

6  she felt that the management was intentionally not

7  giving her the ability to advance?

8    A.   I don't remember any specific statements

9  about gender.  But again, it's so hard to remember.

10   Q.   Do you recall her stating that QualTek had

11  no issue promoting or hiring males and paying them

12  more and they did not have the same qualifications

13  or experience as Lisa did?

14   A.   I certainly don't remember anything as it

15  relates to differences in pay.  That I can say.  I

16  can't -- I don't know about the gender piece of that

17  question, I can't -- I can't remember.

18   Q.   Do you recall ever telling -- asking her

19  whether she wanted to escalate her complaints to Ms.

20  Trybula?

21   A.   I -- I don't.  Again, it's so hard to

22  remember the specifics, but I absolutely -- that is

23  absolutely something I would have said in a

24  conversation, so you know, generally if there were

25  matters that I felt needed to go above me, then

1  that's absolutely something I would have said.

2      Q.   And let's suppose for a minute that the

3  complaints that I -- that I spoke to you about that

4  you can't recall, if those complaints had been made,

5  is that something that you would escalate or ask

6  whether the complainant, in this case Lisa Carlson,

7  wanted to escalate the matter to Ms. Trybula?

8      A.   Yes.

9      Q.   Do you recall at all that Lisa applied for

10  a director of finance position in November 20 -- in

11  November of 2019?

12     A.   No.  I'm not aware of that but I wasn't --

13  I didn't handle recruitment.

14     Q.   Do you recall the requirement to have a

15  degree and to be able to be physically located in

16  the King of Prussia office as a -- as two necessary

17  conditions of being employed in corporate finance?

18     A.   Well, I'll say yes.  Our headquarters was

19  in King of Prussia, Pennsylvania.  Corporate

20  positions were out of King of Prussia.

21     Q.   I'm talking about corporate finance, do

22  you know anything about that requirement?

23     A.   I mean, I don't remember the job

24  description specifically, but our finance team was

25  out of King of Prussia.

Lauren Petzar   June 30, 2022   NDT Assgn # 58458   Page 16

1    Q.   Do you recall any employees being -- doing

2    their job remotely from the King of Prussia office?

3    Doesn't mean that they weren't in an office, but

4    doing their job remotely from another office?  Was

5    that something that occurred, if you know

6    A.   That I will tell you that's part of the

7    reason I left QualTek because they did not approve

8    remote work even under extreme circumstances.  So

9    maybe a one off here or there I could absolutely

10   recall, but the general answer is no, we did not

11   work remotely even during the pandemic.

12   Q.   So you're saying you left because of that

13   -- that condition, correct?

14   A.   Part of the reason.

15   Q.   Did you ask to be as it were -- I don't

16   mean legally accommodated but accommodated from a, I

17   guess, from a computer standpoint to connect

18   remotely to King of Prussia by working at home?

19   A.   I did not because I knew it wasn't

20   supported.  I didn't even -- I didn't even -- I

21   didn't go there.  But it was more complicated than

22   that.

23   Q.   Did you feel that you could have done your

24   job remotely, at least for part of the time?

25   A.   Hypotheticals are always tough.  I think

```
 1  for maybe a short period, not long-term.
 2      Q.   But you never asked because you felt that
 3  the answer would always be no, you have to be
 4  physically present, is that correct?
 5      A.   We were -- we were physically present five
 6  days a week in King of Prussia.
 7      Q.   Is there any other reason why you left?
 8      A.   Yes.  I was a little tired.
 9      Q.   You were a little tired?
10      A.   I had a -- I had -- I just had a baby and
11  it was a long process and I worked -- we work really
12  hard at QualTek. It's -- there's -- it's not easy.
13  And I left because the office relocated to Blue
14  Bell.  I did not want to commute to Blue Bell, that
15  was far for me.  I had a six-month-old that we spent
16  a lot of time and money for.  We used a surrogate to
17  have him and I just took a leap of faith and, you
18  know, walked away for some time with my son.
19      Q.   Did you get maternity leave?
20      A.   I did, I got two weeks of paid leave and I
21  took FMLA, yes.  Yeah, we had a paid parental leave
22  policy.  I was given two weeks of paid time off that
23  ran concurrently with 12 weeks of FMLA.
24      Q.   Did you ever -- did you get a severance
25  from QualTek?
```

```
 1          MR. DOUGHERTY:  I'm going to object to the
 2   extent that severance is confidential and the
 3   company is certainly not waiving any confidential
 4   right -- confidentiality rights it has and I am not
 5   aware of Ms.
 6          Petzar's severance or confidentiality, so
 7   if it is confidential, I am direct -- I am directing
 8   that the company is not waiving any of its rights
 9   and would therefore say Ms. Petzar, you do not have
10   to answer that.
11       A.   Then I --
12          MR. KOLMAN:  I would -- I would add that
13   actually, Mr. Dougherty doesn't represent you.  He
14   hasn't --
15          MR. DOUGHERTY:  No, I represent the
16   company and the company is a signature to that
17   agreement.
18          MR. KOLMAN:  Well, I think whether or not
19   there is an agreement is not confidential.  The
20   contents may be but the -- whether there is or is
21   not a severance -- I'm not asking how much it was or
22   whether there is a severance agreement, that's not a
23   confidential issue.  So I would ask --
24          MR. DOUGHERTY:  It's also not a relevant
25   one, but that's fine, she can answer that.
```

1        Q.    So if there was a severance and there was

2    a severance agreement?  You can answer if --

3        A.    Am I allowed to answer?

4        Q.    Yes.

5        A.    So no, I did not have a severance

6    agreement.

7        Q.    You have a confidentiality agreement?

8        A.    I don't recall signing one, so not that

9    I'm aware of.

10        Q.    Did you sign any agreement when you left?

11        A.    Oh, when I left?  No, I didn't sign any

12    agreements when I left.

13        Q.    Were you given any money when you left?

14        A.    No, I was not.

15        Q.    Okay.  Have you spoken to anyone about

16    this case?

17        A.    No, I have not.

18        Q.    Do you recall Kayla Lorenzen emailing you

19    about -- actually, not just her by the way, but

20    emailing her about -- emailing you about the fact

21    that women were being paid less than men?  Do you

22    remember her doing that?

23        A.    I remember Kayla.  I remember conversing

24    with Kayla.  I do not remember any communications

25    regarding pay disparity.

1     Q.    Do you remember any complaint by Ms.

2  Lorenzen about gender discrimination?  That's a

3  question.

4     A.    I understand.  I'm thinking.  I'm just

5  trying to think back to my exchanges with Kayla.

6  You know, similar with Lisa, I know we conversed in

7  person and in email, that I know.  I just don't

8  recall anything about gender.  I don't.

9     Q.    And do -- you don't recall anything about

10  Lisa complaining about gender discrimination, is

11  that -- is that correct?

12     A.    I don't.  I don't.

13     Q.    And you don't recall Kayla Lorenzen

14  complaining about race discrimination in that people

15  of color were being paid less than white employees,

16  you recall that?

17     A.    I don't.  I don't recall anything about

18  pay disparity.

19     Q.    Anyway, those issues that I just raised,

20  if you had heard them, would they be in your opinion

21  serious enough to escalate upwards to Stephanie

22  Trybula?

23     A.    Yes.  It would have escalated.

24     Q.    When you escalate a matter to Stephanie

25  Trybula, how do you do that?  Do you do it by a memo

1  or by memorandum or in a meeting?  How is it done?

2       A.   My office is right next to hers and we

3  would -- we would stand up and talk to each other in

4  person a lot of times, for you know, exercise to get

5  up off of our desks just to move a minute and most

6  of our conversations were -- were face-to-face.

7       Q.   Did you receive an email from Ms. Trybula

8  saying I received your escalated complaint on behalf

9  of a particular employee and I'm requesting that you

10 do a following or anything -- anything like that?

11      A.   I don't recall as it relates to Lisa, but

12 if there was an exchange via email, that sounds like

13 something Stephanie would have exchanged.

14      Q.   Stephanie testified that she doesn't

15 necessarily document her team meetings or send

16 emails.  Do you know if that's true?

17      A.   I don't want to --

18           MR. DOUGHERTY:  Objection --

19      A.   -- on Stephanie.

20           MR. DOUGHERTY:  -- not the testimony.

21      Q.   You can answer.  Well, let me put it this

22 way. You were right next to her, correct, your

23 office?

24      A.   Yeah, my office is right next to her.

25      Q.   So if there's a serious discrimination

1  **complaint, do you type it up and give it to her?**

2      A.   I mean, as an HR professional I'm trained

3  to document what I deem as a investigatory, if

4  that's the right word, complaint.  So if there is

5  something of a serious nature, then yes, I'm

6  absolutely going to document that on a piece of

7  paper.

8      **Q.   And where would that be filed, by the way?**

9      A.   We kept a folder with employee relations

10 documents on our drive.

11     **Q.   I'm sorry, you kept a -- how's it**

12 **described?**

13     A.   It was just a file folder on our -- on our

14 HR share drive.

15     **Q.   And how would you access the complaints by**

16 **a particular employee?**

17     A.   So you would go to the employee relations

18 folder and then for example, if there was a folder

19 for Lisa, you would go to Lisa's folder and access

20 it.

21         **MR. KOLMAN:**  I'm asking counsel to access

22 that folder for Lisa Carlson and send me any and all

23 details that are in there regarding her complaint

24 and the complaint of -- well, any complaints by

25 Kayla

 1  Lorenzen.  Please mark that on the record.

 2          MR. DOUGHERTY:  Okay.  I'll be --

 3          THE WITNESS:  Can I -- can I -- go ahead,

 4  Colin.

 5          MR. DOUGHERTY:  Tim, you have it.

 6          MR. KOLMAN:  I have her -- oh, yeah, I

 7  have her written complaints that was provided.

 8          MR. DOUGHERTY:  Yeah.

 9          MR. KOLMAN:  I believe there is -- there

10  is some documentation of written complaints.  Is

11  that all there is?

12          MR. DOUGHERTY:  Yeah.

13      Q.   When was the time that you left, by the

14  way?  What year and what month, do you know?

15      A.   A year and a half ago, so 2020.  December

16  -- it was November or December 2020.  I'm looking

17  that way to look at my calendar.

18          THE WITNESS:  Am I allowed to have a two-

19  minute pause?

20          MR. KOLMAN:  Of course.  Let's take 10

21  minutes so --

22          (THERE WAS AN OFF-THE-RECORD DISCUSSION)

23          (RECESS TAKEN FROM 1:40 P.M. TO 1:43 P.M.)

24  BY MR. KOLMAN:

25      Q.   I'm sorry, you were getting the date.  We

1   were just trying to get the date marked in.

2        A.   Oh, in my answer?

3        Q.   Yeah, your answer.

4        A.   When I left QualTek?

5        Q.   When you left.

6        A.   It was November or December of 2020.  It

7   was six months after my son was born, so it was

8   November or December.

9        Q.   Okay.  In August of -- okay, that's 2020,

10  correct?

11       A.   Yes.

12       Q.   So Lisa made a charge of discrimination

13  back in April of 2020, do you recall reading that

14  charge of discrimination?

15       A.   I -- I don't.

16       Q.   Is that something that would normally come

17  to HR or would it go straight to counsel or

18  something else?

19       A.   I mean, Colin would have been looped in,

20  of course.  So it would have gone to HR and

21  definitely Colin. April might, with my son, April I

22  was like in and out with April because I had to go

23  to Texas so I -- Stephanie -- if something came in

24  Stephanie probably just handled it.

25       Q.   With respect to this -- her complaint,

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

1  **would that get filed in the same place as any**

2  **internal complaints that she made, if you know?**

3      A.   You know, I don't know the answer to that.

4  I know there's like a portal with EEO stuff.  I

5  don't know if we kept it anywhere other than that.

6  That would -- Stephanie would know the answer to

7  that, I think.

8          **MR. KOLMAN:**  I want to be the one to take

9  a 15-minute break, all right?  Let's see what else

10  we have to do, if anything.  All right, guys, I'll

11  see you in 15.

12          **(RECESS TAKEN FROM 5:18 P.M. TO 5:30 P.M.)**

13          **MR. KOLMAN:**  I have no further questions.

14          Thank you.

15          **THE WITNESS:**  Thank you.

16          **MR. DOUGHERTY:**  I have no further -- I

17  have no questions for you, Ms. Petzar.

18          **(SIGNATURE RESERVED)**

19          **(DEPOSITION CONCLUDED AT 5:30 P.M.)**

20

21

22

23

24

25

1    STATE OF NORTH CAROLINA

2    COUNTY OF RUTHERFORD          C E R T I F I C A T E

3

4              I, Laura Riley Bridges, Verbatim Reporter and

5    Notary Public, do hereby certify that LAUREN PETZAR appeared

6    remotely before me and verbally declared under penalty of

7    perjury to tell the truth; that said deposition was taken by

8    me and transcribed by me and that the foregoing pages

9    constitute a verbatim transcript of the testimony of the

10   said LAUREN PETZAR.  I do further certify that the persons

11   were present as stated.

12             I do further certify that I am not of counsel

13   for or in the employment of any parties to this action, nor

14   do I have any interest, financial or otherwise, in the

15   outcome thereof.

16             IN WITNESS WHEREOF, I have hereunto

17   subscribed my name, this 6th day of July, 2022.

18

19

20   _____

21   Laura Riley Bridges

22   Notary Number: 200909700079

23   Verbatim Reporter

24

25

```
 1   Date:      July 6, 2022              Assignment #: 58458

 2   Deponent: Lauren Petzar

 3   Case:      Carlson vs. QualTek

 4

 5   DEPONENT:  It has been requested that you read and sign

 6   your transcript.  This transcript is to be read only by

 7   you.  Please make any corrections necessary on the

 8   Correction Sheet ONLY.  You are to sign the Correction

 9   Sheet where indicated.

10

11   After signing the Correction Sheet, do the following:

12        1.The ORIGINAL executed Correction Sheet needs to be

13          returned to our corporation.

14        2.Forward a COPY of the executed Correction Sheet

15          directly to the attorney(s) listed below.

16        (The address(es) can be found on the Appearance Page

17          of your deposition.)

18        3.Retain a copy for your records.

19

20

21   CC:  Naegeli Deposition & Trial

22        Timothy Kolman, Esquire

23        Colin Dougherty, Esquire

24

25
```

```
 1              CORRECTION SHEET

 2 Deposition of: Lauren Petzar        Date: 06/30/22

 3 Regarding:    Carlson vs. QualTek

 4 Reporter:     Bridges

 5 _____

 6 Please make all corrections, changes or clarifications

 7 to your testimony on this sheet, showing page and line

 8 number.  If there are no changes, write "none" across

 9 the page.  Sign this sheet on the line provided.

10 Page    Line   Reason for Change

11 _____  _____  _____

12 _____  _____  _____

13 _____  _____  _____

14 _____  _____  _____

15 _____  _____  _____

16 _____  _____  _____

17 _____  _____  _____

18 _____  _____  _____

19 _____  _____  _____

20 _____  _____  _____

21 _____  _____  _____

22 _____  _____  _____

23 _____  _____  _____

24              Signature_____

25                   Lauren Petzar
```

```
 1                        DECLARATION
 2   Deposition of: Lauren Petzar          Date: 06/30/22
 3   Regarding:     Carlson vs. QualTek
 4   Reporter:      Bridges
 5   _____
 6
 7   I declare under penalty of perjury the following to
 8   be true:
 9
10   I have read my deposition and the same is true and
11   accurate save and except for any corrections as made
12   by me on the Correction Page herein.
13
14   Signed at _____, _____
15   on the _____ day of _____, 2022.
16
17
18
19
20
21
22
23
24              Signature_____
25                        Lauren Petzar
```

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COURT REPORTING

LEGAL VIDEOGRAPHY

VIDEOCONFERENCING

TRIAL PRESENTATION

MOCK JURY SERVICES

LEGAL TRANSCRIPTION

COPYING AND SCANNING

LANGUAGE INTERPRETERS

LISA CARLSON,
2805 243rd Avenue Northwest
St. Francis, MN 55070

      Plaintiff,

v.                              CIVIL ACTION
                              No.: 2:22-cv-00125

QUALTEK, LLC
1150 First Avenue, Suite 600
King of Prussia, PA 19406

      Defendant.
_____







(800) 528-3335

NAEGELIUSA.COM

VIDEOCONFERENCE DEPOSITION OF

SHAWN KEMMERER

TAKEN ON
THURSDAY, JUNE 30, 2022
12:45 P.M.

PENNSYLVANIA

```
 1                          APPEARANCES

 2

 3   Appearing on behalf of the Plaintiff:

 4   TIMOTHY M. KOLMAN, ESQUIRE

 5   Kolman Law, P.C.

 6   414 Hulmeville Avenue

 7   Penndel, Pennsylvania 19047

 8   (844) 537-2529

 9   tkolman@kolmanlaw.com

10

11   Appearing on behalf of the Defendant:

12   COLIN D. DOUGHERTY, ESQUIRE

13   FOX ROTHSCHILD, LLP

14   980 Jolly Road, Suite 110

15   P.O. Box 3001

16   Blue Bell, Pennsylvania 19422-3001

17   (610) 397-6500

18   (610) 397-0450 Fax

19   cdougherty@foxrothschild.com

20

21   ALSO PRESENT:

22   Lisa Carlson

23   Elizabeth Downey

24

25
```

```
 1                          INDEX

 2                                                  Page

 3

 4  EXAMINATION BY MR. KOLMAN                         5

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          EXHIBITS

2    Exhibit                                        Page

3                        (NONE MARKED)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NAEGELI
DEPOSITION & TRIAL

CELEBRATING
40
YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

```
 1              VIDEOCONFERENCE DEPOSITION OF

 2                    SHAWN KEMMERER

 3                       TAKEN ON

 4              THURSDAY, JUNE 30, 2022

 5                     12:45 P.M.

 6

 7  SHAWN KEMMERER, declared his testimony in this

 8  matter is being given under penalty of perjury, was

 9  examined and testified as follows:

10         MR. KOLMAN:  Tim Kolman for the Plaintiff.

11         We consent and agree.

12         MR. DOUGHERTY:  Yes, Colin Dougherty for

13  the

14  Defendant and I agree.

15         THE REPORTER:  And Mr. Kemmerer, if you

16  can just --

17         THE WITNESS:  Shawn Kemmerer and I agree.

18  EXAMINATION

19  BY MR. KOLMAN:

20     Q.   Good afternoon, Mr. Kemmerer.  Thank you

21  for coming today.  You are here pursuant to a

22  subpoena, is that correct?

23     A.   Yes.

24     Q.   And it's true that you and I haven't

25  spoken before you came today into the office, is
```



1  that the case?

2      A.    That's true.

3      Q.    And apart from just the normal niceties of

4  hospitality, we haven't spoken about this matter

5  together prior to this deposition, is that correct?

6      A.    That's true.

7      Q.    So I'm going to ask a few questions today.

8  I know that you're not represented by counsel.

9  Just, if you wouldn't mind just listen to my

10  question, let me finish my question and then if you

11  don't hear it or don't understand it, let me know,

12  I'll be pleased to rephrase it.   And if I

13  inadvertently interrupt you, please let me know so

14  you can finish your answer completely.   Is that

15  fair?

16      A.    Yes.

17      Q.    Have you ever been deposed before?

18      A.    No.

19      Q.    I would just ask that you articulate your

20  answers as you're doing, as opposed to shake of the

21  head or nod of the head, which normally in

22  conversation would be understood, but in this case

23  would not be reflected clearly in the record.   So

24  presumably you have no problem with that. And I will

25  just try to move this along.   I'm sure Mr. Dougherty

1  may have some questions, so let me begin.

2          Is it my understanding that you used to

3  work for QualTek?

4      A.   That's correct.

5      Q.   And how long did you work for QualTek?

6      A.   Just under nine years.

7      Q.   Now, when you say nine years, did you ever

8  work for Velocitel?

9      A.   No.

10     Q.   And when you first came to QualTek, what

11  was your position?

12     A.   Financial analyst.

13     Q.   Can you tell me a little bit about what a

14  financial analyst does, or at least what you did

15  while at QualTek?

16     A.   Sure.  So in the beginning when I came on

17  as a financial analyst, my primary duties were

18  specifically around financial reporting and in the

19  very beginning, more specifically around the

20  accounts payable process, processing vendor

21  invoices, ensuring that they were accurate and

22  should be approved for payment, kind of designing a

23  process around that.  But then ultimately leading

24  into weekly, monthly financial reporting for all of

25  our ongoing projects, which at the time was quite

 1  small.  I was brought on to QualTek in its infancy.

 2      Q.   And did your job description change

 3  throughout the nine years?

 4      A.   Yes.

 5      Q.   And can you tell us how it changed?

 6      A.   Yeah, so the second year I was promoted to

 7  finance manager.  We had hired maybe one or two

 8  financial analysts that would report to me through

 9  that next year.  You know, I was largely training

10  them to do what I had done in the beginning of my

11  tenure there, but then also managing them and kind

12  of working a little more closely with our field

13  market operations personnel.

14          So I was the finance manager for a few

15  years.  Ultimately, there were -- there was some

16  turnover in my superiors.  My director had left.  I

17  assumed some of those responsibilities and I think

18  within the next year or two I was promoted to

19  Director of Finance.

20      Q.   And was that prior to the acquisition of

21  Velocitel?

22      A.   It was.

23      Q.   And in what year was -- and this may be a

24  hard question, let me put it this way.  Was any due

25  diligence done by QualTek prior to the acquisition

1  of Velocitel?

2      A.   Yes.

3      Q.   And what kind of due diligence was that,

4  broadly speaking?

5      A.   I can tell you what I was privy to, and

6  that was largely some financial reviews.  Looking at

7  some of their customer information, revenues, costs,

8  project financials, ultimately helping understanding

9  what we were acquiring that would go on our opening

10 balance sheet.  So largely financial.

11     Q.   And how long did this due diligence take,

12 at least for you?

13     A.   A few months.

14     Q.   And about what time frame was that?

15     A.   Mid 2017 till like mid -- like summer to

16 fall of 2017, I believe.

17     Q.   And did that require you to be in -- I

18 don't know if Velocitel has an office, but did that

19 require you to look directly at Velocitel's

20 financial information?

21     A.   Yes.

22     Q.   And in respect of that, did you work with

23 Lisa Carlson for any of those activities?

24     A.   Not directly, no.

25     Q.   When was the actual acquisition, if you



1  can recall?

2      A.   I can't.  I believe it was 2017 sometime.

3      Q.   And after that -- after the acquisition,

4  did you continue in your position as Director of

5  Finance?

6      A.   I did.

7      Q.   And once Velocitel was acquired, did you

8  need to be involved in any duties that you had not

9  been involved in before in order to smooth the

10  acquisition of Velocitel into QualTek?

11      A.   I would say yes.

12      Q.   And can you briefly describe what was

13  required -- what was required by you in terms of --

14  in terms of that integration.

15      A.   Sure.  So you know, QualTek has their way

16  of managing financial reporting, both at a project

17  level, a market level, a corporate level.  And you

18  know, the goal was to acclimatize the legacy

19  Velocitel processes, people and systems into the

20  QualTek way of doing things, so to speak.

21          The Velocitel business was split up into

22  kind of two major pieces.  You have their major

23  client, which was AT&T and then you had kind of

24  every other client, non-AT&T.  QualTek and what I was

25  involved to prior to the Velocitel acquisition was

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

1  heavily based on the client AT&T.  So my goal was to

2  help bring again, a lot of the Velocitel financial

3  reporting into the same lines of what I'd been used

4  to and have reported on previously, you know, with

5  the legacy QualTek markets.

6      Q.   And in respect of the major client AT&T,

7  and that integration, did you -- was Lisa Carlson

8  involved in any way in assisting in respect of that

9  conversion?

10     A.   Yes.

11     Q.   And can you tell us how she was involved?

12     A.   Sure.

13     Q.   Go ahead.

14     A.   So she -- she brought a lot of financial

15  analytical Excel skills to the table when it comes

16  to what is required for the reporting that I've been

17  talking about. So I showed Lisa many of the things

18  that I would do in kind of hopes to kind of train

19  her in a way to do those same things using her

20  legacy knowledge of the Velocitel business to kind

21  of bring those -- those processes and systems up to,

22  you know, the QualTek way of doing things.

23     Q.   And over what period of time did this

24  training occur if you can recall, approximately?

25     A.   So this would be 2017, late 2017, 2018, I

1  imagine. But I can't say for sure.

2      Q.   Do you recall actually becoming her boss

3  in August of 2018 or thereabouts?

4      A.   Yes.

5      Q.   And in respect of being her boss, did that

6  mean she directly reported to you?

7      A.   Yes.

8      Q.   And did that mean also that you -- you

9  reviewed her performance?

10     A.   Yes.

11     Q.   Did you, in fact, review her performance

12 from August 2018 onwards?

13     A.   Yes.

14     Q.   And did you review that performance in any

15 document?

16     A.   Yes.

17     Q.   And do you recall the nature of the

18 document?

19     A.   So yeah, QualTek has an annual performance

20 measurement process through a web portal that has, I

21 believe 10 or 11 specific attributes that are asked

22 to be expounded upon for specifically for each

23 employee if they had -- the given measurement

24 period.

25     Q.   And can you recall what those, and you may

1   not recall all of them, but as many as you can

2   recall, the 10 or 11 attributes that you had to

3   judge Lisa on in respect of her review?

4       A.   I will try.

5       Q.   Do the best you can.  Take your time.

6       A.   So ethics.  I believe like customer

7   integrity, ethics.  There's a series of performance-

8   based ones, relationship-building.  She was a

9   manager at the time, so there was some managerial

10  notes, you know, how well she can develop and train

11  and supervise people.  How results- oriented the

12  employee is.  That's -- that's about as good as I

13  think I'm going to get.

14      Q.   That's fine.  And do you recall what kind

15  of annual performance you gave her?  Or let me ask

16  you this, at what point did you give her a

17  performance review given that you became her boss

18  around August of 2018, if you can recall?

19      A.   So the performance periods, the review

20  periods usually began for QualTek in September-

21  October time frame. Because it was so recent that I

22  had kind of brought Lisa on to my team, I don't

23  recall if or how I ultimately had given her that

24  review for that one.  But I know I fully did provide

25  one the following year.

1      Q.   And the following year would be 2019?

2      A.   Right.

3      Q.   And what, if you can remember, was the

4  content of the annual performance review done by

5  you?

6      A.   Sure.  So generally very positive.  You

7  know, Lisa was very detail-oriented.  She was always

8  a person that would work as many hours as she needed

9  to to complete a task.  You know, she brought some

10 soft skill like Excel skills to the table that were

11 even beyond me in some instances, and I consider

12 myself pretty highly skilled in Microsoft Excel.  So

13 I was very complimentary in the fact that she was

14 able to help set up and perform a lot of those

15 duties that we had talked about in terms of the way

16 QualTek had set up financial reporting.

17     Q.   At the point that you gave her that

18 review, how integrated was the Velocitel style of

19 financial reporting? How integrated had it become

20 into QualTek?

21     A.   For again, the pieces that I was more

22 focused on by August of 2018 through the end of

23 2018, I can't recall, but I can tell you by the time

24 2019 it was largely integrated to the point where

25 Lisa was mostly just -- there wasn't a lot of -- a

1  lot to do on an integration standpoint, it was just

2  maintaining.

3      Q.   And after that, what was Lisa's job

4  duties?  What were her job duties, if you can

5  recall?

6      A.   Sure.  So project level financial

7  reporting across the markets in which she was

8  designated and that was weekly, monthly reporting

9  resulting in journal entries for accounting

10 purposes, monthly reporting up through corporate

11 for, you know, F&Os which are monthly kind of

12 executive level financial and operational meetings.

13 And then managing a small team to support her in

14 those efforts.

15     Q.   Did you ever give her more than one

16 evaluation while you were there?

17     A.   Again, I can't recall for 2018, but I know

18 I did for 2019.

19     Q.   And during the time after her evaluation,

20 did you find that her skill set and everything that

21 you'd mentioned in the annual performance review

22 continued in terms of her attributes?

23     A.   Yes.

24     Q.   Would it be fair to say that she had

25 become an employee of QualTek in the sense that now

1 she was functioning within the QualTek environment

2 of financial reporting?

3     A.   My opinion, yes.

4     Q.   And what other -- who else reported to you

5 in terms of being director of finance apart from

6 Lisa?

7     A.   I had two to three financial analysts.

8 There was a gentleman names James Champion, a

9 gentleman named Dorian Dheskali, a gentleman named

10 Zachary Van Loon, those were three analyst-level

11 employees that had reported to me.  And then I had

12 also, I believe in 2018 had hired a finance manager

13 named Benjamin Sydnes and at the time I may have

14 still had two other folks that weren't in the Blue

15 Bell, King of Prussia area named Kevin Bettencourt

16 and Amanda Silino, who did a lot of operational

17 level financial duties.

18     Q.   Even though these individuals were not in

19 the King of Prussia office, did they -- did they do

20 much of their work from a remote location?

21     A.   I'll say no from the standpoint of it was

22 from an office location owned or leased by the

23 company, not from their homes, like a work-from-home

24 situation, no.

25     Q.   And those office locations, were where, do

1  you know?

2      A.   Syracuse, New York.  Amanda Silino had

3  worked in Syracuse, New York and Billerica,

4  Massachusetts, Kevin Bettencourt worked in

5  Massachusetts.

6      Q.   Do you know if Velocitel had an office in

7  Minnesota?

8      A.   I do and they did.

9      Q.   They had an office in Minnesota?

10     A.   Yes.

11     Q.   And that would be an office not -- similar

12  to the one at Syracuse and in Massachusetts?

13     A.   That's correct.  That's correct.

14     Q.   With respect to the contract with AT&T,

15  was Lisa involved with that contract?

16     A.   In terms of QualTek's financial reporting

17  and processes internally around that, yes.

18     Q.   And how important was -- if you know, was

19  the client AT&T to QualTek?

20     A.   Paramount.

21     Q.   And why was it paramount?

22     A.   They comprised at a minimum 60 percent of

23  the wireless revenues, which is, you know, my area,

24  throughout the entirety of my employment there.

25  They were the number one customer as long as I was

1  there to my knowledge.

2  **Q.   Do you have a focus on the amount of money**

3  **that was in revenue?**

4  A.   Over what period?

5  **Q.   Over an annual period.**

6  A.   I mean, it again, varied largely from 2014

7  up through 2022.  I know in the very early years

8  before we had acquired Velocitel, it was maybe $17

9  million in 2013.  And I know in 2022 it was well

10  over 200 million when I had departed.

11  **Q.   And could you just describe if you know,**

12  **what exactly Lisa did or was doing with the AT&T --**

13  **with the contract with AT&T turf.**

14  A.   So it really goes to a lot of what I was

15  saying earlier.  Everything that I was working

16  closely with Lisa on was AT&T.  You know, a lot of

17  the non-AT&T stuff was given to other folks within

18  the company and our focus was the AT&T side.  So

19  yeah, everything I had mentioned earlier is what

20  Lisa was working on for AT&T.  I can go through it

21  again, if you'd like.

22  **Q.   That's -- that's fine.  Did you rely on**

23  **Lisa in respect of the contract with AT&T?**

24  A.   For the portions that she was responsible

25  for, yes.

 1      Q.   Okay.  And in respect of those portions,

 2   **was there a way of determining how successful she**

 3   **was by looking at financial reports on a monthly**

 4   **basis or was there some other way in which you could**

 5   **determine whether she was or was not successful in**

 6   **dealing with the contract?**

 7      A.   Sure.  I would say Lisa's responsibility

 8   wasn't necessarily on the performance but more or

 9   less the reporting and being able to provide insight

10   into the performance.  You know, that was our roles

11   as analysts and managers and directors of finance.

12   And while I probably had more of the role in kind of

13   working closely with the executives in that type of

14   reporting, there was also feedback and discussions

15   and meetings that were held by Lisa to discuss

16   performance.  But to measure her success would be to

17   ensure that those reports and forms that we require

18   to be sent weekly, monthly are done on time and Lisa

19   was effective at that.

20      Q.   **When you say insights into the**

21   **performance, can you expand a little bit on what**

22   **insights you're referring to?**

23      A.   Sure.  So when -- when we talk about the

24   financial reporting that the finance team provides,

25   it's largely based off of a full profit and loss

1  statement for a market level. I think Lisa at the

2  time had four major markets that she was responsible

3  for and each one of those had a full profit and loss

4  that we managed from a budget, an actual, a

5  trending, all -- all manners of financial reporting

6  over periods of time. So to be able to create and

7  distribute those is one thing, but it's another to

8  be able to intelligently and effectively communicate

9  what those results mean and understand potential

10  ways to improve them. So between those two things

11  that was what was kind of required of her.

12      Q.   Intelligently communicating what they

13  meant, did she ever memorialize or require to

14  memorialize any of those analyses?

15      A.   Not in any routine fashion, no.

16      Q.   But in terms of a team meeting or meeting

17  with her, did she give her input as to what her take

18  was on -- on what they meant?

19      A.   Trying to think of any specific examples.

20  It was -- it was less of a focus at least for me and

21  what I was looking for, but that's not to say that

22  she didn't.

23      Q.   Now, you indicated earlier in your

24  testimony that you had hired a number of people and

25  you gave their names and I obviously have them. At

1    **some point was Bruce Neff hired to do more or less**

2    **the same job as Lisa, although he was non-turf?**

3         A.   My understanding of what Bruce was

4    initially brought on for was a lot of our system

5    implementation needs at the time.  You know, we had

6    acquired Velocitel, we had talked about trying to do

7    more things with the Oracle platform and I had

8    worked directly with Bruce previously with some of

9    those specific types of needs.  So initially that

10   was the reason to bring Bruce on.  I think once he

11   had come on, it kind of quickly switched to there's

12   a lot of things that Velocitel needs; he also had a

13   skill set with some of the financial reporting needs

14   that we had for the non-AT&T part of the business.

15   So I think it had moved that way.

16        **Q.   Did you now Bruce from UniTek?**

17        A.   I did.

18        **Q.   And did you discuss with Bruce before he**

19   **came on board that there was an opening for him**

20   **possibly or that wasn't you?**

21        A.   No, Bruce actually had reached out to me

22   through LinkedIn at the time.  I think he had saw

23   that there was an opening accounting position and,

24   you know, I had engaged in conversation with him

25   just about what we've had going on, you know, not in

1  any formalized manner.  But again, I think it

2  ultimately came up where there was some finance

3  roles that opened up because of, again, the system

4  needs and kind of the process needs that was a good

5  fit for him ultimately.

6      Q.   When he came on board, would it be fair to

7  say that he was dealing with the non-turf portion

8  and Lisa was still dealing with the turf portion of

9  the -- of the Velocitel wireless revenue?

10     A.   Yes.

11     Q.   And is it true that the turf portion was

12 around 80 or 90 percent of revenue at that time and

13 the non-turf revenue was the remainder?

14     A.   To my recollection, yes, that sounds about

15 right.

16     Q.   How long -- do you remember when Bruce

17 came on board?

18     A.   I'm sorry, I can't recall specifically the

19 time frame.

20     Q.   When Bruce handled unbills, did Lisa

21 calculate it for AT&T turf and send it to Bruce and

22 Bruce consolidated it once a month?

23     A.   Yes.

24     Q.   Now, was there a time that Lisa complained

25 about her title to you and said that her bonus was

 1  incorrect in the system?

 2       A.   Title, I can't say, but bonus, yes.

 3       Q.   **And can you tell us how that came about?**

 4       A.   I believe there was -- so part of --

 5  before I had taken on Lisa as part of my team I know

 6  there was discussions about a potential promotion,

 7  which included a change in salary that I was not

 8  privy to.  I just knew that it was something that

 9  was ongoing.  So in regards to Lisa's title, that

10  wasn't something I had very close involvement with

11  -- with that potential, you know, potential

12  promotion.  But for the bonus, I believe at one

13  point, it was shown or I had seen kind of the piece

14  of the change that was approved and I know her bonus

15  potential, which is always discretionary for

16  QualTek, had changed.  That change was approved.

17       Q.   **Had it changed upwards or downwards?**

18       A.   Upwards.

19       Q.   **Okay.  Do you recall -- just to interrupt**

20  **briefly, had it changed from 5,000 to 20,000?**

21       A.   Exactly, yes.

22       Q.   **Okay.  Go on.  Do you know who changed it,**

23  **by the way?**

24       A.   That I do not know.

25       Q.   **Okay.  Go on.**

1       A.   That's basically it.  So I knew that it

2  had happened but I had only known it had happened

3  once Lisa informed me.  Because again, a lot of

4  those conversations happened before I technically

5  took her over as an employee, or where the

6  discussions happened before then.

7       Q.   **And with respect to the bonus being**

8  **incorrect, what complaint, if any, did Lisa make to**

9  **you?**

10      A.   Sure.  So there was a discretionary bonus

11 that was made on QualTek's behalf and I do not

12 recall why.  I don't know, I don't think it was

13 performance-based but I don't think it's for me to

14 say at this point.  But it was, to my knowledge it

15 was to be based off of some percentage of the annual

16 bonus potential.  That was my understanding, that

17 was Lisa's understanding, but that doesn't

18 necessarily mean that that was correct because it

19 wasn't ever told specifically to us that way.

20      Q.   **Did you know what the percentage bonus**

21 **potential was?**

22      A.   No.

23      Q.   **Do you know how QualTek was doing at the**

24 **time from a financial standpoint?  Broadly speaking.**

25      A.   I mean --

1    Q.    Let me put it this way, was QualTek doing

2  so badly that it was a stretch for them to even pay

3  bonuses?

4    A.    In my opinion, no.

5    Q.    Did you receive a bonus during that time?

6    A.    I did.

7    Q.    And was that bonus consistent with your

8  understanding of what you would get if you had

9  performed well?

10   A.    No.  Again, I don't think it was

11 necessarily related to any specific performance

12 metrics.  And that was kind of the -- just the whole

13 shroud around that bonus payment was, it wasn't very

14 clearly defined how it was calculated, what it was

15 for.  So I was just happy to get something.

16   Q.    Did -- did you bring the issue of Lisa's

17 discontent with her bonus to anyone at QualTek?

18   A.    Yes.

19   Q.    And who did you bring it to?

20   A.    I believe I spoke with Dave Conn and Stef

21 Trybula about that.

22   Q.    And can you recall just broadly what you

23 told them?

24   A.    That the bonus amount, which you know, I'm

25 privy to the financial and salary and bonus

1  information for many employees within the wireless

2  piece, including mine, including Lisa.  I -- that --

3  so I had mentioned Lisa had an understanding that

4  her annual bonus amount as defined in ADP, which

5  holds that information, was incorrect.  I took her

6  at her word and brought that up.  Again, I didn't

7  know at the time if it had changed or if it was

8  approved, I only know what the ADP was telling me.

9        But yeah, I had mentioned that to them and

10  I think it was acknowledged that okay, yeah, there

11  was a change that was not accurately reflected in

12  ADP at that time.

13    Q.   When they said a change that was not

14  adequately reflected, was that the change to

15  $20,000?

16    A.   Yes.

17    Q.   And so who acknowledged that?

18    A.   I believe it was, again, in -- I don't

19  think there's anything in writing, but it's at least

20  between Dave Conn and Stephanie Trybula.  I think

21  they both acknowledged that, yes, it should have

22  been changed.

23    Q.   And having acknowledged it, do you know if

24  they went -- if they did anything to correct what

25  appeared then to be a discrepancy?

1        A.    I don't recall.

2        Q.    Did they tell you, and they may not have,

3   what they might or might not do in respect of

4   putting it right?

5        A.    No.

6        Q.    With regard to the way bonuses were paid

7   at that time, were they split so that there was a

8   bonus, I believe it may have been in November or

9   September and then one six months later?

10       A.    Yes.

11       Q.    And is that the way QualTek always paid

12   their bonuses?  Well, in your experience.

13       A.    No.

14       Q.    Was your bonus split half and half?

15       A.    Yes.

16       Q.    Did you circle back to Lisa and tell her

17   that you had escalated her complaint to Dave Conn

18   and Stephanie Trybula?

19       A.    I believe I did.

20       Q.    And at some point later on, did she inform

21   you that there was still a problem with her bonus?

22       A.    Yes.

23       Q.    And do you remember how long after it was?

24       A.    I'm sorry, I do not.

25       Q.    Do you recall what she said in sum and

1   **substance?**

2        A.   What Lisa had said?

3        **Q.   Yes.   To you a second time.**

4        A.   Just that the facts of it still wasn't

5   apparent in the system and therefore the bonus that

6   she thought she should have been entitled to was

7   never corrected.

8        **Q.   And at that point, did you advocate on her**

9   **behalf again?**

10       A.   Yeah.

11       **Q.   And just tell us what you did.**

12       A.   I believe I put -- I sent an email to

13   Stephanie just kind of explaining that again, that

14   the issue -- I didn't see the change in the system.

15   In talking with Lisa, she also doesn't see it.   It's

16   just a matter of, you know, is there something

17   that's going to be updated in the system, because it

18   was my understanding that any kind of bonus that was

19   calculated to be paid out was discretionary in

20   nature and whatever her total amount or total

21   expected amount was, that, you know, may or may not

22   have been different from what ADP was showing was

23   not necessarily relevant for that calculation.

24       **Q.   Do you understand that the first time you**

25   **complained there was an acknowledgment that her**

1  bonus should have been $20,000?

2      A.   Yes.

3      Q.   And the second time, who did you talk to

4  in respect of the fact that it had not been

5  corrected?

6      A.   I believe Stef, Stephanie.

7      Q.   And did Stephanie respond to what you were

8  saying?

9      A.   I don't recall in any -- I mean, I know

10  there was an acknowledgment that it was initially

11  incorrect.

12      Q.   Was there an acknowledgment that it was

13  still incorrect the second time?

14      A.   Yes.

15      Q.   Was there a statement by her or by someone

16  else that they would attempt to correct it in the

17  system?

18      A.   Verbally, yes.

19      Q.   Do you know what's involved with -- and

20  you may not, of what's involved with correcting it

21  in the system? Is that a difficult thing to do, if

22  you know?

23      A.   I am not involved and I would not know.

24      Q.   Following the second time that you

25  advocated or complained on her behalf, was there a

 1  **third time that she came to you at all to tell you**

 2  **that the matter had not been resolved?**

 3      A.   I can't recall.

 4      **Q.   Did you have any understanding as to why**

 5  **her bonus potentially was $20,000 and not $5,000?**

 6      A.   I believe it was an acknowledgment that

 7  her duties had increased and changed over time from

 8  when they initially brought her on and she's -- she

 9  was effectively running, you know, or managing

10  again, a small team to perform the duties that had

11  been outlined for her to do.  But again, a lot of

12  those conversations kind of came about before I took

13  her on as an employee and would have been more

14  specific with regards to the folks involved in that

15  before me.

16      **Q.   Do you know if, and you may not know, if**

17  **she was ever -- if she was ever put forward for**

18  **promotion to a director?**

19      A.   I knew that there was an attempt, yes.

20      **Q.   And you know that intent from where?**

21      A.   Discussions.

22      **Q.   And can you tell us who you discussed this**

23  **with or who they discussed it with you?**

24      A.   Dave Conn, Adam Spittler, Mike Machini,

25  those are three names that I would have talked to on

1   a daily basis as those things were happening.

2        **Q.   And can you give us an approximate time**

3   **frame for that when that occurred, or maybe it was**

4   **ongoing?**

5        A.   It was.  It was, because I knew it was

6   something where just the general management of that

7   team because I believe at the time Adam Spittler,

8   who was the president of Velocitel was moving into a

9   more corporate sourcing type role and finance, in

10  general, was kind of going through a bit of a shake-

11  up.  So it would have been ongoing.

12       **Q.   Was there ever a discussion at that time**

13  **that Lisa Carlson could not be a director?**

14       A.   Yes.

15       **Q.   And what discussion was that and with**

16  **whom?**

17       A.   So a lot of the discussions I had weren't

18  direct kind of one-on-one communications.  These

19  were kind of more group discussions with the likes

20  of like Dave Conn, Mike Machini.  But the context of

21  those discussions was effectively that there was a

22  greater push to move finance into the corporate

23  location at King of Prussia.  It's definitely a big

24  concern and a focus of executive management of

25  finance and the reporting that that team provides.

 1  You know, even when we look to higher analysts, it's

 2  always making sure that they can report through that

 3  office to have that visibility that, you know,

 4  anyone from the senior management could come by, an

 5  analyst at any point in time and ask about questions

 6  specific to markets they may be discussing.  So

 7  remote corporate finance employees is generally not

 8  a thing that QualTek promotes.

 9       **Q.   Would there be any -- do you know how**

10  **QualTek managed its employees during Covid?**

11       A.   Yes.

12       **Q.   And how did they do that?  Did they have**

13  **everyone still come in?**

14       A.   Yes.

15       **Q.   But they had them come in on a flex basis,**

16  **is that correct?**

17       A.   For a period of time, yes.

18       **Q.   And so that meant that some came in at one**

19  **time and others came in at another time?**

20       A.   Yes.

21       **Q.   In respect of the issue you raised, which**

22  **was visibility and the ability to respond to at any**

23  **particular time to any question, is there any reason**

24  **why Lisa, being as it were, remote from King of**

25  **Prussia could not have responded in much the same**

1  way that she would have responded had she been in

2  the King of Prussia office?

3       A.   Can you ask that again?

4       Q.   Yes.  I'm sorry.  My question is, I

5  understand that there was a push.  Do you know why

6  there was a push at that time to have the focus of

7  financing in the King of Prussia office?

8       A.   Yeah.  Like I mentioned, finance -- the

9  finance organization within QualTek was going

10 through a bit of a mix-up, you know, with Adam

11 Spittler kind of moving out of operations back into

12 more of a senior leadership strategic role and kind

13 of between Dave Conn and Mike Machini trying to kind

14 of get in and understand a lot more of finance and

15 to making sure that they had people where they

16 wanted them to ultimately support their

17 organizations.

18      Q.   Had there ever been a case where the fact

19 that Lisa Carlson was not in the King of Prussia

20 office, was there ever a case where that was deemed

21 a significant disadvantage in respect of doing her

22 job?

23      A.   To me, no.

24      Q.   Did she continue to perform at the level

25 she had performed even though she was not directly


NAEGELI
DEPOSITION & TRIAL
(800) 528-3335
NAEGELIUSA.COM

1  in the King of Prussia office?

2      A.   Yes.

3      Q.   Would there be any reason that you would

4  know of why she could not continue to perform at the

5  level she was performing if she had remained in

6  Minnesota?

7      A.   My opinion?

8      Q.   Yes.

9      A.   No.  No reason.

10     Q.   In respect of the group discussions

11  regarding her possible directorship, was there, in

12  terms of her work anyway, a general consensus that

13  she was qualified to be a director by virtue of her

14  various skills, many of which you've outlined but,

15  in particular, the fact that she was managing a

16  small team and she was working fully and completely

17  as a QualTek employee with respect to the most

18  important client, AT&T?

19          MR. DOUGHERTY:   Objection to form.

20     Q.   You can answer.  I'm just protecting the

21  record.

22     A.   So for -- there was two primary -- well,

23  the move from a manager to a director is a

24  significant one in a sense where there's a lot more

25  focus on ensuring effective communications upwards,

1  and that's directly with operational executives.  So

2  knowing that Lisa is a very skilled analyst and has

3  very strong skills with data manipulation and

4  analytical type duties, she's very, very qualified

5  to do that -- that work.  When it comes to

6  directors, I know QualTek has very specific

7  requirements, both educational and, you know, that

8  communication level where Lisa may not have had the

9  requisite skill set.

10     **Q.   But when you say education, are you**

11  **talking about the necessity for a degree?**

12     A.   Yes.

13     **Q.   And was that degree required to be in some**

14  **area of finance or was it just a degree?**

15     A.   I believe it was accounting or finance,

16  but I can't say for sure.

17     **Q.   And in Lisa's case at least, do you know**

18  **whether a degree in accounting or finance would have**

19  **-- and this is a bit speculative, but let me put it**

20  **this way, did you notice any reduction in the**

21  **quality of Lisa's work by virtue of her not having**

22  **an accounting or finance degree?**

23     A.   No.  In what she was required to do, no.

24     **Q.   In respect of the issue of communications,**

25  **you were referring -- were you referring to a degree**



1  **or were you referring to a degree in something else?**

2      A.    No, not necessarily a degree, but more or

3  less just active communication relationship-building

4  within the organization.  And I mention that because

5  I know specifically in the beginning once Lisa was

6  managing some of her own market level calls, I know

7  that there were executives on those calls and, you

8  know, I think Lisa at one point made a bad

9  impression one way or the other and ultimately that

10  is part of why I think she was kind of seen as

11  someone who can't necessarily effectively perform

12  that level of directors.

13      Q.    **Do you know if they ever, if QualTek ever**

14  **told her that?**

15      A.    I don't.

16      Q.    **Do you know if what you just described was**

17  **ever put into writing and put in her personnel file**

18  **or just put into writing somewhere?**

19      A.    I don't recall.

20      Q.    **Why was Lisa not given a chance to know**

21  **that this was an area that she required to possibly**

22  **improve on before she could get a directorship?**

23      A.    I think maybe that might have been on me

24  in my way of kind of communicating upward for Lisa's

25  skill set. Because again, Lisa had a very strong

 1  skill set for what I was requiring of her and I

 2  didn't necessarily need her to continue at director

 3  level communications and meetings because that

 4  effectively was my role.  You know, if there were

 5  plans to bring her outside of my organization or

 6  promote me and make her director, that was never

 7  explained to me.  But I don't think that was ever

 8  the case.

 9      Q.   So I'm not -- I'm not quite sure I fully

10  understand your answer as far as Lisa's concerned.

11  Did you have a problem with her becoming a director?

12      A.   I don't think it was ever kind of for me

13  to have a problem with it.  It was something where

14  obviously the entire work structure would have

15  needed to change, you know, selfishly where I would

16  have fit in I would have needed to understand, but I

17  don't think it was ever necessarily something I was

18  expecting only because it seemed like by the time

19  Lisa became my employee it was already something

20  that was determined that she can't be.

21      Q.   Okay.  So at that point, it was as it were

22  a fait accompli, is that correct?

23      A.   I'm sorry, I don't know that term.

24      Q.   A fait accompli, it's French.  It means it

25  was a done -- done deal.

1    A.    Yeah.  Seemingly, yeah.

2    **Q.    And why was that?  Was that because she**

3 **did not have a degree and/or was not in the King of**

4 **Prussia office?**

5    A.    Those are the things that I've heard, but

6 you know, the ultimate decision would have lied

7 elsewhere and kind of beyond me.

8    **Q.    And who did you hear that from?**

9    A.    Again, nothing in writing, just kind of

10 discussions from all the folks I mentioned before,

11 you know, Dave Conn, Mike Machini, maybe even Stef.

12 Those were all reasons that I kind of heard that it

13 wasn't going to happen.

14    **Q.    Do you know that Dave Conn put forward**

15 **Lisa as the replacement for Dana Freedman?**

16         **MR. DOUGHERTY:**  Objection.  No foundation.

17         **MR. KOLMAN:**  He knows, what's the problem?

18         **MR. DOUGHERTY:**  Because that's -- you want

19 to do this on the record, fine.  That's not what

20 Dave Conn testified to, that's -- and there's no

21 document to that effect.

22         **MR. KOLMAN:**  That's not true, there is a

23 document directly to that effect.  That's --

24         **MR. DOUGHERTY:**  Oh, there's a document?

25         **MR. KOLMAN:**  -- where you're wrong.

```
 1              MR. DOUGHERTY:  No, there's a document
 2   that Joe Boski put her forward.
 3              MR. KOLMAN:  Yeah, but -- okay.  Well, we
 4   can disagree on that.
 5              MR. DOUGHERTY:  I don't know how we can
 6   since it's -- that's what the document says.  And
 7   you read that document and you keep talking about
 8   it's something else.
 9              MR. KOLMAN:  Okay.  Well, you can talk to
10   the witness about it if you want.
11              MR. DOUGHERTY:  Okay.  So then objection,
12   you're misrepresenting the record.  You're
13   misrepresenting Dave Conn's testimony.  You're not
14   laying a proper foundation for the question.  You're
15   calling for speculation.
16              MR. KOLMAN:  And I'm going to ask the
17   court reporter to mark the record there was a
18   speaking objection.
19              MR. DOUGHERTY:  Okay.  That's fine.
20              MR. KOLMAN:  Thank you.  Okay.  Why don't
21   we go on.
22       Q.   Let me put it this way, do you know if --
23   if Lisa Carlson was ever recommended to be the
24   replacement for Dana Freedman?
25       A.   Like, nothing in writing.  I may have
```

 1  heard that that was something -- again, before --

 2  because Dana had left before I was directly involved

 3  in, you know, what Lisa would be managing or doing

 4  at that point in time.

 5      Q.   Was Dana Freedman a director, if you know?

 6      A.   Yeah, I believe she was.

 7      Q.   Do you know if Dana Freedman ever

 8  recommended that Lisa Carlson be her replacement?

 9      A.   I don't.

10      Q.   You don't know what Dana Freedman was

11  doing prior to her leaving, is that right?

12      A.   I was working closely with Dana on

13  diligence before acquiring Velocitel and because

14  Lisa was a direct report of Dana's, I was more

15  working closely with Dana at that time.  So I do

16  know in a sense of Lisa ultimately was supporting

17  Dana and Dana was effectively doing, you know, was

18  working with me on a lot of the transition items on

19  the early phases of the acquisition before she had

20  left.

21      Q.   Did Dana talk to you about Lisa Carlson

22  and how Lisa might be of help?

23      A.   Not that I recall.  I mean, I had some

24  firsthand experience.  I had met Lisa by then and

25  was able to kind of see her grasp on the AT&T

1   contract and the skills that she had, so I knew she

2   was valuable.  But I could not assess whether, you

3   know, she could ascend from her current position at

4   that point in time.

5       Q.   And you testified the issue of Lisa not

6   being qualified to be a director was done early on,

7   why were there group discussions about whether she

8   should or shouldn't be a director?  Did those occur

9   after this decision that had been made by other

10  people?

11      A.   Maybe.  But what I would say is just

12  because obviously it's within the finance

13  organization and all the people that I've mentioned

14  are obviously my superiors and very relevant to how

15  we are going to be operating going forward.  So

16  it's, you know, if there are promotions or changes

17  to that hierarchy, I would say it's very important

18  to all of us.

19      Q.   When Bruce Neff came on board at any point

20  did he take over the duties of Lisa Carlson?

21      A.   I don't believe so.

22      Q.   Do you recall that in January 2020, two

23  weeks before Lisa was fired she was given the

24  highest raise possible, 10 percent, due to her

25  excellent performance?

1      A.    Can you say that question again?

2      **Q.    Do you know that in January 2020, two**

3  **weeks before she was fired, she was given the**

4  **highest raise percent possible, 10 percent --**

5           **MR. DOUGHERTY:**  Objection to form.

6      **Q.    -- due to her performance?**

7           **MR. DOUGHERTY:**  You can answer.

8      A.    No, I don't recall.

9      **Q.    In that week which ended January 24th, did**

10  **you tell Lisa that she was going to be demoted into**

11  **a reporting role without any direct reports?**

12     A.    No.  Well, scratch that, maybe.  That

13  might have been the understanding at the time.

14     **Q.    The understanding?**

15     A.    Yeah.

16     **Q.    What understanding?**

17     A.    So that Lisa would continue to help kind

18  of work with me on different reporting things

19  because I think at the point in time I might have

20  been moving towards a different role, but you know,

21  those -- I think a lot was kind of in motion at that

22  point in time.

23     **Q.    What was the issue with her being demoted**

24  **to a reporting role given your assessment, your good**

25  **assessment of her with regard to the AT&T turf?**

1          **MR. DOUGHERTY:** Objection to form. You

2    can answer, sir.

3          A.    I think it's more around -- it was more

4    around the hierarchy of finance was undergoing a

5    change in terms of the titles that we wanted to have

6    and the reporting structure. And effectively Lisa's

7    title at the time, I believe was still finance

8    manager and the directive was to eliminate that

9    title, that position to have analysts kind of report

10   up through directors so Lisa kind of fell into this

11   kind of nexus of a title where it doesn't have a

12   home anymore in the new structure.

13         **Q.    When you say directive, which directive**

14   **and from whom?**

15         A.    You know, my -- my managers, Dave Conn,

16   Mike Machini at the time that was -- the direction

17   was to remove that role across the business.  I

18   believe they did in non- wireless and (inaudible) as

19   well.

20         **Q.    Is there any document to reflect that?**

21         A.    Not that I'm aware of.

22         **Q.    Do you know if QualTek has some kind of**

23   **protocol of never documenting meetings?**

24         A.    Not purposely that I'm aware of, no.

25         **Q.    Did you document any meetings that you had**

1 **during this time?**

2     A.   No.

3     **Q.   With respect to this change, would this**

4 **involve Lisa Carlson doing something other than what**

5 **she had done before, which was work on the AT&T turf**

6 **portion?**

7     A.   Yeah.  I think -- again, this was a very

8 small period of time and it was an understanding of

9 what we -- where we thought it was going.  But yeah,

10 I believe at the time the understanding was she'd be

11 more of a financial planning and analysis national

12 more -- more budgeting and forecasting, less actual

13 reporting.  But again, that was such a small period

14 of time but I think that's what I recall.

15     **Q.   Did you consider that a demotion?**

16     A.   No.  I think it's -- it's a different

17 role, for sure and requires a strong knowledge of

18 finance and the business, which she had.  I saw it

19 as something different. But if it's something where

20 the title couldn't be a manager or a director, then

21 you know, I kind of had to follow the will of the

22 business there and say okay, well, then we have to

23 give her a different title.

24     **Q.   But it wasn't that she -- it wasn't that**

25 **there's no work for her to do and then it was taken**

1  over by someone else, is that correct?

2       A.   That's correct.

3       Q.   Okay.  Do you know why she was terminated?

4       A.   I think primarily due to the -- the role.

5  Again, the manager position being removed, and her

6  not having the, you know, what was deemed the

7  requisite skill set to be promoted as well as her

8  being not local to Eastern Pennsylvania.  I think

9  all of those were key reasons, but I ultimately was

10 not involved in the direct decision to do that.

11      Q.   If you were -- if you had been asked,

12 would you have said that she still had an important

13 role to play and it was just a matter of finding her

14 the title?

15      A.   Yes.

16      Q.   Who did take over her job duties after she

17 was terminated?

18      A.   Me.

19      Q.   Well, you already had a lot on your plate

20 so this -- this was given to you in addition?

21      A.   Yes.

22      Q.   Did you ever request that someone be hired

23 to assist you, perhaps not in that area but in

24 others so that you could concentrate on this and

25 other duties that you had that you now -- that you

Shawn Kemmerer   June 30, 2022   NDT Assgn # 58458   Page 46

1  **now had been given or had assumed?**

2      A.    I don't recall.  I mean, I know that you

3  know, I've always been someone to, you know, I'll

4  put in the extra hours if I need to to progress

5  things and you know, being in a position of finance,

6  I try to do that with as few people as possible to

7  maximize the value.  But at the time, you know, with

8  Lisa being let go and I believe maybe some others as

9  well, it was just something where it didn't seem

10  like the right time.

11      Q.    **Do you -- do you know why you were never**

12  **consulted about her termination, given that you were**

13  **her boss?  This may be speculative, I'm --**

14      A.    Sure.

15      Q.    **-- asking if you know.**

16      A.    I know I have -- again, I know not a lot

17  of this is documented or maybe documented at all,

18  but I know I've -- I recommended to several people

19  that I kind of make Lisa -- give her a different

20  role as opposed to terminating her. She has a lot of

21  skills and knowledge that were very useful to my

22  team and the duties that were required of me and my

23  team.  But you know, I always saw it as something

24  above my paygrade that the decision was made and the

25  reasons were never really articulated in a way that

1    I could answer that question effectively.

2        Q.   Do you know anything about any complaints

3    that were ever made maybe by Lisa, maybe not, about

4    disparate pay between males and females?

5        A.   Yes.

6        Q.   Can you tell us what you know about that?

7        A.   So yeah, the only complaint I had received

8    was from Lisa and I believe it was two analysts on

9    her team, Michelle and Derrikus did have a smaller

10   salary than the analysts that were on my team when

11   we had acquired Velocitel.  So I know that they were

12   doing largely different things at that point in

13   time.  Again, the analysts are expected to do a lot

14   in QualTek.  It's a very strong role. And I know

15   what we were asking some of the folks on Lisa's team

16   to do was a bit different.  But I can't quite recall

17   if anything had ever come of it.  I think it was

18   just kind of they live in a different locality, they

19   have different backgrounds and it was never any type

20   of, you know, deliberate wrongdoing to get that pay

21   to be that disparate.

22       Q.   Did you know of any investigation that was

23   done after the complaint?

24       A.   No.

25       Q.   Do you know if Lisa made such a complaint

1   and if she did, when she did it?

2        A.   Outside of telling me, no, I'm not aware.

3        Q.   After Lisa was fired, did you discuss with

4   anyone the reasons why that happened?

5        A.   No.

6        Q.   Were you ever told the reasons why that

7   happened?

8        A.   Not directly.

9        Q.   What about indirectly?

10       A.   It's no different than kind of what I've

11   already mentioned.  You know, her locality and her

12   perceived lack of skills to be promoted kind of put

13   her in this role where the business didn't really

14   see a need for the way that the finance wanted to be

15   structured going forward.  That was always my

16   understanding.

17       Q.   But that understanding is not necessarily

18   based on what you were ever told, is that right?

19       A.   No, I mean, again, indirectly, like

20   through discussions, just again, nothing written

21   down but yeah, that was the understanding.

22       Q.   But you were never part of that?  You

23   never had input into that decision, correct?

24   Because if you had you would have said her skill

25   set's just fine and she still has a contribution to

1   **make and a role should be fine -- found for her,**

2   **correct?**

3        A.   I wouldn't say I didn't have input.  You

4   know, again, I was part of some conversations, but a

5   lot of the decision-making happened above my level

6   and ultimately yeah, my concerns weren't necessarily

7   addressed.

8        **Q.   Okay.**

9            **MR. KOLMAN:**  We're going to take a 10 to

10  15- minute break.  I'm going to represent that I'm

11  not going to talk to Mr. Kemmerer and I'm just going

12  to put us on mute and I'm going to kill the video.

13  And we'll reconvene.

14            **(RECESS TAKEN FROM 3:13 P.M. TO 3:35 P.M.)**

15            **MR. KOLMAN:**  So I have no more questions

16  of the witness.

17            **MR. DOUGHERTY:**  Mr. Kemmerer, I have no

18  questions for you.  Thank you for coming in today.

19            **(SIGNATURE RESERVED)**

20            **(DEPOSITION CONCLUDED AT 3:36 P.M.)**

21

22

23

24

25

1    STATE OF NORTH CAROLINA

2    COUNTY OF RUTHERFORD          C E R T I F I C A T E

3

4              I, Laura Riley Bridges, Verbatim Reporter and

5    Notary Public, do hereby certify that SHAWN KEMMERER

6    appeared remotely before me and verbally declared under

7    penalty of perjury to tell the truth; that said deposition

8    was taken by me and transcribed by me and that the foregoing

9    pages constitute a verbatim transcript of the testimony of

10   the said SHAWN KEMMERER.  I do further certify that the

11   persons were present as stated.

12             I do further certify that I am not of counsel

13   for or in the employment of any parties to this action, nor

14   do I have any interest, financial or otherwise, in the

15   outcome thereof.

16             IN WITNESS WHEREOF, I have hereunto

17   subscribed my name, this 6th day of July, 2022.

18

19

20   _____

21   Laura Riley Bridges

22   Notary Number: 200909700079

23   Verbatim Reporter

24

25

1  Date:      July 6, 2022              Assignment #: 58458

2  Deponent: Shawn Kemmerer

3  Case:      Carlson vs. QualTek

4

5  **DEPONENT:**  It has been requested that you read and sign

6  your transcript.  This transcript is to be read only by

7  you.  Please make any corrections necessary on the

8  Correction Sheet ONLY.  You are to sign the Correction

9  Sheet where indicated.

10

11  After signing the Correction Sheet, do the following:

12       1.The ORIGINAL executed Correction Sheet needs to be

13         returned to our corporation.

14       2.Forward a COPY of the executed Correction Sheet

15         directly to the attorney(s) listed below.

16       (The address(es) can be found on the Appearance Page

17         of your deposition.)

18       3.Retain a copy for your records.

19

20

21  CC:  Naegeli Deposition & Trial

22       Timothy Kolman, Esquire

23       Colin Dougherty, Esquire

24

25

```
 1                    CORRECTION SHEET

 2  Deposition of: Shawn Kemmerer        Date: 06/30/22

 3  Regarding:    Carlson vs. QualTek

 4  Reporter:     Bridges

 5  _____

 6  Please make all corrections, changes or clarifications

 7  to your testimony on this sheet, showing page and line

 8  number.  If there are no changes, write "none" across

 9  the page.  Sign this sheet on the line provided.

10  Page    Line    Reason for Change

11  _____  _____  _____

12  _____  _____  _____

13  _____  _____  _____

14  _____  _____  _____

15  _____  _____  _____

16  _____  _____  _____

17  _____  _____  _____

18  _____  _____  _____

19  _____  _____  _____

20  _____  _____  _____

21  _____  _____  _____

22  _____  _____  _____

23  _____  _____  _____

24          Signature_____

25                    Shawn Kemmerer
```

NAEGELI
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

```
 1              DECLARATION

 2  Deposition of: Shawn Kemmerer        Date: 06/30/22

 3  Regarding:    Carlson vs. QualTek

 4  Reporter:    Bridges

 5  _____

 6

 7  I declare under penalty of perjury the following to

 8  be true:

 9

10  I have read my deposition and the same is true and

11  accurate save and except for any corrections as made

12  by me on the Correction Page herein.

13

14  Signed at _____, _____

15  on the _____ day of _____, 2022.

16

17

18

19

20

21

22

23

24              Signature_____

25                      Shawn Kemmerer
```

NAEGELI   CELEBRATING 40 YEARS IN BUSINESS   (800)528-3335
DEPOSITION & TRIAL   NAEGELIUSA.COM

## <u>CERTIFICATE OF SERVICE</u>

I, Colin D. Dougherty, hereby certify that, on this date, I caused the foregoing document to be filed electronically with this Court, where it is available for viewing and downloading from the Court's ECF system, and that such electronic filing automatically generates a Notice of Electronic Filing constituting service of the filed document, upon interested parties.

By: <u>/s/ Colin D. Dougherty</u>
COLIN D. DOUGHERTY

Dated: <u>July 29, 2022</u>