# EXHIBIT 3

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

LISA CARLSON
2795 243rd Avenue Northwest
St. Francis, MN 55070,

Plaintiff,

v                              No.:  2:22-CV-00125

QualTek WIRELESS LLC
1150 First Avenue, Suite 600
King of Prussia, PA 19406,

Defendant.

_____

ZOOM VIDEOCONFERENCE DEPOSITION OF

LISA CARLSON

_____

DATE TAKEN:  6-14-2022            BY LISA M. HUTTON



```
 1    APPEARANCES:

 2


 3    KOLMAN LAW PC
      414 Hulmeville Avenue
 4    Penndel, Pennsylvania 19047
      Phone:  215-750-3134
 5    Email:  tkolman@kolmanlaw.com
      By:  Timothy Kolman
 6    for the Plaintiff

 7
      FOX ROTHSCHILD LLP
 8    10 Sentry Parkway
      Suite 200
 9    PO Box 3001
      Blue Bell, Pennsylvania 19422
10    Phone:  6120-397-6500
      Email:  cdougherty@foxrothschild.com
11    By:  Colin D. Dougherty
      for the Defendant
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



Page 3

```
 1                    I N D E X

 2                                              PAGE

 3   Examination by Mr. Dougherty                  4

 4

 5

 6

 7

 8                  E X H I B I T S

 9   1   Carlson Discovery 000024 through 26      73

10   2   Carlson Discovery 000044 through 45      77

11   3   Carlson DISCOVERY 000050                 81

12   4   QualTek 000188 through QualTek 000190    83

13   5   QualTek 000197 through QualTek 000198    86

14   6   Bonus chart                              91

15

16

17

18   OBJECTIONS

19       Mr. Kolman 11, 16, 18, 23, 33, 34, 36, 37, 39, 40,

20   41, 43, 46, 47, 48, 49, 54, 55, 59, 67, 68, 69, 82

21

22

23   CERTIFICATE

24

25
```



Page 4

```
 1                        LISA CARLSON,
 2            a witness in the above matter, after having been
 3            first duly sworn, testified under oath as follows:
 4                         EXAMINATION
 5   BY MR. DOUGHERTY:
 6   Q    Ms. Carlson, my name is Colin Dougherty.  I
 7        represent QualTek Wireless in this lawsuit that you
 8        filed.  Could you state and spell your full name
 9        for the record, please?
10   A    Lisa Cai Carlson, L-I-S-A C-A-I C-A-R-L-S-O-N.
11   Q    Have you ever given a deposition before, ma'am?
12   A    No.
13   Q    Okay.  So I'm sure you went over some stuff with
14        your attorney on how these work, and I don't want
15        you to ever tell me anything you talked to him
16        about, but I'll just give you some instructions on
17        the record, okay?  The first one is the nice lady,
18        Ms. Hutton, she can't take down shoulder shrugs and
19        head nods and all that normal stuff we do in normal
20        conversation on the record, so I would ask that all
21        of your answers be verbal and out loud so that she
22        can write it down.  Is that okay?
23   A    Yes.
24   Q    Okay.  Great.  Secondly, I'm going to do my best to
25        do the same for you, I would ask that you wait
```



1        until I am done asking my question before you

2        answer it even if you are super sure you know what

3        I'm about to ask you, and then I will do the same

4        and wait until you are done speaking before I ask

5        the next question.  That way, again, Ms. Hutton can

6        get everything down on the nice, clean record,

7        okay?

8   A    Okay.

9   Q    Finally, I'm going to assume you understand my

10       question if you answer it.  I'm not here to try and

11       trick you, so if you don't understand, please let

12       me know and I'll try and rephrase it or state it

13       differently in a way that we all can understand.

14       Is that okay?

15  A    Yes.

16  Q    Okay.  You are under oath, but we are obviously not

17       in a courtroom.  You look like you are in part of

18       your house.  I'm in my office.  Mr. Kolman is in

19       the room with all his soldiers.  So it's -- you

20       know, if you need to take a break -- I don't know

21       if you smoke, I don't know if, you know, there's a

22       reason you need to take a break fairly routinely.

23       I have had depositions where people who are, for

24       example, diabetic and need to take a break every

25       half hour.  Just let me know and I'm happy to



1        accommodate you, I just ask that you answer any

2        pending question before we take a break.  Is that

3        okay?

4   A   Yes.

5   Q   Okay.  Are you on any medication today that would

6        prevent you from understanding my questions and

7        answering truthfully?

8   A   No.

9   Q   Have you consumed alcohol in the last six hours?

10  A   No.

11  Q   Is there any reason you don't believe you can sit

12       for your deposition today and answer my questions?

13  A   No.

14  Q   Great.  Are you currently employed?

15  A   Yes.

16  Q   And where do you work?

17  A   I work for Medtronic through a company called

18       Donatech, which is a contracting company.

19  Q   And how long did you work for Donatech?

20  A   A year and -- what month is it?  June.  A year and

21       four months.

22  Q   Is that the first job you had after you left

23       QualTek?

24  A   Yes.

25  Q   How much money do you make at Donatech?



1   A   I make $47 an hour, but they just gave me a

2       3 percent increase, and I don't think it's taken

3       effect yet.  But it'll be, like, $48 and some

4       change per hour.

5   Q   Is it a full-time position?

6   A   Yes.

7   Q   Does it provide benefits?

8   A   No.

9   Q   Does it have overtime?

10  A   No, not approved -- it's not approved for overtime

11      right now.

12  Q   Okay.  And I think you said you've been working

13      there for about a year and eight months.  Is that

14      what you said?

15  A   A year and four months in.  February 3, 2021.

16  Q   Did you apply for any jobs after you left QualTek

17      before the Donatech position?

18  A   Yes.

19  Q   Okay.  And where did you apply?

20  A   I applied to many positions through Indeed and

21      other -- I don't recall websites that would, you

22      know, have jobs available.  I also had my resume

23      posted on multiple websites for recruiters to

24      contact.

25  Q   Did you get any job offers during that time before



```
 1          Donatech?
 2     A    No.
 3     Q    Did you have any job interviews during that time
 4          before you accepted the position with Donatech?
 5     A    I believe so, yes.
 6     Q    I'm --
 7     A    I do not fully recall.
 8     Q    Okay.  Do you recall any of the companies that you
 9          interviewed with?
10     A    No.  usually the positions went through recruiters,
11          so I would work with recruiting agencies.
12     Q    Okay.  And where do you currently live, ma'am?
13     A    I live in Minnesota.  Do you want more detail than
14          that?
15     Q    What's -- the town is fine?
16     A    St. Francis, Minnesota.
17     Q    Is that where you lived when you worked for
18          QualTek?
19     A    Yes.
20     Q    Is it the same house?
21     A    Yes.
22     Q    Okay.  What's the -- what's the highest level of
23          education that you achieved?
24     A    Pardon me, I didn't catch that.  It broke up a
25          little bit.
```



Page 9

```
 1   Q   Sorry.  What's the highest level of education that
 2       you've completed?
 3   A   Some college.
 4   Q   Okay.  And where was that?
 5   A   The University of Minnesota Duluth.
 6   Q   Okay.  Do you have, like, an associate's degree or
 7       bachelor's degree or anything like that?
 8   A   No.
 9   Q   Do you have any certificates?  You know, some of
10       those programs give out certificate in analytics,
11       certificate in -- to something.  Do you have any
12       certificate programs you've completed?
13   A   No.
14   Q   Have you ever filed a lawsuit before?
15   A   Yes.
16   Q   Okay.  And where was that?
17   A   In Minnesota.  I had -- yeah, in Minnesota it was
18       filed.
19   Q   Okay.  Were you the plaintiff?  You were the
20       plaintiff?
21   A   Yes.
22   Q   What kind of lawsuit was it?
23   A   I had damage on my driveway from a neighbor's
24       contractor, so I filed small claims court.  They
25       resolved the issue by fixing the damage, so I
```



Page 10

```
 1           dropped the case.
 2   Q       Okay.
 3   A       And I have one additional one.  I was in a very bad
 4           accident, and so I received money from an insurance
 5           company to cover my loss for that fee.  And those
 6           were the only two.
 7   Q       When was the accident?
 8   A       I want to say maybe 2003.
 9   Q       Okay.  So it was 20 years ago almost?
10   A       Yeah, yeah.
11   Q       Okay.  I believe you said you've never given a
12           deposition before, but have you ever otherwise
13           testified under oath?
14   A       No.
15   Q       Okay.  Have you ever filed for personal bankruptcy?
16   A       Yes.
17   Q       Okay.  When was that?
18   A       I believe that was 1999.
19   Q       So again, 23 years --
20   A       Yeah.
21   Q       Something like that?
22   A       Yes, correct.  A long time ago.
23   Q       And was that discharged?
24   A       What does "discharged" mean?
25   Q       Was the bankruptcy case ever closed, resolved,
```


MAGNA ▶
LEGAL SERVICES

1          finished?

2     A    Yes, it was completed in that same year.

3     Q    Okay.  What is your job title currently?

4     A    Senior financial analyst.

5     Q    And what are your job responsibilities?

6     A    I create Excel spreadsheets, report numbers, create

7          presentations of the numbers.  I report results for

8          our portfolio piece under Medtronic.  So I report

9          for the whole portfolio, and then underneath are

10         some businesses.

11    Q    Who's your supervisor?

12    A    Marcello Hernandez.

13    Q    And you said, are you, like, on a placement through

14         Donatech?  How does that work?  Like, who pays your

15         check, Donatech or Medtronic?

16    A    Donatech pays my paycheck, but Medtronic approves

17         my time sheet and hours.

18    Q    Okay.  So could Donatech move you to another role?

19    A    I'm under contract.

20    Q    Okay.  So you are at Medtronic for as long as they

21         need you, something like that?

22              MR. KOLMAN:  Objection.

23              THE WITNESS:  Yeah.

24    BY MR. DOUGHERTY:

25    Q    Okay.



Page 12

```
 1   A     I am.  I am as long as they need me and are able to
 2         retain me.
 3   Q     Okay.  Did you apply for unemployment after you
 4         left your position at QualTek?
 5   A     Yes.
 6   Q     And was that with a Minnesota State agency?
 7   A     Yes.
 8   Q     Do you have any of your own employment application
 9         paperwork?
10   A     Everything is completed online, so there's no paper
11         copies.  It's completely an online system.
12   Q     And I assume you were approved for unemployment?
13   A     Yes.
14   Q     Just so that we are using the same terminology, if
15         I talk -- when I talk about QualTek, I mean the
16         company who bought Velocitel or Old Velocitel.  I
17         know that sometimes they used that name
18         interchangeably after that position, but I want to
19         try and keep the record clear for when you were
20         working for the Minnesota-based company originally
21         called Velocitel and then the company it acquired.
22         Is that okay?
23   A     Yes, but it's -- Velocitel was not a
24         Minnesota-based company.
25   Q     Okay.  Where was Velocitel based out of?
```



Page 13

```
 1    A     Chicago, Illinois.  Northbrook, to be specific.
 2    Q     How did you -- or when did you start working for
 3          Velocitel?
 4    A     November 8, 2010.
 5    Q     Okay.  What was your first position you held with
 6          Velocitel?
 7    A     Project coordinator.
 8    Q     And how long -- how long did you have the project
 9          coordinator role for Velocitel?
10    A     I believe it was a year or a year and a half.
11    Q     Okay.  And then what was your next position with
12          Velocitel?
13    A     I was managing the finance team.  I do not recall
14          the date of the actual title change, but that is
15          what happened.  I obtained a team underneath me,
16          and led the finance team.
17    Q     How many people reported to you?
18    A     It changed as the company had acquired a new
19          contract, so we were hiring rapidly.  So at most I
20          want to say I had 14 to -- 14 plus.  But things
21          structurally changed.  But temporarily I would
22          have, like, 30 employees, but then it was only a
23          temporary thing.
24    Q     Did you hold any other positions at Velocitel?
25    A     Finance manager was the highest position that I
```



Page 14

```
 1           held.
 2    Q      Okay.  And did you hold that until the date of the
 3           acquisition?
 4    A      Pardon me?
 5    Q      Were you in that role on the date of the
 6           acquisition of Velocitel by QualTek?
 7    A      Yes.
 8    Q      Where did you work out of for Velocitel?  Out of
 9           your home or did they have an office?
10    A      They had an office.  I would work from home as
11           needed, but since I had a new team, I was in the
12           office.
13    Q      How many people roughly would you say worked in the
14           office in Minnesota?
15    A      I believe at the maximum it might be 200.
16    Q      So this was a significant operation base.  Is that
17           right?
18    A      Yes, but it was equal to other operation bases we
19           had nationwide.  We had key offices across the
20           nation.  This was one of them.
21    Q      Okay.  How did you first learn about QualTek?
22    A      During the acquisition.
23    Q      Okay.  Did someone -- did a leader or executive at
24           Velocitel tell you about it?  Tell you about
25           QualTek was going to acquire Velocitel?  How did
```



```
 1            that work?
 2    A       I was part of the acquisition, so I worked on
 3            the -- I don't recall the term they used, but the
 4            background secret paperwork for the acquisition and
 5            the date of consolidation and all of that.  So I
 6            was part of the acquisition.
 7    Q       So was it, like, called diligence team or something
 8            like that?
 9    A       No, it was me and my boss Dana Freedman who dealt
10            with the finance piece of the acquisition.
11    Q       Gotcha.  Did you interact with anybody from QualTek
12            during the acquisition?
13    A       Yes.
14    Q       Who?
15    A       Yes.
16    Q       Who was that?
17    A       I do not recall everyone, but I know I worked a lot
18            with Shawn Kemmerer because he had a similar
19            position to me with QualTek.  So we had to convert
20            our data to their data methodology and revenue
21            recognition methodology.  So I worked with him to
22            obtain their profit and methodologies, and then I
23            applied it to Velocitel's information.
24    Q       And after the acquisition you were hired by
25            QualTek.  Is that right?
```



Page 16

```
 1   A    Correct.
 2   Q    Did you have to fill out an application or any type
 3        of onboarding paperwork?
 4   A    I believe so, but I do not fully recall.
 5   Q    Did you have an interview?
 6   A    No, I don't believe so.
 7   Q    Do you remember what your job -- your job title was
 8        when you first joined QualTek?
 9   A    Finance manager.
10   Q    And who did you report to at that time?
11   A    Dana Freedman.
12   Q    And that was the same woman you had reported to at
13        Velocitel?
14   A    Correct.
15   Q    And was -- how was the position of finance --
16        strike that.  Who paid your checks?  Did it say
17        QualTek?  Did it say Velocitel?  Did it say
18        something else after the acquisition?
19   A    I do not recall.  I believe they said QualTek.
20   Q    Was your position -- was the position of finance
21        manager after the acquisition ever explained to
22        you?
23                  MR. KOLMAN:  Objection as to form.
24   BY MR. DOUGHERTY:
25   Q    You can answer it if you understand it.
```



Page 17

```
 1   A    Can you repeat that, please?

 2   Q    Sure.  Was the position of finance manager at

 3        QualTek ever explained to you after the

 4        acquisition?  In other words, were your job duties

 5        or responsibilities explained to you as to what

 6        QualTek expected?

 7   A    QualTek expected me to handle the finance piece for

 8        the Velocitel wireless portion for the AT&T

 9        contracts.  I continued what I was currently doing,

10        and that's what I was doing.

11   Q    Okay.  Did you work on any other portions of AT&T

12        contracts for other QualTek entities?

13   A    I assisted Empire Telecom at the time with the

14        tools that I built for automatically determining

15        revenue recognition, costs for that, so on and so

16        forth.

17   Q    Okay.  When you joined QualTek, did you receive an

18        offer letter, if you recall?

19   A    I do not recall.

20   Q    What was your understanding when you joined QualTek

21        that -- what your pay would be?

22   A    I do not recall having that discussion.  When we

23        were acquired, everything remained status quo for a

24        bit.

25   Q    And --
```



```
 1   A     I do not recall the time line on that though.

 2   Q     No problem.  And how much were you making at the

 3         time of the acquisition?

 4   A     I believe it was $92,000 and change.

 5   Q     And did you have any bonus opportunities?

 6   A     Yes.

 7   Q     What was the bonus opportunity?

 8                    MR. KOLMAN:  Objection as to --

 9                    THE WITNESS:  As a packager?

10                    MR. KOLMAN:  Wait, wait.  When?  In

11         other words, the timing?

12                    MR. DOUGHERTY:  Well, she was answering

13         it, so she seemed to understand.

14                    MR. KOLMAN:  Well, she may have

15         understood, I just want the -- I just want the

16         answer to be clear as to when and what.  I mean,

17         you are right, she can answer.  If you have a

18         follow-up, I guess you ask it.

19   BY MR. DOUGHERTY:

20   Q     Did you have a bonus opportunity when you left

21         QualTek?

22   A     Yes.

23   Q     What was your understanding of the bonus

24         opportunity?

25   A     As a manager, I was part of their bonus program for
```



Page 19

```
 1              10 percent of my annual salary.
 2     Q        And what went into deciding what the bonus was?
 3     A        That was QualTek's standard.  They have a standard
 4              tier for bonusing based on title.
 5     Q        Right.  But was the bonus discretionary?  Was it
 6              your understanding that the bonus was discretionary
 7              or was it automatic?
 8     A        I honestly don't recall.  I believe the bonuses
 9              were tied to personal performance, and I don't
10              understand -- I was never provided with how the
11              bonuses were determined to be paid out.  So I don't
12              really fully understand that.
13     Q        Okay.  Did you have some understanding that the
14              company's performance affected the bonus or not?
15     A        It could have, but I do not fully recall, to be
16              honest.
17     Q        Okay.  Did you eventually have any other positions
18              at QualTek?
19     A        I performed the position of the director of
20              finance, however, my title remained finance
21              manager.
22     Q        Okay.  And why do you say you performed the
23              position of director of finance?
24     A        Because that was the position that Dana Freedman
25              was in, and she resigned, and so I absorbed her
```



Page 20

```
 1           duties.
 2    Q      What duties did you absorb?
 3    A      I conducted the weekly financial result meeting
 4           with all of the directors nationwide.  I provided
 5           all of the financial results for the wireless turf
 6           division to upper management, CFOs, VPs.  I
 7           compiled the bank reporting for the results.  I
 8           completed the budgeting and forecast annual
 9           operating -- I'm losing my -- I can't place the
10           word right now, sorry.  But the AOP process and the
11           updating of the forecast process.  And I managed
12           financial analysts.  I traveled to meet with the
13           directors to help determine their financial, you
14           know, forecast.  And this was nationwide.
15                   I -- let me think here.  The way -- it
16           boils down, to make it just plain and simple, was
17           the wireless division was split into AT&T turf and
18           nonturf.  I handled all AT&T turf, which was about
19           80 percent if not more of the total
20           revenue for the wireless division in QualTek.
21    Q      In QualTek or in the QualTek division that was
22           Velocitel?
23    A      The QualTek division that was Velocitel.  At this
24           point Empire Telecom was still separate.
25    Q      Okay.  And did Dana have -- when she was the
```



```
 1          director -- or first of all, let me ask it this
 2          way.  When did Dana leave?
 3     A    I don't recall the exact date, but it was March,
 4          the end of March, of 2018.
 5     Q    Did she have supervisory authority over both turf
 6          and nonturf?
 7     A    No.  It was -- hold on, I apologize.  At that point
 8          in time I do not recall.  I don't believe so
 9          because nonturf was handled separately.
10     Q    Okay.
11     A    It was always separately, just as Empire was.
12     Q    Who handled nonturf?
13     A    I do not recall.  I believe at that time it was
14          Katrinka Tezyk.  She was the one that was over the
15          nonturf piece.
16     Q    And was she a former Velocitel employee, or did she
17          come from QualTek?
18     A    She was former Velocitel, but acquired by QualTek
19          during the acquisition.
20     Q    Did you ever get a promotion at QualTek?
21     A    Define promotion.
22     Q    All right.  Did you ever get a raise?
23     A    I received raises, yes.
24     Q    Okay.  How often did you receive raises?
25     A    Annually.
```



Page 22

```
 1   Q     Okay.  Did you have a title change?
 2   A     No.
 3   Q     Did you ever sign any additional paperwork
 4         indicating a change in responsibility or job title?
 5   A     I want to clarify one answer.  They did add the
 6         word "FP&A" to finance manager, so -- but we were
 7         already in the FP&A department, that was the
 8         finance piece.  So they called me a finance
 9         manager, FP&A, or something like that.
10   Q     What's FP&A?
11   A     But it was just -- financial planning analysis.
12   Q     Okay.  So it's F as in, like, fox?
13   A     Fox, Peter, and apple.
14   Q     Okay.  Gotcha.  And do you recall when that title
15         change was done?
16   A     At the end of March 2018.
17   Q     So it was after Dana left?
18   A     It was -- correct, the process to give me a new
19         title of director of finance was started prior to
20         Dana leaving.  It was then modified to be just a
21         title of financial manager FP&A.
22   Q     Okay.  Why did you believe you were going to get
23         the director title?
24   A     Because I have -- there was a form they called
25         personal action notice, or PAN form, that says
```



Page 23

```
 1          director of finance to replace Dana Freedman that

 2          was submitted.

 3    Q     Do you know who submitted the PAN form?

 4    A     I believe it was David Conn.

 5    Q     Okay.  And does someone above Mr. Conn have to

 6          approve that?

 7    A     It goes to HR and the HR process.  I do not know

 8          the details of that process, but I believe that the

 9          final signature comes from Elizabeth Downey.

10    Q     Okay.  So just so I understand what happened, did

11          you apply for a position of director or -- because

12          you said you didn't get it?

13                    MR. KOLMAN:  Object as to form.

14                    THE WITNESS:  No, there was no --

15                    MR. KOLMAN:  You can go ahead.

16  BY MR. DOUGHERTY:

17    Q     You can answer.

18    A     There was no application process needed.  It was

19          just understood that I would be taking over Dana's

20          duty.  So she trained me for three months on her

21          duties while this PAN form was submitted to change

22          my title.

23    Q     Who?

24    A     She gave it.

25    Q     Okay.
```



Page 24

```
 1    A      I apologize, I just want to clarify.  Dana gave a
 2           long notice, I believe it might have been 60 days
 3           or 90 days so that there was time to transition her
 4           duties to me.
 5    Q      And did she recommend you for her replacement?
 6    A      Yes.
 7    Q      Do you know who she recommended you to?
 8    A      I know that she recommended me to her superior Joe
 9           Busky, who was currently the CFO at the time, and
10           she worked with David Conn and Adam Spitteler on
11           getting me admitted to be the director.
12    Q      But was that -- were you ever promoted to the
13           position of director?
14    A      They submitted the request to promote me, but it
15           was modified by HR.  That's what I was told,
16           that -- to be a finance manager anyway.  So they
17           crossed off director and wrote finance manager on
18           the form.
19                     MR. KOLMAN:  Continue.  I can hear you.
20           Continue.
21                     THE WITNESS:  Okay.
22    BY MR. DOUGHERTY:
23    Q      Did you -- was it -- was any explanation for that
24           given to you?
25    A      No.
```



Page 25

```
 1   Q    Did you ask anyone?

 2   A    Yes.

 3   Q    Who did you ask?

 4   A    David Conn.

 5   Q    And did he respond?

 6   A    He said he didn't understand why, but that

 7        Elizabeth Downey had said or had made the change to

 8        finance manager.

 9   Q    Did you talk to Mr. Conn, like, in person, on the

10        phone, or via email?

11   A    I don't recall.  Probably in person.  Because

12        during the acquisition I traveled quite a bit to

13        the King of Prussia.

14   Q    So --

15   A    So I traveled frequently to the King of Prussia

16        office, so many conversations happened in person.

17   Q    Okay.  But during the acquisition, that was in,

18        what, June of '17?

19   A    No, the acquisition was -- well, it started in

20        2017, but it was completed the end of '17.  So the

21        transition from Dana Freedman to myself occurred

22        during the first three months of 2018.

23   Q    Okay.  Is that when you were traveling to King of

24        Prussia?

25   A    Yes.
```



Page 26

```
 1   Q    When you were in King of Prussia, did you ever meet
 2        with Liz Downey?
 3   A    No, I was advised not to, and that David Conn would
 4        work to rectify this issue.
 5   Q    Okay.  Who advised you not to meet with Ms. Downey?
 6   A    David Conn.  Liz Downey also was known to be a very
 7        tough cookie.  If you pushed her, she was known to
 8        retaliate.  So I was advised to let them handle
 9        this.
10   Q    And why do you say that Ms. Downey was known to
11        retaliate?
12   A    That was just a known fact.  There were many other
13        employees who have come up against her.  That was
14        just her known persona.
15   Q    So that was something you heard from other former
16        Velocitel employees or someone else?
17   A    Or current QualTek employees.
18   Q    Can you recall anyone specifically who told you
19        that?
20   A    Not specifically.  I do recall later incidences,
21        but at that time I don't recall.  There was so much
22        going on with that acquisition, so I knew that if
23        David Conn advised me to not push the issue, then I
24        listened because he was very high up and close with
25        the upper management.
```



```
 1    Q    So you didn't get the promotion.  Did you make any
 2         complaints?
 3    A    Yes.
 4    Q    To whom?
 5    A    To David Conn.
 6    Q    Did you make --
 7    A    He was my supervisor at that time after Dana left.
 8    Q    Did you make any complaints to anyone in HR?
 9    A    At that time I do not recall.  I believe I stuck
10         with just David Conn based on his advice.  The
11         upper management -- I would like to explain,
12         sorry -- is a friend group.  So David Conn is
13         friends with the CEO.  Elizabeth Downey is friends
14         with the CEO.  So if David Conn advises me not to
15         discuss this issues with another higher-up, I
16         listened.
17    Q    Okay.  So we are now in, I guess, March, the end of
18         March, early April of '18.  Did you ever get
19         another change in title while you were at --
20    A    No.
21                   MR. KOLMAN:  Let him finish.
22                   THE WITNESS:  I apologize, I did not
23         mean to interrupt.
24    BY MR. DOUGHERTY:
25    Q    Did you ever complain to HR about that?
```



Page 28

```
 1   A     Yes.

 2   Q     Okay.  Who did you complain to at HR?

 3   A     Lauren Petzar.

 4   Q     Okay.  Anyone else?

 5   A     Lauren Petzar was the main contact in HR, and above

 6         her were, like, VP and people.  So she was my point

 7         of contact and would actually help me as far as I

 8         understand if needed.

 9   Q     Okay.  When did you first contact Lauren?

10   A     I do not recall the date of the first contact.

11   Q     And did she respond to you?

12   A     I do not recall.  I -- yeah, I do not recall.

13   Q     Okay.  Did she -- did you ever speak with

14         Stefanie either Holmen or Stefanie Trybula, she

15         goes by both names?

16   A     Pardon me?

17   Q     She goes by both names, so I don't --

18   A     At the time she was Stephanie Trybula, and as far

19         as I -- she was Lauren Petzar's boss.  And as far

20         as I understood, Lauren was speaking to her.

21   Q     So what were your complaints to Lauren?

22   A     That I felt I could not be promoted because of

23         being a woman.  I had complained of bullying

24         treatment and mistreatment.  I advised her that I

25         was concerned about potential retaliation, and I
```



Page 29

```
 1              discussed these issues with her.
 2    Q    Do you recall when -- the time frame this was?
 3    A    I believe those started in mid-2019 as I was giving
 4         David Conn time to sort this out.  Because I was
 5         told that they would be trying to get me the
 6         director position by the end of the year, by the
 7         next couple months.  So I was waiting on them to
 8         complete and rectify the issue, which never
 9         happened.
10    Q    Who bullied you?
11    A    Michael Michini and Stephanie Trybula.
12    Q    How did Mr. Michini bully you?
13    A    I had -- they were in the process of being acquired
14         by Bright Star, who was an investment firm.  I
15         don't understand full acquisition or partial,
16         whatever.
17              During that time they needed to present
18         certain numbers that they were told -- that they
19         had told Bright Star they would hit.  I was
20         uncomfortable modifying and adjusting numbers, and
21         so I pushed back, I believe, on that.  And I do not
22         recall how I pushed back.  But Michael Michini came
23         back and decided that he was going to move one of
24         my employees.  This employee contacted me and said
25         she was uncomfortable because he was known to be --
```



Page 30

1          to be very difficult.  In fact, from what I

2          understood, he had served time in prison for

3          assault or hitting somebody, and then they may have

4          died.  But he was a little bit of a scary

5          character.

6                    Michael Michini had decided to do that,

7          to move my employee.  My employee contacted Michael

8          Michini and said I was not -- I would like to not

9          move to a different department.  I want to stay

10         doing the duties that I am.  He then proceeded to

11         call me early on a Monday morning -- because this

12         occurred on a Friday -- and was yelling at me and

13         telling me I put ideas in the employee's head, and

14         it's my fault that she wants to do this.  It

15         brought me to tears he was so difficult.

16                    I turned around that day and I called

17         Lauren Petzar, or I emailed her and told her to

18         call me, and I discussed this issue with her.

19   Q     Okay.  And what -- what, if anything, happened

20         after you discussed it with Lauren?

21   A     Nothing.

22   Q     What was Michael Michini's role with QualTek at the

23         time?

24   A     At the time he was either a senior VP or a

25         temporary CFO.



Page 31

```
 1    Q    Okay.  So was he above you in the chain of command?

 2    A    Absolutely.

 3    Q    Was he your direct boss, or was he Dave Conn's

 4         boss?  Was he Dave Conn's boss's boss?  What's your

 5         understanding of where he was in the food chain?

 6    A    I believe at that time David Conn may have reported

 7         to him.

 8    Q    Okay.  So he never threatened your job though, is

 9         that correct?

10    A    I don't recall.

11    Q    He never commented on the fact that you were a

12         woman when he talked to you that day.  Is that

13         correct?

14    A    I don't recall.

15    Q    Well, he complained that you had told -- or that he

16         thought you were encouraging an employee that was

17         beneath him in the chain of command to not want to

18         transfer.  Is that right?

19    A    He told -- the employee reported to me.  So she was

20         my employee.  And he told me in a very, very

21         forceful yelling tone that it was my fault that she

22         did not want to move because I was putting ideas in

23         her head.

24    Q    All right.  But he never -- he never said that you

25         were -- doing anything improper because you were
```



```
 1            female.  Is that right?
 2     A      I don't recall.
 3     Q      He never used a derogatory term towards you about
 4            being female?
 5     A      I don't recall.  There was many curse words and
 6            derogatory terms in that phone call, and the phone
 7            call was extremely distressing.  So I just remember
 8            the feeling of being so upset and distressed by the
 9            call, and I remember reaching out to Lauren Petzar.
10            The details, I don't recall the actual wording he
11            used.
12     Q      This is at what time?  This was early '19?
13     A      Mid '19.
14     Q      Oh, but if I understand your testimony --
15     A      July.
16     Q      Your complaint was that he was somehow
17            discriminating against you because you are a woman,
18            and I'm trying to understand why you believe that?
19     A      I believe that because I was performing the duty of
20            a director of finance, same as a male counterpart
21            that replaced Katrinka after Katrinka was laid off
22            and he was given the director title.  We performed
23            the same job.  I was promised I would have the
24            director title, and instead they gave it to two men
25            and not me.  And I was still performing the same
```



```
 1          job, and my volume -- the money and the volume of
 2          work that I performed was four times the level of
 3          theirs.  The tools I built to support my financial
 4          side was used by them.  We did identical jobs.
 5          They had much less volume.
 6    Q     Okay.  So I want to talk about that in a second,
 7          but that wasn't exactly what I asked you.  Why do
 8          you believe Michael Michini on the day that he
 9          called you was discriminating against you because
10          you were a woman?  It sounds like you are
11          describing to me that he acted like a jerk, and I
12          understand that, and it made you upset.  But why do
13          you think he did that?  Because you were a woman or
14          was discriminatory because you are a woman?
15                    MR. KOLMAN:  Objection as to form.  You
16          can answer.
17                    THE WITNESS:  I responded that way
18          because you asked me a question about who bullied
19          me.  And that was my answer to your question about
20          bullying.
21    BY MR. DOUGHERTY:
22    Q     Okay.  So can we agree then that you weren't
23          discriminated against because you were a woman by
24          Michael Michini?
25                    MR. KOLMAN:  Objection as to form.  You
```



Page 34

1          can answer.

2                      THE WITNESS:  I do not know how Michael

3          Michini was involved in the background after David

4          Conn requested me to be director since he was above

5          David Conn.  I do not know his involvement in that.

6     Q    So is it fair to say that your only belief that you

7          were discriminated against being a woman is because

8          you understand that two men were promoted to

9          director?

10                     MR. KOLMAN:  Objection as to form.

11                     You can answer again.

12                     THE WITNESS:  That -- yes, and it --

13         yes, that is it.  I was performing the job, yes.

14         The title and the bonus opportunities were given to

15         the men and not me regardless of the fact that my

16         volume and responsibility was four times the volume

17         of theirs.

18    BY MR. DOUGHERTY:

19    Q    Who were the men you are referring to?

20    A    Bruce Smith, and then later on they hired Brandon

21         Eberling.

22    Q    When was Mr. Neff hired?

23    A    I don't recall the exact date.  I just know that

24         they laid off Katrinka Tezyk and hired Bruce Neff.

25         It was understood that Bruce Neff was a friend of



MAGNA ▶
LEGAL SERVICES

Page 35

```
 1              the CFO, so he wanted his friend to come in, and
 2              that's why Bruce Neff was hired and replaced
 3              Katrinka.
 4    Q    And how was that understood?
 5    A    It was common knowledge who was friends.  The CEO
 6              was quite open about discussing these things, and
 7              they had replaced -- Michael Michini, okay, Michael
 8              Michini was, I believe, a temporary CFO until
 9              Steven Forbes came back.  Steven Forbes was
10              retired, and Steven Forbes came back.  And Bruce
11              Neff was a close friend of Steven Forbes.  So that
12              is how I knew his position on that.  Because the
13              CEO and David Conn and Shawn Kemmerer, it was
14              common knowledge how these people were friends.
15    Q    But you are making an -- I guess are you making the
16              assumption that because they are friends, Mr. Neff
17              wasn't qualified?
18    A    No.
19    Q    Okay.  So then why -- why does it matter whom he
20              was friends with?
21    A    They laid off Katrinka Tezyk who was extremely
22              qualified for this position, and replaced it with
23              Bruce.  I was not told of Bruce's qualifications.
24              I do not know his educational background.  I do
25              know that Katrinka Tezyk had the experience with
```



Page 36

```
 1           this and had been doing this, and they laid her off
 2           and replaced her with Bruce.
 3     Q     Well, you aren't Katrinka's supervisor, were you?
 4     A     No, we were performing equal duties.
 5     Q     So you weren't in charge of grading her performance
 6           or tracking her performance, correct?
 7     A     Correct.
 8     Q     So you have no idea how she was actually performing
 9           in her job, correct?
10     A     Correct, just what I observed with my own personal
11           interactions.
12     Q     Okay.  Would you agree with me that qualifications
13           for a position is not simply experienced, there's
14           other things that can go into being qualified,
15           correct?
16                     MR. KOLMAN:  Objection as to form.
17                     You can answer.
18                     THE WITNESS:  Qualifications are --
19           explain what you mean by qualifications.  Repeat
20           the question too, I would like to have clarity on
21           that question.  I don't understand.
22     BY MR. DOUGHERTY:
23     Q     So you testified -- I believe your testimony -- and
24           if I'm misstating it, please let me know, was that
25           Katrinka was qualified for the position.  Is that
```



Page 37

1        right?

2    A    Yes.

3    Q    And but you are basing that solely on your

4         understanding of her experience.  Is that right?

5                   MR. KOLMAN:  Objection.

6                   THE WITNESS:  It's Katrinka.

7    BY MR. DOUGHERTY:

8    Q    Katrinka?

9    A    And she was the original one who hired me at

10        Velocitel in 2010.  So I have worked with

11        Ms. Katrinka for many years, and when the duties

12        are split, as they were between turf and nonturf,

13        Katrinka managed the nonturf piece and had been

14        doing that for a while.  And as far as I understood

15        or could observe, she seemed good.  But as I said,

16        I did not report on her --

17   Q    Right.

18   A    I did not do her performance report.

19   Q    Right.  So you are making an assumption that she

20        was qualified for the position that ultimately went

21        to Mr. Neff?

22                   MR. KOLMAN:  Objection as to form.

23                   You can answer.

24   BY MR. DOUGHERTY:

25   Q    Is that correct?



Page 38

```
 1    A    Yes.

 2    Q    All right.  You actually have no idea if she was

 3         qualified for the position that went to Mr. Neff.

 4         Is that right?

 5    A    What would the qualifications have been for that

 6         position?

 7    Q    Well, I don't know.  You are the one who has

 8         testified that you believe you had been

 9         discriminated against because Mr. Neff was hired

10         for a position that Katrinka had previously held.

11         She was a woman and you are a woman, and you

12         weren't promoted to it as well.  Did I state that

13         correctly?

14    A    Yes, I believe when Mr. Neff was hired, he was

15         hired as a finance manager.  And shortly thereafter

16         promoted to director of finance.

17    Q    Do you know if -- do you know if Mr. Neff has any

18         degrees?

19    A    I do not know anything about Mr. Neff's educational

20         history.

21    Q    Do you know anything about Mr. Neff's work history

22         prior to coming to QualTek?

23    A    Only that he worked at AT&T for a bit, but I could

24         not understand in what capacity or for how long.

25    Q    And do you have any understanding of Mr. -- you
```



Page 39

```
 1          aren't Mr. Neff's supervisor when he was hired as a
 2          financial manager, correct?
 3     A    I was not his supervisor, but we were equal and we
 4          performed the same duties.
 5     Q    So if I understand you correctly, you have no
 6          understanding of Mr. Neff's educational background,
 7          you have no understanding of Mr. Neff's employment
 8          background, and you have no understanding of
 9          Mr. Neff's performance background, but you are
10          assuming that because he got the role of director
11          and you didn't, it was discriminatory based on your
12          sex?
13                    MR. KOLMAN:  Objection as to form.
14     BY MR. DOUGHERTY:
15     Q    Did I state that correctly?
16     A    I apologize.  Am I okay to answer?
17                    MR. KOLMAN:  Yeah, sure.  Of course.
18                    THE WITNESS:  Okay.  And can you repeat
19          the question?
20     BY MR. DOUGHERTY:
21     Q    Sure.  So I'll even break it down.  Do you --
22     A    Okay.
23     Q    Do you agree -- you agree with me, correct, that
24          you have no understanding of Mr. Neff's educational
25          background, correct?
```



Page 40

```
 1    A    Correct.

 2    Q    You have no understanding of Mr. Neff's experience

 3         prior to QualTek, correct?

 4    A    By all my understanding is that he worked at AT&T

 5         for a short period of time.  I do not understand in

 6         which capacity.  I do not have that information.

 7    Q    And AT&T is QualTek's biggest customer.  Is that

 8         right?

 9    A    Correct.  And I also performed the work at AT&T as

10         well.

11    Q    And you have no understanding of Mr. Neff's

12         performance as his position as finance manager,

13         correct?

14    A    I do know that there were issues as far as Excel

15         skills and understanding, because I helped him get

16         processes set up.  I helped him build spreadsheets.

17         I helped him train and understand what to do in

18         this situation.

19    Q    You weren't his supervisor though, correct?

20    A    I was not his supervisor.

21    Q    So if I understand you, your only reason for

22         believing that you were discriminated against was

23         because he's a man and he got the position, and you

24         didn't, is that right?

25                   MR. KOLMAN:  Objection as to form.  You
```



Page 41

```
 1              can answer.
 2                        THE WITNESS:  He was given -- he was
 3              promoted to director of finance as a man while
 4              performing the same duties as me but at a quarter
 5              of the volume.
 6      BY MR. DOUGHERTY:
 7      Q    But ma'am, you also -- but you admitted that you
 8              have no idea of his educational background, you
 9              have no idea of his performance, and you have no
10              idea of his prior experience?
11                        MR. KOLMAN:  Objection as to form.
12      BY MR. DOUGHERTY:
13      Q    So again, is the only belief -- is the only reason
14              for your belief that it was a discriminatory act is
15              because he's a man?
16                        MR. KOLMAN:  Objection as to form.  You
17              can answer.
18                        THE WITNESS:  Can you repeat that so I
19              can answer correctly?
20      BY MR. DOUGHERTY:
21      Q    I'm trying to understand why you believe Mr. Neff's
22              promotion was somehow discriminatory when you know
23              nothing about his experience or background?
24      A    I can't.
25                        MR. KOLMAN:  Okay, which -- I think she
```



Page 42

```
 1          answered that.  I'm going to say asked and answered
 2          on that.
 3                    But you can answer it again if you --
 4          if you want.
 5                    THE WITNESS:  I do feel that as I was
 6          submitted to be a director, so my qualifications
 7          and my location and my performance were appropriate
 8          for that position, it was requested, and I was
 9          denied.  Bruce Neff was approved.  When QualTek
10          submitted me to be the director, they knew I am not
11          relocating.  They knew I did not have a degree.  In
12          fact, I discussed it with Scott Heise, the CEO at
13          QualTek University in January of 2018.  This was
14          well-known.  They proceeded to submit me to be the
15          director with a 20 percent bonus and a raise, and
16          it was denied.  Later Bruce Neff was given the
17          director position, and I was told mine was going to
18          be rectified, and it never was.
19     BY MR. DOUGHERTY:
20     Q    Okay.  But Mr. Neff worked in the King of Prussia,
21          is that correct?
22     A    Correct, but when they submitted the request for
23          me, she knew I would not relocate, and they were
24          okay with it.  In fact, they let me hire staff --
25     Q    But --
```



Page 43

1   A    I thought I would be able to finish, please.  They

2        let me hire staff in Minnesota to report to me

3        here.

4   Q    But ma'am, you were submitted -- I understand that

5        you were submitted, but it was declined.  Isn't

6        that correct?

7   A    Yes, that's the issue.

8                   MR. KOLMAN:  Wait, let Mr. Dougherty

9        finish his question so the court reporter can put

10       down both your question and your answer, okay?

11  BY MR. DOUGHERTY:

12  Q    So ma'am, it was declined, and Mr. Neff worked in

13       King of Prussia and had a college degree and had

14       other experience?

15                  MR. KOLMAN:  Objection as to form.

16  BY MR. DOUGHERTY:

17  Q    Isn't that right?

18                  MR. KOLMAN:  Objection as to form.

19  BY MR. DOUGHERTY:

20  Q    We can move on.  Who's Mr. Eberling?

21  A    He was a man hired as a director in -- I don't

22       recall what year.  I want to say later 2019, but he

23       was director of finance.

24                  MR. KOLMAN:  I'm sorry, can we take

25       five?  I just need to put eye drops in.



Page 44

1              MR. DOUGHERTY:  That's fine.

2              (A short recess was taken.)

3    BY MR. DOUGHERTY:

4    Q    Ms. Carlson, we just came back from a break, and is

5         there anything now after the break or during the

6         break you thought of that -- from your testimony so

7         far that you want to change?

8    A    Not change, but I would like to clarify.

9    Q    Sure.  Go ahead.

10   A    I would like to clarify speaking about experience

11        and Bruce Neff's experience because I was able to

12        see performance and I knew the revenue numbers and

13        I knew how my numbers were -- how my processes went

14        and what my team did.  And they were much more

15        functional.  That they -- so much that QualTek

16        wanted to implement my processes with.  So I do

17        know based on performance that I was definitely

18        qualified more for this position.  Also, I have

19        many years of experience with a very specific type

20        of finance that's required for this, that gave me

21        that extra edge in understanding.

22              So I wanted to clarify to that piece

23        when it came to experience because the amount of

24        revenue and the processes and the teams for

25        revenue -- was four times as high on my side and



Page 45

```
 1            the processes were much more clear.  So much so
 2            that they wanted to implement my process and I
 3            insisted on that side of it.  I had three analysts
 4            handling four times the volume, and he had, I
 5            believe, three or more -- I don't remember how many
 6            analysts he had that were performing much less
 7            efficiently for a significantly less volume.
 8    Q       Is this Mr. Eberling?
 9    A       Mr. Neff.
10    Q       I believe you said there was Mr. Neff and
11            Mr. Eberling?
12    A       Mr. Eberling was hired in the end of 2019, I
13            believe.  So I don't understand exactly what he was
14            doing as I carried on my duties.  But after I was
15            terminated, I -- I was terminated shortly there --
16            like a few months after he was hired, so I don't
17            know exactly what he did or why he was there.
18    Q       So do you even know if he had the same role as you
19            or different role?
20    A       This -- this knowledge is extremely specific.  It's
21            not something you learn in school.  You learn by
22            experience and understanding the contracts with the
23            client and how they do revenue recognition, how we
24            handle the costs associated with it, how that fits
25            into our gap processes, and that's what I was --
```



```
 1          had the extreme knowledge of.  I also helped with
 2          pricing.  I helped with all sorts of aspects of the
 3          contracts with the clients because of my
 4          experience.
 5    Q     Okay.  I don't think that answered my question.
 6          What did Mr. Eberling -- did Mr. Eberling and you
 7          do the same thing?
 8    A     I do not know what Mr. Eberling did.  I don't know
 9          why he was hired, I just know that he was hired as
10          a director.
11    Q     And he was a man, so that's why you are assuming it
12          was discriminatory?
13                    MR. KOLMAN:  Objection as to form.  You
14          can answer.
15                    THE WITNESS:  Okay.  I saw two men get
16          promoted to the position that I was promised when I
17          was performing the job significantly better than
18          what I saw Mr. Neff performing.
19    BY MR. DOUGHERTY:
20    Q     Well -- okay, go ahead.  I'm sorry.
21    A     Okay.  So with this, I could make the assumption
22          that I was discriminated against as a woman, as I
23          was told I would get that position, but instead
24          they gave it to two different men.
25    Q     So what I'm trying to understand is it's unclear to
```



Page 47

```
 1              me whether it is the same position or a different
 2              position?
 3    A         Bruce Neff and I performed the same position.  He
 4              had 20 percent of the business.  I had 80 percent
 5              the business.  Our positions were identical.  In
 6              fact, the way it was split is if a question came in
 7              on turf, it came to me regardless, no matter what
 8              it was.  If it was a question on nonturf, it went
 9              to Bruce Neff.  We handled 100 percent of the
10              finances for those pieces and performed the exact
11              same job.  And I know that because every week we
12              had to perform and report the exact same forms
13              which had to hold the exact same meetings.  We had
14              to provide the base the exact same information.  We
15              both handled all aspects exactly the same, except
16              mine was turf and 80 percent of the business, and
17              his was nonturf 20 percent of the business.
18    Q         Okay.  And you don't know what Mr. Eberling did?
19    A         I don't know what he did or why he was hired.
20    Q         Well, I'm trying to understand, you say they were
21              the same position but they covered different
22              aspects.  One covers turf, one covers nonturf.
23              Turf and nonturf are different, correct?
24                        MR. KOLMAN:  Objection as to form.
25                        THE WITNESS:  The turf and nonturf -- I
```


MAGNA
LEGAL SERVICES

Page 48

```
 1          apologize.  Am I okay to answer?

 2                    MR. KOLMAN:  Sure.

 3                    THE WITNESS:  Okay.  The turf and

 4          nonturf split was simply like a process definition

 5          just so you have a clear line.  How we recognize

 6          revenue, how we reported it to the bank, how we

 7          held our meetings, how we obtained this

 8          information, what our teams bid, were identical.

 9  BY MR. DOUGHERTY:

10  Q     So that's your understanding of Mr. Neff's role,

11          but you don't have an understanding of

12          Mr. Eberling's role, correct?

13  A     I do not.

14                    MR. KOLMAN:  Objection, asked and

15          answered.

16                    THE WITNESS:  Is it okay if I answer?

17                    MR. KOLMAN:  So it's fine.  Only if I

18          tell you not to answer.  But just making the

19          objection asked and answered, you can answer it, no

20          problem.

21                    THE WITNESS:  Okay.

22  BY MR. DOUGHERTY:

23  Q     You testified earlier that Mr. Neff -- you feel you

24          were discriminated against because Mr. Neff and

25          Mr. Eberling were hired, but I'm trying to
```



Page 49

```
 1          understand what the basis on that other than -- if
 2          you don't know what he did, you don't know his
 3          background other than he's a man, right?  Does it
 4          just boil down to that he's a man, he got a
 5          director position and you didn't, and therefore --
 6          you are a woman, therefore it's discrimination?
 7                    MR. KOLMAN:  Objection as to form.  You
 8          can answer it if you can understand it and know
 9          what you are answering.
10                    THE WITNESS:  I can understand it
11          because his position that he was hired for was also
12          one I applied for.  The job description, every
13          single point on that job description was what I was
14          currently doing.
15  BY MR. DOUGHERTY:
16  Q    Well, I guess that's not entirely true, is it?
17          Because doesn't the job description say you had to
18          have a bachelor degree, MBA or CPA preferred, isn't
19          that correct?
20                    MR. KOLMAN:  Objection as to form.
21                    You can answer.
22                    THE WITNESS:  That was a qualification
23          that they had added after I was performing that
24          duty already.
25  BY MR. DOUGHERTY:
```



Page 50

1    Q    Well, but that's -- they posted the job position on
2         a national database.  Isn't that right?
3    A    On their website.
4    Q    Okay.  And they required the position to work in
5         the King of Prussia, right?
6    A    That was a requirement added after I was already
7         performing the job.  I want to repoint to the fact
8         that QualTek knew that I was not relocating and I
9         did not have a degree, and they were okay with it.
10        They let me hire staff in Minnesota, as I was not
11        relocating, and they knew I did not have a degree,
12        yet they still were okay with it and they requested
13        I be promoted to director.  And the form
14        specifically has it crossed off and written finance
15        management.  It states on the form, "replacing Dana
16        Freedman," who was the director of finance, and I
17        absorbed all of his duties.
18   Q    But Mr. Conn put you in for the director position,
19        that is your understanding.  Isn't that right?
20   A    And that's correct.
21   Q    And that position was denied?  You were denied that
22        position by Ms. Downey.  That is your
23        understanding, correct?
24   A    That is my understanding, but I would like to
25        clarify if I can?



Page 51

1    Q      Well --

2                    MR. KOLMAN:  Let her clarify, Colin.

3           Go on.

4    BY MR. DOUGHERTY:

5    Q      Let me finish my question.  Ms. Downey --

6                    MR. KOLMAN:  Wait, wait.  Colin, she's

7           answering your question, and she's simply

8           clarifying.  What's wrong with that?

9                    MR. DOUGHERTY:  I asked a yes or no

10          question.

11                   MR. KOLMAN:  That's not yes or no,

12          that's the trouble.  That's why she's clarifying.

13          Let her clarify.

14                   MR. DOUGHERTY:  Fine, clarify.

15                   MR. KOLMAN:  Go on.

16                   THE WITNESS:  I had spoken with Scott

17          Heise, who was Ms. Downey's superior, and he knew I

18          did not have a degree and I was not relocating, and

19          it was okay with QualTek.  I spoke with him on this

20          before the form was submitted.  The form was

21          submitted after with that knowledge.  Why

22          Ms. Downey declined it, I don't know and David Conn

23          doesn't know, and he could not provide me an

24          explanation.  If it was due to a degree, I believe

25          David Conn would have known and have told me.



Page 52

1   BY MR. DOUGHERTY:

2   Q     Well, why do you believe that?

3   A     Because he -- if that was a simple qualification,

4         you can't have that position because you don't have

5         a degree, he would have known the answer.  He did

6         not have an answer.  He did not understand why

7         Ms. Downey denied this request.

8   Q     What about if she denied because you wouldn't move

9         to the King of Prussia?

10  A     That was already established before the submission

11        of this, and it was clarified and understood by the

12        CEO of the company, who's her superior.

13  Q     But if --

14  A     Ms. Downey does not --

15  Q     He understood that --

16  A     -- they, okay.

17  Q     Let -- can I ask my question now?

18  A     Yes, you go ahead.

19  Q     So the job position that you applied for later that

20        was posted on their website required it to be in

21        the King of Prussia, required a college degree,

22        isn't that correct?

23              MR. KOLMAN:  Asked and answered.

24              You can answer it if you can.

25  BY MR. DOUGHERTY:



Page 53

```
 1  Q    Mr. Neff has a college degree, Mr. Eberling has two

 2       college degrees, and both were willing to work in

 3       the King of Prussia.

 4                 MR. KOLMAN:  Is that a question or is

 5       that a statement?

 6                 MR. DOUGHERTY:  Tim, are you making an

 7       objection?

 8                 MR. KOLMAN:  No, I'm just waiting for

 9       the question.

10                 MR. DOUGHERTY:  Okay.  Federal rules

11       require you are supposed to sit there like a potted

12       plant.  You know the case law, right?

13                 MR. KOLMAN:  I would like a question,

14       Colin.

15                 MR. DOUGHERTY:  I asked a question.

16                 MR. KOLMAN:  I'm not objecting.

17                 MR. DOUGHERTY:  Stop interrupting me.

18                 MR. KOLMAN:  I'm not interrupt you, I

19       thought you were finished.

20  BY MR. DOUGHERTY:

21  Q    So ma'am, if the reason was that you needed a

22       college degree for the position like it was posted,

23       and you didn't have a college degree, that would

24       not be discriminatory against you for being a

25       woman, correct?
```



Page 54

```
 1                    MR. KOLMAN:  Objection as to form.

 2                    You can answer.

 3                    Calls for speculation.

 4                    THE WITNESS:  The position that was

 5          posted requiring a college degree was posted when I

 6          had been performing this job for almost two years.

 7   BY MR. DOUGHERTY:

 8   Q     That wasn't an answer to my question.  The job

 9          required college --

10   A     That was the first --

11   Q     You didn't have it?

12   A     That was the first time I knew of a college degree

13          being required, was a year after I was performing

14          the position.  As I stated, it was a requirement

15          added after I had been performing the position.

16   Q     It was not the first time you had been told you had

17          -- the position was in the King of Prussia,

18          correct?

19   A     That was the first time I was told it was in King

20          of Prussia, as I had been performing it in

21          Minnesota for almost two years.

22   Q     The position was advertised that it was required to

23          be in the King of Prussia, correct?

24   A     The position posted in late 2019 stated that.  At

25          that point I had been performing the job for almost
```



Page 55

```
 1            two years.
 2     Q      And it was your understanding that Ms. Downey was
 3            the one that denied the position, correct?
 4     A      Correct.
 5     Q      Okay.  So Ms. Downey is a woman, and your position
 6            is she discriminated against you for being a woman.
 7            Is that right?
 8                      MR. KOLMAN:  Objection.
 9                      You can answer.
10                      THE WITNESS:  I don't know why she
11            denied it.  Ms. Downey did not work in finance,
12            Ms. Downey worked in HR.  Finance is where the
13            issue was, and that's where I had the issue.  What
14            happens in other departments, I do not know, as I
15            do not work in them.
16     BY MR. DOUGHERTY:
17     Q      But I'm trying to -- Ms. Downey was the ultimate
18            decision-maker, correct?
19     A      She was not supposed to be.  HR is simply supposed
20            to process the forms that are received after the
21            decision has been made by the head of the
22            departments that are hiring.
23     Q      And first of all, that wasn't my question.  She was
24            the ultimate decision-maker, isn't that your
25            understanding, correct?
```



Page 56

```
 1   A    No.
 2   Q    Okay.  And you aren't a -- you were never a CSWE
 3        person, so you have no idea how decisions are
 4        supposed to be made, do you?
 5   A    I was informed by David Conn that this -- they
 6        are -- there are decisions to make, and they
 7        submitted it to HR, and HR simply begins to process
 8        it.  He did not understand why they changed it.
 9   Q    But he told you Ms. Downey changed it, correct?
10   A    Correct.
11   Q    And when Mr. Eberling was hired, you never reached
12        out to Ms. Downey, did you?
13   A    I was advised at the point in March of 2018 when my
14        promotion to director was denied not to contact
15        Ms. Downey and push the issue, david Conn would
16        handle it.  When Mr. Eberling was hired and when
17        Mr. Neff got the promotion, I did make a complaint
18        to Lauren Petzar.
19   Q    And Mr. Eberling was hired 18 months after you
20        first -- the position you didn't get, the
21        promotion, correct?
22   A    Yeah, approximately that time frame.
23   Q    And it's --
24   A    I had been performing it for close to two years.
25   Q    My understanding is you believe then -- your
```



```
 1          testimony is you believe that you were
 2          discriminated twice and not did get a promotion
 3          that went to a man at that point when Mr. Eberling
 4          was hired.  Is that correct?
 5     A    Can you repeat that?  I don't understand.
 6     Q    Sure.  You believe that Mr. Neff was promoted, and
 7          as a man, that was the first discriminatory
 8          promotion to director, correct?
 9     A    Correct.
10     Q    And then 18 months later Mr. Eberling was hired,
11          and I believe your testimony is your belief is that
12          was the second discriminatory hire of a man in the
13          director role, correct?
14     A    Correct.
15     Q    Okay.  So after 18 months Mr. Conn had failed to
16          get you promoted at least twice.  Is that right?
17     A    Mr. Conn -- after the denial from HR in late
18          March of 2018, Mr. Conn had been telling me he was
19          going to rectify this issue.  And I trusted him to
20          do that.  Later on I ended up -- they pushed Shawn
21          Kemmerer, and Shawn Kemmerer was also working to
22          get me the director position.  So I was trusting
23          them to get this done.  After Bruce Neff got
24          promoted, I realized there was an issue, and I made
25          a complaint to HR.
```



Page 58

```
 1    Q     Okay.  And then Mr. Eberling got promoted and

 2          sometime later hired, actually, right?  So --

 3    A     Directly to the director position that was posted

 4          that I applied for, which was the exact job

 5          description that was I was performing.

 6    Q     And despite all of that you never contacted

 7          Ms. Downey?

 8    A     I was advised to not.

 9                    MR. KOLMAN:  Asked and answered.  You

10          can answer it again.

11    BY MR. DOUGHERTY:

12    Q     You were advised by Mr. Conn not to, correct?  More

13          than 18 months and two promotions later, you were

14          still trusting Mr. Conn's advice?

15    A     No, I made the report to HR after Bruce Neff got

16          promoted.  Then I realized there was an issue, and

17          I raised it with HR.  My contact in HR was Lauren

18          Petzar.  The hierarchy within there, I don't know.

19          Lauren I believe reported to Stephanie Trybula who

20          then reported to Elizabeth Downey, but my contact

21          was with Lauren, and I expected Lauren to handle it

22          as she was the manager or director of HR at that

23          time.

24    Q     And Ms. Petzar ultimately never got satisfaction

25          because you were never promoted, correct?
```



Page 59

1                      MR. KOLMAN:  Objection.

2                      THE WITNESS:  Your phone broke up

3         there.  Can you repeat the question?

4    BY MR. DOUGHERTY:

5    Q    Sure.  Ms. Petzar never handled it to your

6         satisfaction because you were never promoted,

7         correct?

8                      MR. KOLMAN:  Objection as to form.

9                      THE WITNESS:  Yes.

10   BY MR. DOUGHERTY:

11   Q    Okay.

12   A    It was never rectified after I made my complaint.

13   Q    Okay.  So I'm trying to understand, Ms. Petzar then

14        offered you a meeting with Ms. Trybula in person, I

15        believe, isn't that right?

16   A    That's correct.

17   Q    And you scheduled that meeting, isn't that correct?

18   A    That's correct.

19   Q    You ultimately chose to cancel that meeting even

20        though you were going to be in King of Prussia.

21        Isn't that correct?

22   A    That's correct, but I want to clarify on why I

23        canceled it.

24   Q    Okay.

25   A    I canceled it because I had a fear of retaliation.



Page 60

```
 1            Ms. Trybula, which she's -- which she then proved
 2            later on was a very difficult person.  And so
 3            she -- I had a strong fear of retaliation.  I was
 4            in the process of closing on a house, and I did not
 5            want to risk losing my job in the middle of closing
 6            on a house.  So I was scared of retaliation.  I
 7            told her that I would prefer not to talk to her,
 8            and I specifically said due to my fear of
 9            retaliation.
10   Q     Who did you say that to?
11   A     Lauren Petzar.
12   Q     And when did you say that to her?
13   A     I believe that was in the fall of 2019.
14   Q     And did you say that in an email?
15   A     I don't recall the form.  I honestly don't recall
16            if it was phone or email.  It would have been one
17            of the two.
18   Q     So you expressed to Ms. Petzar that you wanted to
19            cancel your meeting with Ms. Trybula because you
20            were afraid Ms. Trybula would retaliate against
21            you?
22   A     Correct.
23   Q     What was Ms. Petzar's response?
24   A     I don't recall her exact response.
25   Q     Have you ever seen the QualTek handbook?
```



Page 61

```
 1   A     Like see as in what?  Like laying on the table
 2         or -- what do you mean by "see"?  Please clarify.
 3   Q     Did you receive a copy of it when you were hired?
 4   A     All employees received a copy of the handbook, I
 5         believe via AED (phonetic) and had to sign off on
 6         there for the handbook.  So I do recall I was in
 7         King of Prussia at the point where I had to sign my
 8         final hiring paperwork with QualTek.  The meetings
 9         were very intense, and so they left it at the front
10         desk for me and said just sign these forms because
11         we need to process your payroll.  So I do recall
12         having to rush to sign the forms and not be given a
13         chance to read these documents due to the meetings
14         and requirements of the company.
15   Q     You were given a copy of the handbook.  Isn't that
16         right?
17   A     Not handed a copy of it, no.  I was given papers to
18         sign for onboarding.
19   Q     Sorry.
20   A     Copies were available online if you wanted to go
21         look at them.
22   Q     But I thought you just testified that they left it
23         at the front desk for you?
24   A     They left the paper to acknowledge all of these
25         things.  You have to sign a variety of paperwork
```



Page 62

```
 1              when you get onboarded.  And for them to be able to
 2              process my payroll, I had to sign all of these
 3              forms that day.  So they left it at the front desk.
 4              I was running by, they said here's the packet,
 5              sign, sign, sign.  And then I went on to my next
 6              meeting.  At that point it was still early, and I
 7              had a very good relationship with this company, as
 8              I was performing so well.  I was doing the entire
 9              implementation, their data conversion, everything.
10              So I had trust still.  At that point I don't -- we
11              hadn't even been -- they hadn't even denied my
12              promotion yet.  I still thought I was getting the
13              director position.  So at that point I didn't have
14              reason to mistrust them.
15         Q    And you went to QualTek University, I believe you
16              testified to that?
17         A    Correct, in January of 2018.
18         Q    And there's a manager's part of that that talks
19              about HR roles as a manager.  Isn't that right?
20         A    What was the question?  I didn't understand it.
21         Q    Isn't there a unit in QualTek University that talks
22              about as a manager HR policies, things like no
23              retaliation?
24         A    Sure.  They say they have no retaliation, no
25              discrimination, no bullying, all of which they had
```



Page 63

```
 1            proven that they obviously don't stick to.
 2    Q     Okay.  So everything you perceived from the company
 3            told you there was no retaliation, but your
 4            testimony is you believe Ms. Trybula would
 5            retaliate against you?
 6    A     Absolutely.
 7    Q     And why was that if you already complained to HR to
 8            Ms. Petzar, what's the --
 9    A     What was the question?
10    Q     If you already made a complaint to HR, why do you
11            think Ms. Trybula would retaliate against you when
12            Ms. Petzar wouldn't?
13    A     There was a history of retaliation with
14            Ms. Trybula.  In fact, they -- in the market where
15            I was located, it was a large opportunity in
16            Minnesota.  There was a director, and there was a
17            battle with the director and HR.  So Ms. Trybula
18            flew out and separated the company into --
19            separated the markets into groups, and they -- she
20            took the group and talked about why she was going
21            to terminate this director.  And her tone and her
22            approach was very harsh and very belligerent, that
23            was just her nature.  And so I had a fear of
24            retaliation, and due to closing on a house or just
25            having closed on a house, I did not want to lose my
```



Page 64

```
 1          job at that point.
 2                    And she proved this when later on I
 3          made a complaint about bonuses, and Ms. Trybula
 4          called me with David Conn and Shawn Kemmerer and
 5          chewed me out for making that complaint.  And it's
 6          a week later I was fired.
 7   Q      So when did you complain about bonuses?
 8   A      I complained about bonuses -- oh, I believe it
 9          was -- it was the week of January 24, which I think
10          the 24th was a Friday, in 2020.  So it would have
11          been during that week is when I was demoted and
12          told I was no longer going to have a team and I
13          would be moved to a reporting role.  Keep in mind,
14          they had just given me the highest possible raise
15          for performance two weeks prior.
16                    I then had to take a day off for mental
17          health because it was extremely disturbing.  I had
18          put my all into my team.  They were my heart and
19          soul and we had a good, good relationship.  And
20          even today they still tell me I'm their favorite
21          boss that they ever had.  I had to take a mental
22          health day.
23                    Ms. Trybula went and told David Conn
24          that I was taking a day off because I needed mental
25          health, which was not something I had disclosed to
```



Page 65

1        him or to Shawn Kemmerer, I had told HR, and -- I

2        told Lauren Petzar.  She went and violated my

3        personal confidentiality with HR and told them the

4        reason I was being -- I was off that day.

5                So I emailed Ms. Trybula and I said

6        these conversations I prefer to be private.  I

7        don't want you to discuss my medical history with

8        anybody.  This is a private thing.  She -- and then

9        I had also made a complaint -- I don't remember the

10       exact date, but this all happened during that one

11       week about the bonuses.  Because I had been getting

12       complaints from my employees and other employees

13       around, and I had made a list of the bonuses that

14       were paid out.  I had noticed a pattern that the

15       men were being paid 25 percent of their bonus

16       amount.  On average the women were paid -- mine was

17       14 percent, others were 3 percent, others were 2

18       percent.  The girl -- the woman -- or there was

19       women in there performing the same job as other

20       men, and her bonus potential was half of it.

21               So we started noticing this pattern,

22       and it was like this just proves again women are

23       not getting paid the same.  So I made this

24       complaint, and one of my employees also made a

25       complaint.  After that I was demoted.  I took a



Page 66

```
 1            mental health day, Ms. Trybula revealed my medical
 2            information to somebody who was -- I did not
 3            authorize her to.
 4                      I told her I didn't appreciate that.  I
 5            then got a phone call from Ms. Trybula telling
 6            me -- with Dave Conn and Shawn Kemmerer in a very
 7            belligerent manner that I should just be happy I
 8            got anything at all.  It's none of my business how
 9            they figure this out and if this is how it's going
10            to be, blah, blah, blah.  She was very belligerent
11            to the point I made a complaint to my supervisor,
12            Shawn Kemmerer, about how belligerent she was.  The
13            following week I was terminated.
14    Q       You were informed that the finance department was
15            going through a restructuring before you were
16            terminated.  Isn't that right?
17    A       After I made the complaint, I was demoted to a
18            reporting role and then changed to just straight
19            termination.  After they had given me the highest
20            bonus possible for my performance.
21    Q       Okay.
22    A       Two weeks prior.
23    Q       So did you make a complaint that you didn't receive
24            your bonus, or did you make a complaint that women
25            didn't receive bonuses?
```



Page 67

```
 1    A      I made a --

 2                    THE WITNESS:  Pardon me, Tim, you are

 3           on mute.  Tim?  Tim?  Still on mute.

 4                    MR. KOLMAN:  I'm sorry about that.  Can

 5           you hear me?  I was listening, so I just --

 6                    THE WITNESS:  Okay.  I thought you had

 7           an objection.

 8                    MR. KOLMAN:  Objection to -- what was

 9           the question?

10                    THE WITNESS:  Please repeat the

11           question.

12    BY MR. DOUGHERTY:

13    Q      Did you complain that you didn't receive the bonus

14           you expected or that women didn't?

15                    MR. KOLMAN:  That's an objection as to

16           form.

17                    But you can answer it.

18                    THE WITNESS:  Okay.  I made the

19           complaint that the bonuses paid out were not paid

20           out at an equal percent, noting that all the men on

21           my list where I had received the information got

22           paid 25 percent of their bonuses, where women were

23           paid 5 percent, 10 percent.  I got 14 percent.  And

24           that was it.  So it was a distinguishable pattern

25           based on the information that I had obtained.
```



Page 68

1    BY MR. DOUGHERTY:

2    Q    The amount of bonus dollars you received was more

3         than any of the men though, isn't that correct?

4                   MR. KOLMAN:  Objection as to form.

5                   THE WITNESS:  It's not -- the bonus

6         structure are set based on your position.  I should

7         have had a 20 percent bonus.  But you had a flat

8         bonus.  I was not complaining on this dollar

9         amount, I was complaining about the percentage paid

10        out as the potential bonus for everyone.  Everyone

11        had different bonus levels, so I was concerned that

12        if the men were getting paid 25 percent of their

13        bonus, I should also be getting paid 25 percent of

14        the bonus.  And the women beneath me should have

15        also been paid, but we weren't, only the men were

16        getting paid 25 percent of the bonus.

17   BY MR. DOUGHERTY:

18   Q    So it was your belief that you were entitled to the

19        20 percent bonus because it was -- you believe you

20        should have been a director?

21   A    That is the director's structure based on their

22        bonuses.  Managers get paid 10 percent, directors

23        get 20 percent.  I wasn't given a percent, they

24        gave me a flat bonus, so I had no opportunity to

25        get my bonus based on rate like the one I had



Page 69

```
 1          received two weeks prior.
 2     Q    Yeah, but that was outlined in your offer letter,
 3          correct?
 4                    THE WITNESS:  You are on mute again,
 5          Tim.
 6                    MR. KOLMAN:  Objection as to form,
 7          sorry.
 8                    THE WITNESS:  No problem.
 9                    Can you restate your question?
10     BY MR. DOUGHERTY:
11     Q    Your bonus amount was outlined in your offer
12          letter, correct?
13     A    Correct, as was everybody's.  But when the company
14          makes a determination on what they are paying out,
15          the percentages should be equal.  The company
16          performed this, so everybody only gets a quarter of
17          their bonus.  But we noticed that they only do that
18          for the men, not the women.
19     Q    When were you terminated?
20     A    January 31, 2020.
21     Q    Who performed the termination?
22     A    Lauren Petzar and Shawn Kemmerer.
23     Q    Was it in person?
24     A    Over the phone.
25     Q    And what did they tell you was the reasoning?
```



Page 70

```
 1   A    That my position was no longer available.  I

 2        believe, I don't recall, it had something to do

 3        with some -- some generic reason.  But it was

 4        obvious that it was done in retaliation because I

 5        had made this complaint that -- close to them

 6        deciding to change everything and terminated after

 7        I started complaining.

 8   Q    Are you aware of any other people that were

 9        terminated on January 31?

10   A    No, I'm not -- not that I'm aware of.

11   Q    And were you informed prior to that, that QualTek

12        was going through a company-wide restructuring at

13        the time you were terminated?

14   A    I was advised that they would be restructuring, but

15        I was given a different position.  They had told me

16        they would put me in a reporting role because they

17        wanted me to continue to work with the data.  And

18        then made a complaint -- or I had made the

19        complaint, and then the retaliation happened after

20        that.  And that title that I was told about a week

21        and a half prior was now no longer there, and I was

22        just gone.

23   Q    Have you talked to anybody about this lawsuit other

24        than your attorney?

25   A    As far as what aspects of it?
```



1  Q    As far as anything?

2  A    As far as any?  Only -- people would only know what

3       was publicly available information.  And I'm

4       talking about leaving my father and my mother and

5       my ex that I was with for 20-plus years.

6  Q    Have you talked to any potential witnesses?

7  A    I had reached out to Dana Freedman to ask her if

8       she would speak to my attorney, and she did.

9  Q    Okay.

10 A    I also reached out to Katrinka Tezyk and asked her

11      to speak to my attorney.  She said she was unsure

12      if she legally could, based on the verbiage in her

13      severance agreement, which the EEOC found to be

14      illegal in their findings from my complaint, and

15      that a class of people were affected by verbiage in

16      QualTek's severance agreement, so she was scared to

17      talk to the attorney.  I also contacted Shawn

18      Kemmerer just to see if he would connect with just

19      a simple, "Hey, I see you out there.  Would you

20      like to connect?  Give me a call here if you do."

21      And that was it.

22 Q    Well, was what through LinkedIn?

23 A    Yeah, through LinkedIn.  I had sent him a message.

24 Q    Anyone else?

25 A    I did talk to Kayla Lorenzen about speaking to my



Page 72

```
 1          attorney.  She did not want to -- she was scared of
 2          retaliation because Elizabeth Downey told her after
 3          she made a complaint about the bonus that if she
 4          pushes this issue, she would be terminated.  She
 5          was in the middle of a custody case and is
 6          terrified to get terminated right now because it
 7          would affect her custody case.  So she was nervous
 8          because of the potential.
 9      Q   Who's Kayla Lorenzen?
10      A   She was my former employee.  She's still employed
11          at QualTek.
12      Q   Where does she work?
13      A   She's in the Minnesota office, and she does finance
14          for Velocitel.
15                   MR. DOUGHERTY:  Why don't we take a
16          five-minute break.  I'm going to have some
17          documents to go over after I get them loaded up on
18          my screen and stuff.
19                   MR. KOLMAN:  I'm sorry, you are going
20          to ask about what?
21                   MR. DOUGHERTY:  Some documents.
22                   MR. KOLMAN:  So can we take ten.  Is
23          that okay?
24                   MR. DOUGHERTY:  Yeah, that's fine.
25                   (A short recess was taken.)
```



Page 73

```
 1   BY MR. DOUGHERTY:

 2   Q    Ms. Carlson, we took another break.  Coming back

 3        from the break, is there anything that you thought

 4        of from your testimony that you would like to

 5        change?

 6   A    No.

 7   Q    Okay.  So I'm going to share my screen.  Let me

 8        know if you can see it when it pops up?

 9   A    I can see it.

10   Q    Okay.

11              MR. KOLMAN:  I can see it.

12   BY MR. DOUGHERTY:

13   Q    Great, we'll call this Carlson 1.

14              (Exhibit 1 marked.)

15   BY MR. DOUGHERTY:

16   Q    And it's Carlson -- just Bates Number Carlson

17        Discovery 000024 through 26.  Do you recognize this

18        document, ma'am?

19   A    This is a job description, but this was not the job

20        description posted at the time of my termination.

21        I have a copy of one downloaded from that time.

22        This was posted a month -- over a month after I was

23        terminated.  It was a different one online at that

24        time.

25   Q    Well, you were terminated in 2021?
```



Page 74

```
 1   A    No, I was terminated in 2020.  This is -- the date

 2        posted on this document is 3-2-2020.  There was a

 3        different one posted on 1-27-2020 that I have a

 4        downloaded copy of.

 5   Q    Did you provide that to your counsel for

 6        production?

 7              MR. KOLMAN:  I don't know whether we

 8        had it.  Did you give that to me?  I'm not sure I

 9        saw it.

10              MR. DOUGHERTY:  I have it.

11              MR. KOLMAN:  That's fine, Colin.  One

12        second.

13              Lisa, did you have a copy of that one?

14              THE WITNESS:  I do.  It was also

15        provided to QualTek during the EEOC process along

16        with a detailed description line by line of how

17        this associated with what I was doing for my job.

18        So it was included in EEOC.

19   BY MR. DOUGHERTY:

20   Q    You --

21   A    It was in response to QualTek on I believe 5-20 of

22        2020 during the EEOC process that contained the

23        documents and my responses to each one.

24   Q    Can you provide that to your counsel when we are

25        done so he can get it to me?
```



Page 75

```
 1   A      Yes.

 2   Q      Thank you.

 3                 MR. KOLMAN:  Lisa, did you provide that

 4          to me or are you going to provide it?

 5                 THE WITNESS:  I did provide it.  There

 6          was an email I sent that had the -- I believe it

 7          was titled Carlson Rebuttal to QualTek EEOC or

 8          something like that.  And it contained these

 9          things.  I can resend or forward if you did not get

10          that.

11                 MR. KOLMAN:  Let me kill that sound.

12          One second.

13                 Okay.  Okay, that's good, we are fine.

14   BY MR. DOUGHERTY:

15   Q      Ma'am, how is this one different than the one that

16          you applied for?

17   A      The one posted before I was terminated was not the

18          one I applied for.  The one I applied for was

19          posted in November of 2019.  So again, this

20          document was created and posted after my

21          termination and after two other director of

22          finance, which QualTek does have.  It's in the EEOC

23          filing provided rebuttal and provided to QualTek, I

24          believe, on 5-20-2020 as part of the EEOC process.

25   Q      You said provided, but you mean you provided it to
```



Page 76

1           the EEOC?

2      A    It was a letter from my attorney in response to

3           QualTek's EEOC response.  So it was provided to

4           both QualTek -- I believe it was provided directly

5           to you and also to the EEOC.  So it would be on

6           5-20-2020, I believe, and it has a detailed

7           description of every point and how that -- how I

8           was performing that job at that time.  Do you have

9           that copy from 5-20-2020?  It would have been from

10          Aaron Sharp as an attorney.

11     Q    I do not.

12     A    I don't know if it was provided directly to you.

13                  MR. KOLMAN:  You are saying you don't

14          have a copy.  Is that correct?

15                  MR. DOUGHERTY:  Let's go off the record

16          for a second.

17                  (A short recess was taken.)

18     BY MR. DOUGHERTY:

19     Q    So this is the job application you just sent me

20          from January of 27, 2020.  Do you recognize this

21          document, Ms. Carlson?

22     A    Yes.

23     Q    And was this the application you applied for?

24     A    No, I applied in November of 2019.

25     Q    Is this -- how is this application different than



```
 1          the one you applied for?
 2    A     I would need to see them side by side to detail
 3          that out.  But this was the one that was posted at
 4          the time of my termination.
 5    Q     And it indicates that the position is in King of
 6          Prussia.  Is that correct?
 7    A     Yes, that's what it says.
 8    Q     And it indicates education requirement of a
 9          bachelor's degree in finance, accounting or similar
10          master's degree would be a plus.  CFA or CPA
11          credentials is a plus.  Is that correct?
12    A     That is what it says.
13    Q     Did the position you applied to in November also
14          have those requirements?
15    A     I do not recall what the job description
16          specifically said at that time.
17    Q     Okay.  So let's go to -- we'll call this Carlson 2.
18          It is a Carlson Discovery 000044 to 000045.
19                    (Exhibit 2 marked.)
20    BY MR. DOUGHERTY:
21    Q     Do you recognize this document, ma'am?
22                    MR. KOLMAN:  Wait, does everyone else
23          have something else on the screen?  I may not have
24          it.
25                    THE WITNESS:  Yeah.
```



Page 78

```
 1                    MR. KOLMAN:  Because I've got problems
 2           with my screen.  This is not the first time that's
 3           happened.  One second.  Oh, there it is.  There it
 4           is.  Go ahead.
 5                    THE WITNESS:  Yes, I do recognize this
 6           document.  I only see the first page though.
 7    BY MR. DOUGHERTY:
 8    Q      Okay.
 9    A      But I recognize this page.
10    Q      Here's the second page.
11    A      Yes, okay.
12    Q      Is that your signature?  Or I mean, it looks a
13           little faded from copying, but is that your
14           signature?
15    A      Yes.
16    Q      And is this your offer letter for when you
17           transitioned over from Velocitel to QualTek?
18    A      Yes.
19    Q      And it indicates your salary would be $92,300.  Is
20           that right?
21    A      Yes.
22    Q      Was that the same you were making at Velocitel or
23           less?
24    A      I don't recall, but I believe it was the same.
25    Q      Okay.  And it says here in the next paragraph you
```


MAGNA
LEGAL SERVICES

Page 79

```
 1              will be eligible to participate annually in the
 2              management incentive compensation program, or MICP.
 3              What was your understanding of the MICP?
 4      A       That it was the bonus program that QualTek had in
 5              place, and it had tiers for -- depending on the
 6              level of what your position is.  It was based on
 7              your title.
 8      Q       Okay.  The next sentence is "This discretionary
 9              program provides participants with an annual
10              incentive opportunity based upon company, business
11              group, and individual performance."  Did I read
12              that correctly?
13      A       Yes.
14      Q       What do you understand that sentence to mean?
15      A       That depending upon the performance of the company
16              and individual performance would determine the
17              amount of bonuses paid out.
18      Q       Do you understand that there's a possibility that
19              no bonus could be paid out?
20      A       It was a possibility, but there was a full bonus
21              paid out off of this offer letter.
22      Q       And in your first --
23      A       But it would be in the correct amount, yes.
24      Q       So what was paid in your first year?
25      A       My first year I was paid -- let's see here.  It was
```



Page 80

```
 1          paid out in -- at the end of 2018.  December of
 2          2018 we were advised that the full bonuses would be
 3          paid out half in January and half in June.  When I
 4          received my first half, I noticed that it was
 5          only -- and at this point I apologize, let me
 6          clarify one piece.  This offer letter only was in
 7          place until they had adjusted my offer letter when
 8          they submitted my request to become a director
 9          to -- to HR.  So the bonus that covered most of
10          2018 was actually the $20,000 bonus.
11                    When my amount was paid out after being
12          advised that it was full bonuses, I got half of
13          what HR had in their system as their bonus.  They
14          mistakenly entered my bonus of $5,000, and I was
15          paid $2,500.  I raised this issue to Shawn
16          Kemmerer.  He reached out to HR and was told too
17          bad, we can't change it in the system.  We'll try
18          to fix it by the second half payment.  The second
19          half payment came out, and it was still not
20          corrected in the system, and they told me there was
21          really nothing I could do about it.
22     Q    So it was your understanding that was an accounting
23          error?
24     A    It was an accounting error in HR.
25     Q    Okay.
```



Page 81

```
 1   A    There is a system that contains the bonus amounts,

 2        and mine was incorrectly entered at $5,000 instead

 3        of the $20,000 that I was under at the point of

 4        this.

 5   Q    So under this offer letter, you never received a

 6        bonus?

 7   A    No, not under this offer letter because this offer

 8        letter was only in place for three months.

 9   Q    Okay.  So is then the next offer letter -- this is

10        a document, Carlson Discovery 00050.  We'll call

11        this Carlson 3.

12                  (Exhibit 3 marked.)

13   BY MR. DOUGHERTY:

14   Q    Is the next offer letter you are talking about this

15        document?

16   A    Yes, this is the one that was signed in March of

17        2018.  So it controlled the majority of the year of

18        2018.

19   Q    And that's your signature on the bottom?

20   A    That is.

21   Q    This looks like you got almost a $12,000 raise.  Is

22        that right?  Raise up to $105,000 from $93,000?

23   A    Correct.

24   Q    It indicates your annual bonus potential would be

25        $20,000.  That's what you were talking about?
```



Page 82

```
 1   A      Yes.

 2   Q      Okay.  But you only got $5,000?

 3   A      It was supposed to be the full amount, but HR had

 4          mistakenly entered $5,000 in the system as my bonus

 5          potential.  They had made a clerical error instead

 6          of the $20,000.

 7   Q      Okay.  So that wasn't anything -- you don't think

 8          that was discriminatory, that was just a clerical

 9          error?

10                     MR. KOLMAN:  Objection as to form.

11          Calls for speculation.

12                     You can answer.

13                     THE WITNESS:  Can you repeat the

14          question?

15   BY MR. DOUGHERTY:

16   Q      Sure.  That bonus error -- we talked about a couple

17          of bonus errors and things like that, this one from

18          2018, so I understand it, is not a basis for

19          discrimination complaint, is it?

20                     MR. KOLMAN:  Objection, calls for

21          speculation.

22                     You can answer.

23                     THE WITNESS:  I don't know the reason

24          why they wouldn't correct my bonus into the system

25          to reflect what is actually on my offer letter.
```



Page 83

1    BY MR. DOUGHERTY:

2    Q    Okay.  If we go to the next document, it's

3         Bates-stamped QualTek 00188 and it goes through

4         QualTek 00190.  We'll call this Carlson 4.

5              (Exhibit 4 marked.)

6    BY MR. DOUGHERTY:

7    Q    So this is an email like when you read emails you

8         get to read them backwards -- actually, this one is

9         not backwards.  Yeah.  So here's page 2 with an

10        email.  It's -- the bottom of the first page is

11        from Matt Webb to you on December 2, 2019.  Do you

12        recognize or remember that e-mail?

13   A    I recall the conversation.  I don't remember the

14        exact verbiage in the email, but I do recall this

15        conversation via email.

16   Q    And you had a conversation or interview with Matt

17        Webb?

18   A    Yeah, I want to highlight where your mouse is right

19        now, this is an important part of this here because

20        if you read this piece of the email, it says, "In

21        regards to location, they will not consider anyone

22        outside of the QualTek office?  I currently do the

23        same thing in this position for Velocitel without

24        issue located in Minnesota."  And the company that

25        this was managing is actually located in Minnesota



Page 84

```
 1              and have worked with them -- oh, I recall this
 2              one -- so this was talking regarding a -- let's see
 3              here, they wanted a director to manage the -- it
 4              was acquisition for a company in Minnesota.  And so
 5              that's why I referenced this piece.  This was
 6              managed and actually located in Minnesota, and I
 7              had worked with them for many years.  "It would be
 8              a great benefit to working with them in person.
 9              Look forward to hearing back from you."
10   Q         This position was actually with QualTek Shared
11              Services, isn't that right?
12   A         It was to manage a new company acquisition for a
13              company called Vertical Limits.
14   Q         Okay.
15   A         Which their headquarters is in Minnesota near the
16              Minnesota office.
17   Q         Okay.  But the application specifically had a King
18              of Prussia office location.  Isn't that right?
19   A         I was told they would not consider anybody outside
20              of the QualTek office, which is why I had a
21              question mark, because I was wondering -- because I
22              was currently performing the same position in
23              Minnesota, and the company it was for was in
24              Minnesota as well.
25   Q         Right.  But you were informed it had to be the King
```



Page 85

```
 1            of Prussia office.  Isn't that right?
 2    A    For this position to manage Vertical Limit, Inc., I
 3            believe that I was told that from Lauren Petzar
 4            when I complained about the discrimination.  With
 5            Lauren Petzar I was saying I was going to apply to
 6            this, and they said that might be an issue because
 7            they wanted someone in the QualTek office.  So
 8            that's why I had question with Matt in this email.
 9    Q    So did you have this conversation with Matt Webb
10            that was implied here?
11    A    Yes, I did.
12    Q    And did he inform you that it was in the King of
13            Prussia office?
14    A    He said he was going to talk to his superiors to
15            see and understand why it needed to be in King of
16            Prussia because of the issues I had brought up in
17            the email.
18    Q    And did he also inform you that the decision was
19            made to keep it in King of Prussia?
20    A    Yes.
21    Q    And you were at the time unwilling to move to King
22            of Prussia.  Is that right?  Or to Pennsylvania?
23    A    Correct.  Because I had just closed on the house
24            that I referenced earlier.
25    Q    It looks like there's -- this is actually I think a
```



Page 86

```
 1         follow-up, so it looks like on Monday, December 9
 2         he got back to you?
 3    A    Yes.
 4    Q    And sort of formally said it has to be in King of
 5         Prussia.  Is that right?
 6    A    That's correct.
 7    Q    Okay.  Let's go to the next email, next exhibit.
 8         It starts with QualTek 000197 and goes through
 9         QualTek 000198.
10                   (Exhibit 5 marked.)
11    BY MR. DOUGHERTY:
12    Q    Do you recognize this email?
13    A    Yes.
14    Q    And you sent it to -- who's Kristie Marzocco?
15    A    She was the payroll manager at the time.  So I
16         included her, Lauren Petzar, her boss, and I cc'd
17         my manager.  And it references again how the
18         clerical error was still not corrected apparently
19         after the last one they changed it to $11,000 in
20         the system, again not $20,000.
21    Q    You copied Stephanie Trybula too?
22    A    Trybula, yes.
23    Q    So when you sent this, were you no longer concerned
24         that Ms. Trybula would retaliate against you?
25    A    She retaliated the next day against me.  I was
```



Page 87

```
 1          concerned but at this point I needed to have this
 2          corrected so I wanted to raise the flag as far as I
 3          could, which is why I included Lauren's boss and my
 4          boss.
 5   Q      Is this email from Friday, January 24 from
 6          Ms. Trybula the retaliation you are referring to?
 7   A      No, I'm referring to a phone call that was
 8          received.
 9   Q      Okay.  When did she make that phone call?
10   A      She made the phone call along with David Conn and
11          Shawn Kemmerer that same morning.  She called me
12          after these emails went.
13   Q      Okay.  What did she say?
14   A      She said that she was -- this is where she was very
15          belligerent and very forceful and said that it's
16          none of my business how things are calculated.  I
17          should quote/unquote be grateful that I got
18          anything at all, and that -- I don't recall, it was
19          a very belligerent conversation.  I don't remember
20          the rest of the words from it.  But I remember
21          being extremely upset and telling my boss, Shawn
22          Kemmerer, and I was extremely uncomfortable by her
23          tone and that it was really upsetting.
24   Q      And this occurred on --
25   A      Which is why she --
```



Page 88

```
 1    Q    Go ahead.

 2    A    This occurred on Friday, and you can see in the

 3         email above she follows up with an email saying,

 4         "Thank you for your time on Friday."  Yes, and this

 5         email does not reflect the tone she had in the

 6         call.

 7    Q    So in your email here on the -- from 9:38 says "I'm

 8         echoing Kayla's concerns."  What were Kayla's

 9         concerns?

10    A    Kayla and I compiled the list of the bonuses

11         showing that women were paid a lesser percentage of

12         their bonus, and that also we found that minorities

13         were paid lesser percentage of their bonuses.  So I

14         supported Kayla with this, and we emailed -- we

15         emailed HR, and then I responded back to echo on

16         this -- on her concerns too, to reinforce this.  I

17         was cc'd on the email that Kayla sent, and that's

18         why I requested this information, to understand how

19         these were calculated and determined that one

20         person qualified for a higher percent than another.

21              And as I state right here, this is the

22         second year I've been shorted on the correct bonus

23         paid amount compared to what the percentages were

24         paid and due to my system issue.

25    Q    Do you have that analysis?
```



Page 89

```
 1                    THE WITNESS:  Tim, you are on mute.

 2                    It was also provided in the initial

 3          EEOC claim.

 4   BY MR. DOUGHERTY:

 5   Q    Okay.  This will be -- what are we are up to,

 6          Carlson 6?

 7                    (Exhibit 6 marked.)

 8   BY MR. DOUGHERTY:

 9   Q    This starts at -- it jumps all around.  You know

10          what, strike this one.  This one jumps all around.

11                    (Exhibit 6 taken out.)

12                    MR. DOUGHERTY:  Why don't we take a

13          five-minute break.  I'm going to review my notes.

14          We are probably pretty close to being done.

15                    (A short recess was taken.)

16   BY MR. DOUGHERTY:

17   Q    I have a few more questions.  Ms. Carlson, you

18          testified earlier that you were part of the people

19          putting the transition or the finances together for

20          the QualTek acquisition for Velocitel.  Do I

21          remember that correctly?

22   A    Yes.

23   Q    Who else was on that team or in that group?

24   A    I worked with Dana Freedman and we worked with

25          Shawn Kemmerer on the QualTek side.
```



Page 90

```
 1   Q    I'm sorry, I wasn't clear.  Who else from old
 2        Velocitel was on it?  Just you and Dana or anyone
 3        else?
 4   A    I'm sure there were more people, but Dana and I
 5        assisted with the financial piece.  I'm sure Joe
 6        Busky, the CFO, was involved.  Yeah, that was
 7        pretty much -- and then Peter Nordby, who was our
 8        IT guy, had to be involved.  But we did the
 9        financials.
10   Q    Did Mr. Busky ever ask you to alter or change
11        numbers when they were being presented to QualTek?
12   A    Never.
13   Q    Did you ever express concerns about him for the
14        numbers at Velocitel to anyone at QualTek?
15   A    No, I don't recall doing that at all.
16   Q    Okay.  Was there ever an audit or anything done of
17        the old Velocitel numbers that proved to be
18        incorrect or called into question the veracity of
19        those numbers that you are aware of?
20   A    Not that I'm aware of.
21   Q    So you wouldn't have participated in any audit like
22        that?
23   A    No.  I did participate in every audit that was
24        held, but I provided information to the auditors
25        and was just advised the audits were complete and
```


MAGNA
LEGAL SERVICES

Page 91

```
 1          that I no longer needed to print that document.

 2    Q     Okay.

 3    A     This was an annual thing.  There was annual audits

 4          at the company.

 5    Q     Okay.  Did you have any concerns about the numbers

 6          that were being presented from Velocitel to

 7          QualTek?

 8    A     Not that I recall at all.

 9    Q     I'm going to show you my screen for one more

10          document.

11                     (Exhibit 6 marked.)

12    BY MR. DOUGHERTY:

13    Q     Do you recognize this document, ma'am?

14    A     Yes.

15    Q     Is this the chart you've been referencing about

16          bonuses?

17    A     Yes.

18    Q     Okay.  And this is the chart you and -- I'm sorry,

19          I believe you said Ms. Lorenzen helped you with?

20    A     Yes.

21    Q     And you are talking about your 14 percent bonus.

22          Is that right?

23    A     Yes.

24    Q     You agree with me that you received the highest

25          bonus of anyone on this chart by more than double.
```



Page 92

```
 1           Isn't that right?
 2    A      These were not equal parts.  These were people who
 3           were below me, so either reported to me or were
 4           formerly reporting to me.
 5    Q      And you didn't answer my question.  You would agree
 6           with me that you received the highest bonus on this
 7           chart by more than double.  Correct?
 8    A      I feel that question is misrepresenting the
 9           intention of this chart.  The chart was here to
10           show what -- the information that I had, how people
11           were paid based on percentages.
12    Q      And I'll --
13    A      And again, this is not line by line, so their bonus
14           potential as you can see is much lower.  So the
15           amount is actually irrelevant.
16    Q      And I'll -- again, I'll ask you the same question.
17                   MR. KOLMAN:  We'll stipulate that it
18           says that she got the most on that chart.  It's
19           quite clear that she did.
20    BY MR. DOUGHERTY:
21    Q      Were you aware of what Mr. Champion received?
22    A      I do not.  But the intent in there was Kayla was
23           performing the same job, and her bonus potential
24           was half.  And she still only got paid 9 percent of
25           half.  I -- the colors indicate levels of
```



Page 93

```
 1          management on the hierarchy, that's why they are
 2          colored in different groups.
 3     Q    And how did you get access to bonus and pay
 4          information?
 5     A    I did not access that information.  That is
 6          information that was verbally told to me by the
 7          employee.
 8     Q    So but you didn't actually see anybody's check,
 9          right?
10     A    No.  And I never searched to look for that
11          information because that would have been an
12          inappropriate use of my access that I had.
13     Q    So you don't know if it's true -- the information
14          you provided is true, you are just going with what
15          people told you?
16     A    The date that I collected that chart was the date
17          that the bonuses were paid out.  So people were
18          looking at their paychecks and giving me those
19          dollar amounts because of the discrepancies they
20          saw.
21     Q    Ma'am, we started over three hours ago.  Looking
22          back, is there anything you would want to change or
23          update in your deposition?
24     A    Not that I can think of right now at all.
25                    MR. DOUGHERTY:  Then I have no further
```



Page 94

1        questions.  Mr. Kolman may have some questions for

2        you, I don't know.

3                  MR. KOLMAN:  I don't have any

4        questions.  Thank you.

5                  She would like to read and sign.

6                  I would take a copy.  If you could put

7        it in all forms, that's ASCII, minuscript and any

8        others, that would be great.  Not hard copy.  Sent

9        by email, and we'll print it out.

10                  MR. DOUGHERTY:  I would like mini and a

11        digital.

12                  (The  deposition ended at 11:50 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 95

1   STATE OF MINNESOTA)

2                    ) SS.

3   COUNTY OF GOODHUE )

4

5           Be it known that I took the deposition of LISA

6   CARLSON on the 14th day of June, 2022;

7           That I was then and there a notary public in

8   and for the County of Goodhue, State of Minnesota, and

9   that by virtue thereof; I was duly authorized to

10  administer an oath;

11          That the witness before testifying was by me

12  first duly sworn to testify to the truth and nothing but

13  the truth relative to said cause;

14          That the testimony of said witness was recorded

15  in computerized stenotype and thereafter transcribed by

16  myself, and that the testimony is a true record of the

17  testimony given by the witness to the best of my ability;

18          That I am not related to any of the parties

19  hereto nor interested in the outcome of the matter.

20

21  WITNESSED MY HAND AND SEAL THIS 20TH DAY OF JUNE, 2022.

22

23

24  _____
                   *Lisa M. Hutton*

25                 Lisa M. Hutton

