**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LISA CARLSON** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO.  22-125** |
| | : | |
| **QUALTEK WIRELESS LLC** | : | |

## <u>MEMORANDUM</u>

**KEARNEY, J.**                                                          **August 10, 2022**

A Minnesota employee claims her former Pennsylvania based employer retaliated against her for complaining about gender bias by not promoting her to a position requiring work in Pennsylvania, not paying the correct bonuses for 2018 and 2019, and by firing her after she joined another woman in raising questions about the amount of bonus paid to her and another woman. The employer confirmed it denied promotion because the promotion required the person to be in Pennsylvania and the Minnesota employee did not want to move, and the termination arose from a restructuring of the employer's finance team. The employee also claims some form of oral contract as to a certain bonus payment under the Pennsylvania Wage Payment and Collection Law which is contrary to the written wage contract. Her arguments are based on scattered facts designed to induce a jury's sympathy. But her limited disputes of fact are immaterial to her claims of retaliation and failure to pay her view of a contracted bonus. There are no genuine issues of facts material to her claims. She fails to establish retaliation under federal law or a contractual obligation to pay a certain bonus under Pennsylvania's Wage Payment and Collection Law. We enter summary judgment in favor of the employer and dismiss the employee's Title VII and Equal Pay Act retaliation claims and claims under the Pennsylvania Wage Payment and Collection Law related to her purported bonus.

I.     **Undisputed facts material to the retaliation and wage payment claim.**[1]

Lisa Carlson of Minnesota began working in 2010 for Velocitel, Inc., a regional company based in Illinois providing services to wireless providers including its primary customer, AT&T.[2] Qualtek Wireless, LLC purchased Velocitel in November 2017. Qualtek is headquartered in this District and provides services to wireless telecommunications providers like AT&T throughout the United States.[3]

### *Ms. Carlson begins working for Qualtek in November 2017.*

Qualtek offered positions to several Velocitel employees including offering Ms. Carlson employment as a Market Financing Planning and Analysis Manager, the same position she held at Velocitel, in a November 19, 2017 offer letter.[4] Ms. Carlson does not have a bachelor's degree.[5] Qualtek offered Ms. Carlson an annual base salary of $92,300 and eligibility for participation in an annual Management Incentive Compensation Program, a bonus program.[6] Ms. Carlson had the potential to receive a bonus of up to ten percent of her base salary.[7] Ms. Carlson agreed Qualtek retained the discretion to pay the bonus based on Ms. Carlson's individual performance, Velocitel's performance, and Qualtek's overall performance.[8] Ms. Carlson accepted Qualtek's offer.[9]

Ms. Carlson continued to live in Minnesota while working for Qualtek.[10] She continued to report to her longtime supervisor, Dana Freedman, Velocitel's Director of Financial Planning and Analytics, also hired by Qualtek.[11] Director Freedman worked at Velocitel's corporate headquarters in Illinois.[12]

Qualtek permitted Ms. Carlson to continue working from Minnesota and Director Freedman to continue working from Illinois consistent with its practice, following an acquisition, to "leave everything as is and migrate to a shared services environment."[13] But Director Freedman travelled regularly to Qualtek's King of Prussia headquarters to meet with Qualtek's Finance

team.[14] Qualtek operated under a shared services model; its "back office functions" of Human Resources, risk and safety, payroll, finance, accounting, facilities, and information technology are centralized in one location.[15] The back office functions support all of Qualtek's operations at its field locations to, among other reasons, "ensure that situations are handled consistently so that [Qualtek] [does not] have redundancies across markets."[16]

### Qualtek makes Mr. Neff and Ms. Carlson Finance Managers in February and March 2018.

Qualtek offered Bruce Neff a position as a Finance Manager in February 2018 in its Pennsylvania home office with an annual base salary of $90,000 and eligibility to participate in the company's bonus program with a potential bonus of $10,000 prorated to his start date.[17] Mr. Neff holds a bachelor's degree in accounting and resides in Pennsylvania.[18]

Back in Illinois and Minnesota, Director Freedman resigned from Qualtek in March 2018.[19] Ms. Carlson swears she travelled to King of Prussia nearly every week in the early 2018 to transition Velocitel's financial process to Qualtek's process and (in her view) to transition Director Freedman's duties to her.[20] Former Velocitel Chief Financial Officer Joe Busky recommended Ms. Carlson replace Director Freedman.[21] Director Freedman also recommended Ms. Carlson as her replacement.[22] Former Velocitel CFO Busky completed an internal Velocitel "Personnel Action Notice" form on March 8, 2018 checking off the "promotion" box for Ms. Carlson to the position of "Director FPA" (which we understand as Director of Financial Planning and Analytics) as the "Replacement For" Director Freedman with an annual salary of $102,000.[23]

But Qualtek decided otherwise; it did not offer Ms. Carlson the Director of Financial Planning and Analytics position in March 2018. Qualtek's Chief Administrative Officer Downey instead offered Ms. Carlson the position of Finance Manager with a base salary of $105,000 with an "annual potential bonus eligibility [of] $20,000, however for 2018, it will be prorated to the

commencement date for this position."[24] Ms. Carlson accepted the terms of Qualtek's offer to become a Finance Manager with a potential bonus of up to $20,000 as confirmed in a March 30, 2018 offer letter.[25] There is no dispute Mr. Neff in Pennsylvania earned less in salary and potential bonus than Ms. Carlson when Qualtek hired Mr. Neff as a Finance Manager.

### Ms. Carlson complains about her 2018 bonus without referencing her gender.

Qualtek provided Ms. Carlson with a positive performance review for 2018.[26] Qualtek increased her salary to $115,000 and awarded a $5,000 bonus in December 2018.[27] Qualtek paid $2,500 of her 2018 bonus in December 2018 and $2,500 in June 2019.[28]

Ms. Carlson believed Qualtek made an error in her 2018 bonus award and she should have received a prorated $20,000 bonus for 2018.[29] Ms. Carlson "immediately" noticed the error in her bonus payment after receiving the first half of her 2018 bonus in December 2018 and contacted Qualtek's Payroll Manager Kristie Marzocco.[30] At some unidentified time after receiving the June 2019 payment, Ms. Carlson complained to her supervisor, Director of Finance Shawn Kemmerer, about her bonus.[31]

Director of Finance Kemmerer swore at his deposition: Ms. Carlson complained to him about her bonus and "at one point, it was shown or I had seen kind of the piece of the change that was approved and I know her bonus potential, which is always discretionary for Qualtek, had changed. That change was approved";[32] the approved bonus changed upward, from $5,000 to $20,000, but he did not know who made the change;[33] Qualtek made a discretionary bonus but he does not recall why, does not think it is performance-based "but I don't think it's for me to say at this point";[34] and he and Ms. Carlson understood the bonus "to be based off of some percentage of the annual bonus potential … but that doesn't necessarily mean that that was correct because it wasn't ever told specifically to us that way."[35]

Director Kemmerer swore he raised Ms. Carlson's concerns regarding her bonus to Vice President of Finance Dave Conn and Vice President of Human Resources Stefanie Trybula.[36] Director Kemmerer told Vice Presidents Conn and Trybula "[Ms. Carlson] had an understanding that her annual bonus amount as defined in ADP, which holds that information, was incorrect. I took her at her word and brought that up. Again, I didn't know at the time if it had changed of it was approved, I only know what the ADP was telling me."[37] Director Kemmerer swore Vice Presidents Conn and Trybula "acknowledged that, okay, yeah, there was a change that was not accurately reflected in ADP at that time," referring to the change in potential bonus to $20,000, and "they both acknowledged that, yes, it should have been changed."[38] Director Kemmerer then told Ms. Carlson he raised her complaint with Vice President Conn and Vice President Trybula.[39]

Ms. Carlson, at an unidentified later time, told Director Kemmerer Qualtek had not corrected the bonus potential error and he again spoke to Vice President Trybula who acknowledged the bonus potential error had not been corrected.[40] Director Kemmerer swore he sent an email to Vice President Trybula to notify her he "didn't see the change" to Ms. Carlson's potential bonus amount "in the system."[41] Director Kemmerer testified "[i]t's just a matter of, you know, is there something that's going to be updated in the system, because it was my understanding that any kind of bonus that was calculated to be paid out was discretionary in nature and whatever her total amount or total expected amount was, that, you know, may or may not have been different from what ADP was showing was not necessarily relevant for that calculation."[42] Director Kemmerer swore after raising Ms. Carlson's concerns regarding her 2018 bonus, Vice President Trybula acknowledged the information in the system is "incorrect."[43]

Ms. Carlson concedes there is no record linking the failure to receive the fullest portion of a potential $20,000 bonus for 2018 or her complaints to Director Kemmerer in mid-2019 to her gender.[44]

### Qualtek promotes Mr. Neff to a Director of Finance position and hires Brandon Ebeling to a Director position in 2019.

Qualtek transferred Mr. Neff in February 2019 to Velocitel.[45] The terms and conditions of his employment remained the same.[46] Qualtek promoted Mr. Neff to a Director of Finance position two months later.[47] Qualtek raised his annual salary to $115,000, the same salary increase Qualtek provided to Ms. Carlson at the end of 2018.[48]

Qualtek hired Brandon Ebeling to an open Director of Finance position on October 1, 2019 at a salary of $125,000 with a potential bonus eligibility of fifteen percent of his annual salary.[49] Mr. Ebeling holds a bachelor's degree in finance and master's degree in accounting.[50] Mr. Ebeling's duties included overseeing the west, central, and east divisions of Qualtek Wireless, LLC, working on reconciling the profits and loss for each market, advancing profitability in each market, and working on the management reports necessary to run the business.[51]

### Ms. Carlson complains in October 2019 about Mr. Neff's promotion and Mr. Ebeling's hiring but chooses to not attend a scheduled meeting to address her concerns.

Ms. Carlson alleges she complained about gender discrimination on October 10, 2019, after Mr. Neff's promotion to a Director position in April 2019 and Mr. Ebeling's hiring to a Director position in October 2019.[52] Ms. Carlson contends she complained to Human Resources Director Lauren Petzar on October 10, 2019 about Mr. Neff's promotion to a Director of Finance position and of discrimination on the basis of her gender.[53]

Human Resources Director Petzar sent Ms. Carlson an email on October 14, 2019 as a follow up to their October 10, 2019 conversation.[54] Human Resources Director Petzar asked Ms. Carlson for her availability to schedule a meeting to speak with Qualtek's Vice President of Human

Resources Trybula.[55] Ms. Carlson responded she planned on being in King of Prussia in the coming weeks and asked to wait to speak to Vice President Trybula until then. Human Resources Director Petzar asked Ms. Carlson if she is sure she wanted to wait and suggested they schedule a call and follow up with an in-person meeting. Human Resources Director Petzar suggested she and Ms. Carlson have a phone meeting on Thursday and Friday, October 17 and 18, 2019.

Ms. Carlson cancelled the meeting with Vice President Trybula.[56] Ms. Carlson concedes she cancelled the meeting but asserts she did so only in fear of retaliation.[57] In her separate Statement of Undisputed Facts, Ms. Carlson asserts she cancelled her meeting with Vice President of Human Resources Trybula for fear of retaliation and confided in Human Resources Director Petzar of her retaliation fear, citing her own deposition testimony Vice President Trybula "proved later on was a very difficult person."[58]

### *Ms. Carlson applies for a Director position in November 2019 and then does not pursue the position because Qualtek required this position to be located in Pennsylvania.*

Ms. Carlson applied for an open Director of Finance position at Qualtek's headquarters in King of Prussia in November 2019 even though she lived in Minnesota.[59] Ms. Carlson told Human Resources Director Petzar she applied for the open Director of Finance position in a November 26, 2019 email.[60] Human Resources Director Petzar notified Matt Webb, Qualtek's Director of Recruiting, of Ms. Carlson's application.[61] Human Resources Director Petzar also told Recruiting Director Webb and Vice President of Human Resources Trybula she "had that conversation with [Ms. Carlson] when I was in [Minnesota]. I told [Ms. Carlson] that shared services position [sic] are in [King of Prussia]. She is not relocating. She just purchased a home in [Minnesota]."[62]

Recruiting Director Webb told Ms. Carlson a week later he is the "new head of recruiting and [he would] be happy to set some time aside to discuss this position although I will mention that it will be located at the office in King of Prussia, PA" and asked to schedule a time to speak

to her.[63] Ms. Carlson responded, asking whether Qualtek would consider "anyone outside of the Qualtek [King of Prussia] office" explaining she "currently [performs] the same thing as this position for Velocitel, without issue[,] while located in [Minnesota], and the company that this would manage is actually located in [Minnesota] and I have worked with them for many years and it would be a great benefit to work with them in person."[64] Recruiting Director Webb told Ms. Carlson the Director position must be based at Qualtek's headquarters in Pennsylvania.[65]

Ms. Carlson told Human Resources Director Petzar she would not relocate to Pennsylvania because she purchased a home in Minnesota.[66] Ms. Carlson testified she knew at the time she applied for the open Director position, having been "told they would not consider anybody outside of the Qualtek office" in King of Prussia.[67] Ms. Carlson wondered whether she could work in a Director of Finance position in Minnesota because she performed the same work for Qualtek's new acquisition in Minnesota.[68] Ms. Carlson testified Human Resources Director Petzar told her the position required her to be at the King of Prussia office and her application for the Director position while still in Minnesota "might be an issue."[69] Ms. Carlson testified Recruiting Director Webb asked his "superiors to see and understand why [the position] needed to be in King of Prussia because of the issues I had brought up in the email" and, after inquiring, told Ms. Carlson the position must be in King of Prussia.[70] Ms. Carlson testified she was unwilling to move because she recently purchased a home in Minnesota.[71]

### Ms. Carlson contacts Vice President of Human Resources Trybula to complain about 2019 bonus disparities.

Ms. Carlson received a year-end salary increase to $118,450 in early January 2020.[72] Qualtek also paid her a $2,875 year-end bonus for 2019 on January 24, 2020.[73] Ms. Carlson complained to Payroll Manager Marzocco, Human Resources Director Petzar, and Vice President Trybula about the calculation of her 2019 bonus.[74] Ms. Carlson complained on January 23, 2020

of her "bonus [] calculated off off [sic] the wrong amount. My bonus is 20k, not 11k. Please have the correct amount deposited tomorrow."[75] Human Resources Director Petzar spoke with Ms. Carlson on January 23 and reported the conversation to Vice President Trybula.[76] Director Petzar reported Ms. Carlson is "upset due to the Finance reorg" so much so she "needed to take a mental health day."[77]

Vice President Trybula responded to Ms. Carlson on January 24, 2020: "I am aware that the discretionary bonus amount listed in your offer letter is [$20,000]. Please note that Kevin's email regarding the bonus explained that our Board of Directors approved a reduced bonus for the 2019 calendar year, as the Company did not achieve the appropriate thresholds to pay out a full bonus. Additionally, please be advised that Human Resources did not determine the bonus amounts that were issued to employees. You were approved for a gross amount of $2,875."[78]

Around this same time—January 23, 2022—Kayla Lorenzen, Finance Supervisor and Ms. Carlson's direct report, emailed Vice President Trybula and Director Petzar to complain about her own 2019 bonus.[79] Ms. Lorenzen complained her bonus should be $7,500, she received less, and her team received a higher percentage bonus than she received.[80] Vice President Trybula responded to Ms. Lorenzen's complaint on January 24, 2020, telling Ms. Lorenzen bonuses are discretionary and the company did not reach its threshold to award a full bonus.[81] Ms. Lorenzen responded two hours later with a complaint her bonus is less than fifty percent of her male counterparts with the same title, less than others' bonuses, and complained African American men received one-fifth of the bonus received by others.[82]

Ms. Carlson emailed Vice President Trybula minutes later "echoing" Ms. Lorenzen's "concerns" and questioned Qualtek's method of calculating bonuses, complaining "[t]his is the [second] year that I have been shorted on the correct bonus payout, compared to what [percentages]

were paid to other employees and my counterparts."[83] Vice President Trybula responded bonuses are discretionary and the 2019 bonuses were paid at a reduced amount based on the overall performance of the company.[84]

Vice President Trybula, Vice President of Finance Conn, and Director of Finance Kemmerer (Ms. Carlson's supervisor) spoke with Ms. Carlson on January 24, 2020 as a follow-up to her email questioning her bonus.[85] A memorandum of their talk drafted by Vice President Trybula reports telling Ms. Carlson the company, especially Velocitel, did not hit its 2019 targets.[86] Ms. Carlson denies this fact, objecting to Qualtek's failure to produce a corporate financial document to support lower-than-expected targets for 2019 and producing a document she identifies as a "cash flow analysis" for 2019.[87] The document Ms. Carlson purports to be a "cash flow analysis" for 2019 is a March 31, 2022 press release announcing Qualtek's fourth quarter and annual 2021 financial results.[88] She also cites Director Kemmerer's deposition testimony he did not, in his opinion, believe Qualtek's 2019 performance would make it a "stretch" to pay out bonuses.[89]

### Qualtek reassigns Ms. Carlson to a new financial reporting role and restructures the Finance Team in January 2020.

Ms. Carlson handled the finance side of an AT&T contract.[90] Qualtek lost the AT&T "turf contract," a Velocitel customer in Minnesota at some time not identified by the parties. By 2019, Velocitel's financial reporting became integrated into Qualtek's shared services system.[91] Ms. Carlson no longer had integration work but she remained responsible for weekly financial reporting "across the markets in which she was designated," monthly reporting for journal entries for accounting purposes, and monthly reporting to corporate, executive level financial and operational meetings, and management of a small team of employees.[92]

Ms. Carlson concedes Qualtek eliminated all Finance Manager positions in early 2020, including her position as Finance Manager.[93] Qualtek reassigned Ms. Carlson to a new financial reporting role on January 21, 2020 on Director Kemmerer's recommendation.[94] Ms. Carlson considered the new position a demotion.[95] But she does not dispute her salary remained the same.[96]

### Qualtek restructures the Finance Team and terminates Ms. Carlson's employment on January 31, 2020.

Qualtek Vice President of Finance Conn announced a restructuring of the wireless corporate finance team on January 31, 2020.[97] Qualtek also terminated Ms. Carlson's employment on the same day.[98] Qualtek also transitioned Kayla Lorenzen (who sent the January 24, 2020 email regarding bonus issues) "to a role supporting National Billing/Unbilled efforts for Wireless" as part of restructuring the Finance Team.[99]

### Ms. Carlson filed a charge of discrimination with the EEOC and then sues.

Ms. Carlson filed a charge of discrimination with the EEOC on April 15, 2020.[100] She alleged discrimination based on sex, retaliation, and a violation of the Equal Pay Act beginning March 30, 2018 to the date of her termination on January 31, 2020.

Ms. Carlson sued Qualtek on January 11, 2022, later amending her complaint. She alleges Qualtek: (1) retaliated against her for opposing sex-based discrimination in violation of Title VII; (2) violated Pennsylvania's Wage Payment and Collection Law; (3) violated the Equal Pay Act; and (4) retaliated for complaining about unequal pay in violation of the Equal Pay Act.[101]

## II. Analysis

Qualtek moved for summary judgment on all claims.[102] We held oral argument where Ms. Carlson: (1) clarified her Title VII claim is based on a retaliation theory only, not a disparate treatment claim based on gender;[103] (2) limited her Pennsylvania Wage Payment and Collection Law claim to her 2018 bonus only; and, (3) withdrew her Equal Pay Act claim. Remaining for our

review, then, are Ms. Carlson's claims for Title VII retaliation; a Pennsylvania Wage Payment and Collection Law claim for her 2018 bonus only; and an Equal Pay Act retaliation claim. We grant Qualtek's motion for summary judgment.

### A.    Ms. Carlson fails to adduce evidence of pretext to proceed to trial on her Title VII and Equal Pay Act retaliation claims.

Ms. Carlson claims Qualtek retaliated against her by failing to promote her, failing to pay her full bonus, and terminating her after she complained on October 10, 2019 about Mr. Neff's promotion to a Director position and on January 24, 2020 about gender-based bonus discrepancies in violation of Title VII and the Equal Pay Act.

Congress in Title VII makes it unlawful for an employer to retaliate against an employee for opposing "any practice made an unlawful employment practice by this subchapter."[104] Congress in the Equal Pay Act makes it unlawful for an employer to retaliate against an employee in the form of "discharge or in any manner discriminate against any employee because such employee has filed and complaint or instituted or caused to be instituted any proceedings under or related to this chapter."[105]

We analyze retaliation claims under both Title VII and the Equal Pay Act in the same way under the *McDonnell Douglas*[106] burden-shifting framework.[107] Ms. Carlson must first establish a *prima facie* case of retaliation. To establish a *prima facie* case, Ms. Carlson must point to evidence: (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) there is a causal connection between her protected activity and the adverse employment action.[108] If Ms. Carlson meets this burden, the burden shifts to Qualtek to provide a legitimate, non-retaliatory reason for the adverse employment actions. If it does so, the burden shifts back to Ms. Carlson "to convince the factfinder both that the employer's proffered explanation was false [that is, a pretext], and that retaliation was the real reason for the adverse employment action."[109]

Qualtek conceded at oral argument this is a pretext case.[110] It cites legitimate non-retaliatory reasons for each of the three challenged adverse actions. Its reasons include the discretionary nature of the bonuses set by a written contract.  We also recognize the written contract cannot be amended absent consent in writing.; Ms. Carlson's failure to promote claim fails because Qualtek requires finance directors to be located in Pennsylvania for work in its King of Prussia headquarters; and Ms. Carlson's termination claim fails because Qualtek's Finance Team restructuring in January 2020 eliminates Ms. Carlson's position.

Ms. Carlson contends these reasons are pretext for Qualtek's retaliation against her for complaining about gender-based disparities in failing to promote her to a Director position, disparities in bonuses, and in terminating her. To meet her burden of showing pretext, Ms. Carlson "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve [Qualtek's] articulated legitimate reasons; or (2) believe that an invidious [retaliatory] reason was more likely than not a ... determinative cause of [Qualtek's] action."[111] Ms. Carlson "'cannot simply show [Qualtek's] decision was wrong or mistaken' but rather 'must demonstrate such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in [Qualtek's] proffered legitimate reason for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer … [Qualtek] did not act for [the asserted] nondiscriminatory reasons.'"[112] Our role is not to question the wisdom on Qualtek's internal decisions including whether it should change its policies on Pennsylvania employees or criticize its restructuring. We instead focus on whether Qualtek's reasons provided to Ms. Carlson for failing to promote, bonus disparities, and terminating her are pretext for its real reasons for these adverse actions: to retaliate against her for protected activity as a Qualtek employee.

We need to first define the protected activity which Ms. Carlson claims led to Qualtek's actions.  We then analyze what happened to Ms. Carlson and when it happened. We then examine the adduced evidence to see if Ms. Carlson can show basis for us to disbelieve Qualtek's business reason or find an invidious retaliatory reason is more likely the determinative cause of the adverse action.

> **1.    Ms. Carlson offers no evidentiary basis Qualtek's decision to not promote her to a Pennsylvania Director position is pretext for retaliation following her October 10, 2019 complaint to Human Resources Director Petzar about Mr. Neff's promotion.**

Ms. Carlson swore she complained to Human Resources Director Petzar on October 10, 2019 about Qualtek's failure to promote her to a Director position based on her gender.[113] Although Human Resources Director Petzar swore she does not remember Ms. Carlson complaining about gender-based failure to promote, we will assume Ms. Carlson complained about gender bias; a protected activity.

We now need to find an adverse employment action arising from her October 10, 2019 complaint. At oral argument we asked Ms. Carlson's counsel to identify the adverse employment action Ms. Carlson suffered after the October 10, 2019 protected activity, the second prong of the *prima facie* case. Counsel identified Qualtek's failure to promote her in November 2019 when Ms. Carlson applied for an open Director position. Ms. Carlson's counsel argued the failure to promote her to Director hampered her ability to earn more in wages and bonuses and prevented her from reaching the status of Director.

We are skeptical Ms. Carlson satisfies her burden at the *prima facie* stage to show an adverse action in temporal proximity to her October 10, 2019 complaint. The record shows when Ms. Carlson applied for an open Director position around November 26, 2019, both Human Resources Director Petzar and Recruiting Director Webb told her the position required her to be

in King of Prussia. After she asked Recruiting Director Webb if Qualtek would consider hiring her to the position despite her location in Minnesota, Recruiting Director Webb confirmed the position required work at Qualtek's King of Prussia headquarters. Ms. Carlson did not pursue the position because she would not relocate to Pennsylvania, having purchased a home in Minnesota. The record shows Ms. Carlson did not pursue her interest in the Director position after learning the position required working at Qualtek's headquarters in King of Prussia, a decision she made and not an adverse employment action taken by Qualtek.

But even if the November 2019 "failure" to promote her is an adverse action, Ms. Carlson does not adduce evidence of a causal connection by an unusually suggestive temporal proximity between her October 2019 complaint and the November 2019 "failure" to promote or evidence of a pattern of antagonism or retaliatory animus coupled with timing.[114] Our Court of Appeals considers temporal proximity of two days is unusually suggestive of causation but a temporal proximity of greater than ten days requires supplementary evidence of retaliatory motive.[115] Ms. Carlson offers neither unusually suggestive temporal proximity or "timing plus other evidence" to show a retaliatory motive at the *prima facie* stage.

But even if Ms. Carlson met her burden to establish a *prima facie* case of retaliation, she cannot show Qualtek's reason for failing to promote her in November 2019 is pretextual. The record shows Qualtek required the finance Director position to be located at its headquarters in King of Prussia. The record shows Ms. Carlson knew Qualtek required the Director to be located in King of Prussia. Ms. Carlson asked Recruiting Director Webb if Qualtek "would consider anyone outside of the Qualtek [King of Prussia] office?"[116]

Ms. Carlson contends the location requirement is a pretext for retaliation. She argues she had been doing the same job from Minnesota; her supervisor Director Kemmerer testified in his

opinion there is no reason why Ms. Carlson couldn't continue to perform her work from Minnesota; and the 2018 Personnel Action Notice completed by former Velocitel CFO Busky recommended she be promoted to a Director position. But there is no evidence either Director Kemmerer or former CFO Busky were the decisionmakers in hiring for the November 2019 open Director position. Ms. Carlson's entire argument is because non-decisionmakers **_recommended_** her for a Director position in 2018 while she resided in Minnesota—a recommendation never approved by a Qualtek decisionmaker—Qualtek added the requirement to work in King of Prussia after she "was already performing the job" and is pretext for retaliation in November 2019.[117] Ms. Carlson testified she knew the Director position posted in November 2019 required work at the King of Prussia headquarters.[118] There is no evidence Qualtek hired anyone—man or woman—to a Director position outside of its King of Prussia headquarters. In fact, the two men hired by Qualtek in Director positions—Mr. Neff and Mr. Ebeling—both worked in the King of Prussia office.[119] Ms. Carlson fails to point to evidence to either disbelieve Qualtek's requirement a Director be located at its King of Prussia headquarters or believe an invidious retaliatory reason is more likely than not a determinative cause of Qualtek's failure to hire her to a Director position in November 2019. There is no evidence of "weaknesses, implausibilities, inconsistencies, incoherences, or contradictions" in Qualtek's proffered legitimate reason for its action to allow a reasonable factfinder to rationally find its reason "unworthy of credence" and to infer Qualtek did not act for non-retaliatory reasons.[120] Ms. Carlson's best reasons during oral argument challenged the wisdom of Qualtek's policy of requiring these positions be managed in Pennsylvania and suggesting the job could be done just as well in Minnesota. Maybe she is right. But our concern is not the wisdom of Qualtek's internal processes or business judgment in managing its financial

team. Our concern is whether Ms. Carlson can cite credible evidence Qualtek failed to promote her in November 2019 as retaliation for her October 2019 complaint. Ms. Carlson offers none.

We grant Qualtek's motion for summary judgment on Ms. Carlson's retaliation claims as she offers no basis for us to find Qualtek's policy of requiring its Finance Directors work in its home offices in Pennsylvania is pretext for retaliation against her following her October 10, 2019 complaint.

> **2.      There is no basis to find the Finance Team restructuring resulting in terminating Ms. Carlson is pretext for retaliation for Ms. Carlson's January 24, 2020 email echoing Kayla Lorenzen's concerns about gender-based disparities in bonus payments.**

Ms. Carlson claims Qualtek fired her on January 31, 2020 as retaliation for her January 24, 2020 email complaining about the amount of her 2019 bonus "echoing" Ms. Lorenzen's concerns about gender-based disparities in bonus payments as protected activity. Qualtek terminated Ms. Carlson one week after her January 24, 2020 email.

For purposes of our analysis, we again assume Ms. Carlson meets her burden of establishing a *prima facie* case of retaliation: Her January 24, 2020 email constitutes protected activity, Qualtek terminated her employment, and there is a causal connection between the January 24, 2020 email and her termination a week later.[121]

Qualtek contends it terminated Ms. Carlson because of a company restructure of the Wireless Corporate Finance Team and her inability to meet the company's current needs.[122] Qualtek believed Ms. Carlson's perceived lack of skills "put her in this role where the business didn't really see a need for the way that the finance wanted to be structured going forward."[123] It cites an email from Vice President of Finance Conn to the Finance Team explaining the restructure sent the same day as terminating Ms. Carlson.[124] Vice President Conn's email confirms Qualtek did not terminate Ms. Lorenzen even though she is the person who first complained about gender-

based discrepancies in bonuses.[125] Vice President Conn swore he, the finance team, and his "boss" had a goal to "ultimately have a specific team, corporate finance team in King of Prussia … and "[i]t's what worked in the past, it's what I—the team I wanted to build" and "this is the direction we wanted to go as we were growing and creating a corporate finance team, having a team in King of Prussia."[126] Qualtek also asserts, and Ms. Carlson concedes, it eliminated all Finance Manager positions (the position she held until January 21, 2020) and re-assigned her to a new financial reporting role.[127] Qualtek asserts the restructuring affected at least sixteen other employees and Ms. Carlson does not dispute it.[128]

Ms. Carlson responds Qualtek has "not one document, corporate or otherwise, reflecting, referencing, or relating to any 'reorganization' which resulted in the termination of anyone else but [her]."[129] Ms. Carlson argues Qualtek's January 31, 2020 Finance Team restructuring is a pretext for retaliation against her because no other employee lost a job in the restructuring and, because Qualtek is a "public company," restructuring of the Finance Team "should trigger some paperwork" but there is none.

Ms. Carlson does not adduce facts or otherwise misunderstands the material facts. Qualtek was not then a public company.[130] And Ms. Carlson does not offer evidence Qualtek must, or has, provided advance notice of Finance Team (or any other division or team) restructurings. She baldly argues the Finance Team restructuring reason is not credible and Vice President Conn's January 31, 2020 email regarding restructuring is of no evidentiary value and we must deny summary judgment. She looks for a jury and argues the wisdom of Qualtek's business judgment; she seemingly would do it differently. But she is not the employer. Ms. Carlson fails to cite evidence Qualtek's restructuring of the Finance Team is a pretext; her entire argument is she is the only employee who lost her job and there are no documents or "paperwork" evidencing a restructure

18

except the email on the same day announcing the Finance Team restructure. She contends wholly out of an undisclosed source of corporate experience it is not credible for a company to restructure a Finance Team without some preview documents. We are aware of no such obligation upon an employer and can appreciate corporate security reasons why there may not be advance notice particularly involving Finance Team obligations and the slippery nature of financial data maintained on remote data systems accessed from anywhere. Ms. Carlson then drops back to her old colleague Director Kemmerer who had been very complimentary about her financial skills. But Director Kemmerer testified he is not the decisionmaker in Ms. Carlson's termination.[131] And there is no evidence Director Kemmerer played any role in the Finance Team restructuring decision.

Ms. Carlson must point to evidence to either disbelieve her termination is a result of the Finance Team's restructuring or believe an invidious retaliatory reason is more likely than not a determinative cause of her termination. Vice President Conn swore to the decision to restructure Qualtek's finance team. There is no evidence of "weaknesses, implausibilities, inconsistencies, incoherences, or contradictions" in Qualtek's proffered legitimate reason for its action to allow a reasonable factfinder to rationally find its reason "unworthy of credence" and to infer Qualtek did not act for non-retaliatory reasons.

We grant summary judgment in favor of Qualtek on Ms. Carlson's claim Qualtek terminated her through a restructuring of the Finance Team as retaliation for "echoing" another employee's concerns when, as is not disputed, Qualtek retained the employee making the complaint.

      **3.**         **Ms. Carlson adduces no evidence of a causal nexus between her October 24, 2019 or January 24, 2020 protected activity and retaliation through bonus disparities in 2018 and 2019.**

Ms. Carlson also claims Qualtek's failure to pay her full potential bonus in 2018 and 2019 violates both Title VII and the Equal Pay Act. Qualtek responds bonuses were always discretionary.

      **a.**         **Ms. Carlson offers no protected activity before the 2018 bonus decision.**

When pressed for the timing of her protected activity relevant to her retaliation claims, Ms. Carlson conceded at oral argument she did not complain about bonus disparities based on gender until October 10, 2019.[132] By that time, Qualtek had already determined her bonus—which she contends is erroneous—and paid it in two installments in December 2018 and June 2019.[133] There is no record of protected activity before October 10, 2019. We enter summary judgment in favor of Qualtek on Ms. Carlson's Title VII and Equal Pay Act claims regarding her 2018 bonus.

      **b.**         **Ms. Carlson offers no evidence the 2019 bonus decision is causally connected to protected conduct.**

We turn to Ms. Carlson's 2019 bonus. Qualtek awarded Ms. Carlson a $2,875 bonus around January 24, 2020.[134] Ms. Carlson emailed Vice President of Human Resources Trybula to "echo" Ms. Lorenzen's concerns about gender-based bonus discrepancies and to inquire "how [bonuses] were fairly calculated and determined that one person qualifies for a higher payout than another. This is the [second] year that I have been shorted on the correct bonus payout, compared to what [percentages] were paid to other employees and my counterparts."[135] Vice President Trybula responded the 2019 bonuses are discretionary and paid at a reduced amount because of Qualtek's overall performance.[136]

Ms. Carlson contends her "shorted" 2019 bonus is in retaliation for her complaints of gender bias in promotion and bonus payments. But by January 24, 2020, Qualtek had already

determined and awarded her 2019 bonus; indeed, Ms. Carlson's January 24, 2020 email complained about the 2019 bonus. Ms. Carlson's email to Vice President Trybula on January 24, 2020—even if we construe Ms. Carlson's "echoing" of Ms. Lorenzen's gender-based bonus discrepancies—came *after* the 2019 bonus had already been determined and awarded. We cannot see how the calculation of the 2019 bonus could be in retaliation for Ms. Carlson's January 24, 2020 email to Vice President Trybula. This leaves us with only one other instance of protected activity—the October 10, 2019 complaint to Director of Human Resources Petzar three months earlier. As fully analyzed, Ms. Carlson must meet her burden at the *prima facie* stage to point to evidence of a causal connection between her October 10, 2019 complaints about gender-based promotion discrimination and the 2019 bonus awarded on January 24, 2020. Ms. Carlson may meet this burden by pointing to evidence of an unusually suggestive temporal proximity or evidence of a pattern of antagonism or retaliatory animus coupled with timing. She fails to cite such evidence and does not carry her burden of proving a *prima facie* case of Title VII or Equal Pay Act retaliation.

But even if Ms. Carlson met her burden to establish a *prima facie* case of retaliation as to her bonuses, she fails to meet her burden of showing pretext. Qualtek's asserted reason for paying only a portion of her potential bonus is the discretionary nature of bonuses and the company's performance. Ms. Carlson fails to cite evidence of retaliatory animus as the real reason for her 2019 bonus as a result of her January 24, 2020 complaint or her October 10, 2019 complaint about being passed over for promotion. Ms. Carlson instead cites to a chart she prepared for her EEOC complaint showing Qualtek paid men a higher percentage of bonus than women.[137] But this is not the basis of Ms. Carlson's Title VII and Equal Pay Act retaliation claims. Her amended Complaint alleges Qualtek retaliated against her by paying her less in bonus than Mr. Neff and Mr. Ebeling.[138]

Her chart does not include Mr. Neff or Mr. Ebeling, who hold Director positions different than her.[139] Ms. Carlson fails to connect the dots between her January 24, 2020 email to Vice President Trybula and her 2019 bonus. We enter summary judgment in favor of Qualtek.

> **B.    Ms. Carlson fails to meet her burden on the Wage Payment and Collection Law claim.**

Ms. Carlson contends Qualtek's failure to pay her 2018 bonus is a violation of Pennsylvania's Wage Payment and Collection Law.[140] Pennsylvania's General Assembly through the Wage Act "provides employees a statutory remedy to recover wages and other benefits that are contractually due to them."[141] Bonuses are included in the term "wages" defined as "all earning of an employe[e]."[142]

To recover under Pennsylvania's Wage Act, an employee "must aver a contractual entitlement 'to compensation from wages' and a failure to pay that compensation."[143] Absent a formal employment contract or collective bargaining agreement, an employee must establish "at a minimum, an implied oral contract between the employee and the employer" to recover under the Act.[144] "A promise to pay for services can only be implied, however, in circumstances under which the party rendering the services would be justified in entertaining a reasonable expectation of being compensated by the party receiving the benefit of those services."[145] To maintain a wage payment claim under the Act, Ms. Carlson must demonstrate her contractual entitlement to the 2018 bonus. The burden is on Ms. Carlson "to prove that the bonus is 'earned,' *i.e.* that the right to the … bonus vested under the terms of employment."[146]

Qualtek argues as a threshold matter, Pennsylvania's Wage Act does not apply to Ms. Carlson who did not work for Qualtek in Pennsylvania.[147] It alternatively argues even if she worked in Pennsylvania, her claim fails because she had no contractual right to the discretionary bonuses. Qualtek contends the 2018 bonus is discretionary, citing the November 2017 and March

2018 offer letters stating Ms. Carlson had a bonus "potential" of up to $20,000, not a guaranteed bonus.

Ms. Carlson concedes the language of the March 2018 offer letter describes a "potential" bonus. But at oral argument Ms. Carlson contended the bonus lost its discretionary nature and became a contractual "award" when her supervisor Director Kemmerer complained on her behalf about the bonus to Qualtek's Vice Presidents Conn and Trybula.

The record confirms, after Director Kemmerer raised the bonus issue, Vice Presidents Conn and Trybula "acknowledged that, okay, yeah, there was a change that was not accurately reflected in ADP at that time," referring to the change in potential bonus to $20,000, and "they both acknowledged that, yes, it should have been changed."[148] After Ms. Carlson again told Director Kemmerer Qualtek had not corrected the bonus error, he again spoke to Vice President Trybula who acknowledged the bonus error had not been corrected.[149] Director Kemmerer testified he sent an email to Vice President Trybula to notify her he "didn't see the change" to Ms. Carlson's potential bonus amount "in the system."[150] Director Kemmerer testified "[i]t's just a matter of, you know, is there something that's going to be updated in the system, because it was my understanding that any kind of bonus that was calculated to be paid out was discretionary in nature and whatever her total amount or total expected amount was, that, you know, may or may not have been different from what ADP was showing was not necessarily relevant for that calculation."[151] Director Kemmerer testified Vice President Trybula acknowledged the information in the system is "incorrect."[152]

There is no dispute the March 2018 offer letter made a bonus discretionary: a "potential bonus eligibility … [of] $20,000."[153] The March 2018 offer letter provides: "The terms of your employment may in the future be amended, but only with written authorization, which is signed

by both you and, the Chief Administrative Officer on behalf of the Company, and approved by the Chairman of the Board."[154] But there is no evidence of an oral promise to pay Ms. Carlson a $20,000 bonus modifying the terms of the written March 2018 offer letter.

Under Pennsylvania law, "[a] written contract which is not for the sale of goods may be modified orally, even when the written contract provides that modifications may only be made in writing."[155] An agreement prohibiting non-written modifications "may be modified by subsequent oral agreements if the parties' conduct clearly shows the intent to waive the requirement that the agreements be made in writing" and the existence of an oral contract modifying an earlier written contract "must be proved by clear, precise and convincing evidence."[156] Ms. Carlson fails to provide evidence, let alone clear and convincing evidence, of Qualtek's intent to waive the written authorization requirements of the March 2018 offer letter.

Even if we considered Ms. Carlson's argument Vice Presidents Conn and/or Trybula's statements recognized an error "in the system," they did not form a promise to pay her a full $20,000 bonus for 2018 or amend the written contract. Director Kemmerer's testimony is Vice President Conn and Trybula acknowledged an error in the amount of potential bonus listed in the ADP system. This is not a promise to pay $20,000, but a recognition the system did not accurately reflect the 2018 ***potential*** bonus range of up to $20,000. There is no evidence of an oral promise by Qualtek to pay Ms. Carlson a full $20,000 in bonus for 2018. We enter judgment in favor of Qualtek.

## III. Conclusion

Ms. Carlson did not adduce evidence allowing us to find a genuine issue of material fact concerning the legitimacy of Qualtek's decisions to not promote her to a Director position in Pennsylvania, the calculation of her 2018 or 2019 bonuses, or terminating her when it restructured the Finance Team. She presents jury arguments hoping to invoke sympathy loosely based on

unrelated facts and her views as to how Qualtek should be managed. But she does not show retaliation under Title VII or The Equal Pay Act. She also shows no evidence of Qualtek modifying the contractual terms of her employment including a potential bonus up to $20,000 in Qualtek's discretion somehow turning into a guaranteed bonus of $20,000. We grant Qualtek's motion for summary judgment.

---

[1] Our Policies require parties moving for relief under Fed. R. Civ. P. 56 include a Statement of Undisputed Material Facts ("SUMF") and an appendix to support summary judgment. Qualtek filed its Motion and brief in support of summary judgment at ECF Doc. No. 27, 27-2; SUMF at ECF Doc. No. 27-3; and Appendix at ECF Doc. No. 31. Ms. Carlson filed a response brief at ECF Doc No. 28 which we struck as non-compliant with our policies and procedures with leave to file an amended opposition (ECF Doc. No. 29). Ms. Carlson filed an amended opposition brief at ECF Doc. No. 32-3 which we again struck as non-compliant with our policies and procedures (ECF Doc. No. 34). Ms. Carlson did not refile a compliant opposition brief. Ms. Carlson responded to Qualtek's SUMF at ECF Doc. No. 35 and her own Statement of Undisputed Material Facts at ECF Doc. No. 35-1. She filed a supplemental Appendix at ECF Doc. No. 35-2 which is not Bates-stamped.

[2] ECF Doc. No. 27–3, Qualtek SUMF ¶¶ 19–20, 22; ECF Doc. No. 31, Appendix 4a, amended Complaint at ¶ 11. During Ms. Carlson's employment with Qualtek, its offices were located in King of Prussia, Pennsylvania. Its offices are currently located in Blue Bell, Pennsylvania.

[3] ECF Doc. No. 27–3, Qualtek SUMF ¶ 2.

[4] *Id.*, Qualtek SUMF ¶¶ 33–34, 37; ECF Doc. No. 31, Appendix 50a–51a. The November 19, 2017 offer letter provides: "In the event a dispute does arise regarding your employment with the Company, including any validity interpretation, construction and performance of this letter, said dispute shall be governed by and construed in accordance with the substantive laws of the Commonwealth of Pennsylvania without regard to any conflict of law. Jurisdiction for resolution of any dispute shall be solely in the Eastern District of Pennsylvania. The terms of your employment may in the future be amended, but only with written authorization, which is signed by both you and, the Chief Administrative Officer on behalf of the Company, and approved by the Chairman of the Board." ECF Doc. 31, Appendix 51a.

[5] ECF Doc. No. 27–3, Qualtek SUMF ¶ 9. In Qualtek's SUMF at ¶ 9, it asserts Ms. Carlson does not hold a bachelor's degree. In Ms. Carlson's initial response, ultimately struck for non-compliance with our Policies and Procedures, she admitted this assertion. *See* ECF Doc. No. 28–2, Response to Qualtek SUMF ¶ 9. After filing an amended response, Ms. Carlson denied she does not have a bachelor's degree, citing the Equal Employment Opportunity Commission's determination of her charge. *See* ECF Doc. No. 35, Response to Qualtek SUMF ¶ 9.

[6] *Id.*, Qualtek SUMF ¶¶ 35–37.

[7] *Id.*, Qualtek SUMF ¶ 36.

[8] *Id.*

[9] *Id.*, Qualtek SUMF ¶ 38.

[10] *Id.*, Qualtek SUMF ¶ 25.

[11] *Id.*, Qualtek SUMF ¶¶ 26–27.

[12] *Id.*, Qualtek SUMF ¶ 28.

[13] *Id.*, Qualtek SUMF ¶ 30; ECF Doc. No. 31, Appendix 139a, Deposition of E. Downey at 19.

[14] ECF Doc. No. 36, Supplemental Appendix at 21, Affidavit of D. Freedman ¶ 11.

[15] *Id.*, Qualtek SUMF ¶¶ 11–12; ECF Doc. No. 31, Appendix 138a–139a, Deposition of E. Downey at 18–19.

[16] ECF Doc. No. 31, Appendix 213a–214a, Deposition of S. Trybula at 50–51. Ms. Carlson denies Qualtek's factual assertion it functions under a shared services model. *See* ECF Doc. No. 35, Response to Qualtek SUMF ¶¶ 10–12. Ms. Carlson admits Qualtek's documents show it functions under a vertically integrated shared services model but denies its shared services operates exclusively in King of Prussia. She cites a report from a website, www.opencorporates.com, referring to a "QualTek Wireless LLC <u>branch</u>" showing there is a "branch" of the entity in Minnesota and a "head office address" in Blue Bell, Pennsylvania. *See* Supplemental Appendix at 36 at 16–19. Ms. Carlson's Supplemental Appendix is not Bates-stamped in violation of our policies and procedures and our Orders at ECF Doc. Nos. 29, 34. References to the Supplemental Appendix are to the pagination assigned by the CM/ECF docketing system. This does nothing to show a dispute of material fact Qualtek's headquarters is in Pennsylvania. Ms. Carlson also argues Chief Administrative Officer Elizabeth Downey testified there is no document "reflecting that corporate finance employees must be employed through the Pennsylvania office" and the absence of any such document somehow creates an issue of material fact. *See* ECF Doc. No. 35, Response to Qualtek SUMF ¶ 10. But we have the testimony of Qualtek's Chief Administrative Officer Downey and Vice President of Human Resources Stefanie Trybula swearing to the shared services model located at Qualtek's headquarters in Pennsylvania. This sworn testimony is uncontroverted by evidence adduced by Ms. Carlson and she fails to meet her burden under Federal Rule of Civil Procedure 56.

[17] ECF Doc. No. 31, Appendix 61a–62a.

[18] *Id.*, Appendix 58a.

[19] ECF Doc. No. 27–3, Qualtek SUMF ¶ 39.

[20] *Id.*, Supplemental Appendix at 23, Affidavit of L. Carlson ¶ 7.

[21] *Id.*, Qualtek SUMF ¶ 40.

[22] ECF Doc. No. 36, Supplemental Appendix at 21, Affidavit of D. Freedman ¶¶ 6–7.

[23] ECF Doc. No. 31, Appendix 359a. Someone modified the Personnel Action Notice by crossing out the "Director FPA" position and changing it to "Finance MGR"; increasing the annual salary from $102,000 to $105,000; and checking off the "bonus eligible" box in the amount of $20,000. *Id.* There is no evidence in the record definitively identifying who modified the Personnel Action Notice.

[24] ECF Doc. No. 27–2, Qualtek SUMF ¶¶ 47–49; ECF Doc. No. 31, Appendix 56a.

[25] ECF Doc. No. 31, Appendix 56a.

[26] ECF Doc. No. 27–3, Qualtek SUMF ¶ 59; ECF Doc. No. 31, Appendix 117a–123a.

[27] ECF Doc. No. 27–3, Qualtek SUMF ¶¶ 65–66, 69.

[28] *Id.*, Qualtek SUMF ¶¶ 65–66.

[29] ECF Doc. No. 35–1, Carlson SUMF ¶¶ 84–85.

[30] ECF Doc. No. 31 at 31a.

[31] ECF Doc. No. 35–1, Carlson SUMF ¶ 86.

[32] ECF Doc. No. 31, Appendix 331a–332a, Deposition of S. Kemmerer at 22–23.

[33] *Id.*

[34] *Id.*, Appendix 333a, Deposition of S. Kemmerer at 24.

[35] *Id.*

[36] ECF Doc. No. 28–7 at 25, Deposition of S. Kemmerer at 25. We note the appendix prepared by Qualtek omits page 25 of Mr. Kemmerer's deposition. Ms. Carlson included it in her initial supplemental appendix we struck as non-compliant with our Policies for, among other issues, failure to Bates stamp it. *See* ECF Doc. No. 28-7. We were left to cull out one page of Mr. Kemmerer's deposition from ECF Doc. No. 28–7, now stricken, to ensure a full record. We remind counsel our policies and procedures, including of a fulsome Bates-stamped appendix, are not random requirements but procedures to ensure a clear record of relevant evidence on summary judgment.

[37] ECF Doc. No. 31, Appendix 334a, Deposition of S. Kemmerer at 26. We assume the reference to "ADP" is to ADP, Inc., a business offering technology, data analytics, and strategic guidance in human resources management including payroll. *See* www.adp.com.

[38] *Id.*

[39] ECF Doc. No. 31, Appendix 335a, Deposition of S. Kemmerer at 27.

[40] *Id.*, Appendix 335a–336a, Deposition of S. Kemmerer at 27–28.

[41] *Id.*, Appendix 336a, Deposition of S. Kemmerer at 28.

[42] *Id.*

[43] *Id.*, Appendix 337a, Deposition of S. Kemmerer at 29.

[44] ECF Doc. No. 27–3, Qualtek SUMF ¶ 68; ECF Doc. No. 35, Response to Qualtek SUMF ¶ 68.

[45] ECF Doc. No. 27–3, Qualtek SUMF ¶ 70; ECF Doc. No. 31, Appendix 65a.

[46] ECF Doc. No. 31, Appendix 65a.

[47] ECF Doc. No. 27–3, Qualtek SUMF ¶ 71.

[48] *Id.*, Qualtek SUMF ¶¶ 69, 72.

[49] *Id.*, Qualtek SUMF ¶ 73; ECF Doc. No. 31, Appendix 75a.

[50] ECF Doc. No. 27–3, Qualtek SUMF ¶ 76.

[51] *Id.*, Qualtek SUMF ¶ 77; ECF Doc. No. 31, Appendix 171a, Deposition of E. Downey at 61.

[52] ECF Doc. No. 27–3, Qualtek SUMF ¶ 79; ECF Doc. No. 35, Response to Qualtek SUMF ¶ 79. Ms. Carlson denies she complained to Director Petzar about Mr. Ebeling because he had not yet been hired. *See* ECF Doc. No. 35, Response to Qualtek SUMF ¶ 79. This is incorrect. The record shows Qualtek extended an offer of employment to Mr. Ebeling on October 1, 2019. *See* ECF Doc. No. 31, Appendix 75a–76a. Mr. Ebeling accepted the offer of employment on October 10, 2019. *Id.* Ms. Carlson seems to be referring to Qualtek's failure to promote her to a Director position in March 2018 when former Velocital Chief Financial Officer Busky completed the Velocitel "Personnel Action Notice" checking off her promotion to Director later altered by an unknown person who changed the position from Director to Finance Manager. Ms. Carlson did not complain about the change from CFO Busky's recommendation to the Director position to the Finance Manager position in 2018.

[53] ECF Doc. No. 35, Response to Qualtek SUMF ¶¶ 78–79.

---

[54] ECF Doc. No. 27–3, Qualtek SUMF ¶ 86; ECF Doc. No. 31, Appendix 99a–101a.

[55] ECF Doc. No. 31, Appendix 101a.

[56] *Id.*, Appendix 100a–101a.

[57] ECF Doc. No. 35, Response to Qualtek SUMF ¶ 85.

[58] ECF Doc. No. 35-1, Carlson SUMF ¶¶ 71–72; ECF Doc. No. 31, Appendix 419a–420a, Deposition of L. Carlson.

[59] ECF Doc. No. 27–3, Qualtek SUMF ¶ 88.

[60] ECF Doc. No. 31, Appendix 86a.

[61] *Id.*, Appendix 85a–86a.

[62] *Id.*, Appendix 85a.

[63] *Id.*, Appendix 88a.

[64] *Id.*, Appendix 87a.

[65] *Id.*, Appendix 89a.

[66] ECF Doc. No. 27–3, Qualtek SUMF ¶ 90; ECF Doc. No. 35, Response to Qualtek SUMF ¶¶ 89–90.

[67] ECF Doc. No. 31, Appendix 444a, L. Carlson deposition at 84.

[68] *Id.*

[69] *Id.*, Appendix 444a–445a, L. Carlson deposition at 84–85.

[70] *Id.*

[71] *Id.*

[72] ECF Doc. No. 27–3, Qualtek SUMF ¶ 95.

[73] *Id.*, Qualtek SUMF ¶ 96.

[74] ECF Doc. No. 31, Appendix 105a.

[75] *Id.*

[76] *Id.*, Appendix 98a.

[77] *Id.*

[78] *Id.*, Appendix 104a–105a.

[79] *Id.*, Appendix 107a.

[80] *Id.*

[81] *Id.*, Appendix 106a.

[82] *Id.*

[83] *Id.*, Appendix 104a.

[84] *Id.*

[85] ECF Doc. No. 31, Appendix 93a.

[86] *Id.*

[87] ECF Doc. No. 35, Response to Qualtek SUMF ¶ 93; ECF Doc. No. 35–2, Supplemental Appendix at 45.

[88] ECF Doc. No. 35–2, Supplemental Appendix at 45.

[89] ECF Doc. No. 28–7 at 8, Deposition of S. Kemmerer at 25.

[90] ECF Doc. No. 31, Appendix 163a-164a, Deposition of E. Downey at 43–44; ECF Doc. No. 35, Response to Qualtek SUMF ¶ 56.

[91] ECF Doc. No. 31, Appendix 323a–324a, Deposition of S. Kemmerer at 14–15.

[92] *Id.*

[93] ECF Doc. No. 27–3, Qualtek SUMF ¶ 105; ECF Doc. No. 35, Response to Qualtek SUMF ¶ 105.

[94] ECF Doc. No. 27–3, Qualtek SUMF ¶¶ 106–107.

[95] ECF Doc. No. 35, Response to Qualtek SUMF ¶ 108.

[96] *Id.*, Response to Qualtek SUMF ¶ 109.

[97] ECF Doc. No. 31, Appendix 95a–96a.

[98] ECF Doc. No. 27–3, Qualtek SUMF ¶ 111.

[99] ECF Doc. No. 31, Appendix 95a–96a.

[100] *Id.*, Appendix 29a.

[101] ECF Doc. No. 12.

[102] Summary judgment is proper when "the movant shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts are those 'that could affect the outcome' of the proceeding, and 'a dispute about a material fact is "genuine" if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party.'" *Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017) (quoting *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011)). "Summary judgment is appropriate only if, after drawing all reasonable inferences in favor of the non-moving party, there exists 'no genuine dispute as to any material fact' and the movant 'is entitled to judgment as a matter of law.'" *Moyer v. Patenaude & Felix, A.P.C.*, 991 F.3d 466, 469 (3d Cir. 2021) (quoting *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 770 (3d Cir. 2018)). We do not weigh evidence or make credibility determinations. *Peroza-Benitez v. Smith*, 994 F.3d 157, 164 (3d Cir. 2021) (quoting *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 752 (3d Cir. 2019)).

"The party seeking summary judgment 'has the burden of demonstrating that the evidentiary record presents no genuine issue of material fact.'" *Parkell v. Danberg*, 833 F.3d 313, 323 (3d Cir. 2016) (quoting *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015)). If the movant carries its burden, "the nonmoving party must identify facts in the record that would enable them to make a sufficient showing on essential elements of their case for which they have the burden of proof." *Willis*, 808 F.3d at 643 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "If, after adequate time for discovery, the nonmoving party has not met its burden, pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against the nonmoving party." *Id.* (citing *Celotex*, 477 U.S. at 322–23).

[103] Ms. Carlson's response brief focuses heavily on a Title VII failure to promote and payment of bonus disparate treatment claim despite having not pleaded such a claim in the amended Complaint. *See* ECF Doc. No. 32-3. At oral argument, Ms. Carlson's counsel clarified his response regarding a Title VII disparate treatment claim based on gender is in error and his claim under Title VII and the Equal Pay Act is solely for retaliation.

[104] 42 U.S.C. § 2000e-3(a).

[105] 29 U.S.C. § 215(a)(3). Section 215(a)(3) is a provision of the Fair Labor Standards Act establishing a cause of action for retaliation against employees who assert rights under the Equal Pay Act or the FLSA. *See* Third Circuit Model Jury Instruction 11.1.2, Comment.

[106] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

[107] *Egelkamp v. Archdiocese of Phila.,* No. 19-3734, 2021 WL 1979422, at *9 (E.D. Pa. May 18, 2021) (citing *Carvalho-Grevious v. Delaware State Univ.*, 851 F.3d 249, 257 (3d Cir. 2017) (Title VII retaliation); *Marriott v. Audiovox Corp.*, No. 04-1307, 2006 WL 3805145, at *8-9 (W.D. Pa.

Dec. 22, 2006) (Equal Pay Act retaliation)). *See also Briscella v. Univ. of Pa. Health System*, No. 16-614, 2018 WL 6413305, at \*8 (E.D. Pa. Dec. 4, 2018) (analyzing retaliation claims under Equal Pay Act, Title VII, and Section 1981 together under the *McDonnell Douglas* framework).

[108] *Carvalho-Grevious*, 851 F.3d at 257; *Moore v. City of Phila.*, 461 F.3d 331, 340–41 (3d Cir. 2006).

[109] *Carvalho-Grevious*, 851 F.3d at 257 (quoting *Moore*, 461 F.3d at 342).

[110] We consequently focus our analysis today on a pretext analysis. As shown *passim*, we are also not convinced Ms. Carlson meets her burden of establishing a *prima facie* case of retaliation under Title VII and the Equal Pay Act. But we accept Qualtek's argument and will analyze its motion assuming Ms. Carlson can show evidence sufficient to establish a *prima facie* case of retaliation.

[111] *Daniels v. School Dist. of Phila.*, 776 F.3d 181, 198–99 (3d Cir. 2015) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)).

[112] *Id.* (cleaned up) (quoting *Ross v. Gilhuly*, 755 F.3d 185, 194 n.13 (3d Cir. 2014)).

[113] ECF Doc. No. 31, Appendix 388a–389a, Deposition of L. Carlson at 28–29.

[114] *See Dondero v. Lower Milford Twp.*, 5 F.4th 355, 361–62 (3d Cir. 2021); *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007).

[115] *Blakney v. City of Phila.*, 559 F. App'x 183, 186 (3d Cir. 2014) (citations omitted).

[116] ECF Doc. No. 31, Appendix 87a.

[117] *Id.*, Appendix 410a, Deposition of L. Carlson at 50.

[118] *Id.*, Appendix 414a, Deposition of L. Carlson at 54.

[119] *Id.*, Appendix 61a, 75a, 402a, Deposition of L. Carlson at 42.

[120] *Daniels*, 776 F.3d at 198–99.

[121] We understand Qualtek's position at oral argument Ms. Carlson's January 24, 2020 email simply "echoing" Ms. Lorenzen's complaint regarding her bonus as based on gender bias is not protected activity to establish a *prima facie* case of retaliation under Title VII or the Equal Pay Act. We focus our analysis on pretext.

[122] *Id.*

[123] ECF Doc. No. 27–3, Qualtek SUMF ¶ 111; ECF Doc. No. 31, Appendix 95a–96a; 356a, Deposition of S. Kemmerer at 48.

[124] ECF Doc. No. 31, Appendix 95a–96a.

[125] *Id.*

[126] *Id.* Appendix 263a, Deposition of D. Conn at 52.

[127] ECF Doc. No. 35, Response to Qualtek SUMF ¶¶ 105–107; ECF Doc. No. 31, Appendix 246a, Deposition of D. Conn at 35.

[128] ECF Doc. No. 27–3, Qualtek SUMF ¶ 112. Ms. Carlson did not responds to Qualtek's SUMF ¶ 112. *See* ECF Doc. No. 32.

[129] ECF Doc. No. 35, Response to Qualtek SUMF ¶ 111.

[130] Although not cited in the record as far as we can determine, counsel for Qualtek at oral argument represented Qualtek did not become a public company until 2021. Ms. Carlson's counsel did not dispute this representation.

[131] ECF Doc. No. 31, Appendix 353a–355a, Deposition of S. Kemmerer at 45–47.

[132] *See also*, ECF Doc. No. 35–1, Carlson SUMF ¶¶ 40–42 ("Plaintiff made this gender discrimination complaint in mid-2019 …").

[133] ECF Doc. No. 31, Appendix 69a–70a.

[134] ECF Doc. No. 27–3, Qualtek SUMF ¶ 96.

[135] ECF Doc. No. 31, Appendix 104a.

[136] *Id.*

[137] ECF Doc. No. 31 at 451a–453a, Deposition of L. Carlson at 91–93.

[138] ECF Doc. No. 12 ¶¶ 115, 161.

[139] While this may potentially support a claim for an Equal Pay Act violation or a disparate treatment claim under Title VII, Ms. Carlson has disavowed those causes of action. And by her own admission, the employees listed on her prepared chart are not comparators because they "were below" her and either reported to her or formerly reported to her. ECF Doc. No. 31 at 452a, Deposition of L. Carlson at 92.

[140] 43 P.S. § 260.1, *et seq.* Ms. Carlson conceded at oral argument the Wage Payment and Collection Law claim pertains only to the 2018 bonus, not the 2019 bonus.

[141] *Oberneder v. Link Computer Corp.*, 696 A.2d 148, 150 (Pa. 1997). The statute of limitations for a Pennsylvania Wage Payment and Collection Law claim is three years after the day on which

such wages were due and payable as provided in sections" 260.3 and 260.5. *See* 43 P.S. § 260.9a(g). Ms. Carlson filed her original complaint on January 11, 2022. We question the timeliness of Ms. Carlson's claim under the Act for her 2018 bonus given her allegation her bonus should have been higher when awarded in December 2018. Qualtek did not move for summary judgment on this ground.

[142] 43 P.S. § 260.2a.

[143] *Braun v. Wal-Mart Stores, Inc.*, 24 A.3d 875, 954 (Pa. Super. Ct. 2011) (quoting *Sullivan v. Chartwell Inv. Partners, LP*, 873 A.2d 710, 716 (Pa. Super. Ct. 2005) and *Hartman v. Baker*, 766 A.2d 347, 352 (Pa. Super. Ct.), *appeal denied*, 764 A.2d 1070 (Pa. 2000)).

[144] *Braun*, 24 A.3d at 954 (citing *DeAsencio v. Tyson Foods, Inc.*, 342 F.3d 301, 309 (3d Cir. 2003)).

[145] *Giuliani v. Polysciences, Inc*., 275 F. Supp. 3d 564, 578 (E.D. Pa. 2017) (citing *Oxner v. Cliveden Nursing & Rehab. Ctr. PA, L.P.*, 132 F. Supp. 4d 645, 649 (E.D. Pa. 2015)).

[146] *Blackwell-Murray v. PNC Bank*, 963 F. Supp. 2d 448, 470 (E.D. Pa. 2013) (citing *Stebok v. Am. Gen. Life & Acc. Ins. Co*., 715 F. Supp. 711, 713 (W.D. Pa. 1989), *aff'd*, 888 F.2d 1382 (1989)).

[147] Qualtek relies on *McGoldrick v. True Position, Inc.*, 623 F. Supp. 2d 619 (E.D. Pa. 2009) for the proposition the Act applies only to Pennsylvania-based employees. Ms. Carlson argues she falls under the factors set out by Judge Joyner in *McGoldrick* to determine whether an employee who works outside of Pennsylvania is "based in Pennsylvania" for purposes of the Act "absent a choice of law or forum selection clause." *Id.* at 631. Here, Qualtek's offer letters to Ms. Carlson in November 2017 and March 2018 contain a Pennsylvania forum selection clause. We will assume for our analysis the Act applies to Ms. Carlson under the *McGoldrick* test.

[148] ECF Doc. No. 31, Appendix 334a, Deposition of S. Kemmerer at 26.

[149] *Id.*, Appendix 335a–336a, Deposition of S. Kemmerer at 27–38.

[150] *Id.*, Appendix 336a, Deposition of S. Kemmerer at 28.

[151] *Id.*

[152] *Id.*

[153] *Id.*, Appendix 56a.

[154] *Id.*

[155] *Somerset Community Hosp. v. Allan B. Mitchell & Associates, Inc.*, 685 A.2d 141, 146 (Pa. Super. Ct. 1996) (citing *Universal Builders, Inc. v. Moon Motor Lodge, Inc.*, 244 A.2d 10 (Pa. 1968)).

[156] *Id.* (citing *Accu–Weather v. Prospect Commc'ns*, 644 A.2d 1251 (Pa. Super. Ct. 1994) and *Pellegrene v. Luther*, 169 A.2d 298 (Pa. 1961)).